UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                     :

STRUCTURED ASSET SALES, LLC,        :
                                       :

        Plaintiff,                 :   **Index No.**
                                       :

        v.                        :
                                       :   **COMPLAINT**

EDWARD CHRISTOPHER SHEERAN *p/k/a/*  :
ED SHEERAN, ED SHEERAN LIMITED,   :
GINGERBREAD MAN RECORDS, AMY     :
WADGE, AMY WADGE RECORDS, JAKE    :
GOSLING, STICKY STUDIOS, SONY/ATV  :
MUSIC PUBLISHING LTD, UK, SONY/ATV :
MUSIC PUBLISHING, LLC, ATLANTIC    :
RECORDING CORPORATION *d/b/a*      :
ATLANTIC RECORDS, ATLANTIC       :
RECORDS (UK), BDi MUSIC, BUCKS     :
MUSIC GROUP, WARNER MUSIC GROUP :
CORPORATION *d/b/a/* ASYLUM RECORDS, :
WARNER MUSIC GROUP LTD (UK),     :
                                       :

        Defendants,              :
                                       :
------------------------------------------------------------ X

## <u>INTRODUCTION</u>

1.    This is an action for willful copyright infringement by the owners of the rights to the #1 international hit song "Let's Get it On," a song written and produced by professional songwriters Edward Townsend Jr. and Marvin Gaye Jr. in 1973 and registered with the United States Copyright Office. Defendants Edward Sheeran and Amy Wadge, the credited purported writers of the #1 2014-2015 and present international hit song "Thinking Out Loud," along with the other defendants, copied and exploited, without authorization or credit, the "Let's Get it On" composition.

2.    This case is brought by Structured Asset Sales, LLC, ("SAS"), a Limited Liability Company based in Los Angeles, California, which invests in and owns rights to

thousands of songs and musical compositions and is owned by David Pullman, who is its Founder, Chairman and CEO, as well as the principal of The Pullman Group, LLC, the creator of all Pullman Bonds, including the world famous financial landmark $55 million transaction rated single-A level by multiple ratings agencies Pullman Bond for David Bowie, and Pullman Bond series for the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown and The Isley Brothers, among others.  See **www.pullmanbonds.com**.  SAS is a beneficial owner of one-third of all of the copyright rights of Townsend in all of his catalog of works, including "Let's Get it On."

3.      SAS brings this action for Defendants' infringement of the copyright in the composition of "Let's Get it On," and for all damages arising from that infringement, based on 100% of the ownership of that composition, including 100% of the publishers' share and the writers' share of those rights, less any percentage of rights that are adjudicated in the pending action captioned *Griffin v. Sheeran*, No. 1:17-cv-05221 (S.D.N.Y. July 11, 2017) on behalf of the plaintiffs and against the defendants in that case.[1]

4.      "Let's Get it On" was written and produced by Townsend and Gaye in 1973, registered internationally in 1973, and renewed with the United States Copyright Office in 2000.

5.      "Thinking Out Loud" copies various elements of "Let's Get it On," including but not limited to the melody, rhythms, harmonies, drums, bass line, backing chorus, tempo, syncopation and looping.  Plaintiff brings this action for copyright infringement under 17 U.S.C.§101, 501 *et seq.,* arising from the Defendants' unauthorized reproduction, distribution and/or public performance of the infringing composition.

---

[1] Plaintiffs in that case brought their first action against the defendants in that case on August 9, 2016.  *Griffin v. Sheeran*, No. 1:16-cv-06309.  For purposes of calculating the statute of limitations, the claims in the present case relate back to no later than that initial filing date.

## JURISDICTION

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) because this
action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.* Federal Courts have
exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over the enumerated Defendants because they
have directed their activities and marketing of the infringing works to New York residents, and
New York residents are able to purchase, download, and stream the infringing compositions and
recordings.

8.      Defendants have engaged in systematic and continuous business activities relating
to the Infringing Works. As such, the Defendants have engaged in continuing business activities
in the instant jurisdiction.

9.      The instant Defendants are, at a minimum, constructively aware of their
continuous and substantial commercial interactions with New York residents.

10.      Defendant Sheeran has performed, and he and the other Defendants have
authorized, organized, and promoted performances of the infringing work numerous times in
New York.

11.      The Defendants have generated touring and recording revenues from the
unauthorized and unlawful exploitation of the infringing work, including receiving substantial
revenue from such exploitation in New York. They have advertised the Infringing Works to New
York residents.

12.      The Defendants, individually and collectively, have generated substantial revenue
from the exploitation of the infringing works in New York.

13.      New York has a considerable interest in adjudicating disputes wherein New York
residents are the target of the harm resulting from exploitation of the infringing work.

3

14.     Although some of the defendants are primarily based in the U.K., they facilitated the infringing acts occurring in the U.S. and actively participated in a scheme aiding, inducing, and contributing to copyright infringement in the U.S.  Specifically Sheeran is a resident and has spent substantial time, including time spent while engaged in copyright infringement, in Los Angeles, California, while working on the album which included "Thinking Out Loud."

15.     The Defendants who are primarily based in the U.K. could reasonably have anticipated being sued in a court in the U.S. in general, and New York in particular, given their willful and knowing exploitation of the infringing work in New York.

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1 391(b), §1391(c), and §1400(a), respectively, because Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

## **PARTIES**

17.     The Plaintiff in this case is a limited liability company owned by its founder, chairman and CEO David Pullman, based in Los Angeles.  It is the owner of one third of the estate assets of Mr. Townsend Jr. Mr. Townsend Jr. died intestate in 2003 and his estate was divided one third to each of his children. One of his children, Clef Michael Townsend, sold his entire share and right in the estate to SAS. That interest was put up for sale by Clef Michael Townsend, and the sale was approved by the probate court in California. Mr. Ed Townsend Jr. was the co-writer of the lyrics of "Let's Get It On" and creator of its musical composition. Plaintiff, with the other heirs of Mr. Townsend Jr., are engaged, among other things, in conducting the business of music publishing and otherwise commercially exploiting the musical composition copyrights of the music of Mr. Townsend Jr. They are either the legal owner of the

copyrights or the beneficial owner of the copyright since they share in the proceeds of exploitation of the copyright.

18.     Upon reasonable information and belief, Defendant Edward Sheeran is a musician, singer, songwriter, and producer living in the United Kingdom who does business in New York, individually, and under his company, Gingerbread Man Records. Sheeran was nominated for a Grammy Award for Best Record, Best Performance, and Song of the Year in 2016 for "Thinking Out Loud." He has numerous other awards such as British artist of the year in 2015, Album of the Year in 2015 from BRIT Awards, and Best Male Artist in 2016 from People's Choice Award. Sheeran conducts systematic and continuous business in New York including, but not limited to, public performances, and selling albums and merchandise to the citizens of New York. The Defendant, Edward Sheeran has reproduced, distributed, and publicly performed the infringing work and sound recording and/or authorized its reproduction, distribution and public performance.

19.     Upon reasonable information and belief, Defendant Ed Sheeran, Ltd., is a United Kingdom ("U.K.") entity with its principal place of business a6 61 Great Portland Street, London, W1W 7LA United Kingdom. Upon information and belief Ed Sheeran Limited organizes and negotiates Mr. Sheeran touring arrangements.  Mr. Sheeran is the sole shareholder of Ed Sheeran Limited. Upon information and belief, Ed Sheeran has arranged for the performance of the Infringing Works numerous times in New York. Upon information and belief, Ed Sheeran Limited conducts systematic and continuous business in New York. It has generated substantial revenue from the exploitation of the Infringing Works in New York, including but not limited to public performance of "Thinking Out Loud." Upon further information and belief, Ed Sheeran Limited entered into contracts with other defendants which

authorized and cause widespread exploitation of the Infringing Works in the United States and specifically in New York.

20.     Upon reasonable information and belief, Gingerbread Man Records is Ed Sheeran's record label, based in the United Kingdom.

21.     Upon reasonable information and belief, Defendant Amy Wadge is a singer, music producer, and songwriter living in the United Kingdom who does business, individually and as Amy Wadge Studios and Amy Wadge Records. The Defendant, Ms. Wadge is a music producer and songwriter who regularly conducts business in the State of New York and in this jurisdiction.  The Defendant, Ms. Wadge, claims authorship and ownership of "Thinking Out Loud", and shares in the income derived from the exploitation of "Thinking Out Loud". Defendant Wadge, is violating Plaintiffs' copyrights in "Let's Get It On" by claiming ownership in, and sharing income derived from the exploitation of, "Thinking Out Loud".

22.     Upon reasonable information and belief, Amy Wadge Records is Amy Wadge's record label, based in the United Kingdom.

23.     Upon reasonable information and belief, Jake Gosling produced the recording of the offending recording of "Thinking Out Loud" and benefited from the exploitation of the recording in the United States and around the world. Defendant Gosling operates the studio in which the Infringing Works were first created, namely Sticky Studios located in Windlesham, Surry UK. The Infringing Work was first recorded in that studio.

24.     Upon reasonable information and belief, Sticky Studios is Jake Gosling's recording studio, based in the United Kingdom.

25.     Upon reasonable information and belief, SONY/ATV Music Publishing, Ltd. UK is a business entity headquartered in the United Kingdom and regularly doing business in New

York through its affiliate, SONY/ATV Music Publishing. It arranged for the distribution of the

offending recording of "Thinking Out Loud." Sony/ATV UK is responsible for coordinating,

among other things, the marketing, licensing, promotion and sales of the Infringing Works in the

United States. Upon information and belief, Sony/ATV UK conducts systematic and continuous

business in this district and has generated substantial revenue from the exploitation of the

Infringing Works.

      26.     Upon reasonable information and belief, SONY/ATV Music Publishing, LLC is a

Delaware limited liability corporation with its principal place of business in New York, New

York.  Upon reasonable information and belief, Sony/ATV is the music publisher for "Thinking

Out Loud" and administrates "Let's Get It on" with its sister company EMI both run by

Chairman Matt Bandeer. It has generated substantial revenue from the exploitation of the

Infringing Works. It is in a unique position to have known about and/or participated in the

exploitation of either or both works. Its conflicting position made it impossible for it correct the

problem.

      27.     Upon reasonable information and belief, Atlantic Recording Company d/b/a

Atlantic Records is a Delaware corporation with its principal place of business in New

York.  The Defendant, Atlantic Records, is owned by Warner Music Group Corporation which

also has its principal place of business in New York.  Upon Information and Belief, Warner

Music Group also participated in the exploitation of the Infringing Works. The Defendant,

Atlantic Records, is responsible for the production, manufacture, distribution, marketing, sale

and promotion of "Thinking Out Loud" in the United States.

      28.     Upon reasonable information and belief, Atlantic Records (UK) is a business

entity headquartered in the United Kingdom and regularly doing business in New York. It also

7

participated in the infringing activity described.

29.     Upon reasonable information and belief, BDi Music is a business entity
headquartered in the United Kingdom and regularly doing business in New York. It also
participated in the infringing activity described.

30.     Upon reasonable information and belief, Bucks Music Group is a business entity
headquartered in the United Kingdom and regularly doing business in New York. It also
participated in the infringing activity described.

31.     Upon reasonable information and belief, Warner Music Group, *d/b/a* Asylum
Records, is a Delaware corporation with its principal place of business in New York. It also
participated in the infringing activity described. Asylum is a music label responsible for
coordinating among other things, the production, manufacture, marketing and promotion of the
Infringing Works in the United States. Asylum had offered for sale and caused other to offer for
sale, the Infringing Works in New York.  Asylum has sold and benefitted from the sale of the
Infringing Works in New York.

32.     Upon reasonable information and belief, Warner Music Group Ltd. (UK) is a
business entity headquartered in the United Kingdom and regularly doing business in New York.
It also participated in the infringing activity described.


## FACTS

33.     The musical composition, "Let's Get It On", (the "Work") was written by Marvin
Gaye Jr. ("Gaye") [the copyright registration lists only Townsend as the author] and Edward
Townsend Jr. ("Townsend").  The composition was registered for copyright in 1973 and
copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000844063. A
recording of the song was later made by Gaye, in 1973.  As a co-author of the Work, Mr. Edward

Townsend Jr. co-owned the copyright and shared in the proceeds of the exploitation of the work, through record sales, public performance, synchronization and other uses of the Work. Plaintiff SAS is one of the co-owners of the copyright in the Work through its purchase of all the rights from Clef Michael Townsend, one of the three children of Edward Townsend Jr., approved by California probate court.

34.     The harmonic, melodic, and rhythmic elements of composition in "Let's Get It On" have made this song one of the most famous songs in R&B and soul and popular music history. "Let's Get It On" has been anthologized by celebrated music producers and ranked as one of the top greatest breakbeats of all time. It has been covered by a number other musical performers.

35.     Defendant, Edward Sheeran, professionally known as "Ed Sheeran", is a musical artist. Mr. Sheeran experienced a sharp and sudden rise as an international music star in less than eighteen (18) months as a direct result of the commercial success of the release of "Thinking Out Loud", the lead single in the United States from Sheeran's debut album, "X", of which "Thinking Out Loud" was the hit.

36.     "Thinking Out Loud" infringes "Let's Get It On." This case seeks damages for Defendants' willful copyright infringement.

**Comparison of the Two Songs**

37.     "Let's Get It On" begins with an iconic melody, harmony and rhythm that are recognized around the world. The prominence of the bass line and drum composition throughout the Work make these compositional elements qualitatively unique, copyrightable and important to the musical work as a whole. The combination of these elements is the driving force of this

9

composition.

38.     The two songs share a distinctive combination of musical materials, designated as the backing pattern; it is comprised of a coordination of harmony (chord progression), bass line, and rhythm. The backing pattern as it occurs in these two recordings refers to a combination of music played by the drums, bass, and guitar and/or keyboards. This combination of instruments functions as the accompaniment to the vocal line, which is essentially present to support the vocal line.  This shared backing pattern can be heard at 0:00-0:07 in the Gaye recording and at 0:00-0:06 of the Sheeran recording. After its initial appearance in each song, this pattern is repeated many times during both songs, becoming a major element in each song, forming a distinctive accompaniment to the vocals in each case.

**Comparison of Chord Progression**

39.     The distinctiveness of this backing pattern arises in part from the harmony, or "chord progression" that it articulates. In music theoretical terms, we hear the "tonic" chord (designated as "I") with first scale degree in the bass, followed by a chord with the third scale degree in the bass, then the "subdominant" chord (or "IV") with the fourth scale degree in the bass, and finally the "dominant" chord (or "V") with the fifth scale degree in the bass.

40.     Marvin Gaye's "Let's Get It On" is based a chord progression formed by the chords E-flat, G minor, A-flat, and B-flat. Musicians commonly assign roman-numeral labels to chords in order to specify their harmonic function, and these numerals are based on the position of each chord with regard to the scale in use. The chord build on the first note of the scale—a C note in C major, for instance—will be labeled "I." In a similar manner, those based on the second, third, fourth, fifth, six, and seventh notes will be labeled 'ii," "iii," "IV," "V," "vi," and

10

"vii°" respectively (note that upper-case numerals are used for major chords 4 The term "scale degree" is commonly used to designate a particular note's place within a particular scale. For example, using a simple C-major scale (C, D, E, F, G, A, B, C), we would refer to the first note in the scale, C, as "scale-degree one" or "first scale degree"—meaning simply that it is the first note in that scale. It thus follows that D would be referred to as "second scale degree" and E as "third scale degree," etc. The usefulness of the "scale degree" designation is that it allows musicians to discuss the properties of these notes in a way that is transferable across all keys, making comparisons between songs and musical passages much more effective. 4 and lower-case numerals for minor chords).  This system of labeling is so common that there is almost no student who studies music in North America who does not learn these numerals at some point in his/her training.

41.     Using this system, the chord progression employed in the backing pattern of Gaye's song may be written as I – iii – IV – V (see example 1a).  Sheeran makes a slight adjustment to this chord pattern in his song: the I, IV, and V chords are maintained from Gaye's song, but the iii is replaced with a common substitute. As any freshman harmony textbook will attest, the I chord with the third scale degree in the bass may stand in (or substitute) for the iii chord without affecting the function of the progression (the bass lines in each recording are discussed in more detail immediately below). Sheeran uses this chord, commonly labeled "$I^6$," as a slight modification of Gaye's original (see example 1b), producing a mild and harmonically equivalent variant: I – $I^6$ – IV – V.



*Examples 1a (Gaye) and 1b (Sheeran): chord progressions compared*

42.     In Gaye's song, this chord progression within the backing pattern occurs in the key of E-flat, and in Sheeran's song the progression occurs in D major. But because of the power of the roman numerals (and scale degrees) to capture the relationship between the chords in each case, listeners will hear the two progressions as functionally equivalent. Thus, the strong and marked similarity between the use of this progression in Gaye's and Sheeran's songs is barely affected by the different keys used. That different keys do not affect the identity of a song is borne out by the fact that singers often change the keys of songs to suit their voices. In fact, the value to musicians of thinking about chord progressions in the manner described here is that they make it easy to "transpose" (or change the key of) any given song quickly. Such transposition is considered a basic skill for professional musicians. Many listeners will not recognize that Frank Sinatra sang "My Way" in D major, while Elvis Presley sang that song in C major; it is clearly the same song despite the difference in key. The difference in key between those two versions of "My Way," is slightly greater than the difference between the Gaye and Sheeran songs considered here. Without a direct A-B comparison of the two, virtually no listener (except the very few who possess perfect pitch – less than a fraction of 1% of the population) would be able to hear the difference in key between the two songs. In fact, a vinyl recording of Sheeran running a little fast and one of Gaye running a little slow would meet in the middleground separating the two, making them identical. In short, the backing patterns of the songs use equivalent progressions, with Sheeran's introducing only one minor variation on Gaye's (see example 1a

12

and 1b for comparison). While the shared chord progression may not be enough, in isolation, to support a claim of copyright infringement, the situation changes in an important way when the bass line is added to our consideration.

**Bass Line Comparison**

43.     An important part of why the chord progression sounds the way it does has to do with the notes that comprise the bass line in each song. In Gaye's song, the bass plays an E- flat to accompany the I chord, and then a G to accompany the iii chord. The bass then employs an A- flat to support the IV chord, and a B-flat to support the V chord. This combination creates a bass line that goes: E-flat – G – A-flat – B-flat (see example 2a). This sequence of notes in the bass is understood by musicians as the scale-degree pattern 1 – 3 – 4 – 5. Thinking of the bass pattern as 1 – 3 – 4 – 5 (instead of as specific notes) thus creates the relationship between the notes in a manner substantially similar to that of the I – iii – IV – V pattern mentioned above. Sheeran's "Thinking Out Loud" employs the bass notes D – F sharp – G – A to accompany its I – I[6] – IV – V chord progression (see example 2b). While these specific four notes are seemingly different from those used by in Gaye's song, this difference is entirely due to the difference in key; the relationship between scale-degrees 1 – 3 – 4 – 5 remain unaffected by the change of key from E-flat to D: the two bass lines are equivalent.

13



*Examples 2a (Gaye) and 2b (Sheeran): bass lines compared*

44.     When we think of Sheeran's song in terms of the roman numerals as we did with Gaye's song, the strong substantial similarity between the two songs is further revealed. Sheeran's song employs the identical chord-bass pairing as Gaye's song does: I – I$^6$ – IV – V. The importance of this specific combination of elements is even more strongly reinforced when we consider the rhythm of this chord-bass pair.

**Comparison of Harmonic Rhythm**

45.     There are many ways that musicians think and speak about rhythm. In order to examine the role rhythm plays in the similarity between these two songs, we will turn to a consideration of "harmonic rhythm." The term harmonic rhythm refers to the timing of the chord changes in a song. Gaye's "Let's Get It On" sets the I – iii- IV – V chord-bass progression to a distinctive rhythm as shown in example 3a. This rhythm extends over two measures (or bars) according to a 4/4 time signature, dividing the duration of the first two chord-bass pairings unevenly, as represented by the dotted quarter and eight note tied to a half note. The third and fourth chord-bass pairings divide the second measure in a parallel manner to the first measure.

46.     There is a marked chord progression in "Let's Get it On" that is distinctive. In addition the bass line in "Let's Get it On" is marked and the rhythm is unique. The Ed Sheeran

14

version in "Thinking Out Loud" uses a substantially similar chord progression. In addition, the

bass line used is substantially similar to the bass line in "Let's Get it On," even if a different key

is used.

47. The combination of the shared chord progression, the shared bass line and shared

harmonic rhythm confirm the fact that "Thinking Out Loud" infringes on the Copyright of "Let's

Get it On."



*Example 3a (Gaye): harmonic rhythm, chord-bass pairing*

*Example 3b (Sheeran): harmonic rhythm, chord-bass pairing*



15

48.     Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in Gaye's "Let's Get It On," and this is shown in example 3b. Played in an A-B comparison, 3a and 3b make the strong similarity between the two songs abundantly clear. It does not require an understanding of standard rhythmic notation to see (and hear) that this rhythm is identical between the two songs.

49.     In comparing the melodic vocal pitches for the first two phrases of each of the songs each example is based on a repeated chord progression, supporting variations in the vocal parts.  Although the verse of each song is built upon four hearings of the same progression, the first two phrases (essentially repeated, with ornamental variation, for phrases three and four) are sufficient for comparison purposes.

a. Marvin Gaye, "Let's Get It On," first two phrases of verse:

**I** - **iii** 3-4-5-4-3- | **IV** b3-4-b3-4-b3-1- **V** 2; | **I** - **iii** b3-2-b3-b3-2 | **IV** 2-1-6 | **V** b3-2-1

b. Ed Sheeran, "Thinking Out Loud," first two phrases of verse:

**I** - **I**$^6$ 3-4-5-4-3-2-1- | **IV** 2-3-6-1 **V**; **I** - **I**$^6$ 3-4-5-4-3-2-1- 1 | **IV** - **V**

50.     The striking similarity of the harmony, bass line and rhythm backing patterns of both songs, along with the use of the backing pattern as a repeated element on which each song is constructed, demonstrate that Sheeran's "Thinking Out Loud" is based on Marvin Gaye and Ed Townsend's "Let's Get It On."

51.     Holding aside rhythmic similarities for the moment, the two melodies exhibit many identical elements with pitch alone, all accented in relation to their ornamental differences

**Comparison of Use of Backing Patterns**

52.     Having identified the similarity between the backing pattern in the Gaye and

16

Sheeran songs, we will now demonstrate how often this pattern occurs in each recording. As Example 4a shows, Gaye's song begins with a verse-chorus pair (0:00-0:48), following by a pair of verses (0:48-1:34).  All of this music is based on the backing pattern, which occurs 16 times during these sections. Since the backing pattern is two measures in length, this means that the first 32 measures of the song all feature the backing pattern. Looking at the rest of the song, we can see that there are, in fact, only two places in the song where the backing pattern is not present, and that is in portions of the bridge, which occurs twice overall on the recording. Adding up all the measures of the song, it turns out that there are a total of 104 measures, of which 84 measures employ the backing pattern. This means that approximately 80% of the song features the backing track.

      53.    Example 4b shows the structure of Sheeran's "Thinking Out Loud." The example shows that the backing track is present in 64 of the song's 90 measures, meaning that it is present during about 71% of the song. It is fair to conclude from this comparison that the backing pattern forms the basis of both songs, and that this backing pattern plays the same role in the Sheeran song as it does in the Gaye song.

*Example 4a (Gaye): The overall musical form of "Let's Get It On," indicating the number times the backing pattern appears and showing the percentage of measures that it is present*

| Timing | Section | Description |
|--------|---------|-------------|
| 0:00-0:25 | verse | 8 mm., uses backing pattern (4)*, two beat pick-up |
| 0:25-0:48 | chorus | 8 mm., uses backing pattern (4) |
| 0:48-1:12 | verse | 8 mm., uses backing pattern (4) |
| 1:12-1:34 | verse | 8 mm., uses backing pattern (4) |
| 1:34-2:20 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 2:20-2:43 | chorus | 8 mm., uses backing pattern (4) |
| 2:43-3:06 | chorus | 8 mm., uses backing pattern (4) |
| 3:06-3:51 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 3:51-4:14 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:14-4:37 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:37-4:50 | chorus | 8 mm. to fade out, uses backing pattern (4), free vocal improv |

Total number of measures in song = 104
Total number of measures that employ backing pattern = 84 (80.7%)

*The numeral 4 in parenthesis indicates that the backing pattern appears 4 times. Because the backing pattern in two measures in length, four statements of this backing pattern will be eight measures in length.

18

*Example 4b (Sheeran): The overall musical form of "Thinking Out Loud," indicating the number times the backing pattern appears and showing the percentage of measures that it is present*

| | | |
|---|---|---|
| 0:00-0:24 | A – verse | 8 mm., uses backing pattern (4)* |
| 0:24-0:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 0:49-1:13 | B – bridge | 8 mm., new chord progression, new melody |
| 1:13-1:43 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 1:43-2:08 | A – verse | 8 mm., uses backing pattern (4) |
| 2:08-2:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 2:49-2:56 | B – bridge | 8 mm., new chord progression, new melody |
| 2:56-3:27 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 3:27-3:51 | A – verse | 8 mm., guitar solo, uses backing pattern (4) |
| 3:51-4:21 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 4:21-4:35 | Ending (tag) | 4 mm., repeats last two bars of A'' two times |

Total number of measures in song = 90
Total number of measures that employ backing pattern = 64 (71.1%)

**Comparison of Vocal Melodies**

54.     A comparison of the vocal melody in these two songs shows that there are melodic passages in Sheeran's song that are substantially similar to passages in Gaye's recording. This can be seen most clearly by comparing the first four measures of "Thinking Out Loud" with the second four measures of Gaye's eight-bar chorus for "Let's Get It On." This comparison is shown in examples 5a and 5b (note that timings are given for the Gaye example to make it easier to locate the place in the song example 5a refers to). Since the two songs are in different keys, the best way to compare the melodies is by using scale-degree numbers; identical numbers shared by notes in different songs mean that such notes would be the same if both songs were in the same key.

55.     Both melodies begin on the same chord tone, ascend and then fall in exactly the same manner. Both melodies are delayed until a second chord appears. They both descend stepwise in exactly the same way.  In both songs, verses are composed of couplets formed of a repeated line. In both songs, the repeated line itself contains a repeated progression. Each verse, then, in both songs, contains one progression heard four times, supporting a longer line performed twice. In both songs, the chorus is also in the identical pattern.  In both songs, contrasting sections lead to stop-time solo singing over climactic chords.

56.     There are further similarities in rhythm in the two songs.  They both have four beats per measure. Syncopation, which is the accentuation of a beat that occupies a normally weak metric position (such as the backbeat or offbeat), is also a telltale marker that unites the two songs in unusual ways. Chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both songs.

57.     Melodies are marked by which vocal pitches are metrically accented in relation to others, which appear directly with the chord changes (the strongest accent, especially when aligning with first beats of measures) and which appear in weaker metric locations. Both Gaye's and Sheeran's vocal melodies begin in metrically weak positions, delaying the singing until the second chord appears. Whereas in most songs, verses maintain the same or similar rhythms one after the other, both Gaye and Sheeran provide a great deal of extemporaneous rhythmic abandon in verses that appear after the first, especially ending phrases in different places (on beat 3, on the second half of beat 3, on beat 2, etc.), thus both expressing the same degree of rhythmic freedom on the musical surface.

20

58.     In the first measure of the Gaye example (5a), two sequences of scale-degrees are highlighted by underlining and enclosure within asterisks. The first of these is the scale-degree sequence 6 5 3 2, and the second is the scale-degree sequence 3 5 6 5 3. Note that both of these sequences occur mostly over the first measure of the two-measure backing pattern.

59.     Example 5b shows the first four bars of Sheeran's "Thinking Out Loud." Note that the scale-degree sequences 6 5 3 2 and 3 5 6 5 3 found in "Let's Get It On" both appear in Sheeran's vocal melody, and also mostly in the first measure of the two-measure backing pattern.



**Example 5a (Gaye): "Let's Get It On," last four measures of chorus (0:37-0:48)**

**Example 5b (Sheeran): "Thinking Out Loud," first four measures of song**

## Comparison of Tempos

60.     It should be noted that the tempos of the two songs are virtually identical: Gaye's song clocks in at about 83 beats per minute, while Sheeran's sets a slightly slower pace of about 79 beats per minute. This is a very small difference, especially considering that the two songs are

in the same time signature of 4/4. In fact, within this tempo range any particular live performance of either song could vary by 4 beats per minute, thus erasing any difference, no matter how slight. Similarly to the remarks earlier in this study concerning the differences in key, most listeners could not detect the difference in tempo between the two songs if the songs were not placed in an A-B comparison with one another. In fact, certain performances in what the listener takes to be a steady tempo can actually include a slight increase (and less often decrease) in tempo over the course of the song without most listeners being aware of it. It is thus best to think of tempo in terms of a "range of similarity" in which tempos that are within approximately 5% of one another can be considered equivalent (not unlike the way the "margin of error" functions in polling). Thought of in this way, the slower end of the tempo range for the Gaye song overlaps the faster end of the tempo range for the Sheeran one: the two tempos are equivalent.

61.    Songs with four beats per measure (the same meter as in Gaye and Sheeran) that include the I – iii – IV – V progression class range from a slow 72 beats per minute to a fast 160 bpm. Both Gaye and Sheeran recordings proceed at the same, at 80 bpm ($\pm$ 2 bpm, as they both fluctuate slightly). No other identified song in history prior to "Let's Get it On" includes a I – iii – IV – V or I - $I^6$ – IV – V progression and the same tempo.

62.    In songs that include the I - iii - IV - V progression class, chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both Gaye and Sheeran exhibits. All other known such examples of syncopated changes within the I - iii - IV - V progression class, have a tempo much faster than Gaye's and Sheeran's 80 bpm.

63.    The Gaye and Sheeran songs are two of only four songs identified in history with

the I – iii – IV – V chord progression class that share the same pattern of syncopated chord changes, as well as being the only two such examples with that progression class to move at the tempo of 80 bpm.

### Lack of Any "Prior Art" to "Let's Get it On"

64.     In addition to the foregoing musical similarities between the two songs, both songs share a set of common elements that do not occur in combination in any other song:

    a.  Both songs are based on the same chord progression class (I - iii - IV - V), indeed mostly on exactly the same progression, I - $I^6$ - IV - V.

    b.  Both songs use this progression as a loop in both verse and chorus passages.

    c.  Both upper-voice melodies are based on the shape, ^3 - ^4 - ^5 - ^4 - ^3 - ^2 - ^1, which then moves to scale degrees ^6, ^1 and ^2, with identical accents.

    d.  Both songs emphasize as scale degrees upper-voice ^5 and ^3 over the iii chord, as opposed to the more usual ^7 over iii.

    e.  Both songs end cadential phrases on a non-resolving upper-voice ^1, even though this is not a member of the goal V chord. In both cases, the lack of tension resolution is related to the song's underlying theme.

    f.  Both songs share the same formal structure at sub-phrase, phrase, section, and multi-section levels.

    g.  Both songs have the identical tempo of 80 beats per minute (+2 bpm, as above), uniquely for the chord progression.

    h.  Both songs share the same identical syncopated rhythm of chord changes.

    i.  Both songs' vocal melodies begin in the same markedly weak metrical

23

location, and in both, the vocal goal of ^5 is achieved at the same metrical

position within the phrase.

j. Both songs have a similar distribution of vocal melismas, expressing in both a

similar theme.

65. Defendants' access to Plaintiffs' work is beyond challenge, as "Let's Get it On" is

a world-famous composition and recording, and the two works are indeed substantially similar

for purposes of copyright infringement. The additional fact that no other song shares the

foregoing characteristics is strong evidence not of arbitrary convergence or parallel development,

but knowing, willful infringement.

66. Indeed, upon information and belief Sheeran himself regularly performs both

songs together in a "mash-up" format, moving from one song to the other and back again. At

least one example of one such performance is publicly-available on YouTube

(https://www.youtube.com/watch?v=RxZjVZKVN7k) (see time index 4:29-5:10). Sheeran

transitioned seamlessly between the lyrics of the two songs without changing the notes, tempo,

rhythm or any other elements.

67. Upon reasonable information and belief, "Thinking Out Loud" has hit the number

one (1) position on the national charts in eleven (11) countries since 2014, including both the

United States and the United Kingdom and has been certified platinum multiple times by the

Recording Industry Association of America, indicating sales in excess of one million (1,000,000)

copies sold in the United States, as well as substantial sales internationally. The single and the

album "X" sold over fifteen (15) million copies. In 2015, "Thinking Out Loud" was a top-three

song as measured by performance income in the world. Revenue derived and/or related to

"Thinking Out Loud," including but not limited to record sales, performance tour income,

24

merchandising, synchronization and licensing are in the hundreds of millions of dollars.

68.     According to the Official Charts Company, the recording of "Thinking Out Loud"
is one (1) of the best-selling singles of all time in the U.K., having sold over 2 million
(2,000,000) copies and ten (10) million albums. Upon reasonable information and belief, the
Defendants have authorized the use of "Thinking Out Loud" in compilation albums, television
commercials and music videos. Specifically, the music video for "Thinking Out Loud" is one of
the most popular sponsored music videos on YouTube.  Prior to the viewing of "Thinking Out
Loud" on YouTube, an advertisement appears for which the Defendants are entitled to and
receive a royalty or other revenue, which is Plaintiffs' money. As of June 2018, "Thinking Out
Loud" has been played over **one billion times** on YouTube and streamed **billions** of times.

69.     The Defendant, Mr. Edward Sheeran, has had access to "Let's Get It On" by
virtue of its wide dissemination. In fact, he has referenced and performed the song while also
performing "Thinking Out Loud".  In addition, the Defendant, Edward Sheeran, by and through
the Defendant, SONY/ATV, had increased access to "Let 's Get It On" because both songs are
administered through SONY/ATV.  Furthermore, "Let's Get It On" is available on every major
digital retailer and streaming service including, without limitation, iTunes and Amazon.

70.     The melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation
elements of the "Thinking Out Loud" composition are substantially and/or strikingly similar to
those elements of the "Let's Get It On" composition.  The instant Defendants copied, reproduced,
distributed, and/or publicly performed copyrightable elements of "Let's Get It On" specifically,
the melody, harmony, drums, bass line, backing chorus, tempo and syncopation of "Let's Get It
On"*, without authorization. The two Works in question are therefore substantially similar.

71.     To date, each of the Defendants reproduced, distributed, publicly performed,

and/or authorized the reproduction, distribution, and public performance of the infringing composition and sound recording "Thinking Out Loud" and each of the Defendants continues to infringe "Let's Get It On".

72.    The Defendants were notified of the infringement on or about April 15, 2015 by electronic mail or telephone (the "Notice").  Despite receiving the Notice, the Defendants continued to exploit "Thinking Out Loud" without permission, by using the melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements copied from "Let's Get It On" composition, which use constitutes copyright infringement.

73.    Despite the Notice, all of the Defendants have continued to infringe Plaintiffs' copyrighted work. The infringement by the Defendants is willful, as evidenced by their continuing to infringe "Let's Get It On" after the Notice was provided to them.

74.    The Defendants knowingly and intentionally infringed Plaintiffs' rights.  The Defendants' collective knowledge and intent are established by, among other things, the fact that Defendants to this day have neither sought, nor obtained, a license from the owners of the rights. All conditions precedent to the maintenance and/or establishment of the instant action have been satisfied and/or, otherwise, waived by the Defendants.

**FIRST CAUSE OF ACTION**

**(Willful Copyright Infringement – 17 U.S.C.  § 101, *et seq.*)**

75.    The Plaintiffs repeat and reallege each of the foregoing Paragraphs as though fully set forth herein.  The Defendants' reproduction, distribution, and public performances of the infringing work, "Thinking Out Loud" in the United States and internationally, continue to this day, and Defendants have not deigned to compensate the copyright owners of the Work

(including SAS) for the use of the copyrighted work in "Let's Get It On". The Defendants'
reproduction, distribution, public performance, streaming, concerts, merchandizing,
synchronization, licensing and economic exploitation of "Thinking Out Loud"*, and authorizing
others to do the same, infringes Plaintiffs' exclusive rights under the Copyright Act.

76.     The conduct of the Defendants is knowing and willful.

77.     As a direct and/or proximate result of the Defendants ' wrongful conduct, the
Plaintiffs have been irreparably harmed, suffered damage, and Defendants have profited in an
amount in the amount of hundreds of millions of dollars and to be determined at trial.

78.     The Defendant, Warner Music Group, infringed on Plaintiffs' exclusive copyright
in "Let's Get It On" when it distributed and sold sound recordings, including compact discs,
phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, and all other
economic exploitation and video recordings, embodying "Thinking Out Loud". Such
reproduction and release was wholly unauthorized, as it was without any license or consent of
authority from the Plaintiffs. By virtue of this unauthorized commercial exploitation, Defendant
Warner Music Group have realized illegal revenues.

79.     The Defendants infringed Plaintiff SAS exclusive copyright in "Let's Get It On"
when they issued and/or authorized others to issue licenses to third parties for the use,
publication, and exploitation of "Thinking Out Loud". Said licenses were issued without any
consent or authority from the copyright owners (including plaintiff SAS) of "Let's Get It On,"
from which "Thinking Out Loud" was substantially copied. By virtue of this unauthorized
commercial exploitation, Defendants have realized illegal revenues.

80.     As a direct and/or proximate result of the Defendants' infringement on Plaintiffs'
exclusive copyright in "Let's Get It On", Plaintiffs have suffered damages. Said injuries are

continuing and will not abate in the future.

81.     Pursuant to 17 U.S.C. § 504(c), the Plaintiffs are entitled to statutory damages since the infringement occurred after the copyrights were registered.

**WHEREFORE,** the Plaintiff SAS respectfully request that judgment be entered against the enumerated Defendants, as follows:

A.     For judgment that Defendants have violated the Copyright Act and that all such violations have been willful; and

B.     For judgment assessing Defendants for the damages in excess of one hundred million dollars ($100,000,000.00) suffered by Plaintiffs, including an award of actual damages and Defendants' profits attributable to the infringement, or statutory damages (at Plaintiffs ' election) under the Copyright Act, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1.     Record sales;
2.     Downloads;
3.     Ringtones;
4.     Ringback tones;
5.     Public performance revenues;
6.     Digital revenue;
7.     Streaming revenue;
8.     Synchronization licensing;
9.     Merchandising;
10.    Public appearances;
11.    Endorsements;
12.    Sponsorships;
13.    Spokesperson work;
14.    Touring revenue;
15.    Advertising revenue;
16.    Appearance fees;
17.    Name and likeness income and increase in value;
18.    Rights of publicity income and increase in value;

19. Increased value all Defendants' publishing and/or record company and/or companies;

20. Increased value of all Defendant's, including Sheeran's and Wadge's catalogues;

21. Increased value of music publishing and/or record royalties and rights;

22. Increased value of social media rights, accounts and value;

23. Increased goodwill;

24. Promotional value;

25. Increased value of royalty rate for record deals;

26. Increased value in distribution deals, negotiating power and reduction in costs;

27. Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;

28. Value of obtaining better terms for record company advances and terms and multi-record deals;

29. Value of obtaining better terms of publishing and/or recorded master deals for Sheeran's existing catalogue and for future works;

30. Increased value in negotiating 360 deals with record companies and/or publishers;

31. Sheet music sales and sheet folio income;

32. Any and all music publisher income;

33. Any and all record master income;

34. Any and all record income;

35. Any and all SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection society, mechanical society and performance society income worldwide;

36. Any and all producer royalty income;

37. Any and all arrangement income;

38. Any and all income derived from any existing medium or any medium hereinafter developed worldwide;

39. Any and all income from any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act;

40. Any and all income from any society to which any Defendant belongs or joins in the future;

41. Any and all income and/or residuals from SAG-AFTRA;

42. Any and all income from Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, and any and all download and streaming services; and

43. Any and all of Defendants' equity interests in Spotify, and any other music streaming or download services or companies in

which one or more Defendant has an interest, as it relates to the value from the inclusion of the infringing song in the service; and

**C.**     For judgment granting such other, further, and different relief as to the Court may seem just and proper, including Plaintiffs' costs and reasonable attorneys' fees.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues triable by jury, as enumerated and set forth in more detail in this Complaint.

Dated:  New York, New York
        June 28, 2018

PARNESS LAW FIRM, PLLC

By:_____/s/ Hillel I. Parness_____
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Plaintiff Structured Asset Sales, LLC*

30