# EXHIBIT 7

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ---------------------------------x
      KATHRYN TOWNSEND GRIFFIN,
 4    HELEN MCDONALD, and THE ESTATE
      OF CHERRIGALE TOWNSEND,
 5
                 -against-
 6                                  Civil Action No.:
                                    1:17-CV-05221-RJS/GRIFFIN
 7
 8    EDWARD CHRISTOPHER SHEERAN,
      p/k/a ED SHEERAN, ATLANTIC
 9    RECORDING CORPORATION, d/b/a
      ATLANTIC RECORDS, SONY/ATV
10    MUSIC PUBLISHING LLC and
      WARNER MUSIC GROUP
11    CORPORATION, d/b/a ASYLUM
      RECORDS,
12
                       Defendants.
13
      ---------------------------------x
14                    May 30, 2018
15                    10:02 a.m.
16
17        Videotaped Deposition of ALEXANDER STEWART,
18    taken by Defendants, pursuant to Notice, held at the
19    law offices of Pryor Cashman, LLP, 7 Times Square,
20    New York, New York, before Judith Castore, a
21    Certified Livenote Reporter and Notary Public of the
22    State of New York.
23
24
25
```

Page 82

STEWART

1
2 correct?
3    A   It informed my work to some
4 extent.  But, no, I didn't include it
5 explicitly in the analysis.
6    Q   So your testimony is that you
7 did review the deposit copy before you
8 rendered your June 2015 report?
9    A   No.  I don't recall the
10 timing.
11    Q   So you don't know whether it
12 informed that?
13    A   Yeah, that's a good call.  I
14 don't recall if it informed that or
15 not.
16    Q   And do you recall whether you
17 reviewed the deposit copy before you
18 rendered your December 2017 report?
19    A   Yes, I did.
20    Q   And your testimony is that it
21 informed your opinion in your
22 December 2017 report?
23    A   I found that it supported
24 everything in my report.
25    Q   But in your December 2017

Page 83

STEWART

1
2 report you don't identify the deposit
3 copy as materials that you reviewed in
4 analyzing the two songs at issue,
5 correct?
6    A   I don't know.  Can I see my
7 report?
8    Q   Sure.
9       (Dr. Alexander Stewart's
10    report dated 12/8/17, was marked
11    Stewart Exhibit 2, for
12    identification, as of this date.)
13    Q   So I'm showing you what's
14 been marked Stewart Exhibit 2, which is
15 your report dated December 8, 2017.
16 And I'll direct your attention to the
17 first page.
18       Is this an accurate copy of
19 your December 8, 2017 report in this
20 case?
21    A   It appears to be.
22    Q   And does the second paragraph
23 on Page 1 accurately list the materials
24 that you reviewed in connection with
25 issuing this report?

Page 84

STEWART

1
2    A   It is accurate.  I'm not sure
3 it's exhaustive.
4    Q   Well, what's missing?
5    A   Well, it's missing the
6 deposit copy and it's missing the lead
7 sheets, the published sheet music which
8 I referenced repeatedly in my report,
9 but I apparently didn't include it in
10 this paragraph.
11    Q   We would also ask that any
12 sheet music that you reviewed in
13 connection with your report should be
14 produced to us, as well.
15    A   I believe it was attached to
16 this report, the sheet music.
17    Q   I don't believe it was.
18 Certainly not both.
19    A   Certainly Thinking Out Loud
20 was.  And this seems to be missing the
21 table of contents where I list my
22 attachments.  Do you have that, too?
23    Q   This is what was provided to
24 us.
25    A   But you know there were

Page 85

STEWART

1
2 attachments with this.
3    Q   I wasn't given any
4 attachments.  So we're going to --
5 we'll confirm that.  Obviously to the
6 extent we were given them, we will
7 correct ourselves, but -- and to the
8 extent that we weren't given them, we
9 obviously need to get them and reserve
10 the rights on this deposition pending
11 all of that.
12       So your testimony is that you
13 did have a copy of the deposit copy of
14 Let's Get It On prior to rendering your
15 December 2017 report?
16    A   I believe so.
17    Q   And you didn't believe that
18 it was necessary to refer to it or
19 reference it in any way in this report?
20    A   I found that it supported all
21 my work and it's not referenced in my
22 report.
23    Q   Do you know whether the
24 deposit copy of Let's Get It On was
25 created after the sound recording of

22 (Pages 82 - 85)

Page 86

STEWART

1           STEWART
2 Let's Get It On that you reviewed was
3 created?
4    A   It's my understanding that it
5 was.
6    Q   And what is that
7 understanding based on?
8    A   Based on the fact that it was
9 transcribed by an associate of
10 Mr. Townsend and --
11   Q   Anything else?
12   A   Well, that was standard
13 practice in the industry, it's standard
14 practice now.
15   Q   Anything else?
16   A   That's all that comes to
17 mind.
18   Q   So you don't know for a fact
19 whether or not the deposit copy was
20 created before or after the song was
21 recorded, correct?
22   A   Oh, I believe it was created
23 after.
24   Q   But you're basing that on
25 your assumptions based on standard

Page 87

1 practice and the fact that an associate
2 of Mr. Townsend created it?
3    A   Yes.
4    Q   But you don't know when that
5 associate of Mr. Townsend actually
6 transcribed it, correct?
7    A   I was not there when he did.
8    Q   And you haven't done anything
9 to determine when that occurred,
10 correct?
11   A   I don't know what I could do
12 beyond what I've done, which is to ask
13 about it, who did it and circumstances.
14 I mean --
15   Q   Who did you ask?
16   A   Counsel.
17   Q   And did they give you a date
18 when it was transcribed?
19   A   No.
20   Q   And did they tell you that it
21 was transcribed after the sound
22 recording was created?
23   A   That was my understanding.
24   Q   What was your understanding

Page 88

1           STEWART
2 based on?  Actually no -- strike that.
3    Did they give you a date when
4 it was transcribed?
5    A   No.
6    Q   Did they tell you that it was
7 transcribed after the sound recording
8 was created?
9    A   It was implied in the way it
10 was described to me that this
11 gentleman, whose name I don't recall,
12 generally worked with Mr. Townsend and
13 transcribed his music after it was
14 recorded and then it was deposited in
15 the U.S. Copyright Office.  That was
16 the way they worked and that's what was
17 implied in the way it was described to
18 me.
19   Q   Did plaintiff's counsel
20 specifically say to you that the
21 deposit copy of Let's Get It On was
22 transcribed after the sound recording
23 was created?
24    MR. FRANK:  Objection.
25   Relevance.  Asked and answered.

Page 89

1           STEWART
2    Go ahead.
3    A   I thought it was strongly
4 implied in what they said.
5    Q   Yes or no, did they
6 specifically say to you that the
7 deposit copy was transcribed after the
8 sound recording was created?
9    A   I don't remember their exact
10 words.
11    MR. GOLDSMITH:  Going back a
12 little bit.  I found the provision
13 of the report from you to us on
14 December 8, 2017 by e-mail, and
15 there is -- there are two
16 attachments, one is Mr. -- Dr.
17 Stewart's CV and the other is a
18 one-page document that lists his
19 prior testimony during the last
20 four years.  There's no other
21 attachments to the report that was
22 provided to us.
23    MR. FRANK:  Okay.
24   Q   What is your best
25 recollection of what you intended to

23 (Pages 86 - 89)

STEWART

2 that for us?
3      A   It looks like a deposit copy
4 for Let's Get It On.
5      Q   And it's your testimony that
6 at the time that you had received Dr.
7 Ferrara's report you had already seen
8 the deposit copy for Let's Get It On?
9      A   Yes.  I had seen this deposit
10 copy that we're looking at right now.
11      Q   So I'm going to show you what
12 we have marked as Stewart Exhibit 5.
13          (Let's Get It On deposit
14      copy, was marked Stewart Exhibit
15      5, for identification, as of this
16      date.)
17      Q   Which is just a copy, I will
18 represent to you another copy -- a
19 larger copy of the Let's Get It On
20 deposit copy.  And I would ask you if
21 you could, on that exhibit, hand write
22 the structural sections of Let's Get It
23 On?
24          MR. FRANK:  We're going to
25      direct him not do that.  He's not

STEWART

2 going to create any evidence.  He
3 will comment or testify as to
4 what's before him, but he's not
5 going to do that.
6          MS. FARKAS:  You're directing
7 him not to do that?
8          MR. FRANK:  I'm directing him
9 not to do that.
10          You could ask him anything
11 you want, but he's not going to
12 create evidence for us.
13          MS. FARKAS:  What's the basis
14 for that objection?
15          MR. FRANK:  Because you're
16 asking him to create evidence.
17 It's irrelevant.  His position
18 here is to testify as to his
19 report and he can comment on
20 Mr. Ferrara's report.
21          But we don't have expert
22 witnesses create documents at your
23 direction during depositions.  You
24 could you ask him anything, he's
25 not going to create documents for

STEWART

2      you.
3          I don't think there's any
4      predicate or good faith offer
5      prove to do that.
6          MS. FARKAS:  Why do I need a
7      predicate or a good faith offer to
8      prove?  I'm deposing your expert.
9          MR. FRANK:  I'm going to
10      direct him not to do that.
11          MS. FARKAS:  All right.  Then
12      we'll have to get the judge on the
13      phone.
14      Q   Dr. Stewart, in the other
15 cases in which you've testified as an
16 expert have you ever been asked to
17 markup sheet music or markup an exhibit
18 before?
19      A   Yes.
20      Q   And have you done it?
21      A   Once I was told that I could
22 do it and another time I was told not
23 to.
24      Q   So in the time that you were
25 told you could do it you did it,

STEWART

2 correct?
3      A   Yes.
4      Q   And do you have any knowledge
5 as to whether or not the exhibits that
6 you marked up were allowed and
7 considered by the court?
8      A   I don't.
9      Q   Did you ever see them in
10 papers that were submitted to the
11 court?
12      A   I'm not sure what you mean
13 papers submitted to the court.
14      Q   So in the other cases where
15 you say -- in the other case where you
16 said that you were permitted to markup
17 an exhibit, which case was that?
18      A   You see I seem to recall
19 doing that in a deposition and I'll
20 have to think now which one it was.  I
21 mean, it's possible I'm remembering
22 incorrectly.  I remember being
23 instructed not to and I didn't and
24 nothing happened.
25      Q   Well, let's -- looking at the

STEWART

1
2 deposit copy of Let's Get it On, if you
3 were to -- if you were permitted to
4 tell me what -- how to chart out the
5 structure of the deposit copy of Let's
6 Get It On, and if you look at the first
7 bar of the music and looking at the
8 deposit copy, what section of the song
9 would you say begins at the first bar?
10    A   The verse.
11    Q   And what bar would you say
12 the verse ends?
13    A   I believe -- I can count
14 through it, but I believe it ends at
15 the 16th.  Yes, 16th.
16    Q   And is the 16th the fourth
17 line down, last bar?
18    A   Penultimate bar fourth line
19 down.
20    Q   Where it says let's get it?
21    A   Well, the let's get it is
22 actually part of the next section.
23    Q   What would the -- so the next
24 section would begin on the 16th bar?
25    A   Well, in some sense because

STEWART

1
2 of the melodic phrase, but then in
3 terms of the underpinning harmonies and
4 so forth you could say that in the
5 17th bar the next section begins.
6    Q   And what section is that?
7    A   It's the chorus.
8    Q   And when does that chorus
9 section end, what bar?
10    A   I think 16 bars later.  Yes.
11    Q   So is that on Page 2?
12    A   Yes.
13    Q   It ends with the phrase with
14 so much to give?
15    A   Well, with so much to give is
16 actually again -- let me just count.
17 That's probably the same as before, the
18 melodic phrase and the lyrics are
19 anticipating the next section, but in
20 terms of the underpinnings it begins on
21 the measure to give.  But let me count.
22       No.  Sixteen measures ends
23 with the oh, I believe.
24    Q   Okay.
25    A   So then the next section

STEWART

1
2 begins at we're all sensitive people, I
3 believe.  Yeah.
4    Q   So I'm looking at Page 2.
5 What I'm counting as bar 32, the last
6 bar of the first line of Page 2 that
7 has the lyrics we're all?
8    A   Yeah, that's the beginning of
9 the next section.
10    Q   What section is that?
11    A   A verse.
12    Q   How long does that verse go
13 on for?
14    A   Sixteen measures again.
15    Q   So is it your testimony that
16 the next section would begin on the
17 fifth line down last bar with the
18 lyrics, there's?
19    A   Correct.
20    Q   And what section of the song
21 is that?
22    A   It's another verse.
23    Q   Okay.
24       And how long does that go
25 for?

STEWART

1
2    A   Probably 16 again.  There's a
3 real pattern happening here, right?
4 Yeah.  In fact, this is indicated by
5 the double bar at the bottom of the
6 page, that is the end of that verse.
7    Q   So you're referring to the
8 bottom of Page 2, the last line at the
9 end of the third bar?
10    A   Um-hum.
11    Q   And the fourth --
12    A   The third bar on the bottom
13 line on Page 2 is the end of that
14 section and it's indicated very clearly
15 with a double bar.
16    Q   And so the next section
17 begins in the bar with the rests and
18 the lyric don't?
19    A   Yes, and the chord A-flat
20 written above.
21    Q   Correct.
22       And that -- and that is -- I
23 agree.  I concur that there's an A-flat
24 there.  Got one in.
25       And what section is that?

32 (Pages 122 - 125)

STEWART

1
2    A   I would call that the bridge.
3    Q   How long does that go for?
4    A   I think it goes on all the
5  way to the next double bar on Page 3.
6    Q   Are you referring to Page 3
7  the eighth line down, second line from
8  the bottom?
9    A   Yes.
10    Q   Where there's the double bar?
11    A   Um-hum.
12    Q   And the last bar of music has
13  the lyrics it on?
14    A   Yes.
15    Q   And what section begins at
16  that bar?
17    A   Another verse.
18    Q   You would call that a verse?
19    A   Yeah.
20    Q   And when does that end?
21    A   Well -- actually, yeah,
22  because it has the hook basically let's
23  get it on I think we have to call it a
24  chorus.  Sorry.
25    Q   When does that end?

STEWART

1
2        MS. RICE:  I'm sorry, I want
3  to make sure I understand the
4  question.
5        Are we asking where he thinks
6  that verse that he just talked
7  about ends or where the next
8  reference to the chorus is?  What
9  are you -- because he's talked
10  about both and so I'm not sure
11  what you're --
12    Q   Do you understand the
13  question?
14    A   The question that's pending
15  now is where is the next section,
16  correct?  Where does the next section
17  begin?
18    Q   Right.  But let's make sure
19  the word next is the same to both of
20  us.
21        So we've -- let's just start
22  from the beginning.  We've identified
23  there's a verse -- well, we're on Page
24  3 of the deposit copy, correct?
25    A   Yes.

STEWART

1
2    Q   And you identified a new
3  section beginning in the second to last
4  line of Page 3, and in the last bar of
5  that line that begins with the lyrics
6  it on.  And I'm asking you what would
7  you call that section?
8    A   Yeah.  It's a little
9  difficult.  This section that begins
10  with let's get it on, to me it's a
11  little nebulous what to call it.  It
12  appears it has elements of the chorus
13  because its got the hook let's get it
14  on, but then it kind of starts to seem
15  like it did turns back into a verse
16  sort of partway through.  So I'm having
17  a hard time just saying that it's
18  clearly one or the other, but it's
19  definitely another section.
20    Q   Where would that section end?
21    A   That would end in the next
22  place where it says A-flat on Page 4,
23  and there we have another bridge just
24  as before it began on A-flat on page --
25  at the bottom of Page 2, and now we

STEWART

1
2  have -- moving to A-flat again here.
3  So where it says come on, come on, come
4  on, come on, come on, that's --
5    Q   So just to be clear, you're
6  saying that the next section begins on
7  Page 4, Line 7?
8    A   Yes.
9    Q   Bar 4?
10    A   Yes.
11    Q   What would you call that
12  section?
13    A   Bridge, a short bridge.
14    Q   Okay.
15        And how long does that --
16    A   Until the next double bar.
17  So that would last one, two, three,
18  four, five, six, seven -- eight
19  measures.
20    Q   So now we're on the bottom of
21  the same page?
22    A   Yes.
23    Q   The last bar of music?
24    A   Yes.
25    Q   And what would you call that?

33 (Pages 126 - 129)

STEWART

2    A    That's another sort of tricky
3  one.  I guess you could call it another
4  verse, but it's also kind of the outro
5  or ending.
6    Q    So would you call either the
7  outro or --
8    A    An ending that is based kind
9  of on the verse and it just kind of
10  repeats to the end.
11    Q    Thank you.
12        If you look at Page 5 of the
13  Ferrara report.
14        If you look at the structure
15  of Thinking Out Loud that Dr. Ferrara
16  has written at the bottom of Page 5.
17        Do you see that?
18    A    Yes.
19    Q    I'm going to read to you what
20  you have just told me is the structure
21  of the deposit copy of Let's Get It On,
22  and I'd like you to compare it to the
23  structure of Thinking Out Loud as
24  charted by Dr. Ferrara.
25        So you have told me that it's

STEWART

2  verse 16 bars, chorus 16 bars, verse 16
3  bars, verse 16 bars, bridge, I believe
4  you also said 16 bars.  The next
5  section --
6    A    The bridge, no, it was
7  longer.  That first bridge in Let's Get
8  It On is longer.
9    Q    You're right, 32 bars.
10    A    Um-hum.
11    Q    So bridge 32 bars.  The next
12  section you were unclear whether you
13  would label that as a verse or a
14  chorus?
15    A    Um-hum.
16    Q    You had it at 32 bars.  The
17  next section you had as a bridge for
18  eight bars, and then you had the outro
19  or verse for the remainder of the song?
20    A    Yes.
21    Q    Would you agree that the
22  structure of the Let's Get It On
23  deposit copy and Thinking Out Loud are
24  different?
25    A    They have differences and

STEWART

2  they have similarities.
3    Q    But they're different,
4  correct?
5        MR. FRANK:  Asked and
6    answered.
7        Objection.
8    A    There are differences and
9  there are similarities.
10    Q    Well, if something has
11  differences and similarities they're
12  not the same, correct?
13    A    They are not identical.
14    Q    They're not even close to
15  identical, are they?
16        MR. FRANK:  Objection.
17        Asked and answered.
18        You can go ahead.
19    A    I have to say they have
20  similarities and differences.  And I
21  think some of the similarities are
22  important.  I'd be happy to tell you
23  what you they are.
24    Q    I'm simply asking you if the
25  structure of the two songs is the same.

STEWART

2  I didn't ask you if have they have
3  similarities, I asked you if they are
4  the same structurally?
5        MR. FRANK:  Objection.  Asked
6    and answered.
7        Go ahead.
8    Q    Are the structures of the
9  deposit copy of Let's Get It On and
10  Thinking Out Loud the same?
11    A    They have important
12  similarities and they have important
13  differences.
14    Q    What key is the deposit copy
15  of Let's Get It On in?
16    A    E-flat.
17    Q    And what key is the recorded
18  version of Let's Get It On in?
19    A    E-flat.
20    Q    And your transcriptions are
21  the key of D major, correct?
22    A    D major?
23    Q    Yeah.
24    A    Yeah because I transposed
25  them to the same key for comparison

34 (Pages 130 - 133)

STEWART

1
2 purposes which is standard
3 musicological procedure.
4     Q   And what is the basic chord
5 progression in Let's Get It On deposit
6 copy?
7     A   For the verses and choruses
8 it is in the key of E-flat.  Should I
9 give it to you or in the key of D or
10 using Roman numerals?
11    Q   No, Roman numerals.
12    A   One with the capital I
13 meaning major, three with three small
14 Is meaning minor, and then IV major, V
15 major.  So I, III, IV, V.
16    Q   And would I be correct that
17 the V is a V major VII?
18    A   No, it's not.
19    Q   So it's your testimony that
20 the deposit copy, the last chord in the
21 chord progression is not a V major VII?
22    A   It would be my testimony,
23 yes.
24    Q   Would you agree that the
25 basic chord progression in the Let's

STEWART

1
2 Get It On deposit copy and Thinking Out
3 Loud are not identical?
4     A   They are extremely similar
5 but they are not identical.
6     Q   Looking at the deposit copy,
7 the fourth chord depicted there, what
8 do you see written there?
9     A   B-flat VII.
10    Q   So is that not a V major VII?
11    A   It's not.
12    Q   What is it?
13    A   It's a V dominant VII.
14    Q   V dominant VII?
15    A   Yes.
16    Q   How would you actually notate
17 that in your report Roman Numeral wise?
18    A   V-VII.  Roman Numeral 5.
19    Q   Roman numeral 5 like a V --
20 an upper case V with a VII.
21        Do you agree that the basic
22 chord progression in the Let's Get It
23 On deposit copy is not original to
24 Let's Get It On?
25    A   These four chords have been

STEWART

1
2 used in other compositions prior to
3 Let's Get It On.
4     Q   And would you agree that it's
5 a relatively common chord progression
6 that predates Let's Get It On?
7     A   I wouldn't say it's that
8 common.
9     Q   How common would you say it
10 is?
11    A   Well, there were -- out of
12 hundreds of thousands of songs there
13 were a handful who used it.  I can't
14 really -- I mean it was more than -- a
15 lot more than one.  More than one and
16 certainly not --
17    Q   Hundreds?
18    A   I don't think so.
19    Q   Dozens?
20    A   I think Dr. Ferrara has done
21 a pretty good job of trying to find
22 every song that has a progression
23 that's even remotely similar and he's
24 come up with how many.
25    Q   What makes you think he's

STEWART

1
2 done a pretty good job of finding every
3 song that has that progression?
4     A   Well, because this is what he
5 kind of always does is try to bury us
6 with so-called prior art that he says
7 is similar.
8     Q   Well, how many pieces of
9 prior art do you think are enough to
10 prove that it's not original to Let's
11 Get It On?
12    A   Well, I think I already said
13 it's not original so I don't think we
14 have any issue there.  I said that
15 other songs have this chord
16 progression.
17    Q   So can I turn your attention
18 to Visual Exhibit E to Dr. Ferrara's
19 report?
20    A   Visual Exhibit E.
21        Yes.
22    Q   And do you see that this is
23 an excerpt from a guitar method book
24 called Guitar for Advanced Beginners.
25        Do you see that?

35 (Pages 134 - 137)

Page 138

STEWART

1
2    A   It's very difficult to read.
3 But, yes, it seems to say that.
4    Q   If you turn the page twice
5 you can see that there's an excerpt
6 from Page 84 of this Guitar Book for
7 Advanced Beginners?
8    A   Yes.
9    Q   And do you see about midway
10 down -- the bottom half of the page
11 references the chord progression that
12 is at issue here.
13      Do you see that?  The
14 I-III-IV-V chord progression?
15    A   Yes.
16    Q   And do you see the sentence
17 right above that that says by the
18 way -- well, hold on.  The start of
19 that section says, we first played the
20 I-III-IV-V progression in Class VII.
21 And then I'm skipping over the next
22 sentence, is says is shows up in songs
23 like "If I Had A Hammer" by Pete Seeger
24 and Lee Hays, "Cruel to be Kind" by
25 Nick Lowe, "Ziggie Stardust" by David

Page 139

STEWART

1
2 Bowe, "Good Little Girl/Bad Little Boy"
3 from Adventure Time, "Stuck on You" by
4 Lionel Richie, "Live and Let Die" by
5 the Wings, "Fun, Fun, Fun" by the Beach
6 Boys, "Crocodile Rock" by Elton John
7 and "Let's Get It On" by Marvin Gaye.
8      Do you see that?
9    A   Yes.
10    Q   Do you disagree with any of
11 those?  Do you disagree with anything
12 in that sentence?
13    A   I can't really comment on
14 that because I haven't listened to all
15 of these songs to confirm that.
16    Q   And it says, by the which
17 even though Let's Get It On was
18 recorded in 1973 which is after dozens
19 of other I-III-IV-V songs were
20 recorded, I firmly believe that Marvin
21 Gaye did not plagiarize this song - he
22 was simply writing a song using a
23 common progression just like every
24 other professional songwriter does.
25      Do you see that sentence?

Page 140

STEWART

1
2    A   Yes.
3    Q   Do you agree?
4    A   First of all --
5      MR. FRANK:  Which part of the
6 sentence are you asking him if he
7 agrees with?  There's several
8 propositions.  Whether Marvin Gaye
9 plagiarized Let's Get It On or
10 whether it's common progression
11 and every other professional
12 songwriter uses it?
13    Q   Is there anything in that
14 sentence that you disagree with?
15    A   Well, just on your previous
16 sentence that you read I would like to
17 say that some of these songs that are
18 listed postdate Let's Get It On, so
19 that needs to be pointed out.  No, I
20 have not listened to all of them.  But
21 in terms of the sentence you just read,
22 I don't think I have a problem with
23 that.  I think what's unique about what
24 Marvin Gaye did was the way that he
25 expressed it -- this chord progression

Page 141

STEWART

1
2 in a distinctive way.  So this case is
3 not really just about abstract four
4 chords, it's about how these four
5 chords were expressed in this
6 composition.
7    Q   Well, but if the -- if the
8 existence of this chord progression
9 were the only similarity that you found
10 between these two songs, would your
11 conclusion still be that the similarity
12 can only be the result of copying?
13      MR. FRANK:  Objection,
14 predicate.
15      Go ahead.
16    A   Could you repeat that?
17    Q   Sure.
18      If the existence of this
19 similar chord progression were the only
20 similarity between these two
21 compositions, would your conclusion
22 still be that the similarity can only
23 be the result of copying from Let's Get
24 It On?
25    A   Well, if it were just this

36 (Pages 138 - 141)

Page 142

STEWART

1
2 chord progression in the abstract that
3 were the only thing in common; yeah, it
4 would not -- what was your phrase?
5     Q   Well, I'm use your phrase
6 from your report which is that these
7 similarities can only be the result of
8 copying Let's Get It On?
9     A   That would not be my
10 conclusion if that were the only thing.
11 And that's, again, the chord
12 progression in the abstract, just these
13 Roman numerals, not the way that it's
14 actually expressed in terms of
15 rhythmically and all the other details.
16     MS. FARKAS:  Why don't --
17 it's probably a good time for a
18 break.
19     VIDEOGRAPHER:  The time is
20 12:50.  This is the end of Video
21 2.  We're off the record.
22     (Whereupon, a lunch recess
23 was taken at 12:50 p.m.)
24
25

Page 143

STEWART

1
2     A F T E R N O O N   S E S S I O N
3     (Time noted:  2:00 p.m.)
4 A-L-E-X-A-N-D-E-R  S-T-E-W-A-R-T,
5     Resumed, having been previously sworn by a
6 Notary Public within and for the State of New York,
7 was further examined and testified under oath as
8 follows:
9     VIDEOGRAPHER:  The time is
10 2:00 p.m.  We're on the record.
11 This is Video 3.
12 CONTINUED EXAMINATION BY MS. FARKAS:
13     Q   Good afternoon, Dr. Stewart.
14     A   Good afternoon.
15     Q   You had testified earlier
16 about the June 2015 report and you had
17 testified that you had corrected or
18 made certain changes to the June 2015
19 report a few days after you transmitted
20 the report dated June 3, 2015 to
21 plaintiff's counsel; is that correct?
22     A   I'm confused because I'm not
23 sure what you mean by the June 15th
24 report.
25     Q   No, I said the June 2015.

Page 144

STEWART

1
2 Maybe I misspoke, I will say it again.
3     A   I thought it said.
4     Q   I might have misspoken.
5     So we had marked a report
6 from you that was signed by you and
7 dated June 3, 2015, correct?
8     A   Yes.
9     Q   And you had testified
10 earlier, I believe, that you had made
11 certain changes to that report dated
12 June 3, 2015, a few days later; is that
13 correct?
14     A   Yes.
15     Q   And that you had sent that
16 onto plaintiff's counsel, correct?
17     A   Yes.
18     Q   How did you send it to
19 plaintiff's counsel, via e-mail?
20     A   Well, you know, I left for
21 Europe like that same week and I recall
22 that I attached it to an e-mail right
23 before I left.  And then I was kind of
24 out of touch for a couple of weeks.
25     MS. FARKAS:  Well, we would

Page 145

STEWART

1
2     ask for the transmittal e-mail to
3     be produced to us along with
4     whatever was sent along with it.
5     MR. FRANK:  Sure.
6     Q   Do you know -- I believe both
7 your June 2015 report and your
8 December 2017 report identify the
9 compensation for your preparing the
10 report and analysis at $275 an hour; is
11 that correct?
12     A   Yes.
13     Q   Do you know what the total
14 compensation that you've been paid to
15 date is on this matter?
16     A   I don't recall.
17     Q   We have two transmittal
18 letters, the first one I had shown you
19 from April 2015 that had a $2,000
20 payment, and I will represent to you
21 that there's a second letter that has
22 another 2000 payment sent to you.
23     Do you recall whether you
24 were paid anything more than that
25 $4,000 on this matter?

37 (Pages 142 - 145)

Page 154

STEWART

1 the Let's Get It On RP?
2
3    A   Okay.
4        Now we're not comparing with
5 the sheet music that you gave me a
6 minute ago.  We're not calling this RP,
7 right?
8    Q   No.
9    A   The sheet music?
10   Q   It's the work that you used
11 to render your report.
12   A   I can't answer that without
13 going through the whole recording and
14 comparing it word-for-word.
15   Q   On Page 12 of your report you
16 say, quote, I have found few important
17 lyrical similarities; is that correct?
18   A   That's correct.
19   Q   And is there anything in the
20 lyrics that you see in the deposit copy
21 that would cause you to believe that
22 you would come to a different
23 conclusion if you were to review the
24 lyrics of the deposit copy?
25   A   In other words, do I -- would

Page 155

STEWART

1 I still stand by that statement that
2 there were few similarities in the
3 lyrics between the deposit copy of
4 Let's Get It On and the recorded
5 version of Thinking Out Loud?
6    Q   Correct.
7    A   I see -- I mean, I've not
8 gone through this with that particular
9 focus in mind, so I can't really give
10 you a definitive answer.
11   Q   But you testified earlier
12 that you reviewed the deposit copy of
13 Let's Get It On before you issued your
14 December of 2017 report, right?
15   A   Um-hum.  Yes.
16   Q   And I believe you also
17 testified that there was nothing in the
18 deposit copy that would cause you to
19 change your December 2017 report,
20 correct?
21   A   That's correct.
22   Q   And so that would pertain to
23 your conclusion about the lyrics, as
24 well?

Page 156

STEWART

1
2    A   I have not really focused on
3 the lyrics between the deposit copy and
4 Mr. Sheeran's song.  And as I'm looking
5 at it now, I mean there are a lot of
6 references to "baby" and "sugar", I
7 think there's also a sugar in
8 Mr. Sheeran's song.  But I think
9 there's nothing in this that I see that
10 would cause me to radically revise that
11 statement, no.  I think there may be
12 some words held in common, but I don't
13 see --
14   Q   Do you think the appearance
15 of the word "baby" in two songs is
16 something that gives rise to an
17 inference of copying?
18   A   No.  Not necessarily, no.
19       I mean, you have it in the
20 context of other similarities, too,
21 but...
22   Q   Are you saying that baby
23 doesn't appear in the recording of
24 Let's Get It On?
25   A   It does.  I don't know if it

Page 157

STEWART

1
2 appears as frequently.  Anyway, I
3 think -- rather than belabor this, I
4 don't think that I would change that
5 opinion, just to be clear.
6        Okay.
7    Q   On Page 3 of your report you
8 state that, quote, both songs
9 occasionally deploy a, quote, blue,
10 closed quote, third, open paren, (a
11 third degree of the scale that ranges
12 from minor to major or somewhere in
13 between), closed paren closed quote.
14       Correct?
15   A   Yes.
16   Q   Do you agree that the use of
17 an occasional blue -- excuse me, the
18 use of -- let me start over.
19       Do you agree that the use of
20 an occasional blue note is not original
21 to Let's Get It On RP?
22   A   I would agree with that
23 statement.
24   Q   Would you agree that the use
25 of an occasional blue note was common

40 (Pages 154 - 157)

STEWART

1
2 before Let's Get It On RP?
3    A   Yes.
4    Q   Would you agree in terms of
5 pitch that an F is a different note
6 than an F-sharp?
7    A   Devoid of any context, yes.
8    Q   Do you -- if you can turn to
9 the deposit copy of Let's Get It On.
10   A   Um-hum.
11   Q   Do you see any blue notes
12 there?
13   A   Yes.
14   Q   Where do you see them?
15   A   In the second and third
16 measure.  In the fifth measure.  Sixth,
17 and seventh.
18   Q   Can you tell me where you see
19 it in the third measure?
20   A   On the very first note there
21 is a G-flat.  But the very first G at
22 the beginning of the piece is also --
23 it could be considered within that
24 spectrum.  I mean, all the thirds are
25 regarded as the same toneme,

STEWART

1
2 T-O-N-E-M-E, in analysis of blues.
3    Q   Looking at -- going back to
4 your report on Page 4.
5    A   Yes.
6    Q   Looking at Example 1.
7    A   Yes.
8    Q   You label that example as the
9 basic baselines in Let's Get It On and
10 Thinking Out Loud.
11      Do you see that?
12   A   Yes.
13   Q   And you say in your report
14 that --
15      MS. RICE:  I'm sorry, which
16   report is it?
17      MS. FARKAS:  His December
18   report.
19   Q   You state in your report on
20 Page 5 that, quote, this is the only
21 base part heard for the first 24
22 seconds.  Because it is in the
23 beginning of the song it makes a
24 lasting first impression, closed quote.
25   A   Yes, I see that.

STEWART

1
2    Q   Focusing on that second
3 sentence about it making a lasting
4 first impression, is that your expert
5 opinion?
6    A   Yes.
7    Q   And what is that opinion
8 based on?  What expertise do you have
9 in what creates a lasting first
10 impression?
11   A   It's based on many things.
12 It's based first and -- first of all on
13 my experience as a listener, and I know
14 that first impressions are important
15 and tend to be in clear focus because
16 it's something that a listener is
17 hearing at the outset.  And I have done
18 quite a bit of reading in music
19 cognition and my readings in that
20 discipline have supported that
21 conclusion as well.
22   Q   What is music cognition?
23   A   It's the study of how music
24 is perceived and how mental structures
25 conceptualize musical sounds.

STEWART

1
2    Q   And how is -- was there a
3 particular methodology that you
4 employed in determining that the
5 opening baseline of the only -- excuse
6 me, the opening base part of Thinking
7 Out Loud creates a lasting first
8 impression?
9    A   I'm not sure I understand the
10 question.
11   Q   Well, what did you do to
12 determine that it creates a lasting
13 first impression?
14   A   It certainly had that effect
15 on me.  I remember that -- hearing that
16 as the base part of the song.
17   Q   And did you conduct any
18 surveys to determine whether that base
19 part had a lasting first impression on
20 anyone other than you?
21   A   Again, I mean based on my
22 research and studying studies in my --
23 as a scholar, it's supported by
24 everything that I've done in that work,
25 as well.  That first impressions are

41 (Pages 158 - 161)

STEWART

1
2  online, was there any other type of
3  survey evidence that you did to
4  conclude that most listeners familiar
5  with Let's Get It On would undoubtedly
6  recognize the similarity?
7      A   Well, everybody that I played
8  it for recognized it right away.  I
9  played it for colleagues at work.  I
10 mean, we can test that.  Have I
11 conducted a survey involving hundreds
12 of thousands of people where I play the
13 two songs and ask them if they hear
14 that they're similar?  No, I haven't
15 done that.
16         To my knowledge this just
17 seems so obvious that it seems
18 ridiculous to keep discussing it.
19 That's my opinion.
20     Q   Are you claiming to be an
21 expert on what the lay listener would
22 hear?
23     A   It's not really my job -- I
24 mean, I'm offering an opinion here, but
25 in copyright law I guess that would be

STEWART

1
2  considered the intrinsic test.  As the
3  expert I'm supposed to be doing the
4  extrinsic test.  So my job is to look
5  at the musical expression and compare
6  it.  I'm opining that average listeners
7  too would also hear these similarities.
8      Q   So that is part of your
9  opinion here?
10     A   That's part of my opinion,
11 but ultimately -- at the end of the day
12 that's not what I'm hired to opine on.
13 That would be the job of the jury.
14     Q   Do you agree that the base
15 guitar part does not begin until
16 approximately 24 seconds into Thinking
17 Out Loud?
18     A   I would not agree with that.
19     Q   I'm asking about the base
20 guitar part, not the guitar part.
21     A   Yes.  I understood the
22 question.
23         I don't agree with that.
24     Q   Why don't you agree with
25 that?

STEWART

1
2      A   Because according to
3  Mr. Sheeran there is no base guitar in
4  this song.
5      Q   Well, what do you think
6  begins at approximately 24 seconds into
7  Thinking Out Loud?
8      A   The drums come in and
9  keyboards.
10     Q   And there's no guitar
11 playing, there's no base guitar
12 playing?
13     A   Not according to Mr. Sheeran.
14     Q   Well, I'm not asking
15 according to Mr. Sheeran.  I'm asking
16 according to your analysis of the song.
17 You listened to the two songs and you
18 conducted an analysis of the two songs.
19 Are you amending -- do you want to
20 amend your report?
21     A   Where do I say that the base
22 guitar comes in?
23     Q   The part where you --
24     A   Oh, yes, here.  Well, no,
25 here's a reference to a base guitarist

STEWART

1
2  the could be heard and seen in a live
3  performance.
4      Q   So I'm going to play for you
5  the commercially released version of
6  Thinking Out Loud.  And I'm going to
7  say now at -- well, maybe you'll say
8  now at the 24 second mark.  Actually,
9  no.  I'm going to play it for you and
10 if you can let us know when you -- if
11 and when you hear a base guitar begin.
12     (Whereupon, the song is being played.)
13     Q   That was about the first 51
14 seconds of the songs.  Is it your
15 testimony that you haven't heard a base
16 guitar come into the song?
17     A   No, I haven't.
18     Q   What are you hearing after
19 the first 24 seconds?
20     A   I told you before I'm hearing
21 keyboard and drums or drum sequence or
22 drum machine.
23     Q   And you're not hearing any
24 base guitar or guitar?
25     A   Guitar is present from the

STEWART

1
2 beginning.
3     Q   And is the -- in -- your
4 opinion is that guitar continues after
5 24 seconds?
6     A   Yes.  As I stated before,
7 Mr. Sheeran was very clear that there
8 is no base guitar on the entire track.
9     Q   But I'm asking about your
10 testimony and your analysis of the two
11 songs.  And your opinion about
12 Mr. Sheeran's testimony -- you didn't
13 hear Mr. Sheeran's testimony until
14 after you rendered your report,
15 correct?
16     A   That's correct.
17     Q   Now, in Example 1 on Page 4,
18 you've only transcribed a portion of
19 the opening guitar part, correct?
20     A   I'm sorry, where?
21     Q   Your Example 1 on Page 4.
22     A   That's correct.
23     Q   Just the lowest notes?
24     A   That's correct.
25     Q   And nowhere in your report do

STEWART

1
2 you transcribe the full guitar part
3 that you hear in the first 24 seconds,
4 correct?
5     A   That's correct.
6     Q   So your testimony is that the
7 only guitar part that you're hearing in
8 Thinking Out Loud is a guitar part not
9 a base guitar, correct?
10     A   Well, they're two different
11 instruments, base guitar and guitar.
12     Q   I understand.
13     A   So you're asking me do I hear
14 a base guitar in Thinking Out Loud?
15     Q   Yes.
16     A   I do not.
17     Q   And you only hear guitar?
18     A   That's right.
19     Q   You hear a guitar throughout
20 Thinking Out Loud, correct?
21     A   That's correct.
22     Q   Is it your testimony that the
23 lowest guitar notes in the opening 24
24 seconds of Thinking Out Loud is the
25 baseline?

STEWART

1
2     A   The lowest guitar note in the
3 opening 24 seconds is the baseline,
4 that's what you're asking me?
5     Q   Yes.
6     A   Yes.
7     Q   And does the baseline change
8 throughout Thinking Out Loud?
9     A   That's an interesting
10 question.  I mean, there is an
11 additional base part that is added but
12 this base part continues on.  And,
13 again, according to Mr. Sheeran, the
14 composition as he did it on his demo is
15 the composition.  And that does not
16 contain any other base part except for
17 this part that's notated here.
18     Q   So now is your testimony that
19 the demo is the composition?
20     A   No, I'm saying as regards to
21 base part he's quite clear that --
22 that -- okay.  Let me revise that.
23         He's very clear that what
24 he's playing on the demo is the
25 composition and on that you hear only

STEWART

1
2 this base part.  That does not mean
3 that the base part that's added on in
4 the studio version is not part of the
5 composition, too, as it evolved; it is.
6     Q   Are the lowest notes of the
7 keyboard in the first 24 seconds of --
8 sorry, at 24 seconds in on Thinking Out
9 Loud, are the lowest notes of the
10 keyboard considered the baseline?
11     A   They're part of it.
12     Q   What's the baseline of
13 Thinking Out Loud?
14     A   It's this in Example 1.
15     Q   You think that continues
16 throughout the entire song?
17     A   Yes.
18     Q   Without change?
19     A   Well, there may be minor
20 embellishments and of course it changes
21 during the bridge or the pre-chorus or
22 whatever you call it.  If I might
23 add -- or you don't like me to add, so
24 I won't.
25         MR. FRANK:  Wait for a

45 (Pages 174 - 177)

Page 190

STEWART

1
2 forest.
3    Q   Well, I guess you and Dr.
4 Ferrara are going to have to disagree
5 on that one.
6         Can you answer my question,
7 please?
8    A   Well, actually we agree
9 because he did the analysis correctly
10 in the beginning.  And now he's trying
11 to find something to be rather pedantic
12 about frankly and show that there's a
13 difference where there really is not a
14 substantial difference.
15   Q   Okay.
16        Well, putting your attacks on
17 Dr. Ferrara's integrity aside, can you
18 answer my question please?
19   A   And that question is what?
20   Q   How many notes are in bar two
21 of Let's Get It On?
22   A   How many notes are in bar two
23 of Let's Get It On?
24   Q   In Musical Example 2.
25   A   One, two, three, four --

Page 191

STEWART

1
2 five.
3    Q   And how many are in bar four
4 of Let's Get It On in Ferrara Musical
5 Example 2?
6    A   Seven.
7        MS. FARKAS:  Let's take a
8 quick break.
9        VIDEOGRAPHER:  The time is
10 2:56.  We're off the record.
11        (Whereupon, a brief recess
12 was taken.)
13        VIDEOGRAPHER:  The time is
14 3:08 p.m.  We're on the record.
15   Q   We were talking earlier about
16 what you consider to be the baseline of
17 Thinking Out Loud.  And I had played
18 for you about 51 seconds of Thinking
19 Out Loud and asked you about whether
20 the baseline changed in Thinking Out
21 Loud.  And I'd like to focus on around
22 24, 25 seconds into Thinking Out Loud.
23 Am I correct that a new baseline comes
24 in at that point in Thinking Out Loud?
25        MR. FRANK:  If I could -- if

Page 192

STEWART

1
2 I could interpose.  Your exact
3 question was whether the base --
4 guitar came in, you didn't use the
5 words baseline.  You used base
6 guitar.
7    Q   I understand.
8    A   That's what I was listening
9 for because you asked for me to
10 indicate when the base guitar came in.
11   Q   Okay.
12   A   And it doesn't.
13   Q   And what does come in?
14   A   There is an additional base
15 part the joins the base part in the
16 guitar.
17   Q   And at the time that you
18 wrote your December 2017 report, did
19 you have an understanding or a belief
20 as to what instrument was playing that
21 baseline starting at 25 seconds into
22 Thinking Out Loud?
23   A   I wasn't sure.
24   Q   Do you have a sense now as to
25 what instrument was playing that

Page 193

STEWART

1
2 baseline?
3    A   I would be perfectly happy to
4 accept Mr. Sheeran's statement that
5 it's in the keyboard.  I don't know why
6 it would be -- he wouldn't have any
7 reason to fabricate, he seems like a
8 very honest guy.
9    Q   Yes, he does.
10        And I believe he testified
11 that it was a programmed keyboard that
12 played the baseline starting at 25
13 seconds, is that --
14   A   I'm not sure he said that, I
15 would have to hear it again.  But I
16 think he talked about the drums being
17 programmed, I'm not sure he said that
18 the base was.
19   Q   Irrespective of what it was,
20 can we at least agree on a lingo going
21 forward that we're going to call it the
22 new baseline?
23   A   The additional baseline I'll
24 agree to.
25   Q   Call it the different

49 (Pages 190 - 193)

1          STEWART
2 baseline.
3      A   How about if we compromise,
4 the new additional baseline.
5      Q   Sure.  We'll all reserve our
6 rights.
7          What are we calling it?
8      A   What did you call it a moment
9 ago, the --
10     Q   The new baseline.
11     A   No, but you said another
12 term.
13     Q   Well, look, let's just agree
14 that the baseline that begins at 25
15 seconds into Thinking Out Loud is
16 different from the baseline that is
17 heard in the first 24 seconds of the
18 song.  Is that -- can we agree on that?
19     A   It joins in along with the
20 guitar baseline.
21     Q   So why don't we call it
22 Baseline B, this way we're not putting
23 any adjective on it?
24     A   Sure.
25     Q   So the baseline that begins

1          STEWART
2 at roughly 25 seconds into Thinking Out
3 Loud we will now refer to as Baseline
4 B.
5          Okay?
6      A   And it's nice that it's a B
7 for base.
8      Q   I try.  Sometimes
9 unintentionally, but I try.
10     A   We should have B1 and B2.
11     Q   No, no, just stop.  This
12 isn't cutting into my time.
13          So do you agree that Baseline
14 B in Thinking Out Loud starts at about
15 25 seconds in and continues through the
16 duration of the song?
17     A   I think that that additional
18 base part does continue through most of
19 the rest of the song.
20     Q   And am I correct that you do
21 not provide any transcription of
22 Baseline B in your reports; is that
23 correct?
24     A   I believe I don't.
25          MR. GOLDSMITH:  For the

1          STEWART
2 record, Larry got disconnected so
3 I'm going to call him back.
4          MS. FARKAS:  Well, before you
5 mute Larry, have you heard
6 anything since we came back from
7 break?  Larry?
8          MR. FERRARA:  Yes.
9          MS. FARKAS:  I'm going to
10 summarize and I'm sure I will get
11 swatted if I do this incorrectly.
12 But there is an agreement within
13 my questioning and the testimony
14 that there is a new baseline that
15 begins at about 25 seconds into
16 Thinking Out Loud, that that new
17 baseline -- that Dr. Stewart was
18 not certain what instrument was
19 playing that baseline when he did
20 his report, but based on
21 Mr. Sheeran's testimony is willing
22 to accept that it is some form of
23 keyboard programmed or not that is
24 emitting the sounds of the new
25 baseline.  And for purposes of

1          STEWART
2 going forward we are calling the
3 baseline that begins at about 25
4 seconds in as Baseline B.
5          MR. FERRARA:  Thank you.
6 I'll mute now.  Thank you.
7      A   Just one minor correction.
8 Remember, we didn't agree to call it
9 the new baseline we agreed to call it
10 the new additional baseline.
11     Q   Well, we agreed to call it
12 Baseline B.
13     A   Okay.
14     Q   To avoid all of that.
15     A   But I never agreed to the new
16 baseline --
17     Q   Fair enough.
18     A   -- categorization.
19     Q   It's very old.
20     A   Yeah.  Okay.
21     Q   That was sarcasm.
22     A   It's too bad Dr. Ferrara
23 missed all of that, it was exciting.
24          MS. RICE:  He would have
25 laughed.

STEWART

1
2 differently.
3    Q   Looking at Let's Get It On in
4 beat four of bar one there's a kick or
5 base drum in the Let's Get It On RP but
6 there's no corresponding kick drum in
7 Thinking Out Loud, correct?
8    A   On beat four?
9    Q   Yes.
10    A   That's correct.
11    Q   And that's shown both in your
12 transcription and in the chart that's
13 below it, correct?
14    A   Correct.
15    Q   And on beat four in bar two
16 of Let's Get It On there is a kick or
17 base drum but there's no kick or base
18 drum that corresponds in Thinking Out
19 Loud, correct?
20    A   Correct.
21    Q   And that's notated both in
22 your transcriptions and in the chart
23 below, correct?
24    A   Yes.
25    Q   Now, as illustrated in your

STEWART

1
2 Example 2, the similarity between the
3 high hat patterns in the two songs are
4 repeating eighth notes; is that
5 correct?
6    A   On the closed high hat, yes.
7    Q   And do you agree that
8 repeatings eighth notes on the closed
9 high hat symbols is common before Let's
10 Get It On?
11    A   Well, this is something that
12 happens in all of these depositions,
13 you want to separate each element out
14 and talk about whether it ever happens
15 in other songs.  And I'm happy to do
16 that, I'll oblige you the best I can.
17       Yes, a study pattern eighth
18 notes in the high hat is heard in many
19 songs with other varying drum parts
20 underneath it.
21    Q   Would you agree it's common
22 place in numerous genres of music?
23    A   These steady eighth notes on
24 the high hat?
25    Q   Yes.

STEWART

1
2    A   Yes.
3    Q   And, in fact, while you've
4 transcribed all eighth notes in the
5 high hat for Thinking Out Loud, the
6 transcription of the high hat in Let's
7 Get It On starts with a quarter note,
8 right?
9    A   I'm scared go back to this
10 because I don't want to get you angry
11 again.
12    Q   This is the same opening
13 thing that you think happens this one
14 time?
15    A   Yes.  And we're talking about
16 the beginning -- so it's -- I'm sorry,
17 should I speak or do you want to speak?
18    Q   I'll speak.
19    A   Yes.
20    Q   You agree that there's a
21 difference but it's a difference for
22 the same reasons that you previously
23 testified about that --
24    A   Yes.
25    Q   -- it's unique to the opening

STEWART

1
2 of Let's Get It On?
3    A   As I recall, um-hum.  And,
4 again, the drum part in Thinking Out
5 Loud is coming partway into the song.
6    Q   But it's the beginning of the
7 drum section, correct?
8    A   It is.  It is.
9    Q   Focusing on the similarity
10 that you allege exists between the
11 snare drum in both songs.  The
12 similarity is that both songs play on
13 beats two and four, correct?
14    A   Yes.
15    Q   And beats two and four are
16 sometimes referred to as backbeats,
17 correct?
18    A   Yes.
19    Q   Do you agree that a snare
20 drum playing on the backbeat was common
21 prior to Let's Get It On?
22    A   Yes.
23    Q   Do you agree that the base
24 drum patterns in the two songs are not
25 identical?

62 (Pages 242 - 245)

Page 246

STEWART

2   A   They're extremely similar but
3   not identical.
4     Q   Is it your opinion that the
5   drum pattern in Let's Get It On is
6   original to Let's Get It On?
7     A   Original in what sense?
8     Q   Do you believe that the --
9   whoever created the drum pattern in
10  Let's Get It On was the first person to
11  come up with that drum pattern?
12    A   In that sense, probably not.
13  In terms of a more legal definition of
14  original, meaning not copied, it could
15  very well be original.
16    Q   Did the drum pattern in Let's
17  Get It On exist in songs prior to Let's
18  Get It On?
19    A   Most likely, yes, but that
20  doesn't mean that the drummer
21  necessarily copied it from someone
22  else.
23    Q   I'm not suggesting that Let's
24  Get It On infringes or copies any other
25  work.  I'm simply asking whether you

Page 247

STEWART

2   believe that the drum pattern that
3   exists in Let's Get It On existed in
4   songs prior to Let's Get It On?
5     A   It could have and this
6   drummer could have invented it
7   independently, but it could have
8   existed in other songs.
9     Q   Well, in Dr. Ferrara's report
10  he identifies several drum method books
11  that show drum patterns very similar,
12  if not identical, to the drum pattern
13  in Let's Get It On.
14        Have you looked at those?
15    A   I've looked at the examples
16  he provided.
17    Q   And two of those drum
18  patterns are from James Brown's 1965
19  Papa's Got a Brand New Bag and 1964 Out
20  Of Sight.
21        Do you recall those two
22  examples?
23    A   Yes, I do.
24    Q   And those obviously predate
25  Let's Get It On, correct?

Page 248

STEWART

2   A   Yes.  And I'm quite familiar
3   with those works.
4     Q   You had mentioned James Brown
5   before.
6         And do you agree that those
7   drum patterns are very similar to the
8   drum pattern in Let's Get It On?
9     A   No.
10    Q   And how are they different?
11    A   First of all, the -- there is
12  no high hat on -- let's look at his
13  example.  Which visual example is that?
14  I mean, I can kind of do this from
15  memory because I'm so familiar with
16  these tracks, but it might be better to
17  actually look at it.
18        MR. FRANK:  For the record
19  which one are you looking at?
20  Which --
21        THE WITNESS:  I'm looking
22  at -- I found it right away,
23  believe it or not, Visual Exhibit
24  I.  And I actually have this book,
25  too, by Jim Payne.

Page 249

STEWART

2         First of all, let's start
3   with Brand New Bag.  There's some
4   really important differences here.
5   The high hat is used as an open
6   sound on the and of one and on the
7   and of three.  So you have
8   (whereupon, the witness is making
9   sounds), which is very different
10  than this (whereupon, the witness
11  is making sounds), so it's really
12  significantly different.  And then
13  the backbeat is a click -- it's a
14  rimshot, it's not a snare drum hit
15  so that sounds completely
16  different.
17        And should we turn to Out Of
18  Sight?
19    Q   Why do you think it sounds
20  completely different?
21    A   Because it does.  Do you hear
22  the difference between (whereupon, the
23  witness is making sounds) and the
24  difference between a big sonic boom --
25  well boom is not the right -- I'm not

63 (Pages 246 - 249)

STEWART

1
2  sure how -- how would I represent the
3  sound of a snare drum?  It's very
4  different than the sort of clean and
5  precise and less loud sound on the
6  click.
7      Q   But looking at Papa's Got a
8  Brand New Bag, both songs have high
9  hats played on eighth notes, correct?
10     A   They do.
11     Q   So you're distinguishing
12 between opened and closed high hat, is
13 that your distinction there?
14     A   Well, because it has a
15 incredibly different sound.  And so in
16 a different -- you know, we've been
17 talking a lot about duration.  So the
18 duration of the high hat hit on the and
19 of one and on the and of three is much
20 longer because the high is open.  When
21 the high hat is closed it's a very
22 short and crisp note.
23     Q   Don't you have an open circle
24 on Let's Get It On, as well?
25     A   On one note, yes.  And it's

STEWART

1
2  not clear that that's happening
3  throughout the whole song.
4      Q   And -- but that doesn't
5  change --
6      A   And it's not clear that --
7  whether it's happening in Thinking Out
8  Loud, too.  It's really hard to hear on
9  the track, I listened very closely.
10     Q   Okay.
11         But while the open or closed
12 high hat might change the timbre or the
13 sound, it's not changing the rhythm,
14 correct?
15     A   It's changing -- you put a
16 lot of emphasis before on duration.
17 It's changing the duration drastically.
18     Q   It's an eighth note, correct?
19     A   Well, this is a great example
20 of how something that's represented as
21 an eighth note in both of these first
22 two notes on a high hate actually have
23 completely different durations.  One --
24 the first one is a (whereupon, the
25 witness is making sounds), it's like a

STEWART

1
2  microsecond.  And then the second
3  (whereupon, the witness is making
4  sounds), lasts for the whole half beat.
5  So the durations are completely
6  different.
7      Q   So it's note an eighth note?
8      A   Well, this is the way drum --
9  I mean, again, we're back to the
10 conventions of notation.  If you wrote
11 it in another way it would be really
12 hard to visualize what the rhythm is
13 and it would be next to impossible for
14 a drummer to read it.  Because a
15 drummer just wants to see.  Okay.  I'm
16 hitting the high hat on each eighth
17 note.
18     Q   Yeah, I mean --
19     A   And then the other
20 information that he's being given here
21 is that that second note is sustained
22 by opening the high hat with his foot.
23     Q   But it's a bar of music,
24 right, that's being shown here?
25     A   Yes.

STEWART

1
2      Q   So there's only so many
3  eighth notes that fit in a bar of music
4  when you have 4/4 time, right?
5      A   It would be eight to the bar.
6      Q   So an eighth note is an
7  eighth note is an eighth note in terms
8  of rhythmic duration, correct?
9      A   No.  I mean, that sounds
10 weird for me to say that, I recognize
11 it.  But the fact is that this is
12 indicating two very different lengths
13 of notes.  And this is what's
14 incredible about percussion notation is
15 that durations become even less
16 significant in this situation than they
17 are in the other situation we're
18 talking about with the base.  Because
19 drummers like to just see where they
20 hit the drum.  That's what they want to
21 be able see.  So is this first base
22 drum kick drum hit in eighth note or
23 does he choke it off halfway through
24 the beat or is it allowed to ring out.
25     Q   Okay.

STEWART

2    A   You know, so I'm not trying
3  to be difficult here, but this is
4  really important, I think, in terms of
5  understanding this notation.
6    Q   And looking at the example of
7  Out Of Sight.
8    A   Yes.
9    Q   There's high hat on the
10 eighth notes, correct?
11   A   No.  There is no high hat at
12 all.
13   Q   I stand corrected.
14       But the ride symbol pattern
15 is identical to the repeating drum
16 patterns in Thinking Out Loud, no?
17   A   It's a steady stream of
18 eighth notes, yes.  But the ride symbol
19 has a longer sustained than the closed
20 high hat, too.  So this is going to be
21 (whereupon, the witness is making
22 sounds) instead of (whereupon, the
23 witness is making sounds).
24       Sorry.  It's not possible to
25 transcribe that.  But that -- you know,

STEWART

2  her difficulty in writing that out is
3  sort of like our difficulty in notating
4  it in music.  You know.
5    Q   So you think that unless the
6  exact same percussion instrument is
7  playing it with the exact same way for
8  the exact same duration there's no
9  similarity between the rhythmic
10 patterns?
11   A   Well, if you heard these you
12 would hear they sound very different.
13 And they're also at very different
14 tempos.  Look at the tempo here, it's
15 129 and 130.  So these are completely
16 different types of groves.  These are
17 faster groves.  That -- we're talking
18 about rock ballads in terms of Let's
19 Get It On and Thinking Out Loud.
20   Q   So do you think that if
21 Thinking Out Loud was a faster tempo
22 than Let's Get It On you wouldn't have
23 opined that the two songs are
24 substantially similar as you claim you
25 have done?

STEWART

2    A   No, I think -- I thought you
3  might mention that.  And it's a
4  question of genre here, too.  You know,
5  this is a different genre being funk
6  and sole rather that a rock ballad.
7  But that's a valid point you make.
8    Q   Awesome.
9        Turning to Exhibit J to the
10 Ferrara report.
11   A   There are other differences
12 in these, two, but I guess you're done
13 with this, right?
14   Q   For now.
15   A   So turn to what?
16   Q   Turn to Exhibit J.
17       MR. FRANK:  That would be one
18 more over.
19   A   Its significant differences.
20       Okay.
21   Q   Let me try and shortcut this
22 given the time.
23       You're not -- putting aside
24 whether you believe there are
25 differences between the different

STEWART

2  examples we're giving here, we're not
3  going to agree on that today.  But
4  you're not contending that's anyone can
5  own the rhythmic pattern that exists in
6  Let's Get It On, are you?
7        MR. FRANK:  Objection.
8        Predicate.  Calls for a legal
9        conclusion.
10       Go ahead.
11   A   Well, again, I'm a
12 musicologist not a lawyer.
13   Q   Well, let me --
14   A   And I have --
15   Q   Sorry.  Let me help you out
16 here then.
17       If the drum pattern was the
18 only thing that you believed was
19 similar between the two songs and
20 nothing else was similar, would you
21 believe that Thinking Out Loud copied
22 from Let's Get It On?  Would you think
23 that that was the only conclusion that
24 someone could reach?
25   A   Yeah, that's a good question.

65 (Pages 254 - 257)

Page 258

STEWART

1
2 And basically one of the strategies in
3 these cases that I've encountered in
4 the past is the idea of separating all
5 these elements and saying each element
6 by itself is not protectable.  So -- I
7 know this is --
8     Q    I'm not --
9     A    I'll answer your question,
10 but give me a -- I'm going to right
11 now.  Okay.  Sorry.
12     Q    I'm going to hold you to it.
13     A    Yes.
14          The answer is if that's all
15 that were in common I don't think we'd
16 be sitting here today if that were in
17 isolation by itself.
18     Q    And that was the question?
19     A    Yes.  I answered it.
20     Q    And so just to close the loop
21 on it, you're not contending that the
22 drum parts in and of themselves would
23 be indicative of copying?
24     A    Only these elements in
25 combination.

Page 259

STEWART

1
2     Q    Right.
3          So the drum parts in
4 isolation would not be indicative of
5 copying, correct?
6     A    Well, it could have probative
7 value but it would not in and of itself
8 be enough to have a definitive proof of
9 copying, no.
10     MS. FARKAS:  Just off the
11     record for a second.
12     VIDEOGRAPHER:  The time is
13     4:18.  We're off the record.
14     (Whereupon, a brief recess
15     was taken.)
16     VIDEOGRAPHER:  The time is
17     4:39 p.m.  We're back on the
18     record.  This is Video 5.
19     Q    On Page 7 of your
20 December 2017 report, and I'm
21 paraphrasing, you say in my opinion the
22 distinctive combination of these
23 baselines and drum parts can only
24 indicate copying.
25     A    I'm sorry.  Could you point

Page 260

STEWART

1
2 me to where that is?
3     Q    Sure.  It's the second
4 sentence where it says in my opinion on
5 the top of Page 7 of your report.
6     A    Yes.
7     Q    In this sentence are you
8 opining that the two songs are
9 strikingly similar?
10     A    What do you mean by
11 strikingly similar?
12     Q    Do you know what strikingly
13 similar means?
14     A    I've heard the term in a
15 legal context.
16     Q    And do you have an
17 understanding of what it means?
18     A    Roughly, I guess.
19     Q    And what's your rough
20 understanding?
21     A    Yeah, I guess that it would
22 preclude a possibility of independent
23 creation.
24     Q    So you are opining that the
25 two songs are strikingly similar in

Page 261

STEWART

1
2 this sentence?
3     A    In terms of the combination
4 of these elements, yes.
5     Q    And what led you to that
6 conclusion other than the transcription
7 of the two songs and the comparison of
8 them that we've been talking about
9 today, anything else?
10     A    The absence of prior art that
11 has the degree of similarity that these
12 two songs held.
13     Q    Can you tell us about whether
14 you conducted any search for prior art
15 in this case prior to -- let's start
16 with prior to issuing your June 2015
17 report?
18     A    Yes.
19     Q    And do you have a particular
20 process that you use when searching for
21 prior art?
22     A    Well, believe it or not one
23 very useful method has been to ask
24 musician friends of mine who have
25 extensive knowledge of repertoires if

66 (Pages 258 - 261)

Page 274

1                STEWART
2   that there was no prior art?
3       A   Well, you know, you can't
4   prove a negative.
5       Q   True.
6       A   So you could say that there
7   are no green sheep in the world
8   occurring naturally, but I can't prove
9   it.  So I think at some point based on
10  your observation you just say, well, I
11  think I've observed or digested enough
12  data to draw this conclusion.  And this
13  is a scientific method, I mean, that is
14  in universal use.
15      Q   Would you say that your
16  knowledge of rock music is as deep as
17  your knowledge of jazz music?
18      A   No.
19      Q   Would you say that your
20  knowledge of popular music is the same
21  and as deep as your knowledge of jazz
22  music?
23      A   Once again, it's extensive
24  and deep in many years of experience
25  performing.  But, no, jazz is my -- my

Page 275

1                STEWART
2   passion.  I mean, I've done so many
3   rock gigs that I can't even begin to
4   count them.
5       Q   When you were comparing the
6   two songs, did you undertake any effort
7   to exclude elements that are not
8   original to Let's Get It On when
9   comparing the two songs?
10      A   I think we covered that.
11          Yeah, I didn't consider that
12  these first three things we were
13  talking about in my report; tempo, key,
14  length, other performance elements,
15  certain improvisational elements, so
16  forth.
17      Q   Do you believe that the two
18  songs as whole works are identical?
19      A   No.
20      Q   Do you believe that they're
21  virtually identical?
22      A   No.  The entire songs -- the
23  songs in their entirety as entire
24  works, no.  The answer is no, which was
25  what your question was.

Page 276

1                STEWART
2       Q   Do you believe that anyone
3   can own a groove?
4          MR. FRANK:  Objection to
5   form.
6          Go ahead.
7       A   That's a great question.
8   But, you know, there are a lot of
9   different definitions of what a groove
10  is.
11      Q   What's your definition of a
12  groove?
13      A   Well, a lot of people use the
14  term in the sort of more subjective way
15  that it's like a feel.  And when it's
16  defined like that my answer would be
17  categorically no, you cannot own a
18  groove.
19      Q   Is beginning of vocal phrase
20  after a rest something that's original
21  to Let's Get It On?
22      A   No.
23      Q   You have discussed in your
24  report certain similarities that you
25  believe exist in the vocal melodies

Page 277

1                STEWART
2   that you've identified in your report.
3   Are you aware of that?
4       A   Yes.
5       Q   Are you contending that any
6   of those vocal melody similarities in
7   and of themselves would be indicative
8   of copying if no other similarities
9   existed in the two songs?
10      A   Yes.
11      Q   Which ones?
12      A   All of the ones that I
13  mentioned and maybe even some others.
14      Q   So looking at Example 3 in
15  your report, are you contending that
16  the similarities that you claim exist
17  in Example 3, that if those were the
18  only similarities that existed between
19  the songs, would your conclusion be
20  that the only explanation is that
21  Thinking Out Loud copied from Let's Get
22  It On?
23      A   No.
24      Q   What about Example 4?  If
25  that was the only similarity between

70 (Pages 274 - 277)

STEWART

2 the two songs, would your conclusion be
3 that the only explanation is copying?
4    A   No.  You asked me if it could
5 be indicative of copying and my answer
6 is yes.  But would it be the only --
7 how did you just phrase it?
8    Q   Explanation.
9    A   The only explanation, my
10 answer is no.
11    Q   Well, going back to the
12 question about being indicative of
13 copying.  If that was -- if either
14 Example 3 or Example 4 were the only
15 similarities that someone brought to
16 your attention, would you advise them
17 to go forward with a claim?
18    A   Probably not because the
19 litigation is so expensive and time
20 consuming and stressful that I think
21 you need to have a very strong case to
22 make it actionable.
23    Q   And that would not be a
24 strong case in your opinion?
25    A   I think that would not.  That

STEWART

2 would be not enough to constitute a
3 strong case, yes.
4    Q   You also identify at some
5 point the concept -- in Example 5 you
6 identify certain notes that employ the
7 repeated notes on a descending scale.
8      Is the concept of repeatings
9 notes on a descending scale original to
10 Let's Get It On?
11    A   No.  Original in the sense of
12 never having been done before, original
13 in the sense of not a copy?
14    Q   The former.
15    A   No.
16    MS. FARKAS:  Let's take a
17 five-minute break and I may be
18 finished or very close to
19 finished.
20    VIDEOGRAPHER:  The time is
21 5:04 p.m.  We're off the record.
22    (Whereupon, a brief recess
23 was taken.)
24    VIDEOGRAPHER:  The time is
25 5:16 p.m.  We're on the record.

STEWART

2    MS. FARKAS:  So I just want
3 to request on the record.  We made
4 some references to how much time
5 he's put in for certain things in
6 his invoice, and so we'd like to
7 request on the record copies of
8 invoices that he's issued to you.
9    MR. FRANK:  Sure.
10    Q   What we would like to do is
11 I'm going to play you -- I believe we
12 have nine recordings, and I simply want
13 to know if you recognize them.
14    A   Okay.
15      Nothing more than if I've
16 heard them before?
17    Q   And if you can identify them,
18 correct.
19    A   Um-hum.
20    Q   And we'll play it -- you can
21 put your hand up if you've got it.
22 There's not -- it's not a test for how
23 long it takes you.  Just asking.
24    A   I can name that tune in one
25 note.

STEWART

2    Q   Well, we'll see.
3    MR. FRANK:  Are they actual
4 commercial recordings or are
5 they --
6    MS. FARKAS:  They should
7 be -- yes.  My understanding is
8 they're actually -- they're not,
9 you know, me.  They're actually
10 commercially released recordings.
11    MR. GOLDSMITH:  And we'll
12 identify each as Audio Exhibit 1,
13 2 -- so this is Audio Exhibit 1.
14    (Whereupon, the recording was played.)
15    A   Yes, I am very familiar with
16 this song, it's Petula Clark.
17    Q   And what's the name of the
18 song?
19    A   Downtown.
20    Q   You are one for one.
21    A   What's the prize?
22    Q   You get to leave.
23    MR. GOLDSMITH:  Exhibit 2.
24    (Whereupon, the recording was played.)
25    A   Do you want to listen to the

71 (Pages 278 - 281)