UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KATHRYN TOWNSEND GRIFFIN, HELEN   :
MCDONALD, and The Estate of CHERRIGALE   :
TOWNSEND,   :
  :
                Plaintiffs,   :     Docket No. 17-cv-5221 (RJS)
  :
     -against-   :
  :
EDWARD CHRISTOPER SHEERAN, p/k/a   :
ED SHEERAN, ATLANTIC RECORDING   :
CORPORATION, d/b/a ATLANTIC RECORDS,   :
SONY/ATV MUSIC PUBLISHING, LLC and   :
WARNER MUSIC GROUP CORPORATION   :
d/b/a ASYLUM RECORDS,   :
  :
           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


FRANK & RICE, P.A.
Attorneys for Plaintiffs
325 West Park Avenue
Tallahassee, Florida 32301
Telephone: (850) 629-4168
Facsimile: (850) 629-4184

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Preliminary Statement ................................................................................................. 1

Background Facts ........................................................................................................ 1

SUMMARY JUDGMENT STANDARD ...................................................................... 2

POINT I

APPLICABLE LAW ..................................................................................................... 3

A.   Copyright Protection Only Requires that the Work be Original
     to the Author, Not that it be Novel .................................................................. 3

B.   There is No Prior Art Doctrine in Copyright Law .......................................... 4

C.   A Work May be Copyrighted Even if It Consists Solely of a
     Combination of Pre- Existing Common Elements ........................................... 4

POINT II

ELEMENTS OF A COPYRIGHT INFRINGEMENT CLAIM .................................... 5

A.   Beneficial Ownership ....................................................................................... 5

B.   Unauthorized Copying ..................................................................................... 5

C.   Access is Not Disputed .................................................................................... 6

POINT III

LET'S GET IT ON & THINKING OUT LOUD
CONTAIN PROBATIVE SIMILARITIES ................................................................... 7

A.   Harmony ............................................................................................................ 7

B.   Harmonic Rhythm ............................................................................................ 8

C.   Vocal Melody .................................................................................................... 9

D.   Syncopated Bass Line Melody ........................................................................ 11

E.   Drum Composition ........................................................................................... 13

## TABLE OF CONTENTS

F.      Key, Tempo, Meter, & Genre .................................................................... 16

G.      Defendants Do Not Dispute Copying "Let's Get It On" in "Thinking Out Loud" ................ 17

POINT V

THINKING OUT LOUD BEARS SUBSTANTIAL SIMILARITY
TO PROTECTED EXPRESSION IN LET'S GET IT ON .................................................. 18

A.      The Appropriate Inquiry is Quantitative and Qualitative
        Significance of the Copied Material to the Original Work ................................ 18

B.      The Combination of Elements in Let's Get It On is Protectable ......................... 20

C.      Total Concept and Feel .................................................................... 21

D.      Musical Compositions are Entitled to Broad Copyright Protection ...................... 22

E.      Disagreement Between Opposing Experts Makes Summary Judgment Inappropriate ........... 23

POINT VI

THE COPYRIGHT IN LET'S GET IT ON IS NOT LIMITED TO SHEET MUSIC ........................... 23

A.      The Musical Expression Embodied On the
        "Let's Get It On" Single is the Copyrighted Work ...................................... 23

B.      The 1909 Act Extended Copyright to the First
        Recording of the Musical Work ........................................................ 25

C.      Copyright Protection Extends to a Work's Embodiment on the First Recording ........... 26

D.      Policy Considerations Require that the Marvin Gaye Recording be Considered ........... 28

E.      There is Substantial Similarity Between the Deposit
        Copy Elements of Let's Get it On and Thinking Out Loud ............................... 29

THE DEFENDANTS' STANDING ARGUMENT REGARDING KATHRYN
TOWNSEND GRIFFIN IS WITHOUT MERIT ...................................................... 29

Conclusion ............................................................................. 30

## Table of Authorities

### *Cases*

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.,*
  722 F.2d 988 (2d Cir. 1983) .................................................................. 6

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.,*
  191 F.2d 99 (2d Cir. 1951) ................................................................. 3-4

*Allen v. Scholastic Inc.,*
  739 F.Supp.2d. 642 (S.D.N.Y. 2011) .................................................. 17

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................. 2

*Archie MD, Inc. v. Elsevier, Inc.,*
  261 F.Supp.3d 512 (S.D.N.Y. 2017) ................................................... 24

*Arnstein v. Porter,*
  154 F.2d 464 (2d Cir.1946) ................................................................ 18

*Baxter v MCA Inc.,*
  812 F.2d 421 (9th Cir. 1987) .............................................................. 17

*Beaudin v. Ben and Jerry's Homemade, Inc.,*
  95 F.3d 1 (2d Cir. 1996) ..................................................................... 22

*Boisson v. Banian, Ltd.,*
  273 F. 3d 262 (2d Cir. 2001) ................................................................ 4

*Bridgeport Music, Inc. v. UMG Recordings, Inc.,*
  585 F.3d 267 (6th Cir.2009) .......................................................... 21, 27

*Business Trends Analysts, Inc. v. The Freedonia Group, Inc.,*
  700 F.Supp. 1213 (S.D.N.Y.1988) ........................................................ 3

*Corner v. Israel,*
  732 F.2d 267 (2d Cir. 1984) ................................................................. 5

*Davis v. E. I DuPont de Nemours & Co.,*
  240 F.Supp. 612 (S.D.N.Y. 1965) ...................................................... 24

*Diamond Direct, LLC v. Star Diamond Group, Inc.,*
  116 F. Supp. 2d 525 (S.D.N.Y. 2000) ................................................... 4

*F a Mills, Inc. v. Standard Music Roll Co,*
  223 F.849 (D.N.J. 1915) ..................................................................... 26

## Table of Authorities

### *Cases*

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ................................................................................. 3,5,7,21-22

*Fred Fisher Inc. v. Dillingham*,
298 F.145 (S.D.N.Y. 1924) ....................................................................... 4, 17, 20

*G. Ricordi & Co. v. Columbia Graphophone Co.*,
263 F. 354 (2d Cir. 1920) .......................................................................... 25

*Gaste v. Kaiserman*,
863 F.2d 1061 (2d Cir. 1988) .................................................................... 3

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003) ...................................................................... 17

*Glover v. Austin*,
289 Fed.Appx. 430 (2d Cir. 2008) ............................................................ 17

*Jorgenson v. Epic/Sony Records*,
351 F.3d. 46 (2d Cir. 2003) ....................................................................... 5-6

*Kerzer v. Kingly Mfg.*,
156 F.3d 396 (2d Cir. 1998) ...................................................................... 2

*Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*,
945 F.2d 509 (2d Cir. 1991) ...................................................................... 22

*Knitwaves, Inc. v. Lollytogs Ltd.*,
71 F.3d 996 (2d Cir. 1995) ........................................................................ 4, 7, 20

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012) ..................................................................... 24

*Laureyssens v. Idea Group, Inc.*,
964 F.2d 131 (2d Cir. 1992) ...................................................................... 6

*Lefkowitz v. Bank of New York*,
676 F.Supp.2d 229 (S.D.N.Y. 2009)......................................................... 30

*Lessem v. Taylor*,
766 F.Supp.2d 504 (S.D.N.Y. 2011) ........................................................ 4, 6, 23

*Levine v. McDonald's Corp.*,
735 F.Supp. 92 (S.D.N.Y. 1990) ............................................................... 5, 17

## Table of Authorities

### *Cases*

*Markham v. Allen,*
    326 U.S. 490, 491 (1946)…………………………………………………………  30

*Matthew Bender & Co., Inc. v. West Pub. Co.,*
    158 F.3d 674 (2d Cir. 1998)  23

*Midway Mfg. Co. v. Arctic Intern., Inc.,*
    547 F.Supp. 999 (N.D.Ill. 1982)  27

*Moser v. Pollin,*
    294 F.3d 335 (2d Cir. 2002)………………………………………………………...  30

*New Old Music Group, Inc. v. Gottwald,*
    122 F.Supp.3d 78 (S.D.N.Y. 2015)  4, 6, 13, 5-20

*Nichols v. Universal Pictures Corporation,*
    45 F.2d 119 (2d Cir. 1930)  22

*Repp v. Webber,*
    132 F.3d 882 (2d Cir. 1997)  17

*Ringgold v. Black Ent. Television, Inc.,*
    126 F.3d 70 (2d Cir. 1997)  6

*Roberts v. Gordy,*
    877 F.3d 1024 (11th Cir. 2017)  24

*Santrayll v. Burrell,*
    1996 WL134803 (S.D.N.Y. 1996)  4-5

*Sheldon v. Metro-Goldwyn Pictures Corporation,*
    81 F.2d. 49 (2d Cir. 1936)  22

*Swirksy v. Carey,*
    376 F.3d 841 (9th Cir. 2004)  10, 17, 20

*Tempo Music, Inc. v. Famous Music Corp.,*
    838 F.Supp. 162, 169 (S.D.N.Y. 1993)  7

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000)  26-27

*Tin Pan Apple, Inc. v Miller Brewing Co., Inc.,*
    1994 WL 62360, at *4 (S.D.N.Y. 1994)  23

## Table of Authorities

### *Cases*

*TufAmerica,*
     968 F.Supp.2d 588 (S.D.N.Y. 2013) .................................................... 18

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,*
     338 F.3d 127 (2d Cir. 2003) ........................................................... 21-22

*Ulloa v Universal Music and Video Distrib. Corp.,*
     2004 WL 840279 (S.D.N.Y. 2004) ..................................................... 4

*Ulloa v. Universal Music & Distribution, Corp.,*
     303 F.Supp.2d 409, 413 (S.D.N.Y. 2004) ........................................ 23

*United States v. Backer,*
     134 F.2d 533 (2d Cir. 1943) ............................................................... 24

*Vargas v. Pfizer, Inc.,*
     418 F.Supp.2d 369 (S.D.N.Y.2005) ................................................... 17

*Warner Bros. Entertainment v. RDR Books,*
     575 F.Supp.2d 513, 534 (2d. Cir. 1997) ........................................... 18

*White-Smith Music Pub. Co. v. Apollo Co.,*
     209 U.S. 1 (1908) ................................................................................. 25

*Williams v. Bridgeport Music, Inc.,*
     2014 WL 7877773 (C.D.Cal. 2014) ................................................... 27

*Williams v. Broadus,*
     2001 WL 984714, at *3 (S.D.N.Y. 2001) ......................................... 18

*Williams v. Gaye,*
     2018 WL 1403577, *6 (9th Cir. 2018) ............................................ 22

*Williams v. Gaye,*
     895 F.3d 1106 (9th Cir. 2018) ......................................................... 27

*Winter v. U.S.,*
     196 F.3d 339 (2d Cir. 1999) ............................................................... 2

*Zalewski v. Cicero Builder Dev., Inc.,*
     754 F.3d 95 (2d Cir. 2014) ................................................................. 22

## Table of Authorities

### *Statutes*

U.S. Constitution Article 1 - Section 8 Clause 8 ................................................................. 28

17 U.S.C. § 410(c) ................................................................................................................. 3

Copyright Act of 1909 §1(e), 35 Stat. 1075 (1909) .............................................................. 26

Fed. R. Civ. P. 56(c) ............................................................................................................. 2

### *Other Sources*

1 M. Nimmer & D. Nimmer, *Copyright* § 1.08[C][1] (1990)) ............................................. 3

1 M. Nimmer & D. Nimmer, *Copyright,* § 2.01[A] .............................................................. 4

2 M. Nimmer & D. Nimmer, *Copyright* § 7.17[A] ............................................................... 28

2 M. Nimmer & D. Nimmer, *Copyright* § 7.20[B][1] ........................................................... 24

4 M. Nimmer & D. Nimmer, *Copyright* § 13.01(B) ............................................................. 6

4 M. Nimmer & D. Nimmer, *Copyright* § § 13.03(B) ........................................................... 22

Copyright: Its History and Its Law, Richard Rogers Bowker (1912) ..................................... 25

The Harvard Dictionary of Music (Fourth Edition, 2003) ...................................................... 9

## PRELIMINARY STATEMENT

The defendants do not dispute that they copied Let's Get It On in Thinking Out Loud. Instead, the defendants argue that, even though they copied Let's Get It On, they did not infringe the copyright because Thinking Out Loud is not "identical" as a result of different lyrics and other added elements. Of course, this is not the law. The defendants cannot avoid liability for copying Let's Get It On simply by changing the words.

## BACKGROUND FACTS

Let's Get it On is an iconic song recorded by one of the twentieth century's most iconic artists, Marvin Gaye.  The song has been broadcast over 1 million times and has been honored as one of the 500 Greatest Songs of All Time. Let's Get It On has been featured in films, television shows, and even ads for Levi jeans.  The song is world famous.

One day in 2014, while coming out of the shower, Ed Sheeran heard his co-writer, Amy Wadge, playing the chord progression from Let's Get It On. Sheeran Tr., 64:24 – 66:5. Sheeran and Wadge went out to dinner, and when they returned the finished a demo of Thinking Out Loud using the Let's Get It On chord progression, in about an hour. Sheeran Tr., 73:14- 74:7. Later, the producer, Jake Gosling, added the drums and bass guitar parts. Sheeran Tr., 81:13-15; 129:18-23. Neither Sheeran, Wadge or Gosling have disputed copying Let's Get It On in Thinking Out Loud. Thinking Out Loud was released in 2014 and was a number one hit song worldwide.

In November 2014, video footage of Ed Sheeran singing Let's Get It On in the middle of a concert performance of Thinking Out Loud, was uploaded to YouTube. Frank Dec., ¶ 3, Video Exh. 1. The concert footage of Sheeran's seamless transition between songs crystalizes that he

simply changed the words of Let's Get It On – a point that had been made in critic's reviews.[1] Stewart Dec, ¶ 4. Thinking Out Loud and Let's Get It On contain the same chord progressions, harmonic rhythms, and virtually the same bass line melodies, drum parts, tempos and melodic hooks. Stewart Dec., ¶¶ 2-4. The defendants do not dispute they copied Let's Get It On, but instead argue that there has been no unlawful appropriation because the two works are not "identical." Def. Brief, 4-5, 27. Defendants' legal argument is without basis in law and must be rejected.

<h2 style="text-align:center">SUMMARY JUDGMENT STANDARD</h2>

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *e.g., Winter v. U.S.*, 196 F.3d 339, 346 (2d Cir. 1999). When examining the evidence, the Court should resolve all factual ambiguities and grant all inferences in favor of the non-moving party and must construe the evidence liberally in favor of the party opposing the motion. *See, e.g., Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.* at 82-83; *see, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat summary judgment, the non-moving party need offer only enough evidence to enable a reasonable jury to return a verdict in its favor. *Id.* Here, a reasonable jury could find that Lets' Get It On is original and therefore

---

[1] In critical reviews, Thinking Out Loud was called an "egregious steal" of Let's Get It On and "an incredibly obvious successor to Marvin Gaye's 1973 superlative slow jam "Let's Get It On" – the gently loping four-note bass pattern and crisp '70s soul drums absolutely smack of the Gaye classic." See, "Blurred Lines Isn't Even the Biggest Marvin Gaye Ripoff This Decade: Ever Heard Ed Sheeran's Thinking Out Loud?" Spin Magazine by Andrew Unterberger, Mar. 11, 2015

protectable, that Le'ts Get It On was copied, and that Thinking Out Loud bears substantial

similarity to Let's Get It On, so defendants' motion must be denied.

## POINT I

## APPLICABLE LAW

A.   **Copyright Protection Only Requires that the Work be Original to the Author, Not that it be Novel**

The Copyright Act provides that a certificate of registration "shall constitute *prima facie*

evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. §

410(c). The certificate "establishes a presumption of originality in the work registered." *Business*

*Trends Analysts, Inc. v. The Freedonia Group, Inc.,* 700 F.Supp. 1213, 1231 (S.D.N.Y.1988).

"To qualify for copyright protection, a work must be original to the author." *Feist*

*Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (citations omitted). "Original,

as the term is used in copyright, means only that the work was independently created by the

author (as opposed to copied from other works), and that it possesses at least some minimal

degree of creativity." *Id.* at 345. "[T]he requisite level of creativity is **extremely low**; even a slight

amount will suffice. The vast majority of works make the grade quite easily, as they possess some

creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* at 345 (quoting 1 M.

Nimmer & D. Nimmer, *Copyright* § 1.08[C][1] (1990)).

"Sufficient originality for copyright purposes amounts to **little more than a prohibition**

**of actual copying**." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988); *Alfred Bell & Co.*

*v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951) (citations omitted). All that is

needed … is that the 'author' contributed **something more than a 'merely trivial' variation**,

something recognizably 'his own.'" *Id.*, at 102-03. "[T]he 'quantum of originality necessary to

invoke copyright protection is **very small**.'" *Diamond Direct, LLC v. Star Diamond Group, Inc.*, 116 F. Supp. 2d 525, 528-29 (S.D.N.Y. 2000).

Novelty is not required for copyright protection. *Boisson v. Banian, Ltd.*, 273 F. 3d 262, 270 (2d Cir. 2001) ("Absent evidence of copying, an author is entitled to copyright protection for an independently produced original work despite its identical nature to a prior work, because it is independent creation, and not novelty that is required."). Because novelty is not required, "[t]he 'author' is entitled to a copyright if he independently contrived a work completely identical with what went before .…" *Alfred Bell*, 191 F.2d at 103.

**B.     There is No Prior Art Doctrine in Copyright Law**

Defendants cite a number of musical works that pre-date Let's Get It On as "prior art" to support their claim that Let's Get It On is not original. Def. Memo. However, the law is clear that originality, and **not prior art**, determines whether a work is protectable. *See* 1 Nimmer & Nimmer, *supra,* § 2.01[A], at 2–9. Whether a piece of music incorporates components from **prior musical works is irrelevant** to the question of whether the subject work is original. *Fred Fisher Inc. v. Dillingham,* 298 F.145 (S.D.N.Y. 1924). See *Ulloa v Universal Music and Video Distrib. Corp.,* 2004 WL 840279 (S.D.N.Y. 2004); *Lessem v. Taylor*, 766 F.Supp.2d 504 (S.D.N.Y. 2011); *New Old Music Group, Inc. v. Gottwald*, 122 F.Supp.3d 78 (S.D.N.Y. 2015).

**C.     A Work May be Copyrighted Even if It Consists Solely of a Combination of Pre-Existing Common Elements**

A combination of pre-existing elements qualifies for copyright protection, as long as the author's selection and arrangement "display[s] some minimal level of creativity." *Feist*, 499 U.S. at 358. Further, a work "may be copyrightable even though it is entirely a compilation of unprotectable elements." *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1003–04 (2d Cir.1995). This is black letter law and is applied equally to music cases. See *Santrayll v. Burrell*, 1996

WL134803 (S.D.N.Y. 1996)("the repetition of the non-protectable word "uh-oh" in a distinctive

rhythm comprises a sufficiently original composition to render it protectable by the copyright

laws."); *Levine v. McDonald's Corp.*, 735 F.Supp. 92, 98 (S.D.N.Y. 1990) ("plaintiffs' use of

various non-copyrightable [musical] elements is itself copyrightable if they have been arranged in

a unique and recognizable way.").

## POINT II

### ELEMENTS OF A COPYRIGHT INFRINGEMENT CLAIM

The elements of a copyright infringement claim are (i) ownership of a valid copyright;

and (ii) unauthorized copying. *Feist*, 499 U.S. 340, 361.

### A.    Beneficial Ownership

The right to royalties is a sufficient beneficial interest in the copyright to give standing to

seek judicial relief under the copyright law against infringement, both under the 1909 Copyright

Act and under the 1976 Copyright Act. *Corner v. Israel*, 732 F.2d 267, 270-271 (2d Cir. 1984).

The defendants do not dispute that plaintiffs are the beneficial owners of a 22% interest in Let's

Get It On and therefore have legal standing. SUF ¶ 22, 23, 25, 26.[2] Townsend created Let's Get It

On and assigned his copyright in consideration for future royalties. Ashby Dec., ¶ 3, 6 (Dkt. No.

69). Plaintiffs are the successors to Townsend's beneficial interest and receive 22.22% of the

royalties from Let's Get It On. Ashby Dec., ¶ 7. (Dkt No. 69); SUF ¶ 22, 23, 25, 26.

### B.    Unauthorized Copying

Unauthorized copying is established by showing that the portion 'actually copied'

amounts to an "unlawful appropriation." *Jorgenson v. Epic/Sony Records*, 351 F.3d 46 (2d Cir.

2003). "Actual copying may be established by direct or indirect evidence." *Id*. Indirect evidence

---

[2] "SUF" refers to Plaintiff's response to the Defendants' Rule 56 statement.

is established by showing that the composer of defendants' work had access to plaintiff's work and that there are similarities probative of copying." *Id*. A showing of "probative similarity requires only the fact that the infringing work copies something from the copyrighted work." *Ringgold v. Black Ent. Television, Inc.,* 126 F.3d 70, 75 (2d Cir. 1997).

Analysis of the works and expert testimony can be used to prove probative similarities. *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946). To prove copying, the similarities between the two works need not be extensive, and need not involve protected elements of the plaintiff's work. They just need to be similarities one would not expect to arise if the two works had been created independently. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992); 4 Nimmer on Copyright § 13.01[B]. The aggregate of commonplace similarities not found in any other work compels the conclusion of copying and requires denial of summary judgment on that issue for defendant. *Lessem v. Taylor*, 766 F.Supp.2d 504, 512 (S.D.N.Y. 2011).

## C.   Access is Not Disputed

Access in this case is not disputed. Let's Get It On has been broadcast more than 1 million times. Ed Sheeran admitted he knew Let's Get It On. Sheeran Tr., 77:11-20; p. 96:2-4 ("like anyone, I know [Let's Get It On], I'm aware of it and you know the words to the chorus . . ."). Video footage of a live concert captured Ed Sheeran singing Let's Get It On at a concert in 2014. Frank Dec., ¶ 3, Video Exh. 1. "The law is clear that the degree of probative similarity necessary to raise an inference of copying is inversely related to the proof of access." *New Old Music*, at n. 10. ("the greater the proof of access, the less striking the similarities must be in order for actual copying to be inferred"). Copying can be subconscious. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998-999 (2d Cir. 1983). As demonstrated below, the evidence of probative similarities between the songs is substantial and compelling.

## POINT III

### LET'S GET IT ON  & THINKING OUT LOUD
### CONTAIN PROBATIVE SIMILARITIES

Plaintiffs' expert, Dr. Alex Stewart,[3] analyzed Let's Get It On (referred to by defendants as "LGO") and Thinking Out Loud (referred to by defendants as "TOL") by listening to both songs, transcribing the parts, examining sheet music and comparing them. Stewart Dec., ¶ 1. He concluded that Lets' Get It On is an original work by virtue of the unique selection, coordination and arrangement of elements, specifically, (a) I-iii-IV-V harmonic progression; (b) harmonic rhythm with anticipated second and fourth chords; (c) melodic hook; (d) syncopated bass line melody; (e) drum part; (f) tempo. Stewart Dec., ¶ 2-4. Townsend's independent contributions more than satisfy the "extremely low" creativity requirement, even if defendants contend otherwise. *Feist*, 499 U.S. at 358; *Knitwaves*, 71 F.3d 996, 1003–04. Dr. Stewart also found similarities in the songs that are probative of copying. Stewart Dec., ¶¶ 17, 37, 40-44, 49, 77, 79.

### A.      Harmony

First, "harmony *can*, as a matter of law, be the subject of copyright." *Tempo Music, Inc. v. Famous Music Corp.*, 838 F.Supp. 162, 169 (S.D.N.Y. 1993)(emphasis in original). This is because the choice of harmonic relationships may be considered a creative choice. *Id.* at 168. The beginning harmony in both songs in this case is a four-chord progression (which is notated on the deposit copy. Stewart Dec., ¶ 5) that can be transposed to the key of D as follows:[4]

|                  | First Chord   | Second Chord   | Third Chord   | Fourth Chord |
|------------------|---------------|----------------|---------------|--------------|
| Let's Get It On  | D major / I   | F# minor / iii | G major / IV  | A major / V  |
| Thinking Out Loud | D major / I  | F# minor / iii | G major / IV  | A major / V  |

---

[3] Dr. Stewart is Professor of Music, Director of Jazz Studies and former Director of Latin American and Caribbean Studies at the University of Vermont.

[4] For comparison analytical purposes, musicologists sometimes express harmonies in Roman numerals in which the number denotes the scale degree of the root and upper-case letters indicate major while lower case letter denote minor. Ferrara Report, ¶ 16; Stewart Dec, ¶ 6. The chart expresses the harmonies in both ways.

The chord progressions in the two songs at issue are identical for the first 24 seconds of Thinking Out Loud, and the same or similar progression appears in over 86% of Let's Get It On and 70% of Thinking Out Loud. Stewart Dec., ¶¶ 5-13; Ferrara Report, ¶ 17. The chord progression was not commonplace when Let's Get It On was written. Stewart Dec., ¶ 7.

**B.     Harmonic Rhythm**

Harmonic rhythm is the rate of change of chords. Ferrara Report, p. 4; Stewart Dec., ¶ 14. In Let's Get It On, the harmonic rhythm of the four-chord progression is distinctive in that the second and fourth chords are "anticipated" or placed ahead of the beat. Stewart Dec., ¶¶ 14-15 See Def. Brief, p. 16. The anticipated second and fourth chords gives the musical work a distinctive rhythm or swing - a relaxed, confident groove. Stewart Dec., ¶¶ 14-16. The distinctive harmonic rhythm in Let's Get It On is notated on the sheet music deposit copy by the careful placement of the chord changes above particular lyrics. Stewart Dec., ¶ 14. The harmonic rhythm of the four-chord progression in Let's Get It On also occurs throughout Thinking Out Loud. Stewart, Dec., ¶ 17. The defendants have only identified one song that pre-dates Let's Get It On with the same chord progression and harmonic rhythm, "Georgy Girl." Stewart Dec., ¶ 23.

Defendants claim that "harmonic rhythm – which derives from the exceedingly common and unprotectible harmonic progression" is unsourced and a false statement. *Id.* Harmonic rhythm, or the rate of change of chords, is independent from the chord progression and is not derived from it. Stewart Dec., ¶ 18. The same chord progression can have any number of different harmonic rhythms. Stewart Dec., ¶ 18. The anticipated second and fourth chord harmonic rhythm of Let's Get It On is distinctive and is copied in Thinking Out Loud. Stewart Dec., ¶ 17; Ferrara Dec., ¶ 8 ("the second and fourth chord anticipate the third beat of their

respective bars."). Finally, the harmonic rhythm of Let's Get It On is not found in any of the instructional books cited by Dr. Ferrara. Stewart Dec., ¶ 23.

It must be noted that defendants' expert Dr. Ferrara changed his definition of harmonic rhythm in his declaration from his initial report in an obvious attempt to create a difference in the harmonic rhythms of the two works. Dr. Ferrara's initial report correctly states that harmonic rhythm is "the rate of change of chords." Ferrara Report, ¶ 7(b) (citing The Harvard Dictionary of Music (Fourth Edition, 2003, Harvard University Press, p. 376)(Grove, Vol. 10, 854)). In his declaration, Dr. Ferrara now has changed the definition to "the pace at which the chords are *played* or change." The rate at which chords are played is not the definition. Stewart Dec., ¶ 18. The defendants seize on Dr. Ferrara's definitional change to manufacture purported differences in harmonic rhythm that do not exist. Def. Brief, p. 16; Stewart Dec., ¶ 19.

Defendants claim that "[t]o achieve the same harmonic rhythm in both works, one would need to cut in half the value of the notes and chords in the LGO Deposit Copy." Def. Brief, p. 16. However, this is another manufactured difference because Let's Get It On can be written as a two-bar progression (as in Dr. Ferrara and Dr. Stewart's transcriptions) or a four-bar progression (as in deposit copy) without changing the internal relationship of the rhythms. Stewart Dec. ¶ 22.

## C.     Vocal Melody

The "hook" or chorus of Let's Get It On – "Let's get it on – sugar – Let's get it on"- is the most memorable part of the song and features a distinctive and memorable, eleven note pitch sequence 6-5-3-2-6-5-3-5-6-5-3, which features the song's title as a lyric. Stewart Dec., ¶ 57. This melodic hook is substantially copied and used as the verse melody in Thinking Out Loud, including in the opening lines of the song. Stewart Dec., ¶ 58.[5]

---

[5] A related melody, Melody "A" is also used in the opening line of Let's Get It On.  Stewart Dec., ¶¶ 64-68. Melody "B" from Let's Get It On is used as the chorus melody in Thinking Out Loud. Stewart Dec., ¶¶ 69-72.



Let's Get It On – melodic hook

Thinking Out Loud - verse

The similarity of these melodies is best evidenced by defendant Ed Sheeran himself. In November, 2014, he was performing an acoustic version of Thinking Out Loud in concert in Zurich. Frank Dec., ¶ 3, Video Exh. 1. In the middle of the performance, Sheeran began singing the chorus of Let's Get It On and then transitioned back to Thinking Out Loud. The two songs flowed seamlessly together and the audience was quite pleased. Frank Dec., ¶ 3, Video Exh. 1. Stewart Dec., ¶ 4.

This and other melodies identified by Dr. Stewart in Let's Get It On are substantially similar (although not identical) to the melodies in Thinking Out Loud. Stewart Dec., ¶¶ 62-75. While there some differences in the pitch sequences in the two songs, these are minimized by the overall extreme similarity of the accompaniment that underpins these melodies (harmony, harmonic rhythm, bass melody, drum part, tempo). Stewart Dec., ¶¶ 59, 63, 71. As the court noted in *Swirksy v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004), "no [musicological] approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key, and thereby support a conclusion that compositions are dissimilar as a matter of law. It is these elements that determine what notes and pitches are heard in a song and at what point in the song they are found. To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis."

### D.    Syncopated Bass Line Melody

The basic bass lines in Let's Get It On and Thinking Out Loud are on scale degrees 1-3-4-5, in which 3 and 5 are syncopated or anticipated. Frank Dec., ¶ 4, Exh. 3, p. 2; Stewart Dec., ¶ 25. Dr. Ferrara transcribed the pitch sequence in the bass line in the first 24 seconds of Thinking Out Loud and in Let's Get It On almost identically in his initial report (reproduced below). Stewart Dec., ¶ 26-27; Frank Dec., Exh. 4 (Ferrara Initial Report, p. 6). The arrows (not included in Dr. Ferrara's Report) indicate the bass notes implied by the chord names and their metric placement in the deposit copy. Stewart Dec., ¶ 25.



The bass-line melodies in Let's Get It On and Thinking Out Loud feature a distinctive "descending sixth" note – in the transcription below, the "3" following "1".[6]  Stewart Dec., ¶¶ 33-39.

---

[6] The bass line of the first 24 seconds of Thinking Out Loud is performed on the guitar. Stewart Dec., ¶¶ 24-25; Ferrara Report, ¶ 50, 52 ("the lowest notes in the opening guitar part in TOL . . . embody greater similarity to the bass guitar line in LGIO RP"); ¶ 60 ("the lowest notes in the guitar part in TOL, which are the 'bass line' for only the first 24 seconds of TOL"). An additional bass part, "bass line B" is added to Thinking Out Loud at 24 seconds and occurs contemporaneously with the original bass part throughout the rest of Thinking Out Loud. Stewart Dec., ¶ 39. Bass line B "doubles" the descending sixth note ("3") with ascending third ("3"). This also occurs in Let's Get It On where the descending sixth note ("3") in the bass line is doubled by an ascending third ("3") of additional bass part on the saxophone. Stewart Dec., ¶ 39-40.



The usual way of playing the "3" after the "1" would be to move up the scale, or ascend, to "3". Stewart Dec. ¶¶ 33-39. Instead, Let's Get It On features the unusual choice of leaping[7] downward by six intervals for the "3", resulting in a distinctive melody and musical expression. SUF, 132 (discussing the same in the context of another melody); Stewart Dec., ¶¶ 33-39; Farkas Dec. Exh. 4 (Ferrara Report, Visual Exh. F, p. 4) ("the attached transcription shows the first iteration of the bass line in 'Thinking' has a leap down from 1 to 3 that is similar to 'Let's'.") Dr. Ferrara's phrase, "a leap down from 1 to 3" has the same meaning as a "descending sixth." Stewart Dec., ¶ 37. Dr. Ferrara also confirmed that the published sheet music for Thinking Out Loud includes a descending sixth.[8]  Ferrara Report., ¶ 64.

In addition, the bass lines in both works develop in the same way. An additional and identical bass note (circled in blue) is added to the bass line during the course of Let's Get It On (in measures 9 and 10) and Thinking Out Loud (in the last chorus) Stewart Dec., ¶ 41. *Further*, what was previously the only uncopied note from the Let's Get It On's bass line (sole black note above) appears in the final chorus of Thinking Out Loud (circled in green). Stewart Dec., ¶ 41. The bass line from Let's Get It On is completely reproduced in the last chorus of Thinking Out

---

[7] "A 'leap' skips one or more scale degrees (e.g., from 1 to 6)". Ferrara Report, n. 14.
[8] In addition, in both songs, the descending sixth note is "doubled" by an ascending third note in an additional bass line melody (saxophone in Let's Get It On and bass guitar in Thinking Out Loud). Stewart Dec., ¶¶ 39-40.

Loud (the red notes indicate the same pitch, though Let's Get it On descends and Thiking Out Loud ascends). Stewart Dec., ¶¶ 41-42.



### E.    Drum Composition

It is a triable issue of fact whether the drum part of musical composition is protectable. *Vargas v. Pfizer, Inc.,* 418 F.Supp.2d 369, 372 (S.D.N.Y.2005); *New Old Music Group, Inc. v. Gottwald*, 122 F.Supp.3d 78, 97 (S.D.N.Y. 2015). The drum part in Let's Get It On is a creative combination of eighth note closed hi-hats, accented snare drums on 2 and 4 and syncopated notes on the bass, or "kick", drum. Stewart Dec., ¶ 45. The drum part in Let's Get It On is virtually completely reproduced in Thinking Out Loud.  Stewart Dec., ¶ 45; Ferrara Report ¶ 70; Musical Example 4, p. 24. The importance of the extremely similar drum part in Thinking Out Loud cannot be overstated. Defendant, Ed Sheeran, commented to his manager that the drums in the Thinking Out Loud made it sound like Let's Get It On. Frank Dec., ¶ 14, Exh. 13.

In both works, the first appearance of the drum set rhythms begins with a crash symbol (circled in blue below):



Stewart Dec., ¶ 46; Ferrara Report, Musical Example 4, p. 25. Following the opening measure of each song, the drum set rhythms are virtually identical. Stewart Dec. ¶ 47; Ferrara Report, Musical Example 4, p. 25. The drum parts of Let's Get It On and Thinking Out Loud both include eighth-note high hats, snare drum on 2 and 4, bass drum on the "1" and syncopated on the "and" of two and the "and" of three. Stewart Dec. ¶ 47.



As shown above, one small difference is that there is an additional bass drum on the "4" of Let's Get It On that doubles the snare that is not present in Thinking out Loud. Stewart Dec., ¶ 48. This difference is insignificant because the snare drum in Thinking Out Loud (and Let's Get it On) also "attacks" on the "4" so that bass drum is "doubling" its effect. Stewart Dec., ¶ 48. The syncopated bass drum attacks on the "and" of 2 and 3 are the material element of the drum part in both works because they give Let's Get It On and Thinking Out Loud their off-beat swing and accent or reinforce the syncopated "3" and "5" bass notes in the bass line melody that simultaneously occur . Stewart Dec., ¶ 48.

The particular combination of these elements in the drum part in Let's Get It On and copied in Thinking Out Loud is not found Dr. Ferrara's prior art. Stewart Dec., ¶ 49. Dr.

Ferrara's examples of prior art, "Papa's Got A Brand New Bag" and "Out Of Sight" are plainly off the mark. Stewart Dec., ¶ 49.  First, Papa's uses open hi-hats which are compositionally different, and notated differently (with an 'o' above hi-hat) than closed hi-hats (no 'o' above hi-hat) used in Let's Get It On and Thinking Out Loud. Stewart Dec., ¶ 50; Farkas Dec., Exh. 4 at Exh. I. See *New Old Music*, at 87 ("the fact that **Dr. Ferrara** himself notated open and closed hi-hats differently belies the assertion that such differences are not compositional elements.") (emphasis added).[9] In addition, Papa's features rim clicks which are compositionally different and notated differently than snare drums attacks (with an "x" instead of a note head). Stewart Dec., ¶ 50. Rim clicks (crisp clicks of drumstick on the rim of a drum) are of much shorter duration than the longer resonating note on the full snare drum head. Stewart Dec., ¶ 50. The tempo of Papa's is 130 beats per minute is extremely different than Let's Get It On. Stewart Dec., ¶ 50; Farkas Dec., Exh. 4 at Exh. I.



Stewart Dec, ¶ 51.

Similarly, Out of Sight does not have any hi-hats at all, and instead uses a ride cymbal, which has a more legato (longer duration) than even open hi-hats and is also compositionally different and the tempos are very different as reflected in their notation on ledger lines above the staff as can be seen below. Stewart Dec., ¶ 52; Ferrara Report, ¶ 74 (stating it is a "ride cymbal

---

[9] Dr. Ferrara was the defendants' expert witness in New Old and notated the open and closed hi-hats differently in compositional form. *New Old Music*, at 87. His claim here that the rhythm in Papa's is "identical" to Thinking Out Loud, despite the open hi-hats in Papa's is plainly inaccurate. The Court in *New Old Music* pointed out inconsistencies in Dr. Ferrara's testimony in that case as well.

pattern"). In addition, "Out Of Sight" also features rim clicks which are compositionally different and a very different tempo.  Stewart Dec., ¶¶ 51-52.



Finally, all of the instruction books cited by Dr. Ferrara purporting to contain similar drum parts as Let's Get It On were all published more than 10 or 20 years **after** Let's Get It On was written and so have no value regarding the originality of the drum part. Stewart Dec., ¶ 54. Farkas Dec. Exh. 4 at Exh. I (published in 1996); Exh. J (published in 1997); Exh. K (published in 1982); Exh. L (published in 1997)).

**F.      Key, Tempo, Meter, & Genre**

Let's Get It On and Thinking Out Loud share nearly identical keys, tempos, meter, and genres. Let's Get It On is in the key of E flat major, has a tempo of 82 beats per minute, is in 4/4 time, and is a rock or soul ballad. Stewart Dec., ¶¶ 2, 79; Ferrara Dec., ¶ 16. Thinking Out Loud is in the key of D major, has a tempo of 79 beats per minute, is in 4/4 time, and is a rock or a soul ballad. Stewart Dec., ¶¶ 2, 79. The key of D major is the closest key to E Flat major; D major is a "half step" or "semitone" below E flat). Stewart Dec., ¶ 79.

| | Melody | Harmony | Harmonic Rhythm | Bass | Drums | Key | Tempo | Genre |
|---|---|---|---|---|---|---|---|---|
| LGO | 6-5-3-2-6-5-3-5-6-5-3 | I-iii-IV-V | Anticipated 2nd and 4th chords | 1-3-4-5 | Hi-hat: 8th Snare: 2, 4 Bass: 1, &(2), &(3), 4 | Eb | 82 bpm | Rock/Soul Ballad |
| TOL | 6-5-3-2-1-2-3-6-1-3-5-6-5-3 | I-iii-IV-V | Anticipated 2nd and 4th chords | 1-3-4-5 | Hi-hat: 8th Snare: 2, 4 Bass: 1, &(2), &(3) | Dmaj | 79 bpm | Rock/Soul Ballad |

**Yellow column is notated on deposit copy. Green is implied.**

As defendants' own expert has previously opined, the fact that two songs share the same tempo can be probative of copying. *New Old Music* at n. 9 ("as "**Dr. Ferrara** himself suggests, the fact that two songs share the same tempo can be probative of copying.")(citing *Glover v. Austin*, 289 Fed.Appx. 430, 432 (2d Cir. 2008)(emphasis added). The same is true in the substantial similarity context. *Id.* (citing *Levine v. McDonald's Corp.*, 735 F.Supp. 92, 97 (S.D.N.Y.1990) (use of "rapid tempo" may be protectable in "compilation" with other elements); *see also Swirsky,* 376 F.3d at 848 n. 13.

### G.   Defendants Do Not Dispute Copying "Let's Get It On" in "Thinking Out Loud"

Prior art may be used to rebut an inference of copying, *Baxter v MCA Inc.*, 812 F.2d 421, 425 (9th Cir. 1987), however, the defendants do not dispute copying Let's Get It On.[10] Accordingly, the prior art is irrelevant.

Defendants' cite to *Allen v. Scholastic Inc.*, 739 F.Supp.2d. 642, 655 n.122 (S.D.N.Y. 2011) for the holding that "expert musicologists can opine . . . whether constituent elements of [the infringed work] existed in prior art and that it is therefore not original to the plaintiff," however nothing remotely close to this sentence appears in *Allen*, nor could it as it is contrary to well settled law. *Vargas* at 373 ("the presence of similar compositions or elements of the composition in other works is irrelevant in assessing originality"); *Fred Fisher*, 298 F.145 (L.Hand)("it is [no] defense that there was in the prior art substantially the same figure."). The only question then is whether Thinking Out Loud bears substantial similarity to Let's Get It On.

---

[10] Independent creation is an affirmative defense to copyright infringement. *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). "Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

## POINT V

### THINKING OUT LOUD BEARS SUBSTANTIAL SIMILARITY TO PROTECTED EXPRESSION IN LET'S GET IT ON

A plaintiff must show that the portion of the work that was actually copied amounts to an "improper or unlawful appropriation." *New Old Music*, at 93 (citing *Jorgensen*, 351 F.3d at 51). In order to show that "improper appropriation" has occurred, a plaintiff must establish that "a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." *New Old Music* (citing *Hamil*, 193 F.3d at 99). In order to determine if there is a substantial similarity between two music works, courts normally apply the ordinary observer test. *Id.* (internal citation omitted). The plaintiff must prove that defendant "took from plaintiff's work so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such . . . music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997)(quoting *Arnstein v. Porter*, 154 F.2d 464, 473 (2d Cir.1946).

### A.  The Appropriate Inquiry is Quantitative and Qualitative Significance of the Copied Material to the Original Work

The appropriate inquiry under the substantial similarity test is whether "the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred. *Warner Bros. Entertainment v. RDR Books*, 575 F.Supp.2d 513, 534 (citing Ringgold, 126 F.3d at 75, (2d. Cir. 1997). *TufAmerica,* 968 F.Supp.2d 588, 598 (S.D.N.Y. 2013). The relevant "question in each case is whether the similarity relates to matter that constitutes a substantial portion of [the pre-existing] work—not whether such material constitutes a substantial portion of [the allegedly infringing] work." *TufAmerica,* 968 F at 599 (quoting *Williams v. Broadus,* 2001 WL 984714, at *3 (S.D.N.Y.2001)) (alterations in original).

Quantitatively, the combination of elements is present in 86% of Let's Get it On and is repeated throughout it. Qualitatively, the combination of elements provides the entire harmonic and rhythmic foundation of Let's Get It On as well as the central melodic hook of the song. Stewart Dec., ¶P 56-61. The combination of rhythm, harmony and melody is present in 70% of Thinking Out Loud and is what gives Let's Get It On its defining and distinctive relaxed, confident swing. Stewart Dec., ¶ 76. A reasonable juror could find that defendants "took from plaintiffs' work so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such . . . music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff." *Repp.*, 132 F.3d at 889.

Full score comparisons reveal the extent of the similar identity of the two works. The top two lines or staves of Let's Get It On are taken directly from the deposit copy and closely track the recording. **Of the 93 notes depicted in the transcription of Thinking Out Loud below, which includes all the significant parts of the first part of the second verse, all but 12 notes, or 87%, are found in the chorus of Let's Get It On.**

### FULL SCORE COMPARISON

Let's Get It On, chorus



Thinking Out Loud, 2nd verse



The similarities identified above in the second verse of Thinking Out Loud, are also present in the first verse (without drums and with the basic bass line melody). Stewart Dec., ¶ 78. The chorus sections of Thinking Out Loud also contain the chord progression, harmonic rhythm, drum parts and bass lines. Stewart Dec., ¶ 78. These verses and choruses constitute 70% of the entire song. Stewart Dec., ¶ 76.

**B.      The Combination of Elements in Let's Get It On is Protectable**

Even assuming that the individual elements are not original, the "selection, coordination, and arrangement" of the copied elements in Let's Get It On is sufficiently original, *i.e.,* contains a modicum of creativity, that Let's Get It On is protectable. *New Old Music quoting Knitwaves* ("unoriginal elements, combined in an original way, can constitute protectable elements of a copyrighted work."). "[P]lagiarism of any substantial component part, either in melody or accompaniment, would be the proper subject of [a copyright infringement] suit*." Fred Fisher v Dillingham*, 298 F. 145, 147 (S.D.N.Y. 1924). Substantial similarity can be found in a combination of elements such as chord progression, key, tempo, rhythm, and genre, even if those elements are individually unprotected. See, *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004). Defendants have not shown that the combination of harmony and harmonic rhythm, existed in

prior art let alone in combination with the melody or the drum part and bass line. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345 (1991) ("Originality, as the term is used in copyright, "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.)"

## C.    Total Concept and Feel

Defendants argument that by changing the words of the song to reflect a more somber tone, they have changed the total concept and feel of the copied musical expression, should be rejected. Def. Brief, 5, 24 (Thinking Out Loud is "somber" and Let's Get It On is "positive"). See *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d. 267(6th Cir. 2009) (where defendants literally copied the rhythmic musical element "the overall concept or tone of the work was not relevant to the jury's task").

In a last-ditch effort, defendants argue that substantial similarity cannot exist because Thinking Out Loud has additional "parts" that were not copied from Let's Get It On and that are not in dispute. Def. Memo, pp. 4 (lyrics, additional bass-guitar line, additional chord progressions). In *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127 (2d Cir. 2003) the Second Circuit held it was error to grant summary judgment by analyzing the "total concept and feel," or "overall aesthetic," of the works without considering whether "*material portions* of the [defendants' work] infringed on corresponding parts of the [plaintiff's work.]" *Id.* at 135. The court concluded that whatever effect the addition of certain elements in the defendants' work would have on a comparison of the two works' "overall feel," it did not "alter the fact that the rest of the [defendants' work] is a near—exact copy of the [plaintiff's work], and therefore infringing." *Id.* at 137. Likewise here, we ask the Court to consider whether the plaintiff's work "selected, coordinated, or arranged uncopyrightable [elements] in an original

way," and whether the subsequent work "feature[s] the same selection and arrangement." *Id.* at 136 (quoting *Feist,* 499 U.S. at 362, 349, 111 S.Ct. 1282). It is "entirely immaterial that, in many respects, plaintiff's and defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown." 4 Nimmer § 13.03(B), at 13–52 to 53. "It is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corporation*, 81 F.2d. 49 (2d Cir. 1936)(L. Hand).

**D.     Musical Compositions are Entitled to Broad Copyright Protection**

Musical compositions are entitled to broad copyright protection. *Williams v. Gaye*, 2018 WL 1403577, *6 (9th Cir. 2018)("the Gayes need not prove virtual identity to substantiate their infringement action."). Defendants argue that plaintiff's copyright in Let's Get It On enjoys only thin protection because it is a combination of unprotectable elements. Def. Brief. p. 4, 18. First, case law is clear that 'thin' protection applies factual compilations such as phone books, not musical works. *Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*, 945 F.2d 509, 514 (2d Cir. 1991)(even thin copyright is "not anorexic").

Second, the cases cited by defendants do not support their argument that copying must be identical in order be infringement. See *Beaudin v. Ben and Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996)(rejecting defendants' claim that "identical copying" was required); *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 107 (2d Cir. 2014)("close copying" sufficient). The protection of a copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corporation*, 45 F.2d 119, 121 (2d Cir. 1930).

**E.     Disagreement Between Opposing Experts Makes Summary Judgment Inappropriate**

It is black letter law that the "question of whether particular elements of a work

demonstrate sufficient originality and creativity to warrant copyright protection [is] a question for

the factfinder." *Matthew Bender & Co., Inc. v. West Pub. Co.,* 158 F.3d 674, 681 (2d Cir. 1998);

*Tin Pan Apple, Inc. v Miller Brewing Co., Inc.,* 1994 WL 62360, at *4 (S.D.N.Y. 1994)(plaintiffs

"entitled to test their claims of originality at trial."). The case law is clear that it is inappropriate

for this Court to decide the issue of summary judgment in defendants' favor where the experts

disagree on whether the composition of Lets' Get It On is original. See *Ulloa v. Universal Music*

*& Distribution, Corp.,* 303 F.Supp.2d 409, 413 (S.D.N.Y. 2004); *Lessem,* 766 F.Supp.2d 504,

512; *Levine,* 735 F.Supp.2d 92.

## POINT VI

## THE COPYRIGHT IN LET'S GET IT ON IS NOT LIMITED TO SHEET MUSIC

In an effort to avoid liability, defendants seek to arbitrarily limit the substantial similarity

at issue, and avoid liability, by arbitrarily reducing the the scope of copyright in "Let's Get It

On" to the "metes and bounds" of the deposit copy without regard to the Marvin Gaye recording

from which it was transcribed. As shown below, the express terms 1909 Copyright Act and case

law make clear that composition as embodied on the Marvin Gaye recording must be considered

because it is the first mechanical reproduction of Let's Get It On.

**A.     The Musical Expression Embodied On the "Let's Get It On" Single is the
        Copyrighted Work**

It is undisputed that the Marvin Gaye recording of Let's Get It On is the first recording of

this musical work. SUF ¶ 32. The deposit copy is based on, derived, and transcribed from the

Marvin Gaye recording. Stewart Dec., ¶ 81. As explained below, this fact cannot be disputed.

The demo version of Let's Get It On was recorded on March 13, 1973 and was released

for the first time in 2001 on the Motown album, Let's Get It On (Deluxe Edition). Frank Dec.,

Exh. 9. The demo version contains many different lyrics that are not included on the single

version, such as "Understanding and brotherhood" and "everybody ought to try and do some

good."  Stewart Dec. ¶ 85, Frank Dec., ¶ 3 (Audio Exh. 1); ¶ 11, Exh. 10. On March 22, 1973,

Gaye and Townsend reconvened to cut the lead vocals for Let's Get It On and Gaye

"recomposed the words to Let's Get It On". Farkas Dec., Exh. 14 at page 8 of 9; Frank Dec., ¶

10, Exh. 9.

The sheet music deposit copy for Let's Get It On is a word-for-word transcription of the

"recomposed" lyrics from the single version recording of Let's Get It On. Stewart Dec., ¶ 84. It

is therefore impossible that the sheet music deposit copy was created before Let's Get It On was

recorded, since it contains the lyrics recomposed by Marvin Gaye. Stewart Dec., ¶ 84. The

copyright application for Let's Get It On for which the sheet music was deposited was filed on

July 17, 1973. SUF ¶ 2016; Farkas Dec., Exh. 12 at p. 7 of 12. [11]

In addition to the tell-tale lyrics, the deposit copy is a direct transcription of the melody,

harmony, and harmonic rhythm from the single version of the recording. Stewart Dec., ¶¶ 85-86;

SUF ¶ 73, 75. The exactness of the melodies, including inflections and melismas, can only be the

---

[11] The application indicates the date of publication as February 14, 1973, however as demonstrated above, this is
clearly a mistake made as a result of the intervening four months between the time Let's Get It On was recorded and
the copyright registration application was filed.  Errors in publication date do not affect the validity of the copyright.
*United States v. Backer*, 134 F.2d 533 (2d Cir. 1943)(copyright duly registered despite error in publication date
because no prejudice to defendant); *Davis v. E. I DuPont de Nemours & Co.*, 240 F.Supp.612, 625-626 (S.D.N.Y.
1965)(in absence of prejudicial reliance, error of 27 days does not invalidate copyright)(citing cases); 2 Nimmer on
Copyright § 7.20[B][1] ("[A] misstatement or clerical error in the registration application, if unaccompanied by
fraud, should neither invalidate the copyright nor render the registration certificate incapable of supporting an
infringement action."); *Roberts v. Gordy*, 877 F.3d 1024, 1030 (11th Cir. 2017)(*L.A. Printex Indus., Inc. v.
Aeropostale, Inc.*, 676 F.3d 841, 853 (9th Cir. 2012); see also *Archie MD, Inc. v. Elsevier, Inc.*, 261 F.Supp.3d 512,
520 (S.D.N.Y. 2017) (stating that the applicant must subjectively know of the inaccuracy when preparing the
application).

result of transcription from the recording and cannot be the "instructions" for Marvin Gaye's vocal performance on the recording. Stewart Dec., ¶ 81; SUF ¶¶ 73, 75. The deposit copy has the same chord placements, structure/form and number of measures as the single version. Stewart Dec., ¶ 86. Defendants concede that, "[i]f the LGO Deposit Copy was created after and were based on the LGO Recording, then it surely would have had the same structure as the LGO Recording." Def. Brief, p. 12, n.11. In fact, it does. Stewart Dec., ¶ 86.

**B.      The 1909 Act Extended Copyright to the First Recording of the Musical Work**

The design of the 1909 Act was to extend a musical composition's copyright to its first mechanical reproduction. This was a legislative compromise between the interests of the music industry and the tech industry (the manufacturers of player pianos) that arose from the Supreme Court's decision in *White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1 (1908). See Bowker, Copyright – Its History and Its Law (1912) at 204. In *White-Smith*, the Supreme Court held that mechanical reproductions such as player piano rolls did not constitute copies of musical compositions, and therefore the copyright owner of the musical composition had no statutory right to stop others from selling player piano rolls of their popular copyrighted musical works or to receive a royalty for their sale. Justice Holmes's concurring opinion invited Congress to change the law. *Id.* at 18-20 (Holmes, J. concurring).

In response, the 1909 Copyright Act gave the owner of copyright in a musical composition the exclusive right to decide whether any mechanical reproductions could be made, by granting the copyright owner the exclusive right to make the first mechanical reproduction. *G. Ricordi & Co. v. Columbia Graphophone Co.*, 263 F. 354, 355 (2d Cir. 1920). As a compromise to the player piano industry (who were now losing the unfettered right to make piano roll copies of popular songs without permission), the 1909 Act provided that, once the copyright owner

elected (at his sole discretion) to permit a mechanical reproduction to be made, then any other

person could also do so by paying a statutory royalty. Bowker, at 204; 1909 Act § 1(e).

The former part of this compromise is delineated in Section 1(e) of the 1909 Act, which

extended copyright protection to – "any system of notation or *any form of record in which the*

*thought of an author may be recorded* and from which it may be read or reproduced." Copyright

Act of 1909 §1(e), 35 Stat. 1075 (1909) (repealed 1978) (emphasis added). In addition, §1(e)

extended the musical composition copyright to:

> . . . secure copyright controlling the parts of instruments serving to reproduce
> mechanically the musical work . . extending copyright control to such mechanical
> reproductions.

Id. By its terms, the 1909 Act Section 1(e) "extend[ed] copyright control to such mechanical

reproductions" as a new "phase" of the copyright. *F a Mills, Inc. v. Standard Music Roll Co*, 223

F.849, 852 (D.N.J. 1915) ("Subsection 'e' [of the 1909 Act] confers and deals with *certain phases*

of a new copyright"). The case law discussed below is clear that scope of copyright protection

extends to the embodiment in the first mechanical reproduction (or recording) of the work.

**C.**     **Copyright Protection Extends to a Work's Embodiment on the First Recording**

In *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000), Michael Bolton made

the argument made by defendants here, that the sheet music deposited by the Isley Brothers, for

their work, "Love is a Wonderful Thing," "differed from their recorded version of the song" and

that "the deposit copy does not include the majority of the musical elements that were part of the

infringement claim." The Ninth Circuit rejected this argument and found that plaintiffs had

deposited a "complete copy" of the work, even though the first recording contained infringed

elements that were not included (or different from) the deposited lead sheet: "Although the 1909

Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright

office, our definition of 'complete copy' is broad and deferential." *Id. Three Boys* squarely holds that the scope of copyright in a musical composition under the 1909 Act is not limited to the deposited lead sheet, but extends to elements in the first recording.

In *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267 (6th Cir.2009), the Sixth Circuit rejected the argument that a copyright was limited to the deposited sheet music and did not include elements that existed only in a sound recording of the work, holding, "testimony at trial established that the song was composed and recorded in the studio simultaneously and, therefore, that the composition was embedded in the sound recording." Id. at 276.[12]

The defendants cite *Williams v. Bridgeport Music, Inc.*, 2014 WL 7877773, at \*9 (C.D.Cal. 2014) in support of their argument. However, this is not helpful to them because the reasoning was rejected on appeal. In *Williams*, the district court held that a sound recording of the work alleged to have been infringed could not be played at trial because it differed from the deposit copy lead sheet. Nevertheless, the jury found the deposit copy was infringed. On appeal in that case, the Ninth Circuit, upheld the jury's award for infringement of the deposit copy. Although it was not at issue on appeal since the plaintiff had prevailed, the Ninth Circuit rejected the district court's reasoning to exclude the sound recording from the jury's consideration stating, "[t]o our knowledge, the [defendants] position had not found support in case law until the district court's ruling." *Williams v. Gaye*, 895 F.3d 1106, n.9 (9th Cir. 2018). The Ninth Circuit then cited case law holding the opposite, including *Three Boys* (discussed above). Finally, the Ninth Circuit noted that deposit copies do not have a copyright function, only an archival function:

---

[12] By analogy, see also *Midway Mfg. Co. v. Arctic Intern., Inc.*, 547 F.Supp.999 (N.D.Ill. 1982)(holding that a deposit of video tape of "attract mode" in Pac-Man was sufficient to extend copyright protection to the entire game, not just the elements on the video tape, because the video tape was copied from the game).

> The function of deposit is to provide the Library of Congress *via* the Copyright Office with copies and phonorecords of all works published within the United States," and that the argument "that deposit has a copyright as well as an archival function" is "attenuated by the fact that the Library of Congress need not add all deposited works to its collection" or "preserve those works which it does add to its collection.

Id. citing 2 Nimmer on Copyright § 7.17[A] (2017).

There is no prejudice to defendants in deciding that Let's Get It On, as embodied on the Marvin Gaye recording, is the copyrighted work at issue, and the defendants cannot claim that any prejudice would exist. For example, defendants do not claim to have viewed the deposit copy of Let's Get It On and relied on the absence of drum part transcription in deciding to copy the drum part. To the contrary, defendant Sheeran was familiar with the Marvin Gaye recording.

## D.    Policy Considerations Require that the Marvin Gaye Recording be Considered

By 1960, sheet music had greatly declined in relative importance as a medium of exploiting popular music.[13] As a result, records were frequently issued at the outset to test the public reaction, and sheet music might not be issued at all if the record failed to catch on. *Id.* Regardless, composers were compelled to create sheet music in order to have a copy to deposit in the Copyright Office with their copyright application, because until 1978, the Copyright Office would not accept a phonograph record as a deposit copy of a musical composition.

There is no case prior to 1978 that squarely addresses the significance of deposit copies. In other words, this was an argument that was never made in a case or had never come up. Accordingly, copyright owners had no reason to transcribe every element of every recording, particularly, when a lead sheet was deemed sufficient by the Copyright Office to issue a certificate of registration.[14] To now hold, 50 or 100 years after the fact, that entire generations of

---

[13] 1960 Copyright Office Study available at https://www.copyright.gov/history/studies/study5.pdf.

[14] It cannot be overlooked that many songwriters cannot read music, and even those who do would not necessarily know how to transcribe a drum part as it is not written with pitched notes. The expense of transcribing every part of

songwriters have failed to adequately to protect their copyrights from infringers, particularly where they are powerless now to change their deposits, would be a violent construction of the Act. A ruling in defendants' favor will proclaim "opening day" on the taking of the most iconic guitar riffs, bass lines and breakbeats to any company enterprising enough to index the greatest instrumental omissions from the deposit copies of the world's most popular works.

**E.     There is Substantial Similarity Between the Deposit Copy Elements of Let's Get it On and Thinking Out Loud**

Even if the Court does not consider the elements of Let's Get It On embodied on the sound recording, there is substantial similarity of protectible musical expression between the Let's Get It On deposit copy and Thinking Out Loud. Stewart Dec. ¶¶ 3-4. The identical and distinctive rhythmic expression of anticipated second and fourth chords of the 1-iii-IV-V chord progression and implied basic bass line melody in Let's Get It On and the substantially similar melodic hook in Let's Get It On and Thinking Out Loud is sufficient similarity to constitute infringement. Defendants have identified only one other musical work in the history of music with the same combination of chord progression and anticipated second and fourth chords, however, the substantially similar melodic hook in Let's Get It On copied in Thinking Out Loud, is not found in Georgy Girl.

### THE DEFENDANTS' STANDING ARGUMENT REGARDING KATHRYN TOWNSEND GRIFFIN IS WITHOUT MERIT

The defendants freely acknowledge the transfer of a beneficial interest in the copyright of Let's Get It On to Kathryn Townsend Griffin by Order of the California Probate Court.  (Doc. 72, defendants' State of Undisputed Facts, Fact 202).

The defendants' argument is, in essence, a proverbial "back door" request for this Court

---

every song of every recording have been prohibitive and the time expended by composers to transcribe every part would be at the expense of time spent creating new works in contrast to the purpose of copyright "[t]o promote the progress of science and useful arts." U.S. Constitution Article 1 Section 8 Clause 8.

to go behind and/or revisit the validity of the California Probate Court's Order as it relates

to the distribution of the Townsend Probate Estate's assets/property. This type of action

has long since been proscribed by Federal Case precedent pursuant to United States Supreme

Court case of *Markham v. Allen*, 326 U.S. 490, 491 (1946), in which the Court established the

time-honored "probate exception" to the jurisdiction of the Federal Courts as it relates to the

rulings and/or proceedings of state probate courts. This jurisdiction has routinely adhered to that

non-interference philosophy in repeatedly determining that Federal Courts lack the requisite

jurisdiction to adjudicate (or re-adjudicate) state probate matters. See *Lefkowitz v. Bank of New*

*York*, 676 F.Supp.2d 229 (S.D.N.Y. 2009); see also *Moser v. Pollin*, 294 F.3d 335 (2d Cir. 2002).

## Conclusion

For the reasons herein and in the accompanying papers, we respectfully request that the

Court deny defendants' motion for summary judgment should be denied.

Dated: September 7, 2018

FRANK & RICE, P.A.
Attorneys for Plaintiffs


By:      _____
Patrick R. Frank, Esq.
Keisha D. Rice, Esq.
Katherine L. Viker, Esq.
Frank & Rice, P.A.
325 West Park Avenue
Tallahassee, Florida 32301
Telephone: (850) 629-4168
Facsimile: (850) 629-4184
Attorney(s) for Plaintiffs