# EXHIBIT 17

# XII

## MECHANICAL MUSIC PROVISIONS

"Canned music" contest

As the international copyright provision with the manufacturing clause was the central feature of the copyright campaign culminating in the law of 1891, so the provision for the control of mechanical music with the compulsory license clause was the central feature of the contest culminating in the act of 1909. This came to be known as the "canned music" fight, and arguments pro and con consumed the greater part of the hearings before the Committees on Patents. The solution finally reached was in the provisos added to the musical subsection (e) of section 1 of the bill, which in full is as follows:

"(e) To perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit; and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or repro-

Mechanical music provisos

duced: *Provided*, That the provisions of this Act, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after this Act goes into effect, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights: *And*

*Provided further, and as a condition of extending the copyright control to such mechanical reproductions,* That whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of two cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the twentieth day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the twentieth of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit: *And provided further*, That it shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.

" In case of the failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand the court may award taxable costs to the plaintiff and a reasonable

*Margin notes:* Compulsory license · Damages

counsel fee, and the court may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this Act, not exceeding three times such amount.

**Public performance**

" The reproduction or rendition of a musical composition by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs."

This provision, though somewhat involved in form, tells its own story, and there has thus far been no occasion for judicial construction.

**The compromise result**

In the series of discussions before the Committees, the friends of copyright argued for the exclusive and unrestricted right of the musical composer to control absolutely the mechanical reproductions of his work, while the representatives of "canned music" argued at first that mechanical reproduction should be permitted without reference to copyright, and later that there should be entire liberty to make reproductions of a musical work on the sole condition of a specified payment to the copyright proprietor. The provision as actually adopted was a compromise upholding the negative right of the author to prevent mechanical reproduction, but requiring him, in the event of a grant of authority to any one manufacturer to reproduce his work mechanically, to extend that privilege to any other manufacturer on payment of the specified royalty. This scheme is practically modeled on what was known as the Pearsall-Smith royalty plan, which, as proposed for books, was stoutly fought by the proponents of the copyright act of 1891, throughout that memorable copyright campaign.

In the case of the White-Smith Music Pub. Co. *v.* Apollo Co., in which the Æolian Co. was supposed

to be the real complainant, the representatives of the musical author were, in 1906, denied protection against the mechanical music rolls made by the defendant, by the Circuit Court of Appeals, where the judges considered themselves "constrained" by the necessity of strict construction to decide that "a perforated roll is not a copy in fact of complainant's staff notation," while saying "that the rights sought to be protected belong to the same class as those covered by the specific provisions of the copyright statutes." It was presumed by many during the copyright campaign that the Supreme Court would make a broad construction of the statute, but that court held, February 24, 1908, in an opinion written by Justice Day, that the considerations adduced "properly address themselves to the legislative and not to the judicial branch of the Government" and that "as the act of Congress now stands, we believe it does not include these records as copies or publications of the copyright music involved in these cases." Justice Holmes, while not dissenting, added a memorandum to the effect that " the result is to give to copyright less scope than its rational significance and the ground on which it is granted seems to me to demand. . . . On principle, anything that mechanically reproduces that collocation of sounds ought to be held a copy, or if the statute is too narrow, ought to be made so by a further act, except so far as some extraneous consideration of policy may oppose." While the judges thus felt "constrained" to deny relief, their strong language in defense of copyright control doubtless had its effect upon the legislative authorities in the framing and the passage of the new code.

This decision was confirmatory of an earlier decision, in Stern *v.* Rosey in 1901, of Judge Shepard in the Court of Appeals in the District of Columbia,

206          COPYRIGHT

that the mechanical reproduction of two copyrighted songs could not be prevented under the existing law.

**Punishment of infringement**

Specific and elaborate provision is made for the punishment of infringers under the mechanical music proviso (sec. 1, e) by sec. 25, e:

"Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section one, subsection (e), of this Act: *Provided also*, That whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work relying upon the compulsory license provision of this Act, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in its discretion, in addition to sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section one, subsection (e), by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid."

**Notice to proprietor of intention to use**

The Copyright Office provides a special form (U) on a blue card for registration of "notice of use on mechanical instruments," in which the copyright owner of a musical composition gives notice that he "has used or has licensed the use of said composition for the manufacture of parts of instruments serving to reproduce mechanically such musical work." The recording fee for such notice, as fixed by the statute (sec. 61), is twenty-five cents for the first fifty words and twenty-five cents additional for each additional hundred words. Copyright Office form and fees

For recording and certifying the license referred to (sec. 1, e) the statute provides (sec. 61) for a fee of one dollar for not over three hundred words, two dollars if not over one thousand words and one dollar for each additional one thousand words or fraction thereof over three hundred words.

The actual fixing of a specified price, as that of two cents or a halfpenny on each reproduction, is a feature quite new in law, American or English, and involves a serious constitutional question. Congress has granted to the Interstate Commerce Commission, and state legislatures to specified authorities, as public service commissions, power to regulate prices; and the U. S. Supreme Court, in 1909, confirming the N. Y. Court of Appeals in the Consolidated Gas Co. cases, upheld the application of the sovereign power of the state to limit the price of gas to 80 cents per 1000 cubic feet, as sold by a corporation enjoying a public franchise. In this compulsory license provision of the copyright code, Congress has gone further in two directions: it has fixed a royalty price, not by definition or limitation of a "reasonable" price, but absolutely, and it has applied this provision not to a corporation enjoying franchise privileges, but to the individual owner of property created by his own labor. The constitutional question

**English law**     The English laws had not mentioned mechanical reproduction up to the musical copyright act of 1906, which in section 3 expressly provided that "'pirated copies' and 'plates' shall not, for the purposes of this Act, be deemed to include perforated music rolls used for playing mechanical instruments, or records used for the reproduction of sound waves, or the matrices or other appliances by which such rolls or records respectively are made." The test case meanwhile on this question was that of Boosey *v.* Whight, which was finally decided in the Court of Appeal in 1900, with respect to the use of copyrighted songs on the perforated rolls of the Æolian. Justice Sterling in the lower court had decided that the perforations were not an infringement of the copyright but that the marginal directions for playing might be such; Justice Lindley, M. R., held with him that the perforated roll was not a "copy" of the sheet music, but overruled him on the second point, holding that the directions, though copied from the printed page, were neither music nor a literary composition.

**The new British code**     The new British measure as prepared in 1910 included as incident to copyright the sole right "in the case of a literary, dramatic or musical work, to make any record, perforated roll, cinematograph film, or other contrivance by means of which the work may be mechanically performed or delivered," thus in the simplest fashion completely covering the control of mechanical reproduction in conformity with the convention of Berlin. But in the Parliament of 1911 the bill emerged from committee stage with an elaborate proviso, based on the American precedent, excepting from the definition of infringement contrivances for the mechanical reproduction of sounds on (1) proof that the copyright owner has previously acquiesced in mechanical reproduction, (2) prescribed notice of

Case 1:17-cv-05221-LLS  Document 85-1  Filed 09/28/18  Page 9 of 21

intention, and (3) payment of royalty of 2½ or 5 per
cent with a minimum of a halfpenny for each record,
or in the case of different works on the same record,
to each copyright proprietor.

When the international representatives met at
Berne in 1886, the mechanical reproduction of music
was confined chiefly if not wholly to Swiss music-
boxes and orchestrions and to hand-organs, of
comparatively little commercial importance; and,
possibly with some thought of the recognition of the
hospitality of Switzerland, little emphasis was placed
on the protection of musical composers against me-
chanical reproduction of their works. In fact, the final
protocol of the Berne Convention of 1886 contained,
as clause 3, the following paragraph: "It is under-
stood that the manufacture and sale of instruments
for the mechanical reproduction of musical airs which
are copyright, shall not be considered as constitut-
ing an infringement of musical copyright." *The Berne situation, 1886*

Despite strong representations at the congresses
of the International Association for the protection of
literary property, held at London in 1890, Neuf-
châtel in 1891, and Milan in 1892, and a vigorous
endeavor in connection with the Paris convention of
1896 to replace this clause, it was not modified until
the convention of Berlin in 1908, in preparation for
which a strong resolution was passed at the congress
of the International Association at Vevey in 1901. *Lack of action at Paris, 1896*

With the increasing development of the phono-
graph and of the mechanical player, mechanical re-
productions became so important a matter to musical
composers and publishers, that much of the discussion
in respect to the amendatory convention of Berlin of
1908 was upon this subject. In the amended conven-
tion, the subject was fully covered by article 13: *The Berlin provision, 1908*

"Authors of musical works have the exclusive right

to authorize: (1) the adaptation of these works t
instruments serving to reproduce them mechanically
(2) the public performance of the same works b
means of these instruments.

"The limitations and conditions relative to the ap
plication of this article shall be determined by th
domestic legislation of each country in its own case
but all limitations and conditions of this nature sha
have an effect strictly limited to the country whic
shall have adopted them.

"The provisions of paragraph 1 have no retroactiv
effect, and therefore are not applicable in a countr
of the Union to works which, in that country, sha
have been lawfully adapted to mechanical instru
ments before the going into force of the presen
Convention.

"The adaptations made by virtue of paragraphs
and 3 of this article and imported without the author
ization of the parties interested into a country wher
they are not lawful, may be seized there."

**German precedents**    In Germany, under the general copyright law c
1870, the higher courts gave to musical composer
control over mechanical reproductions from which, a
the industry grew, the authors or publishers obtaine
some little return. But succeeding the adoption c
the permissive clause in the Berne convention c
1886, it was proposed in the new copyright law to fre
mechanical reproductions from the control of th
composer. A protest was at once made by musica
authors and publishers, which resulted in a modifica
tion of the form proposed by the government and th
addition of a clause giving control where the repro
duction involved personal interpretation. In this forr
the "unfortunate section 22" became part of the la
of 1901 relating to copyright in literary and musica
works. Section 22 was in the following language:

## MECHANICAL MUSIC   211

"Reproduction is permitted when a musical composition is, after publication, transferred to such discs, plates, cylinders, bands and similar parts of instruments for the mechanical rendering of pieces of music. This provision is applicable also to interchangeable parts, provided that they are not applied to instruments by which the work can, as regards strength and duration of tone and tempo, be rendered in a manner resembling a personal performance."

This had the extraordinary and contradictory effect of giving the author control over the finer reproductions of his works but denying to him any control over the cruder reproductions, as on hand-organs, orchestrions, etc. The opposition which developed against this impossible situation was largely influential in bringing about the modification at Berlin in 1908 of the Berne clause. The law of May 22, 1910, amended the previous general laws in conformity with the Berlin convention, especially by extending protection to the mechanical reproduction of music and cinematograph reproduction of artistic works. Section 22 of the law of 1901 was specifically replaced by an elaborate section, modeled on the American compulsory license provision and requiring a composer who permitted mechanical reproduction to grant similar rights on equal terms to any other manufacturers domiciled in Germany, with provisions for reciprocity and for the treatment of non-German composers through the tribunals of Leipzig. This law became effective coördinately with the Berlin convention on September 9, 1910, and in connection with it an ordinance promulgated by the Emperor July 12, 1910, defined the time during which mechanical reproductions already made of copyrighted works should still be permitted. The use of extracts from musical as from other works, as perhaps in *potpourris*,

Law of 1910

seems however still to be permitted as a result of the law of 1901.

**Germany and the United States**

As a result of the reciprocal provisions of the new German law, the President of the United States on December 8, 1910, proclaimed reciprocal relations between Germany and the United States with reference to mechanical reproductions of music. In the opinion of May 6, 1911, approved by the Attorney-General, a Presidential proclamation is required to determine "the existence of reciprocal conditions" as to the mechanical music provision (sec. 1, e) as in respect to sec. 8; but as the proclamation of December 8 did not recite that reciprocal conditions existed between September 9 and December 8, 1910, it is held that "it would not afford evidence sufficient to sustain an action for infringement between said dates."

**French precedents**

In France the general copyright act of 1793, as considered to cover mechanical music, was interpreted or modified by the act of 1866, which enacted that "the manufacture and sale of instruments serving to reproduce mechanically musical airs which are still in the private domain, does not constitute musical infringement." In the suit of Enoch *v. Société des phonographes et gramophones*, the Civil Court of the Seine had decided in 1903 that phonographic instruments were excepted from the protection of the law of 1793 by the "general immunities" concerning the mechanical musical instruments in the act of 1866. But in 1905 the Court of Appeals of Paris reversed this decision, holding that the law of 1866 applied solely to musical airs, that is, those involving no words, on the ground that the law of 1793 was enunciatory of the rights of authors, applying to all modes of publication and distribution, and that the word "publication" should be understood broadly "as jurisprudence has applied it to numerous modes of publication discov-

ered since the law of July 19 and 24, 1793, and the Code of 1810, and as nothing prevents its extension, in consequence of scientific progress"; and it therefore concluded that literary works either by themselves or associated with music were practically under the law of 1793 and not exempted by the law of 1866. A more recent case, in the Court of Commerce of the Seine in 1905, resulted, however, in the dismissal of a suit for infringement. France accepted the Berlin convention, June 28, 1910; but its provision in article 13, that "the limitations and conditions" as to mechanical music protection "shall be determined by the domestic legislation of each country in its own case," makes uncertain whether protection becomes effective in the absence of specific legislation.

In Belgium in 1904, in the suit of Massenet and *Belgian* Puccini *v. Compagnie Générale des phonographes, et al.,* *precedents* it was held by the court of first instance of Brussels that the introduction for sale of discs and cylinders reproducing the musical compositions of the plaintiffs was illegal and liable for damages and punishable as an infringement. This decision was, however, overruled by the Court of Appeals of Brussels in 1905. Belgium accepted the Berlin convention, May 23, 1910, has since protected mechanical reproduction, and was proclaimed as in reciprocal relations with the United States, June 14, 1911.

In Italy the copyright law was considered in rela- *Italian* tion to mechanical instruments by several court deci- *precedents* sions of which the latest and most important seems to be in the case of the *Società Italiana d. Autori v.* Gramophone Co. of London, in which, in 1906, the Royal Court of Milan held that reproductions of music by gramophone constituted infringement. This decision held that article three of the Berne convention of 1886 could not derogate from or modify the domestic

214          COPYRIGHT

private law of 1882, and as the Italian law specifi-
cally covers publication and reproduction "by any
method," it includes gramophone discs. "Publica-
tion means a process by which the intellectual con-
cept of the artist is revealed, and brought to the
knowledge of others." "What the legislature wanted
has been this: that the author be the exclusive owner
of the external form in which the creation of the mind
has been fixed, and, so to speak, materialized; and
that the right be reserved to him to get from his
studies and his exertions all the economic benefits
which he could derive therefrom."

**Other
countries**

In the laws of Switzerland of 1883, and Monaco
and Tunis of 1889, the fabrication and sale of me-
chanical instruments or devices for reproducing
musical airs were excepted from the definition of
piracy. But all these countries have ratified the Ber-
lin convention "without reservation." Luxemburg
and Norway have applied the Berlin provision and
were proclaimed as in reciprocal relation with the
United States on June 14, 1911. Russia has followed
American precedent in the new law of 1911, but has
no reciprocal relations with the United States.

**Argument
for inclusion**

As the opposition to the control by musical com-
posers of mechanical reproductions of their works is
still strong in the United States and in several coun-
tries, notwithstanding recent conventions and legis-
lation, and is based largely upon restrictive definitions
of the words "writings" and "copies" or their equiva-
lent in other languages, it may be well to include here
the argument made by the writer as Vice-president
of the American (Authors) Copyright League, at the
Congressional hearings on the new American code,
of which the essential portions are as follows:

"The American Copyright League stands, as it
has stood for a quarter of a century, simply and

solely for the protection of authors' rights to the fullest extent, and it asserts that a musical composer is as fully entitled as is the author of any other creative work to the exclusive and full benefits of his compositions, in whatever manner reproduced. The opponents of the bill base their objections largely on a restrictive definition of the word 'writings,' and criticise the bill because this word 'writings' is interpreted throughout the bill by the word 'works,' although this accurately reflects the understanding of Congress and the interpretation of the courts. They would, in fact, confine copyright protection specifically, it may be said, to e-y-e-deas, that is, visible records, and exclude as not visible or legible by the eye, copies of musical compositions mechanically made and interpreted.

"The earliest *writing* which remains to us is in the Assyrian wedge-shaped inscriptions, made by pressing the end of a squared stick into a soft clay cylinder; the phonograph point inscribes its record in exactly the same manner upon the 'wax' or composition of the cylinder or disc, for the mechanism only revolves the roll, and the point is actuated by the sound vibrations. The words 'phonograph,' 'graphophone' and 'gramophone' literally mean 'sound-writing,' for the Greek form *graph-*, the Latin form *scrib-*, and the Saxon form *write*, equally parts of our language, denote exactly the same meaning. It is even probable that a future development of phonograph impressions (the third dimension being translated into breadth of stroke as can be mechanically done) will give ultimately a visual phonograph alphabet even more natural and logical than Professor Bell's remarkable system of 'visible speech,' which, of course, like all alphabets, can be read only when the reader has mastered the significance of the

*Inscribed writings*

symbols. Mr. Edison has himself made some experiments in this direction, though the confusion from the overtones, which give *quality* of speech, has so far prevented result. A large share of literary productivity to-day is by voice-dictation recorded mechanically by a stenographer on the typewriter or directly on the phonograph disc, and I may instance from personal experience a further step. As one of the committee for the Edison birthday dinner, commemorating the twenty-fifth anniversary of his invention of the incandescent lamp, I was asked to supply some original verse, and it occurred to me to put this in shape by help of Mr. Edison's inventions, without direct or indirect hand- or type-writing. Accordingly I completed the verses mentally without use of paper and voiced them into an Edison phonograph, verifying this through the telephone, and the lines were set in type by the printer from the sound-record, and thus printed on the *menu* for the dinner. Thus my formulated ideas were recorded through the nerves and other mechanism of the vocal organs, instead of through the nerves and other mechanism of the hand, directly by the phonograph point on the phonograph cylinder; and it seems a common-sense inference that if I had caused copies of the phonograph cylinder, though not legible in the ordinary sense, to be published instead of the secondary copies in print, I should be as much entitled to copyright protection in the one case as in the other. The 'telegraphone' directly records on a steel tape the sounds of the human voice as sent through the telephone, and by an absolutely invisible re-arrangement of the magnetized particles of steel, makes a writing in which there is no possibility of visual legibility.

**Direct sound-writing**

"Moreover, invention is now developing a series of reproducing mechanisms such as Dr. Cahill's 'tel-

**Music transmissal**

harmonicon' or 'dynamophone,' in which musical compositions will be translated to the ear without the interposition even of a cylinder or disc sound-record; and it seems a common-sense inference that the musical composer should have as full rights in this as in other forms of copying or reproducing his thought. Buda-Pesth is said to have not only a telephone 'newspaper,' but a system of reading novels and other works of literature to telephone subscribers, and if this should reach such proportions as substantially to reduce the sale of the printed copies of a new novel from which the author would receive benefit, it would also seem a common-sense inference that the same or an equivalent royalty should be paid him.

"In music writing or notation there are two and **Music** only two essentials: relative vertical position, show- **notation** ing pitch, and relative horizontal position, showing duration of notes. The earliest form of our present music writing is the system of the 'large,' 'long,' 'breve' and 'semi-breve' notes, in which the pitch was shown by the vertical relations of the notes, and the length of the note by the length of the black mark, the 'large' mark being twice the length of the 'long' mark. This corresponds closely to the perforated music roll of to-day, which could be read by a practiced eye with and probably without staff lines, to the extent that if every other form of reproduction were destroyed, the melody and harmony of a musical work could be reproduced into the ordinary notation of music writing. I speak from personal knowledge of these music rolls, having had a mechanical instrument for some years. The different kinds of rolls differ in the relative spacing and in distance from the edge of the roll, which gives the standard, but a foreshortened photograph of any, bringing them to the same scale, would pattern closely the

early form of music writing above cited. The London postal telegraph system dispatches newspaper material from St. Martin's le Grand throughout the kingdom from continuous perforated ribbons made somewhat in the same way, visible and legible only to an expert, and reproductions by the medium of this device would certainly not vitiate copyright.

**The law prior to 1909**

"It may be observed that the existing law gives to the author or proprietor of a musical composition the sole liberty not only of printing, but of publishing, copying, vending, performing, or representing a musical composition; that the statute does not restrict 'copying' either to a copy of 'staff notation' or from or in any particular form, but prohibits in general any copy of a musical composition; that there is no suggestion in the statute that the copy must be one to be read, *e. g.*, a copy of a sculpture; that any sound-record is in the wide sense as truly a copy of a musical composition as a printed sheet, which is not a copy, in fact, of the author's manuscript writing; and that as the roll has for its sole purpose the performing by the aid of a mechanism useless without it, of a musical composition, just as a printed sheet of music has the sole purpose of the performing by the aid of the voice, the piano, or the orchestra, of a musical composition, the maker and vendor of the roll is in exactly the same position as the maker or vendor of a printed sheet of music.

**Manuscript and copies**

"But even if phonograph and perforated records should not be considered, as is sculpture, to be 'writings,' the arguments of the opponents of this bill do not fit the case. The Constitution explicitly provides that authors shall have *exclusive rights* to their writings. This cannot mean exclusive rights to their written manuscripts, for these are protected by common law and no constitutional provision was neces-

sary. It meant and means evidently that authors
shall have exclusive rights to the benefits of their
writings, the usufruct of the property they have
created, and that means practically a monopoly con-
trol over all copies or reproductions from such writ-
ings, whether the copies are in handwriting, printing,
or any other form. A musical score is definitely a
writing, for it is even more than a literary manuscript,
originally in the personal handwriting of the com-
poser himself, without the intervention of a steno-
grapher or a typewriting machine. Therefore, if the
narrowest meaning of the word 'writings' should be
interpreted into the Constitution such as would ex-
clude sculptures and other works which are admit-
tedly proper and legal subjects of copyright, it would
still specifically include musical and dramatic as well
as literary manuscripts. There is no specification in
the Constitution confining the exclusive rights over
writings to copies in handwriting or print or any other
stated process of reproduction; in fact, the Constitu-
tion does not use the word 'copyright' or in any
way limit by specification the comprehensiveness of
the exclusive rights Congress is thus authorized to
secure. Indeed, Congress in the copyright laws has
interpreted the Constitution to cover the several
artistic or reproductive processes from time to time
developed or invented; thus in the law of 1865 the
provisions of the copyright laws were extended to
include 'photographs,' which did not exist at the time
of the adoption of the Constitution — which word
specifically means 'light-writings' as phonograph
records specifically mean 'sound-writings.'

"The position taken by the American Copyright **Protection of**
League is that an author is literally entitled to the **the inventor**
exclusive right, that is, the exclusive *benefit*, in his
writings, in whatever form the writings, that is, his

recorded thoughts, can be reproduced for sale or gain.
If Mark Twain writes a book or Bronson Howard a
play or Sousa or Victor Herbert a musical composi-
tion or Millet makes a painting or French a statue,
each is equally entitled to whatever benefit inures
from his creative genius. Mr. Sousa has stated clearly
that although Caruso has been paid $3000 — and the
fact widely advertised — for singing into a phono-
graph record, and his own band (not under his leader-
ship) has also been paid for playing his compositions
and those of others into the phonograph horn, he has
never received as a musical composer one cent for
such use of his creations, though from twenty to a
hundred of his compositions are to be found on the
catalogues of the several manufacturers of mechani-
The counter cal instruments. Mr. J. Howlett Davis, who properly
argument appeared as an inventor in defense of his own inven-
tions in mechanical instruments, which he mistakenly
believes would be rendered useless if the copyright
protection were extended to sound-records, really
asked that Congress should protect the thing which
he had invented, and compel users to pay for it, but
should permit him to use the thought which the mu-
sical composer had invented and expressed, without
paying for it. His argument analyzed presents an
even stronger argument for the proposed copyright
bill than for the protection of patented inventions.
When Mr. Sousa buys a patented cornet he has paid
for the use of it, but Mr. Sousa makes no claim either
to make another cornet like it or to play copyrighted
musical compositions for profit without payment or
permission. A piano, a pianola, a music roll or new
form of mechanism, is patentable; a musical composi-
tion as played on a piano by hand or by mechanism,
whether reproduced on a printed sheet or a mechani-
cal roll, is copyrightable; but each should have like

protection. I speak from specific knowledge as one who has taken out patents as well as copyrights and as the active head for some years of the Edison Illuminating Company of New York and a participant in successfully defending the Edison lamp patents. Mr. Edison, both as an inventor and as a manufacturer of his own inventions, has profited much more than a million dollars from his patents, and would naturally be expected to be foremost in upholding the right of authors to payment for their brains."

The acceptance by most countries within the International Copyright Union of the Berlin convention, without reservation on this question of mechanical music, sets an example of complete protection of the musical composer which it is hoped may be ultimately adopted by the United States as well as by other countries.

**Complete protection**