# EXHIBIT 18

86th Congress } COMMITTEE PRINT
1st Session

# COPYRIGHT LAW REVISION

## STUDIES

PREPARED FOR THE

SUBCOMMITTEE ON
PATENTS, TRADEMARKS, AND COPYRIGHTS

OF THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE
EIGHTY-SIXTH CONGRESS, FIRST SESSION

PURSUANT TO

S. Res. 53

STUDIES 5-6

5. The Compulsory License Provisions of the U.S. Copyright Law
6. The Economic Aspects of the Compulsory License



Printed for the use of the Committee on the Judiciary

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1960

46476

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

| | |
|---|---|
| ESTES KEFAUVER, Tennessee | ALEXANDER WILEY, Wisconsin |
| OLIN D. JOHNSTON, South Carolina | WILLIAM LANGER, North Dakota [1] |
| THOMAS C. HENNINGS, JR., Missouri | EVERETT McKINLEY DIRKSEN, Illinois |
| JOHN L. McCLELLAN, Arkansas | ROMAN L. HRUSKA, Nebraska |
| JOSEPH C. O'MAHONEY, Wyoming | KENNETH B. KEATING, New York |
| SAM J. ERVIN, JR., North Carolina | |
| JOHN A. CARROLL, Colorado | |
| THOMAS J. DODD, Connecticut | |
| PHILIP A. HART, Michigan | |

### SUBCOMMITTEE ON PATENTS, TRADEMARKS, AND COPYRIGHTS

JOSEPH C. O'MAHONEY, Wyoming, *Chairman*

OLIN D. JOHNSTON, South Carolina        ALEXANDER WILEY, Wisconsin
PHILIP A. HART, Michigan

ROBERT L. WRIGHT, *Chief Counsel*
JOHN C. STEDMAN, *Associate Counsel*
STEPHEN G. HAASER, *Chief Clerk*

---

[1] The late Honorable William Langer, while a member of this committee, died on Nov. 8, 1959.

II


# COPYRIGHT OFFICE NOTE

The studies presented herein are part of a series of studies prepared for the Copyright Office of the Library of Congress under a program for the comprehensive reexamination of the copyright law (title 17 of the U.S. Code) with a view to its general revision.

The Copyright Office has supervised the preparation of the studies in directing their general subject matter and scope, and has sought to assure their objectivity and general accuracy. However, any views expressed in the studies are those of the authors and not of the Copyright Office.

Each of the studies herein was first submitted in draft form to an advisory panel of specialists appointed by the Librarian of Congress, for their review and comment. The panel members, who are broadly representative of the various industry and scholarly groups concerned with copyright, were also asked to submit their views on the issues presented in the studies. Thereafter each study, as then revised in the light of the panel's comments, was made available to other interested persons who were invited to submit their views on the issues. The views submitted by the panel and others are appended to the studies. These are, of course, the views of the writers alone, some of whom are affiliated with groups or industries whose private interests may be affected, while others are independent scholars of copyright problems.

        ABE A. GOLDMAN,
         *Chief of Research,*
          *Copyright Office.*
        ARTHUR FISHER,
       *Register of Copyrights,*
        *Library of Congress.*
       L. QUINCY MUMFORD,
        *Librarian of Congress.*

# CONTENTS

| Study No. | | Page |
|---|---|---|
| 5. | The Compulsory License Provisions of the U.S. Copyright Law | IX |
| | Comments and Views Submitted to the Copyright Office | 59 |
| 6. | The Economic Aspects of the Compulsory License | 87 |
| | Comments and Views Submitted to the Copyright Office | 115 |

VII

# STUDY NO. 5

## THE COMPULSORY LICENSE PROVISIONS OF THE U.S. COPYRIGHT LAW

By Prof. Harry G. Henn

July 1956

IX

# CONTENTS

| | Page |
|---|---|
| Introduction | 1 |
| I. Analysis of pertinent provisions of present copyright law | 2 |
|     A. Legislative history of present compulsory license provisions | 2 |
|     B. The present compulsory license provisions | 12 |
|     C. Judicial and administrative construction of present provisions | 15 |
| II. Legislative history of compulsory licensing provisions in the United States since 1909 | 21 |
|     A. Proposed bills | 21 |
|     B. Summary | 35 |
| III. Compulsory license provisions in the laws of other countries and in international conventions | 36 |
|     A. National laws | 36 |
|     B. International conventions | 41 |
| IV. Present music publishing-recording industry practices in the United States | 44 |
|     A. Public domain | 46 |
|     B. Common-law copyright | 46 |
|     C. Statutory copyright | 49 |
| V. Problems in evaluating compulsory license provisions of present copyright law | 52 |
|     A. Compulsory license principle | 53 |
|     B. Reproduction permitted under compulsory license | 54 |
|     C. Statutory royalty rate | 54 |
|     D. Procedural implementation | 56 |
|     E. Extension of compulsory license principles to nonmusical works | 56 |
|     F. Statutory language | 57 |
|     G. Effective date of amendments | 57 |
| VI. Recapitulation of major issues | 57 |

Under section 1(e) nonpayment of the 2-cent royalty per part manufactured might result in an award for the amount of such royalty and in addition a sum not exceeding three times such amount. Whether this maximum award under section 1(e) is three or four times the amount of the statutory royalty is questionable, presumably the former judging by occasional references to treble recovery and 6 cents.[49] Section 101(e) permits a recovery of the statutory royalty and, where the person has failed to file the required notice of intention to use, in addition thereto, a further sum not to exceed three times the amount provided in section 1(e). Again, there is a problem of construction as to whether this further sum is limited to three times the statutory royalty, or three times the amount of maximum recovery under section 1(e). If the latter, and such maximum recovery under section 1(e) is either three or four times the amount of the statutory royalty, then the overall recovery, under both sections 1(e) and 101(e), could total 12 or 16 times the statutory royalty.

### C. JUDICIAL AND ADMINISTRATIVE CONSTRUCTION OF PRESENT PROVISIONS

Except for the relocation of the semicolon in section 1(e) in 1947[50] to separate the provision relating to public-performance-for-profit rights from the provisions relating to recording and mechanical reproduction rights and the change of numbering of section 25(e) to 101(e),[51] the foregoing statutes have remained the same since 1909.[52]

Section 1(e) is, of course, the fifth and final subsection of section 1 of the copyright law, which enumerates the exclusive rights as to copyrighted works. Section 1(e) consists of three paragraphs, all limited to musical compositions. The first clause confirms public-performance-for-profit rights, which are limited by the so-called "jukebox" exception of the third and final paragraph of section 1(e). The second clause, after a second reference to the right of arrangement,[53] and of the balance of the first and second paragraphs of section 1(e) relate to recording and mechanical reproduction rights.

Under the first paragraph of section 1(e) (subsequent to the first clause), the proprietor of the copyright of a musical composition,[54] written by an American author or a foreign author whose country grants similar rights to U.S. citizens as evidenced by a Presidential

---

[49] See note 65, infra.
[50] See note 47, supra.
[51] Act of July 30, 1947 (61 Stat. 652).
[52] For clause-by-clause analysis of the compulsory license provisions, see Evans, "The Law of Copyright and the Right of Mechanical Reproduction of Musical Compositions" in Third Copyright Law Symposium 113, at pp. 118–181 (1940).
[53] The second clause can be said to embrace two distinct rights: (1) the right to make any arrangement or setting of the musical composition or the melody thereof in any system of notation from which it may be read, and (2) the right to make any form of record from which it may be reproduced. Sec. 1(b) previously recognizes the right to arrange or adapt a musical work. Howell, "Copyright Law," 148 (3d ed. 1952).
[54] The term "musical compositions" is defined by the Regulations of the Copyright Office (37 Code Fed. Regs., sec. 202.6 (1955)) as follows:
"§ 202.6 *Musical compositions (Class E)*. This class includes all musical compositions (other than dramatico-musical compositions), with or without words, as well as new versions of musical compositions, such as adaptations, arrangements and editings, when such editing is the writing of an author."

proclamation,[55] originally [56] copyrighted, either as a published or unpublished work,[57] after July 1, 1909, enjoys, as part of the copyright, the exclusive right to record and make mechanical reproductions thereof.[58] The proprietor need not exercise nor authorize the exercise of such rights. However, if the proprietor does exercise or authorize the exercise of mechanical reproduction rights, any other person may,

---

[55] "Proclamations, Conventions, and Treaties Establishing Copyright Relations Between the United States of America and Other Countries" (Copyright Office, May 1956); "International Copyright Relations of the United States of America" (Department of State, revised as of Jan. 20, 1955); 29 Ops. Att'y Gen. 64 (1911). The Universal Copyright Convention (see pp. 43-44, infra), and implementing legislation (act of Aug. 31, 1954, 68 Stat. 1030, effective Sept. 16, 1955); 17 U.S.C. 9(c) (Supp. 1955) eliminates the sec. 1(e) requirement of reciprocal treatment with respect to mechanical reproduction rights (since the Convention is based on national treatment) and of special proclamations so far as musical compositions which have qualified for protection under the Convention are concerned. Sec. 1(e), defining authors whose copyrighted musical compositions are entitled to recording and mechanical reproduction rights, is to be distinguished from the differently worded sec. 9, defining the authors whose works are eligible for statutory copyright. Compare *G. Ricordi & Co. v. Columbia Graphophone Co.*, 258 Fed. 72 (S.D.N.Y. 1919), overruling 256 Fed. 699 (S.D.N.Y. 1919), with *Leibowitz v. Columbia Graphophone Co.*, 298 Fed. 342 (S.D.N.Y. 1923). See also H. Rept. No. 2222, 60th Cong., 2d sess., p. 9 (1909).

[56] Sec. 1(e) became effective July 1, 1909, and was not retroactive. *M. Witmark & Sons v. Standard Music Roll Co.*, 213 Fed. 532 (D.N.J. 1914), aff'd, 221 Fed. 376 (3d Cir. 1915). The date of original copyrighting controls. Musical compositions originally copyrighted prior to July 1, 1909, are not protected against recording and mechanical reproduction as the result of renewal of copyright subsequent to that date. *E. B. Marks Music Corp. v. Continental Record Co.*, 120 F. Supp. 275, on rearg., 100 U.S.P.Q. 446 (S.D.N.Y. 1954), aff'd, 222 F. 2d 488 (2d Cir. 1955), cert. denied, 350 U.S. 861, 76 Sup. Ct. 101, 100 L. Ed. 69 (1955). Rejecting the contention that renewal, since a "new estate," was a "new copyright" for purposes of sec. 1(e), the court stated (222 F. 2d at 491):

"We think the words above quoted from the proviso to sec. 1(e) are clearly destructive of the plaintiff's contention that Congress intended that the mechanical reproduction of a song, which for years had been in the 'public domain,' may, by renewal, be fenced into a monopolistic field."

See also *Jerome v. Twentieth Century Fox-Film Corp.*, 67 F. Supp. 736, 741-742 (S.D.N.Y. 1946), aff'd on other grounds per curiam, 165 F. 2d 784 (2d Cir. 1948):

"Assuming that plaintiff's copyright does not include the mechanical reproduction rights because the original copyright was obtained in 1896, almost 13 years prior to July 1909, that does not support defendant's argument that the renewal of the copyright in 1923 did not carry with it the motion picture rights."

See also 58 F. Supp. 13, 15 (S.D.N.Y. 1944). Renewal results essentially in a new copyright, distinct from the original copyright. *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F. 2d 469 (2d Cir. 1951); cf. note 56 supra. The renewal copyright is "free and clear of any rights, interests, or licenses attached to the copyright for the initial term." *Fitch v. Schubert*, 20 F. Supp. 314, 315 (S.D.N.Y. 1937); *Silverman v. Sunrise Pictures Corp.*, 273 Fed. 909 (2d Cir. 1921), cert. denied, 262 U.S. 758, 43 Sup. Ct. 705, 67 L. Ed. 1219 (1923); *Southern Music Pub. Co. v. Bibo-Lang, Inc.*, 10 F. Supp. 972 (S.D.N.Y. 1935). Quaere, as to the effect of renewal on licenses, negotiated or compulsory, under the original copyright. See note 230 infra.

[57] Musical compositions (music or words and music, but not words alone) (see note 54 supra) may be copyrighted as published works or unpublished works (that is, works not reproduced for sale). See note 235 infra. The word "published," as used in sec. 1(e), has been construed as including unpublished as well as published works. *Shilkret v. Musicraft Records*, 131 F. 2d 929 (2d Cir. 1942). Cf. *Marx v. United States*, 96 F. 2d 204 (9th Cir. 1938). But see *Leibowitz v. Columbia Graphophone Co.*, 298 Fed. 342 (S.D.N.Y. 1923).

[58] This right obviously embraces recording and mechanical reproduction methods known in 1909, e.g., records, disks, and cylinders for phonographs; rolls for player-pianos. It has never been seriously urged that subsequently developed methods, such as long-playing records, electrical transcriptions, tape and wire recordings, were not covered. Some question, however, has been raised with respect to use in sound motion pictures, so-called "synchronization rights." Early sound films used a record on a turntable synchronized with the film ("Vitaphone"). Today the sound is reproduced by a sound track on the film itself ("Movietone"). See *Jerome v. Twentieth Century-Fox Film Corp.*, 67 F. Supp. 736, 741 (S.D.N.Y. 1946) (stating sound track on film is not type of "mechanical reproduction" to which sec. 1(e) applies), aff'd on other grounds per curiam, 165 F. 2d 784 (2d Cir. 1948), criticized in Dubin, "Copyright Aspects of Sound Recordings," 26 So. Calif. L. Rev. 139, at 147-149 (1953). Cf. *Foreign & Domestic Music Corp. v. Licht*, 196 F. 2d 627, 629 (2d Cir. 1952); *Encore Music Publications, Inc. v. London Film Productions, Inc.*, 89 U.S.P.Q. 501 (S.D.N.Y. 1951); *Foreign & Domestic Music Corp. v. Michael Wyngate, Inc.*, 66 F. Supp. 82 (S.D.N.Y. 1946); *Famous Music Corp. v. Melz*, 28 F. Supp. 767, 769 (W.D. La. 1939) (dictum). Cf. *L. C. Page & Co. v. Fox Film Corp.*, 83 F. 2d 196, 199 (2d Cir. 1936) (copyright of motion picture held to protect music on sound track). Quaere, as to kinescope recordings. See pp. 13-14, supra, 51-52, infra.

under the compulsory license provision, make "similar use"[59] of the musical composition upon payment by the manufacturer to the proprietor of a royalty of 2 cents "on each such part manufactured,"[60] and the proprietor is required to file a notice of use in the Copyright

---

[59] See 2 Ladas, "The International Protection of Literary and Artistic Property," pp. 790–791 (1938):

"Thus, not only the same, but a similar use may be made by other persons. This should mean that use by the owner on phonograph records would involve permission for use by others on rolls of piano players."

Textually, sec. 1(e) is capable of the construction that protection to the copyright owner thereunder renders unlawful the making of recordings, whether known in 1909 or subsequently developed, including mechanical reproductions known in 1909 (i.e., disks, rolls, bands, cylinders); that the compulsory license provision comes into operation only upon the owner's making or authorizing the making of mechanical reproductions known in 1909; and that the "similar use" permitted under compulsory license must, by way of further limitation, be the same type of such mechanical reproduction, thus excluding (by strict construction since the clause is in derogation of the composer's rights) such post-1909 uses as electrical transcriptions and tape and wire recordings for radio broadcasting, kinescope, and television tape recordings for telecasting, and synchronization of sound film by means of disks or sound tracks. Accordingly, even if use on motion picture sound tracks be proscribed by sec. 1(e), it does not necessarily follow that the compulsory license provision would ever apply to permit use on sound tracks, whether the copyright owner permitted use on disks, sound tracks, or otherwise. Cf. Dubin, "Copyright Aspects of Sound Recordings," 26 So. Calif. L. Rev. 139, 147–148 (1953). In connection with the enjoyment of a compulsory license, some latitude is allowed manufacturers to prepare individual instrumental or vocal arrangements of the composition. *Edward B. Marks Music Corp.* v. *Foullon*, 79 F. Supp. 664 (S.D.N.Y. 1948), aff'd, 171 F. 2d 905 (2d Cir. 1949). Furthermore, under a compulsory license, the words of the musical composition may not be used. *F. A. Mills, Inc.* v. *Standard Music Roll Co.*, 223 Fed. 849 (D.N.J. 1915), aff'd, 241 Fed. 360 (3d Cir. 1917). But see *M. Witmark & Sons* v. *Standard Music Roll Co.*, 213 Fed. 532 (D.N.J. 1914), aff'd, 221 Fed. 376 (3d Cir. 1915). Nor may the composition be publicly performed for profit by means of any record made under a compulsory license. *Irving Berlin, Inc.* v. *Daigle*, 31 F. 2d 832 (5th Cir. 1929); *Famous Music Corp.* v. *Melz*, 28 F. Supp. 767 (W.D. La. 1939); *Associated Music Publishers, Inc.* v. *Debs Memorial Radio Fund, Inc.*, 46 F. Supp. 829 (S.D.N.Y. 1942). Contrariwise, if an exhibitor has a public-performance-for-profit license covering the music composition, a motion picture with a sound track which infringes such composition may be exhibited without making the exhibitor an infringer. *Foreign & Domestic Music Corp.* v. *Licht*, 196 F. 2d 627 (2d Cir. 1952). Persons desirous of making recordings or other uses of the work may always attempt to negotiate a license with the copyright owner in cases where the availability of the compulsory license provision is doubtful. See pp. 51–52, infra.

[60] The term "part" refers to the statutory phrase, "parts of instruments serving to reproduce mechanically the musical work," which codified the ruling of the U.S. Supreme Court in *White-Smith Music Publishing Co.* v. *Apollo Co.*, 209 U.S. 1, 28 Sup. Ct. 319, 52 L. Ed. 655 (1908), that a pianola roll, since incapable of being read, was not a "copy" but a part of a mechanical music-producing machine. Verified reports and royalty payments may be required by the copyright proprietor on the 20th day of each month on the "number of parts" manufactured during the previous month. Two cents per part was thought in 1909 to be equivalent to 5 percent of the manufacturer's selling price, and a "reasonable royalty" and "adequate return" to the composer. H. Rept. No. 2222, 60th Cong., 2d sess., pp. 6, 7 (1909). Quaere, in the case of two or more compositions on the same "part," whether the royalty was intended to be 2 cents per composition, or, if two cents in toto, how it was intended to be allocated; in the case of disks or tapes, whether each side thereof or the whole is a "part." See p. 14, supra. It has been contended that the royalty should be based on parts sold, not on parts manufactured. 37 Music Trades 6 (Mar. 13, 1909). Although the royalty is at the same rate for all compositions, the statutory royalty provision calls for returns to composers based theoretically on manufacturer's estimates of prospective sales, and hence is automatically geared to public acceptance. Payment of the royalty cannot be avoided by going through the final manufacturing step outside the United States. *G. Ricordi & Co.* v. *Columbia Graphophone Co.*, 258 Fed. 72 (S.D.N.Y. 1919) (disk records made and sold in Canada held subject to statutory royalty as "manufactured" in United States since first eight of nine manufacturing steps occurred in United States. For the Canadian law since 1921, see p. 38, infra. Application of the statutory royalty rate for long-playing records, tape and wire recordings, motion picture sound tracks, etc., obviously creates difficulty, especially in the case of longer musical compositions. If, say, 500 positive prints of a sound motion picture were made to supply exhibition demands, the producer, at the statutory royalty rate, would pay only $10 per musical composition recorded on the sound track. See *Jerome* v. *Twentieth Century-Fox Film Corp.*, 67 F. Supp. 736, 741 (S.D.N.Y. 1946), aff'd on other grounds per curiam, 165 F. 2d 748 (2d Cir. 1948). The payment of the royalty does not compensate for public performance for profit of the recorded musical composition; permission for such performance must be obtained by actual license.

Office.[61] The proprietor's failure to file such notice of use constitutes a complete defense to any suit, action, or proceeding for an infringement of the recording or mechanical reproduction rights.[62]

Remedies for infringement of recording or mechanical reproduction rights in musical compositions are outlined in various sections of the copyright law. Where the copyright proprietor has not exercised or permitted the exercise of mechanical reproduction rights, and the compulsory license provision, therefore, does not come into operation, the general remedies of sections 101(a)–(d), 104, 106, 108–112, 115–116 of the copyright law, so far as relevant, apply. However, where the mechanical reproduction rights have been duly exercised, thereby activating the compulsory license provision, specific remedies are set forth in sections 1(e) and 101(e). These sections are not consistent in terminology or in substance, as pointed out above.[63]

The second paragraph of section 1(e) provides:

> In case of failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand, the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this title, not exceeding three times such amount.

These provisions are somewhat restated in the first half of section 101(e):

> SEC. 101. * * * (e) ROYALTIES FOR USE OF MECHANICAL REPRODUCTION OF MUSICAL WORKS.—Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section 1, subsection (e), of this title: *Provided, also* * * *

Then follows the proviso which constitutes the second half of section 101(e) to the effect that whenever any person intends to rely upon the compulsory license provision, he must serve notice of such

---

[61] The notice of use should be filed on Form U, either with or after the application for copyright registration of the composition, and should be accompanied by the $2 recordation fee for a notice containing five titles or less, plus 50 cents for each title over five. The copyright registration numbers, dates of publication or registration, and names of authors should be given as well as the correct titles of the compositions. Copyright Office Circular No. 5 (March 1954). In the fiscal year 1955, almost 8,000 notices of use were filed. Annual Report of the Register of Copyrights for the Fiscal Year Ending June 30, 1955, p. 11. Such notice-of-use requirement, since not a condition of the copyright but a procedural prerequisite to enforcement, is not affected by the Universal Copyright Convention. Cary, "The United States and Universal Copyright: An Analysis of Public Law 743" in "Universal Copyright Convention Analyzed," pp. 100–101 (1955); Sherman, "The Universal Copyright Convention: Its Effect on United States Law," 55 Colum. L. Rev. 1137, 1155 (1955).

[62] Although the statute provides that the proprietor's failure to file the notice of use shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright, the courts have limited the defense to claims of infringement of mechanical reproduction rights, treating the latter as the antecedent of such copyright. *Lutz v. Buck*, 40 F. 2d 501 (5th Cir. 1930); *Irving Berlin, Inc. v. Daigle, Irving Berlin, Inc. v. Russo*, 31 F. 2d 832 (5th Cir. 1929), rev'g 26 F. 2d 149, 150 (E.D. La. 1928) (public performance for profit); *F. A. Mills, Inc. v. Standard Music Roll Co.*, 223 Fed. 849 (D.N.J. 1915), aff'd, 241 Fed. 360 (3d Cir. 1917) (copying of words). The statute failed to incorporate the provisions of some five earlier bills that each of the rights given the copyright proprietor be treated as a "separate estate." See note 43 supra; see also note 56 supra.

[63] See pp. 14–15, supra.

intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the Copyright Office, sending to the Copyright Office a duplicate of such notice.[64] If this be not done, the proviso goes on to provide that—

> the court may, in its discretion, in addition to sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e), of this title, by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid.

These provisions have been rarely invoked, and there are few reported cases attempting to construe them.[65]

Although doubts concerning the constitutionality of the compulsory license provision have been raised from time to time, they apparently have never been seriously urged in any reported litigation.[66]

While the copyright law since 1909 has protected, to the extent indicated above, musical compositions against recording and mechanical reproduction, it has not changed the ruling in *White-Smith Music Publishing Co.* v. *Apollo Co.*[67] that recordings were not "copies" of the musical composition or "writings" of an author within the scope of the existing copyright statute. Accordingly, the copyright statute

---

[64] 17 U.S.C. 101(e) (1952). No special form is required for such notice of intention to use. Copyright Office Circular No. 5 (March 1954).

[65] *Miller* v. *Goody*, 125 F. Supp. 348 (S.D.N.Y. 1954) (award of damages at three times statutory royalty and impounding matrices pending defendant's filing of notice of intention to use and payment of damages); *Edward B. Marks Corp.* v. *Foullon*, 77 U.S.P.Q. 502 (S.D.N.Y. 1948) (award of $333.30 as statutory royalties and damages on 5,555 records, per license agreement, together with costs and attorney's fees), aff'd, 171 F. 2d 905, 907 (2d Cir. 1949): "Moreover, sec. 1(e) allows the judge to triple the royalties against him if he defaults in his payments; and sec. 25(e) does the same if he does not serve upon the owner notice of his intention in advance." *Leo Feist, Inc.* v. *American Music Roll Co.*, 253 Fed. 860 (E.D. Pa. 1918) (award of $373.74—equivalent to statutory royalty and $150 counsel fee, and $100 punitive damages for defendant's subsequent failure to report and pay monthly on demand). The only remedies for infringement of recording and mechanical reproduction rights are against the manufacturer under secs. 1(e) and 101(e); distributors are accordingly not liable. *Miller* v. *Goody*, 139 F. Supp. 176 (S.D.N.Y. 1956). See also *Foreign & Domestic Music Corp.* v. *Licht*, 196 F. 2d 627 (2d Cir. 1952). (Nonimported motion picture containing sound track infringing musical composition held not subject to seizure in hands of exhibitor licensed to perform composition publicly for profit.)

[66] The constitutional reference to copyright as "the exclusive Right" casts some doubt on the constitutionality of provisions establishing rights lacking in exclusivity, such as compulsory license provisions. Fenning, "Copyright Before the Constitution," 17 J. Pat. Off. Soc'y 379, 385 (1935); Fenning, "The Origin of the Patent and Copyright Clause of the Constituiton," 17 Geo. L. J. 109, 116–117 (1929); Weil, "American Copyright Law," pp. 62–65 (1917); DeWolf, "An Outline of Copyright Law," p. 101 (1925). Of course, the recording and mechanical reproduction rights are exclusive, only becoming nonexclusive by the copyright owner's exercise of mechanical reproduction rights, thereby activating the compulsory license provision. The compulsory license was not introduced to impair existing rights but to define rights then being recognized for the first time in the copyright statute. H. Rept. No. 2222, 60th Cong., 2d sess., p. 9 (1909). But see Evans, "The Law of Copyright and the Right of Mechanical Reproduction of Musical Compositions" in Third Copyright Law Symposium 113, at pp. 148–150 (1940); Joiner, "Analysis, Criticism, Comparison and Suggested Corrections of the Copyright Law of the United States Relative to Mechanical Reproduction of Music" in Second Copyright Law Symposium 43, at pp. 66–67 (1940). For one explanation why the constitutionality of the compulsory license provision has not been litigated, at least by copyright owners, see p. 23, infra. Cf. attacks by Representative W. Sterling Cole on the constitutionality of the compulsory license provision of the Atomic Energy Act of 1954 (42 U.S.C., section 2183(e) (Supp. 1955)) on the basis of the constitutional reference to "the exclusive Right" of the inventor; 2 Hearings on S. 3690 and H.R. 9757, 83d Cong. 2d sess., p. 658 (1954); 2 U.S. Code Congressional and Administrative News 3487–3491 (1954); 100 Congressional Record A5356, A5358, July 23, 1954; 102 Congressional Record A1903 (daily ed. Feb. 29, 1956). See also Comment: "The Constitutionality of the Patent Provisions of the 1954 Atomic Energy Act," 22 U. of Chi. L. Rev. 920 (1955).

[67] See note 6 supra; see also *Miller* v. *Goody*, 139 F. Supp. 176 (S.D.N.Y. 1956).

provides no basis for protecting the recording itself [68] or the rendition recorded.[69]

Whether recordings are "writings" in the constitutional sense and hence constitutionally eligible subject matter for Federal statutory copyright protection, should Congress attempt to extend copyright protection to them; [70] whether the public distribution or sale of a recording constitutes publication of the work and/or rendition so as to terminate any common-law rights therein; [71] and whether a recording is a "copy" which can serve as the medium for securing [72] or perfecting [73] statutory copyright in the recorded work, or which, if published

---

[68] 17 U.S.C. 5 (1952); H. Rept. No. 2222, 60th Cong., 2d sess., p. 9 (1909); Copyright Office Circular No. 5 (March 1954). But see *Aeolian Co. v. Royal Music Roll Co.*, 196 Fed. 926 (W.D.N.Y. 1912), criticized in DeWolf, "An Outline of Copyright Law," pp. 101–102 (1925); note, 5 Stan. L. Rev. 433 (1953). Protection may be available on grounds of unfair competition. *Fonotipia Ltd. v. Bradley*, 171 Fed. 951 (C.C.E.D.N.Y. 1909). But see *G. Ricordi & Co. v. Haendler*, 194 F. 2d 914, 916 (2d Cir. 1952); *Hebrew Publishing Co. v. Scharfstein*, 288 N.Y. 374, 43 N.E. 2d 449 (1942).

[69] Compare *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F. 2d 657 (2d Cir. 1955) with *RCA Mfg. Co. v. Whiteman*, 114 F. 2d 86 (2d Cir. 1940), cert. denied, 311 U.S. 712, 61 Sup. Ct. 393, 85 L. Ed. 463 (1940) (sale of records of rendition held divestitive of common-law rights therein). Contra: *Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433, 194 Atl. 631 (1937); *Waring v. Dunlea*, 26 F. Supp. 338 (E.D.N.C. 1939); *National Ass'n of Performing Artists v. Wm. Penn Broadcasting Co.*, 38 F. Supp. 531 (E.D.Pa. 1941). But see N.C. Gen. Stat., sec. 66–28 (1950); S.C. Code, sec. 66–101 (1952); Fla. Stat. secs. 543. 02–03 (1953). For a complete discussion, see Kaplan "Performer's Rights and Copyright: The Capitol Records Case," 69 Harv. L. Rev. 409 (1956); Nimmer, "Copyright 1955," 43 Calif. L. Rev. 791, 801–806 (1955); note, 31 N.Y.U.L. Rev. 415 (1955).

[70] United States Constitution, art. I, sec. 8, clause 8. The *White-Smith Music Publishing Co.* case involved interpretation of the pre-1909 copyright act and not of the constitutional term "writings." A recent commentator has expressed opinion that constitutionally "writings" include records (and "authors" include performers). Kaplan, "Performer's Rights and Copyright: The Capitol Records Case," 69 Harv. L. Rev. 409, 413–414 (1956).

[71] Until recently it was generally assumed that the sale of records was not publication of the embodied composition. Burton, "Business Practices in the Copyright Field," Seven Copyright Problems Analyzed 80, 102–104 (1952). Recording was neither copying nor publishing. *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1, 28 Sup. Ct. 319, 52 L. Ed. 655 (1908). Records were likened to a captured performance which was not a publication. *Ferris v. Frohman*, 223 U.S. 424, 32 Sup. Ct. 263, 56 L. Ed. 492 (1912). Records have been frequently issued at the outset to test the public reaction, and sheet music might not be issued at all if the record failed to catch on. Sheet music has greatly declined in relative importance as a medium of exploiting popular music. The traditional view was that statutory copyright need not be resorted to unless sheet music be issued. Kaplan, "Publication in Copyright Law: The Question of Phonograph Records," 103 U. of Pa. L. Rev. 469, 472 n. 20 (1955). A growing number of recent cases has held or indicated that the sale of a recording constitutes publication of the recorded composition. *Biltmore Music Corp. v. Kittinger*, C.O. Bull. No. 29, p. 32 (S.D. Cal. 1954); *Mills Music Co. v. Cromwell Music, Inc.*, 126 F. Supp. 54 (S.D.N.Y. 1954); *Shapiro, Bernstein & Co. v. Miracle Record Co.*, 91 F. Supp. 473 (N.D. Ill. 1950); *Blanc v. Lantz*, 83 U.S.P.Q. 137 (Cal. Super. Ct. 1949) (intentionally making sound track of music public held divestitive of common-law rights in music under the State statute); cf. *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F. 2d 657 (2d Cir. 1955); *Yacoubian v. Carroll*, 74 U.S.P.Q. 257 (S.D. Cal. 1947). See Nimmer, "Copyright Publication," 56 Colum. L. Rev. 185, 192–194 (1956). The traditional view was incorporated in the Universal Copyright Convention, art. VI, defining "publication" as meaning the "reproduction in tangible form and the general distribution to the public of copies of a work from which it can be read or otherwise visually perceived." But see *RCA Mfg. Co. v. Whiteman*, 114 F. 2d 86 (2d Cir. 1940), cert. denied, 211 U.S. 712, 61 Sup. Ct. 393, 85 L. Ed. 463 (1940).

[72] 17 U.S.C. 10, 12 (1952). "Very doubtful" under the present statute. Kaplan, "Publication in Copyright Law: The Question of Phonograph Records," 103 U. of Pa. L. Rev. 469, 482–484 (1955). Generally, statutory copyright is secured by publication with copyright notice or registration and deposit of a copy of an unpublished work. Logically what amounts to a divestitive publication of a musical composition ought to qualify as an investitive publication thereof, although the converse would not necessarily be so. The location of the copyright notice would present problems. See note 74 infra.

[73] 17 U.S.C. 12, 13 (1952). Phonograph records have not been accepted for registration and deposit by the Copyright Office in recent years, although works in Braille and motion pictures with sound tracks have been accepted. See Kaplan, "Publication in Copyright Law: The Question of Phonograph Records," 103 U. of Pa. L. Rev. 469, 483 n. 65 (1955). The Copyright Office has not refused to accept motion pictures because sound tracks were attached to them, but has made no ruling as to whether the registration does or does not include the sound track. If the sound track were submitted separately, registration would presumably be denied. See also *Yacoubian v. Carroll*, 74 U.S.P.Q. 257 (S.D. Cal. 1947) (issuance of records held not reproduction of copies for sale of musical composition previously copyrighted under sec. 12; hence deposit of two "copies" not required under secs. 12, 13).

or offered for sale in the United States by authority of the copyright proprietor, must bear the statutory copyright notice,[74] are intriguing questions which are beyond the scope of this study.

## II. Legislative History of Compulsory Licensing Provisions In the United States Since 1909

### A. PROPOSED BILLS

#### 1. *The 68th Congress*

The compulsory licensing feature of section 1(e) did not come up for further legislative consideration for 16 years.

(a) *H.R. 11258 and S. 4355*

On January 2, 1925, Representative Perkins introduced a bill designed to revise the copyright law and permit the entry of the United States into the International (Berne) Copyright Union. H.R. 11258 [75] and its Senate counterpart, S. 4355,[76] had been drafted by the Register of Copyrights, Thorvald Solberg, at the request of the Authors' League, and contained no provision for compulsory licensing of mechanical reproduction rights. Instead, section 12(d) simply granted to authors, their administrators, executors, or assigns the right—

> to make, copy, and vend any phonograph record, or any perforated roll or other contrivance by means of which, in whole or in part, the copyright work may be mechanically reproduced * * *.

Hearty support for the complete elimination of the licensing provision was given by Nathan Burkan, of ASCAP, who testified during hearings held from January 22 through February 24, 1925, that compulsory licensing was an arbitrary, discriminatory class legislation which forced authors to do business with persons not of their own choosing at terms contrary to those specified in section 1(e) and without any means of enforcing their claims against unknown record producers.[77] More specifically Mr. Burkan alleged the phonograph industry was reporting on sales of records, rather than the number of records produced; was furnishing uncertified statements of accounts on a quarterly, instead of a monthly, basis; and was charging the author 10 percent for "breakage" as well as costs for "arrangements" and advertising. Mr. Burkan further claimed manufacturers were refusing to pay royalties on records exported abroad or on records produced from matrices shipped abroad. In addition, many record companies produced records without any intention of paying the license fee or delayed payment, sometimes until they became bank-

---

[74] 17 U.S.C. 10 (1952). The statute is silent with respect to the location of copyright notice on records, tape and wire recordings, etc. 17 U.S.C. 19, 20 (1952). Cases in the past have held that a copyright notice was not required on a phonograph record or perforated roll. *Irving Berlin, Inc.* v. *Daigle; Irving Berlin, Inc.* v. *Russo*, 31 F. 2d 832 (5th Cir. 1929); *Buck* v. *Heretis*, 24 F. 2d 876 (E.D.S.C. 1928); *Buck* v. *Lester*, 24 F. 2d 877 (E.D.S.C. 1928). Quaere, whether a record manufactured under the compulsory license provision (assuming it to be a copy, and its public distribution or sale to be a publication, of the recorded musical composition) can be said to be published or offered for sale by authority of the copyright proprietor.
[75] H.R. 11258, 68th Cong., 2d sess. (1925).
[76] S. 4355, 68th Cong., 2d sess. (1925) (introduced by Senator Ernst, Feb. 17, 1925).
[77] Hearings on H.R. 11258, 68th Cong., 2d sess., pp. 148–168 (1925).

rupt. Thus an author, even after securing judgment, was frequently left without recourse against the manufacturer.[78]

Representatives of the Music Industries Chamber of Commerce and individual record manufacturers replied to these charges by reminding the committee that American business had been passing through an economic recession which had affected other industries as well as phonograph record manufacturers, and that failure to pay royalties had in several of the instant cases been due to the belief that the alien author had not been domiciled in the United States,[79] and therefore not entitled to such payment.

Claiming $2 million in royalties had been paid in 1924 on the basis of a $50 million business to approximately 300 to 400 copyright owners, and that elimination of the compulsory license provision was not necessary for the entry of the United States into the Berne Union, the record manufacturers pleaded for the retention of the compulsory license provision, but with modifications which would (1) change the "unfair method of basing royalty payments upon production"; (2) extend the license to include "word" music rolls;[80] and (3) protect publishers against financially or otherwise irresponsible manufacturers of mechanical devices.[81]

On the last day of the hearings a subcommittee was appointed to consider the bill during recess, and informal hearings were held April 22 and May 8, 1925.

### 2. The 69th Congress

#### (a) H.R. 5841

A bill identical to the two bills considered by the 68th Congress was reintroduced by Representative Perkins at the beginning of the 69th Congress, on December 17, 1925,[82] but no further action was taken. For the next 2 years, 1926-27, compulsory licensing continued a controversial subject.

#### (b) S. 2328 and H.R. 10353

With the rapid development of radio broadcasting in the early 1920's a dispute soon developed between ASCAP and the radio stations over the licensing of the performances of musical compositions. S. 2328 [83] and H.R. 10353 [84] were introduced on January 26 and March 15, 1926, by Senator Dill and Representative Vestal, respectively, as a possible solution to the controversy between the two interests. By adding a new subsection (f) to section 1, the bills proposed to extend compulsory licensing to musical compositions used for broadcast purposes, with a license fee based on the power of the transmitting station. This license was to be applicable only to sub-

---

[78] Id., at pp. 157-160.
[79] See note 55, supra.
[80] Piano rolls on which the lyrics were printed. Use of the words had been held to infringe under sec. 1(a) of the act. *F. A. Mills, Inc.* v. *Standard Music Roll Co.*, 223 Fed. 849 (D.N.J. 1915), aff'd, 241 Fed. 360 (3d Cir. 1917). Rolls without words were becoming unsalable; 10 cents or more royalty per roll was usually asked. But see *M. Witmark & Sons* v. *Standard Music Roll Co.*, 213 Fed. 532 (D.N.J. 1914), aff'd, 221 Fed. 376 (3d Cir. 1915) (pre-1909 work).
[81] Hearings on H.R. 11258, 68th Cong., 2d sess., pp. 233-275 (1925).
[82] H.R. 5841, 69th Cong., 1st sess. (1925).
[83] S. 2328, 69th Cong., 1st sess. (1926).
[84] H.R. 10353, 69th Cong., 1st sess. (1926).

sequently copyrighted compositions so as not to impair existing contracts.[85]

Joint hearings were held April 5 to 22, 1926, at which a representative of the Music Industries Chamber of Commerce listed the bad features of the existing compulsory license provision as: (1) failure to include the so-called "word" roll; (2) pressure on the part of music publishers to make the record manufacturers take a certain number of compositions each month in order to get the few they actually wanted; and (3) lack of protection for the copyright owner against use of his music by financially irresponsible concerns.[86]

On the other hand, Nathan Burkan questioned the constitutionality of compulsory licensing and explained failure to make an attack in the courts as follows: [87]

> Unquestionably this act was so artfully drawn, that if an attack was made upon the compulsory provisions of the act and the court declared them unconstitutional, the whole act would have to fall. That would have left the authors in the same plight they were in from 1888 to July 1909 * * *
>
> Another reason for the failure to make any attack upon the constitutionality of this proposition was the power of boycott that these reproducers of mechanical instruments possessed.

Mr. Burkan also alleged:[88]

> The act of 1909, while it provided in case of any infringement of the copyrighted work that the infringer should be liable to very severe penalties, damages, costs, to injunction, seizure, and forfeiture of infringing material, and to criminal punishment, in the case of the illegal mechanical reproduction, the sole remedy * * * is limited to a recovery of three times the royalty fixed by the statute; * * * If the mechanical reproducer made no reports or kept false books as to the number of records or rolls he manufactured then the composers' plight is more desperate * * *

In discussing *Wheaton v. Peters*,[89] often cited as a basis for the compulsory licensing provision, Mr. Burkan stated:

> This case is no authority for the proposition that Congress can attach to a copyright grant a compulsory license feature.
>
> On the contrary, the holding of the case is that Congress in vesting the exclusive right may impose conditions. A compulsory license is the antithesis of the exclusive right.[90]

In short, Mr. Burkan characterized the two bills as being [91]—

> vicious and paternalistic price-fixing measures, lacking in merit and iniquitous because unconstitutional, because depriving a body of useful citizens of their property, without just compensations, for the private benefit of a powerful group * * *

(c) *H.R. 10434*

In the meantime Representative Vestal had also introduced a general revision bill, H.R. 10434,[92] which was designed to permit the entry of the United States into the Berne Union. Approximately two-thirds of H.R. 10434 contained text identical with the Perkins bill, the remainder constituted compromises worked out by conflict-

---

[85] Hearings on S. 2328 and H.R. 10353, 69th Cong., 1st sess., pp. 31-32 (1926). See note 66 supra.
[86] Id., at p. 87.
[87] Id., at p. 314. See note 66 supra.
[88] Id., at p. 315.
[89] 8 Pet. 591 (U.S. 1834).
[90] Hearings on S. 2328 and H.R. 10353, 69th Cong., 1st sess., p. 329 (1926). See note 66 supra.
[91] Id., at p. 371.
[92] H.R. 10434, 69th Cong., 1st sess. (1926).