```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KATHRYN TOWNSEND GRIFFIN,
et al.,

               Plaintiffs,

        v.                              17 CV 5221 (LLS)

EDWARD CHRISTOPHER SHEERAN,
et al.,

               Defendants.

------------------------------x
                                        New York, N.Y.
                                        March 8, 2019
                                        2:40 p.m.
Before:

                HON. LOUIS L. STANTON,

                                        District Judge

                        APPEARANCES

FRANK & RICE PA
     Attorneys for Plaintiffs
BY:  PATRICK R. FRANK
     KEISHA D. RICE

PRYOR CASHMAN LLP
     Attorneys for Defendants
BY:  DONALD S. ZAKARIN
     ILENE S. FARKAS
     ANDREW M. GOLDSMITH

PARNESS LAW FIRM PLLC
     Attorneys for Intervenor Plaintiff
BY:  HILLEL I. PARNESS
```

1           (In the robing room)

2           THE COURT:  Well, when do you want a trial?

3           MR. ZAKARIN:  We would like, if possible,
4    mid-September or October, and I'll explain why.

5           Mr. Sheeran is on tour in Europe and in Asia through
6    that period of time.  I think he has something that he's going
7    to be recording at some point in Europe, but most of the time
8    between now and early -- the beginning of September, when he
9    comes off tour, he's out -- he's not a United States citizen
10   he's a U.K. citizen but he's on tour in Europe and Asia.

11          We've raised the issue with counsel.  And that's when
12   we would be prepared to go to trial with him here.

13          MR. FRANK:  While we oppose waiting until September,
14   we're prepared to go forward as soon as the Court is inclined
15   to set it.  We're ready at any time.

16          THE COURT:  What aggrieves you about September?
17   Anything concrete or just a general desire to get ahead with
18   business?

19          MR. FRANK:  A general desire to get ahead with
20   business; no particular reason.

21          THE COURT:  No particular pain?

22          MR. FRANK:  No particular pain, no, your Honor.

23          THE COURT:  What do you have to accomplish between now
24   and then?

25          MR. ZAKARIN:  The work required for your pretrial

order, jury instructions, those things.  Everything else is complete.  And that, certainly, we're prepared to do, your Honor, on any schedule that you want.

THE COURT:  I remember when these rules about pretrial orders came in -- and I can tell you they were not welcomed -- people said, look, you've got to try the case three times, you do it once in depositions, you do it once in the pretrial order, and you finally get it to trial.

The form of pretrial order is sort of elusive.  It's so hard to put the musical -- the music, I was going to say, it isn't really a fact anyhow, it's like a vision -- into words, and then to separate out material facts is a challenge that I leave to you.

MR. ZAKARIN:  I've done it but not -- at trial, but not recently.

THE COURT:  It can be done serviceably.

MR. ZAKARIN:  Yes.

THE COURT:  What's your experience?  The jury really listens to the music and that's what guides it?

MR. ZAKARIN:  Yes and no.  I think also, at least in my experience, they listen to the experts.

MS. RICE:  Yes.

MR. ZAKARIN:  They do pay close attention to the experts, like any other jury and any other witness --

THE COURT:  Well, they keep hoping he will do their

1   work for them, and he's got the same hope.
2               MR. ZAKARIN:  Don't we all?
3               But that is my experience.  They listen, but they pay
4   close attention to the experts.  And after long years of doing
5   this, I truly believe in the jury system.  I think they
6   mostly -- maybe not always but mostly -- get it, and get it
7   right.
8               THE COURT:  I don't remember the date of this, but
9   approximately five years, as I remember, before I stopped
10  practicing, which would have put it into around 1980, the
11  University of Chicago did a -- "comprehensive" doesn't begin to
12  describe it -- number of individual tests of the jury system,
13  and they used panels which, I think, maybe they had 800 or a
14  thousand of them.  It was an enormous survey.  Now, I think
15  they had, my impression is six or less -- as I visualize it, it
16  may be four or five, maybe six -- on each panel, organized by
17  every single way the imagination could produce of
18  cross-sectioning - age, gender, education, race, everything,
19  economic status.  Every way you could slice, it was covered in
20  that enormous sample, broken down into the different panels.
21  So, as far as the mind of man could imagine it, there was no
22  slant in any direction.
23              They were given a simple case, but it contained two
24  elements.  One was what they called the moral question.  That
25  really meant liability, yes or no.  The other was damages.

1    And, you know, to a trial lawyer, this was just gripping.

2              Their report came out, and there was really almost
3    nothing fuzzy.  It was clear, and it was agreed:  On almost
4    every question, the juries did a super job on the moral
5    question.  I'll give you the only sample moral question I
6    remember.  It was the decision of the directors of the railroad
7    not to put on the train a device which would make collisions
8    much less frequent, pretty reliably, and it was quite
9    expensive.  What they were doing was balancing the cost of
10   putting this on every train against the total cost of the
11   injuries and the accidents or insurance, the cost of not doing
12   it.  And they decided against it.  And in the collision next
13   week, indeed somebody had their leg cut off or whatever.
14   That's the liability question:  It wasn't negligence.  They
15   considered it, they thought about it, and that's the decision
16   they made.  And then there are the damages.

17             On the moral question, every panel was, on almost
18   every question, consistent and reasonable and united.  I guess
19   maybe the verdicts had to be unanimous, as here, I don't
20   remember.  On the damages, they were all over the lot, all over
21   the lot --

22             MR. ZAKARIN:  You probably bring --

23             THE COURT:  -- to the extreme that it was not a bit --
24   they got from each juror what he thought before the discussion,
25   on both polls, and how he voted after the discussion.  So you

had the result.  It wasn't a bit unusual for every juror to have thought that the verdict should be less than it turned out to be, and it was, in the end, higher than any juror would have come in with.  There was no evidence of converging on a mean; Quite to the contrary, they often drifted apart and gained energy.  There were verdicts lower than any juror would have given on the one way the way it --

          MR. FRANK:  That's interesting.

          MR. ZAKARIN:  It's almost there's group dynamics that come into that.

          THE COURT:  It's group dynamics; they egg each other up or down.  I thought it was just fascinating.  Nobody was really deeply surprised by it, I don't think.

          It was pretty current in those days, that study, because I remember thinking about it when I was newly on the bench, and the discussion then was, should the judge -- we could easily do it, we have the power -- to comment on -- we could tell a jury at least a reasonable range, here might be from here to here.  Nobody does it.  We don't comment on the evidence either.  We could, but nobody does.

          I finally figured out the answer:  We don't have to.  It's because we have damage experts, and the field is covered for both points of view.  And it gives them some value, some idea of the value of a dollar.  They can still go haywire, but it was just fascinating exercise.  I think our juries here are

more sure and more accurate on the verdict than the damages.

MR. ZAKARIN:  I think that's not uncommon, but I also think you've got -- I think it's a sophisticated jury pool, which at least I've seen, here, and I think they're good.

THE COURT:  Medium.

MR. ZAKARIN:  Medium?

THE COURT:  A lot of Westchester housewives.  What you get is a lot of good sense.

MR. ZAKARIN:  It comes off the voter rolls.

THE COURT:  And what one of them misses, somebody else picks up.  They do very, very good work.

MR. ZAKARIN:  That's my impression as well.

THE COURT:  I don't say that to scare you.

MR. ZAKARIN:  No.

THE COURT:  When I was trying cases, that's what scared me.

MR. ZAKARIN:  Everything scares me about every trial that I've ever had, and probably always will, and if it stops scaring me, maybe I won't do it anymore.

THE COURT:  The great trial lawyer, Theodore Kiendl, probably the best cross-examiner in the country -- and he was sitting at the counsel table when we opened a -- I say "we."  I was carrying bags, listening.  He said to his partner, Ralph Carson, great equity lawyer, well, I hear the trumpets blow again, doesn't that give you a great feeling?  Carson said,

1   yes, a great sinking feeling.
2           Well, anyway, you can manage comfortably getting
3   everything done between now and then.
4           MR. ZAKARIN:  Yes.
5           THE COURT:  How long do you think the case will take
6   to try?
7           MR. ZAKARIN:  My guess is five to seven days, maximum.
8           Do you think differently?
9           MR. FRANK:  I think that's consistent with what we
10  thought.  Obviously, we can't speak for what the defendants
11  will proffer for their case in chief, but we're thinking
12  somewhere between two and three days for the plaintiff's case
13  in chief, so that's probably consistent with what Mr. Zakarin
14  said.
15          THE COURT:  Well, we generally try a four-day week and
16  use Fridays for conferences.  So a week or two --
17          MR. FRANK:  Fine.
18          THE COURT:  -- for budget.
19          MR. ZAKARIN:  Yes.
20          In terms of the schedule, your Honor, I would only
21  ask, if it's going to be in September, a very close friend of
22  mine for 30 years, his son is getting married the 21st --
23          THE COURT:  I'm having trouble hearing.
24          MR. ZAKARIN:  I'm sorry, the son of a very close
25  friend for 30 years is getting married in California the

1    weekend of the 21st of September.  So if I can just --
2             THE COURT:  September?  You want to finish it before
3    then?
4             MR. ZAKARIN:  If possible or after that or before
5    that.
6             THE COURT:  Oh, sure.
7             MR. ZAKARIN:  I just don't want that coming in the
8    middle of the trial, because then I would not go to the
9    wedding.  And then they would not like me very much.
10            THE COURT:  September 17th?
11            MR. ZAKARIN:  The wedding is the 21st.  I'm perfectly
12   content to start around the 10th.
13            MS. FARKAS:  It would have to start around
14   September 10 or --
15            THE COURT:  Excuse me?
16            MS. FARKAS:  So I think we were suggesting we start
17   around September 10 or we start just after he gets back, at the
18   end of September or very beginning of October.
19            MR. ZAKARIN:  Either one is fine for me, your Honor.
20            MS. RICE:  It looks --
21            THE COURT:  You'll enjoy it more if this is off your
22   mind.
23            MS. RICE:  It looks like he's finished by August 24th,
24   I believe.
25            MR. ZAKARIN:  I think we're told actually he comes off

1   tour.
2            MS. FARKAS:  I think he has something at the very end
3   of August, but he has some other commitment, I think it's
4   September 6th or 7th, so for him to get back into this country,
5   and be able to at least meet with him, prep a little bit, I
6   mean the 10th is probably cutting it a little tight but we
7   could do that if we had to.  I don't know what day of the week
8   the 10th is.
9            MR. FRANK:  A Tuesday.
10           MS. FARKAS:  I don't know what day Labor Day is.
11           MR. FRANK:  The week before.
12           THE COURT:  Labor Day.  And then Thanksgiving wrecks
13  November.  I don't know how one day can do that.
14           When will you be going out, Friday or the end of the
15  week?
16           MR. ZAKARIN:  I assume I would fly out Thursday night,
17  is my guess, and I'd fly back on Sunday or Monday morning, one
18  of the two.
19           THE COURT:  When --
20           MS. FARKAS:  I think the last day that Mr. Sheeran is
21  booked on something, as of now, is September 7th.  And I think
22  it's out of the country.  So, presumably, he is free as of --
23           MR. ZAKARIN:  So he would fly in on Sunday the 8th, we
24  could work with him, prepare him, so that's why the 10th -- but
25  if the 10th -- your Honor may have other things.  Your Honor

1   has your own schedule too.

2           THE COURT:  No, we can start it Monday, September 9,
3   if you want.  And that gives you most of the next week as
4   backup, if that doesn't interfere with his September
5   commitments.

6           MR. ZAKARIN:  I just wonder whether starting on that
7   Monday is tight for him finishing something on that weekend out
8   of the country and then coming in.

9           THE COURT:  It may be.

10          MR. ZAKARIN:  I'm wondering whether a day or two more
11  might work for him.

12          THE COURT:  Well, we could do that.  We could start it
13  on the 11th.  That's Wednesday.

14          MS. FARKAS:  Your Honor, I think that would be a
15  little better because he has to get to this country.

16          THE COURT:  Sure.  That gives us Wednesday, Thursday,
17  and Friday that we can use if we have to.  And then we'll see
18  how we're going, and then pick it up and finish it the next
19  week.

20          MR. ZAKARIN:  The truth of the matter is, if my family
21  goes --

22          THE COURT:  Thursday the 19th, you'd like --

23          MR. ZAKARIN:  Yes, but if we're not done, if my family
24  flies out on the 19th, I can fly on the 20th or even the
25  morning of the 21st if I have to.

Case 1:17-cv-05221-LLS   Document 105   Filed 04/16/19   Page 12 of 20      12

J38KTOWCcorrected

1        THE COURT:  Yes.
2        MR. ZAKARIN:  The trial comes first.  The wedding is
3    that 21st, that night.
4        THE COURT:  The 21st?
5        MR. ZAKARIN:  So if I had to fly out in the morning,
6    with the time difference, I would do it.
7        THE COURT:  Well, it's fine with me.
8        I was wondering -- different people feel different
9    ways about it -- I was thinking, if we want to pick a jury on
10   Tuesday and be ready to go.
11       MR. ZAKARIN:  That's fine.  I think that makes some
12   sense.  Pick the jury on the 10th?
13       THE COURT:  Yes.  One of your partners can do it.
14       MS. RICE:  You can still have the rest of the day to
15   continue --
16       MR. ZAKARIN:  Start the trial on the 11th?  That's
17   fine.
18       THE COURT:  I know some people used to feel it was
19   imperative to be there for that, but the way we pick the
20   juries, it doesn't really make much difference, it's all
21   court-done and it's pretty quick.
22       MR. ZAKARIN:  Yes.
23       THE COURT:  Maybe we get that out of the way and then
24   start, bang, on the Wednesday.
25       MR. FRANK:  It would be perfect.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J38KTOWCcorrected

1        THE COURT:  Yes.
2        MR. ZAKARIN:  The trial comes first.  The wedding is
3    that 21st, that night.
4        THE COURT:  The 21st?
5        MR. ZAKARIN:  So if I had to fly out in the morning,
6    with the time difference, I would do it.
7        THE COURT:  Well, it's fine with me.
8        I was wondering -- different people feel different
9    ways about it -- I was thinking, if we want to pick a jury on
10   Tuesday and be ready to go.
11       MR. ZAKARIN:  That's fine.  I think that makes some
12   sense.  Pick the jury on the 10th?
13       THE COURT:  Yes.  One of your partners can do it.
14       MS. RICE:  You can still have the rest of the day to
15   continue --
16       MR. ZAKARIN:  Start the trial on the 11th?  That's
17   fine.
18       THE COURT:  I know some people used to feel it was
19   imperative to be there for that, but the way we pick the
20   juries, it doesn't really make much difference, it's all
21   court-done and it's pretty quick.
22       MR. ZAKARIN:  Yes.
23       THE COURT:  Maybe we get that out of the way and then
24   start, bang, on the Wednesday.
25       MR. FRANK:  It would be perfect.

1    MR. ZAKARIN:  That's fine.

2    THE COURT:  That will use our time well.

3    MR. ZAKARIN:  That's great.

4    THE COURT:  We'll do that.

5    Now, that means you don't have to be here for that,
6  really, but we should have the final pretrial conference on
7  Friday the 6th.  That is not very substantive.  If you miss
8  that, you're not missing much.  What happens is, the mechanics
9  of the picking the jury, hours, administrative stuff, and it's
10 not a settlement conference either.  So it's just simply when
11 should we go to pick the jury and how late do you do this, and
12 what about jurors, technical stuff.

13   MR. ZAKARIN:  That's fine.

14   THE COURT:  A capable colleague is well up to --
15 perhaps.

16   MS. FARKAS:  Perhaps.

17   THE COURT:  You wouldn't find it demanding, but it
18 gets a lot of stuff out of the way that otherwise takes trial
19 time.

20   MS. FARKAS:  Sure.

21   THE COURT:  So we can do that on Friday the 6th.

22   Which, in turn, means that I would like to have the
23 joint pretrial order in my chambers -- I say that because
24 things that get mailed in are screened by the marshals, and
25 sometimes they're busy and sometimes they're not busy,

1   sometimes they drop things and pick them up.  I need it at noon

2   on Wednesday the 4th so that I can be reading it and thinking

3   about it.

4            That, in turn, means that the plaintiff ought to give

5   the defendant a draft pretrial order by, let's say, August 15

6   or something like that.  The purpose of that date is to make

7   sure that the defendant isn't put with his back to the wall by

8   being given it almost as a fait accompli.  It gives him time to

9   put in his stuff and combine the two into a common, although

10  reflecting differences, common document.  So that ought to be

11  done by Thursday, the 15th of August, and earlier, as suits

12  you.  The only thing I'm really interested in is having it on

13  Wednesday before the trial.

14            MS. FARKAS:  Would you be opposed to getting us that

15  earlier, given the amount of time --

16            MR. FRANK:  Not at all.

17            MS. FARKAS:  -- between now and then, to given that

18  the judge wants an exchange?

19            THE COURT:  That kind of thing is all to the good

20  because there are a lot of decisions -- little decisions, but

21  they can be important -- in the drafting of it.

22            MS. FARKAS:  We can work out on our own a schedule as

23  long as we get it to you by noon that day?

24            THE COURT:  Starting tomorrow.

25            MR. FRANK:  We can probably get it to you by the end

Case 1:17-cv-05221-LLS  Document 105  Filed 04/16/19  Page 15 of 20    15
J38KTOWCcorrected

1     of July.
2                 THE COURT:  But it's a joint product.  What you
3     basically are doing is making decisions - is this point worth
4     fighting over?  Otherwise, not.
5                 MR. ZAKARIN:  You want the proposed jury instructions
6     and voir dire, as well, on the 4th?
7                 THE COURT:  The instructions, the verdict form, the
8     trial briefs, voir dire, any questions that are particularly
9     important on voir dire.
10                The voir dires are pretty much canned and mechanical,
11    but you do want to have an idea of what is suggested by the
12    parties, that you may see something that you think really
13    matters, to not overlook it.
14                MR. ZAKARIN:  Okay.
15                MR. FRANK:  Your Honor, do you request, or require,
16    that the parties, all of the parties, be here during jury
17    selection?
18                THE COURT:  The parties?  I do not.
19                MR. FRANK:  Okay.
20                THE COURT:  I leave it entirely to them.
21                MR. FRANK:  Okay.
22                THE COURT:  As far as I'm concerned, they don't have
23    to attend the trial.
24                MR. FRANK:  Okay.
25                THE COURT:  I tried a case when I was in practice, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  my major client was an Australian, and I told him, you don't

2  have to come, we can get it all in without you.  I lost it.

3          MR. FRANK:  Okay, then.

4          MS. RICE:  I was expecting it to end a different way.

5          THE COURT:  Just a technical --

6          MR. FRANK:  Point taken.

7          MR. ZAKARIN:  But not necessarily linked, they're not

8  necessarily linked thoughts.

9          THE COURT:  You know, the only cases that you remember

10  and think about are the ones you lost.

11          MR. ZAKARIN:  The only thing I ever think about is

12  everything I lose.

13          THE COURT:  Yes.

14          MR. ZAKARIN:  Winning disappears, disappears.

15          THE COURT:  I still, in the middle of the night, wake

16  up and think, I should have done this, I should have done that.

17  The winning thing?  You know, everything was perfect.

18          MR. ZAKARIN:  You forget about those quickly.

19          I have one more question -- I'm sorry.

20          THE COURT:  The correct attitude is that held by a

21  Phoenix lawyer.  I had a couple of cases down in Phoenix, and

22  got down there, I had been waiting to get to the Southwest.  I

23  loved it.  And there was a lawyer named Philip Von Ammon - tall

24  vigorous, handsome, great trial lawyer, known as Philip Von

25  Arrogant.  He used to say, I've tried a great many cases --

indeed, he had -- and I've never lost a case, never lost. He said, of course, my clients have lost quite a few. That's the attitude.

MR. ZAKARIN: There's always some good stories like that.

There was one more question I had, which was: Any motions in limine, when do you want them?

THE COURT: The same true is true about the trial briefs: Basically, I want them in time to think about them. And in the trial briefs, take the same approach. What would you want if you were trying the case? Warning about some piece of evidence that normally you wouldn't see the significance to, so you can take that into account; not rhetoric, it's not really polemic, it's instructional. Therefore, I don't want paraphrases of cases. Give me the Court's language, and if it doesn't quite fit, so do it anyway. I'll make any adjustments that are necessary. Don't manicure it. What the Court said does interest me because sometimes the tone is unconveyable except that way.

So just the working materials you would need to try the case. Take that approach. It's not a rhetorical document. I'm getting ready to present it, as you are.

In limine motions: Well, if you give them to me the night before the trial, they're of no use to you.

MR. ZAKARIN: I agree.

1           THE COURT:  A week or two before.

2           I'll tell you what I would do:  Give them to me in
3    time for me to take, let's say, three or four days to think
4    about them and get back to you, and the answer still be useful
5    to you in planning -- it's the answer you need.

6           MR. ZAKARIN:  It seems to me that something around two
7    weeks before our conference sounds right.

8           THE COURT:  That's fine, that's fine.

9           Most of the questions presented in in limine motions
10   are reserved until trial anyway.  It's not laziness; it's
11   because they're questions that are better evaluated after you
12   have heard a lot of other evidence.  You really will do it
13   better from the hip in the middle of trial than you will
14   abstractly.  You're just running a risk that you're going to
15   handcuff somebody in a way that it later turns out he shouldn't
16   have been handcuffed.

17          MR. ZAKARIN:  I think it's useful even if it's not
18   ruled on or decided.  At least it's informative --

19          THE COURT:  Advance warning.

20          MR. ZAKARIN:  -- of advance issues that we think, or
21   they think, are going to arise during trial that may be of
22   significance from an evidentiary point.

23          THE COURT:  I can't tell you how rare it is that a
24   case is won from ambush.  It just doesn't happen in real life.

25          MR. ZAKARIN:  Hopefully not.

```
 1              THE COURT:  Those books on cross-examination about --
 2   you know, the guy asks the one question too much and supposing
 3   he stopped short of that question, it would have been the first
 4   question I asked on redirect, so...
 5              Okey-doke.  Anything else?
 6              MR. ZAKARIN:  There is one more thing.  It doesn't
 7   relate to the trial.
 8              THE COURT:  Okay.
 9              MR. ZAKARIN:  We've mostly agreed on this.  One of the
10   plaintiffs is elderly and ill.  She was deposed last April in
11   the case, before the close of discovery.
12              THE COURT:  On film?
13              MR. ZAKARIN:  I don't think she was on video.
14   Transcript; she was deposed.
15              The plaintiffs want to preserve her testimony --
16              MR. FRANK:  Actually, we were just about to interject.
17   I may be able to save some time.  She is just got sent to
18   hospice, so she's not -- we had previously wanted to preserve
19   one of the plaintiffs' testimony, but she's been referred to
20   hospice, and she's not even aware of what's going on right now.
21   So it's gotten to the point where it's devolved; it's too late
22   to even do it.
23              MR. ZAKARIN:  I'm sorry.
24              MR. FRANK:  That has developed over the last ten days.
25              MR. ZAKARIN:  Okay.  I am sorry.
```

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | MR. FRANK:  It's become moot.                                            |
| 2   | MR. ZAKARIN:  That obviates that.  I'm sorry.                            |
| 3   | MS. RICE:  No.                                                           |
| 4   | MR. ZAKARIN:  The issue, then, is nonexistent,                           |
| 5   | unfortunately.                                                           |
| 6   | THE COURT:  Okay.  Well, don't settle it.  That's the                    |
| 7   | only thing.                                                              |
| 8   | MR. FRANK:  Okay.                                                        |
| 9   | THE COURT:  Nice case for trial.                                         |
| 10  | MS. FARKAS:  You're supposed to look at that, I                          |
| 11  | thought.                                                                 |
| 12  | MR. ZAKARIN:  Your Honor, I think you will be trying                     |
| 13  | this case come September.                                                |
| 14  | THE COURT:  Good, good.  We need the experience, and                     |
| 15  | we need to use that room there.  Spiders are building webs in            |
| 16  | it.                                                                      |
| 17  | * * *                                                                    |