# EXHIBIT 3

Page 1

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    --------------------------------x
     KATHRYN TOWNSEND GRIFFIN,
4    HELEN MCDONALD, and THE ESTATE
     OF CHERRIGALE TOWNSEND,
5
              -against-
6                          Civil Action No.:
                           1:17-CV-05221-RJS/GRIFFIN
7
8    EDWARD CHRISTOPHER SHEERAN,
     p/k/a ED SHEERAN, ATLANTIC
9    RECORDING CORPORATION, d/b/a
     ATLANTIC RECORDS, SONY/ATV
10   MUSIC PUBLISHING LLC and
     WARNER MUSIC GROUP
11   CORPORATION, d/b/a ASYLUM
     RECORDS,
12
                      Defendants.
13
     --------------------------------x
14                   May 30, 2018
15                   10:02 a.m.
16
17       Videotaped Deposition of ALEXANDER STEWART,
18   taken by Defendants, pursuant to Notice, held at the
19   law offices of Pryor Cashman, LLP, 7 Times Square,
20   New York, New York, before Judith Castore, a
21   Certified Livenote Reporter and Notary Public of the
22   State of New York.
23
24
25

Page 22

```
 1                    STEWART
 2      A    I'll have an opportunity.
 3      Q    So generally speaking when
 4 you're asked to compare two -- let me
 5 take a step back.
 6           Is it safe to a say that the
 7 vast majority of what you're asked to
 8 do as an expert is to compare two
 9 pieces of music as opposed to other
10 types of copyrightable works?
11      A    Oh, yes, yes.
12      Q    And I'm focusing now on a
13 situation where you're being asked to
14 compare two musical compositions.
15           Okay?
16      A    Yes.
17      Q    As opposed to -- you
18 understand the difference between a
19 music composition and a sound recording
20 of that composition, correct?
21      A    Yes.
22      Q    So I'm distinguishing here
23 between those two things.
24           And just so that the record
25 is clear, what is your understanding
```

Page 23

```
                           STEWART
 1
 2    about the difference between a musical
 3    composition and a sound recording?
 4         A    Well, the sound recording --
 5    first of all, they're two separate
 6    copyrights.  The sound recording is the
 7    performance or the embodiment of the
 8    composition.
 9         Q    So focusing on just the
10    musical composition.  Do you have a
11    particular methodology in general when
12    you're asked to compare two musical
13    compositions?
14         A    Yes.  First I listen to both
15    works in their entirety with -- and
16    give a very close listening trying to
17    hear parts that sound similar so that I
18    can zero in on them, and it may be
19    repeated listening to get to that
20    point.  And then I transcribe or put
21    into musical notation or look for
22    representations of that music that may
23    have already been done in the form of
24    sheet music and so forth.  And check
25    that for accuracy.  But that's the
```

```
 1                      STEWART
 2   important step is to put -- have some
 3   form of musical notation to compare so
 4   you can actually look at the notes and
 5   the musical expression.
 6        Q    So I'm going to just take it
 7   step-by-step, if you don't mind.
 8             So is it correct that
 9   typically the first thing you do in
10   your analysis is listen to the two
11   songs at issue?
12        A    Yes.
13        Q    And when you're listening to
14   the songs at issue, what are you
15   listening to?
16        A    I don't understand what
17   you're asking.
18        Q    Apparently neither did he.
19             What form does the music take
20   that you're listening to?  If you're
21   trying to compare two musical
22   compositions, a musical composition in
23   and of itself might not be capable of
24   being listened to, correct?
25        A    Good point.  Yeah.  I mean,
```

```
 1                    STEWART
 2           MR. FRANK:  Objection.
 3      Predicate, form.
 4           Go ahead.
 5      A    For every song that's been
 6  written in the last 40 years, no.
 7  Every single song, no.  But for the
 8  vast majority in the popular music
 9  idiom, yes.
10      Q    When you are asked generally
11  speaking to analyze two pieces of
12  music, do you make that assumption when
13  you are analyzing the songs?
14      A    Make what assumption?
15      Q    That was is embodied in the
16  commercially released sound recording
17  is in fact the musical composition?
18      A    That has been the standard
19  operating procedure of every
20  musicologist in this field that I know
21  of for all the time I've been involved
22  doing this.  And this emphasis on the
23  deposit copy is something that is new,
24  and I think that's what you are leading
25  toward, and that has not been the
```

```
 1                    STEWART
 2   standard practice.  So I -- if you want
 3   to cut to the chase, I think that's
 4   what you're trying to imply here.
 5             You know, you're shaking your
 6   head.  So what do you want -- what are
 7   you asking me then?
 8        Q    The way it works is I ask
 9   questions and you give me answers.  And
10   if you don't understand my questions,
11   I'll rephrase it, but --
12        A    Can I just try to explain --
13        Q    There's no question pending
14   right now.
15        A    Sure.
16        Q    Generally speaking, when you
17   are asked to analyze two songs, are you
18   assuming that the commercially released
19   sound recording that you are given
20   accurately reflects the musical
21   composition that you are being asked to
22   analyze?
23        A    Because in almost every
24   instance this recording has been the
25   first embodiment that -- of this
```

```
 1              STEWART
 2  particular composition or has been
 3  released with the understanding that it
 4  embodies the composition, my answer
 5  would be yes.  You know, ontologically
 6  the recording almost always precedes
 7  any other form that the composition
 8  might be represented in.
 9       Q    But hypothetically speaking,
10  it is possible that a musical
11  composition could be written prior to
12  and outside of the studio, correct?
13       A    Yes.
14       Q    Do you compose music?
15       A    Not much.
16       Q    Have you ever composed music?
17       A    Yes.
18       Q    And what's your process for
19  composing music?
20       A    I've generally worked in the
21  studio, but I've also used the old
22  fashioned method of paper and pencil.
23       Q    And when you're using the old
24  fashion method of paper and pencil, can
25  you explain to me what your process was
```

Page 80

```
 1                    STEWART
 2    transcription of the entire musical
 3    composition of Let's Get It On?
 4         A    Yes.
 5              MS. FARKAS:   We would ask
 6         that those be produced.
 7         Q    Right.
 8              And the transcription that
 9    I'm asking about are ones that you
10    actually prepared.
11         A    Yes.
12         Q    So your answer remains the
13    same?
14         A    Yes.
15         Q    Other than the two
16    commercially released sound recordings
17    that are identified in your report, and
18    the two YouTube video that are
19    identified in your report, is there
20    anything else that you reviewed in
21    order to create your June 2015 written
22    report?
23         A    Yes.
24         Q    And what is that?
25         A    I reviewed another version of
```

Page 81

```
 1                    STEWART
 2  Let's Get It On, the, I guess, extended
 3  version.  I also looked at other
 4  performances of Mr. Sheeran that were
 5  on YouTube, there were quite a few.
 6  Some of which the last time I looked
 7  had been taken down.
 8            Let's see.  Of course I
 9  bought the sheet music for both songs.
10  And I think I attached them to my
11  report.  And at some point I looked at
12  the deposit copy, too, and I can't
13  remember the exact timing on that.  The
14  deposit copy for Let's Get It On.
15       Q    Is it your testimony that you
16  reviewed the deposit copy for Let's Get
17  It On before you wrote your June 2015
18  report?
19       A    I don't recall.
20       Q    Where did you get the deposit
21  copy from?
22       A    From counsel.
23       Q    But you didn't analyze the
24  deposit copy in your June 2015 report
25  or your December 2017 report; is that
```

1                    STEWART

2    correct?

3        A    It informed my work to some

4    extent.  But, no, I didn't include it

5    explicitly in the analysis.

6        Q    So your testimony is that you

7    did review the deposit copy before you

8    rendered your June 2015 report?

9        A    No.  I don't recall the

10   timing.

11       Q    So you don't know whether it

12   informed that?

13       A    Yeah, that's a good call.  I

14   don't recall if it informed that or

15   not.

16       Q    And do you recall whether you

17   reviewed the deposit copy before you

18   rendered your December 2017 report?

19       A    Yes, I did.

20       Q    And your testimony is that it

21   informed your opinion in your

22   December 2017 report?

23       A    I found that it supported

24   everything in my report.

25       Q    But in your December 2017

```
 1                    STEWART
 2   Sheet Music Plus, it's not that one.
 3   When you Google sheet music it's the
 4   other name that comes up.
 5        Q    Well, we can leave a blank in
 6   the transcript and you can fill it in.
 7   INSERT:_____
 8        A    I would be happy to provide
 9   that to you.
10        Q    To figure out the name.
11             When you are transcribing
12   melody, and when you did so in this
13   case, how do you typically depict
14   melody?
15        A    The same way I would depict
16   any musical expression, with notes and
17   rhythms and -- you know -- I mean,
18   notes imply rhythmic placement as well
19   as pitch, so...
20        Q    And in order to accurately
21   transcribe and analyze the melody of a
22   particular song you have to notate each
23   note the melody, correct?
24        A    Yes.
25        Q    And you have to notate the
```

```
 1                    STEWART
 2   rhythmic duration of each note,
 3   correct?
 4        A    Yes.
 5        Q    And it's important that you
 6   do that accurately, correct?
 7        A    Yes.
 8        Q    So when you are transcribing,
 9   what exactly are you transcribing, can
10   you give me a sense?  In this case what
11   exactly did you transcribe in addition
12   to the melody?
13        A    Well, as expressed in the
14   vocals, for example, when you refer to
15   the melody, right?  So I transcribed
16   the base parts, the drum parts, the
17   chords.  I think that's what I
18   remember.
19        Q    And you're making those
20   transcriptions from the commercially
21   released sound recordings?
22        A    Yes.  And in one instance
23   from this performance of Ed Sheeran.
24        Q    The YouTube video?
25        A    Yeah.
```

```
 1                    STEWART
 2   purposes which is standard
 3   musicological procedure.
 4        Q    And what is the basic chord
 5   progression in Let's Get It On deposit
 6   copy?
 7        A    For the verses and choruses
 8   it is in the key of E-flat.  Should I
 9   give it to you or in the key of D or
10   using Roman numerals?
11        Q    No, Roman numerals.
12        A    One with the capital I
13   meaning major, three with three small
14   Is meaning minor, and then IV major, V
15   major.  So I, III, IV, V.
16        Q    And would I be correct that
17   the V is a V major VII?
18        A    No, it's not.
19        Q    So it's your testimony that
20   the deposit copy, the last chord in the
21   chord progression is not a V major VII?
22        A    It would be my testimony,
23   yes.
24        Q    Would you agree that the
25   basic chord progression in the Let's
```

```
 1                    STEWART
 2   Get It On deposit copy and Thinking Out
 3   Loud are not identical?
 4        A    They are extremely similar
 5   but they are not identical.
 6        Q    Looking at the deposit copy,
 7   the fourth chord depicted there, what
 8   do you see written there?
 9        A    B-flat VII.
10        Q    So is that not a V major VII?
11        A    It's not.
12        Q    What is it?
13        A    It's a V dominant VII.
14        Q    V dominant VII?
15        A    Yes.
16        Q    How would you actually notate
17   that in your report Roman Numeral wise?
18        A    V-VII.  Roman Numeral 5.
19        Q    Roman numeral 5 like a V --
20   an upper case V with a VII.
21             Do you agree that the basic
22   chord progression in the Let's Get It
23   On deposit copy is not original to
24   Let's Get It On?
25        A    These four chords have been
```

```
 1                    STEWART
 2   used in other compositions prior to
 3   Let's Get It On.
 4        Q    And would you agree that it's
 5   a relatively common chord progression
 6   that predates Let's Get It On?
 7        A    I wouldn't say it's that
 8   common.
 9        Q    How common would you say it
10   is?
11        A    Well, there were -- out of
12   hundreds of thousands of songs there
13   were a handful who used it.  I can't
14   really -- I mean it was more than -- a
15   lot more than one.  More than one and
16   certainly not --
17        Q    Hundreds?
18        A    I don't think so.
19        Q    Dozens?
20        A    I think Dr. Ferrara has done
21   a pretty good job of trying to find
22   every song that has a progression
23   that's even remotely similar and he's
24   come up with how many.
25        Q    What makes you think he's
```

```
 1                    STEWART
 2   done a pretty good job of finding every
 3   song that has that progression?
 4        A    Well, because this is what he
 5   kind of always does is try to bury us
 6   with so-called prior art that he says
 7   is similar.
 8        Q    Well, how many pieces of
 9   prior art do you think are enough to
10   prove that it's not original to Let's
11   Get It On?
12        A    Well, I think I already said
13   it's not original so I don't think we
14   have any issue there.  I said that
15   other songs have this chord
16   progression.
17        Q    So can I turn your attention
18   to Visual Exhibit E to Dr. Ferrara's
19   report?
20        A    Visual Exhibit E.
21             Yes.
22        Q    And do you see that this is
23   an excerpt from a guitar method book
24   called Guitar for Advanced Beginners.
25             Do you see that?
```

Page 138

STEWART

1

2       A    It's very difficult to read.

3  But, yes, it seems to say that.

4       Q    If you turn the page twice

5  you can see that there's an excerpt

6  from Page 84 of this Guitar Book for

7  Advanced Beginners?

8       A    Yes.

9       Q    And do you see about midway

10  down -- the bottom half of the page

11  references the chord progression that

12  is at issue here.

13           Do you see that?  The

14  I-III-IV-V chord progression?

15       A    Yes.

16       Q    And do you see the sentence

17  right above that that says by the

18  way -- well, hold on.  The start of

19  that section says, we first played the

20  I-III-IV-V progression in Class VII.

21  And then I'm skipping over the next

22  sentence, is says is shows up in songs

23  like "If I Had A Hammer" by Pete Seeger

24  and Lee Hays, "Cruel to be Kind" by

25  Nick Lowe, "Ziggie Stardust" by David

1           STEWART

2    Bowe, "Good Little Girl/Bad Little Boy"

3    from Adventure Time, "Stuck on You" by

4    Lionel Richie, "Live and Let Die" by

5    the Wings, "Fun, Fun, Fun" by the Beach

6    Boys, "Crocodile Rock" by Elton John

7    and "Let's Get It On" by Marvin Gaye.

8              Do you see that?

9       A    Yes.

10      Q    Do you disagree with any of

11   those?  Do you disagree with anything

12   in that sentence?

13      A    I can't really comment on

14   that because I haven't listened to all

15   of these songs to confirm that.

16      Q    And it says, by the which

17   even though Let's Get It On was

18   recorded in 1973 which is after dozens

19   of other I-III-IV-V songs were

20   recorded, I firmly believe that Marvin

21   Gaye did not plagiarize this song - he

22   was simply writing a song using a

23   common progression just like every

24   other professional songwriter does.

25              Do you see that sentence?

```
                              STEWART
 1
 2        A     Yes.
 3        Q     Do you agree?
 4        A     First of all --
 5              MR. FRANK:  Which part of the
 6        sentence are you asking him if he
 7        agrees with?  There's several
 8        propositions.  Whether Marvin Gaye
 9        plagiarized Let's Get It On or
10        whether it's common progression
11        and every other professional
12        songwriter uses it?
13        Q     Is there anything in that
14   sentence that you disagree with?
15        A     Well, just on your previous
16   sentence that you read I would like to
17   say that some of these songs that are
18   listed postdate Let's Get It On, so
19   that needs to be pointed out.  No, I
20   have not listened to all of them.  But
21   in terms of the sentence you just read,
22   I don't think I have a problem with
23   that.  I think what's unique about what
24   Marvin Gaye did was the way that he
25   expressed it -- this chord progression
```

Page 141

```
 1                    STEWART
 2    in a distinctive way.  So this case is
 3    not really just about abstract four
 4    chords, it's about how these four
 5    chords were expressed in this
 6    composition.
 7         Q    Well, but if the -- if the
 8    existence of this chord progression
 9    were the only similarity that you found
10    between these two songs, would your
11    conclusion still be that the similarity
12    can only be the result of copying?
13              MR. FRANK:  Objection,
14         predicate.
15              Go ahead.
16         A    Could you repeat that?
17         Q    Sure.
18              If the existence of this
19    similar chord progression were the only
20    similarity between these two
21    compositions, would your conclusion
22    still be that the similarity can only
23    be the result of copying from Let's Get
24    It On?
25         A    Well, if it were just this
```

Page 142

1                          STEWART

2      chord progression in the abstract that

3      were the only thing in common; yeah, it

4      would not -- what was your phrase?

5           Q    Well, I'm use your phrase

6      from your report which is that these

7      similarities can only be the result of

8      copying Let's Get It On?

9           A    That would not be my

10     conclusion if that were the only thing.

11     And that's, again, the chord

12     progression in the abstract, just these

13     Roman numerals, not the way that it's

14     actually expressed in terms of

15     rhythmically and all the other details.

16               MS. FARKAS:  Why don't --

17          it's probably a good time for a

18          break.

19               VIDEOGRAPHER:  The time is

20          12:50.  This is the end of Video

21          2.  We're off the record.

22               (Whereupon, a lunch recess

23          was taken at 12:50 p.m.)

24

25

1                    STEWART

2        A     I think I was.

3        Q     When you send invoices are

4    they itemized in any way?

5        A     I don't recall.

6        Q     Do you typically send

7    itemized invoices?

8        A     Yes.  I mean, itemized in

9    terms of what kinds of work I was

10   doing, what the tasks were that I was

11   accomplishing.

12       Q     What are some of the

13   categories of tasks that you would

14   itemize on your invoices?

15       A     Transcription analysis,

16   writing the report, those kinds of

17   things.

18       Q     I think you testified earlier

19   that the fourth chord on the Let's Get

20   It On deposit copy is a V 7 chord,

21   correct?

22       A     Yes.

23       Q     And I'd like to show you

24   what's been marked as Stewart

25   Exhibit 6.

```
 1                    STEWART
 2            (Sheet music to Let's Get It
 3       On, was marked Stewart Exhibit 6,
 4       for identification, as of this
 5       date.)
 6       Q    Can you identify this
 7  document for us?
 8       A    It appears to be the sheet
 9  music to Let's Get It On.
10       Q    And if you look at the bottom
11  left corner of really any of the pages
12  other than the cover page, do you see
13  it says musicnotes.com at the bottom
14  left?
15       A    Yes.
16       Q    Does that refresh your
17  recollection as to whether that's a
18  site from which you get sheet music?
19       A    That's the sight I generally
20  go to, yes.
21       Q    Am I correct that the fourth
22  chord noted on the published sheet
23  music for Let's Get It On is a V 7
24  chord?
25       A    Yes.
```

1                      STEWART

2    this sentence?

3          A     In terms of the combination

4    of these elements, yes.

5          Q     And what led you to that

6    conclusion other than the transcription

7    of the two songs and the comparison of

8    them that we've been talking about

9    today, anything else?

10          A     The absence of prior art that

11    has the degree of similarity that these

12    two songs held.

13          Q     Can you tell us about whether

14    you conducted any search for prior art

15    in this case prior to -- let's start

16    with prior to issuing your June 2015

17    report?

18          A     Yes.

19          Q     And do you have a particular

20    process that you use when searching for

21    prior art?

22          A     Well, believe it or not one

23    very useful method has been to ask

24    musician friends of mine who have

25    extensive knowledge of repertoires if

Page 262

                              STEWART
1   they know of other songs like these.
2
3              And then if they recommend
4   that I -- if they say oh, yes, there's
5   this, this or this, then they warrant
6   closer looks in terms of listening to
7   the tracks to see how similar they are.
8   And of course we can always count on
9   Dr. Ferrara to come up with many, many
10  examples of what he claims are examples
11  of prior art that are similar, as well.
12  So that's at a later stage than what
13  you're talking about.
14       Q    That's correct.
15            So in this instance, do you
16  recall whether you asked other
17  musicians about prior art?
18       A    Yes, I think I did.
19       Q    And who did you ask?
20       A    Colleagues of mine in the
21  music department, guitarists.  Just
22  musicians who I work with.  I can't
23  give you -- this is -- we're talking
24  about a number of years ago.  But, I
25  mean, I still am out performing and

```
 1              STEWART
 2   doing gigs so I might ask somebody else
 3   who's on the gig with me.
 4        Q    And what exactly -- do you
 5   recall what exactly you asked them in
 6   this instance?
 7        A    Yeah, I would have asked
 8   them, you know, you have two songs here
 9   that have -- you know, I might ask them
10   do you know of other songs that have
11   this I-III-IV-V progression.  And that
12   would be a go way to begin the
13   comparison to see if the way that the
14   I-III-IV-V progression as expressed in
15   the different songs is the same as it
16   is in these songs.
17        Q    Do you recall that happening
18   because you said you I might ask?  Do
19   you recall that you actually did that?
20        A    Yeah, I do recall.  But I
21   don't recall exactly whom I asked at
22   this point in time.  But, yeah, this
23   would be -- well, given it sounds like
24   I'm saying, a conditional would be --
25   but this is my standard practice when
```

1              STEWART
2    I'm working on something without kind
3    of tipping my hand in terms of what the
4    situation is, you know, in terms of any
5    legal situation.  But to just ask
6    somebody on a gig; hey, man, do you
7    know other songs with at I-III-IV-V
8    progression.  And they might say, yeah,
9    Get Off My Cloud has a similar
10   progression to that.  And so then I
11   would check that out.  But other songs
12   I would think of on my own.  But my
13   research on prior art would be happy
14   to -- to acknowledge that Dr. Ferrara
15   obviously has spent a lot of time on
16   that.  So I've looked very carefully at
17   all of the examples that he's
18   proffered, as well.
19        Q    But I want to focus on what
20   you did independently of Dr. Ferrara.
21   And I want to focus on what specific
22   recollection you have of what you
23   actually did prior to rendering your
24   report.
25        A    Yeah.  So prior to writing

Page 265

```
                              STEWART
 1                            STEWART
 2    that line that I just read that you
 3    sited in my report.
 4         Q    Well --
 5         A    At that point in time of
 6    course I'd already seen an extensive
 7    list of songs that Dr. Ferrara had
 8    produced.  And, in fact, he even
 9    produced a list of songs in his report
10    that is Visual Exhibit G that I was
11    provided really early on in the case.
12    So there was stuff to work with there
13    already in terms of making the
14    comparison.  And, you know, it's a very
15    time consuming thing because I have to
16    transcribe those examples, too, in
17    order to compare them the same way that
18    I compared Let's Get It On and Thinking
19    Out Loud.
20         Q    So is it fair to say that you
21    typically rely upon the defendant's
22    prior art searches for your prior art
23    search, is that a large part of your
24    prior art search?
25         A    I don't know if it's a large
```

Page 266

                              STEWART

1
2    part, but it's part of it, yes.
3         Q    So let's talk about the other
4    parts in this instance.
5              Sitting here today, what do
6    you specifically recall that you did on
7    your own to search for prior art?  You
8    mentioned that you may have spoken with
9    musicians.
10             Do you recall actually
11   speaking to any musicians about prior
12   art in this case?
13        A    Yes.
14        Q    Who did you speak with?
15        A    I can't remember who
16   specifically.
17        Q    Then how do you know you
18   spoke with anyone?
19        A    Because I remember doing it.
20   But, you know, let's back up for a
21   second because you're covering a bit of
22   ground that we already covered at the
23   beginning, too.  In which I said my
24   primary source is my own knowledge of
25   repertoire and based on 40 or 50 years

```
 1                    STEWART
 2   as a performer doing covers of these
 3   songs and also as a researcher and
 4   scholar in popular music.  So, you
 5   know, I can -- when somebody provides
 6   me with two songs right off the bat I'm
 7   going to -- if there's something else
 8   that was really similar, I'm going
 9   to -- that is in the repertoire that
10   I'm familiar with, I'm going to know
11   right away that, as I mentioned
12   earlier, maybe there is not anything
13   worth pursuing in this matter because
14   it's something that is present in prior
15   art.
16        Q    Okay.
17        A    So that happens frequently in
18   terms of just relying on my -- my
19   current knowledge.
20        Q    Sure.  Understood.
21             But, again, you keep -- and I
22   don't think you're doing it
23   intentionally, but you keep drifting
24   off into the general.  And I'm really
25   focusing on what did you do in this
```

Page 268

1                    STEWART

2    case.

3         A     What you --

4         Q     So in terms of your own

5    musical knowledge.

6              So you were presented with a

7    potential claim, you were asked to

8    evaluate it and you were -- you had

9    some reaction to it based on your own

10   knowledge and experience with music; is

11   that correct?

12        A     Yes.

13        Q     And do you recall whether any

14   songs came to mind to you as possible

15   sources of prior art whether or not you

16   ultimately rejected them?

17        A     Yeah, anything that I thought

18   of I would hear that it was

19   rhythmically different, that the metric

20   placement of these -- these -- of this

21   expression was different.

22        Q     Do you recall any songs,

23   sitting here today, that came to mind

24   from your own knowledge?

25        A     From three years ago, no.

```
 1                    STEWART
 2        Q    Do you recall how many songs
 3   came to mind?
 4        A    Well, it's sort of like -- in
 5   some ways the process doesn't really
 6   take that long because the music is in
 7   my memory.  So it's -- you asked
 8   earlier like how much time do you spend
 9   doing this?  It might take a matter of
10   minutes for me to think of something
11   that's very similar and it doesn't even
12   take any more work in terms of it
13   because I can hear it in my heed that
14   it's going to eliminate the possibility
15   of this being pursued further and
16   then -- so it's -- this is why it's
17   sort of difficult to answer your
18   question.
19        Q    Do you recall transcribing
20   any portion of any song that came to
21   mind from your own knowledge of music
22   in this case?
23        A    I can't remember, no.
24        Q    Do you recall whether any of
25   the musicians that you may have
```

STEWART

1
2  lot different guitar students because
3  most people come to him don't
4  necessarily want to learn jazz.  So, I
5  mean, like every guitar teacher I know
6  they've had to teach across a wide
7  spectrum of repertoire and genres.
8      Q     So other than -- I believe
9  you said you asked somewhere around
10  three to five or so musicians?
11      A     Um-hum.
12      Q     You don't recall transcribing
13  any of the songs that they suggested to
14  you; is that correct?
15      A     That's correct.  I don't
16  recall.
17      Q     And the other source of prior
18  art that you consulted prior to
19  rendering an opinion was your own --
20  your own historical knowledge of music?
21      A     Encyclopedia.
22      Q     I was going to say.  Okay.  I
23  fell like you used it, I'm not adopting
24  it.
25      A     No, please do.  But --

STEWART

1

2      Q     I don't think that's

3   possible.

4      A     Yeah.  And then -- but let's

5   not discount the fact that I received a

6   list of songs from Dr. Ferrara early

7   on, and I can't tell you precisely

8   when.  But any time that he provides

9   something or something comes to me by

10   that way I feel obligated to, you know,

11   investigate it thoroughly and to deal

12   with it fairly.

13      Q     And would it be safe to say

14   that you were primarily focused on

15   songs that had the combination of the

16   drum pattern and the chord progression

17   that you've identified?

18      A     And the baseline.

19      Q     And the baseline.

20      A     Yes.

21      Q     And it was that combination

22   that you were looking for?

23      A     Primarily.

24      Q     And what was the point at

25   which you had done enough to conclude