# EXHIBIT 7

I6t1gric

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KATHRYN TOWNSEND GRIFFIN,
HELEN McDONALD, THE ESTATE OF
CHERRIGALE TOWNSEND,

                    Plaintiffs,

          v.                              17 Civ. 5221 (RJS)

EDWARD CHRISTOPHER SHEERAN,
personally known as Ed
Sheeran, ATLANTIC RECORDING
CORPORATION, d/b/a Atlantic
Records, WARNER MUSIC GROUP
CORPORATION, d/b/a Asylum
Records, SONY/ATV MUSIC
PUBLISHING, LLC,

                    Defendants.            Conference

------------------------------x

                                           New York, N.Y.
                                           June 29, 2018
                                           10:08 a.m.

Before:

                    HON. RICHARD J. SULLIVAN,

                                           District Judge

                         APPEARANCES

FRANK & RICE, P.A.
     Attorneys for Plaintiffs
BY:  PATRICK R. FRANK, ESQ. (Present Via Speakerphone)
     KEISHA D. RICE, ESQ. (Present Via Speakerphone)
     KATHERINE L. VIKER, ESQ. (Present Via Speakerphone)

PRYOR CASHMAN LLP
     Attorneys for Defendants
BY:  DONALD S. ZAKARIN, ESQ.
     ILENE S. FARKAS, ESQ.
     ANDREW M. GOLDSMITH, ESQ.

I6t1gric

```
1            (Case called)

2            THE COURT:  Let me take appearances.  For the

3    plaintiff?

4            MS. RICE:  For the plaintiff, we have Keisha Rice,

5    Patrick Frank, and Katherine Viker.

6            THE COURT:  Good morning.  And you're all together on

7    the one line?

8            MS. RICE:  That's correct, your Honor.

9            THE COURT:  So since there's three of you, let me ask

10   that whoever is speaking just identify themselves just so the

11   court reporter can make the correct attributions on the

12   transcript and so we can know who's talking, okay?

13           MS. RICE:  Of course, your Honor.

14           THE COURT:  Great.  And then for the defendants, for

15   Mr. Sheeran?

16           MR. ZAKARIN:  Your Honor, Don Zakarin, and with me is

17   Ilene Farkas and Andrew Goldsmith.

18           THE COURT:  Okay.  Good morning to each of you.

19           And Mr. Sheeran is not coming today?

20           MR. ZAKARIN:  He's on tour, your Honor.

21           THE COURT:  Oh.  Well, you know, New York's a nice

22   place to come to.

23           Okay.  We're here in connection with I guess a couple

24   of letters that I've received.  I have a letter from the

25   plaintiffs on their contemplated motion to compel discovery,
```

I6t1gric

```
1    and then I have a letter from the defendants on a contemplated

2    motion for summary judgment.  And then just yesterday I

3    received a letter from SAS, and they're not here today.  I

4    guess I didn't order them to be here.  I had declined their

5    request to intervene.  But they wrote a letter informing me

6    that they filed a new case.  They're anticipating that that

7    case will be assigned to me as related, and they're asking me

8    to basically stay this case so that the new case can catch up.

9    And so defendants are opposing that request, but I guess it's

10   premature to deal with that since SAS is not even here.

11           MR. ZAKARIN:  Your Honor, I sent a letter in response

12   last night, which you may not have received.

13           THE COURT:  No, I got it.  I received it last night.

14   So I guess we're not going to deal with that now, since they're

15   not here.  I think it's unlikely I'm going to grant that

16   request.

17           So let's deal now with the letters that I do have and

18   with the parties who are here.

19           So for the plaintiff's motion to compel, the

20   plaintiffs are seeking to compel the production of documents

21   relating to international profits that were derived from the

22   song "Let's Get It On," as well as documents related to the

23   defendant's expert.  With respect to the first of those, the

24   fact discovery, what I would call fact discovery related to

25   international sales, it seems to me that this is way out of
```

I6t1gric

1    time.

2         So I'm not sure who for the plaintiffs is going to

3    cover this, but why are you making this request now when fact

4    discovery wrapped up in March, for the most part?

5         MS. RICE:  Thank you, your Honor.  And good morning to

6    everyone.  This is Keisha Rice.

7         May it please the Court.  The reason that we are

8    making this request now is because -- and we will be attaching

9    these to our motion to compel if we're allowed to go forward

10   with it today -- throughout the discovery process, the

11   defendants have, on multiple occasions, indicated to us that

12   they did have the information that we had requested, that they

13   were simply waiting to get it back from Mr. Sheeran.  We have

14   extensive correspondence.  And so there was never an instance

15   in which they said that they did not have it until very near

16   the end of the discovery process, and so the reason that we

17   waited this long is because there's been a continual

18   communication with us that they did have it, or the demo, and

19   so, you know, we waited until the last possible minute for them

20   to provide that to us, which they asked us to do.  At one point

21   in time it was because Mr. Sheeran was touring and needed to

22   stop in order to get the information to them to get to us.  So

23   there has been communication throughout and there have been

24   assurances from the other side that we will be attaching to our

25   motion that the demo with the date/time stamp and the metadata

I6t1gric

1    to identify the location of the recording was requested, asked

2    for, and that the defendants at all times understood exactly

3    what we were asking for.  In good faith, we took them at their

4    word and waited until the last possible moment, even up until

5    the very, very end of discovery, waiting to get that.  And so

6    at this point in time they now decided that they don't have it,

7    they never had it, and so now there's the foregoing issue.

8         THE COURT:  All right.  Well, I mean, as a general

9    matter, I mean, if you're going to wait past the discovery

10   deadline, you're just sort of out of luck.  But it seems to me

11   that you're making really two arguments.  The first is that you

12   were promised a demo tape, it hasn't been produced, and because

13   it hasn't been produced, you are entitled to a presumption that

14   the infringement took place in the United States, took place

15   abroad, or some part of it took place here and that you're

16   entitled to therefore international profits.  I just think

17   there's a huge leap here.  Most of what you're asking for here,

18   in your letter, anyway, is records related to international

19   profits, right, from the song?

20        MS. RICE:  Yes, your Honor, and that's because there

21   are other songs on the album that we have information and

22   evidence that were created while in the United States, and so

23   we find it very unlikely that this would be the one song on the

24   album that was not created in the United States.  And so that

25   might be the leap that your Honor is talking about.  But from

I6t1gric

1      our communications to the defendants, we have on multiple

2      occasions told them about that, and that is exactly why they

3      have -- they wanted to basically bridge that gap and provide

4      the demo.

5            THE COURT:  Okay.  Who's covering this for the

6      defendants?

7            MR. ZAKARIN:  This one is me, your Honor.

8            THE COURT:  Okay.  Just so they can know who's

9      speaking.

10            MR. ZAKARIN:  This is Don Zakarin.

11            So let me try to deal with this sequentially.  First

12      of all, where the song was written in any event is not a

13      predicate act under the law.  But let's deal with it as if it

14      is a predicate act.  There is no evidence that this song was

15      written in the United States.  There is all of the evidence --

16      Ed Sheeran's sworn testimony; the actual original demo which he

17      transferred from the lost iPhone to his iPad, we've also now

18      located, your Honor, as well, on Amy Wadge's computer, which

19      was sent to her from the iPhone that day, so we have that

20      original.

21            THE COURT:  That last one has not been produced yet?

22            MR. ZAKARIN:  We only found out about it this week.

23      we're happy to give especially that to them as well.

24            We have the original recording which was made on

25      February 5, 2014, which is the original recording that is the

I6t1gric

1    commercially-released recording two days after the song was

2    written in England.

3         So we have all of those facts.  There are no facts

4    that even remotely suggest the song was written here.

5         But going to the predicate act, Ed Sheeran is signed

6    to a UK record company.  Ed Sheeran is signed to a UK

7    publishing company.  Rather than acts of infringement here,

8    facilitating and causing foreign profits that then flow into

9    the United States, it's actually the exact opposite.  It is

10   foreign activities which enable the exploitation of the song

11   here.  And they have been given all of the information relating

12   to the exploitation of the song here, even down to the

13   testimony of Atlantic Records, which is the US licensee, that

14   recordings sold in the US were manufactured in the US,

15   recordings sold ex-US were manufactured ex-US.  There is zero

16   evidence that would support a predicate act exception.  So all

17   they have is Ed Sheeran's iPhone on which he recorded the

18   composition when it was written on February 3 or February 4 --

19   that's as one day was turning into the next -- in 2014.

20   Because his iPhone is missing, despite the fact that he was in

21   the UK at the time and recorded it at the time, they say the

22   Court should conclude, because of the missing iPhone, that

23   actually everything occurred here, without the slightest

24   evidence, and indeed all of the evidence to the contrary.

25   There is no predicate act.  There is no basis for it, and there

I6t1gric

1    are no profits that flowed into this country from abroad.

2    There is money that flowed from this country to the other

3    countries, and they have that information.

4            THE COURT:  Okay.  I mean, Ms. Rice, I'll give you a

5    chance to respond to that.

6            MS. RICE:  Your Honor, I think that we're -- I mean,

7    if they have now a recording that was recorded on the night

8    that it was created, as Mr. Zakarin says, going from one night

9    into the next morning, that was sent from Mr. Sheeran to

10   Ms. Wadge's computer that night, as he states, they're willing

11   to give us that, that would certainly have the metadata on it

12   that we are requesting.

13           THE COURT:  All right.  So Mr. Zakarin, you're not

14   opposing that.  You're happy to give them that recording.

15           MR. ZAKARIN:  Happy to, your Honor.  All the other

16   evidence they have -- they have the original recording, they

17   have everything -- but we're happy to provide this as well.  We

18   just have to request it from Ms. Wadge.

19           THE COURT:  Why don't you do that, because that would

20   seem to be responsive to requests that were timely made.

21           I have to say it seems like a huge leap to me to infer

22   from the evidence or lack of evidence so far that there was an

23   infringement here, and that's going to be the crucial step to

24   getting this international revenue information, so I think it's

25   a long shot, that that's going to happen, but why don't you

I6t1gric

1    take a look at what they're going to produce, and then if you

2    want to renew that motion, you can.  But I think it's a long

3    shot, candidly.  Okay, Ms. Rice?

4         MS. RICE:  All right, your Honor.  Thank you.

5         THE COURT:  All right.  The next motion is the

6    contemplated motion of the defendants for summary judgment.

7    Oh, no, I'm sorry.  We forgot the second half of the discovery

8    dispute, and that's --

9         MS. RICE:  Yes, your Honor.

10        THE COURT:  -- plaintiffs are seeking materials

11   related to the defendant's engagement of their musicologist.

12        MS. RICE:  Yes, your Honor.

13        THE COURT:  The expert.  And so the defendant's letter

14   indicates that "To the extent Dr. Ferrara, in forming his

15   opinions, relied upon any facts, data, or information provided

16   by counsel, that has been disclosed through his report."  It's

17   not clear to me what exactly it is that is being sought here.

18        MS. RICE:  Your Honor, this is Keisha Rice.

19        THE COURT:  Yes.

20        MS. RICE:  We are requesting invoices, transmittal

21   letters, all of the items that they have requested for us, from

22   the plaintiffs, that were also attached to the plaintiff's

23   expert report, but the invoices, and with respect to the

24   defendant, the invoices and the transmittal letters actually

25   speak to who engaged Dr. Ferrara.  We have information from not

1    only emails and correspondence that took place at the

2    inception, basically, or at the notification of this potential

3    lawsuit back in 2015, that Mr. Ferrara may have actually been

4    engaged for another artist rather than particularly for --

5    rather than for this case.  He may have been engaged for the

6    purposes of another case.  And so we would like to get a little

7    bit more information about that.  They requested the same

8    information from us for that exact same purpose, and so we just

9    would like to request that information so that we can find not

10   only the scope of work that was requested of Mr. Ferrara back

11   in 2015, with respect to this case, but also to see if

12   Mr. Ferrara was particularly engaged for this case, because

13   according to their own emails, that's not the case.

14            THE COURT:  All right.  I mean, your letter says that

15   you're seeking transmittal documents, contracts, invoices, and

16   any materials conveyed to the defendant's musicologist in

17   connection with his work on this case.

18            So who's carrying the ball for the defendants on this

19   one?

20            MR. ZAKARIN:  I'll carry this one, your Honor.  My

21   brief ceases at music.  I turned it over to Ms. Farkas.  But on

22   this stuff, I can still handle it, I think.

23            THE COURT:  All right.  So transmittal documents,

24   contracts, and invoices.

25            MR. ZAKARIN:  Okay.  We've told them precisely what

I6t1gric

1  Dr. Ferrara has charged.  We've given them all that

2  information.  We've given them everything that they're entitled

3  to under the Federal Rules of Civil Procedure.  What they are

4  talking about is privileged communications because --

5         THE COURT:  Well, wait.  Let's just talk about

6  transmittal documents.

7         MR. ZAKARIN:  Everything that he's received, used in

8  his opinion is in his opinion and it's identified, piece by

9  piece.

10         Insofar as who retained him back in 2015 when they

11  made the claim, Sony/ATV is the US publisher for Ed Sheeran,

12  who had probably reached out to Dr. Ferrara, as his publisher,

13  to obtain an opinion, or at least a preliminary opinion, and

14  he's representing, in that capacity, the defendants.  He's

15  representing Sheeran, who is signed to Sony/ATV UK.  The claim

16  is brought in the US so the US publisher deals with it, and

17  Sheeran is the person, and it's clear, and we've told them, who

18  is paying Dr. Ferrara.  What their claim seems to be, and

19  they've made this, is that Dr. Ferrara is somehow an employee

20  of Sony/ATV.  He's not.  He is a full-time professor at NYU.

21  He has been retained by Sony/ATV and other defendants in

22  copyright cases over the years -- writers, publishers, record

23  companies.  He's also been retained by people who are suing

24  Sony/ATV and record companies and, indeed, is currently

25  representing some in an infringement case that we're actually

I6t1gric

1    defending, so he is against us there.  Nothing odd.

2            So I don't know what they're looking for.  Insofar as

3    they say we asked for the same information, actually, we've

4    abandoned the request for any information relating to

5    transmittal or the time spent on a particular activity, which

6    was a prior art issue, your Honor.  Prior art is one of the key

7    issues that Ms. Farkas will deal with.  But Dr. Stewart, their

8    expert, has announced that he did X amount of work on looking

9    at prior art.  We don't believe it's so.  We asked for

10   information about that.  We've abandoned that.  They have all

11   of the prior art in Dr. Ferrara's opinion.  They have

12   everything that the federal rules require and, indeed, more.

13   They have all the financial information in terms of payment.  I

14   don't know what they're looking for.

15           THE COURT:  Well, that's really the question.  So for

16   you to tell me they have everything the rules require, that's

17   my call.  I'm just trying to nail down, what are the documents,

18   what is the universe of documents and what are you declining to

19   produce?  It sounds like you're not sure of that.

20           MR. ZAKARIN:  And maybe Ms. Farkas can deal with that.

21   I think what they want that we're not producing is specific

22   letters or transmittals between us and Dr. Ferrara and his

23   invoices to us which say what he's specifically doing at any

24   particular point.  They have in fact been informed what he has

25   charged and what he's been paid and what his rates are.

I6t1gric

1        THE COURT:  Okay.  And so Ms. Rice, I guess I'll ask

2   you again, because I'm still not clear -- what is it that you

3   are seeking, that you think you're entitled to and --

4        MS. RICE:  Your Honor, we are seeking the invoice

5   which would have the scope of work, not necessarily any

6   privileged communications, but it would have the scope of work

7   under which Dr. Ferrara would have been charged -- or would

8   have been asked to perform, and then we are also asking for the

9   transmittal letters that would have indicated all of that

10  information if it's not on the invoice.  So if the invoice just

11  has how much he charges, that's something that Mr. Zakarin has

12  said that's something that's already been disclosed.  If the

13  invoice does, however, have scope of work on it, then that's

14  something that we would like to see because we would like to

15  see the terms under which he was employed particularly for this

16  case.

17       And then your Honor, also, on the flip side of that,

18  for the transmittal letters, in the event that, like I said,

19  the invoice only has the price, the charge under which

20  Dr. Ferrara agreed to perform the work, the transmittal letters

21  would have the information that we would be able to determine

22  the scope of work from those as well, the same reasons that

23  they asked for that information from us, because that's what

24  you're able to determine from that.  And simply because they

25  abandoned that request, doesn't mean that, you know, we're

I6t1gric

```
 1    abandoning that request, unless the Court finds it appropriate.

 2              THE COURT:  All right.  So I don't even know if there

 3    are transmittal letters.  Are there transmittal letters?  Is

 4    there a transmittal letter?

 5              MS. FARKAS:  I'm not sure what they mean by

 6    transmittal letters.  There are communications between our

 7    office and Dr. Ferrara about his analysis, which would be

 8    privileged.  His report details what he was hired to do and

 9    what tasks he performed.  His report also details -- and we

10    have produced everything, every piece of information and

11    document and piece of sheet music and recording that he relied

12    upon in rendering his report.  So to the extent that there are

13    transmittals between Dr. Ferrara and our office -- and those

14    are the only transmittals of which I'm aware, and I was the one

15    primarily dealing with him -- they're all privileged

16    communications under the federal rules, as I understand it, so

17    it's unclear what possible relevance any of the communications

18    that they're seeking have to any issue in dispute.  And for

19    what it's worth, they chose not to depose Dr. Ferrara.  They

20    chose not to ask him any questions and are now, I guess,

21    through a letter to your Honor, trying to get discovery to

22    which they're not entitled.

23              THE COURT:  But they're not entitled to it because

24    it's privileged.  That's what you're saying.

25              MS. FARKAS:  Yes, under --
```

I6t1gric

| | |
|---|---|
| 1 | THE COURT:  But have you asserted the privilege and |
| 2 | have you prepared a privilege log?  That's usually the way it |
| 3 | works, right?  They ask for documents and you say no, you don't |
| 4 | get those documents because they're privileged and here's what |
| 5 | the documents are and here's the privilege that applies.  So it |
| 6 | sounds like you haven't done that. |
| 7 | MS. FARKAS:  We're happy to do it.  They did not |
| 8 | provide any privilege logs to us either for any of the |
| 9 | communications that were, you know, between them and their |
| 10 | expert.  To the extent that that would solve the issue, we're |
| 11 | happy to provide a privilege log, but it seems a bit |
| 12 | unnecessary to us and unclear what they were seeking other than |
| 13 | documents that are expressly covered under the rules. |
| 14 | THE COURT:  Well, look, I'm still confused as to what |
| 15 | they're seeking.  I'm not sure they even know what they're |
| 16 | seeking. |
| 17 | You're looking for letters from the attorneys to the |
| 18 | expert; that's what you're looking for, Ms. Rice? |
| 19 | MS. RICE:  Yes, your Honor. |
| 20 | THE COURT:  And you don't think those are privileged? |
| 21 | MS. RICE:  No, your Honor, to the extent that they |
| 22 | outlined the scope of work.  Now if they are letters that talk |
| 23 | about findings or perspectives or things like that, that's a |
| 24 | different matter.  But we are looking for the -- and I'm glad |
| 25 | Ms. Farkas is there to speak on this because I can speak |

I6t1gric

directly to her on this issue and identify exactly what we're talking about.  We are looking for the exact same documents that she requested from Dr. Stewart during his deposition.  She requested transmittal letters, she requested an invoice.  We provided those actually by email to her during the deposition, just for ease of, you know -- just so that she could have everything.  So those are the exact documents.  It's not nebulous at all.  She knows exactly which documents we're talking about -- the same ones she requested of Dr. Stewart.  Communications between us, nothing privileged, but just the transmittal letters between us and Dr. Stewart.  She wanted to know what information was given to Dr. Stewart, what we said to Dr. Stewart as to how we indicated to him what the scope of work would be; not necessarily his findings, not necessarily any privileged communication, but the outline of the scope of work.

THE COURT:  It seems to be pretty straightforward.  I don't know.  So, Ms. Farkas, does that give you any insight as to what they're seeking?  I assume it's not a large number of documents, and if you think they're privileged or there are portions of them that are privileged, I guess you can assert that privilege, but I think we've had trouble -- at least I've had trouble -- figuring out what exactly we're talking about, and I think maybe I have a better idea now than when I woke up this morning.

I6t1gric

```
1          So what I would propose is, maybe it makes sense for
2     you folks to talk, see if you can get to an agreement as to
3     what is discoverable.  If there's a disagreement as to whether
4     it's discoverable in the first place or whether it's
5     privileged, then I think you can tee it up for me in a more
6     precise way, because right now it's sort of a generic request
7     over documents that I don't even know what it means and I don't
8     know what privilege would be asserted.  So I think this, unlike
9     the other request, sort of came in while expert discovery was
10    still going on.  It was wrapping up, but -- so I can't say that
11    this one is untimely.
12         So I guess that's what I'd be inclined to encourage
13    you to do and have you get back to me in ten days.
14              MS. FARKAS:  That's fine.
15              MS. RICE:  Yes, your Honor.
16              THE COURT:  Then if you resolve it, don't worry about
17    it, but if that is an issue I'm going to need to resolve, why
18    don't you then write me a joint letter that lays out what the
19    dispute still is and what your respective positions are, okay?
20    So within ten days, is that okay?
21              MS. RICE:  Yes, your Honor.
22              THE COURT:  I just want to see what date that is.
23              MR. ZAKARIN:  The 9th?
24              THE COURT:  I guess the 9th.  I don't know.  Is that
25    all right?  I know people may have vacations scheduled and
```

I6t1gric

1   things like that.  But this shouldn't take that long, I don't

2   think.

3           MS. FARKAS:  Your Honor, could we have till the 11th?

4           THE COURT:  Okay.  That's fine.  So by July 11th then.

5   If there is still a live dispute, you'll send me a joint

6   letter, and if not, then we'll all go our merry ways.

7           MS. RICE:  All right, your Honor.  Thank you.

8           THE COURT:  Okay.  So I think that then resolves, for

9   now at least, the discovery issues that were raised by the

10  plaintiff's letter.

11          So now let's talk about the defendant's contemplated

12  motion for summary judgment.

13          And so basically defendants are saying, we've got

14  enough here now to establish as a matter of law that these are

15  not similar, they're not sufficiently similar to justify this

16  action in the first place, right?

17          MS. FARKAS:  That's right, your Honor.  This is Ilene

18  Farkas speaking.  So we have a copyright infringement case over

19  a musical composition, and in order to prove copyright

20  infringement, one of the things that the plaintiffs will have

21  to prove is that the two songs are what's called substantially

22  similar.

23          THE COURT:  Substantially similar, yes.

24          MS. FARKAS:  And one of the criteria for substantially

25  similar, first, is that the defendant has to have copied the

I6t1gric

plaintiff's song, and we have ample evidence of the independent

creation of "Thinking Out Loud."

THE COURT:  Right.  And then that protectable elements

would have been poached, not just unprotected or

nonprotectable, right?

MS. FARKAS:  Correct.  Because as your Honor I'm sure

knows, not any copying is actionable, that it has to be

actually copying of protectable elements of expression that are

owned by the plaintiff.  Here, you know, the plaintiffs, as the

Court probably is aware, only own a piece of "Let's Get It On."

They own about 22 percent of the song.  The other copyright

owners have not joined in the action other than now, belatedly,

this Structured Assets.

And when you have a piece of music, you have various

types of copyrights.  You have the copyright in the musical

composition and then there are also copyrights in the sound

recordings of that musical composition.  Here, we're only

talking about the underlying musical composition, not any sound

recording thereof, and the sound recording copyrights will vary

depending on that particular performance and that particular

recording of the musical composition and what is included or

not included or added to that particular recording of that

particular composition.  We're not talking about any sort of

sound recording here; we're only talking about the copyright

and the actual musical composition.  And so we're not talking

I6t1gric

1   about the Marvin Gaye recording or any other recording of

2   "Let's Get It On."

3         So here, when the copyright was registered for this

4   particular musical composition, there was what's called a

5   government copy that was recorded with the copyright office.

6   In order to register a work, you have to not only fill out a

7   form and pay a fee, but you have to deposit that which you are

8   claiming is the copyrighted work with the copyright office as

9   proof of what the copyrighted work is.  It's for public notice

10  and to memorialize that which you are copying.  Here, what was

11  deposited with the copyright office was sheet music.  The sheet

12  music contained vocal melody, lyrics, chord progression, and

13  the rhythm, the 4/4 meter of the song.  And that's pretty much

14  it.  In fact, that is it.  There was no percussion in the

15  deposit copy, there was no bass line in the deposit copy.

16  Obviously Marvin Gaye's performance was not included in the

17  written sheet music or anything else that was added to that

18  particular -- or any other particular recording of this

19  particular music composition.  It was embodied in the deposit

20  copy in the sheet music.

21        In terms of that sheet music, our expert, Dr. Ferrara,

22  who is a, you know, worldwide esteemed musicologist who's been

23  a musicologist and a music professor at NYU and heads the

24  department at NYU for decades, analyzed and compared the

25  deposit copy of "Let's Get It On" to "Thinking Out Loud" and

I6t1gric

1    found no actionable similarities, and we are confident that

2    anyone who analyzes the deposit copy against "Thinking Out

3    Loud" will find no actionable similarities.  Plaintiffs don't

4    contend that the lyrics are similar.  There's no claim there.

5    The vocal melodies are utterly different, despite their

6    expert's attempt to try and pad his report with a couple of

7    vocal similarities, and I will get to that in a moment.  Rhythm

8    is not protectable, and their expert concedes that.  So we're

9    down to a chord progression.  The chord progression, which

10   their expert acknowledges is not protectable and if this case

11   were solely based on the chord progression, he would agree that

12   there is no claim --

13             THE COURT:  But I'm pausing for a second because I'm

14   not sure I need experts to tell me what is and isn't

15   protectable.  I don't really care whether an NYU musicologist

16   or some other musicologist thinks something is protectable or

17   not.  That's my job, right?

18             MS. FARKAS:  That is correct, your Honor.  So maybe

19   I'm jumping too far when I say "protectable."  Their expert

20   only identified these similarities between "Thinking Out Loud"

21   and "Let's Get It On."  And we have put in ample evidence of

22   prior art that shows that this chord progression existed well

23   before Ed Townsend and Marvin Gaye wrote "Let's Get It On."  In

24   fact, it's in rudimentary guitar books as a basic chord

25   progression, and in fact we've even, as your Honor will see on

I6t1gric

summary judgment, that we put one in that actually comments on
how common this is and even goes further and says that, you
know, clearly "Let's Get It On" did not create this chord
progression because it existed in all of these other songs and
identifies a few other songs.

So what we have here is the only similarity that has
really been identified by their expert is a similarity in a
chord progression that existed well before "Let's Get It On."
And the only other similarities that he arguably identifies in
his report are some similarities in certain plucked things in
the vocal melodies that even he acknowledges that in order to
find similarities, he has to delete large portions of these
notes to get them to line up, thus acknowledging that they're
not similar.  And finding that, you know, if he's identified
nine, he acknowledges that four or five or sometimes six of
them are not similar.  So we think that that is not indicative
of copying and is completely not supportive of any claim of
copying.

And even if this Court were to go a step further and
analyze the similarities that Dr. Stewart has identified in the
sound recording of "Let's Get It On" that are not contained in
the deposit copy, which we think is not proper on an
infringement case, we are ready to show and our expert will
show that these similarities are either not similar at all, and
we can show them just with objective criteria, or he is

1    ignoring the actual realities of the song.

2           Their expert, who by the way, has been criticized

3    several times by many courts with respect to the methodology he

4    uses and his failure to consider prior art, he has a habit of

5    manipulating the music in order to make it appear to be more

6    similar or ignoring large portions of the music.  So what he

7    does here is he takes the -- what he calls the bass line, which

8    is not the bass line of the song and is actually the guitar

9    part of the song, that only is prevalent in the first 24

10   seconds of the song, and labels that as "the bass line" of the

11   song and then says that this is a similarity between the two

12   songs.  What he does is he's taking the guitar part of the

13   song, taking the lowest notes of the guitar part, ignoring the

14   rest of the guitar part, which is utterly dissimilar, to

15   "Thinking Out Loud" and comparing those things.  In doing so,

16   he's ignoring that at 24 seconds of "Thinking Out Loud" through

17   the rest of the song, the actual bass line comes in, which he

18   admitted in his deposition is not the same, and is in fact

19   significantly different than that which appears in the other

20   song.

21          So these are things that we will obviously flesh out

22   in our motion, but we are quite confident that this Court can

23   determine on a motion for summary judgment that there is no

24   actionable similarity between these two songs.

25          The only real remaining similarity that he identifies

I6t1gric

is the drum pattern, which is a basic drum pattern, which is

not in the deposit copy of the song.  So we believe it is

irrelevant because it was added during the production of the

sound recording and is not part of the musical composition, so

it's irrelevant.  But even if this Court were to consider the

drum pattern, that too is a very basic rudimentary drum pattern

that exists in prior art, is in basic drum method books, and

their own expert has acknowledged that that in and of itself is

not indicative of copying.

So we have here two very different songs that at best,

contain similar chord progressions that there's no dispute are

not indicative of copying.

They may also argue that, you know, well, this Court

should throw up its hands because there are competing expert

reports and that just in and of itself precludes the Court from

granting summary judgment.  Obviously we disagree based on

everything I just said, and there's ample authority for the

notion that simply because there are competing experts, that

does not preclude summary judgment and the Court can find that

there's no protectable expression at issue as a matter of law.

THE COURT:  All right.  There's a little bit of expert

discovery that may still be happening, but what remains to be

done is not going to affect any of this, right?

MS. FARKAS:  I don't see how, no.

THE COURT:  All right.  And for the plaintiffs, who is

I6t1gric

1  responding?

2         MS. RICE:  Again, this is Keisha Rice, your Honor.

3         THE COURT:  Okay.

4         MS. RICE:  Your Honor, with respect, to the extent

5  that your Honor does feel that experts are necessary or at

6  least needed or to be allowed to be listened to in this

7  particular case, I think that we don't necessarily even get

8  there with some of the arguments that they made.  However, I

9  will talk about some of the expert issues that Ms. Farkas has

10  discussed.

11         First and foremost, one of the reasons that

12  Dr. Stewart has identified the bass line and said that it is

13  present in the deposit copy is because when we did the

14  deposition of Mr. Sheeran and we asked him specifically, what

15  do you consider the bass line of the song, he says the lowest

16  part of the guitar.  Well, if it's in the defendant's own

17  words, that's what he's determining to be the bass line, and

18  that is what's present in the deposit copy, then we really

19  don't need to go much further than that because he's actually

20  saying that, or affirming what we believe, that the deposit

21  copy does in fact have the bass line within its four corners.

22         Also, with respect to the rhythm and the drum section,

23  Mr. Sheeran actually, in a couple of his emails back and forth

24  that the defendants have turned over during discovery, also

25  specifically says that the drums in the song make it sound like

1    "Let's Get It On."  And so again, we don't really need to get

2    to expert reports for those kinds of things that are reinforced

3    by the defendant's own testimony in deposition.  However, to

4    the extent that we do get into the expert reports and

5    testimony, we do have Dr. Stewart saying that he has done an

6    analysis of the deposit copy.  That analysis is present in his

7    report.  He specifically talks about the comparisons as to what

8    Mr. Sheeran has said with respect to the bass line and the

9    drums.  Those are not only present in the deposit copy --

10   because rhythm is not just the drums, it's also the syncopation

11   with which the chords are played, and that syncopation is

12   present in the deposit copy.  So the syncopation does go toward

13   the rhythm as well.

14          We also have an analysis where Dr. Stewart has talked

15   about the comparison of the sheet music that is present or that

16   is on the internet that both Dr. Ferrara and Dr. Stewart did

17   download, and he talks about the similarities between the

18   deposit copy and the sheet music to "Let's Get It On" and does

19   a very thorough analysis of the similarities with respect to

20   the deposit copy, so in no way do the plaintiffs rely simply on

21   the sound recordings.  We certainly believe that the sound

22   recordings -- we agree that it's copyrightable.  We also agree

23   that the sound recordings also, you know, would be able to

24   withhold, or withstand -- would be able to stand on its own as

25   a document or as a recording that could be infringed and has

I6t1gric

```
 1    been infringed upon, so --

 2              THE COURT:  Wait a minute.  Hold on.

 3              MS. RICE:  -- we feel very, very confident that there

 4    are some pretty genuine issues of material fact here that would

 5    help the plaintiffs not only survive summary judgment but, with

 6    respect specifically to a copyright infringement case, not only

 7    meet the standard of the ordinary person being able to listen

 8    to the music and, just like some of the -- lots of responses on

 9    the internet and on the media, and have been able to just --

10    the common man, the ordinary man hearing this and hearing the

11    similarities, but we also would reach the secondary step, which

12    requires that there's particular discernment that sometimes is

13    needed in order to determine sometimes protected and

14    unprotected works, and so in the event that your Honor finds it

15    appropriate that expert testimony and/or reports meet that

16    second step of discernment, we believe that we present enough

17    evidence to also be able to survive summary judgment on those

18    issues.

19              THE COURT:  All right.  I'm not sure I understood what

20    you were saying with respect to the sound recording.  You're

21    saying that this inquiry is not limited to the deposit copy,

22    it's not limited to just the notes on a page, that this will

23    entail listening to two recordings and comparing them?

24              MS. RICE:  Yes, your Honor, that is correct.

25              THE COURT:  And what's your basis for saying that?
```

I6t1gric

1          MS. RICE:  Our basis for saying that is, first of all,

2     because the sound recording is an interpretation of the deposit

3     copy, not only would the sound recording be a representation of

4     what would be on the deposit copy -- to the extent that it's

5     different, it certainly may be an interpretation -- but it is a

6     very valid interpretation of the artist and the composer's

7     contemporaneous expression of the deposit copy, and so that's

8     why we believe that it certainly encompasses the sound

9     recording as well.  We agree, to the extent that there may

10    be -- with respect to the sound recording, there may be

11    differences in -- not necessarily even differences.  I think we

12    all agree on the percentages or proportionment of how much that

13    the law would, or in past cases has allowed, as far as

14    infringement rights of the plaintiffs with respect to the sound

15    recording, so I don't think that we necessarily agree with the

16    claim that the plaintiffs would only be entitled to portions of

17    anything that would be recoverable due to infringement, but to

18    the extent that we believe that the sound recording could be

19    considered and in play in this case, your Honor is correct,

20    that is the plaintiff's position.

21          THE COURT:  All right.  And you disagree with that,

22    Ms. Farkas, right, or --

23          MR. ZAKARIN:  If I can, your Honor, I'll just address

24    it.

25          There's a reason why there's no law in their letter,

1    and we provided your Honor with the law that's clear, that the

2    metes and bounds of a copyright are what's deposited, whether

3    it's a recording that was deposited or sheet music that was

4    deposited.  And it's not some interpreted expansion.  Copyright

5    protects that which you claim and you register with the

6    copyright office.  And what was registered here is sheet music.

7    So any embellishments, any changes, any bass line, anything

8    that Marvin Gaye added in the recording of that song is not

9    what's within the metes and bounds of their copyright.  That's

10   what they want it to be, but that's not what the law is, and

11   that's why they didn't cite any case law in their letter.

12            THE COURT:  Okay.  And Ms. Rice, I guess what's your

13   response to that?  What are you relying on to make this

14   argument that you've just articulated?

15            MS. RICE:  Your Honor, we're simply arguing that, you

16   know, the sound recording is certainly also copyrightable and

17   so there would be -- to the extent that it's something that has

18   been copyrighted and deposited as well, along with the sheet

19   music that we all have copies of, then that would be something

20   on which we would also be bringing an infringement, or entitled

21   to damages under infringement claim.  However --

22            THE COURT:  Whoa, whoa, whoa, whoa.

23            MS. RICE:  -- that's something that's kind of a little

24   bit above and beyond what we're really concentrating on, and I

25   think that a majority, at least of our argument, relies on the

I6t1gric

1    issues and similarities with the deposit copy.  We don't

2    necessarily need to go any further.  But we believe that we

3    would be able to --

4            THE COURT:  But I just want to be clear on the first

5    part of what you said.  You're saying that a sound recording is

6    copyrightable, which of course it is, but you're saying it's

7    infringement to sound like it -- not to copy it but to sound

8    like it.  That's your theory.

9            MS. RICE:  No, your Honor.  No, your Honor.  I think

10   to the extent that there are things within the deposit copy

11   that could be expressed, in the same way that they are

12   expressed by the original artist, I think in that respect --

13   and so I don't believe that it's necessarily an infringement

14   upon the sound recording.  We are arguing that in this

15   particular case, there's a difference between saying that

16   there's an infringement on the sound recording and saying that

17   there's an infringement on sound interpretation of the deposit

18   copy.  We are saying that there certainly is a sound

19   interpretation infringement of the copy.  However, you know, we

20   don't necessarily need to rely on that.  We believe that on the

21   deposit copy in and of itself, we have an ample analysis with

22   not only Mr. Sheeran's remarks and his own testimony, but also

23   with our expert analysis, that the deposit copy in and of

24   itself well represents the intentions of the plaintiffs.  So --

25           THE COURT:  Okay.

I6t1gric

1          MS. RICE:  I think those two things are a little bit

2    separated.  I think there's a difference between our argument

3    about the sound interpretation of the deposit copy and the

4    copyrightable sound recording.  And we're talking more about

5    the interpretation of the deposit copy, the sound

6    interpretation of the deposit copy.

7          THE COURT:  Okay.  I have no idea what you're talking

8    about, but I'm not going to ask you again.

9          I think clearly this is a motion that can be made.  It

10   is, generally speaking, an uphill climb on summary judgment to

11   win, to have a Court make a finding that there's no substantial

12   similarity, but it happens, and so I think we'll see.  I can't

13   say I'm that familiar with the songs.  But I don't think you

14   need to be a musicologist and I don't think you need to be that

15   familiar with the songs to be able to determine whether there's

16   substantial similarity or not.

17          So I guess I'll see what you have to say.  I'll see

18   what the experts have to say about similarity.  I don't much

19   care what they have to say about the law.  So be mindful of

20   that.  If some musicology professor is going to pop off and

21   tell me what's protectable and what's not protectable, he or

22   she loses all credibility at that point.  It makes me think

23   that they and their attorneys don't understand what is the

24   proper role of an expert.

25          But I think this is about sheet music, basically.  So

I6t1gric

1   Ms. Rice, I think if you're going to press this point that

2   you've twice tried to articulate and twice I've not understood

3   what the heck you're saying, I think you're going to need to do

4   that in your papers.

5          All right.  So let's talk about the schedule here.

6   Well, no.  I'm sorry.  There's another part of this motion now.

7   There's a motion for partial summary judgment with respect to

8   Ms. Griffin, right?  It's sort of an interesting issue of

9   whether or not a California probate court is entitled to sort

10  of preclusive effect, *res judicata*, in a federal copyright

11  action.  So do you want to be heard on that too?

12         MR. ZAKARIN:  Your Honor, in raising the issue, we're

13  mindful of the notion that it may be viewed as some sort of a

14  collateral attack, as it were, on a determination that was

15  made, that we were not a party to, and indeed, would not have

16  had at the time standing because there was no interest that we

17  had.  Indeed, "Thinking Out Loud" was not written for another

18  seven years thereafter.  But the copyright law does have a

19  specific section which addresses succession.

20         THE COURT:  Well, transfer of ownership.  You're

21  talking about 17 U.S. Code Section 201 --

22         MR. ZAKARIN:  Yes, your Honor.

23         THE COURT:  -- (d)?

24         MR. ZAKARIN:  Yes, and it refers to by intestate

25  succession and it refers to the laws of any particular state,

I6t1gric

```
1    and the law in California, as we've articulated it, is that if

2    you're adopted, then you have no right to intestate succession.

3             Now the probate court in California, as we've

4    presented at least here, was presented without any information

5    that in fact Ms. Griffin was adopted at birth.  We don't know

6    that she's actually Ed Townsend's natural daughter, but that's

7    not even the issue, whether she is.  I mean, if there were

8    proof that she were, we would not be making the argument.  But

9    even if that were the case, unless he affiliated her, she was

10   not his daughter at birth, she was adopted at birth, and under

11   law of intestate succession, she should not have been declared

12   an heir.  They did not identify her as adopted.  That seems to

13   be clear.

14            THE COURT:  But this is a standing argument you're

15   making, right?

16            MR. ZAKARIN:  Yes, because --

17            THE COURT:  And Section 201(d) is not on standing at

18   all; it's just about transfer of ownership.

19            MR. ZAKARIN:  But if she's not an owner of the rights

20   because under applicable law she was not entitled to be an

21   intestate successor, then she has no standing to sue for

22   infringement of that which she did not succeed to.

23            THE COURT:  Right.  But she's saying she does have an

24   interest, right?  So she's saying that she is an owner.  She's

25   saying she's an owner; you're saying she's not an owner.
```

I6t1gric

```
 1    You're pointing to the statute; she's pointing to a probate

 2    court decision applying the statute.  Right?

 3              MR. ZAKARIN:  The probate court decision did not apply

 4    the statute.  As far as I know, the probate court decision

 5    determining that she was his heir was based upon --

 6              THE COURT:  So a probate court that is applying the

 7    laws, the applicable laws of intestate succession --

 8              MR. ZAKARIN:  Yes, your Honor.  Without being told

 9    that in fact she was adopted at birth.

10              THE COURT:  Not clear that the probate judge was told

11    or not told, right?  I mean, there's certainly something in the

12    record there to indicate a reference to her adoption, right?

13              MR. ZAKARIN:  There's a bill from two years earlier

14    which refers to a discussion between the attorney and her, I

15    think, but as far as I know, all of the forms that were

16    submitted, as far as we can tell, did not identify her as

17    having been adopted at all.

18              THE COURT:  But I just want to be clear.  So in your

19    reading of the copyright law, federal courts should be deciding

20    who's an heir and who's not an heir, and I should have experts

21    come in and do blood tests and DNA, and that's the function of

22    the federal court.

23              MR. ZAKARIN:  No, your Honor.  I think that goes

24    further than --

25              THE COURT:  That would be great fun, I guess, but I
```

I6t1gric

1    just have never heard that ever, ever happening.

2              MR. ZAKARIN:  It goes further than we suggested, and

3    as we said in the letter, and I'm mindful of this, which is

4    that it is an uphill battle because it is a probate court

5    decision and your Honor would be, in effect, put in the

6    position of assessing, is this probate court decision

7    appropriate.  It's a secondary argument for us on a standing

8    argument, and --

9              THE COURT:  I guess --

10             MR. ZAKARIN:  -- I raise it as an argument, and I'm

11   prepared, your Honor, not to ultimately pursue it, even though

12   I believe we're correct on it, because I'm much more focused

13   on, and I want to keep the purity of, the summary judgment with

14   respect to infringement, because I think that is the larger

15   issue.  That secondary issue as to whether she is or is not

16   entitled to participate, to pursue an infringement claim, is a

17   secondary issue that we would only get to if your Honor did not

18   conclude that summary judgment as to a finding of no

19   infringement is appropriate.  So --

20             THE COURT:  All right.  Is this a defense or is this a

21   standing argument?

22             MR. ZAKARIN:  It is ultimately I think a standing

23   argument whether she is an heir with standing to pursue an

24   infringement claim.

25             THE COURT:  Well, in other words, if she is not the

I6t1gric

1   owner, that's the defense too, right?  In other words --

2           MR. ZAKARIN:  I mean, I guess that's right, but maybe

3   it is quasi-standing, quasi-you don't have a fight.  Maybe it's

4   in a sense you failed to state a claim because you're not,

5   under the law of California, entitled to have succeeded under

6   intestate succession to Townsend's interests.

7           THE COURT:  But one of the elements for a copyright

8   infringement claim is that you are the owner or that the

9   ownership interest has been transferred to you, right?

10          MR. ZAKARIN:  You have a beneficial -- in this case it

11  would be beneficial ownership interest in the copyright, that

12  is correct.  But beneficial ownership interest in this context,

13  because they are not owners of the legal title but they are

14  entitled to royalties derived from the exploitation.

15          THE COURT:  All right.  But it's the same inquiry.

16  Whether you call this a defense or you call it a standing

17  argument, it's going to be whether or not this person is an

18  heir.  The statute talks about that being bequeathed or passed

19  as personal property by applicable laws of intestate

20  succession.  No question that the estate of Mr. Sheeran was in

21  California, right?  Mr. Townsend.  Not Sheeran.  Sheeran is

22  still with us.

23          MR. ZAKARIN:  Yes.

24          THE COURT:  Sorry.

25          MR. ZAKARIN:  As far as we know, yes.

I6t1gric

1      THE COURT:  So it's California law.  You're saying I

2  should just look to the language of the statute, which says

3  that a person who's adopted is not entitled to inherit; and

4  they're saying, well, you should look to a state court that

5  said she is the heir.  Right?

6      MR. ZAKARIN:  Pretty straightforward legal issue, and

7  she has acknowledged -- there is no, I think, factual

8  dispute -- that she was adopted.

9      THE COURT:  Okay.  So you want to develop that or you

10  don't want to develop that in your motion?

11      MR. ZAKARIN:  I mean, your Honor, we'll develop it.

12  As I said, it's a secondary point.  We will present it as an

13  undisputed fact:  Here's what the statute says, here's what

14  California law says.  And that tees up the precise question,

15  which is, is it the law or is it a determination of probate

16  court that decides it, which I think is a fairly narrow issue.

17      THE COURT:  Okay.  So I guess you folks should look at

18  the case of *Riley v. New York Trust Co.*, Supreme Court,

19  315 U.S. 343, which I guess deals with the issue of whether or

20  not a probate court judgment in one state is entitled, under

21  the full faith and credit clause, to being respected in another

22  state.  The facts are distinct from here, but I think it might

23  be relevant.

24      MR. ZAKARIN:  Thank you, your Honor.

25      THE COURT:  Okay.  Ms. Rice, I don't know if you're

I6t1gric

1    carrying the ball on this one too.  Do you want to be heard, or

2    do you want to just brief it?

3        MS. RICE:  Your Honor, I think that, you know, with

4    respect to that issue, especially if it's something that they

5    may or may not develop or continue to pursue, I think that we

6    will probably just go ahead and stand on our briefs.

7        THE COURT:  Okay.  Well, I mean, look, if they want to

8    develop it, then you should respond to it.  I mean, I think the

9    point on this *Riley* case is that one of the factors, one of the

10   things that the Supreme Court talks about is that, well, where

11   folks in New York or in another state wouldn't have standing to

12   come into this case, Georgia, to be heard in the probate court,

13   that's part of the analysis as to why the Georgia probate court

14   decision is not entitled to protection under the full faith and

15   credit clause with respect to property that's outside of

16   Georgia.  Take a look at it.  I think it's worth looking at.

17   There might be other cases as well, but that's one that my law

18   clerk found and brought to my attention.

19       MS. RICE:  Well, your Honor, to the extent that they

20   do decide -- as your Honor just said, that they do decide to

21   continue to develop it, then we are certainly happy to discuss

22   it.  Although we are certainly willing to take a look at the

23   cite that your Honor just gave, in this particular instance we

24   believe that the Rooker-Feldman doctrine was something that

25   would perhaps maybe eliminate the need or eliminate the request

I6t1gric

```
1    from the defendants of this Court to take a look at a state
2    court finding and a state probate court as to the disposition
3    of property and/or the transfer of property that had already
4    been determined by a state probate court.  However, we're
5    certainly willing to take a look at the case that your Honor
6    has mentioned and happy to respond accordingly.
7              THE COURT:  Okay.  Well, I mean, I think they're going
8    to do the first round of briefing, so you're going to respond
9    to whatever they decide to rely on.
10             MS. RICE:  Yes, your Honor.
11             MR. FRANK:  Your Honor, this is Patrick Frank on
12   behalf of the plaintiff.  Can I make just one more point.
13             THE COURT:  Sure.
14             MR. FRANK:  I think respectfully, with respect to
15   opposing counsel, I think that this whole argument is sort of
16   proceeding from a misnomer, or a misapprehension of the
17   California probate code.  The purpose of the provision that
18   they're relying upon, the issue as to whether an adoption of a
19   biological child precludes or cuts off their ability to come
20   back later in an intestate probate proceeding, that is
21   something that -- that statute can only be invoked by the other
22   beneficiaries to the estate when there's no will.  It's
23   intestate.  So in this instance, we had two heirs to the
24   estate.  We had Cherrigale Townsend, who was Mr. Townsend's
25   wife, and we had Helen McDonald, who was his sister, and what
```

I6t1gric

1    they're suggesting in this instance is that Ms. McDonald and

2    Ms. Townsend somehow conspired to dupe the probate court in

3    California into letting Kathy Griffin become an heir, but if

4    you look at that, take it to its logical conclusion, they're

5    basically saying that Ms. McDonald and Ms. Townsend duped the

6    probate court so that they could get a smaller share.  So they

7    would have no incentive to do so.  They would be the only

8    persons who had the requisite standing in that probate

9    proceeding to say, hey, we don't want this person to be a

10   beneficiary because she was adopted.

11           So I don't even think they have the ability to provoke

12   that particular provision.  I think they're misinterpreting it.

13   And in the practical, real-world terms, it just doesn't make

14   any sense.  Why would two beneficiaries conspire so that they

15   could get a lesser share?

16           So I just wanted to put that in for food for thought,

17   your Honor.

18           THE COURT:  Okay.  Well, look, I think it's an

19   interesting issue, but I think it's really a sideshow in terms

20   of, the main event here is whether or not this is an infringing

21   work, and I think that's really the main point that the

22   defendants are pushing, so if I were to agree with them on that

23   motion, I wouldn't even get to this other one, but it was the

24   subject of a letter, so that's why we're discussing it.  So

25   defendants should decide whether or not they want to pursue

I6t1gric

| | |
|---|---|
| 1 | that alternative, lesser motion, which would only affect one of |
| 2 | the plaintiffs. |
| 3 | So let's talk about timing now.  How long do you think |
| 4 | it will take you to make your motion? |
| 5 | MR. ZAKARIN:  Your Honor, subject to what happens with |
| 6 | this exchange of correspondence by July 11, we had contemplated |
| 7 | a schedule that would have us making the motion by July 26, |
| 8 | with their response due by the latter part of August, and |
| 9 | because of the Labor Day holiday and the Jewish holidays in the |
| 10 | early part of September, we were proposing reply September 18. |
| 11 | And something along those lines would work for us. |
| 12 | THE COURT:  Okay.  Ms. Rice, are you okay with that? |
| 13 | MS. RICE:  Yes, your Honor. |
| 14 | THE COURT:  Okay.  So July 26, which is a Thursday. |
| 15 | Go with the 27th. |
| 16 | MR. ZAKARIN:  27th is fine. |
| 17 | THE COURT:  So July 27th. |
| 18 | MR. ZAKARIN:  I blame Ms. Farkas for this. |
| 19 | THE COURT:  And then -- |
| 20 | MS. FARKAS:  I thought you wanted a long weekend. |
| 21 | MR. ZAKARIN:  No. |
| 22 | THE COURT:  So then we could do August 27th, which is |
| 23 | a Monday, or the 28th, which is a Tuesday, or I don't care. |
| 24 | Ms. Rice, do you have a view?  I mean, I'm mindful of |
| 25 | the fact that lawyers are people, lawyers have families, |

I6t1gric

1   lawyers sometimes take vacations too, so I'm willing to be

2   flexible in light of the season.  But you tell me, Ms. Rice.

3   Is that enough time?

4           MS. RICE:  Your Honor, I believe that is enough time.

5   If we could do the Tuesday, that would be --

6           THE COURT:  Okay.  The 28th.  August 28th.

7           And then September 18th, in light of other things,

8   you're okay with for the reply?  That's a Tuesday also.

9           MR. ZAKARIN:  We're okay with that.

10          THE COURT:  I meant Ms. Rice.  Normally I would give a

11  week or ten days for a reply, but you're saying because of

12  Labor Day, summer stuff, and then Jewish holidays, you need a

13  little more time.  So that's the 18th.  You're okay with that,

14  Ms. Rice?

15          MS. RICE:  Yes, your Honor.

16          THE COURT:  Okay.  So I'll issue a short order just

17  memorializing that as well as the fact that you folks are going

18  to get back to me if there's going to be a further follow-up on

19  the discovery issue, the expert discovery issue.

20          Okay.  Anything else we should cover today?

21          No?

22          MS. RICE:  Nothing for plaintiffs, your Honor.

23          THE COURT:  All right.  Thanks very much.  If anyone

24  needs a copy of the transcript, you can take that up with the

25  court reporter.  Let me thank the court reporter, as always,

I6t1gric

1    for her time and her talent.  I think I have another matter

2    now, so if you want to get a copy of the transcript, you should

3    take that up with the court reporter through the website rather

4    than in person.  Okay?

5            ALL COUNSEL:  Thank you, your Honor.

6            THE COURT:  Great.  Thanks very much.  Have a nice

7    day, enjoy the weekend and the summer.

8            MR. FRANK:  Thank you for your time, your Honor.

9            THE COURT:  Thank you.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25