REDACTED FOR PUBLIC FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHRYN TOWNSEND GRIFFIN, THE ESTATE OF CHERRIGALE TOWNSEND and THE HELEN CHRISTINE TOWNSEND MCDONALD TRUST

*Plaintiffs*,

-against-

EDWARD CHRISTOPHER SHEERAN, p/k/a ED SHEERAN, ATLANTIC RECORDING CORPORATION, d/b/a ATLANTIC RECORDS, SONY/ATV MUSIC PUBLISHING, LLC, and WARNER MUSIC GROUP CORPORATION, d/b/a ASYLUM RECORDS

*Defendants*.

ECF CASE

17-cv-5221 (LLS)

**PRE-TRIAL DECLARATION OF BARRY MASSARSKY**

I, **Barry Massarsky**, declare as follows:

1. I have personal knowledge of, and am fully familiar with, the facts set forth in this Declaration, which I respectfully submit in accordance with Rule 4(a)(5) of Judge Stanton's Individual Practices to summarize my education, professional experience and anticipated direct testimony at trial. Consistent with Rule 4(a)(5), the following only summarizes my anticipated direct testimony and does not purport to represent a comprehensive recitation of such testimony.

I.  **Education & Professional Experience**

2. I am by training and profession a music industry economist. Throughout my now 42-year career working in and analyzing the business of the music business, I have specialized in performing economic and market analyses for both sound recordings and copyrighted musical works. I obtained a Bachelor of Arts degree, cum laude, from Boston University in 1977, which included numerous courses in economic analysis. I obtained a Master of Business Administration from Cornell University in 1981.

3. I was a litigation economist for the United States Department of Justice (working on the IBM litigation in the 1970s). Thereafter, I became an economist at ASCAP, where I worked for over a decade. I started my consulting firm in 1992. I have continuously provided consulting

services in the music industry since that time. In 2021, I sold my consulting firm to Citrin Cooperman Advisors, LLC. where I am now a partner and co-service leader of its Music Economics and Valuation practice. For a full recitation of my education, professional experience, qualifications and background, I respectfully refer the Court to my curriculum vitae, annexed hereto as **Exhibit 1**.

## II.     Summary Of Direct Testimony

### A.     Overview

4.    I will testify regarding the United States revenues, costs and profits attributable to "Thinking Out Loud" ("TOL") relating to the Ed Sheeran release of the album "X." Specifically, based on spreadsheets and charts detailing the revenue and expenses of Atlantic Records, Sony Music Publishing (formerly known as Sony/ATV Music Publishing) and Ed Sheeran, which have been stipulated into evidence by the parties as Joint Exhibits 5, 6 and 7 pursuant to Joint Exhibit 8, I will offer opinions concerning the overall United States income, costs and profits appropriately attributable to TOL inclusive of music publishing income, writer share royalties and artist royalties payable to Ed Sheeran and record company income, inclusive of both income directly generated by TOL and that portion of the income of "X" properly attributable to TOL.

5.    The revenue allocable to the single version of TOL (whether in physical form, digital form or by streaming) are relatively straightforward as the revenues are directly allocable to TOL. However, when it comes to the revenue and expenses allocable to the album $X$ on which TOL was one of the tracks, the allocation process can be done in several ways. One way is on a straight line basis, allocating the revenue and expenses based on the number of tracks on the album. But, as I will testify, where a particular track was not the first single, allocating album revenue on a straight line basis is not the proper methodology because it unfairly attributes album revenue equally across all tracks when, in fact, the sales of the album are really attributable to the success of the first single released from the album.

6.    In regard to the portion of the income from "X" properly attributable to TOL, as detailed in my expert report, I will testify that while TOL is only one of 15.60 tracks on the album (there are multiple versions of the album containing different numbers of tracks and I have computed the foregoing ratio based on the actual sales of each configuration of the albums and the number of tracks on each such configuration), it is my opinion that less than a straight line based prorated share of the revenues from $X$ are fairly attributable to TOL. TOL was not the first or even

the second single released from *X* and the album had achieved great success even before TOL was released.

7. As detailed in my report and as I will testify, Sheeran's first single from the album, "Sing," was a primary driver of album sales up until the popular airplay recognition of the second single "Don't." TOL was released (as the third of five singles) three months after the album's release and after the album had already achieved very significant sales.

8. On this point, I will testify regarding the "First Single Theorem," which opines that the first released single track that generates airplay momentum is a leading factor in the financial success of an album. I will testify that I measure impact based on peak radio airplay near the album release date. I will testify that, here, I conducted a study of comparable albums to "X" to calculate the length of time between the first single's peak date on radio and the date of the album's release. To facilitate this testimony, I will rely upon the below chart:

| Album | Artist | First Single | Album Release Date | First Single Peak Radio Airplay | Number of Days Apart |
|---|---|---|---|---|---|
| X | Ed Sheeran | Sing | 6/20/2014 | 5/21/2014 | -30 |
| American Beauty / American Psycho | Fall Out Boy | Centuries | 1/16/2015 | 2/22/2015 | 37 |
| Dreams Worth More Than Money | Meek Mill | Check | 6/29/2015 | 6/13/2015 | -16 |
| Blurryface | twenty one pilots | Fairly Local | 5/19/2015 | 3/29/2015 | -51 |
| Listen | David Guetta | Lovers on the Sun | 11/21/2014 | 9/20/2014 | -62 |
| Skrillex And Diplo Present Jack U | Skrillex & Diplo | Take U There | 2/27/2015 | 1/17/2015 | -41 |
| Magazines Or Novels | Andy Grammer | Back Home | 8/5/2014 | 9/28/2014 | 54 |
| Trigga | Trey Songz | NaNa | 7/1/2014 | 5/10/2014 | -52 |
| Save Rock And Roll | Fall Out Boy | My Songs Know What Yo | 4/12/2013 | 6/25/2013 | 74 |
| Everything Is 4 | Jason Derulo | Want To Want Me | 5/29/2015 | 6/11/2015 | 13 |
| Drones | Muse | Psycho | 6/5/2015 | 5/13/2015 | -23 |
| Hood Billionaire | Rick Ross | Elvis Presley Blvd. | 11/24/2014 | 10/4/2014 | -51 |
| Average of Comps | | | | | -10.7 |

9. I also will testify that although there is considerable streaming activity of the tracks on *X,* and TOL was extremely successful in the streaming market, streaming does not promote album sales. On the contrary, as the streaming market has massively increased, album sales have plummeted. This is because streaming is substitutional and not promotional toward album sales. According to year-end RIAA statistics, from 2014-2021, paid subscription service revenue has increased 971.6% while album sales have decreased 42.3%. That is because interactive streaming allows the consumer to choose which recordings he or she wants to listen to. They do not have to acquire the whole album to listen to any individual recording that they want to hear. Streaming does not therefore positively impact album sales. If anything, a very successfully streamed song depresses album sales. I will use the below chart to document my opinion:

3

**RIAA Year End Industry Revenue**

A line chart showing US Revenue (in Millions) from 2014 to 2021.

- Paid Subscription Revenue: 2014: $800; 2015: $1,159; 2016: $2,244; 2017: $3,501; 2018: $4,656; 2019: $5,934; 2020: $6,973; 2021: $8,574
- Album Revenues (Digital & Physical): 2014: $3,298; 2015: $2,987; 2016: $2,305; 2017: $2,114; 2018: $1,617; 2019: $1,507; 2020: $1,447; 2021: $1,904

10.     In addition, I will testify that, while I have not specifically factored all of these elements into my calculations, there are a number of other factors that contributed to sales of the album "X." This includes the comprehensive marketing campaign undertaken, and the expenses incurred, by Atlantic Records, public appearances by the artist, Ed Sheeran, a very successful video released in support of TOL, an extensive touring schedule, and the tremendous precedent of success and loyal fan base evident with Ed Sheeran.

11.     Because the Plaintiffs in this case only own a 22.22% beneficial interest in the allegedly infringed song, "Let's Get It On" ("LGO"), whatever the profits that are ultimately fairly allocable to the alleged infringing elements contained in TOL versus both non-infringing elements and factors other than the infringing elements themselves, I will opine regarding the portion of profits that should be allocated to that 22.22% interest <u>before</u> further apportioning between infringing and non-infringing elements and other factors of the Defendants' profits not attributable to the alleged infringement.

### B. Adjustments To Atlantic P&L Statement

#### i. TOL Share Of Tracks Per Album

12. I will testify that across all versions of "X" sold in the US, there were 6 different configurations of tracks per album, ranging from 12 tracks on the regular version to 33 tracks on the physical "Wembley Edition."

13. I will testify that, on average, based on sales of each configuration, there were 15.60 tracks per album sold, and TOL was 1.05 of those tracks. Therefore, on a straight-line basis, TOL's share of the album is 6.72% (1.05/15.60). The source of this analysis is from DEF 3615 which updated two prior versions of the same spread sheet, the original of which was provided to Plaintiffs on January 26, 2018.

14. To facilitate this testimony, I will rely upon the following chart (portions of which have been redacted for public filing):

| (A) Total Tracks per Album | (B) Albums Sold through June 2022 | (C) Share of Albums Sold = (B) / Sum of (B) | (D) Tracks x Share of Albums Sold = (A) X (C) |
|---|---|---|---|
| 12 | | 42.2% | 5.069 |
| 16 | | 37.1% | 5.930 |
| 17 | | 11.5% | 1.956 |
| 23 | | 0.1% | 0.015 |
| 24 | | 4.3% | 1.023 |
| 33 | | 4.9% | 1.602 |
| (1) Weighted Number of Tracks Per Album Sold (sum of (D)) | | | 15.596 |

| (E) TOL Tracks per Album | (F) Albums Sold through June 2022 | (G) Share of Albums Sold = (G) / Sum of (G) | (H) TOL x Share of Albums Sold = (E) X (G) |
|---|---|---|---|
| 1 | | 42.2% | 0.422 |
| 1 | | 37.1% | 0.371 |
| 1 | | 11.5% | 0.115 |
| 1 | | 0.1% | 0.001 |
| 1 | | 4.3% | 0.043 |
| 2 | | 4.9% | 0.097 |
| (2) Weighted "Thinking Out Loud" Tracks Per Album Sold (sum of (H)) | | | 1.049 |

| "Thinking Out Loud" Share of Albums Sold (2) / (1) | 6.72% |
|---|---|

15. I also will testify that, in Atlantic's Profit & Loss Statement (Joint Exhibit 6), TOL's revenue from Physical Albums (Gross Sales less Returns) and Digital Albums, and TOL's manufacturing costs are all calculated at a 1/12th share of the album, or 8.33%. Atlantic did this calculation based on the assumption (or for the sake of simplicity), which is inaccurate, that there was only one configuration of the album *X*, and that there were 12 tracks on that configuration. However, based on my calculation above, Atlantic's assumption ignored all of the various versions of the album, the number of tracks contained on each configuration of the album, and the sales of each different configuration of the album in using the 1/12 calculation. In so doing, Atlantic mistakenly inflated the relative values accorded each track, including TOL, and similarly, mistakenly increased the allocated share of expenses borne by each track.

REDACTED FOR PUBLIC FILING

16. I will testify that the more precise and correct share accorded to TOL, both for allocating revenue (before applying the First Single Theorem) and expenses, should have been calculated at 6.72%. I will testify regarding the proper adjustments to be made to Atlantic's P&L Statement based on this more precise calculation.

17. To facilitate this testimony, I will rely upon the below chart (which has been redacted for public filing):

| Selected Financials from Atlantic Records | Original (8.33% of Album) | Adjusted (6.72% of Album) | Difference |
|---|---|---|---|
| Physical Album Revenue | | | |
| Digital Album Revenue | | | |
| Manufacturing Cost | | | |
| Distribution Cost | | | |
| Royalties Cost | | | |
| Marketing Cost | | | |
| Overhead Cost | | | |
| Corporate Tax | | | |
| Total Difference to Net Profit Margin After Tax | | | $ |

### ii. First Single Theorem – Album Sales Exclusions

18. I will testify that initial album sales of "X" are disproportionately tied to the promotional push of the first single, "Sing," which was released on or about April 7, 2014. For the period of time from album release until the second single "Don't" (which was released to radio on July 15, 2014) overtook "Sing" on US radio airplay, "Sing" was the only song on the album with any consumer awareness (coupled with general consumer awareness of Ed Sheeran) to influence album sales. Therefore, I will testify that TOL's share of album revenue should exclude sales of "X" from this period.

19. I pinpointed July 29, 2014 as the last date when the first single, "Sing," had more plays than the second single, "Don't." Thereafter, a confluence of factors influenced album sales prior to the release of TOL. The following timeline illustrates the multiplicity of events that may have affected the sales of "X" during this period:



REDACTED FOR PUBLIC FILING
Significant Events in the Post-"Sing" Period

20. I will testify regarding the total albums sold through July 29, 2014. I will testify that the revenue derived from sales from before July 29, 2014 should be excluded as not having been generated by the alleged infringement.

21. I will further testify regarding the total albums sold through June 30, 2022 (which is the last date of Luminate data I had available to me in making my computations) and thereby calculate the percentage of albums sold during the excluded period. I will rely upon the below chart to facilitate my testimony (which has been redacted for public filing):

| Week End Date | SoundScan/Luminate for "X" | | Total Album Units Sold |
|---|---|---|---|
| | Physical Album Units Sold | Digital Album Units Sold | |
| 6/22/2014 | | | |
| 6/29/2014 | | | |
| 7/6/2014 | | | |
| 7/13/2014 | | | |
| 7/20/2014 | | | |
| 7/27/2014 | | | |
| 7/29/2014 | | | |
| Total Albums To Exclude | | | |
| Total Albums Through June 30, 2022 | | | |
| Share of Album Sales To Exclude | | | 14.31% |

22. Upon excluding the applicable percentage of album sales, I will testify how these adjustments affect Atlantic's revenues and net profits. I will rely upon the below chart to facilitate this testimony (which has been redacted for public filing):

7

REDACTED FOR PUBLIC FILING

| Selected Financials from Atlantic Records | Album Sales Revenue (after TOL share adjustment) | Excluding 14.31% of Album Sales | Difference |
|---|---|---|---|
| Physical Album Revenue | $ | | |
| Digital Album Revenue | $ | | |
| **Total Difference to Gross Margin** | | | $ |
| **Total Difference to Net Profit Margin After Tax** | | | $ |

### C. Summary Of TOL Profits Prior To Apportionment Analysis

23.    Upon adjusting Atlantic's revenues and profits as detailed above, I will testify regarding the net profits of each defendant, and I then will calculate for the jury the share of such profits that may be allocated to the Plaintiffs' 22.22% beneficial interest in LGO <u>before</u> further apportioning such profits between infringing and non-infringing elements and other factors not attributable to the infringement. To facilitate that testimony, I will rely upon the following chart (which has been redacted for public filing):

| Source | Net Profit After Tax |
|---|---|
| Ed Sheeran (Joint Exhibit 5) | $ |
| Atlantic Records (Joint Exhibit 6) - Adjusted | $ |
| Sony Music Publishing (Joint Exhibit 7) | $ |
| **Net Profit After Tax** | $ |
| | |
| **Plaintiffs' Beneficial Interest (22.22%)** | $ |

24.    Again, I emphasize that, accepting the revenue and expense figures that are reflected on Joint Exhibits 5, 6 and 7 (which I understand have been stipulated by the parties into evidence), this amount is the profits of TOL that would be attributable to Plaintiffs' 22.22% share of LGO, but that is before any allocation of infringing and non-infringing elements and before allocating any value to other factors.

25.    As I stated above, it is not my intention to testify as to the allocation of infringing and non-infringing elements, including such factors as the proportion of musical elements that are not alleged to be infringing versus musical elements that are claimed to be infringing, although I also understand that the lyrics are not alleged to be infringing. I understand that other witnesses will testify to such allocations in accordance with the facts and common musical industry practices and understanding. I also do not intend to testify regarding the factors that contributed to the

success of TOL such as Atlantic's marketing expenditures, Ed Sheeran's popularity as a performing artist and his video. I understand that other witnesses intend to provide such testimony and evidence.

Dated: March 6, 2023

_____
BARRY M. MASSARSKY

REDACTED FOR PUBLIC FILING

# EXHIBIT 1

REDACTED FOR PUBLIC FILING

EXHIBIT 1

## BARRY MASSARSKY CV

**Education:**
Graduated from Boston University in 1977 with a Bachelor of Arts degree, *cum laude,* which included numerous courses in economic analysis.

Masters of Business Administration from Cornell University in 1981, with an emphasis in managerial and industrial organization economics.

**Employment:**

1977 to 1979, employed as a litigation economist with the United States Department of Justice, conducting economic analyses in connection with the government's antitrust suit against IBM.

1981 through 1992, employed as an economist by the American Society of Composers, Authors and Publishers (ASCAP).   1987-1992, was  Senior Economist.

In 1992, formed an economic consulting firm named Barry M. Massarsky Consulting, Inc. ("Massarsky Consulting"), providing advisory consulting services to music industry clientele relating to strategies affecting music licensing and royalty earnings.  The firm employed three other economists including Ms. Nari Matsuura.

In December, 2021, Massarsky Consulting was sold to Citrin Cooperman Advisors and became a partner and co-service leader of its Music Economics and Valuation practice.

**Experience**

From 1992 onward, provided consulting services for the Recording Industry Association of America (RIAA) with respect to performing rights matters, preparing and presenting analyses of the first-time value of a sound recordings in the context of a public performance.

In 2001, began advising a new performance rights collective, SoundExchange, which directs royalty payments to artists and recording companies for performnce income of recordings generated from licensed revenue realized from subscription-based digital-transmitted audio services, and other digital transmissions conforming to the operating requirements set forth in either the Digital Performance for Sound Recordings Act or the Digital Millennium Copyright Act.

Massarsky Consulting and now Citron Cooperman Advisors evaluates royalty streams for all music genre classifications for music publishing companies, including Universal Music Publishing Group, Warner Chappell, SONY Music Publishing, Spirit Music Group, Round Hill Music, Concord Music, Kobalt Music Publishing and Reservoir Media.

Also provided consulting services for composer catalogues such as Marvin Hamlisch, the Estate of George Gershwin, Diane Warren, the Guess Who, Pete Townshend, Lionel Richie, Paul Simon and Green Day and others.

Starting in 1993, provided consulting services to SESAC, a performing rights competitor to ASCAP and BMI, including the economic appraisal of music repertory valuation and the modeling of innovative music license approaches.

**Expert Witness Experience**

2001, retained as an expert witness for Zomba and its affiliated companies in the *Zomba v. MP3.com*.   Provided deposition testimony and case settled.

2001, retained as an expert witness for Major Bob Music Publishing (Garth Brooks) in its lawsuit against MP3.com, which also settled prior to trial.

2003, retained as an expert witness for both the Country Roads Music plaintiffs (Bob Dylan, Billy Joel and James Taylor) and Fonomusic/Fonovisa in their lawsuits against MP3.com.

2004, retained by the RIAA and BMG in a copyright infringement action against Launch Media.  Deposed and testified at trial in 2007.

2004, retained by the RIAA as an expert witness in its lawsuit against iMesh, a popular file-sharing service.

2007, retained as an expert witness in *Slip N' Slide Records Inc. v. TVT Records, LLC,* Case No. 05-2113-Civ (Torres) in United States District Court of Florida.  Testified as a rebuttal expert to the plaintiff's assertions of damages relating to a specific recording's hypothetical sales value.

2009, deposed in *Tango v. Tibble*, which involving claims of legal malpractice relating to a collection of David Bowie and other recordings.

2009, retained as an economic expert in *Avonti Garrett v. Baptist Healthcare Systems, Inc.* regarding the future earnings of deceased award-winning songwriter Stephen Garrett.

2010, provided an expert rebuttal report regarding a damage claim in *Victory v. Virgin (EMI) Records.*

2010, retained by Plaintiffs in *EMI Records and EMI Publishing v. MP3Tunes.com,* to provide an expert opinion regarding a lost license theory of recovery.

2015, testified in Sydney, Australia representing the copyright interests of the Australian recording industry in a radio simulcast rate setting case opposing the Australian radio industry.

2015, expert in *UMG Recordings Inc. et.al v. Global Eagle Entertainment*, on behalf of UMG and UMPG concerning affirmative damages relating to copyright infringement against a major airline music program supplier.

2016, expert for Justin Bieber and Usher among other parties, in a copyright infringement action concerning the song "Someone to Love."

2018, expert SONY/ATV (now SONY Music Publishing) and VIACOM in *Twelve Sixty et.al. v. Extreme Music Library Limited et.al* with respect to a music royalties claim against Extreme Music filed by two music composers.

2020, I was retained in *Green v West*, a copyright infringement matter, providing a rebuttal report to plaintiff's expert damages theories.

2021, retained as an expert witness in a music copyright case representing the artist, Marshmello and his creative collaborator, Jon Bastille, relating to the song, "Happier."

2021, retained as an expert relating to a contract dispute between Reservoir Media and Music Royalty Consulting, Inc.

2021, retained as an expert witness for ABKCO Music & Records against Coda Publishing.

2021, retained by Vicki Cornell, as surviving spouse to the artist, Chris Cornell, in an action against the band known as Soundgarden, providing an expert rebuttal report to opposing expert's report relating to of music valuation of the band's master recording assets.

2022, retained as defendant's expert witness in *Sean Hall et.al. v. Taylor Swift, et.al.* in a copyright infringement action relating to the song, "Shake It Off."

Testified in the following cases: *United States v. ASCAP, In the matter of the Application of Salem Media of California, Inc. and New England Continental Media, Inc.* [Civil Action No. 13-95 (WCC)]; and *In Re Determination of Statutory License Terms and Rates for Certain Digital Subscription Transmissions of Sound Recordings* (Copyright Office Library of Congress) (CARP DSTRA Docket No. 96-5).

Massarsky Consulting and now Citron Cooperman Advisors are recognized as a premier music catalog valuation firm for all forms of transactions within the music industry.

REDACTED FOR PUBLIC FILING

**Publications And Speaking Engagements**

Authored "The Operating Dynamics behind ASCAP, BMI and SESAC, The U.S. Performing Rights Societies," which appeared in *Technological Strategies for Protecting Intellectual Property in the Networked Multimedia Environment*, Volume 1, Issue 1, January 1994, pp. 217-225.

Have spoken at professional seminars including the Copyright Society of the South, the Association of Independent Music Publishers (AIMP) for both the Nashville and Los Angeles branches, the CMJ Music Forum in New York and The Hollywood Reporter/Billboard Film/TV Music Conference in Los Angeles, as well as private bank presentations for SunTrust and City National Bank.