```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   KATHRYN TOWNSEND GRIFFIN, et
     al.,
 4
                 Plaintiffs,
 5
                 v.                        17 Cv 5221 (LLS)
 6
     EDWARD CHRISTOPHER SHEERAN,
 7   personally
     known as Ed Sheeran, et al.,
 8
                 Defendants.
 9
     ------------------------------x
10                                        New York, N.Y.
                                          April 25, 2023
11                                        11:00 a.m.

12
     Before:
13
                       HON. LOUIS L. STANTON,
14
                                          District Judge
15                                           – and a Jury –

16                         APPEARANCES

17   FRANK & ASSOCIATES PC
          Attorneys for Plaintiffs
18   BY:  PATRICK FRANK
          KEISHA RICE
19        KATHERINE VIKER
          – and –
20   BEN CRUMP LAW
     BY:  BEN CRUMP
21        Attorneys for Plaintiffs

22   PRYOR CASHMAN LLP
          Attorneys for Defendants
23   BY:  ILENE SUSAN FARKAS
          DONALD S. ZAKARIN
24        ANDREW MARK GOLDSMITH
          BRIAN MAIDA
25
     ALSO PRESENT:
```

KIM PASSEY, paralegal

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.

3          I have some preliminary remarks to make to the jury

4     about the conduct of the trial.  We will have the openings

5     right after that.

6          (Jury present)

7          Good morning, members of the jury.  Welcome back.

8     I'll have some preliminary remarks to make to you just about

9     the conduct of the trial and what we'll be doing, and

10    immediately after that we will have the opening statements and

11    then the witnesses.

12         This is a claim of copyright infringement.  In simple

13    terms, a copyright is a protection provided by law to authors

14    or creators some certain original works, including musical

15    compositions.  Copyright law protects against the wrongful,

16    unauthorized copying of a creator's original expression.  If

17    someone else does use the copyright, protected elements of a

18    work without the consent of the owner, they are said to have

19    infringed the copyright.

20         Not every portion or aspect of a copyrighted work is

21    given copyright protection.  A particular element within a work

22    may be unprotected, even though other elements, or the work as

23    a whole, warrant protection.  For instance, some phrases of

24    speech are unprotectable because they are so commonplace that

25    they are no longer original.  In the context of a musical

1    composition, commonplace musical building blocks that are

2    unprotectable include the key, the meter, the tempo, chord

3    progressions, and common song structures.  Sometimes some

4    combinations of commonplace and unprotectable elements are

5    afforded copyright protection if the way they are combined is

6    new and their arrangement is novel.

7           Copyright protection only covers the work as it was

8    registered with the U.S. Copyright Office.  The scope of the

9    copyright's protection is limited to the sheet music of *Let's*

10   *Get It On*, which was deposited with the copyright office:  We

11   call it the Deposit Copy.  The Deposit Copy of *Let's Get It On*

12   is the only valid definition of the elements included in *Let's*

13   *Get It On*, which have the protection of copyright, the ones

14   that were deposited in the Deposit Copy.

15          That is significant in this case because Ed Townsend's

16   collaborator, Marvin Gaye, recorded and commercially released

17   *Let's Get It On*.  This audio version of the song will be

18   referred to as the sound recording.  That's the way it is

19   recorded.  It was not registered and it has elements which are

20   not in the Deposit Copy:  They were added later by the Marvin

21   Gaye sound recording.  Those elements do not have copyright

22   protection because they are not in the Deposit Copy.  Musical

23   elements in the sound recording version of the song, but which

24   are not expressed in the Deposit Copy, are not protected even

25   if the elements had been added by Ed Townsend himself because

1  those elements have not undergone the copyright process.  So

2  when I prevent witnesses from talking about the sound

3  recording, it's because the sound recording has little or

4  nothing to do with whether Sheeran's *Thinking Out Loud*

5  infringes the copyright of *Let's Get It On*.

6          Now let me explain the jobs that you and I are to

7  perform during the trial.  I will decide which rules of law

8  apply to this case, and I'll decide this in response to

9  questions raised by the attorneys as we go along and also in

10  the final instructions given to you after the evidence and the

11  arguments are completed.

12          It's your function in the case to decide the issues of

13  fact.  Your decision on the issues of fact is to be based only

14  on evidence.  Anything to say is evidence; nothing any of the

15  lawyers say is evidence.  Questions by themselves are not

16  evidence.  The evidence consists of the sworn testimony of

17  witnesses and the exhibits which will be received in evidence

18  for your consideration and certain agreed facts to which the

19  parties have stipulated.

20          Any answer from a witness that I direct you to

21  disregard or that I strike from the record is not evidence and

22  shouldn't be considered by you in any way.  Anything you may

23  have seen or heard outside the courtroom is not evidence and

24  must be disregarded.  You are to decide the case only on the

25  evidence presented here in the courtroom.

1           How do you decide what to believe and what not to

2    believe?  Listen to the witnesses, watch them, observe them,

3    then decide whether you believe them or disbelieve them or how

4    much credit you would give or not give to their testimony, the

5    same way you decide such questions in your ordinary life.  Did

6    they know what they were talking about?  Do they have a reason

7    to falsify or exaggerate or distort their testimony?  Do they

8    have a motive to be served in the statements they make to you?

9    Use your common sense and good judgment to evaluate their

10   testimony based on all of the circumstances.  Is it probably

11   true or is it probably untrue is a useful way of evaluating the

12   testimony.

13           It is very important that you keep an open mind

14   throughout the case.  Don't form any judgments until the

15   evidence is completed and the case is given to you to discuss

16   and decide.  Remember that the evidence comes in step by step.

17   First a witness testifies on direct examination.  Then the

18   other side has the opportunity to cross-examine.  First one

19   side presents its evidence, then the other side has the

20   opportunity to present evidence.  Remember that there may be

21   two or more sides to any story.  And remember also, in the

22   stories that you heard as a child, something that you heard

23   near the end of the story changed your understanding of

24   everything that you had heard up till then.  You won't be in a

25   position to make a judgment until you have heard the whole of

1    the evidence.

2          Trial procedure.  First, the lawyers have the

3    opportunity to make opening statements to you, and they will do

4    that as soon as I finish talking.  Those statements are not

5    evidence.  They serve no purpose other than to give you an idea

6    in advance about the evidence that the lawyers expect you to

7    hear from the witnesses.  Those statements permit the lawyers

8    to tell you a bit about what the case is all about, but they

9    are not evidence themselves.  That comes only from the

10   witnesses and the exhibits.  And after the opening statements,

11   we'll start receiving evidence.  Each witness first gives

12   direct testimony and then the witness can be cross-examined by

13   the other side.  Remember that the lawyers present evidence to

14   you.  They ask questions, but they don't give evidence

15   themselves.

16          Questions are not evidence either.  Lawyers have an

17   obligation to make objections to questions, and when they

18   believe that something being offered is improper under the

19   rules of evidence, they are not being obstructive when they

20   object.  It's their duty.  You shouldn't be influenced by the

21   objection or by my ruling on it.

22          If the objection is sustained, ignore the question.

23   Don't try to guess what the answer would have been if I had

24   allowed the witness to answer.  If the objection's overruled,

25   treat the answer like any other.  If you are instructed that

1    some item is received for a limited purpose only, you must

2    follow that instruction and use that evidence only for that

3    purpose.  Testimony that I exclude or tell you to disregard is

4    not evidence and must not be considered or referred to in your

5    deliberations on your verdict.

6         After all the evidence has been received, the lawyers

7    have an opportunity to sum up and make a closing statement to

8    you.  They may review the evidence and make arguments to you

9    about what verdict they think you should or should not draw

10   from it.  Remember that those summations, again, are not

11   evidence.  You may find it very helpful, but it is only an

12   argument.

13        And after the summations, I'll instruct you on the

14   rules of law that you are to apply.  For the moment, I'll just

15   say that the Townsend plaintiffs have the burden of proving

16   their copyright infringement claim and potential damages by a

17   preponderance of the evidence.  A preponderance of the evidence

18   means that if after hearing all of the evidence, you believe it

19   is more likely than not that some event occurred, then that

20   event has been proven to you by a preponderance of the

21   evidence.  If you believe it is more likely it did not occur,

22   of course it's not been proved.  And if you find the likelihood

23   evenly balanced – maybe yes, maybe no – then the party that has

24   the burden of proving that to you has not succeeded.

25        Following my instructions, you will go into the jury

1    room, review all the evidence, discuss it among yourself, and

2    based on that you will reach your verdict.  You will never have

3    to explain your reasons or anything about your verdict to

4    anyone.  Your verdict stands as you state it.

5              We'll have opening statements now.

6              MR. FRANK:  Thank you, your Honor.  We're prepared to

7    go forward.

8              MR. CRUMP:  May it please the court.

9              Ladies and gentlemen of the jury, if you remember

10   nothing else about this trial, about this case, simply remember

11   it is about giving credit where credit is due.  I'm Attorney

12   Ben Crump, along with my co-counsels Attorney Keisha Rice,

13   Attorney Katherine Viker and Attorney Pat Frank.

14             We have the honor of representing Ms. Kathy Townsend

15   Griffin, seated at plaintiff's table today.

16             Will you stand, Ms. Townsend.  Thank you.

17             Also, we represent the estate of Cherrigale Townsend,

18   the late ex-wife of Ed Townsend.  We also represent the estate

19   of Helen McDonald, the sister of Ed Townsend, who was there

20   when Ed Townsend wrote the composition for *Let's Get It On*, and

21   she was there when he presented it to Marvin Gaye for the first

22   time.

23             Unfortunately they both passed during the course of

24   this litigation.  Kathy Townsend is the sole daughter and the

25   only living direct relative of Mr. Ed Townsend, the writer of

1   *Let's Get It On*.  They have other families present with us here

2   in the court, also.

3           At the very onset I want, on behalf of my client,

4   Kathy Townsend, on behalf of opposing counsel and our lawyers,

5   on behalf of the judge, the JA, the court reporter, the

6   bailiff, all of us are officers of the court.  And we just want

7   to say thank you at the onset, at the very onset, because we

8   understand how valuable your time is and the sacrifices that

9   you have made to be with us during these several days of this

10  trial.  And we don't take that lightly.  We don't take that for

11  granted at all, especially not the plaintiffs who have been

12  waiting very long for this day.  And so we are very, very

13  grateful.  We will try to be judicious with our arguments and

14  presenting the case to you, and we will make sure that your

15  time is used purposefully.

16          This is a lawsuit for the violations of the Federal

17  Copyright Act of 1976.  Specifically, it relates to the song

18  *Let's Get It On*, as you've heard, written by our client's

19  father, Mr. Ed Townsend, in 1973 and performed by the legendary

20  R&B artist Marvin Gaye.  You will hear that Mr. Ed Townsend

21  wrote several hit songs for Motown artists.  He was legendary.

22          Now, for many of you, this isn't the first time that

23  you all have heard *Let's Get It On*.  In fact, it's been called

24  the perfect song for that moment.  Some of you may know what I

25  mean when we say "that moment."  Its relevance and influence

1    has flourished throughout decades.  *Let's Get It On* is

2    interwoven in our lives through movies, television shows,

3    television commercials.  It is woven throughout the

4    constellation of popular culture not only in America, but

5    around the world.

6         It is undeniably engrained in our minds and it is an

7    evergreen song in the American song book.  And later today,

8    Ms. Kathy Griffin Townsend will passionately explain to you

9    what the term evergreen means from the opening chords, the

10   song, *Let's Get It On* capacity separates you.  It has become a

11   cornerstone in the American experience.  The evidence will show

12   that *Let's Get It On* is a song that evokes love and intimacy

13   long before the song at issue today by Mr. Ed Sheeran was ever

14   recorded.

15        In this case, you will here the computer-generated

16   audio file created by the defendants playing what is called the

17   Deposit Copy of *Let's Get It On*.  The evidence in this case is

18   going to show that four decades later in 2014, the defendant,

19   Mr. Ed Sheeran, recognized the magic of *Let's Get It On* and

20   decided to capture a bit of that magic for his own benefit

21   without obtaining permission or authorization from the

22   plaintiffs.  The evidence will show that after the release of

23   *Thinking Out Loud*, the defendant Mr. Ed Sheeran's career was

24   catapulted into the stratosphere causing him to go from an

25   opening act to selling out headlining stadium tours virtually

1   overnight, beyond solidifying his influence in the music

2   industry.

3           In 2015, Mr. Ed Sheeran garnered his first Grammy for

4   best song for *Thinking Out Loud*.  And since then, it's become a

5   musical standard at weddings and other special occasions.  The

6   evidence will show that when Mr. Ed Sheeran released *Thinking*

7   *Out Loud*, he copied from the plaintiffs, and violated the

8   Federal Copyright Act of 1976 in this case because he did not

9   ask for permission to use *Let's Get It On*.

10          The evidence will also show that Mr. Ed Sheeran did

11  not license the song *Let's Get It On*.  In fact, he took none of

12  the normal legal steps one takes when they wish to use

13  another's work.  In this instance, the necessary steps to

14  obtain permission or authorization from the plaintiffs would

15  have been relatively simple given that, as evidence will show,

16  the defendant Sony ATV Publishing Company actually administers

17  the publishing for both *Thinking Out Loud* and for *Let's Get It*

18  *On*.

19          You're going to hear testimony today from Ms. Kathy

20  Griffin Townsend about how Sony treated her father, this

21  legendary Motown R&B songwriter, in comparison to how Sony

22  treated this British pop star named Mr. Ed Sheeran.  The

23  evidence will also show that, in fact, the songs are so

24  similar, the evidence will be that when *Thinking Out Loud* was

25  released, Kathy Griffin Townsend received countless calls from

1    her friends and relatives alike talking about the similarities,

2    saying, Hey, that's your father's song, that's your father and

3    Marvin Gaye's song.

4          From the evidence presented in this case, we will meet

5    our burden, as the judge said, more likely than not -- not to

6    be confused with beyond a reasonable doubt -- more likely than

7    not that the defendants, Mr. Ed Sheeran, Atlantic Records, and

8    Sony ATV Music Publishing, copied plaintiff's music composition

9    *Let's Get It On* in violation of the Copyright Act of 1976.

10         We are confident that you will find that Alex

11    Stewart's testimony and opinions to be compelling evidence of

12    the copying by the defendant, Mr. Ed Sheeran.  But in this

13    case, you don't have to take the expert's testimony as the

14    final word because in this case, we have a smoking gun.

15         Mr. Ed Sheeran himself in concert merged *Thinking Out

16    Loud* with *Let's Get It On* in the form of an interpolation,

17    which plaintiff expert Dr. Stewart will explain to you all in

18    more detail.  But in that video you will see Mr. Ed Sheeran

19    switching from *Thinking Out Loud* and then to *Let's Get It On*,

20    and then he switches back to *Thinking Out Loud*, demonstrating

21    to you all just how similar the defendant's song is to *Let's

22    Get It On.*  The melody never changed, the chord progression

23    never changed, the harmony never changed, and the harmonic

24    rhythm never changed.  And you will conclude after hearing for

25    yourself that *Thinking Out Loud* is similar to *Let's Get It On*,

 1    substantially similar.

 2          Despite Mr. Ed Sheeran's best efforts and the

 3    defendants to convince you that the seamless combination of

 4    these two songs is a mere coincidence.  The evidence will

 5    demonstrate otherwise.  You know, Maya Angelou tells us that,

 6    when someone tells you who they are, it's our duty to believe

 7    them.  Well, we're prepared to take it one step further in this

 8    case.  When someone provides you a voluntary confession,

 9    believe them.  Make no mistake about it, the evidence will show

10    that Mr. Ed Sheeran seamlessly combining the songs at issue

11    together is a confession.  And when you have a confession in

12    hand -- now, I'm a country lawyer -- but when you have a

13    confession in hand, generally one does not need to look

14    elsewhere for the culprit.

15          Defendants will attempt to dazzle you with reams of

16    musical theory and suggest that the two songs at issue are not,

17    in fact, alike.  But we implore you to use your common sense

18    and what is evident before your eyes.  The defendants will

19    further attempt to suggest that all songs are based on a theory

20    of four chords, which prevents any copying to have occurred.

21    But common sense dictates that two songs have the capacity to

22    sound different, which makes them copyrightable.  And as will

23    be shown to you throughout the course of this trial, these two

24    songs simply do not sound different.

25          They will attempt to convince you that *Let's Get It On*

1   is not particularly an original -- not particularly original.

2   The irony of that statement, of course, is that the evidence

3   will show that Sony ATV itself saw the value and the magic of

4   *Let's Get It On* and has made money for decades administering

5   the copyrights and the publishing rights for *Let's Get It On*.

6   But when it doesn't suit their financial interests, they will

7   go to great length to attempt to convince you that there is,

8   in fact, nothing particularly special about *Let's Get It On*.

9           The evidence will show you that Sony will be unable to

10  explain, beyond relying on coincidence, why and how the

11  defendant, Mr. Ed Sheeran, is able to seamlessly combine the

12  two songs together if he himself did not recognize the inherent

13  similarity between the two songs.  They will try to say it's

14  just common to mash up songs during concerts.

15          But Dr. Stewart will explain to you about

16  interpolation, many other musicians, like Mr. Ed Sheeran, see

17  the similarities when they specifically play these two songs

18  together in concert all the time.  Out of the millions upon

19  millions of songs that the defendant, Mr. Ed Sheeran, has

20  available from which to choose, he elected to combine *Thinking*

21  *Out Loud* and *Let's Get It On* and then back to *Thinking Out*

22  *Loud*.  Think about that and whether the variant de facto

23  explanations that the defendants will offer during the course

24  of this trial are plausible.

25          You hear of the mashups.  But listen particularly with

1    your ears and watch with your eyes when they go back and forth.

2    Listen to other songs, and you're going to notice something

3    different, we suggest.  When someone shows you who they are,

4    believe them.  When someone confesses, you believe them.  That

5    concert video is a confession.

6         Because we respect your time and your sacrifices, all

7    we ask is for you to believe what will be presented before your

8    eyes and ears during the course of this trial.  Nobody wants

9    you to decide based on sympathy or bias.  No sympathy or bias

10   for Kathryn Griffin Townsend.  Evidence is what we're asking

11   you to base your verdict on.  And nobody certainly is not

12   asking you to base your verdict on sympathy for Mr. Ed Sheeran

13   or Atlantic Records or Warner Music or Sony ATV.  No, everybody

14   is equal in this courtroom.  The plaintiff and each and every

15   one of these defendants, all equal.

16        Today we are simply asking you to rely on your basic

17   senses, like your ears, your sense of hearing, and your eyes

18   when you see that video, your sense of seeing.  But perhaps the

19   most important sense we're asking you to use is your common

20   sense.  And as Judge Stanton said, based on all the

21   circumstances, common sense.  You can take the evidence and you

22   can apply your common sense to that evidence because that's why

23   we have you here as the trier of fact.  We want you to use your

24   common sense.  Your lived experiences.  We want you to base

25   your verdict on your verdict.  Your common sense.

 1            And in doing so, we are going to ask you to return a

 2   verdict holding the defendants liable for infringing upon the

 3   copyright of *Let's Get It On*, because as I said at the

 4   beginning, at the very onset, if you remember nothing else, if

 5   you don't remember what I say, if you don't remember what

 6   opposing counsel says, if you don't remember what witnesses

 7   say, expert witnesses say, please, please, please remember

 8   this:  This case is simply about giving credit where credit is

 9   due.

10            Thank you, again, for your time and your consideration

11   in this most important case.

12            THE COURT:  Thank you, Mr. Crump.

13            MS. FARKAS:  Just checking if it was still morning.

14            Good morning.  My name is Eileen Farkas, and with me

15   at counsel table for Ed Sheeran, Atlantic Records and Sony

16   Music Publishing are Andrew Goldsmith, Brian Maida, Don

17   Zakarin, and Robert Michael.  Of course, Mr. Sheeran is here as

18   well.

19            So let's talk about what this case is actually about.

20   Ed Townsend, one of the writers of the song *Let's Get It On*,

21   died in 2003.  As you have already heard, the plaintiffs in

22   this case are the heirs of Ed Townsend.  As you have also

23   heard, the plaintiffs claim that the song *Thinking Out Loud*,

24   written by Ed Sheeran and Amy Wadge, infringes *Let's Get It On*.

25            The evidence in this case will show that Ed Sheeran

and Amy Wadge independently created *Thinking Out Loud*.  Their
song was born from an emotional conversation that they had had
the night before creating the song, about watching their
grandparents and their relatives live their entire lives with
the same partner, and then losing that loved one.  They created
this heartfelt song without copying from *Let's Get It On*.  It
was their original creation.

There are three critical things that we will prove to
you in this case.  First, Ed Sheeran and Amy Wadge are
established and experienced songwriters.  They independently
created *Thinking Out Loud*.  They did not copy from *Let's Get It
On*.  Independent creation is not copying.  You will hear that
the lyrics and the melody of the songs, what Ed Sheeran is
singing when he sings the lyrics, they are completely
different.  In fact, the lyrics aren't even at issue in this
case, and the vast majority of what Ed is singing is not at
issue.

So what is?

Second critical thing.  Plaintiff's case rises and
falls on two things that belong to no one:  A frequently used
chord progression and the rhythm that that chord progression,
which is known as anticipation.  Two things that everyone here
agrees are exceedingly common basic musical building blocks
that no one can own.  And when I say everyone, I mean the
plaintiffs, the judge, and the plaintiff's own expert.

1          Number three, we will show you that *Let's Get It On*

2   was not the first to use these elements in combination anyway.

3   These two elements were used in songs created both before *Let's*

4   *Get It On* and before *Thinking Out Loud*.  Because they know

5   this, the rest of the alleged similarities that they will throw

6   into this case either do not exist, they are just not similar,

7   or just like the chord progression and the anticipation, are so

8   basic that no one can own them either.

9          This is what we will prove to you.  You will hear the

10  phrase musical building blocks, the alphabet of music.  The

11  evidence and the law that applies to this case, as the judge

12  will instruct you, will demonstrate that the elements that are

13  at issue in this case, the claim similarities between these two

14  songs are nothing more than basic musical building blocks.

15  Free to all musicians, all songwriters to use.

16         Plaintiffs do not own them because no one owns them,

17  and no one has a monopoly on them.  And no one can prevent

18  other people from using them because all songwriters draw from

19  this basic musical toolkit to create their own music.

20         So let's with look at the evidence that this case will

21  show you and that we will present both through our witnesses

22  and through our cross-examination of the plaintiff's witnesses.

23         I'll start by telling you a little bit about the only

24  two people who were present when *Thinking Out Loud* was created:

25  Ed Sheeran and Amy Wadge.  We will introduce you to Ed Sheeran,

1    who is a defendant in this case and here in the courtroom

2    today.  You will also hear from Amy Wadge.  Ms. Wadge is not a

3    defendant in this case and she has no obligation to be here.

4    But the claim that she supposedly copied *Let's Get It On* was so

5    untrue and so upsetting to her, and even though she hasn't been

6    sued in this case, she is flying here from England to testify

7    about how they created this song with Ed and that it had

8    nothing to do with *Let's Get It On*.

9          And she knows this because she was there.  The

10   evidence will show that Ed and Amy independently created

11   *Thinking Out Loud*, just as they had independently created lots

12   of songs before that together.

13         You will hear from the producer of the recording of

14   *Thinking Out Loud*, Jake Gosling.  Just like Amy, Jake has no

15   obligation to be here.  But he too is flying here from England

16   to testify about the recording process of *Thinking Out Loud* in

17   the studio.  And he will too tell you that the recording of

18   *Thinking Out Loud* had nothing to do with *Let's Get It On*.

19         Mr. Sheeran will also testify about how he created

20   *Thinking Out Loud* with his friend Amy.  He will tell you how he

21   met Amy when he was a teenage songwriter.  Amy is 15 years

22   older than him.  How they were introduced together in a writing

23   session and how they became cowriters and good friends.  Ed and

24   Amy will testify about their musical influences.

25         Ed grew up in the '90s and early 2000s, and Amy grew

1   up in the '80s and '90s, and they were into singer/songwriter,

2   hip hop, country, and folk music.  You will hear how Ed and Amy

3   write together.  Sometimes in life you work with someone and it

4   clicks, and that is how it was for Ed and Amy.

5        You will hear the very first time they met, years

6   before they wrote *Thinking Out Loud*, in two or three days they

7   wrote nine songs together.  Five of them released on an EP

8   called *Songs I Wrote with Amy*.  You hear not only is Ed Sheeran

9   a talented and versatile songwriter, but he is extremely

10   dedicated to songwriting and recording music.  It is something

11   he works very hard at doing and it is very personal to him.

12        Ed and Amy will both tell you that Amy came to visit

13   him in early 2014, and the evidence that you will hear from

14   both Ed and Amy is that, like any friends who haven't seen each

15   other for a while, they stayed up late that night talking and

16   catching up.  They talked about things that were going on in

17   their lives.  And you will hear how this conversation inspired

18   the creation of *Thinking Out Loud*.

19        They shared about personal losses.  Amy talked about

20   the fact that her mother-in-law was dying.  It was a very

21   emotional time for her and, in fact, her mother-in-law died

22   shortly thereafter.  Ed too had just suffered a great loss in

23   his family with the recent death of his grandfather.  And these

24   two friends, both relatively young, talked about how

25   extraordinary it was to think about people who loved each other

1    for decades, spending their whole adult life together, and how

2    lost Ed's grandmother was without Ed's grandfather.  And both

3    he and Amy will tell you about how they talked about what it

4    must be like to be in a loving relationship for that many years

5    and then to lose that person.

6         The reason why Amy and Ed's discussion is so relevant

7    to this case is because, as you will hear, this conversation

8    about personal losses is what was the inspiration for *Thinking*

9    *Out Loud*.  You will hear from them, on the second day of Amy's

10   visit to Ed's house, she and Ed were getting ready to go out to

11   dinner with Ed's parents.  When Ed went upstairs to take a

12   shower, Amy did what songwriters do.  She picked up a guitar

13   and started strumming.  And she started strumming some basic

14   chords, chords that had been used in songs over and over and

15   over.

16        In fact, Amy will tell you that she have used this

17   exact same chord progression that's in *Thinking Out Loud* in

18   another song that she released before *Thinking Out Loud*.  And

19   that she was performing that song at gigs right around the time

20   that she had met with Ed that day.

21        Ed will testify that when he got out of the shower, he

22   heard Amy strumming on the guitar.  You will hear how they then

23   wrote the beginning of the song inspired by their discussion

24   about long-lasting love from the night before.  You will hear

25   from Ed and Amy that they then went to dinner with Ed's

 1   parents, that afterwards they turned down an invite to go back

 2   to Ed's parents' house for coffee because they wanted to finish

 3   what they started.

 4        The undisputed evidence in this case about the

 5   creation of *Thinking Out Loud* that you will hear is that

 6   *Thinking Out Loud* is a song about finding everlasting,

 7   unconditional love.

 8        Here are a few of the lyrics from *Thinking Out Loud*:

 9   When my hair is all gone and my memory fades and the crowds

10   don't remember my name.  When my hands don't play the strings

11   the same way, I know that you'll still love me the same.

12   Because, honey, your soul can never grow old.  It's evergreen.

13   Baby, your smile is forever in my mind and memory.

14        Ed and Amy will testify that, fueled by their real-

15   life experiences, they built off that theme.  And that by

16   midnight that night, they had written *Thinking Out Loud*.  This

17   is the undisputed evidence that you will hear about the

18   creation of *Thinking Out Loud*.  Independent creation is not

19   copying.

20        There are three plaintiffs in this lawsuit.  You've

21   heard who they are.  Ms. Griffin is the only currently living

22   plaintiff.  And as you will see, Ms. Griffin has no personal

23   knowledge about the creation of *Let's Get It On*.  She was not

24   there when it was created in 1973.  She did not meet Ed

25   Townsend until 1986, 13 years after he wrote *Let's Get It On*.

1           You will see there is not a single plaintiff witness

2    who can tell you anything about how Ed Townsend came to write

3    *Let's Get It On*, what musical influences he drew upon, and

4    whether, like all songwriters, he used the same commonplace

5    musical building blocks that are available to all songwriters

6    when he wrote *Let's Get It On*.

7           You will also see that Ms. Griffin has no personal

8    knowledge about the creation of *Thinking Out Loud* either.  And

9    yet, she claims that Ed Sheeran and Amy Wadge copied *Let's Get*

10   *It On* and, therefore, all of the defendants should be forced to

11   pay her a portion of the profits from *Thinking Out Loud*.  Who

12   is not a plaintiff is the owner of the copyright in *Thinking*

13   *Out Loud*?  The owner of the copyright is not a part of this

14   case.

15          At its core, this case is not about the lyrics or the

16   notes that Ed Sheeran is singing.  What this case is about is

17   whether Ms. Griffin can own a chord progression and the rhythm

18   at which it is played, whether Ms. Griffin can therefore

19   prevent every songwriter from here on forward from using those

20   elements that have been commonly used in songs as far back as

21   anyone can remember.

22          The evidence will show what a chord is, which is a

23   combination of three or more notes played simultaneously.  A

24   chord progression is just a sequence of chords.  There is no

25   dispute here that the basic chord progression from *Let's Get It*

1    *On* is a four-chord progression that repeats throughout the

2    entire song, almost the entire song.

3          The evidence will show Ed Townsend did not create that

4    chord progression.  He didn't invent the rhythm of the chord

5    progression.  Both of these elements were used many, many, many

6    times in songs both before and Ed Townsend wrote *Let's Get It*

7    *On*, and none of the prior songwriters who used this chord ever

8    sued Ed Townsend or his estate for using it.

9          Because no one can own these musical elements, the

10   judge in this case, Judge Stanton has already ruled that both

11   of these elements are basic musical building blocks that are

12   available to every songwriter to use now in their songs

13   forevermore.

14         So what Ms. Griffin is seeking from you now is the

15   right to monopolize a combination of those two elements.

16   Ms. Griffin wants to be the sole and exclusive owner of this

17   combination of unprotectable musical building blocks.  She

18   wants to prevent all songwriters from ever using them together

19   in a song ever again.

20         How can it be that 50 years after the creation of

21   *Let's Get It On*, the plaintiffs can now obtain the exclusive

22   right to these commonplace musical building blocks?  How can it

23   be that no one else can use them without fear of being sued?

24   The answer is that Ms. Griffin does not and cannot own these

25   musical elements.

1          And, in fact, the evidence will show that Mr. Townsend

2     didn't create them either.  You will hear from Judge Stanton,

3     when he explains the law -- and it is his explanation that

4     matters -- there are very specific legal requirements for these

5     combination claims.  The evidence in this case will show that

6     the plaintiffs cannot prove even a single one of these

7     requirements, let alone all of them.  The evidence will show

8     that none of these elements alone are, or in combination, are

9     novel or original to *Let's Get It On*.  And we will show that

10    these elements are actually different in each song.

11         So what is the evidence that the plaintiffs are going

12    to present to you about how and why they think *Let's Get It On*

13    copies -- that *Thinking Out Loud* copies *Let's Get It On*?  The

14    plaintiffs don't know how *Thinking Out Loud* was created.  They

15    weren't there.  So they will try to persuade you that because

16    *Let's Get It On* was a well-known song -- and we don't dispute

17    that it was and still is -- that that creates a possibility

18    that Ed and Amy could have copied from it because they share

19    some entirely unremarkable similarities that appear in many

20    other songs.

21         The judge has already told you that this case is

22    limited to the Deposit Copy of *Let's Get It On*, which you will

23    see is five pages of sheet music.  That's what this case is

24    limited to, this registered sheet music.  It defines the

25    outside limit of the copyright.  Just as Judge Stanton said,

1    just because a song as a whole is copyrighted, it does not mean

2    that every individual piece of it is protected by copyright.

3    No one owns basic musical building blocks.

4          As I have mentioned and the judge has already informed

5    you, that some of the things that are written down in the sheet

6    music are not individually covered by the copyright.  For

7    example, the chord progression in the Deposit Copy is not owned

8    by anyone.  Not Ed Townsend, not Ed Sheeran, not Amy Wadge.

9    No one.  The chord progression belongs to everyone and can be

10   used by everyone.

11         This judge will instruct you on that again at the end

12   of the case.  And as you have also heard from the judge, the

13   copyright in *Let's Get It On* here does not cover any recording

14   of the song by Marvin Gaye or anyone else.  None of the

15   plaintiffs own or can sue on any recording of *Let's Get It On*.

16   The recordings are not part of this case.

17         So what do the plaintiffs rely upon in this case?

18         Do the plaintiffs claim that the lyrics are remotely

19   similar?  No, because the lyrics of the two songs are not

20   remotely similar.

21         What about the melodies?  By melodies, I mean the tune

22   that Ed here is singing when he is singing the lyrics of

23   *Thinking Out Loud*, what notes you would sing if you sung the

24   song.

25         Do the plaintiffs base their claim on the melodies of

1    the two songs?  Well, as you will hear, the vast majority of

2    the melodies are not at issue.  All music is based on the

3    letters of the alphabet of music called notes or pitches.

4            But the plaintiffs will try to persuade you that by

5    plucking a few notes from here and a few from there and saying,

6    see, there are some similarities in the melodies of the two

7    songs, they will try to convince you that this is somehow

8    significant, and it is not.

9            The evidence will show and you will hear for

10   yourselves that the melodies of these two songs are very, very

11   different.  I will address this part of their claim and the

12   evidence you will hear in a few minutes.  So these two

13   elements, the lyrics and melody, two of the most important

14   elements in any song and what people typically think of when

15   they think of a song and sing a song, are not even remotely

16   similar.

17           So let's examine the crux of what the plaintiffs are

18   going to tell you about.  As I mentioned, the plaintiffs are

19   claiming that the *Thinking Out Loud* uses a chord progression

20   that features four chords that are similar to the chord

21   progression in *Let's Get It On*, and that *Thinking Out Loud*

22   plays that chord progression in a certain way, with harmonic

23   rhythm known as anticipation, on the second and the fourth

24   chord, that's similar to the harmonic progression in -- the

25   harmonic rhythm used in *Let's Get It On*.

1          So what's important to know about the chord

2     progressions?  One, they are different in each song.  They

3     admit that.  Two, they are commonly used musical building

4     blocks, like the ABCs.  And three, the judge has already ruled

5     that *the Let's Get It On* chord progression is commonplace and

6     unprotectable, and none of this is disputed.

7          The evidence will show that this chord progression in

8     *Let's Get It On*, sometimes referred to as a 1,3,4,5 chord

9     progression, is so basic, it has been used by songwriters over

10    and over and over again.  So no one, not Ms. Griffin, not

11    Mr. Townsend, not Mr. Sheeran, no one can own it.

12         You will hear from Dr. Lawrence Ferrara, a full

13    professor of music over 30 years at New York University, who

14    for over 16 years oversaw over 400 faculty for the undergrad

15    master's and pH programs at NYU.  Dr. Ferrara has more than

16    three decades of experience analyzing music copyright claims.

17    He is a world renowned expert in the field.  You will hear

18    about his impressive qualifications.

19         He will testify regarding the claimed musical

20    similarities between these two songs.  Dr. Ferrara will testify

21    that Mr. Townsend was hardly the first person to use this chord

22    progression.  Indeed, Dr. Ferrara has found many, many, many

23    songs that contain the chord progressions at issue.  It has

24    been used in song after song after song after song.

25         Dr. Ferrara will testify many of these songs created

1  before *Thinking Out Loud* and *Let's Get It On*, everyone from

2  Buddy Holly to the Beach Boys to the BeeGees, to the Beatles to

3  Elton John have used this chord progression before Ed Townsend.

4  In fact, the evidence will show that the 1,3,4,5 chord

5  progression Ed Townsend used in *Let's Get It On* is so common,

6  that it is taught in basic how to play guitar and piano books.

7  And you will see that one of those books, a piano instruction

8  book published in 1967, six years before *Let's Get It On* was

9  written, teaches ten popular rock and roll chord progressions

10  for the piano, including the same 1,3,4,5 chord progression

11  that Ed Townsend used six years later when he wrote *Let's Get*

12  *It On*.

13       So if this chord progression is so commonplace, why

14  are we here?

15       Did anyone ever sue Ed Townsend for using this chord

16  progression?  No.

17       Did Marvin Gaye or Ed Townsend ever sue anyone for

18  using their chord progression?  No.

19       The difference here is that Kathryn Griffin, who

20  unlike Ed Townsend is not a professional songwriter and had

21  nothing to do with the creation of *Let's Get It On*, is suing.

22       Now let's talk about the evidence relating to this

23  harmonic rhythm, the anticipation or the syncopation used with

24  this exceedingly common chord progression.  The evidence will

25  also show the harmonic rhythm used in *Thinking Out Loud* is

1    different than the harmonic rhythm used in *Let's Get It On*.

2    You will also hear that the judge has already also ruled that

3    anticipation is commonplace, and that the plaintiffs cannot own

4    it or stop anyone else from using it.

5         It is undisputed in this case that anticipation has

6    been used in music for literally hundreds of years.  It is such

7    a basic musical building block, that no one has the right to

8    use it or prevent others from using it.  In fact, consistent

9    with the widespread use of anticipation, we will show you that

10   Ed Sheeran himself has used anticipation in over 20 songs

11   before he wrote *Thinking Out Loud*, and ten of them used the

12   same anticipation of the second and fourth chords that are at

13   issue here.

14        The evidence will also show that Amy Wadge, as

15   cowriter, wrote a prior song that used the very same chord

16   progression at issue and anticipation in a similar manner to

17   what is used in *Thinking Out Loud* before she wrote -- cowrote

18   *Thinking Out Loud* with Mr. Sheeran.  The evidence will show

19   that plaintiff's claim is simply baseless.

20        Despite all of this evidence, the plaintiffs cling to

21   the fact that long after Ed Sheeran wrote *Thinking Out Loud*, he

22   briefly sang a few snippets of the lyrics to *Let's Get It On* in

23   a live performance when he was performing *Thinking Out Loud*.

24   They claim that by doing this, it somehow shows he copied *Let's*

25   *Get It On*.

1          In fact, it shows the complete opposite.  You will

2     hear from Ed Sheeran that, during his live performances, he

3     regularly combined songs with parts of other songs.  Sometimes

4     he combines them with his own songs.  Sometimes he combines

5     them with songs written by others.  Some people call that a

6     melody or a mashup or segwaying from one song to the other.

7          The evidence will show that Ed Sheeran has been doing

8     these types of performances ever since he was a kid.  He was by

9     no means the first person to do mashups of songs.  They have

10    been around probably for as long as people have been performing

11    music.

12         You will hear from Mr. Sheeran that he has done this

13    on every single one of his tours, mashing up two songs

14    together, three songs together, four songs together, both

15    before and after *Thinking Out Loud*.  The evidence will show

16    that Ed Sheeran also mashed up *Thinking Out Loud* with other

17    well-known songs.  But no one, other than these plaintiffs,

18    have ever suggested that mashing up two songs together is

19    evidence of infringement.

20         By the way, if you think about this whole mashup claim

21    that they are clinging so desperately to, and you listen to the

22    various mashups that we will play for you, you have to ask

23    yourselves, do you really think, if Mr. Sheeran copied *Let's

24    Get It On*, he would go on stage and publicly perform it when he

25    is doing *Thinking Out Loud*?  Of course he wouldn't.

1          Now let's circle back to plaintiff's attempt to claim

2   that there is alleged similarities in the vocal melodies.  The

3   undisputed evidence will show these melodies are nothing alike,

4   and you will hear it for yourself.  And because they are not

5   anything alike, the plaintiff's expert will distort the

6   melodies.  He will change the melodies and change the rhythm,

7   change the pitches, change the rhythmic duration these pitches

8   are at to make them as close as possible, to make appearances

9   of similarities when none exists.

10          He will point to snippets of notes that he plucks from

11  different locations in each song, something that he, you know,

12  said is not something that should be done.  And he will try to

13  tell you that one note here is similar to one note there.  It's

14  like audio photoshopping.

15          Our expert, Dr. Ferrara, will show you that what

16  plaintiff's expert is trying to do is not only misleading, it's

17  purposefully misleading.  And Dr. Ferrara will show you that

18  the melodies and the notes within those melodies are nothing

19  alike.  The entire effort with the melodies, and what the

20  plaintiff's expert is doing, is also a complete waste of all of

21  our time.  Because even when he presents it in the way he wants

22  to present it, they are still completely different.

23          There is only seven notes in a scale.  Seven notes.

24  So the same notes and even sequences of notes are going to

25  appear in millions of songs.  If you start randomly plucking

notes from different sections of two different songs, it's like finding the letters A, B and C among ten words in a sentence. It's evidence of nothing.

Our expert, Dr. Ferrara, will play these melodies for you at the piano so you can hear for yourself how these pitches sound when they are played as they have been written in each song, and you will hear how different these melodies are. It's actually striking.

As you hear this evidence, I hope you will ask yourselves: Why are the plaintiffs doing this? Why are they manipulating the evidence to make it appear that the songs are more similar than they are?

So we have melodies that are nothing alike, very common chord progression, and anticipation, which is even more common. So what are the plaintiffs argue? They fall back on their combination claim, that the combination somehow is something that they can own. But as I mentioned, there is very specific requirements for these combination claims, and the plaintiffs will not be able to prove any of them.

So what will they be unable to prove? First, they will not be able to prove that *Let's Get It On* was the first song to combine these elements. We will show you that there are several songs that have combined this exact same chord progression at issue and the exact anticipation at issue. This evidence alone defeats plaintiff's claim.

1        Second, the plaintiffs also cannot prove that the

2   elements in the combination are identical or virtually

3   identical in both songs.  The evidence will show that both the

4   chord progression and the harmonic rhythm in *Thinking Out Loud*

5   is different in important ways from *Let's Get It On*.

6        There is a third problem with plaintiff's combination

7   claim.  It's only two unprotectable elements.  Zero plus zero

8   doesn't equal anything.  But even if the plaintiffs could

9   overcome all of these problems with their claim -- and the

10  evidence will show that they cannot -- it still would not be

11  enough for you to find an infringement, and that is because

12  Ed Sheeran and Amy Wadge did not copy *Let's Get It On* based on

13  the evidence of the two people, the only two people who were

14  there and how they did so, which will be the only evidence that

15  is presented to you by any witness that has any knowledge of

16  those facts.  Their independent creation of *Thinking Out Loud*

17  alone also bars the plaintiff's claim.  Independent creation

18  means they did not copy.

19        Ultimately, the evidence will show that Ed and Amy

20  created *Thinking Out Loud* on their own.  The evidence will also

21  show that the claim similarities are actually different.

22  Different keys, different melodies, different lyrics, different

23  songs.  Not only are they different, but plaintiffs admit they

24  can't own any of the claimed similarities.  Chord progressions

25  that have been used in dozens and dozens of songs, and that is

1    taught in beginner how to play guitar and piano books.  A

2    rhythmic device of anticipation, which is so common it dates

3    back to medieval time.  These are the elements of the alphabet,

4    the fabric of music available to all songwriters.

5         All of the songwriters involved in this case deserve

6    credit for their own work and they have gotten due credit for

7    their work.  Ed Sheeran and Amy Wadge have been wrongly accused

8    here.  They have been wrongly accused of taking something they

9    did not take.  Ms. Griffin wants you to take *Thinking Out Loud*

10   away from them and give her ownership of something that would

11   change the way songwriters are able to write.  We ask that you

12   not let that happen.

13        I want to thank each of you for your time and your

14   service in this case, and we look forward to presenting our

15   case to you.

16        THE COURT:  Thank you, Ms. Farkas.

17        Shall we call a witness?

18        MR. FRANK:  We can, your Honor.

19        The plaintiffs call the plaintiff, Plaintiff Kathy

20   Griffin Townsend.

21    KATHRYN GRIFFIN TOWNSEND,

22       called as a witness by the Plaintiffs,

23       having been duly sworn, testified as follows:

24        THE DEPUTY CLERK:  Please state your full name and

25   spell it.

 1          THE WITNESS:  Kathryn Griffin Townsend.  K-a-t-h-r-y-n

 2    G-r-i-f-f-i-n T-o-w-n-s-e-n-d.

 3          THE DEPUTY CLERK:  You may be seated.

 4          THE WITNESS:  Thank you.

 5          MR. CRUMP:  May it please the court.

 6    DIRECT EXAMINATION

 7    BY MR. CRUMP:

 8    Q.  Good morning, Ms. Kathryn --

 9    A.  Good morning.

10    Q.  -- griffin.

11          You just stated your name for the record, but could

12    you do it again.  Could you tell the jury your whole name?

13    A.  Kathryn Griffin Townsend.

14    Q.  Are you married, Ms. Townsend?

15    A.  Yes, I am.

16    Q.  Do you have any children, Ms. Townsend?

17    A.  Yes, I do.

18    Q.  Can you tell the jury, what is your educational background?

19    A.  I have three years of college, I am a certified a

20    peer-to-peer recovery coach specialist, specializing in

21    substance abuse, mental health, and sex rehabilitation.

22    Q.  Do you have any formal musical training?

23    A.  Yes, I do.

24    Q.  Could you tell the jury about your musical training?

25    A.  I studied piano as a child, I played flute, piccolo, some

1   percussion, and I also studied Italian opera.

2   Q.  And did you have any musical training when you were a child

3   or in school?

4   A.  Yes, I did.

5   Q.  OK.  Would you tell the jury about that?

6   A.  I played in the high school band, I also taught rifle and

7   flag for color guards.

8   Q.  Have you ever song professionally?

9   A.  Yes, I have.

10  Q.  In what capacity?

11  A.  I've been -- I was on the '83 Cold-Blooded tour with Rick

12  James.  I performed with my brother's group, Surface.  I also

13  still occasionally perform with Parliament-Funkadelic.

14  Q.  Is that George Clinton's band?

15  A.  Yes, it is.

16  Q.  Can you tell this jury if you could read music?

17  A.  Yes, I can.

18  Q.  Can you write music?

19  A.  Yes, I can.

20  Q.  Have you ever written any songs?

21  A.  Yes, I have.  George Clinton and I have published songs

22  that are on a few of his albums.

23  Q.  Are you currently working in music now?

24  A.  Sometimes.

25  Q.  Are you the plaintiff in this case today?

1   A.   Yes.

2   Q.   Can you tell this jury, who is Mr. Ed Townsend?

3   A.   Edward Benjamin Townsend is my biological father.

4   Q.   And are you the heir to Mr. Ed Townsend's estate?

5   A.   Yes.  I'm the sole living heir to my father's estate,

6   direct heir.

7   Q.   Ms. Townsend, can you tell this jury, what was your father,

8   Mr. Ed Townsend's, occupation?

9   A.   My father was a performer, songwriter, and producer.

10  Q.   And can you tell this jury, what do songwriters do?

11  A.   They capture the beauty, feelings, emotions of things that

12  inspire them, and put it to music and lyric.

13  Q.   How do songwriters make a living off of their songs,

14  Ms. Townsend?

15  A.   It's through the copyright and their protection, and the

16  copyrights are collected which generate salaries for the

17  songwriters.

18  Q.   Was your father a famous songwriter?

19  A.   Yes.

20  Q.   Can you tell the jury how he was revered in the music

21  industry?

22  A.   My father was very well-known by many, many exceptional

23  individuals in the music industry, and he worked with many

24  great legends.

25  Q.   He was known in the music industry, was he as well-known

 1    outside of the music industry?

 2    A.  He had many fans.  Even to this day.  People love his

 3    compositions.

 4    Q.  He wasn't as well-known as Marvin Gaye, was he?

 5    A.  I wouldn't say no.

 6    Q.  Did your father work for record labels?

 7    A.  Yes, he did.

 8    Q.  Can you tell the jury who some of the record labels that

 9    hired your father to write songs?

10    A.  Motown, Stax Records, he worked at Capitol.

11    Q.  Did your father ever work with any famous recording

12    artists?

13    A.  He worked with many.

14    Q.  Can you tell the jury some of the hit songs that your

15    father wrote for artists, their names?

16            What are the names of the artists he worked with?

17    A.  He worked with Dionne Warwick, Cissy Houston, who was

18    Whitney Houston's mom, he worked with Johnny Nash.  He worked

19    with a lot of old artists, such as Nelson Riddle.  He opened

20    for Frank Sinatra.  He worked for Brook Benton, Arthur Prysock,

21    Dionne and Dee Dee Warwick.  He also wrote for Johnny Nash, he

22    wrote for Stevie Wonder, he wrote for the Main Ingredients,

23    Cuba Gooding Senior, and many others.

24    Q.  Did he work with Smokey Robinson?

25    A.  Yes, he did.

1   Q.  Did he work with Berry Gordy?

2   A.  I couldn't hear you.

3   Q.  Did he would with Berry Gordy?

4   A.  Yes, he did.

5   Q.  From Motown?

6   A.  Yes, he did.

7   Q.  What are some of your father's songs that he wrote?

8   A.  *Let's Get It On; I Finally Got Myself Together* by the

9   Impressions; *Foolish Fools*.  He wrote *The Same Thing It Took To*

10  *Get Your Baby Hooked Is Going To Take The Same Thing To Keep*

11  *Her; For Your Love, Oh, I Would Do Anything*.

12  Q.  Did he write that for Stevie Wonder as well?

13  A.  Stevie Wonder used *For Your Love* and he got permission from

14  my father to do it.

15  Q.  Your father wrote *Let's Get It On* that's at issue in this

16  case, correct?

17  A.  Yes.

18  Q.  Your father didn't write *Thinking Out Loud*, did he?

19  A.  No.

20  Q.  Do you know what process your father employed when he

21  created his song?

22  A.  My father sat down and had an extensive conversation with

23  me about why he was inspired to write *Let's Get It On*.

24          MR. GOLDSMITH:  Objection, your Honor.  I think we're

25  going to be hearing hearsay now.

 1          THE COURT:  You'll have to speak up.

 2          MR. GOLDSMITH:  I'm sorry, your Honor.  I think we're

 3   now hearing hearsay of what Mr. Townsend supposedly told

 4   Ms. Griffin.

 5          MR. CRUMP:  Your Honor, Ms. Helen McDonald is

 6   available and she was in this case.  We believe that it is

 7   common knowledge that people have offered testimony on how the

 8   song was inspired.

 9          MR. GOLDSMITH:  They have Ms. McDonald's testimony,

10   which they can read into the record.

11          THE COURT:  The objection is sustained.

12   BY MR. CRUMP:

13   Q.  We will read it into the record in just a minute about what

14   your father and Ms. McDonald experienced.

15          Do you know how Marvin Gaye became involved in *Let's

16   Get It On*?

17   A.  Yes.

18   Q.  How did he?

19          MR. GOLDSMITH:  Your Honor, this is going to be the

20   same objection.  Ms. McDonald testified to it, and the only

21   knowledge that Ms. Griffin would have is what she may have

22   heard from either Ms. McDonald or from Ed Townsend, which would

23   be hearsay.  She wasn't there.  She didn't even meet him until

24   13 years after it was written.

25          THE COURT:  Sustained.

1          MR. CRUMP:  OK, your Honor.  We will go to the next

2    question.

3    BY MR. CRUMP:

4    Q.  Have you ever heard the term evergreen?

5    A.  Yes.

6    Q.  Can you tell the jury what is meant by evergreen,

7    Ms. Townsend?

8    A.  In the music industry, it is my understanding that an

9    evergreen is a lifelong song, having lifelong longevity.

10   Q.  In the music industry, have you heard of a thing called the

11   American Songbook?

12   A.  Yes.

13   Q.  And do you know if *Let's Get It On* is documented in the

14   American Songbook?

15   A.  Yes, it is.

16   Q.  And can you tell the jury what that is?

17          What is that documentation?

18   A.  It is an internationally acclaimed ballad that is

19   recognized all over the universe.  I'm going to say universe,

20   but over the world.

21   Q.  Even in England?

22   A.  Yes.

23   Q.  Even in Ireland?

24   A.  Yes.

25   Q.  Ms. Townsend, do you have ownership over your father's

 1    catalog?

 2    A.    Partial.

 3    Q.    And you share that with your other family members here in

 4    this court today?

 5    A.    Yes.

 6    Q.    Does a company administer your father's music catalog for

 7    you and your family?

 8    A.    Yes.

 9    Q.    And who is that company?

10    A.    Sony ATV, AMI.

11    Q.    Do you know if Sony is a publishing company?

12    A.    Yes.

13    Q.    What does Sony as a publishing company do for your father's

14    catalog?

15    A.    Oversee it, manage it, collect the royalties.  They pay

16    themselves as well as paying out to the owners of the

17    copyrights and protection from copyright infringements and

18    other things that are supposed to be protected.

19    Q.    So you said Sony collects royalties?

20    A.    Yes.

21    Q.    Did you say Sony licensed music?

22    A.    Yes.

23    Q.    Licensed the music in your father's catalog?

24    A.    Yes.

25    Q.    And they are supposed to protect your father's catalog?

```
 1   A.  Yes.

 2   Q.  And they get paid for doing so?

 3   A.  Yes.

 4   Q.  And over the years, you've received royalty checks?

 5   A.  Yes.

 6   Q.  And they've received money from collecting on those

 7   copyrights?

 8   A.  Yes.

 9   Q.  And those publishing rights?

10   A.  Yes.

11   Q.  Have you heard of the term music business?

12   A.  Yes.

13   Q.  Is Sony supposed to take care of the music business for

14   your father's catalog?

15   A.  Yes.

16   Q.  Do you believe that Sony has handled the business

17   appropriately for your father's catalog?

18   A.  No.

19        MR. GOLDSMITH:  I'll object, your Honor, foundation

20   for that.

21        THE COURT:  Sustained.

22   BY MR. CRUMP:

23   Q.  Sony is a defendant here.

24        You've had dealings with this defendant Sony, correct?

25   A.  Yes.
```

1   Q.  And you have firsthand knowledge about your dealings with

2   Sony, correct?

3   A.  Yes.

4   Q.  In fact, they send you mail and you try to correspond with

5   them, correct?

6   A.  Yes.

7   Q.  So with that, do you believe Sony has handled the business

8   for your father's catalog appropriately?

9   A.  No.

10          MR. GOLDSMITH:  Same objection, your Honor.  There is

11  no foundation.

12  Q.  Why not?

13          THE COURT:  Sustained.

14          MR. GOLDSMITH:  It's irrelevant.

15          THE COURT:  Mr. Crump, usually we let the witness

16  testify and you ask the questions.  You've got that reversed, I

17  think, for the present interrogation.

18          MR. CRUMP:  I apologize, Judge.  I want to ask a

19  question then.

20          THE COURT:  You're leading is the point.

21          MR. CRUMP:  OK.  I'll ask open-ended questions.

22          Thank you, your Honor.

23  BY MR. CRUMP:

24  Q.  Have you had -- what have your relationships with Sony

25  Music over your father's estate been like?

1    A.   I have called Sony multiple times.  I have never been

2    approached by Sony to give me an update or anything about the

3    management and the overseeing of this catalog.  All I get are

4    royalty statements and checks.  But they all state that if you

5    have questions, you can call these numbers.

6         I have called numbers, left messages multiple times to

7    talk with them.  And to no avail, I have not been called back

8    throughout my portion of receiving royalties from my father's

9    catalog.

10        There are many questions that I had and I have.

11   Q.   Ms. Townsend, do you know if Sony ATV also manages the

12   catalog for Mr. Ed Sheeran, *Thinking Out Loud*?

13   A.   Yes.

14   Q.   Did you ever try to contact Sony with questions about

15   *Thinking Out Loud* and *Let's Get It On*?

16   A.   Yes, I did.

17   Q.   And how did you try to contact them?

18   A.   I placed calls to Sony, I went to Sony with all of my

19   attorneys, including you, Attorney Crump.  I wanted to go into

20   Sony when we were not allowed access for them to talk to me.  I

21   put it out there that I just wanted to talk with them.  I

22   wanted some clarity, some understanding.

23        It was never my intentions going into this to be

24   sitting here in this courtroom with this matter.  All I wanted

25   to do was let's discuss it, and all of my outcries fell on deaf

1    ears.  So we ended up here today.

2              (Continued on next page)

BY MR. CRUMP:

Q.  And how do you believe Sony was treating your father's legacy?

A.  Because we have been so rudely ignored and my father was an iconic, talented man with a big heart and great compassion and his work is just as important and just as humongous as all great artists and creators of their own interpretations of music.

     This is not about wanting something for nothing or being referred to, as some people say about heir, as a copyright troll?  I work.  I care.  And, yes.  I am so impressed with my father's work and his iconic creativity.  I love it.  And I love that he has helped pass it on through our DNA.

Q.  What did you promise your father you would do in his older years before he died?

A.  I promised my father that I would protect his intellectual properties as he did and that I would stand up to anything or anyone who would copy, steal, take without permission.  I called so I could understand the accounting of collecting his royalties.

Q.  Is that something your father was teaching you to do, about trying to check on the catalog, while he was living?

A.  Yes, attorney.  You see, it has already been said that I didn't know my father until I was 26 years old.  This is true.

1    But upon finding out what my true bloodline was and then coming

2    to a whole realization of understanding now who I am, why I am,

3    how I understood things was huge for me.  It was very huge for

4    me.

5    Q.  So music was important to both you and your father.

6    A.  All my life.

7    Q.  What did your father talk to you about why protecting the

8    catalog was so important to you and your family and future

9    family?

10            MR. ZAKARIN:  Objection, your Honor.  It's going to

11    call for hearsay.

12    BY MR. CRUMP:

13    Q.  I said:  What did you and your father talk about?

14            THE WITNESS:  May I just have some water, your Honor.

15            THE COURT:  It may or it may not.

16            THE WITNESS:  Thank you.  I'm sorry.

17    BY MR. CRUMP:

18    Q.  You can answer the question.

19            What did you and your father talk about about the

20    importance of his catalog and the future for your family and

21    what that meant?

22    A.  My dad, no matter how many hard times he might have fallen

23    on, in and out of his career, he never, ever, ever sold it,

24    pawned it, traded it, disrespected it.  He held it in the

25    highest of dignity.  He was proud.  He was bold.  He was great.

1          And I'm honored that God chose me to be an heir, to be

2    his blood, so that I too can sit here today and share in that

3    compassion that my father set in front of me and spoke to me

4    about.  I believe in doing the right thing, and I believe in

5    the truth.

6    BY MR. CRUMP:

7    Q.  Ms. Townsend, can you tell the jury about music catalogs

8    and generational wealth in your opinion.

9          MR. ZAKARIN:  Your Honor, I think the question is

10   irrelevant.  It's asking for an irrelevant response.

11         THE COURT:  Sustained as to form.

12         MR. CRUMP:  Okay.  Yes, sir, your Honor.

13   Q.  Do you have an understanding about music catalogs and

14   generational wealth?

15         Yes or no first.

16   A.  I believe that I do.

17   Q.  Can you share with the jury what your understanding is

18   about music catalogs and generational wealth.

19   A.  I understand that by inheriting some of my father's

20   greatest creations, he said to me to protect it and to pass it

21   onto his children, his grandchildren, his great grandchildren.

22   And he was very proud of that.

23         MR. ZAKARIN:  Your Honor, I'd move to strike as pure

24   hearsay, and it's irrelevant.

25         MR. CRUMP:  Your Honor, we asked what her

1    understanding was of music catalog and generational wealth.  So

2    she can confine her answer to her --

3              THE COURT:  Mr. Crump, excuse me.  Usually when your

4    adversary objects, you have to wait until I rule before

5    proceeding.

6              MR. CRUMP:  Yes, sir.  I would ask that they not be

7    speaking objections though because that misleads.

8              THE COURT:  Thank you.

9              The objection to relevance is slightly premature.  The

10   balance of the objection is overruled.

11             This is a copyright case, Mr. Crump.

12             MR. CRUMP:  Yes, sir, your Honor.

13             THE COURT:  It's not an estate accounting case.

14             MR. CRUMP:  Yes, sir.  Thank you for the direction,

15   your Honor.

16   Q.  Ms. Townsend, can you tell this jury:  How did you first

17   hear about the song "Thinking Out Loud"?

18   A.  Several of my acquaintances in the music industry --

19   songwriters, producers, entertainers -- called me and asked me,

20   have you heard this British artist singing your father's song?

21   He changed the lyrics to "Let's Get It On" to "Thinking Out

22   Loud."

23             And I began to listen to it, and I heard instantly the

24   similarities.  That's how I became aware of it, because my

25   phone was just ringing off the hook.

1   Q.  Now, did you immediately run out and try to say, oh, it

2   infringed on my father's copyright?

3   A.  No.  No.

4   Q.  Can you tell the jury:  What did you do after so many

5   people came to you?

6   A.  I asked professional entertainers, producers, and

7   songwriters to listen to the song carefully and see if they

8   could hear what I was hearing because I did not want to just

9   jump out there if maybe I was wrong.

10        And in doing this, the majority of the individuals

11  that I spoke with said that there were very much so

12  similarities.  Some said to me, the words are just changed.

13  It's "Let's Get It On."

14        MR. ZAKARIN:  Objection.  Move to strike, your Honor.

15  It's pure hearsay.

16        THE COURT:  Overruled.

17        MR. CRUMP:  Thank you, your Honor.

18  Q.  Ms. Townsend, can you tell the jury:  You've mentioned this

19  term "copyright troll."

20        What is your understanding or definition of a

21  "copyright troll"?

22  A.  My understanding of a copyright troll is somebody wanting

23  something for nothing and, also to me, unwilling to go out and

24  work and earn their keep by the sweat of their brow, sitting

25  back waiting to collect monies because they have inherited

1  different individuals' copy-written, protected work.  And I

2  wanted to say I'm not that.

3          THE COURT:  Mr. Crump, I overruled the hearsay

4  objection because her statement was really for the factual

5  evidence.  It's not accepted for its truth.

6          MR. ZAKARIN:  Thank you, your Honor.

7          MR. CRUMP:  Thank you so much, your Honor.

8  Q.  And I think you were saying that you didn't want to be a

9  copyright troll.

10 A.  I'm not a copyright troll.

11 Q.  Have you ever sued anybody else for copyrighting your

12 father's music?

13 A.  No.

14 Q.  You're not just trying to go out and find music to bring

15 lawsuits, are you?

16 A.  Attorney Crump, I have a very, very important, busy

17 occupation that requires concentration, safety.  And it

18 involves protecting other peoples' lives.

19 Q.  Yes, ma'am.

20         Does Sony still represent your father's catalog to

21 this day?

22 A.  Yes.

23 Q.  And do they still have an obligation to pay you from

24 royalties managing the copyright and publishing rights?

25 A.  Yes.

 1   Q.  And are you aware if Sony represents Mr. Ed Sheeran's music

 2   publishing?

 3   A.  Attorney Crump, I'm aware because I see them sitting right

 4   behind Mr. Sheeran today.

 5   Q.  But they also have the responsibility to protect your

 6   copyright and publishing interests too; correct?

 7   A.  Yes, they do.

 8   Q.  They have the fiduciary duty, in your mind, to protect

 9   both.

10   A.  Yes.

11          MR. ZAKARIN:  Your Honor, I think Mr. Crump is

12   testifying.

13          MR. CRUMP:  Forgive me, your Honor.  I'll rephrase.

14   Q.  Based on your understanding, Ms. Townsend, that Sony

15   Music/ATV is over the catalog of Mr. Ed Townsend and Mr. Ed

16   Sheeran, what does that say to you?

17   A.  I feel that my father's work was severely compromised

18   because if Sony oversees my dad's catalog and Mr. Sheeran, I

19   cannot understand how Sony would even allow or have a

20   conversation about this similarity that we're here today for

21   without having a discussion with me because I feel like my

22   father's legacy right now has been treated like trash, like my

23   father was not important.

24          He's not the popular man today because, yes.  As I

25   heard this morning in the opening statement for Mr. Sheeran,

1   that my father is dead.  But that doesn't mean to me that my

2   father's legacy is dead and that we don't count and we don't

3   matter.  We breathe the same air.

4          MR. ZAKARIN:  Your Honor, instead of my bouncing up

5   repeatedly on all of this, it seems to me it is irrelevant.

6   It's an attack on Sony.  It has nothing to do with whether

7   there is an infringement or not.

8          I can address it on cross, but I think I should have

9   an objection to this because it has nothing to do with this

10  case.  It's entirely irrelevant.

11         THE COURT:  It's background, and it's offered as

12  background, and I think it's time that we moved to the

13  foreground.

14         MR. CRUMP:  Thank you, your Honor.

15  Q.  My question:  I know you tried to reach out to them.

16         Did Sony ever try to reach out to you about this?

17  A.  No.

18  Q.  Ms. Townsend, do you have any personal animosity towards

19  Mr. Ed Sheeran?

20  A.  I have absolutely none of that.  I respect Mr. Sheeran for

21  his wonderful, talented gifts that God gave him to share with

22  the world.  I wanted just to have that conversation.  Again,

23  I'll tell you all I didn't want to be here like this.  I just

24  needed somebody to talk to me.  I think Mr. Sheeran is a great

25  artist with a great future.

1              And I really want you to know, Mr. Sheeran, that it

2      didn't have to come to this.  But I have to protect my father's

3      legacy.

4              MR. CRUMP:  I think that's it, your Honor.

5              THE COURT:  Are you finished?

6              MR. CRUMP:  I was going to conclude on that, your

7      Honor.  I was going to conclude on that, unless --

8              THE COURT:  Then we will all break for lunch.

9              MR. CRUMP:  Thank you, your Honor.

10             THE COURT:  Let's resume at 2:15.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. RICE:

2   Q.  Do your lyrics generally touch on something that is so

3   personal to you?

4   A.  Yes.

5   Q.  OK.  Are you familiar with your song *Take It Back*?

6   A.  Yeah.

7   Q.  OK.  Did you write that song, *Take It Back*?

8   A.  I'm a writer on *Take It Back*, yes.

9   Q.  OK.  Are these the lyrics to *Take It Back*:  I'm not a

10  rapper, I'm a singer with a flow.  I've got a habit of spitting

11  quicker lyrics, you know.  You found me ripping the rips out of

12  pages they sit in.  I'm never wanting to get bitten because

13  plagiarism is hidden.

14          Again, are those your lyrics?

15  A.  Those are my lyrics, yeah.

16          Can I just give some context?

17  Q.  If I need more, I'll certainly ask.

18  A.  But can I give context for the court, please?

19  Q.  If I need some, I'll ask.  I don't need any more context.

20  You answer the question.

21  A.  That's all I'm allowed to do is answer anything, I can't --

22          Because Ms. Griffin was offering stuff as well.  I

23  just answer whatever you give me?

24  Q.  Sir, honestly, I'm going to ask you the questions and I

25  would like to know the answers.  If I want to know some more,

 1   I'll be more than happy to ask.

 2   A.  Cool.

 3          But I can freely talk so the -- I can --

 4   Q.  You have to respond to a question here, unfortunately, and

 5   I ask you answer it.  I appreciate your answer, so...

 6   A.  OK.  I'm sure it will come up in cross.

 7   Q.  So let's go ahead and talk about a couple of other

 8   sections.

 9          Are you aware of the video that has been part of this

10   case in which *Thinking Out Loud* -- and we've discussed it a few

11   times -- has been played with *Let's Get It On* together?

12   A.  Yes, I'm aware of that video.  It's a mashup.  I play gigs.

13   I play songs in my gigs.  I sometimes mash up songs with

14   similar chords.

15          I would just like to point out --

16   Q.  I know --

17   A.  Am I allowed to answer the question?

18   Q.  You're absolutely allowed to answer a question that I've

19   asked.  I haven't --

20   A.  I feel like you don't want me to answer because you know

21   what I'm going to say is going to make quite a lot of sense.

22          MR. FRANK:  I move to strike.

23          Your Honor, could you direct the witness to answer the

24   questions that have been posed to him?

25          THE COURT:  Don't argue with the witness.

1          Ask questions, and if you get unresponsive answers,

2  the jury will notice it and it will be on the record.

3          MS. RICE:  I agree, your Honor.

4          THE COURT:  Put your next question.

5          MS. RICE:  Absolutely, your Honor.

6  BY MS. RICE:

7  Q.  So my question was:  Was that you in the video?

8  A.  That is me in the video, yes.

9          MS. RICE:  OK.  Can we go ahead and put that video up,

10  please?

11         MS. FARKAS:  Your Honor, this is one of the exhibits

12  that is under objection and the subject of our motion, so

13  perhaps we can -- so I don't want to publish to the jury while

14  this objection is still before your Honor.

15         THE COURT:  Yes.  I want to see it before it is

16  offered in evidence, and I'm just trying to think of the most

17  practical way of doing that.

18         Come up and tell me the nature of the objection, and

19  if you have a copy of the exhibit, show it.

20         MR. CRUMP:  Your Honor.

21         JUROR:  May I use the restroom?

22         THE COURT:  Ms. Walsh, do you want to take a break?

23         That's a good idea.  I'll work this out during the

24  break.

25

```
 1                  (Jury not present)

 2                  THE COURT:  OK.  I've seen it.

 3                  What are the objections?

 4                  MS. FARKAS:  Should we approach, your Honor?

 5                  THE COURT:  Yes, you may.  The jury isn't here.

 6           The grounds of the objection are irrelevance and

 7      prejudice.  Those are the objections that the issues that that

 8      video pertains to, there is no dispute that there is access to

 9      Let's Get It On, and there is no dispute that there is

10      similarity in the chord progression and the anticipation.

11           The fact that Mr. Sheeran performed a snippet of the

12      lyrics to Let's Get It On over the chords of Thinking Out Loud

13      doesn't pertain to any issue in dispute in this case.  It

14      doesn't go to prove anything that is a disputed issue.  And so

15      the notion that they are going to put in this video which is

16      well after Mr. Sheeran had already created Thinking Out Loud to

17      suggest, clearly they are going to suggest copying, is

18      irrelevant to any issue in dispute and prejudicial.

19                  THE COURT:  Is this example a substantial similarity

20      conceded?

21                  MS. FARKAS:  No, your Honor.  They are unprotectable

22      elements amongst other things, and they are different.  We are

23      not saying that they are the same.

24                  THE COURT:  Anybody want to be heard on it?

25                  MR. FRANK:  I do, your Honor, if I may.
```

1          As a preliminary matter, this issue was raised

2   previously by the defendants, if the court will recall, one

3   month ago via their sixth motion in limine.  It was denied by

4   the court at that time.

5          They've offered no additional information or legal

6   arguments that would support it being -- your previous ruling

7   being reversed at the time, I think the principle of

8   res judicata would allow it in.

9          Perhaps more importantly, your Honor, is the fact that

10  I just heard for the first time that they concede some

11  similarities.  We sat here for about 45 minutes this morning

12  listening to a dissection of the two songs and why they are not

13  alike and what the evidence will show.  By virtue of that

14  argument, they put it squarely before the court.

15          MR. GOLDSMITH:  Sit down?

16          I'm sorry, your Honor.

17          MR. FRANK:  And then finally, your Honor, third

18  point -- and this came up, I'm sorry, this came up this

19  morning.

20          Ms. Farkas in her opening argument said -- actually

21  said something that we have never heard before as well.  She

22  said this video doesn't say what you think it says.  She says

23  it says the opposite of what it says.  So, in theory, under her

24  argument this morning, this should be helpful to them because

25  apparently it says the opposite.

 1              Then finally, your Honor, even though they've conceded

 2   access, what we have to prove here, the point of why we're

 3   here, is we have to prove copying.  This is probative evidence

 4   of copying, and that is why we're asking to have it admitted.

 5              MR. GOLDSMITH:  Your Honor, if I can very briefly

 6   respond?

 7              THE COURT:  I've just heard the complete history of

 8   the exhibit --

 9              MR. FRANK:  Thank you, your Honor.

10              THE COURT:  -- from the beginning of the case to the

11   date of these.  I feel fully informed, but I want to hear what

12   you have to say about it, Mr. Goldsmith.

13              MR. GOLDSMITH:  I promise, your Honor, I'll be very,

14   very brief.

15              We haven't conceded substantial similarity.  All that

16   we are saying, and your Honor did deny the motion with leave to

17   address it in context at trial, which is what we're doing.  All

18   that we're saying is that --

19              THE COURT:  Yes, and here we are addressing it.

20              MR. GOLDSMITH:  Correct.  That's all that we're doing.

21              THE COURT:  It's admitted.

22              MR. GOLDSMITH:  Mr. Frank says it is res judicata,

23   which it's not.  I wanted to address that comment.

24              THE COURT:  Do you want me to reconsider?

25              MR. GOLDSMITH:  I do, your Honor, that's why --

1              THE COURT:  Over careful consideration, it's admitted.

2              MR. GOLDSMITH:  I understand, your Honor.

3              MS. RICE:  Thank you, your Honor.

4              MR. FRANK:  Should we bring in the jury?

5              MS. RICE:  Your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)
 2               THE COURT:  The exhibit is admitted and the video will
 3    be played to the jury.
 4               I must caution you, we don't allow dancing in the jury
 5    box.
 6               MS. RICE:  Could you play the video, please.
 7               (Video played)
 8               Thank you.
 9    BY MS. RICE:
10    Q.  Mr. Sheeran, in that video, are you able to recall how many
11    times that you combined the two songs Let's Get It On and
12    Thinking Out Loud?
13    A.  Well, in the history of me performing ever?
14    Q.  In that video.
15    A.  In that video?
16    Q.  Yes.
17    A.  Um, I don't understand the question.
18    Q.  Sure.
19               In the video that we just watched --
20    A.  Yeah.
21    Q.  -- do you recall how many times you switched between the
22    two songs, going from one song to the other song back to the
23    first song?
24    A.  Once.
25    Q.  OK.  Was it your idea to combine those two songs or someone
```

 1   else's idea to combine those two songs?

 2   A.  I mash up songs at a lot of gigs.  Every song has very

 3   similar chords to every other song.  You could go from *Let It*

 4   *Be* to *No Woman No Cry* and switch back.  I could do that with --

 5   Q.  Mr. Sheeran, I understand.

 6   A.  Can I -- am I allowed to answer?

 7   Q.  I interject that that is not responsive.

 8   A.  Am I allowed the answer the questions that you're asking

 9   me?

10   Q.  Mr. Sheeran, that's unresponsive.

11          Whose idea was it to combine those two songs?

12   A.  Probably mine.

13   Q.  You described that those, the series of combining those two

14   songs in that video was a mashup.

15          What do you consider a mashup?

16   A.  Um, when you're playing a song live and it fits in the same

17   key.  Most pop songs revolve around sort of three or four

18   chords, and you can kind of play most pop songs over most pop

19   songs.  They are -- if it's in a major key, you could choose

20   another pop song in a major key and mash up and go back or mash

21   up another song in a minor key.  You can mash up quite a few

22   other songs.

23          And with *Thinking Out Loud*, I've done it with *Let's*

24   *Get It On*; I've done it with *Crazy Love*, Van Morrison; *Someone*

25   *You Loved*, Lewis Capaldi; I've done it with *Can't Help Falling*

1   *In Love*, Elvis Presley.  It's quite simple to weave in and out

2   songs.

3         And quite frankly, if I had done what you're accusing

4   me of doing, I would be an idiot to stand on stage in front of

5   20,000 people and show that.  I'm just mashing up a song with

6   another song.

7   Q.  I appreciate your perspective, I'm just asking the

8   questions that I'm asking.

9         You mentioned Elvis Presley.  How familiar are you

10  with Elvis Presley's work?

11  A.  I know some songs.

12  Q.  OK.  Are you familiar with the Isley Brothers?

13  A.  Um, *Unchained Melody*, is that?

14        Is that the right --

15        No?

16  Q.  It's OK.  It's OK.  It's all right if you're not.

17        What about Big Mama Thornton?

18  A.  No.

19  Q.  How about the song *Nothing But A Hound Dog*?

20  A.  I know the Elvis version.

21  Q.  All right.  I wanted to ask you about your inspiration

22  writing process.

23        Do you collaborate frequently?

24  A.  It differs from song to song.  I could write a song on my

25  own and I write a song -- I've written songs with folk bands

1    featuring 12 people as part of the bands.  I've written songs

2    one on one.  I have written songs in rooms of five, songs of

3    three.  It depends.

4    Q.  Do you frequently write songs simply on your own?

5    A.  Yeah.

6    Q.  About what percentage of the time do you write songs just

7    on your own?

8    A.  I can -- I couldn't be able to tell you that, but I've got

9    billboard number ones that are written 100 percent me and

10   billboard number ones that aren't.

11   Q.  OK.  All right.  Thank you.

12        We talked a little bit about your inspiration for

13   lyrics in the beginning of our discussion today, and I wanted

14   to ask you, are you familiar with your song *You Need Me, I*

15   *Don't Need You*?

16   A.  Yes.

17   Q.  OK.  It's from your album *+*, is that correct?

18   A.  There's a few iterations on different projects, but it is

19   on my album *plus*, yes.

20   Q.  Thank you for saying that.

21        I'm going to reference in my question right now the

22   version of *You Need Me, I Don't Need You* from the album *+*?

23   A.  OK.

24   Q.  OK.  Are the lyrics in that song *You Need Me, I Don't Need*

25   *You* as played on *+*, "Going to be breaking into other people's

1   tunes when I chase it and replace it with the elephant in the

2   room with a facelift, slipping into another rapper's shoes

3   using new places."

4          Are those your lyrics?

5   A.  I would have to see them written down.  I don't think you

6   quoted them correctly, but I would have to see them written

7   down.

8          MS. RICE:  Do you have that one available?

9   Q.  OK.  We're going to go ahead and pull up those lyrics for

10  you.

11  A.  Me reading lyrics that you've got aren't necessarily the

12  lyrics that I write.  You're just reading lyrics --

13  Q.  Mr. Sheeran, you just mentioned that you need the lyrics in

14  front of you, so...

15  A.  Yeah.  Yeah, I don't --

16  Q.  Do you want the lyrics --

17         Please feel very comfortable to say them the right way

18  if they're not up there the right way.

19  A.  Could we just Google them rather them having something you

20  may have doctored?

21  Q.  You're here today.  I'm asking you questions, not Google,

22  so...

23  A.  OK.

24         MS. FARKAS:  I would just like to note an objection.

25  We have no idea what the source of this document is or where

 1    they got these supposed lyrics from.

 2              MS. RICE:  OK.

 3    Q.  Are any of those your words or not?

 4    A.  I have no idea what you've brought.  We've never seen them

 5    before.

 6              If you brought them up on Google, probably more

 7    likely.

 8    Q.  OK.  That's fine.

 9              So I had a couple questions about something that you

10    just mentioned about saying that most pop songs can fit over

11    most pop songs.

12    A.  Yes.

13    Q.  Is it your belief that most songs are simply built off of

14    four chords?

15    A.  It's my belief that most pop songs are built from building

16    blocks that have been freely available to artists for hundreds

17    of years, yes.

18    Q.  OK.  Sony ATV is a defendant in this case.  We've talked

19    about that, correct?

20    A.  Yes.

21    Q.  And Sony ATV administers the rights to *Thinking Out Loud*,

22    correct?

23    A.  Yes.

24    Q.  OK.

25    A.  Half the rights, by the way, because it is published by

1    someone else.  So 50 percent of *Thinking Out Loud* is published

2    by Sony ATV.

3    Q.  Thank you.  Thank you.

4         Do you feel that your piece *Thinking Out Loud* deserves

5    protection yet *Let's Get It On* doesn't deserve protection?

6    A.  No, I wouldn't say that at all.

7    Q.  OK.  Why do you feel that simply because something uses

8    those building blocks that you just mentioned, that it can be

9    taken from someone else?

10        MS. FARKAS:  Objection, your Honor.  It's

11   argumentative.  There is no foundation, and he's a fact witness

12   here.

13        THE COURT:  Sustained.

14   Q.  Do you feel that something that has four basic building

15   blocks should be protected?

16        MS. FARKAS:  Same objection, your Honor.

17        THE COURT:  Well, I don't think the question is very

18   clear, for one thing.

19        Sustained as to form.

20        MS. RICE:  Yes, your Honor.

21   Q.  Is your music protected, Mr. Sheeran?

22        MS. FARKAS:  Same objection, your Honor.  She keeps

23   using the word protected, which I see as a legal conclusion,

24   and this is a fact witness.  I'm not sure what she's asking.

25   Maybe she can clarify the question.

 1             MS. RICE:  No problem.

 2   Q.  Does your music have a copyright; is it copyrighted?

 3             MS. FARKAS:  Same objection, your Honor.

 4   Q.  Did you file it?

 5   A.  I personally didn't file it, no.

 6   Q.  Was it filed?

 7             THE COURT:  Is it the one that says copyright?

 8             The objection to that is overruled.

 9   A.  I write my songs, yes.

10   Q.  Did you copyright your songs?

11   A.  Sorry?

12   Q.  Did you copyright your songs?

13   A.  I didn't personally, no.

14   Q.  But they were copyrighted?

15   A.  I assume so, yeah.  I'm not a publisher.

16   Q.  Does your song *Thinking Out Loud* have four, as you call it,

17   basic building blocks?

18   A.  Um, the verse and the chorus do.  The bridge that leads

19   into the chorus are different chords.  But yes, it uses four

20   chords primarily in the verse.

21   Q.  OK.  Mr. Sheeran, we talked a little bit about your

22   collaboration process.

23             Have you collaborated with any of the following

24   individuals:  Fred Gibson?

25   A.  Yes.

1  Q.  David Hodges?

2  A.  Yes.

3  Q.  Paris Washington?

4  A.  I'm sorry.  What?

5  Q.  Paris Washington, do you recognize that name as someone

6  with whom you've collaborated?

7  A.  I mean, possibly.  There is sometimes I work on songs that

8  other people work on that, I've written hundreds if not

9  thousands of songs and had cuts on lots of other artist's

10  projects.  Like, they could be countless people I've worked

11  with that I wouldn't know that I've worked with.

12  Q.  Are you saying that you write songs and don't know with

13  whom you write those songs?

14  A.  Um, no, I'm not saying that.  I'm saying that, like, for

15  instance, a song called the Eastside sung by Khalid and Halsey.

16  And when I wrote that song, I got sent the backing track of

17  that song.  I was with a producer called Benny Blanco, and I

18  wrote the top line to it.  I didn't know who wrote the backing

19  track, but I knew I wrote the top line.  You get splits

20  through, you sign off the splits, that's that.  You're not

21  necessarily in the room all the time with people.

22  Q.  So in your collaboration process, does some of it occur

23  remotely?

24  A.  I mean, it depends from song to song.  It depends.

25  Q.  In a situation like the one that you just mentioned, where

1    you write a song with other people, how is compensation

2    determined?

3    A.  The writers agree on the splits and then it is signed off.

4    Q.  And are you part of that process?

5    A.  Usually, yes.

6    Q.  So how do you decide in which cases someone does receive

7    compensation and someone does not receive compensation for

8    their collaboration?

9    A.  I don't understand the question.

10   Q.  How do you decide if someone gets paid for their

11   contribution on a piece?

12   A.  If they've written the song, then they get a split of the

13   song.

14   Q.  So it's writing on the song, not performing on the song?

15          What is the difference that you're --

16   A.  Well, one is writing on a song and the other is performing

17   on the song.

18   Q.  OK.  Is there a difference in how someone is compensated

19   for writing the song --

20          I'm sorry, go ahead.

21   A.  I'm sorry.  Yeah.  A writer would get a writer split and a

22   performer would usually get paid a session royalty fee for

23   coming in and playing the instrument, or the producer would get

24   a producer fee and then points on the song, which would be a

25   percentage -- you have 100 percent, and it would be points on

1    that.  A producer usually would get between four and six

2    points, maybe seven or eight if they are top producer, and that

3    would be a percentage of that song.  And they would also get

4    between $10,000 or, you know, some producers get $500,000 per

5    song, and that would be their compensation.

6         But the writers -- so there is the recording and then

7    there is the publishing.  The publishing of the song, the

8    recording is the recorded version of the song.  So the writers

9    would get a split of the publishing, and the record would be

10   the producer and the producer points and the producer fee.  And

11   the musicians that play on that record would get compensated by

12   paying a session royalty fee, essentially.

13        It's two separate things.

14   Q.  Thank you.

15        Would you consider the song *Galway Girl* to be a hit

16   for you?

17   A.  Yeah, yeah.

18   Q.  And what do you consider a hit in terms of commercial

19   success?

20   A.  Personally, a hit for me is if I can play it live.  I've

21   had some songs that were commercial failures that work really

22   well live.  So, for me, a hit is if it works well live.

23   Q.  Have you had a hit that meets the definition of commercial

24   success that you've written without collaboration?

25   A.  Me?

1   Q.  Yes.

2   A.  Yeah.  *The A Team* was my first hit.  That, you know, sold

3   26 million copies worldwide.

4           *Perfect* is one of my biggest hits.  That sold about

5   60 million copies worldwide.

6           Both 100 percent me.

7           *I See Fire* I did for *The Hobbit*, which was a very big

8   hit.  Maybe not in America, but across Europe and Asia,

9   Australia.  Yeah, countless.

10          THE COURT:  Counsel, come up.

11          MS. RICE:  I'm sorry, your Honor?

12          THE COURT:  Come up, please.

13          MS. RICE:  Can you hear me a little bit?

14          MS. FARKAS:  He wants you to come up.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1                    (At the sidebar)

 2              THE COURT:  Ms. Rice, it's a noise so the jury can't

 3    hear.

 4              In what way is this line of inquiry making it more or

 5    less likely proving the infringement in this case?

 6              MS. RICE:  Your Honor, this goes to his inspiration in

 7    his song-writing process.  We've explored earlier how his song-

 8    writing process is affected by his personal experiences and his

 9    interaction with other people.  We want to see how much his

10    collaboration factors into that originality and that song-

11    writing process.

12              THE COURT:  How do you draw conclusions about that

13    from the questions you have asked and the answers to the

14    questions that you have been asking?

15              MS. RICE:  I think that we get a sense of what type of

16    influences the collaborators that he's working with are

17    bringing to the process and how those collaborators contribute

18    to the final product that he places into the market.

19              THE COURT:  How does that bear on the issues in this

20    case?

21              MS. RICE:  Well, your Honor, we see them as relevant

22    because, for one, it increases the probability of access

23    because --

24              THE COURT:  There is no question of access, is there?

25              I thought that was agreed.

1    MS. FARKAS:  They asked it in his deposition.  It was

2    asked in his deposition.  And yes, you're right, your Honor.

3    MS. RICE:  Your Honor, the issue is that I think that

4    you can't agree to it and then at the same time claim

5    independent creation because they are a bit exclusive of each

6    other.

7    MS. FARKAS:  Every song he's ever heard in his life he

8    copied?

9    THE COURT:  Ms. Rice, I think your examination is

10    wandering terribly --

11    MS. RICE:  OK.

12    THE COURT:  -- and wasting a great deal of time.

13    MS. RICE:  OK.

14    THE COURT:  And so I'm asking you to focus on the

15    issue of infringement in this case --

16    MS. RICE:  OK.

17    THE COURT:  -- in which you're representing your

18    client, and ask questions which will make that infringement

19    more or less likely, and then keep the questions related to

20    that --

21    MS. RICE:  Yes, your Honor.

22    THE COURT:  -- so that the answers have some meaning.

23    MS. RICE:  Yes, your Honor.

24    THE COURT:  We don't have time for general aimless

25    conversation about collaboration with other people, which is

 1    way off the point of this claim.

 2                MS. RICE:  Yes, your Honor.

 3                THE COURT:  How much longer do you think you are going

 4    to be?

 5                MS. RICE:  I think I can be done for today.  I do have

 6    quite a bit more, but in light of your comments I would --

 7                THE COURT:  With this witness?

 8                MS. RICE:  Yes, your Honor.

 9                THE COURT:  How much longer do you think you're going

10    to be?

11                MS. RICE:  I think that I would be able to finish

12    within an hour.

13                THE COURT:  If you're going to be another hour, you're

14    going to have to spend a great deal more --

15                MS. RICE:  I understand that, your Honor.

16                THE COURT:  -- than what you're doing.

17                Otherwise, I'll cut you off at five.

18                MS. RICE:  I understand.

19                THE COURT:  It's now 4:22, so that gives you a little

20    over -- it gives you a little over half an hour.

21                MS. RICE:  OK.  Your Honor, would your Honor like me

22    to close for today and evaluate if there is anything else?

23                THE COURT:  No.

24                MS. RICE:  Or take a few minutes --

25                THE COURT:  No.  Use your time, but use it

 1   productively with questions that have meaning and bear on the

 2   issue of infringement in this case.

 3           MS. RICE:  OK.  Would you mind if I take couple of

 4   minutes and see what I would like to -- maybe just two to

 5   three minutes to just take a look and see?

 6           THE COURT:  Sure.  Take as much as you want up to

 7   three minutes.

 8           MS. RICE:  Thank you, your Honor.  I understand.

 9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                          2:25 p.m.

3          MR. CRUMP:  Your Honor, would you like the witness to

4    retake the stand?

5          THE COURT:  I thought you were through with her.

6          MR. CRUMP:  I am.

7          MR. ZAKARIN:  I think it's my turn, your Honor.  And I

8    would like the witness to take the stand.

9          Your Honor, may I proceed?

10          THE COURT:  Yes.

11          MR. ZAKARIN:  Thank you.

12   CROSS-EXAMINATION

13   BY MR. ZAKARIN:

14   Q.  Good afternoon, Ms. Griffin.

15   A.  Good afternoon, Mr. Zakarin.

16   Q.  Now, you testified this morning about Sony/ATV publishing

17   both the Ed Townsend catalog and Ed Sheeran's compositions as

18   well; correct?

19   A.  Yes.

20   Q.  And you know that the publisher is Jobete Music; don't you?

21   A.  That's a part of it.

22   Q.  And Jobete is the actual publisher.  It's a company created

23   and owned by Berry Gordy; isn't right?

24   A.  To my knowledge.

25   Q.  I'm going to switch my glasses back and forth.  I've

1    reached that age.

2    A.   Me too.

3    Q.   You pointed out in your testimony that Sony/ATV people were

4    sitting someplace behind counsel table.

5         Do you remember that testimony?

6    A.   Yes.

7    Q.   You're suing Sony in this case, aren't you?

8         Strike that.

9         You don't think it's odd that who you're suing would

10   be sitting proximate to the defendants' counsel table?

11   A.   Do I feel odd?  Nobody is sitting on the side with me, and

12   they represent me as well as Mr. Sheeran.

13   Q.   But you are suing them in this case.

14   A.   Yes.

15   Q.   In effect, you've also said that Sony, in words or in

16   substance, has not paid attention to your claim in this case.

17   I think you were trying to suggest that they're favoring

18   Mr. Sheeran over Ed Townsend.

19        Was that the sum and substance of your testimony?

20   A.   What I think you're saying, to my understanding, is that

21   I'm mind reading Sony.  No.  I'm only going by how my inner

22   feelings are about no contact with me personally when all I

23   ever wanted to do was ask some questions, get clarity about the

24   Jobetes and the Cherry Towns and the EMIs and it used to be the

25   BMIs and whatever.  I just wanted clarity coming from the

1   professionals.

2   Q.  You're aware, aren't you, that when you first made a claim

3   in this case, your lawyers, in 2015, Sony went to them and sent

4   them the reports of two eminent musicologists.

5        You're aware of that, aren't you?

6   A.  I believe so.

7   Q.  Sony reacted to your claim, communicated with your lawyers,

8   sent them musicologist reports that said there is no viable

9   claim.

10       You're aware of that; right?

11  A.  What I'm saying --

12  Q.  Please tell me if I'm wrong.

13  A.  What I'm saying is nobody spoke to me.  They can talk to

14  the lawyers all day long.  I'm not a lawyer.  I am an heir that

15  has a vested interest in my dad's intellectual properties.  I'm

16  not a lawyer.

17  Q.  But you hired lawyers with whom Sony dealt and provided

18  information; isn't that right?

19  A.  I did hire lawyers, yes.

20  Q.  And Sony communicated with them directly, did they not?

21  A.  To my knowledge.

22  Q.  And, as I said, the reports that Sony obtained and provided

23  to your counsel way back in 2015 from two musicologists said

24  there is no viable claim here.

25       You're not aware of that; right?

 1   Q.  Your lawyers didn't share that with you?

 2   A.  No.  I'm not aware of that.  Not to my recollection.

 3           MR. ZAKARIN:  Your Honor, may I approach the witness

 4   with a document?

 5           THE COURT:  Yes.

 6           MR. CRUMP:  No objection, your Honor.

 7           THE COURT:  Proceed.

 8   BY MR. ZAKARIN:

 9   Q.  Now, this email was sent from Bruce Scavuzzo, who is at

10   Sony/ATV, and it was sent to Keisha Rice on April 15, 2015.

11           Do you see that?

12   A.  Yes.

13   Q.  And Keisha Rice is one of your attorneys.  She's in this

14   courtroom; is that correct?

15   A.  Correct.

16   Q.  And in the middle paragraph of that email, it says:  "As a

17   major music publisher, Sony/ATV takes copyright allegations of

18   copyright infringement very seriously.  I believe that Peter"

19   that's Peter Brodsky -- "explained to you that one of our first

20   steps when we are advised of a claim is to obtain an opinion

21   from a musicologist.

22           "In this particular instance, we have obtained two

23   opinions.  Attached to this letter are reports from Laurence

24   Ferrera and Anthony Ricigliano, two very reputable

25   musicologists.

1          "As you will see, they conclude that there is no

2    infringement here, since the primarily similarity between the

3    two songs seems to be an extremely common chord progression."

4          Is it your testimony that you were not informed of

5    those reports that were delivered to your counsel way back in

6    2015 advising them that that's what Sony had done?

7    A.   It is my legal testimony.  I hired lawyers to handle the

8    business.  I am not the business.  I did not ever read this.

9    And if my lawyers saw fit not to show me this, which, what I

10   heard you say is I did hire lawyers to handle this, and those

11   musicologists that Sony hired, that was them.

12          I do have the right to hire my own musicologist.  It

13   might be a tomato or tomato.  It could be a pecan or pecan.  I

14   wanted my own personal clarity.  That's why I wanted my own

15   musicologist.

16   Q.   And in fact, you did hire your own musicologist.  And

17   that's Dr. Stewart; right?

18   A.   Yes, I did.

19   Q.   Do you recall at your deposition, you were asked a question

20   about your musicologist and his report?

21          You were asked whether you had bothered to read your

22   own musicologist's report.

23          Do you remember what your answer was?

24   A.   No, I don't.

25   Q.   You testified that you had never read Dr. Stewart's report.

```
 1              Is that still true?
 2   A.   I have seen it to date.  But then, when you all deposed me,
 3   I had not.
 4   Q.   So you had already sued, and your deposition is being taken
 5   in the case.  And this, I believe, was in 2018.  And you did
 6   not -- you had not, rather, bothered to read the musicologist's
 7   report, even though you had already brought the case.
 8              Is that right?
 9   A.   Well, on that day of the deposition, one point was that I
10   recall very clearly is I was offered $75,000 to make this go
11   away.  And I said specifically, I would pay each one of you
12   $75,000 not to disrespect my father's legacy.  So I hadn't had
13   a chance to read the musicology report at that point.
14              MR. ZAKARIN:  Your Honor, I'm going to move to strike
15   that as both nonresponsive and inappropriate.
16              MR. CRUMP:  Judge, if he asks a question and she gives
17   an answer, that's her answer.  He asked about her deposition,
18   and she testified what happened at the deposition.
19              THE COURT:  Sometimes I like to think for a minute
20   before I speak.  It's rather rare, but give me a chance.
21              The objection is overruled.  The question was asked
22   and answered.
23   BY MR. ZAKARIN:
24   Q.   Now, in terms of Sony not paying attention to you, do you
25   recall testifying as well at your deposition that Sony sends
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   you letters all the time about the licensing of Ed Townsend's

2   works?

3   A.  I received letters but not human beings talking to me.

4   Q.  And you testified, did you not, that with respect to the

5   letters regarding Sony's licensing -- it's not Sony's

6   licensing.  It's Jobete's licensing -- about Ed Townsend's

7   compositions that you don't bother reading them.  You just put

8   them in a box.

9           Is that right?

10  A.  Not necessarily.

11  Q.  You're now reading them?

12  A.  Yes, I do.

13  Q.  As of 2018, when you testified, you didn't bother to read

14  them?

15  A.  Not all of them, because I wanted clarity from Sony to

16  explain a lot of all of the mechanicals and what is this and

17  this and this.

18          I just wanted them to reach out to me so I could

19  understand all of this paperwork that I have from day one upon

20  receiving royalties, and I feel that's not a big ask.  The

21  paper is not talking to me.  I work better with human being

22  contact.  That's just how I'm created.

23  Q.  I understand.  Now let's switch gears a little bit.

24          You're aware, aren't you, that this Court has already

25  ruled that the chord progression that Ed Townsend used is

1  commonplace and unprotectable.

2          You're aware of that, are you not?

3  A.  I don't understand what that particular statement means.

4  Q.  That the chord progression in this "Let's Get It On," 1, 2,

5  3 --

6  A.  I understand numbers and the music notes, but when it comes

7  down to the musicology, that's not my profession.

8  Q.  I understand.  All I'm asking is:  Are you aware or are you

9  not aware that it's already been ruled in this case that the

10  chord progression in "Let's Get It On" is commonplace?

11          It's been used before and it's unprotectable.  Just

12  yes or no.

13  A.  That's what they say.  But for me, I can only go by my

14  natural instincts by what I hear and what I feel and what has

15  been told to me by many professionals.  That's why we're here,

16  Attorney Zakarin.

17  Q.  And you're aware that the Court has also ruled that the

18  anticipation and the chord progression is commonplace --

19          MR. CRUMP:  Objection, your Honor.  Outside the scope.

20  Outside the scope of direct, and we have experts that are going

21  to testify to this.

22          THE COURT:  Overruled.  In this court, speaking as a

23  whole, that objection, which was paid great honor two

24  generations ago, is almost now routinely overruled and the

25  question allowed.

1        MR. CRUMP:  Thank you, your Honor.

2        MR. ZAKARIN:  I actually think I didn't quite finish

3   that question.  I think it got cut off.  So for the court

4   reporter, let me try it again.

5   Q.  You're also aware, are you not, Ms. Griffin, that the Court

6   has also determined that the anticipation, the change in the

7   chords that Ed Townsend used in "Let's Get It On," was not

8   original to him.  It is commonplace and unprotectable.

9        Isn't that right?

10  A.  I'm not sure about that.

11  Q.  So this is not something that's within your knowledge.

12  A.  I'm not an expert in musicology.

13  Q.  Well, my question really didn't go to whether you're an

14  expert in musicology.  It went to whether you are aware of the

15  Court's rulings that those elements are commonplace and

16  unprotectable.

17       That's just a yes or no.

18  A.  I heard that today in the attorneys' opening statement.

19  Q.  So it's your statement that until today, you were not aware

20  of those rulings that the Court issued years ago?

21  A.  I'm not understanding the rules clearly even to this

22  moment.

23  Q.  I want to switch topics again a little bit.

24       You mentioned -- this will be very brief.

25       You mentioned during your direct examination about

1   your musical training.

2   A.  Uh-huh.

3   Q.  And being in the school band in high school.

4   A.  Uh-huh.

5   Q.  And having taken piano lessons.

6   A.  Uh-huh.

7   Q.  And that you read music.

8   A.  Uh-huh.

9   Q.  And you also testified that you have written a song or

10  songs with George Clinton.  Is that correct?

11  A.  Yes, I have.  Oil Jones on the *Medicaid Fraud Dogg* album

12  and a song by the title of "Jolene."  And they are out and for

13  sale as we speak.

14  Q.  What I would like to do is to put up the -- I think we have

15  a copy of the Oil Jones album.

16  A.  And it is my voice on the song as well.

17  Q.  Yes.  I watched the video.

18  A.  No.  I am not in the video.  I am in the actual recordings

19  and writing.

20  Q.  Let me turn to the credits on Oil Jones.  I don't know if

21  you can screen it.

22          MR. ZAKARIN:  I'm going to offer Oil Jones as an

23  exhibit, a cross-examination exhibit, the credits from this

24  album.  The witness has testified that she is a cowriter of Oil

25  Jones.

1          Your Honor, I'm going to offer the album cover and the

2    credits as a cross-examination exhibit.

3          MR. CRUMP:  No objection at all, your Honor.

4          THE COURT:  Received.

5          (Defendant's Exhibit 400 received in evidence)

6    BY MR. ZAKARIN:

7    Q.  That's the credits on the album on Oil Jones.  And you see

8    that the listed writers there are George Clinton and Tracey

9    Lewis-Clinton.

10          Do you see that?

11   A.  Are you talking to me.

12   Q.  Yes, I am?

13   A.  Yes.

14   Q.  Now, you're not listed as a writer.  You're listed for

15   mouth-popping and vocals.

16          Is that correct?

17   A.  I see what's on there.

18   Q.  Were you aware that George Clinton did not credit you as a

19   cowriter on Oil Jones?

20   A.  I spent a lot of time with George and his wife, who is

21   present here today, who was sitting right there, when we wrote

22   it together.  Interestingly, I know a lot of people don't know

23   what mouth-popping is, but the entire song was borne from the

24   mouth popping.

25          If you need an example, I'll give it to you.

1   Q.  I did actually understand because I had seen the video.

2        My question though was simply -- I'm not debating

3   whether you were or were not a writer.  I asked:  You're not

4   credited as a writer.

5   A.  It doesn't matter to me, Mr. Zakarin.  This was fun for me.

6   The fact that I worked so closely with George Clinton and

7   Parliament for many years -- everything ain't about money and

8   recognition when it's something that you love and you enjoy.

9   And the kind of work that I do, I need a break every now and

10  then.

11  BY MR. ZAKARIN:

12  Q.  I agree.  I'm just curious as to whether you were aware of

13  that.

14  A.  It doesn't matter to me.

15  Q.  I'm glad.

16       Now, you've testified as well that you didn't meet Ed

17  Townsend until 1986; is that right?

18  A.  Correct.

19  Q.  And "Let's Get It On" was written in or about 1973; right?

20  A.  I was 13.  I heard it.  I didn't know it was my father, but

21  I loved the song, even as a child.

22  Q.  Now, since you didn't meet Ed Townsend until 1986, you

23  weren't present in 1973 when you wrote "Let's Get It On," were

24  you?

25  A.  Absolutely not.  No.

 1    Q.  You didn't grow up in Ed Townsend's household?

 2    A.  No, I did not.  How could I when I didn't know at that time

 3    that I was his biological daughter.  Back when I came up,

 4    families kept secrets.  I just happened to be one of those

 5    secrets.  And what's done in the dark came out in the light

 6    because here I am.

 7    Q.  I understand.  For whatever it's worth, my kids know my

 8    taste in music, although they don't particularly care for it,

 9    but they were exposed to the music that I grew up with and that

10    I liked because they grew up in my household.

11         You, having not grown up in Ed Townsend's household,

12    you don't have personal knowledge as to his musical influences,

13    do you?

14    A.  I have the parents that raised me who loved Motown --

15    stacks of records:  R&B, country western, and don't forget the

16    most important in our African-American household was gospel.

17    So I was always surrounded, whether it was with Ed Townsend or

18    the Griffins, with music.

19         It's always been in my life.  It's always been in my

20    household.  It was just an added blessing when I met my father.

21    And then I kind of understood why I had so much love and

22    interest in music.

23    Q.  All that I was asking -- and I appreciate that,

24    Ms. Griffin.  I truly do.

25         All I that was asking is:  Because you weren't there

1    in his household, you really weren't aware personally of his

2    musical influences, either growing up or even into the 1960's

3    and 70's.

4            Isn't that right?

5    A.  I did hear once from a very different Johnny Nash, because

6    I happened to be living with that family when I was in college.

7    And I heard him talk about Ed Townsend.  As a matter of fact,

8    Ed Townsend visited that house.  And we walked right past each

9    other, and I had no idea.

10           That is -- and I've never really discussed that with

11   anybody.  But I had heard the name, but I had no idea I had any

12   connection there.  It wasn't my interest.

13   Q.  You knew Ed Townsend's sister, Helen McDonald, before she

14   passed, didn't you?

15   A.  Yes, I did.

16   Q.  And I take it you met her sometime after you met Ed

17   Townsend?

18   A.  I met my father first; then my biological brothers; then I

19   met my two aunts, Aunt Helen and Aunt Gwen.

20   Q.  Did you meet Helen McDonald before Ed Townsend passed away?

21   A.  Yes.

22   Q.  Now, Ms. McDonald who, unfortunately, is no longer with us,

23   had her deposition taken in this case.

24           Do you recall that?

25   A.  I was there.

1    Q.  Yes, you were.

2           Do you recall that Ms. McDonald testified that Ed

3    Townsend listened to gospel music, rhythm and blues, classical

4    music, and country and western music.

5           Do you recall her testimony?

6    A.  I don't remember her saying any of that.  I can't remember

7    that far back about what my father listened to.  I don't

8    remember that.

9    Q.  You're not denying that she said it.  You're just saying

10   you don't recall it.

11   A.  I don't recall hearing it.  I can't remember everything.

12   Q.  That's fine.

13          You don't have any reason to doubt the accuracy of

14   Ms. McDonald's testimony, do you?

15   A.  No.  Why would she lie to me.

16   Q.  Now, do you recall also that Ms. McDonald testified that Ed

17   Townsend listened to the music of Curtis Mayfield, Buddy Holly,

18   Elton John, the Bee Gees, The Rolling Stones, and The Beach

19   Boys.

20          Do you recall her testimony in that regard?

21   A.  Yes.  And I also recall my father saying to me that he

22   produced Curtis Mayfield.

23   Q.  I was going to is it that next.  You saved me the trouble.

24   Thank you.

25   A.  Okay.

1    Q.  Again, you don't have any reason to doubt the accuracy of

2    Ms. McDonald's testimony in terms of the music, the particular

3    artists that Ed Townsend listened to?

4    A.  She was around in that era.  Like I said earlier, I had met

5    my father before the age of 26 in 1986.  So it would be me

6    speculating who she saw, what she knew.  She's not here to

7    testify for herself today.  I can testify on.  When I met my

8    father, what he said to me and what my Aunt Helen said to me.

9    That's all I can justify.

10   Q.  Again, because you weren't around Ed Townsend in 1973, you

11   don't know if he was influenced in doing any of his writing by

12   the music of Curtis Mayfield, do you?

13   A.  No.  I just know that my father was an iconic musical

14   genius.

15   Q.  And you don't know whether he was influenced in his writing

16   by the music of Buddy Holly?

17   A.  How would I know that.

18   Q.  The same thing if I asked you Elton John or the Bee Gees or

19   The Rolling Stones or The Beach Boys.

20          You don't know if in his writing he was influenced by

21   each of those artists?

22   A.  I don't know.  All I've seen are pictures.  I didn't get to

23   talk to a lot of those people.  A lot of them are dead.

24   Q.  As you're sitting there in the witness box, do you know

25   whether any of these singer songwriters that I've just

1    identified used a similar chord progression in any of their

2    songs to the chord progression that Ed Townsend used in "Let's

3    Get It On"?

4            Do you know one way or the other?

5    A.  I have not had the kind of time to dissect any of my

6    father's recordings.  There are over 200.  I just love music.

7    I listen to it, I write, and I sing.  When I have time as my

8    break from my work in being a Human trafficking Services

9    Director in Harris County.

10   Q.  I won't inflect my singing on anybody.

11   A.  Thank you.

12   Q.  Do you know if any of those artists, those

13   singer/songwriters I just mentioned, used a similar

14   anticipation in their songs that Ed Townsend used in "Let's Get

15   It On"?

16   A.  I am going to say that I have never, ever, until this case

17   sat down to try to dissect peoples' work.  I just like what I

18   like, and I don't like what I don't like.  My main source of

19   living does not come from music.

20           It comes from law enforcement and rescuing human

21   trafficking victims all over the world.  That's my passion.  I

22   just enjoy music, and I'm honored Ed Townsend was my daddy.  It

23   is what it is.

24   Q.  Now, you testified about Ed Townsend -- I think it was his

25   first hit song in 1958 called "For Your Love."

1              You mentioned that in your direct testimony.

2              Do you recall that?

3    A.  Yes, I do.

4    Q.  By the way, as an heir of Ed Townsend, you're still being

5    paid royalties on that song, aren't you?

6    A.  As far as I know.

7    Q.  You get royalty statements, don't you?

8    A.  Anywhere from one penny to in the thousands of dollars,

9    yes.

10   Q.  Have you ever played "For Your Love," the Ed Townsend song,

11   to yourself?

12   A.  Yes.  I listen to it all the time.

13   Q.  Are you aware that the chord progression in "For Your Love"

14   is also a very common chord progression that was used in many

15   songs in the 1950's and 60's?

16   A.  When it comes to "For Your Love," I am listening to the

17   message that is backed up by the music.  I am not sitting up

18   dissecting anybody's anything.  Again, if I hear it, I will

19   speak on it.  I'll speak on it.  I've heard other songs that

20   sound similar, but I'm not dissecting it.  This one just

21   happens to be a part of my father's legacy.

22   Q.  I understand.

23   A.  It is what it is.

24   Q.  You're aware that the chord progression in "For Your Love"

25   is a 1, 6, 2, 5 chord progression, a very common chord

1    progression.

2              Are you aware of that?

3    A.  For your love.  Okay.

4    Q.  Are you familiar with another hit song from the 1950's -- I

5    certainly am -- by Little Anthony and the Imperials called

6    "Tears on My Pillow"?

7    A.  "Tears on My Pillow".

8    Q.  You sing it well.

9    A.  That's not my flavor.

10   Q.  You're aware that it's the same chord progression?

11   A.  No.  I'm not aware.

12   Q.  Are you aware of the 1950's song "Earth Angel" by The

13   Penguins?

14   A.  Earth Angel.

15   Q.  By the way, when you learned piano, did you learn the song

16   "Heart and Soul" that you got to play on the piano?

17   A.  Can I show you what I learned.  My very first piano lesson

18   was:

19              (Keyboard played)

20   BY MR. ZAKARIN:

21   Q.  You're a very good pianist.

22   A.  No, I'm not.  No.  I'm not.  I'm just saying I know enough

23   for what I do.  I don't dissect everybody's work is all I'm

24   saying to you.

25   Q.  I appreciate that.  Let me just go back to my question.

1    A.  Okay.

2    Q.  Did you learn "Heart and Soul" on the piano?

3    A.  No.  Never.

4         Is that a song, "Heart and Soul"?

5    Q.  Yes.

6    A.  No.  I don't know that song.

7    Q.  Now, if the same chord progression was used in "Heart and

8    Soul", in "Tears on My Pillow", in "Earth Angel," that Ed

9    Townsend used in "For Your Love", you would agree that Ed

10   Townsend was still perfectly free to use that chord progression

11   in "For Your Love" too.

12        Wouldn't you agree?

13   A.  What I know is now you're asking me to read my daddy's

14   mind.  First of all, I wasn't even born in the 50's.  So that

15   has never crossed my mind.

16   Q.  You've never given thought to, if he used the chord

17   progression, he was free to do it?

18   A.  Never, because I knew my father to be honest, and I don't

19   think my father was a thief, not the father that I knew, of

20   other peoples' music.

21   Q.  Understand that nobody on this side is saying that your

22   father stole anything, not at all.  We're saying that he was

23   free to use it because it was commonplace.

24        So let me go to my next question.

25        When Ed Townsend wrote "Let's Get It On," you don't

1  have any personal knowledge, do you, as to how he came to

2  choose the particular chord progression that he used?

3        Isn't that right?

4  A.  My father only discussed with me what "Let's Get it on" was

5  really about, why he wrote it.  And his interpretation of it

6  was very, very personal, which made it very personal to me.

7  Q.  And I appreciate that.  But all I'm asking is:  He didn't

8  tell you -- and you didn't discuss, and you don't know -- how

9  he selected the particular chord progression that he used.

10  Isn't that right?

11  A.  Why would he tell me that?

12  Q.  I'm not suggesting that he would.

13        Let's discuss anticipation for a few minutes.

14        Do you know if Ed Townsend had ever used anticipation

15  in any of songs before "Let's Get it on"?

16  A.  I don't have a clue.

17  Q.  Again, you don't know what influenced him to use

18  anticipation when he wrote "Let's Get It On," do you?

19  A.  I only know what he said the words meant.  I never got that

20  technical with my dad about -- he told me about the music

21  because the message that he told me has helped to redirect my

22  life because "Let's Get It On" was written about

23  rehabilitation.

24        And I am in lifetime rehabilitation, and I thank God

25  for that, and I'm not ashamed of it.  I'm proud that I'm still

1     alive to be clean and sober.  This is my 20th year, and I'm

2     proud of that because I know a lot of other people are not

3     living here today.  They're gone.  So that meant something to

4     my father to get sober.  And for me to get sober, I'm so

5     grateful for that miracle because I thought I was gone forever.

6     Q.  You have my total agreement with that.  You have no

7     disagreement with any of us for that.

8          Just as you were not present -- and you've been very

9     forthright in acknowledging that you know nothing about how Ed

10     Townsend came to write "Let's Get It On," what influenced him,

11     what he might have used, what other prior works he might have

12     referred to.  And I appreciate that.

13          Similarly, you weren't present when Ed Sheeran and Amy

14     Wadge wrote "Thinking Out Loud."

15          Isn't that right?

16     A.  I didn't know that this very talented man was even alive.

17     I never even heard of Mr. Sheeran until "Thinking Out Loud."

18     Q.  So you, therefore, don't have any personal knowledge of how

19     Ed and Amy came to use the chord progression that they used in

20     "Thinking Out Loud"?

21          Isn't that right?

22     A.  I don't know.  I wasn't there.

23     Q.  I agree.

24          And because you weren't there, it's fair to say that

25     you don't know if they independently came up with using a

 1    commonplace chord progression that was used in many songs.

 2    Isn't that right?

 3    A.   All I know is his words are very beautiful and very

 4    sentimental too, just like "Let's Get It On."  Those words are

 5    very special too.  I was listening to the music, lifting the

 6    vocals off and comparing with my ear, to the best of my

 7    ability, how similar they sound to me, not being a musicologist

 8    or specialist, only what it sounded like to me.  So I asked for

 9    other professionals to compare it and see if I was on the right

10    track before it even went to the next level.

11    Q.   Now, because you don't know how they came to use this chord

12    progression, you don't know if it was a chord progression that

13    was familiar to them.

14    A.   I missed the first part of what you said, sir.

15    Q.   I'm sorry.

16            Because you don't know how they came to use that chord

17    progression, you don't know if it was a chord progression that

18    they had used before or that was comfortable to them.

19            Isn't that right?

20    A.   Again, I'm going to repeat.  I had never heard of Ed

21    Sheeran or Amy -- I can't pronounce her last name.  So why

22    would I be knowing anything about their music when I never knew

23    anything until "Thinking Out Loud."

24            I mean, no disrespect, Mr. Sheeran.

25            I just never heard of him until "Thinking Out Loud."

1    Q.  Have you, since this case has been brought, bothered to

2    examine any of Ed Sheeran's other songs to see if he used

3    either anticipation in them or any similar chord progressions?

4    A.  No.

5    Q.  Have you examined any of Amy Wadge's prior songs to see if

6    she had used anticipation or any similar chord progressions in

7    her earlier songs?

8    A.  To be perfectly honest, I haven't even Googled her because

9    I can't tell you what her last name is.  No.

10   Q.  Her name is easy to spell but hard to pronounce.  We'll

11   leave it at that.

12          Now let's talk about key in terms of songs.  You're a

13   singer, as you've pointed out.

14          Isn't that right?

15   A.  Used to be.

16   Q.  You still are.

17          When you sing, are there keys that are more

18   comfortable for you to sing in than others?

19   A.  Honestly, Mr. Zakarin --

20   Q.  I hope so.

21   A.  When I was entirely clean and sober, I had a whole other

22   range until I became a substance abuser and a nicotine user.  I

23   used to sound like Janet Jackson.  Now I sound like Freddie

24   Jackson.  And I'm old.  So of course I don't sound like I used

25   to.

1    Q.  In any event, all that I'm trying to find out is:  Even now

2    with your less-fluid voice --

3    A.  Okay.

4    Q.  I have found the same thing, although I'm restricted to

5    singing in the car when nobody is there.  My voice is much less

6    than it was.

7    A.  Solo so nobody can hear you.

8    Q.  That's probably a very good idea.

9    A.  Yeah.

10   Q.  Do you have keys that are just more comfortable for you to

11   sing in?

12   A.  It depends on how I wake up that day.

13   Q.  Fair enough.

14          MR. ZAKARIN:  Your Honor, I have no further questions

15   of this witness.

16          Thank you, Ms. Griffin.

17          THE WITNESS:  Thank you, Mr. Zakarin.

18          THE COURT:  Redirect.

19          MR. CRUMP:  Thank you, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. CRUMP:

22   Q.  Ms. Townsend, do you know if Jobete Music, which is Motown

23   Publishing, who is that administered by?

24   A.  I thought -- I think Sony.

25   Q.  Okay.  Ms. Townsend, before you retained any attorneys, did

1    you try to reach out to Sony?

2    A.  Yes, sir.

3    Q.  And Sony never responded back to you I think you testified.

4    A.  I got answering machines.  No callbacks.

5    Q.  Okay.  Now, with Sony, you're suing them, but they are

6    still administering the catalog?

7    A.  As far as to my knowledge, yes.

8    Q.  But you're suing them.

9    A.  Yes.

10   Q.  Can you explain how you they're administering your catalog

11   and you're suing them.

12   A.  Because I feel they've been so negligent in responding to

13   me and the fact that my father's work was important enough for

14   Sony to get paid and offer a settlement for me to sell, to my

15   knowledge, my portion of my father's work.  And the amount that

16   was quoted to me by my legal team was $6 million.  I turned it

17   down because my father told me to protect his legacy.

18            MR. ZAKARIN:  Your Honor, I move to strike.  That has

19   nothing to do with the infringement claim whatsoever, if I

20   understand what she's testifying to.

21            THE COURT:  It's a topic that we went into at some

22   length this morning.  It seems to me that it is pretty far

23   afield.  Sustained.

24   BY MR. CRUMP:

25   Q.  So why did you get attorneys in the first place in this

1 matter?

2 A.  Because I made a vow to protect my father's intellectual

3 properties and his legacy.  And like I said, he did everything

4 to protect it when he was alive, and it was passed on to me.

5 And I'm going to stand up with that same integrity for my

6 father's legacy.

7          That's why we're here with the scales of justice.  And

8 I respect the jury, the judge, and both legal teams to do this

9 so that the truth will come out, as we all will know it.  And I

10 respect that.

11 Q.  Thank you.

12          Can you tell this jury:  Are you and George Clinton,

13 the R&B icon, friends?

14 A.  Very good friends, yes.

15 Q.  Was George Clinton in this courtroom yesterday?

16 A.  Yes, sir.

17 Q.  Why did you decide to record a song with your friend,

18 George Clinton?

19 A.  We'd just sit around like friends, and we write.  And the

20 ones that we did write just happened to make it on his albums.

21 And even my daughter and George's wife are sitting here in this

22 courtroom today.  And my daughter is also a published artist

23 that was once signed to Atlantic Records, sitting right here

24 today.

25 Q.  Were you doing the song with George for relaxation?

1          What motivated you to do the song?  Was it

2    professional?

3    A.  When we sit down and do creations, it was fun.

4          THE COURT:  Mr. Crump, I think we need to go back to

5    what the direct was about, infringement or no infringement in

6    this case, not relationship and history and other songs.

7          MR. CRUMP:  Yes, sir, your Honor.  I only brought it

8    up because they brought up George Clinton.  So I was trying to

9    clarify for the jury.  But I will follow the judge's

10   instruction.

11         THE WITNESS:  Attorney Crump, may I speak on the

12   infringement?

13         MR. CRUMP:  No.  The judge wants me to move on, and I

14   want to be respectful.

15   Q.  Just a moment about your father.

16         Was your father a simple musician, or was he something

17   more in your opinion?

18   A.  I'm going to just continue to tell you.  What was simple to

19   my father, because he was iconic, is not simple to me.  That's

20   why I haven't been able to tell you that I have been dissecting

21   these different songs.  Whereas, my father could really

22   understand that, that's never been my focus.

23   Q.  You're not a musicologist; correct?

24   A.  Definitely not.

25         MR. CRUMP:  If I can just have a moment.

1              (Pause)

2     BY MR. CRUMP:

3     Q.   Ms. Townsend, I have no more questions.  Thank you.

4     A.   Thank you.

5              MR. ZAKARIN:  I have nothing further, your Honor.

6              THE COURT:  Thank you, Ms. Townsend.

7              THE WITNESS:  Thank you, your Honor.

8              THE COURT:  You're excused.

9              THE WITNESS:  Thank you.

10             (Witness excused)

11             MS. RICE:  Your Honor, next, the plaintiffs would like

12    to present the deposition testimony of Ms. Helen McDonald, an

13    excerpt from that deposition.

14             May we publish that excerpt?

15             THE COURT:  How do you propose to present it?

16             MS. RICE:  Your Honor, what we had planned on doing is

17    I was going to go to the lectern, and one of my colleagues was

18    going to read in the portion in which Ms. McDonald responds to

19    questions, and I was going to ask the questions so that the

20    jury could understand how that deposition testimony took place.

21    There's also been no objection, your Honor.

22             THE COURT:  That's a good way.

23             MS. RICE:  Thank you, your Honor.

24             THE COURT:  There are many ways, but that's a good

25    way.

1            MS. RICE:  Thank you, your Honor.

2            May we proceed?

3            THE COURT:  Why I explain a little so the jury

4    actually knows what a deposition is.  It's testimony taken

5    under oath but not in a courtroom essentially.

6            MS. RICE:  Your Honor, may we publish the deposit

7    expert?

8            MR. ZAKARIN:  Your Honor, I would only ask to have a

9    copy of it so I can verify that it is what I've agreed to with

10   Mr. Frank.

11           MR. CRUMP:  Attorney Shaer will take the stand, your

12   Honor.

13           THE COURT:  It's more lively if someone takes the

14   position of the witness and reads the answers so it has a

15   question-and-answer life to it which it would not have if it

16   was one person droning through the testimony.

17           MS. RICE:  This is the deposition testimony from

18   Ms. Helen McDonald who was a plaintiff in this matter who is

19   deceased.  And we currently represent her estate:

20   Q.  You're family with the song "Let's Get It On"; correct?

21   A.  Yes.

22   Q.  And Ed cowrote that song with Marvin Gaye?

23   A.  He did not cowrite it with Marvin Gaye.  Ed wrote the song.

24   Q.  Ed wrote the song?

25   A.  Yes.  He wrote it.  In fact, he wrote it at my house.

1    Q.  When was that?

2    A.  In the 70's.

3    Q.  Around 1973?  Does that sound correct?

4    A.  It could have been.

5    Q.  So do you have any knowledge about the process by which Ed

6    created the song?

7    A.  All I know is that he was sitting at the piano.  And as he

8    was writing it at the time, he came in my room.  He woke me up.

9    He was staying with me.  He had just come from New York.  So he

10   was at my house, and he came in my room and woke me up and

11   said, come in here.  I want you to hear something.  And he

12   played "Let's Get It On."  And he hadn't quite finished it.

13   And then he played another song that was recorded on the album,

14   "If I Should Die Tonight."

15   Q.  You said he played the song for you.  What?

16   A.  On the piano.

17   Q.  Did he sing as well?

18   A.  Yes.

19   Q.  Did he single the lyrics or close to the lyrics of the

20   final song?

21   A.  Yes.

22   Q.  And Marvin Gaye ultimately recorded the song; correct?

23   A.  He did.

24   Q.  How did that come about?

25   A.  Ed had called me at work the next day, after he played the

1    song for me, and asked me if I would cook dinner because he

2    wanted to invite Marvin Gaye over and introduce him to the song

3    and see if he would record it.

4    Q.  Did Marvin Gaye come over?

5    A.  Yes.

6    Q.  And then what happened?

7    A.  Then we ate dinner, and they talked.  And we played and

8    talked.  And I wasn't in on all of it, but, you know, they

9    talked.

10   Q.  Do you know if Ed gave any portion of the song to Marvin?

11   A.  Yes.

12   Q.  Did he?

13   A.  Yes.  Yes.

14   Q.  I want it to just be clear.

15        Do you know how much of the song he gave to Marvin?

16   A.  I used to know, but I've forgotten exactly.

17   Q.  Does one third sound correct?

18   A.  It could have been a third.

19   Q.  Do you know if the share that Marvin had in relation to Ed

20   ever changed over time?  Or did it always stay the same?

21   A.  I don't know of any change."

22        MS. RICE:  Thank you, Ms. Share.  That's the end of

23   our excerpt.  We'd like to move that excerpt into evidence.

24        MR. ZAKARIN:  No objection, your Honor.

25        THE COURT:  Received.

```
 1              (Plaintiffs' Exhibit 121 received in evidence)
 2              MS. RICE:  Your Honor, next the plaintiff would like
 3    to call Mr. Ed Sheeran.
 4     EDWARD CHRISTOPHER SHEERAN,
 5          called as a witness by the Plaintiffs,
 6          having been duly sworn, testified as follows:
 7              THE DEPUTY CLERK:  Please state your full name and
 8    spell it.
 9              THE WITNESS:  Edward Christopher Sheeran, E-d-w-a-r-d
10    C-h-r-i-s-t-o-p-h-e-r S-h-e-e-r-a-n.
11              THE DEPUTY CLERK:  You may be seated.
12              THE WITNESS:  Thank you.
13    DIRECT EXAMINATION
14    BY MS. RICE:
15    Q.  Good afternoon, Mr. Sheeran.
16    A.  Good afternoon.
17    Q.  My name is Keisha Rice.  I'm representing the plaintiffs in
18    this matter.  I believe that we met at your deposition.
19              So you've already stated your name for the record.
20              You're one of the defendants in this matter; correct?
21    A.  I am, yes.
22    Q.  Are you aware that Sony/ATV is also a defendant in this
23    matter?
24    A.  I am, yes.
25    Q.  Are you aware that Sony/ATV administers the publishing of
```

1    "Thinking Out Loud."

2    A.  I am, yes.

3    Q.  Are you aware that Atlantic Records is also a defendant in

4    this case?

5    A.  Yes.

6    Q.  Are you aware that they distribute "Thinking Out Loud"?

7    A.  Yes.

8    Q.  Are you aware that Sony/ATV administers the publishing for

9    the other song in the case, "Let's Get It On"?

10   A.  I was not aware of that, no, until today.

11   Q.  So is it your testimony today that no one has ever

12   mentioned that to you before today?

13   A.  They might have mentioned it, but I didn't know.  Sorry.

14   Q.  Mr. Sheeran, I'd like to talk to you a little bit about

15   your musical training.

16          How much music school have you had?

17   A.  I don't understand the question.

18   Q.  Sure.

19          Have you ever attended music school?

20   A.  Again, like school?  College?  University?  What?

21   Q.  Have you ever been formally taught any theory or any

22   performance-related instruction regarding your current

23   profession?

24   A.  I was sort of taught in school school, normal school but

25   not at high level.  It was just at regular classes that you

1   would do with maths or whatever.

2   Q.  What is "school school"?

3   A.  Like elementary school, high school.  I joined a sort of

4   music college when I was 17, but that was more music

5   production.  It wasn't theory or anything.  And then I went to

6   a music university for about four weeks when I was 18.  I

7   wasn't there long enough to really learn anything.

8   Q.  When you attended music school, did you ever have any

9   classes on plagiarism or inspiration?

10  A.  No.

11  Q.  So you've never had any formal training about either of

12  those two subjects?

13  A.  No.

14  Q.  Do you know anything about either of those two subjects?

15  A.  I'm a songwriter.  So I know what the building blocks of

16  the song is.  And I know pretty much what would be copyrighted

17  and what wouldn't be.

18  Q.  I understand that you're aware of the building blocks, but

19  I was asking about plagiarism and inspiration.

20  A.  I did not take a degree in plagiarism and inspiration, no.

21  Q.  At the time that you wrote "Thinking Out Loud," had you had

22  any of that formal training past the school school that you

23  mentioned?

24  A.  No.  I'm not a formally trained musician.

25  Q.  So does that mean that you cannot play by ear or read

1    music?

2    A.  I can play by ear.  I have relative pitch, and I can't read

3    music.

4    Q.  Can you explain what "relative pitch" is.

5    A.  Relative pitch is if you were to play me a note.  It's kind

6    of like perfect but not -- perfect pitch would be you could

7    play any note and I could tell you exactly what that note is.

8    But relative pitch is, to my knowledge -- my brother has

9    perfect pitch.  And I've basically got relative pitch, which

10   would be, I guess, strumming a C and me being like, is that a

11   C.

12   Q.  So is an example of that that if you heard someone playing

13   a chord, you would be able to tell what key that was in?

14   A.  Sometimes.

15   Q.  Thank you.

16          Earlier today, did you hear what your counsel

17   mentioned about your thought process behind the lyrics of

18   "Thinking Out Loud"?

19   A.  Yes.

20          (Continued on next page)

21

22

23

24

25

 1              (In open court)

 2    BY MS. RICE:

 3    Q.  All right.  Mr. Sheeran, I would like to ask you a few

 4    questions about the deposition that you took in this case.

 5              Do you recall being deposed in this case?

 6    A.  Um, I remember being deposed, yep.

 7              MS. RICE:  OK.  And can we pull up page 69, please.

 8    May we have permission to publish page 69 of Mr. Sheeran's

 9    deposition testimony?

10    Q.  Do you remember the discussion about hooks that we had?

11    A.  No.  Sorry.

12    Q.  Do you want to take a look at that excerpt?

13    A.  I've just read it, yeah.

14    Q.  OK.  Great.

15              Do you see where it says that you refer to hooks as

16    being cynical or mathematical?

17    A.  No, I said that's what you think about hooks.  I said, That

18    is quite a cynical way to look at song-writing, quite a

19    mathematical way.  I write songs because they make me feel

20    good.  I don't write song thinking of an audience.  So that's

21    why I am not too aware of what people perceive as a hook.  So

22    to me, a song is song.  It's not mathematical.

23              That's what I said.

24    Q.  Thank you.

25              On the song *Thinking Out Loud* that we've talked about

1    today, is Amy Wadge the only other collaborator on that song?

2    A.   On the song-writing, it's me and Amy.  And then on the

3    production, a guy named Jake Gosling made most of my first

4    album and a couple of songs on the second album.  The song and

5    recording are two different things.

6    Q.   And prior to being involved in *Thinking Out Loud*, in

7    writing *Thinking Out Loud*, did Ms. Wadge have any commercial

8    successful songs?

9    A.   Me and Amy collaborated on quite a few songs on my first

10   album.  I can't speak for Amy, she is going to be doing her

11   testimony.  She has had considerable cuts.  So cuts on other

12   people's songs, and she had a few cuts, yes.

13   Q.   And were any of those songs other songs that you

14   collaborated on commercially successful?

15   A.   I mean, it depends on what you perceive as commercially

16   successful.  I -- yes.  Some of the songs had sold tens,

17   hundreds, thousands of copies.  It depends on what you perceive

18   as that.

19   Q.   Now, you previously testified that you were aware of and

20   had heard *Let's Get It On*, the song at issue in this

21   litigation, prior to writing *Thinking Out Loud*, correct?

22   A.   Yeah.  I first heard it in Austin Powers when I was young.

23   That's true, that's the first time I heard it.

24   Q.   Understood.

25        Now, did you change the key, the chords, the chord

1   pattern, or the rhythm, as initiated by Ms. Wadge, the night

2   you wrote the song?

3   A.  Um, when we wrote the song, she was strumming chords.  I

4   joined in.  We collabed, collaborated.  And yeah, I added some

5   chords into the pre, and we went back and forth with the lyrics

6   and melodies.  That's kind of how song-writing works.

7   Q.  So after you ordered -- after you added the chords and some

8   lyrics, what was the biggest difference between that version

9   and the commercially available version?

10  A.  So there's kind of two ways that I would song-write.  For

11  instance, me and Amy were in the studio yesterday, and some of

12  the songs we wrote on guitar, and then we would record them,

13  and then that would be the song.  And some songs we would write

14  to a track, and then that would be the finished track.

15          But in this instance, we wrote the song sort of

16  one-on-one, guitar-to-guitar, recorded it on an iPhone, and

17  then had the, I guess, like, voice memo demo.  And I would have

18  taken that in to a producer who would then have produced that

19  song.

20  Q.  OK.  I want to mention your reference to the Van Morrison

21  song that you believed *Thinking Out Loud* sounded like that you

22  mentioned earlier.

23          What song was that?

24  A.  Well, there's about seven or eight Van Morrison songs that

25  use similar chords.  There is *Have I Told You Lately That I*

 1    *Love You*; there is *Crazy Love*; there is one *Tupelo Honey*.

 2          They all kind of go around the same chord sequence.

 3    It's very common in Van Morrison music.

 4    Q.  Which one were you talking about out of those, though?

 5    A.  Well, my favorite one was on the album of *Moondance*.  *Crazy*

 6    *Love* is on *Moondance*, so I would say that.  *Have I Told You*

 7    *Lately* is probably arguably one of his most famous songs and

 8    uses the same chords.

 9    Q.  You mentioned earlier with your music-writing process

10    specifically with *Thinking Out Loud*, Ms. Wadge's participation.

11          Can you talk a little bit about Mr. Gosling's

12    participation?

13    A.  Yes.  Sorry, I didn't know that was a question.

14    Q.  That's fine.

15          Can you talk a little bit about Mr. Gosling's

16    participation in that creation?

17    A.  Jake Gosling is a producer.  So he would record my guitar,

18    he would program drum, he would record bass.  And yeah,

19    production is more about the sound of things.  So it would be,

20    like, tuning up this kick drum to sound like this, and are we

21    going to do electric bass or do we do programmed bass, and

22    maybe some harmonies here or something.  So he produced the

23    song.

24    Q.  Did you of tell anyone at Sony or Atlantic Records or even

25    Mr. Gosling that you believed that *Thinking Out Loud* sounded

1  like the Van Morrison song?

2  A.  Um, no.  It was referred to as the Van Morrison song by my

3  record label once I recorded it, but in its form on a voice

4  memo, it sounded like a song or on an acoustic guitar.  When it

5  was produced up, it had elements of things that would be

6  traditional to Van Morrison music, such as the way that the

7  piano is played, or I don't know.

8  Q.  OK.

9  A.  It sounded like an emulated Van Morrison production-wise.

10 Q.  If you believed that it emulated Van Morrison, have you

11 ever given credit to Van Morrison in the creation of *Thinking*

12 *Out Loud*?

13 A.  No, but he turned up at my hotel the month that it came out

14 and had breakfast with me and told me that he liked it.  We've

15 since become friends and I give his kids guitars.  But he is a

16 fan of the song.

17 Q.  All right.  I believe I'm almost done.  I would like to

18 take just one last break and I think we should be, I should be

19 done with my questions for you.

20       (Counsel confer)

21       Are you aware that, in this case, one of the arguments

22 that's been made has been independent creation as a defense?

23 A.  I don't understand the question.

24 Q.  OK.  Do you know what independent creation is?

25 A.  Can you explain it to me, please?

1    Q.  I'm just asking if you happen --

2    A.  I'm asking if you can explain it to me, please.

3    Q.  It's --

4    A.  Do you know?

5    Q.  It's just about what you know, not about what I know.

6    A.  Do you know?

7            MS. FARKAS:  Your Honor.

8    Q.  This is nonresponsive.

9    A.  I'm saying I don't understand the question.  I'm asking you

10   to explain it to me.  If you don't know either, we're in the

11   same position.

12   Q.  I'm just curious as to --

13           THE COURT:  Ms. Farkas.

14   Q.  It's nonresponsive.  It's an issue about whether or not you

15   know what it is.  It's your defense.  I'm asking --

16           THE COURT:  Ms. Rice.

17           MS. FARKAS:  Couple of things.

18           THE COURT:  Ms. Rice.

19           MS. RICE:  Yes?

20           THE COURT:  You asked him about independent creation.

21   He asked you to define it for him so he would know exactly what

22   he was answering and talking about.

23           I suggest that instead of arguing with him, you tell

24   him what you mean by independent creation.

25   A.  It's OK if you don't know.  I don't know either.

1  Q.  What I would like to know is if, when you created this

2  song, did you create it out of your own mind, experiences?

3  A.  Yes.  Me and Amy Wadge wrote the song *Thinking Out Loud*.

4  Q.  And did you base it on that, those experiences?

5  A.  Yeah.  The song is written from -- well, I can remember our

6  conversation would be my grandfather had just passed way, my

7  grandmother could barely walk.  And we were talking about

8  everlasting love.  And the first lyric "when your legs don't

9  work like they used to be before and I can't sweep you off your

10 feet" was basically being in love at a very, very old age, but

11 still having the same romance that you had in your 20s.

12         I had gotten into a new relationship at the time, so

13 that was the inspiration of the song.  And yeah, it's my

14 experience.

15 Q.  OK.  So when you used that as your defense, that's what

16 you're saying?

17         MS. FARKAS:  Objection, your Honor.

18 A.  I don't --

19         THE COURT:  Sustained.

20         MS. RICE:  OK.  I believe that's all that I have, your

21 Honor.

22         THE COURT:  You can't get it that way.

23         MS. RICE:  I'm sorry.

24         THE COURT:  Don't ask him a legal conclusion.  You

25 can't get it that way.

 1                MS. RICE:  I missed what he said.

 2                (Counsel confer)

 3    BY MS. RICE:

 4    Q.  Mr. Sheeran, finally, we've discussed several times about

 5    whether or not you were familiar with *Let's Get It On* prior to

 6    *Thinking Out Loud*.

 7                Were you aware of whether or not Ms. Wadge was aware

 8    of *Thinking Out Loud*?

 9    A.  Of *Thinking Out Loud* or of *Let's Get It On*?

10    Q.  I'm sorry, *Let's Get It On*.  I apologize.

11    A.  No.  We had never discussed that.  And if you can see from

12    the mashup video, I know the chorus, which is the lyrics *Let's*

13    *Get It On*, and then in a bit I say, We're all sensitive people.

14    Then I go I don't know the song, so I wasn't obviously that

15    familiar with it when I was mashing it up either.

16    Q.  You weren't aware of the deposition in which she says she

17    was aware?

18    A.  I haven't --

19                MS. FARKAS:  Excuse me.  Hold on.

20                THE WITNESS:  I'm sorry.

21                MS. FARKAS:  Ms. Wadge was not deposed.

22                MS. RICE:  I did misspeak.  Your attorney is correct.

23    Her affidavit, her affidavit.

24                MS. FARKAS:  Rephrase the question then.

25    A.  I haven't discussed it with Amy.  To be honest, all this

1    stuff put me off on it.  It's, like, not on my radar.

2    Q.  I understand.

3              MS. RICE:  That's all I have for you, Mr. Sheeran.

4    Thank you.

5              MS. FARKAS:  Your Honor, we plan to call Mr. Sheeran

6    on our case.  We're not going to cross-examine him on their

7    case.

8              THE COURT:  Very well.

9              THE WITNESS:  Thank you.

10             THE COURT:  Thank you.

11             Mr. Sheeran, you're excused for the moment.

12             THE WITNESS:  I'm sorry.  I'll see you Thursday.

13             THE COURT:  For the day, perhaps.

14             (Witness excused)

15             MR. FRANK:  Your Honor, our next witness is

16   Dr. Stewart.  But given the fact that we have 20 minutes and

17   Dr. Stewart's presentation is likely to be very lengthy, given

18   the musicological analysis, I wondered if the court wanted to

19   adjourn until tomorrow.

20             We can start if the court is inclined.

21             THE COURT:  No.  Since we have 20 minutes left and his

22   presentation is going to be rather long, we better start on it

23   and use the 20 minutes.

24             MR. FRANK:  Yes, your Honor.  We'll do that.

25             Your Honor, plaintiffs call Dr. Alexander Stewart.  I

1    believe he's coming in momentarily.  That's him.

2     ALEXANDER STEWART,

3         called as a witness by the Plaintiffs,

4         having been duly sworn, testified as follows:

5             THE DEPUTY CLERK:  Please state your full name and

6    spell it.

7             THE WITNESS:  Alexander Stewart.  A-l-e-x-a-n-d-e-r

8    S-t-e-w-a-r-t.

9             THE DEPUTY CLERK:  You may be seated.

10   DIRECT EXAMINATION

11   BY MR. FRANK:

12   Q.  Dr. Stewart, could you tell the court what it is you doing

13   for a living, please?

14   A.  I'm a tenured professor at the University of Vermont.

15   Q.  Presumably attendance to be professor, you have to have

16   some educational background that went with that, correct?

17   A.  Yes.

18   Q.  Could you share that with the court?

19   A.  Well, I got a bachelor of fine arts in music education at

20   C.W. Post campus of Long Island University in 1988, and then

21   worked on a master's, which I earned from Manhattan School of

22   Music in 1991.  Then in 1994, I began a doctorate at City

23   University of New York, the graduate center, and I completed

24   that in 2000.  That's the educational part.

25             (Continued on next page)

BY MR. FRANK:

Q.  And what position do you currently hold?

A.  I'm a professor at the University of Vermont.

Q.  And presumably that is you in the photograph there; correct?

A.  That is I.

Q.  What are you doing?

A.  I'm conducting the university jazz ensemble, and that's part of my job there.  I started the jazz program.  I founded it.  There was no jazz studies program when I came there.  I also started the jazz studies program at the C.W. Post campus of Long Island University.

Q.  Dr. Stewart, do you play any instruments?

A.  I play saxophone and some other woodwinds, flute, clarinet but primarily saxophone.

Q.  You're conversant with piano.  You're going to show us some samples.  Correct?

A.  Well, I have the kind of piano chops that are really -- i have that as a secondary instrument that I've developed, but it's not my main thing at all.

Q.  Would you be so kind to tell us a little bit about your activities as a performer outside of teaching.

A.  Well, I've been really lucky to play with some of the people that I really idolized over the course of my career.  I was touring Europe and North America with the Lionel Hampton

1    orchestra.  We had, as guest stars during some of these tours,

2    people like with Dizzy Gillespie and Dee Dee Bridgewater, the

3    singer.

4         But I've done more than just jazz.  I always wanted to

5    just be the kind of musician that was professional enough be

6    the type play in a lot of different situations.  So I played

7    pop-type music with Frankie Valli, The Drifters, Mary Wilson,

8    other jazz artists such as -- Ray Charles is kind of somewhere

9    in the middle.  He does jazz and popular music and country for

10   that matter.  Recordings with Wynton Marsalis.  You can read

11   some on the screen some of the artist I've been able to work

12   with.

13   Q.  Now, in addition to all everything you've outlined for the

14   Court, have you had the opportunity to do, for instance,

15   scholarly research?

16   A.  Yes.  I've been active as a scholar.  I spent about 20

17   years as a freelance musician in New York City before I went to

18   Vermont.  When I worked on my doctorate, I started doing more

19   scholarly-type work, research.  That became a real primary

20   focus of mine.

21        I published a lot -- a fair amount on jazz of course,

22   because that's kind of my main area as a musician, also in

23   Latin-American music.  In fact, I was the director of Latin

24   American studies at the University of Vermont for a while.

25   Popular music, I wrote an article, one of the first scholarly

1    articles, on funk, funk music.  That's been cited probably

2    about 50 times in different books and articles and journals.

3    So popular music is another area that I've worked on a lot,

4    Latin-American music.

5          One thing I've been proud of is that I was able to get

6    a Fulbright Scholarship, a fellowship.  So I spent the year of

7    2006 and '07 in Mexico with my family.  I was researching

8    Afro-Mexican music

9          Should I go on?

10   Q.  I would like you to explain to the Court, Dr. Stewart, what

11   exactly a Fulbright scholarship is, in order to acquire one,

12   what one has to do to.

13   A.  It is very competitive.  You, of course, have to provide an

14   outline, what your project is going to be.  My project was

15   researching Afro-Mexican music and culture on the Costa Chica,

16   which is on the Pacific Coast in Mexico.

17         It was accepted.  I packed up my family.  We went to

18   Mexico, to Huaca.  We lived there for a year.  I think, in a

19   lot of ways, it was the best year of my life.  We had an

20   incredible time.

21         Out of that, I published an article and continued on

22   to do some other work in South America, in Peru and Chile, that

23   was connected to that Pacific Coast and music in Mexico.

24   Q.  Now, you've been engaged by the plaintiffs in this case to

25   serve in the capacity as an expert musicologist; is that

1   correct?

2   A.  Yes.

3   Q.  Have you had experience serving in that capacity before?

4   A.  I started in around 2002.

5   Q.  How did you get started?

6   A.  It was kind of just a chance encounter.  In 2002, a music

7   publisher, who had been located right down here in the World

8   Trade Center -- she couldn't get back to their office for quite

9   a while.

10          So in 2002, she moved to Burlington, Vermont, which

11  where I was living because of my job at the University of

12  Vermont.  And I met her, and she was involved in some music

13  copyright cases.

14          She said that they had a musicologist that they had

15  been using who was primarily involved -- his background was

16  more classical music.  So she thought, maybe you would be a

17  better fit for us, since you've done this work in popular

18  music.  It was just that sort of chance encounter that led to

19  my doing work in is this field.

20  Q.  I think you said you commenced this kind of work back in

21  2002.  So I guess you've been working in this field,

22  intermittently, for what?  21 years?

23  A.  Yes.  I guess it's been that long.

24  Q.  And you've identified -- I believe it's slide number 5 --

25  previous clients of yours -- Lizzo, Lady Gaga, The Weeknd,

1    Meghan Trainor, Bill Withers.

2             What exactly -- what was the work you were able to do

3    for those particular people or entities?

4    A.   Various tasks.  Sometimes artists are concerned about music

5    that they've created, whether it has too much similarity to

6    other works.  So they engage me to analyze it to see if there

7    could be a problem.  So I've done a couple of those kinds of

8    projects for Lizzo.  And for Meghan Trainor, the same thing;

9    The Weeknd, similar-type work.  I did several things for Bill

10   Withers.  He had some of his music sampled, and he was not

11   happy about it.

12            Sampling is when you take part of a recording of

13   another song and you put it in your new song.

14            Bill was not happy about that at all.  So I did work

15   for him on several songs.  I think one of them settled, and

16   another one, I had to tell him that I didn't really think the

17   case was strong enough to pursue.  So he dropped it.

18   Q.   Who is Bill Withers, by the way, Dr. Stewart?

19   A.   Well, he's an exceptionally gifted -- he was an

20   exceptionally gifted musician/singer from West Virginia who --

21   his life story is really compelling.  But I think that would be

22   a bit of a detour.

23            But he was in the Navy.  And he came to music kind of

24   late.  But he was just an amazing musician.  I never actually

25   met him personally.  I don't want it to sound like we were

1    buddies or anything.  But I worked very closely with his

2    lawyer, his personal lawyer, over an extended period of time.

3    Q.  This is the gentleman who brought us "Lean On Me"; correct?

4    A.  Yes.

5    Q.  This is also the gentleman who brought "Ain't No Sunshine

6    When She's Gone"; correct?

7    A.  Yes.

8    Q.  This is also the gentleman that brought "Use Me," which has

9    been covered a million times.  Correct?

10   A.  That was one sample that had been unauthorized, but I

11   didn't think we were able to pursue it.

12          MS. FARKAS:  Your Honor, I would just ask counsel to

13   let the witness testify and to not ask leading questions,

14   please.

15   BY MR. FRANK:

16   Q.  With regard to Mr. Withers, it sounds like you were

17   actually, at some point in time, engaged to do an analysis and

18   you actually decided that there was an infringement.

19          Is that fair?

20   A.  Based on some developing legal standards, I told him I

21   thought it was de minimis, which means that it was not

22   substantial enough to pursue.  So he didn't.

23   Q.  It sounds like you've worked on behalf of people who are

24   pretty prominent artists and writers in the entertainment

25   industry; is that correct?

1    A.  I guess so.

2    Q.  As far as your affiliations, have you represented or

3    testified or provided reports or consultation for defendants in

4    copyright litigation?

5    A.  Yes.

6    Q.  And you've also done it for plaintiffs as you're doing here

7    today; correct?

8    A.  Yes, I have.

9    Q.  Dr. Stewart, in order to get into your analysis, I believe

10   we're going to need to talk about some basic threshold terms,

11   musical terms, the building blocks I think we've used before.

12   So I wonder if you might indulge us by telling us what rhythm

13   is.

14   A.  This is going to be kind of basic stuff, and some people

15   who have musical training already will know a lot of this

16   stuff, but we're not all on an equal or level playing field

17   when it comes to that.  I teach classes all the time with kind

18   of a mixed constituency.  Some of the students know a lot about

19   music.  Some don't know much at all.  Some read music; some

20   don't.

21          I'm sorry if you know a lot of this already, but it's

22   still worthwhile to go through.

23          You asked me what is rhythm and that is simply just

24   placement of musical sounds in time.

25   Q.  What about meter?

1    A.  Meter is how we group the beats in a piece of music.  So a

2    piece of music can have the beats groups in 2s, 3s, or 4s or

3    even other kind of odd figures.  The most basic groupings are

4    2, 3, and 4.

5    Q.  Have you brought us an audio sample to demonstrate what's

6    depicted in that music?

7    A.  Yes.  So this will help us, as we're going through the

8    music examples in this case, to understand.  Even if you don't

9    read music, you can kind of still follow it because it's really

10   kind of graphic.  Pitches rise as the melody rises.  We'll talk

11   about pitch in a minute.  The beats are grouped in measures or

12   bars.

13          So this example here has two measures that are grouped

14   in two -- 1, 2, 1, 2; and then two measures that are grouped in

15   three -- 1, 2, 3; 1, 2, 3; and then two measures grouped in 1,

16   2, 3, 4; 1, 2, 3, 4.  You can see the bar lines separate each

17   of these measures.

18          There is also a tempo marking that we'll talk about in

19   a minute.  If you want to play the example, it just gives the

20   very basic meters and the groupings of these beats.

21          (Audio played)

22          THE WITNESS:  So if you're able to follow along with

23   that, you can see the different measures in how the beats are

24   grouped.

25   BY MR. FRANK:

 1    Q.  Could you speak to what "pitch" means, Dr. Stewart.

 2    A.  Pitch is just very simply the highness and lowness of a

 3    sound.  So, of course, higher notes are going to have a higher

 4    pitch, and lower notes are going to have a lower pitch.  It's a

 5    very simple concept.

 6    Q.  I think I'd be remiss if I don't ask you to define what

 7    "rhythm" is for today's purposes.

 8    A.  We weren't really done with that.

 9    Q.  We weren't.  I apologize.  I got too excited.

10    A.  So several symbols that you should be familiar with.  A

11    sharp raises a pitch by a half step which is to the next

12    nearest note on the keyboard.  So a sharp after an F would

13    raise it to F sharp or one step up to that black key.  An E

14    flat would lower it to the next lower key.  And the natural

15    would cancel out a sharp or a flat.

16    Q.  And then with regard to rhythm, can you define "rhythm" for

17    us.

18    A.  We did that before.  I think this slide is actually about

19    another concept related to rhythm, and that is syncopation or

20    rhythmic placement -- rhythmic displacement.  And that's

21    placing notes or figures off the beats, off the regular beats,

22    in a piece of music.

23    Q.  Do you have a sample to go with this musical depiction?

24    A.  Sure.  So this will start with two hits on the bass drum

25    that on the beat.  And the three notes that are in red are

1    three syncopated notes that are off the beat.

2            So, if I were tapping it with my foot and this were

3    the beat, the off beats would be.  So my clapping would be the

4    syncopation.  But to see it in musical notation at the same

5    time as you hear it, this slide will help.

6            (Audio played)

7    BY MR. FRANK:

8    Q.  How does the concept of tempo play into all of these terms

9    we've been speaking about?

10   A.  Tempo is simply the speed or pace of a piece of music.  We

11   measure that in BPM or beats per minute.  We musicians use a

12   device called a metronome to set the tempo or to tell us the

13   proper tempo for a proper piece of music.  Nowadays, we all

14   carry a metronome on our iPhones or portable devices.

15   Q.  When you say "we all," who are you referring to?

16   A.  Musicians.

17   Q.  I'm sorry to interrupt you.  Go ahead.

18   A.  No problem.

19           So the song, one of the songs at issue here, of course

20   is "Thinking Out Loud," and the tempo is 79 beats per minute.

21   There is no tempo marking on the deposit copy of "Let's Get it

22   on."

23           So I just put several tempos here so you can kind of

24   get a sense how different genres use different tempos,

25   different speeds, different paces.  A lot of that is related to

1   dance as well, to movement.  We tart with 80 beats per minute,

2   which is, again, about the tempo of "Thinking Out Loud."

3           (Audio played)

4           THE WITNESS:  That is generally what we'd say is at

5   the upper end of a ballad tempo.  The next tempo is kind of in

6   the midrange of what a lot of hip-hop is set at, which would be

7   from maybe 85 to 95 beats per minute.  So this is 92 beats per

8   minute.

9           (Audio played)

10          THE WITNESS:  And then finally, 120 is the tempo that

11  a lot of disco and that kind of dance music is set to.  It's

12  basically about 2 beats per second.

13          (Audio played)

14  BY MR. FRANK:

15  Q.  Could you speak or define melody for us, Dr. Stewart.

16  A.  It's really just a succession of pitches in musical time.

17  Q.  Now, you've got an additional term here that seems to be

18  identified as "melodic contour."

19          What is that?

20  A.  Melodies have a contours.  They can be a rising melody or a

21  falling melody.  They can this rise and then fall.  This gives

22  you a kind of a graphic representation of a lot of melodic

23  contours.

24          Of course a lot of melodic contours might be more

25  complex than these kind of simple, graphic representations that

1    you see here.  But it's something that -- researchers have

2    found that humans are very sensitive melodic contour; that

3    they're really able to hear that remember melodic contours

4    quite well.

5            MR. FRANK:  Could we go to slide 13, please.

6            THE COURT:  Is this a good place to break?

7            MR. FRANK:  Yes, Your Honor.

8            THE COURT:  We'll resume at 11:00 tomorrow morning,

9    the same place, the same rules.  Don't discuss it.  Keep an

10   open mind and then put it out of your mind.  We're moving at a

11   good pace.  Have a good evening.

12           MR. FRANK:  Thank you, your Honor.

13           (Adjourned to April 26, 2023, at 11:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 KATHRYN GRIFFIN TOWNSEND

Direct By Mr. Crump  . . . . . . . . . . . . . 125
Cross By Mr. Zakarin . . . . . . . . . . . . . 168
Redirect By Mr. Crump  . . . . . . . . . . . . 192

 EDWARD CHRISTOPHER SHEERAN

Direct By Ms. Rice . . . . . . . . . . . . . . 200

 ALEXANDER STEWART

Direct By Mr. Frank  . . . . . . . . . . . . . 213

                    PLAINTIFF EXHIBITS

Exhibit No.                                Received

 121   . . . . . . . . . . . . . . . . . . . . 200

                    DEFENDANT EXHIBITS

Exhibit No.                                Received

 400   . . . . . . . . . . . . . . . . . . . . 178