UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------x

KATHRYN TOWNSEND GRIFFIN, *et al.*,

          Plaintiffs,

          v.                           17 Cv 5221 (LLS)

EDWARD CHRISTOPHER SHEERAN,
personally known as Ed
Sheeran, *et al.*,

          Defendants.

-----------------------------x

                         New York, N.Y.
                         April 26, 2023
                         11:10 a.m.

                         – And a Jury –

Before:

               HON. LOUIS L. STANTON,

                         District Judge

                 APPEARANCES

FRANK & ASSOCIATES PC
BY:  PATRICK RYAN FRANK
     KEISHA RICE
     KATHERINE VIKER
     – AND –
BEN CRUMP LAW
BY:  BEN CRUMP
     Attorneys for Plaintiffs

PRYOR CASHMAN LLP
     Attorneys for Defendants
BY:  ILENE SUSAN FARKAS
     DONALD S. ZAKARIN
     ANDREW MARK GOLDSMITH
     BRIAN MAIDA

1              (In robing room; jury not present)

2              THE COURT:  What now?  It's a little messy if we're

3    doing it in the courtroom and we go in and out, and they're

4    wondering what's going on.

5              MS. FARKAS:  Of course.

6              THE COURT:  And here, it really sort of gets settled,

7    and you come out when you've had a majestic conference.

8              MS. FARKAS:  Basically, to cut to the chase, we got

9    new slides last night around midnight for Dr. Stewart's

10   testimony.

11             THE COURT:  That's early.

12             MS. FARKAS:  I guess it was before midnight, with no

13   explanation as to what has been changed, whether new slides

14   have been added.

15             As you point out, before we call the jury in and make

16   it a majestic moment, we wanted to bring it to your Honor's

17   attention.  To the extent that there are new slides, we would

18   like to know that now.  To the extent that there have been

19   changes in the slides, we'd like to know that as well.

20             THE COURT:  Sure.  Which are the new ones?

21             MR. FRANK:  There aren't any new ones, your Honor.

22   What has changed is our expert last night, just to add to the

23   slide.  If you look at each of the slides, there is an

24   attribution, a citation to a source at the bottom.  And he's

25   added those.  He's augmented the sources for them.  The

1    substance of the exhibit has not changed.

2             THE COURT:  At all?

3             MR. GOLDSMITH:  That's not true, your Honor.  I've

4    reviewed the slides, and I've already noted at least three

5    changes from what they had sent us previously.  I can show you.

6             MR. FRANK:  Show me the changes.

7             MR. GOLDSMITH:  Do you have the most recent deck?

8             MR. FRANK:  Sure.

9             MR. GOLDSMITH:  Do you have the older one?

10            These two in parentheses were never there before.  The

11   same on this slide, never there before.  And that was never

12   there before.  That's just what I noticed.  I don't know if

13   there's anything more than that.

14            MR. FRANK:  We've had a previous slide with the exact

15   same material.  I don't understand.  We've given you the slides

16   before.  I don't know what that means.

17            THE COURT:  That's what he'd like to know.

18            MS. FARKAS:  Your Honor, part of the problem is there

19   is -- for example, there is one melodic element at issue, which

20   is --

21            MR. FRANK:  There are three.

22            MS. FARKAS:  I know.  I'm taking them one at a time.

23            One of the melodic elements at issue is the opening

24   melody, but they have various slides purporting to analyze that

25   particular melody in different ways.  That's their choice.  I

1   can cross-examine him on that.

2   But to make changes to one slide -- because they're

3   analyzing it in different ways, if they say, well, that was on

4   one slide and it wasn't on another slide, it makes a difference

5   to us.  It's a substantive difference, and he's now making

6   changes to his different analyses.

7   MR. GOLDSMITH:  As I pointed out, there are changes.

8   You stated there were no changes.  You seem to not be aware

9   yourself of the changes.  We need to know if there are any

10   other changes.

11   MR. FRANK:  I see what he did here.  First of all, I

12   did say there were changes.  He changed the sources.  At the

13   very, very bottom of the thing, he changed these on the

14   exhibits to identify what the source is to give them more

15   information.

16   What they're complaining about is this, these two in

17   parenthesis.  I see what he did.  He's always had this passing

18   tone.  He's just put these two 2 notes to demonstrate what he's

19   been testifying to.  It's the same opinion he's had, but he's

20   just depicting it differently.  But it's the same opinion.  He

21   just put them into parenthesis to show that they're passing

22   tones.  That's all he did.

23   THE COURT:  But if they're not the same numbers, then

24   they indicate different tones.

25   MR. FRANK:  They are the same numbers.

1    MS. FARKAS:  They weren't in the slide before midnight

2    last night.  We can talk about the significance of passing

3    tones.  That's not the point.  The point is there have been

4    changes in the slides and we don't know which slides have been

5    changed.

6         Mr. Frank came in here and said, no.  No.  It's just

7    the sources.  He then came in here and tried to make it a

8    nonpoint.  The hundred slides that support Dr. Stewart's

9    analyses we saw for the first time a week ago.  These are new

10   analyses.  We'll deal with that I guess on cross.

11        But this is brand new analyses, brand new

12   transcriptions, that have never been in this case in six years.

13   Okay.  They changed them before Monday's exercise when he got

14   on the stand.  okay.

15        Now they've changed it again, midnight in the middle

16   of his testimony.  We're simply asking to know what he changed.

17   If Mr. Frank is unable to walk us through what has been

18   changed, we're concerned about that.

19        THE COURT:  Mr. Crump, what do you think?

20        MR. CRUMP:  I remember yesterday, Judge, in court them

21   offering emails.  I noticed them.  I had no problem with them

22   because I genuinely believe in everything going in.  The jury

23   can sort stuff out.  They can cross.

24        That's how I felt, yesterday, what he did.  I could

25   cross on it.  Genuinely I want them to try their case.  We want

1    to try our case.  They shouldn't try and dictate how we try our

2    case.  And I promise you, Judge, we won't dictate how they try

3    their case.

4           THE COURT:  Okay.  Do you know what substantive

5    changes have been made?  What he picked out as a slide, let's

6    talk about it.

7           Can you, fairly rapidly, determine whether it has a

8    change or not?

9           MR. GOLDSMITH:  I can't.  I'm, unfortunately, not that

10   talented that I can remember exactly what it was before as to

11   what it is now.

12          THE COURT:  You have them from yesterday.

13          MR. GOLDSMITH:  I don't have it printed out.  It would

14   be very difficult to do it as we go along.

15          MS. FARKAS:  The other option is that Dr. Stewart be

16   required to identify.

17          MR. GOLDSMITH:  I think it would be better if

18   Dr. Stewart could just tell us which slide has been changed.

19   It sounds like maybe it's only these three.  If there are no

20   more, then we know what has been changed.  So why can't we just

21   ask Dr. Stewart to tell us right now he changed.

22          THE COURT:  That's direction I had been headed.  My

23   thought was he should do it before each slide before he gets to

24   that slide.  One way of enforcing that is to say you can, at

25   that point ask him, were there any changes on this slide from

1    the ones you gave us before, any changes at all.  And let's get

2    his answer on the record.

3            MR. GOLDSMITH:  Are you suggesting during

4    cross-examination?

5            THE COURT:  I don't think so traditionally.  "By

6    Mr. Crump."  We're trying a case.  I'll give you the right

7    to -- I don't know what it's called.  It's called an

8    interruption.  You can call it "Preliminary Cross-examination"

9    if you wish.

10           When he starts dealing with a slide, I'll let you ask

11   him the question, is there any change from this slide that you

12   gave us last night from the previous slide.  And you can do it

13   on each one.  They may get the idea that there is some sort of

14   linked changes in this case, a moving target, which we've had,

15   God know, for six months.

16           MR. GOLDSMITH:  While we're all here, there is a

17   separate issue on the demonstratives that we wanted to address.

18   So it's slide 23.  We still have a continuing objection which

19   we made during Monday's appearance.

20           It references Dr. Ferrera's, our expert, undated

21   report from 2015.  It was actually offered before he was

22   engaged as an expert in this case.  It was offered when he was

23   a consultant on behalf of Sony.  At that time, he was analyzing

24   the "Let's Get It On" recording by Marvin Gaye and not the

25   sheet music.

1          There's an opinion that they're trying to put on the

2     screen from that report that addresses on the harmonic rhythm

3     in the recording, the Marvin Gaye recording, which Dr. Ferrera

4     has opined is different from the harmonic rhythm in the sheet

5     music.

6          So this slide is both irrelevant and highly

7     prejudicial because it analyzes the Marvin Gaye recording and

8     not the sheet music.  So we would ask that the portion of this

9     slide that I've underlined be whited out or deleted because

10    this portion relies on the recording.  The first part that I

11    bracketed is okay because it's the same in both the recording

12    and the sheet music.

13         THE COURT:  The bracketed part says:  "Both songs use

14    a similar (but not identical) chord progression."

15         MR. GOLDSMITH:  We're okay with that.  The rest we

16    would --

17         THE COURT:  And it then proceeds -- and this is the

18    objected-to portion:  "In the same harmonic rhythm of two

19    chords per bar in which the second and fourth chords are

20    anticipated, i.e., may occur on the second half of the two."

21         MR. GOLDSMITH:  We don't object to that graphic.  That

22    graphic is okay.  It's just the text.

23         THE COURT:  I certainly recognize Dr. Stewart's

24    handiwork.

25         How do you think this part of the testimony affects

1    the jury?

2              MR. FRANK:  This particular slide?

3              THE COURT:  The ways of expressing the conclusion and

4    the supporting conclusions that he draws.

5              MR. FRANK:  I think it doesn't affect the jury because

6    the harmonic rhythm is one of the issues in the case.  I don't

7    believe -- correct me if I'm wrong.  I'm sure you will.

8              But both experts agree, I think, that harmonic rhythm

9    is expressed -- harmonic rhythm is expressed in the deposit

10   copy.  So this is a statement from -- I'm sorry.

11             Dr. Stewart is quoting Dr. Ferrera talking about the

12   harmonic rhythms.  If Dr. Ferrera wants to get on the stand and

13   clarify that that's not what he meant -- he was actually

14   specifically talking about sound recording -- he's certainly

15   within his rights to do that.

16             Our position is that the harmonic progression is

17   embodied in the deposit copy, and we are addressing the

18   opinion.  The distinction I'm making is that --

19             THE COURT:  Your position is that the harmonic is in

20   the deposit copy?

21             MR. FRANK:  It is.  Yes.  It's embodied in the deposit

22   copy.  So we believe that it's relevant.  That's one of the

23   constituent elements that we believe go with the selection and

24   arrangement argument.

25             MR. GOLDSMITH:  If I may respond very briefly to that,

1    please.  There is no dispute that there is a harmonic rhythm in

2    the deposit copy.  The problem is that the harmonic rhythm in

3    the deposit copy, according to our expert, is different from

4    the harmonic rhythm in the recording.

5         Here, he was analyzing the harmonic rhythm in the

6    recording.  So this is just another back-door way to get the

7    recording into the case.  Our expert should not have to

8    explain, oh, I was analyzing the recording here when the

9    recording is not part of the case.

10        His opinion is that the harmonic rhythm and the sheet

11   music is totally different from the harmonic rhythm in the

12   recording.  So presenting his analysis of the recording is

13   irrelevant and prejudicial.

14        THE COURT:  It's been forbidden before.

15        MR. FRANK:  We are not presenting the recording.

16   What's been forbidden is putting that recording into evidence

17   or representing that elements of the recording -- that elements

18   of the recording are protected when they're not.  I believe

19   what the Court's ruling was that we couldn't represent that

20   they were protected.

21        THE COURT:  If there was no recording, there would be

22   no relevance of this exhibit.

23        Is that true?  And the statements in it wouldn't even

24   be made.

25        MR. FRANK:  I would respectfully object, your Honor.

1   I would respectfully dissent to that because they're

2   representing to you that his opinion is expressly related to

3   the sound recording.

4          I understand what they're representing, but we believe

5   that this opinion also applies to the deposit copy.  If they

6   would like their expert to clarify that, they're welcome to do

7   that.  The harmonic rhythm is embodied in the deposit copy as

8   well.  If this is out of context in some way, that's up to

9   their expert to clarify that.

10          THE COURT:  Maybe.

11          MR. FRANK:  Maybe.

12          THE COURT:  Would you like a voir dire on it when he

13   gets to that point?

14          MS. FARKAS:  Your Honor, this is clearly intended to

15   confuse the jury.

16          THE COURT:  My question is, however, very clear.

17          Do you want a voir dire of him at the point that he

18   embarks on this explanation?

19          MR. GOLDSMITH:  I'm not sure if a voir dire is

20   necessary because all this is is Dr. Stewart's addressing

21   Dr. Ferrera's opinion on the recording.  And I can show you the

22   report, where it comes from.  And Dr. Ferrera is analyzing the

23   recording.  Your point before was very on point.

24          THE COURT:  I'm not ordering you to have a voir dire

25   on it.  In the middle of a trial, that is a way of handling the

 1    defense that you see in what you've got here.  And I'm offering

 2    you the opportunity.  If you don't want it, don't take it.  Do

 3    it through Dr. Ferrera.

 4         MR. GOLDSMITH:  The problem, Your Honor, is if it goes

 5    in at all, then Dr. Ferrera will be required to address the

 6    Marvin Gaye recording, which should never be part of this case.

 7    And the point you made before is exactly the right one, which

 8    is that if recording did not exist, this analysis that they're

 9    trying to put before the jury would not exist.

10         THE COURT:  Isn't that what you're going to move to

11    exclude?

12         MS. FARKAS:  Voir dire Dr. Stewart when the slide

13    comes up?

14         Is that what you're saying?

15         THE COURT:  I've said it eight times.

16         MS. FARKAS:  Sure, your Honor.  We'll do that.

17         THE COURT:  That may help bring some antiseptic in

18    that situation.

19         MR. GOLDSMITH:  Just so we're clear, do you want that

20    to be done outside the presence of the jury or in the presence?

21         THE COURT:  The point of it is that it's done in the

22    presence of the jury, where you're supposed to be trying the

23    case.

24         MR. GOLDSMITH:  Understood, your Honor.  Thank you,

25    your Honor.

1              MR. FRANK:  Thank you, your Honor.

2              THE COURT:  What you're doing is producing subjects

3    for their conversation in the room when they are deciding the

4    case.

5              MR. GOLDSMITH:  Understood.

6              MR. FRANK:  Thank you, your Honor.

7              MR. CRUMP:  Can I briefly say one thing.

8              THE COURT:  I don't know.  I'm not sure.

9              MR. CRUMP:  Your Honor, previously, in my absence, it

10   was brought up about a letter written that I was going to do

11   inappropriate things or say inappropriate things.  And

12   yesterday I tried to go and be as respectful to the Court.

13             THE COURT:  You certainly were.

14             MR. CRUMP:  So I wanted to have it on the record that

15   as a duly qualified licensed attorney, I will always follow the

16   Court's instruction.  And I've been hired to be trial counsel

17   by the client, who wanted me to do parts of the case.

18             THE COURT:  Sure.

19             MR. CRUMP:  I would only ask that our client not be

20   forbidden to have her case tried, and I will follow the Court's

21   direction on that.

22             THE COURT:  Don't worry at all.  At the end of the

23   pretrial conference, they said that they wanted you to do the

24   final closing argument, and I said no because you would be a

25   stranger, basically a stranger, in the case.

1              So yesterday morning, they put you in to make the

2    opening statement and examine the witness.  And I thought that

3    was a rather adroit and absolutely justifiable curing of the

4    gap that I had foreseen at the end of the conference.

5              As far as I'm concerned, you can do whatever you want.

6    You're fully on board.

7              MR. CRUMP:  Thank you very much, your Honor.

8              THE COURT:  And your behavior, so far, there's been

9    nothing to criticize.

10             MR. CRUMP:  Thank you.  I just wanted to preface that

11   before you.

12             THE COURT:  Feel free to raise -- personal feelings

13   are one more terrible burden when you're busy trying a case,

14   and the lawyer shouldn't have to perform under that burden.

15   Feel clear to bring it up.  We're all human beings.

16             MR. CRUMP:  Thank you so much, your Honor.

17             MR. FRANK:  Thank you, your Honor.

18

19

20

21

22

23

24

25

 1                    (Continued on next page)

 2                    (In open court; jury present)

 3              THE COURT:  Good morning.  Please be seated.

 4              Members of the jury, this is something that occurs

 5    from time to time.  And the lawyers want a conference with me

 6    about some things that are coming up in the case and just

 7    really administrative or procedural questions.

 8              Frequently they're taken care of during the day by a

 9    quick "conference at the side.  If it looks like it's going to

10    be longer, we do it in the robing room.  This morning was an

11    instance of that.

12              I'm telling you this because I don't want you to be

13    suspecting that we were playing string games or reading the

14    newspaper.  We were talking about the administration of the

15    case.  And it saves time in the long run for all of us to do it

16    as we go along.  That's why you were waiting in the jury room.

17              MR. FRANK:  May it please the Court.

18              Ms. Passey, could you put the screen to 13, please.

19              Plaintiffs recall Dr. Alexander Stewart.

20              Your Honor, may we proceed?

21              THE COURT:  You may.

22              MR. FRANK:  Thank you, your Honor.

23     ALEXANDER STEWART, recalled.

24    DIRECT EXAMINATION

25              (In open court; jury present)

1         THE COURT:  Dr. Stewart, you're still under oath.

2         THE WITNESS:  Yes, your Honor.

3  BY MR. FRANK:

4  Q.  When we left off yesterday, Dr. Stewart, at 5:00, I believe

5  we were at slide 13.

6         Could you explain what's embedded on that slide,

7  please.

8  A.  Again, I apologize for some of you who may have musical

9  training.  But in my classes, where I teach musical history,

10  there is a wide spectrum of music experienced and knowledge.

11  And it helps put us on the same page in terms of how we use

12  these terms.

13         So this is an important concept in terms of analyzing

14  music for comparison.  And I believe that all musicologists who

15  do this kind of use this system.  And that's assigning Arabic

16  numerals or these 7 integer, 8 integer to each pitch that

17  enables us to compare melodies across different songs without

18  worrying about what key they're in because all these

19  relationships remain the same, regardless of the key.

20         So probably everybody's familiar with the solfege

21  syllables:  "Do-re-mi-fa-so-la-ti-do."  This is basically just

22  another way of using numbers:  1, 2, 3, 4, 5, 6, 7, 8.

23         So most of the time, we're going to be using these

24  numerals or integers to describe the melody we're talking

25  about.  So if you want to play the example, it's just a simple

1    C major scale.  You could do this either the solfege syllables

2    or the numbers to describe these pitches and their relationship

3    within the scale.

4            (Keyboard Played)

5    BY MR. FRANK:

6    Q.  Could you speak to scale degrees, Dr. Stewart.

7            What are those?

8    A.  What I was getting a moment ago was using these numbers to

9    describe a certain melody.  I thought it would be helpful to

10   look a specific melody and see it in terms of its pitch

11   sequence.  Here is a very familiar song that uses the pitch

12   1875678165.

13           If you could play the sample, please.

14           (Audio played)

15   BY MR. FRANK:

16   Q.  Could you explain for us, Dr. Stewart, what keys are.

17   A.  The key is the central organizing pitch that a piece of

18   music would be in.  The scale we just heard, a C major scale,

19   the keynote or what we also call the topic is the first note

20   and the last note of the scale.  So the C major scale starts on

21   C and ends on C.

22           It gives kind of a sense of resolution or finality

23   when you reach that pitch.  So if you're going up the scale

24   from 1 to 7 and you stop at 7, if I may to the piano for

25   demonstration.

1          Most people will want to hear one more pitch after

2     that.  That gives them a sense of resolution.  that's because

3     we're ending on the topic or the keynote of the piece.  That

4     last piece is called the keynote because it leads us back to

5     the topic or back to the 1.  Notice that 1 and 8 are going to

6     be the same sound because they're both expressions of the topic

7     or the pitch class.

8          The deposit copy of "Let's Get It On" is in the key of

9     E flat.  And the studio recording of "Thinking Out Loud" is in

10    the key of D.  These are two keys that would be as closest

11    together as can be.  In western music, they're only a half step

12    apart, E flat and D.

13         We're going to be looking at "Let's Get It On" in the

14    key of D, the same key as "Thinking Out Loud" for comparison.

15    I think the other musicologist did the same thing.  It's just a

16    way of comparing them.  When you do that, all the musical

17    relationships remain the same.  Nothing is changed in terms of

18    the composition.

19    Q.  Dr. Stewart, can you tell us what chords are.

20    A.  We've been talking about horizontal expression, musical

21    expression, with melodies and scales.  We also have vertical

22    considerations which would be musical simultaneities can form

23    harmonies or chords.

24         The most basic form in western music is a triad, and

25    it is composed of the first, third, and fifth note of the

```
 1   scale.  Here is a simple C major triad with the root being C.
 2   And then you skip a note.  You don't play a D, but you have the
 3   third, which would be E; and then G, which is the fifth.
 4           We can go to  the next slide.
 5   Q.  What happens when you add a seventh in that scenario?
 6   A.  So you don't have to stop there with the three notes.  You
 7   can continue stacking up more pitches using the same
 8   methodology, skipping a note each time.  So after the fifth,
 9   you would add a seventh.  After the seventh, a ninth, eleventh,
10   thirteenth even.
11           So we're going to be talking about some chords that
12   have 7ths in them.  If I may one more time, if you take the
13   basic C major 7.
14           (Keyboard played)
15           THE WITNESS:  You could also invert it.  Instead of
16   playing it like that, you could put the 7the on the bottom
17   which kind of yields a more interesting sound.
18           (Keyboard played)
19   BY MR. FRANK:
20   Q.  Dr. Stewart, within the context of chords, how would you
21   explain what a triad is?
22   A.  I think we did that just a moment ago, maybe the next
23   slide.  Yes.  So the triad is again, three notes comprised of
24   the root, the third, and the fifth.  So in this example, I've
25   harmonized a major scale.
```

1          What's significant here is that we also use numbers in

2    another way to analyze the music.  And we use Roman numerals to

3    talk about the harmony.  Remember Arabic numerals were for the

4    melodic pitches, the linear or horizontal.

5          For the chords or the vertical sounds, we use Roman

6    numeral to indicate what the root of the chord is.  So the

7    chord built on the first degree of the scale uses the I because

8    it's major.  So upper case Roman numerals indicate major.

9    Lower case Roman numerals indicate minor.

10         So a harmonized major scale begins with a major triad

11   and then a minor triad.  And on 3 -- not in every triad,

12   Notice that the Roman numerals are in lower case because it's

13   minor.

14         And then a 4 chord on the 4th degree of the scale, IV,

15   and V for the chord built on the 5th degree of the scale.

16   We're not going really go beyond that now because the harmonies

17   that we're dealing with in this case are basically the chord

18   built on the first degree of the scale, which would be I, IV,

19   and V.  So let's hear the chords though of the harmonized major

20   scale.  Those are the three principal chords that we're dealing

21   with.

22         (Audio played)

23   BY MR. FRANK:

24   Q.  I think you've indicated, Dr. Stewart, that you've

25   transposed the two songs at issue in this litigation into D

 1   major?

 2   A.  Well, we transposed one of them, the "Let's Get It On,"

 3   from E flat to D.  "Thinking Out Loud" was in D.  So I thought

 4   it would be helpful now to look at the pitches in the key of D.

 5   It's the same idea, 1 through 8.  So here is the scale in the

 6   key of D.

 7           (Audio played)

 8           THE WITNESS:  So the pitches in green are the topic or

 9   the keynotes, 1 and 8.  So 8 is really the same sound as 1.

10   BY MR. FRANK:

11   Q.  Dr. Stewart, could you speak to the distinction in major

12   and minor chords.

13   A.  Yes.  The difference is just in a single pitch.  The third

14   degree of the scale or the third in the chord is a half step

15   lower.  So in the key of D, D major as an F sharp which is the

16   third note of the triad.

17           And D minor has an F natural.  Remember a natural

18   cancels out a sharp or a flat.  We also see two ways of

19   representing the harmony here.  We have a D above the chord,

20   above the triad.

21           It doesn't have anything following it, no dash or

22   anything.  That is understood to be major.  The D with the dash

23   after it indicates that it's minor, D minor.  We also again

24   have the Roman numerals.  The upper case Roman numeral means

25   it's major.  The lower case means it's minor.  Let's listen to

 1   the difference of these triads.

 2          (Audio played)

 3   BY MR. FRANK:

 4   Q.  Dr. Stewart, what happens when you take a familiar song and

 5   turn it into a minor?

 6   A.  It's still recognizable.  It's going to be the same

 7   composition.  So in this particular composition, it's still

 8   minor.  It's still in green.  I think everyone would recognize

 9   what song it is.  It wouldn't be considered that it's a new

10   composition just because it has that one different notes.

11          (Audio played)

12          THE WITNESS:  So maybe instead of a happy birthday,

13   it's a sad birthday.  But you get the point.  It didn't really

14   change it.  It's still recognizable, what the song is.

15   BY MR. FRANK:

16   Q.  Can you explain what this is, Dr. Stewart.

17   A.  Sure.  This is from the musicologist for the defense's

18   preliminary report.  And he gave the basic harmony of the two

19   songs.  And he notes that both songs use a similar but not

20   identical chord progression and the same harmonic rhythm of two

21   chords per bar in which the second and third chords are

22   anticipated.  We're going to look closely at this because it's

23   an important point in the songs.

24          Now, he has an error here -- I think's just probably

25   typographical because in other places, he describes the harmony

1    correctly.  But he has the second chord of "Let's Get It On" as

2    a two minor chord and we know it's a 3 minor chord.  The chord

3    progression, again, is I, uppercase Roman Number, 3, lowercase

4    Roman numeral, 4 uppercase, 5 uppercase.  There is one

5    difference in "Thinking Out Loud" that we're going to also look

6    at closely.  So I'll come back to that in a minute.

7            He says that it's basically the same or similar

8    harmonic progression or chord progression.

9    Q.  What have you done here, Dr. Stewart?

10   A.  Yes.  So this slide illustrates the rhythm in each song.

11   Let's hear it, and then we're going to look at it a little more

12   closely in detail.

13           (Audio played)

14           THE WITNESS:  Now, to me, those sound very, very

15   similar.

16           MS. FARKAS:  Objection, your Honor.

17           THE COURT:  Sustained.

18   BY MR. FRANK:

19   Q.  Go ahead, Dr. Stewart.

20           What was your -- what was your opinion -- go ahead.

21           What were you going to say after that?

22   A.  Well, let's listen one more time.

23           (Audio played)

24   BY MR. FRANK:

25   Q.  Dr. Stewart, would you be able to describe for the Court

1    how those two cord progressions vary, if at all.

2    A.  Yes.  Please go to the next slide.

3            So on this slide, I've circled in green the notes that

4    are different between these two chord progressions.  So you'll

5    see that one note in the second chord of "Let's Get It On" is

6    different.  It's circled.  In "Thinking Out Loud," that note is

7    different.  It's up a half step to D.

8            In "Let's Get It On," there's also an additional note

9    on the fourth chord which is the 7th.  The difference between

10   these two is not really articulated in "Thinking Out Loud"

11   during the first 24 seconds or the first verse of "Thinking Out

12   Loud" because that one pitch on the second chord is not sounded

13   at all.

14           It's only two pitches played on the second chord on

15   the recording, F sharp and A.  So it really kind of defines

16   more clearly F sharp minor.  You could say that essentially the

17   second chord is the same for those first 24 seconds.

18           So even this very, very small difference between the

19   two doesn't exist during that whole opening section of

20   "Thinking Out Loud."

21   Q.  Dr. Stewart, if you would, with respect to the scenario you

22   just spoke to, would you identify and point to the note that

23   you're talking about that doesn't exist in the first 24

24   seconds.

25   A.  Sure.

1    Q.   Maybe in the next slide?

2    A.   Yes.  So this note here, the top note, is not present

3    during that whole opening section.  So it really sounds -- at

4    that point, it really would just as easily be three, lower case

5    Roman numeral, which would make it the same as "Let's Get It

6    On."

7    Q.   Thank you.

8    A.   Let's play -- no.  We don't need to play this again.  I

9    think we've played it several times.

10           Let's go to the next slide.

11   Q.   Can you describe harmonic rhythm.  You've mentioned it

12   earlier in your testimony.

13   A.   So just as melody with a successions of pitches in musical

14   time, chords are also occurring in musical time.  So when we

15   talk about harmonic rhythm, we're talking about rhythm that the

16   chords that are played.  So it's basically the rate of change

17   of the chords, but it's also where they're placed rhythmically.

18   Q.   Could you demonstrate how that plays out with regard to the

19   two songs.

20   A.   Sure.  I think the next slide give -- yes. So one of the

21   things that makes this progression particularly interesting and

22   aesthetically pleasing is the anticipation of the second and

23   fourth chords in both of these songs.

24           They're anticipated, meaning that they're played

25   slightly ahead of the third beat.  They anticipate the third

 1   beat.  When we heard them in the last example, the chords were

 2   squarely on 1 and 3 -- 1, 2, 3, 4; 1, 2, 3, 4.  Now we're going

 3   to hear the second and fourth chords are anticipated.  So it's

 4   1, 2, 3, 4; 1, 2, 3, 4.  Let's listen to it with this

 5   anticipation.

 6            (Audio played)

 7            THE WITNESS:  So I think that really propels the music

 8   forward and gives it a lot of rhythmic interest.  It's a very

 9   significant part of the foundation of both of these songs.

10   BY MR. FRANK:

11   Q.  Have you had occasion to analyze the defendants' analysis

12   as it relates to harmonic rhythm?

13   A.  Yes, I have.

14   Q.  Would that slide depict what the analysis is?

15   A.  Yes.  So the defendants' musicologist provided this

16   analysis that shows the basic harmony in the deposit copy of

17   "Let's Get It On," which is the top line there.  And then he's

18   given five he found in "Thinking Out Loud."  "TOL" stands for

19   "Thinking Out Loud."

20   Q.  Dr. Stewart, if you could go back for a moment.  I think

21   you used the term "deposit copy."

22            Can you explain for the Court again, if you haven't

23   already, what that means and what that is.

24   A.  Sure.  So when a piece is registered for copyright, a copy

25   has to be submitted to the U.S. Copyright Office as part of the

1   registration process.

2   Q.  And you mentioned that one of these that's depicted on the

3   harmonic analysis comes from a deposit copy.

4         Could you clarify one which it is.

5   A.  Yes.  It's "Let's Get It On."  The top one is the deposit

6   copy.

7   Q.  Okay.  Thank you.

8         If you could continue with your response to the

9   analysis.

10  A.  Yes.  So the five variations that Dr. Ferrera provided of

11  "Thinking Out Loud" are underneath his depiction of the basic

12  harmony from the deposit copy of "Let's Get It On."

13        I think the next slide will give us the opportunity to

14  hear these.

15        (Audio played)

16        THE WITNESS:  Could you wait one second.  Go to the

17  next slide, please.  Thanks.

18        So on the right, we have the chords realized in terms

19  of the actual pitches.  As we go down that sheet on the right,

20  we have "Thinking Out Loud" 1, his first variation, "Thinking

21  Out Loud" 2, 3, 4, 5.  And then at the bottom, we have

22  "Thinking Out Loud" again.  That's kind of what he did over

23  here.

24        So we'll go down the list and hear these.  He

25  identifies "TOL" number 4 and number 5 as being the most

1    similar to "LGIO," or "Let's Get It On."

2    BY MR. FRANK:

3    Q.  Do you have audio samples that correlate with this?

4    A.  Yes.  Let's follow this.  On the left, it will be

5    highlighted as each chord progressions is played on the right.

6              (Audio played)

7    A.  So that was "Let's Get It On" again at the end.  So there

8    are a lot of different variations there, which is something

9    that you would expect.  When musicians are playing these chord

10   progressions, they don't play them the same way every time.

11   Generally, a keyboard player would use different variations.

12             MS. FARKAS:  Objection.  To the extent that

13   Dr. Stewart is talking about "Let's Get It On," let's stick to

14   the deposit copy and not what performers might realize with the

15   deposit copy, please.

16             THE WITNESS:  I was not referring to the deposit copy.

17   I was just saying that what was done in "Thinking Out Loud" was

18   a common thing to do in songs.

19             MR. FRANK:  Could you go to the next slide, please.

20             THE WITNESS:  So here is the deposit copy of "Let's

21   Get It On."  The first two pages here are the application with

22   the basic information.  Note that the company was -- two

23   different companies, corporations, listed there:  Stone Diamond

24   Music Corp. in Hollywood, California, and Cherritown Music, in

25   Fosterdale, New York, which I think Mr. Townsend was having

1    medical treatment at the time.  So he used that as his address.

2    Below that, you see his name, Ed Townsend.  The date is down

3    below that.

4         The second page has some of the same information.  So

5    this is just basically to identify the author and the author's

6    location and the date of registration.

7         The next two pages are the actual deposit copy.  This

8    is the music as transcribed, put into music notation, and

9    submitted to the U.S. Copyright Office.  So those are the first

10   two pages.

11        The next slide will give pages 3 and 4.  And then the

12   fifth page is the last page of the actual music.  The sixth

13   page is some notations that I think the U.S. copy right office

14   had made about where it was being put and so forth.

15   BY MR. FRANK:

16   Q.  To be clear, this was one of the materials that you

17   reviewed in connection with the opinions you're proffering

18   today.  Correct?

19   A.  I'm sorry?

20   Q.  This was one of the documents of the materials, the deposit

21   copy, that you reviewed in connection with your analysis?

22   A.  Yes.  I asked for this practically at the inception of my

23   engagement to do this analysis of these two songs.

24   Q.  Do you have samples of the deposit copy?

25   A.  Sorry?

1    Q.  Do you have audio samples of the deposit copy depicted

2    there?

3    A.  Yes.  So what I've done here is taken the deposit copy

4    music notation and put it in Sibelius, which is a music

5    notation software.  With that software, you can also play back.

6    It gives you the example as a MIDI file, which is a musical

7    instrument digital interface.  Basically, it will then sound

8    out the notes that you put into Sibelius.  So that gives us the

9    ability to hear this next phrase.

10          What I've done here -- this is kind of an important

11   point -- is to show that if you take the note values and cut

12   them in half, but you also cut the tempo in half.  There is no

13   change to the way it sounds.  It sounds absolutely identical to

14   what you hear each time.  And I think this slide will

15   illustrate that dramatically.

16          (Audio played)

17          THE WITNESS:  That sounds the same because it was the

18   same example.  Let's play the second one.

19          (Audio played)

20          THE WITNESS:  Could we try that one more time, one

21   followed by two.

22          (Audio played)

23          THE WITNESS:  So you may not remember that the tempo

24   is indicated by the BPM or beats per minute.  So in the upper

25   left corner of each of those examples, you have a quarter note

1   equal to 164.  If you take that tempo and cut it in half to 82,

2   the tempo is half as fast.  If you do the same thing with the

3   rhythms, it sounds exactly the same.

4   Q.  You've had occasion to review professional reports that

5   were proffered by the defendants in this case, were you not?

6   A.  Yes.

7   Q.  Was an opinion or a position espoused as it relates to

8   harmonic rhythm by the defendants?

9   A.  Well, the defendants' musicologist has put a lot of weight

10  on the fact that these were notated differently.  So in the

11  deposit copy, he's made a big deal that it's four measures

12  long, in his reports, in the deposit copy but only two measures

13  long in "Thinking Out Loud."

14         But I think the slide we just saw dramatically

15  illustrates that there is no difference in the sound.  In fact,

16  he even acknowledges here in the last part of his statement

17  from his report:  "Only if one cuts in half the value of the

18  notes in the chords of "LGIO" is the harmonic rhythm between

19  these chord progressions the same."

20         Well, in other words, it's just a notational kind of

21  contrivance.  It's not any difference in the actual musical

22  sound.  So I think he's trying to manufacture a difference here

23  that doesn't really exist in terms of the music.

24         MS. FARKAS:  I would just note an objection that I

25  don't think there is any dispute that the deposit copy does not

 1   contain a tempo.  So Dr. Stewart's opining on what the deposit

 2   copy sounds like with him just choosing tempos that he wishes

 3   to choose is not a reflection of what is actually in the

 4   deposit copy.

 5           MR. FRANK:  Thank you.  We'll move on.

 6   Q.  Dr. Stewart, could we move to the next.

 7           THE COURT:  You can bring that out on cross.

 8           MR. FRANK:  Thank you, your Honor.

 9   Q.  Dr. Stuart, you provided -- can you identify first what's

10   embodied in this slide.

11   A.  Sure.  So just carrying on with what we were just talking

12   about, Dr. Ferrera seems to imply that there are six chords in

13   "Let's Get It On" because he says -- If we could go back one

14   slide.  Yes.  So he says here:  "There are two chords in bar 1;

15   1 chord in bar 2; 2 chords in bar 3; and one chord in bar 4."

16           So that's kind of implying, or more than that even,

17   that there are actually six chords.

18   Q.  How many chords are there in "Let's Get It On"?

19   A.  There are four.  We'll go back to the deposit copy and see

20   that clearly in a moment.  So we'll look at the deposit copy in

21   just a second.

22           When the four chords in "Let's Get It On" are notated

23   as a two-measure progression, as they are in both of our

24   transcriptions, the chords fall in between the second and third

25   beats exactly the same way in both songs.

1              The internal relationships of the chords remains the

2    same.  The rhythm and duration of the chords remains the same,

3    even when we do this procedure of cutting the tempo in half and

4    cutting the values in half.

5              It's really like the same thing as putting the two

6    songs in the same key for comparison.  We would do the same

7    procedure with the rhythms, if we're going to compare them.

8    That's exactly what he did, as well as I, in most of his

9    analysis.

10             Let's go to the next slide.

11             So we go back to the deposit copy here.  I circle -- I

12   put in green the first four chords of "Let's Get It On" in the

13   key of E flat.  It's E flat, G minor, A flat, B flat.  And then

14   just to distinguish them, the next four chords, in blue:  E

15   flat, G minor, A flat, B flat 7.  Then they have four chords

16   again and so on.

17             So I think it's very clear that there are just four

18   chords.  And the way they're placed here in the measures --

19   remember the measures are delineating the time.  It's clear

20   that the second chord is anticipated because it comes earlier.

21             It's not after the bar line.  The same with the fourth

22   chord.  So we have the same harmonic rhythm, four chords with

23   the second and fourth chords being anticipated.  The basic

24   analysis, once again, is:  I iii IV and V with a 7th added.

25   That's all indicated precisely in this deposit copy.

1              We could I think go to the next slide.

2              MR. FRANK:  If you would, Dr. Stewart, for the purpose

3    of the Court's edification, could you just kind of explain the

4    methodology about how you created these particular graphs.

5              THE WITNESS:  So this represents graphically the

6    harmonic rhythm and makes it kind of easier for anyone who

7    doesn't read music.  And, again, it's really illustrating the

8    point I was talking about with the tempo doubled and the note

9    values doubled.  It's still the same thing.

10             So if we count at the slower tempo, 1, 2, 3, 4, and at

11   the double tempo, 1, 2, 3, 4.  And if I clap the harmonic

12   rhythm in each case, it doesn't change what I'm clapping.  So

13   1, 2, 3, 4, 1, 2, 3, 4, 1, 2, 3, 4, 1, 2, 3, 4, 1, 2, 3, 4.  So

14   nothing is changed.  It's just purely a notational kind of

15   contrivance.  And the music could be notated in different ways,

16   and it would still sound the same.

17   Q.  Dr. Stewart, could you explain the term musical

18   "architecture."

19             What is that?

20   A.  There was one other little detail in that slide.

21   Q.  Please go back.

22   A.  The reason there are two here is because notice that the

23   second chord I put F sharp minor, the same in both songs,

24   because, as I mentioned before, that one additional note that

25   you hear in the basic chord progressions of "Thinking Out Loud"

1   is not heard during that whole first part of the verse, which

2   actually we're going to be calling verse 1A.  So if we go to

3   the musical structure, we can talk about that.

4   Q.  Before you go to the musical structure, could we go back to

5   the slide.

6           Could you point out for the Court that additional

7   note.

8           Do you have a pointer available to you?

9   A.  This is not music notation.  Here you see that there is a D

10  major chord with F sharp in the bass.

11  Q.  And that appears when in the "Thinking Out Loud"?

12  A.  It happens in much of the song but not at the beginning;

13  and here that note, that additional note, D, is not present.

14  Q.  Thank you.

15  A.  It's a small detail, but it changes the harmonic analysis

16  and makes them really the same for that whole opening section.

17  Q.  So I think you were speaking to what musical architecture

18  is.

19  A.  Yes.  So most musical compositions are built from sections

20  that repeat.  Repetition is a very powerful tool in music.

21  Very few pieces, especially in popular music, would be what we

22  call through composed, meaning that the music is constantly

23  changing.  In fact, that would be kind of difficult for most

24  listeners to comprehend, if it was always changing.  So

25  repeating sections is the standard way that music is

1    structured.

2           An example would be the very simple, common structure

3    of verse, chorus, verse, chorus, verse, chorus.  It's also

4    called strophic.  So an example would be like the "Battle Hymn

5    of the Republic", "mine eyes have seen the glory of the coming

6    of the Lord."  That's the first verse.  And then "glory, glory

7    hallelujah" is the chorus that everybody knows or the refrain.

8    The next verse is "I've seen him in the watch fires of a

9    hundred circling camps," and I don't remember the rest of it.

10          Most of the people -- people would be most familiar

11   with the refrain or the chorus.  That's the part usually where

12   everybody joins in.  The verse might be a solo singer.  The

13   verse kind of advances a narrative because the lyrics change

14   each time while the melody stays the same in the verse.  But in

15   the chorus, we return to the same lyrics each time and melody.

16   So this is generally the kind of most memorable part of the

17   song.

18          In the popular music industry, it's also called the

19   hook.  It's considered the most valuable part of the song

20   because it's the most memorable.  It's kind of gospel in the

21   popular music industry that a song has to have at least one

22   very memorable hook.

23          Very often the title of the song is also directly

24   referenced during the chorus.  So it kind of connects to the

25   overall theme of the piece of music.

1    Q.  Dr. Stewart, you've identified verse and chorus, which I

2    think is fairly evident.  But you've identified some other

3    components of the musical architecture:  Pre-choruses, bridges,

4    interludes, and outros.

5           What are those?

6    A.  Yes.  So popular music and other forms, genres as well,

7    often have other sections besides just the verse and the chorus

8    of the strophic form.  And common sections are intros,

9    introductions.

10          The pre-choruses, which would typically come between

11   the verse and the chorus; bridges, which often just happen

12   once, maybe twice.  But they kind of take the music in a

13   different direction for a minute before going back.

14          Interludes, which are sections where maybe the vocal

15   drops out and there's an instrumental part.  And then outros,

16   which would be the ending.  So those are the common kind of

17   structural forms that you find in popular music, especially

18   today.

19   Q.  As it relates to bridges, to your knowledge, Dr. Stewart,

20   do they serve a particular function within the context of the

21   musical architecture?

22   A.  Well, they take the music to a different place.  Yeah.

23          MR. FRANK:  Okay.  If we could proceed to the next

24   slide.

25          THE WITNESS:  No.

1          MR. FRANK:  You're not done yet.  I apologize.

2          THE WITNESS:  I thought you would ask me.

3          The next slide will provide a roadmap, if you will, of

4     the form or structure of each song according to the defendants'

5     musicologist -- and I don't have any problem with accepting his

6     analysis of the form.

7          I think it's easier to just use that.  Different

8     analysts may call different sections by slightly different

9     names sometimes because this is an analytical decision, what to

10    call something.  Sometimes they might choose something a little

11    different from one another.  But I'm fine with his roadmap.  So

12    if we, in a moment, turn to the next slide, we can look at

13    these, the form or structure of each of these songs.  And --

14  Q.  Dr. Stewart, I apologize.  I'm going to jump back on you

15    for one moment.

16         The last line, it seems to me you're suggesting your

17    opinion is that the common elements between the two songs at

18    issue in this litigation are contained in the verses of the

19    songs, the choruses, and the interlude?

20  A.  That's correct.  So it's important to understand these

21    structures as we proceed because where we're going to hear the

22    most similarities, according to my analysis, are in the verses

23    of "Thinking Out Loud," the choruses of "Thinking Out Loud,"

24    and the interlude.

25  Q.  Would you like to proceed to the next slide, Doctor.

1    A.  So here is the analysis of form from the defendants'

2    musicologist.  And you'll see that he has for "Let's Get It On"

3    a verse 1 which lasts 16 measures of bars; chorus 1; verse 2;

4    verse 3; bridge 1; verse 4; chorus 2; bridge 2, and then outro.

5            I've add the times on the left side to coincide with

6    also a computer-generated recording of the deposit copy that

7    the defense generated.  so those times conform to this

8    computer-generated or AI-generated recording of the deposit

9    copy.

10           And then on the right is the form of "Thinking Out

11   Loud."  Notice that there is a verse 1A and 1B, a pre-chorus 1,

12   a chorus 1, verse 2A and 2B, pre-chorus 2, chorus 2, interlude

13   that also contains a guitar solo, and then, finally, chorus 3.

14   Those are all his analysis and his timings.

15   Q.  To be clear, Dr. Stewart, when you say "AI generated," can

16   you describe what that is.

17   A.  Like I said, that refers to artificial intelligence.  I'm

18   not really familiar with what software they used to produce

19   this because it's something different than I've ever heard

20   before.  We'll hear it in a moment.

21   Q.  You've brought or you have the defendants' audio file as

22   part of your presentation?

23   A.  Yes.  The next slide will take us through the form using

24   their audio file that they produced, and it will -- as each

25   section of the piece goes by or begins, it gives a timing and

1    the name of what that is in the form.

2          In other words, you'll hear verse 1.  It will say 0

3    seconds; 24 seconds, chorus 1, and forth as we go through the

4    form.  So it's important to we get a handle on these different

5    sections of each song, and this will help us to I think begin

6    to do that.

7    Q.  So what we're about to hear is the AI-generated version of

8    "Let's Get It On"?

9    A.  Yes.  I'm not sure if that's the accurate way to describe

10   this, because I'm not really sure how this was done, but it was

11   computer-generated somehow.  It was not human beings in a live

12   performance.

13         MR. FRANK:  I understand.  Could we hear that audio

14   recording.

15         (Audio played)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MR. FRANK:

2    Q.  Dr. Stewart, did that sound particularly soulful to you?

3           MS. FARKAS:  Objection.

4           MR. FRANK:  I'll withdraw the question.

5    Q.  Dr. Stewart, did you have occasion to put the depict -- or

6    create a depiction of the chords created by the defendants in

7    making that AI-generated audio file?

8           MS. FARKAS:  Objection, mischaracterizes the evidence.

9    Q.  Could you explain --

10          I'm sorry, go ahead.

11   A.  Well, the thing that bothered --

12   Q.  Could you explain what you have done with respect to slide

13   45?

14   A.  Yes.  So here is the harmony or the realization of the

15   Deposit Copy in the key of D -- what we just heard was in E

16   flat -- that the chords that were used in that -- first, I

17   should point out that, like in *Thinking Out Loud*, both songs

18   use the same chords for the chorus and for the verse.  So you

19   here these progressions over and over in both songs throughout

20   that entire rendition of the Deposit Copy.  You heard the

21   chords in root position, meaning that the root of the chord was

22   on the bottom on each chord.

23          And this is something that really kind of bugs me as a

24   musician because it just does not sound very pleasing,

25   especially after four minutes of hearing this.  What's

1  particularly jarring is this movement from the third chord to

2  the fourth chord, so...

3          (Keyboard played)

4          So it moves from this chord, and there is this big

5  kind of -- there is a jump from the fourth chord.

6          (Keyboard played)

7          That is not smooth.  Most musicians when they play a

8  chord progression would attempt to have smoother voice leading,

9  and I'm not sure why in this example we just heard that choice

10  was made.  But it's really degrading to me as a musician to

11  hear it played that way, with that jump.

12          (Keyboard played)

13          When it could have been more easily played as...

14          (Keyboard played)

15          So let's listen to these two examples.  And I'm not

16  going to speculate as to why it was done that way.  Either

17  maybe a musician didn't create or program the software to

18  create that, but...

19          MS. FARKAS:  Couple of objections here.

20          First of all, this witness should not be speculating.

21          Second of all, not to mention that his speculation on

22  this fourth chord, which contradicts his prior testimony in his

23  own slide 17.  He's the one who transcribed in A7 the exact way

24  it is being played.  And if is he going to complain about it

25  now, I guess I'll deal with it on cross.

 1               MR. FRANK:  Are you withdrawing your objection?

 2               MS. FARKAS:  No.

 3   BY MR. FRANK:

 4   Q.  Dr. Stewart, if you can proceed.

 5   A.  Well, what I'm saying is that is what's on the recording we

 6   just heard, those are the chords and the way they were

 7   expressed -- let's listen to it.

 8               To me, what I have transcribed here sounds exactly

 9   like what we just heard for practically four minutes straight.

10               Example one, please.

11               (Audio played)

12               Like I say -- wait, not yet.  So this next example is

13   how it should be played with smoother voice leading, and it's

14   all the same pitches, not one different pitch.  But they are

15   ordered differently in a way that creates better voice leading,

16   creates a smoother transition from chord to chord.

17               MS. FARKAS:  I'm sorry.

18   A.  So every note here --

19               MR. FRANK:  Let her object.  She had an objection.

20               MS. FARKAS:  So I'm going to object to any other

21   variations from the Deposit Copy and the witness's speculation

22   as to how it might otherwise have been played.  We have the

23   Deposit Copy in front of us, and that's the only work that is

24   at issue.

25               MR. FRANK:  We'll move on.

1              THE COURT:  Overruled.

2              MR. FRANK:  I'm sorry.  I apologize, your Honor.

3    Q.  Then proceed, Dr. Stewart.

4              What was your point?

5    A.  I was just going to say that the person who programmed the

6    computer to play that version we just heard made choices about

7    how to express these chords, and I don't think it was done in a

8    way that any competent musician would do it.

9              If we listen to the next example, it shows the way

10   that a competent musician would express this.  Again, there is

11   not one note here that is not in the Deposit Copy.  It's

12   exactly conformed --

13             MS. FARKAS:  Your Honor.

14   A.  -- conforms to the Deposit Copy.

15             MS. FARKAS:  He is opining as to how musicians might

16   perform the Deposit Copy.  That is irrelevant and not at issue

17   in this case.

18             What is at issue in this case is what is expressed in

19   the Deposit Copy, not how some or many different performers

20   might perform it in different ways.

21             MR. FRANK:  Respectfully what Dr. Stewart is

22   responding to are the choices that were made in utilizing the

23   AI program.  This isn't about personal choices of musicians and

24   live performances.  He is responding that specific things were

25   done with the AI recording for the defendants that make it more

1   dissonant and less appealing to the ear, shall we say.

2            They conform -- his proposed samples conform with the

3   Deposit Copy.  He is just saying that he has concerns about

4   what was -- what the AI depicts.

5            MS. FARKAS:  It lacks any foundation.  This witness

6   has no idea what choices were made when this audio file was

7   created.  It's created based on how it is depicted in the

8   Deposit Copy.  If he has a problem with that and wants to

9   change the Deposit Copy, I think that raises a bigger issue.

10           MR. FRANK:  The transcription is there is a

11   foundation, there's a transcription and an audio recording that

12   depicts the choices that were made creating the AI file.

13           MS. FARKAS:  And you stipulated to it.  They

14   stipulated to this exhibit.  They stipulated to how it was, how

15   it sounded.

16           MR. FRANK:  We did.

17           MS. FARKAS:  Yes, you did.

18           MR. FRANK:  That's why we are addressing it within the

19   context of this slide.

20           THE COURT:  Any objection is overruled.

21   BY MR. FRANK:

22   Q.  Dr. Stewart, what were you saying?

23   A.  Well, I think we should just hear these.

24           So let's hear the first one again and then the second.

25           (Audio played)

1   Q.  Are you ready to proceed to the next slide?

2   A.  Yes.

3   Q.  Presumably this is the audio file for the commercial

4   recording of *Thinking Out Loud*?

5   A.  Yes, it is.  And like what we just heard with the *Let's Get*

6   *It On*, this will give captions that give the timing of each

7   section, as well as the name that Dr. Ferrara has assigned to

8   each of these sections.  First 1A, 1B, pre-chorus, chorus, etc.

9   Q.  Would you like for the file to be played now?

10  A.  Please.

11          (Audio played)

12          This is 1B.

13          2B.

14  Q.  Dr. Stewart, before you go forward, I believe you testified

15  earlier as to the musical phenomenon of a hook.

16          Do you recall that?

17  A.  Of a what?

18  Q.  A hook.

19  A.  Yeah.

20  Q.  Can you identify the musical hook in the song?

21          You just heard where it is.

22  A.  The chorus.

23  Q.  The chorus.  Thank you.

24          Attendant to your analysis, Dr. Stewart, did you have

25  occasion to come to the opinion about a lot of similarities

1  between the two songs?

2  A.   Yes, I have.  I have identified three principal melodic

3  similarities, and one is in the verse of *Thinking Out Loud*, one

4  is in the chorus of *Thinking Out Loud*, and the third is in the

5  interlude.

6       So we will begin with the verse.  The opening phrase

7  of *Let's Get It On*, "I've been really trying baby," "When your

8  legs don't work like they used to before," and then the

9  following three phrases after that.

10      Let's listen to the recording on the right.

11      (Audio played)

12      And the one below.

13      (Audio played)

14      OK.  And the transcription there gives the pitches and

15  note that, since this is during verse 1A, the chords are really

16  identical as well.  So this melody is happening over the same

17  chords, the same harmonic rhythm.  Phrasing is very similar,

18  the placement of the phrases begins after the second beat in

19  both of them.

20      And if we could go to the next slide.

21      MS. FARKAS:  So I just want to point out for the

22  record, we received a new set of these slides last night around

23  midnight, and I would just ask the witness that to the extent

24  that any of these melody transcriptions or analyses, slides

25  have been altered since the ones that we received before

 1   midnight last night, I would ask that you point out what has

 2   been changed.

 3          THE WITNESS:  Sure.

 4          Do you want me to address that on the last slide?

 5          MS. FARKAS:  My understanding, my guess is that

 6   nothing has changed on this, the last slide, which is why I

 7   didn't stand up then.

 8          But I don't know what's going on from this point

 9   forward.  If something changed, yes.  Please do.

10   A.  Well, on this slide, it's exactly the same.  Nothing has

11   changed.

12          What I've done here is, you know, visually they look a

13   little different at times, and there is this flurry of notes at

14   the end, near the end of the phrase here, all on the syllable

15   try.  So that is stretched out for all of the different notes

16   in the Deposit Copy.

17          My point here is that that's a vowel sound I, and so

18   it's not clearly articulated like if it were a consonant that

19   was changing on each one of these pitches.  And we have some --

20   at the end here, we have three very -- four very rapid notes.

21   This first note here is 30-second note.  And at this tempo,

22   that is about 7.5 hundredths of a second, each of those notes.

23   The next notes after that are about 1,500ths, hundredths of a

24   second on each of the notes.

25          So if you imagine a singer trying to articulate

1  distinct notes that are that short of duration, and they are

2  not being articulated with any kind of change of consonant or

3  anything, it's really going to be inaudible.  Try singing try.

4  I mean, to articulate the same note --

5          Oops, I didn't mean to go forward.

6          Could you go back, please?

7          So these are three notes in a row, Es, on that same

8  vowel sound happening at that incredibly rapid pace.  I submit

9  that I can't really hear them in any of these versions.

10         So let's begin with the Deposit Copy recording that

11  the defendants produced up in the upper right that is their

12  recording.  And see, I'll point at those pitches, those notes,

13  when we get there.  But I can't hear them, and so they are

14  there visually.

15         But, well, let's listen.

16         (Audio played)

17         And then if we could hear my --

18         MS. FARKAS:  I have an objection to this, your Honor.

19  Your Honor has already ruled that omissions or additions or

20  errors in transcriptions that are not faithful to what is

21  actually in the Deposit Copy are inadmissible.

22         We can also cite to several decisions one from the

23  Second Circuit and another from other courts across the country

24  that have found that manipulations to the actual copyrighted

25  work are not admissible.  So, you know, it's one thing to put

1    in transcriptions that manipulate and omit notes and pitches

2    and change what is actually expressed in the Deposit Copy,

3    which your Honor has already found is inadmissible.

4           And it also makes it even worse to then play

5    audio-recorded performances for the jury that reflect those

6    alterations.  We should be sticking to what is in the Deposit

7    Copy.

8           MR. FRANK:  Respectfully, I think that this does --

9           MS. FARKAS:  Can you let the judge ...

10          MS. RICE:  He gets to respond.

11          MR. FRANK:  Respectfully, I believe that this does

12   conform with the Deposit Copy.  I think the simple point that

13   Dr. Stewart was trying to make was that these notes are not

14   perceivable, and he is suggesting that because they are being

15   sung in a string in the nature of the syllable being sung, they

16   are not distinguishable from the rest of the musical notation.

17   He hasn't changed anything or altered the Deposit Copy.  It

18   conforms with what is in the Deposit Copy.

19          MS. FARKAS:  There is only one Deposit Copy and, of

20   course, he has changed it.  He has deleted two notes from the

21   bottom one.  He has moved lyrics over.  He has changed rhythmic

22   durations.  This is a manipulation of the Deposit Copy.  The

23   top one is the Deposit Copy.

24          Why are we talking about anything else?  What

25   Dr. Stewart perceives is irrelevant.

1              MR. FRANK:  Dr. Stewart has disclosed that the top is

2      the Deposit Copy.  He is trying to explain the concept of

3      imperceivable notes in the interplay, the different notes which

4      notes are more important than others based on their similarity

5      and closeness in time as they are expressed.

6              THE COURT:  I think the best thing to do is have

7      lunch.

8              We'll resume at 2:15.  We can carry on with this.

9      You've heard the flavor of the argument.  That's all you need.

10             MR. FRANK:  Thank you, your Honor.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Jury not present)

 2             THE COURT:  What I would like from the defendant, in

 3   support of the objection, is a short written statement of the

 4   changes that you perceive being made from the Deposit Copy.

 5   That's point one.  And the significance of the changes of each

 6   change, that's point two.

 7             Try to get them to my chambers by 1:30 so that

 8   Mr. Frank can respond to each of them by 2:00.

 9             MR. FRANK:  Thank you, your Honor.

10             THE COURT:  I assume that's workable.  It's a narrow

11   point.

12             MR. FRANK:  Very workable, your Honor.

13             THE COURT:  And that will allow me presumably to rule

14   by 2:15.

15             MR. FRANK:  Thank you, your Honor.

16             MS. FARKAS:  Yes, your Honor.

17                  (Luncheon recess)

18

19

20

21

22

23

24

25
```

1                              AFTERNOON SESSION

2                                  2:15 p.m.

3            (Jury not present)

4            THE COURT:  I was told I was hard to hear in the back

5    of the room.  I just started to do this and forgot all about

6    it.  But this is working well?

7            OK.  Thank you.  My apologies.  The upshot --

8            Excuse me, Mr. Frank.  I don't mean to interrupt.

9            The upshot is that Exhibits 49,50 -- I'm sorry.  49 is

10   not excluded.

11           Exhibits 48, 50, and 51 are excluded.

12           MR. FRANK:  Yes, your Honor.  Thank you.

13           Your Honor, I'm told we're working on an IT glitch

14   right now.

15           THE COURT:  I understand.

16           MR. FRANK:  Thank you.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  That matter has been taken care of.  Now

3    we're trying to take care of the electronic system.

4              (Pause)

5              If Dr. Stewart is still around, he should take the

6    stand.

7              MR. FRANK:  Dr. Stewart.  We're still waiting.

8              THE COURT:  It's fixed.

9              THE DEPUTY CLERK:  They are fixing something else.

10             THE COURT:  Something else.  Are you getting a picture

11   on your screens?  No.  It's black.

12             Do we need it, or can we proceed with the testimony?

13             MR. FRANK:  I think, your Honor, we probably need the

14   visual aids because they depict the Deposit Copy and the

15   analysis Dr. Stewart has done as well as the audio samples.

16             THE JURY:  We can see now.

17             MS. PASSEY:  Counsel's table just aren't working.  I

18   guess we can move forward.

19             MR. FRANK:  Some of the screens look like they are

20   intermittently working.

21             MS. PASSEY:  That's different.  That's not the

22   court's, that's mine.  That is why that is working.

23             MR. FRANK:  Kim, if you could start us off at slide

24   49.

25             May it please the court.  May we proceed, your Honor?

 1    May we proceed, your Honor?

 2            THE COURT:  Are you asking are we in session now?

 3            MR. FRANK:  Yes, your Honor.

 4            THE COURT:  Yes, we are.  We're awaiting your next

 5    question.

 6            MR. FRANK:  Thank you very much, your Honor.

 7    BY MR. FRANK:

 8    Q.  Dr. Stewart, with respect to slide No. 49, could you

 9    identify what you've done here and your analysis.

10    A.  Yes.  I've put up the pitch sequences, you remember, back

11    when we were talking about those while back.  They indicate

12    the pitch order in each of these examples, and this is the

13    opening phrase of *Let's Get It On*, as well as the first phrase

14    of *Thinking Out Loud*, verse 1A.

15            The pitch sequences are there on the bottom and the

16    notes in red are the same.  They coincide with notes in

17    *Thinking Out Loud*.  This also gives us an indication of the

18    melodic contour.  Basically *Let's Get It On* goes up and down,

19    up down, up down, up.

20            The contour in *Thinking Out Loud* is very similar.

21    It's up down up down up, so it has one fewer up down.

22    Q.  Do you have audio samples for all these samples for these

23    particular sequences?

24    A.  Yes, I believe so.  If you want to play the first one.

25            (Audio played)

1              And the second.

2              (Audio played)

3         So the phrases begin on practically the same place in

4    the measure after the second beat.  You can see that the

5    pitches in red are the same.  Not all the pitches are the same,

6    and their main difference is that *Thinking Out Loud* goes up to

7    six, whereas *Let's Get It On* has two instances of four.

8              Those instances of four are what are called passing

9    tones, a way of getting from three to five, and then the six,

10   which is the note above five is in music theory called a

11   neighbor tone.

12             So the basic gesture is 3532231 with the difference in

13   the passing tones between three and four -- I mean, between

14   three and five -- and the neighbor tone between the two

15   instances of five.

16             Remember that these are happening over the same

17   harmonic progression, the same chords.  So the context is

18   exactly the same with the harmonic rhythm and the chords during

19   this early 24 seconds of *Thinking Out Loud* are virtually

20   identical because that one note that was different in the

21   chords is not present.

22   Q.  And for purposes of clarification, Dr. Stewart, with

23   respect to the numerals at the bottom of the slide, you have a

24   two two in parentheses.  What is that intended to depict?

25   A.  That is indicating that those are the slurs that I was

1  talking about before on the vowel sound.  The notes are not

2  articulated with any kind of clarity, especially, I mean, they

3  are incredibly brief.  The 30-second note is about 7.5

4  hundredths of a second at this tempo.  And the 16th notes are

5  about 1.5 hundredth of a second.

6       But most importantly, they are just on a vowel sound

7  so there is no way to really hear.  There's much more than kind

8  of a bravado in the voice.

9  Q.  Do you have any other additional analysis attached to this

10 particular slide?

11 A.  No.

12 Q.  Could we skip to, I believe, slide 62.

13      Could you explain for us what a blue note or a toneme

14 is, Dr. Stewart?

15 A.  Yes.  Both songs employ an occasional blue third.  This is

16 the third degree of the scale.

17      And I already talked about the major and minor chords

18 and how the third is determinative of a major or minor.  But in

19 African-American music, an important characteristic of much of

20 it is the blue third.  This can be the third degree of the

21 scale, which can be major or minor or anywhere in between, and

22 music theorists regard it as still the same toneme or the same

23 pitch.  The corollary would be, in linguistics, a phoneme is a

24 sound that changes the meaning of a word.  And so it is

25 considered that the blue third is still a third no matter how

1    it is articulated within that spectrum of major to minor.  It's

2    not changing it from being a third.

3            Now, in this instance in this song, there is no

4    suggestion of either song being in a minor key.  They are in a

5    major key.  So this third is entirely -- it's not anything that

6    changes the composition to express it either as a blue third or

7    a major third or a minor third.  That would remain the same

8    composition regardless.

9    Q.  Do you have --

10   A.  I'm sorry.

11           THE COURT:  Can a single note be either major or

12   minor, or does it require being part of a chord to be major or

13   a minor?

14           THE WITNESS:  It does not require being part of a

15   chord.

16           THE COURT:  Excuse me?

17           THE WITNESS:  It does not require being part of a

18   chord.  In this instance when we're talking about the blue

19   third, it's the third degree of the scale using the Arabic

20   numbers.

21           THE COURT:  And it is a single note?

22           THE WITNESS:  Yes.

23           THE COURT:  One pitch.

24           THE WITNESS:  One pitch.

25           But no matter how the tuning is, it's still considered

1    the third degree of the scale.

2              THE COURT:  Well, I know you made that point, which is

3    not part of my question.

4              THE WITNESS:  I'm sorry.

5              THE COURT:  Your answer is a single note can be major

6    or minor?

7              THE WITNESS:  No.  I'm only talking about the third

8    note of the scale, so that's the only one that can be either

9    major or minor or somewhere in between.

10             THE COURT:  Putting it the other way, the third note

11   of the scale can be either major or minor?

12             THE WITNESS:  Yes.

13             THE COURT:  Even though another single note that large

14   cannot be?

15             THE WITNESS:  Well, if you change one of the other,

16   like the sixth, for example, if you make that a flat six, that

17   would be considered not the same toneme.  That would need to be

18   indicated as a flat six.

19             So it's really the third and sometimes the seventh,

20   and this has to do with blues and African-American music more

21   generally, that because these pitches had this quality really

22   going back historically, you know, over 100 years in the blues

23   and other African-American idioms.  The scholars realized that

24   it was really still always a third.

25             However, if you change one of the other pitches, like

 1    the fifth, and raised it, or the fourth and raised it, you

 2    would have to note that analytically as a sharp four or a sharp

 3    five or a two.  If you lowered it, it would be a flat two.  So

 4    that would require indicating it as a distinct pitch, distinct

 5    toneme.

 6            THE COURT:  Is that particularly true of a stringed

 7    instrument, or is it equally true of a piano?

 8            THE WITNESS:  Well, a piano can't really play notes in

 9    between a major and minor third.  So a stringed instrument

10    could play any variation of the pitch, absolutely.

11            THE COURT:  Thank you.

12            MR. FRANK:  Thank you, your Honor.

13    BY MR. FRANK:

14    Q.  Dr. Stewart, could you speak to the concept of the blue

15    note or the toneme within the context of the melodic

16    similarities of the opening melodies?

17            Could we go to the next slide.

18            MS. PASSEY:  Audio is out.

19            MR. FRANK:  Audio is out again?

20            MS. PASSEY:  No.

21    Q.  There we go.

22    A.  So, yes, in both songs, they begin on the major third, and

23    Marvin Gaye's vocal as it descends goes into the blue third.

24    You can see the natural sign in front of the note.

25            And what I've done here is show how if you made the

1  *Thinking Out Loud* vocal without changing the toneme, it is

2  still three.  But you lower it so it is more bluesy sounding,

3  you have this similarity that is quite apparent, that you've

4  made *Thinking Out Loud* a little grittier, a little more bluesy

5  sounding.

6        So we can just compare it by listening to each of

7  these examples.

8  Q.  If you can play the audio.

9        THE COURT:  I would prefer that you not refer to

10  Marvin Gaye vocal, if I understand what you mean by that

11  reference.

12        THE WITNESS:  Sorry.  Yeah, I understand.

13        THE COURT:  I don't want any more of it.

14        THE WITNESS:  Yes, sir.

15        (Audio played)

16  A.  So the difference is subtle, but it's made it a little

17  bluesier sounding.

18        MS. FARKAS:  I just want to note an objection to the

19  record that that is not *Thinking Out Loud*.

20  BY MS. FARKAS:

21  Q.  Dr. Stewart, what is your analysis with regard to the

22  melodic similarities of the opening melody?

23  A.  Well, the pitch sequence would remain the same by changing

24  this toneme.  I mean by changing this pitch, it is still

25  considered three.  So you've not changed the toneme and the

1    analysis of the pitch sequence would not change by making this

2    note a blue note.

3          So this next slide is just showing, comparing the

4    Deposit Copy of *Let's Get It On*, that first phrase, with the

5    entire verse 1A with the blue third.

6          MS. FARKAS:  Before you play the audio, I'm going to

7    just reiterate my objection that they are playing audio that

8    does not accurately represent the two works at issue by his own

9    admission.

10          I would prefer that we stick to the actual works that

11    are at issue.

12          MR. FRANK:  In the same way that Dr. Stewart utilized

13    the transposition into the same key, he is illustrating the

14    modalities he used to engage in this particular analysis.

15          MS. FARKAS:  If my adversary is suggesting that

16    transposing into the same key is the same as changing the notes

17    of a melody, then we might have a bigger problem here, but I'll

18    keep it simple.  That is not the melody of *Thinking Out Loud* by

19    Dr. Stewart's own testimony.

20          MR. FRANK:  Dr. Stewart is not suggesting that the

21    notes have been changed.  He's suggesting that they are being

22    utilized as a blue third, which is the same note.  That is the

23    point, that they are the same note.

24          MS. FARKAS:  Well, I believe that if I asked

25    Dr. Stewart if there is a blue note in that portion of *Thinking*

1   *Out Loud*, and I would assume he would say there is not.

2          THE COURT:  Why don't you ask him.

3          MS. FARKAS:  Dr. Stewart, in *Thinking Out Loud* as it

4   actually exists, is there a blue third over the lyric work?

5          THE WITNESS:  Yes.

6          MS. FARKAS:  I'm not talking about in this document.

7   I'm talking in the published sheet music and commercially

8   released version of *Thinking Out Loud*.

9          THE WITNESS:  Well, there is in my transcription

10  consistently all along from 2015.  If we went back to several

11  slides, you would see that there is a blue third both over the

12  work.  Do you see the little grace note?

13         MS. FARKAS:  I'm not talking about the grace note.

14  I'm talking about the actual note that appears in the published

15  sheet music for *Thinking Out Loud*.

16         THE WITNESS:  Well, neither your musicologist nor I

17  rely exclusively on the sheet music because that doesn't always

18  represent what's on the recording.  So we both transcribe what

19  we heard on the recording.

20         MS. FARKAS:  Well, let's focus on --

21         THE WITNESS:  There is also a blue third further down

22  over the word smile.

23         MS. FARKAS:  Let's focus on you because you're sitting

24  here and you're testifying.  We will hear from Dr. Ferrara and

25  Dr. Ferrara -- we'll leave it at that.

1           I'm asking with your transcriptions and compared to

2    the published sheet music.  If we look at the grace note there

3    and the blue notes you have put before the jury, is there a

4    blue note in the published sheet music of *Thinking Out Loud*?

5           THE WITNESS:  I don't recall.

6           MS. FARKAS:  Would you like me to show you?

7           THE WITNESS:  Um, the point is whether there is or

8    there isn't, the sheet music for published sheet music for

9    songs is notoriously not representative of every detail of the

10   recording.

11          MS. FARKAS:  So it's not --

12          THE WITNESS:  For my entire career, I have not relied

13   just on the sheet music.  If I'm learning a cover version of a

14   song, I listen to it and copy what's on the recording.

15   Sometimes the sheet music is accurate and sometimes it's way

16   off.

17          MS. FARKAS:  OK.  So I think that's a no, it's not in

18   the published sheet music; that's your testimony?

19          THE WITNESS:  I don't recall.  I relied on the

20   recording as the rep -- as embodiment of the composition as do

21   all of us.  That's what was released as *Thinking Out Loud*.  It

22   wasn't the sheet music that was copyrighted.  It was the song,

23   the recording as representing as embodying the composition.

24          MS. FARKAS:  I mean, Dr. Stewart and I are going to

25   continue to have a disagreement on this.  So our position is

1  that's not the actual work at issue.  We certainly can

2  cross-examine him on it further, but we're concerned about

3  things being played to the jury that are not accurate.

4       THE COURT:  It's a difficult point, and I think it is

5  probably better for cross-examination.  Then you can gather up

6  all the references and have them before you at once.

7       MS. FARKAS:  OK.  Thank you, your Honor.

8  BY MR. FRANK:

9  Q.  Dr. Stewart, in connection with your engagement in this

10  case, have you had occasion to listen to *Thinking Out Loud* a

11  few times?

12  A.  Many, many, many times.

13  Q.  How many times would you say you've listened to it?

14  A.  Well, I can't even estimate.  100, hundreds.  Of course not

15  just listening in the sense of casual listening, but to

16  transcribe something or to put it into musical notation from

17  the recording requires incredibly close listening and comparing

18  every note, checking it on another instrument, such as a

19  keyboard, to make sure you've transcribed it correctly.

20  Q.  And with respect to doing that, your testimony today is

21  that what we see here on the slide embodied in slide 65 is

22  actually the blue note that you reference, it's your testimony

23  that the blue note is in the audio recording that was

24  commercially released of *Thinking Out Loud*?

25  A.  Yes.  So what I heard on the word work was an inflicted

1   note and that is why there is a grace note there.

2          Now, in this example, it's represented -- I've

3   turned -- well, yeah, so over the word work, you see the

4   inflected note, and over the word smile you see the inflected

5   note also.

6          It's still the same degree of the scale.  What I've

7   done here is just made it a little bluesier sounding for

8   comparison sake.

9   Q.  Thank you.

10          Did you have any other observations or analysis

11  attendant to this particular slide?

12  A.  No.  I would just like to listen to the entire verse A now.

13          (Audio played)

14          So it's a subtle difference, but what I would also

15  like to point to is here, now we're getting to hear the second

16  and third and fourth phrases of verse 1A, and they follow the

17  same pattern.  They are very similar to the first phrase,

18  except the second phrase and the fourth phrase are shorter.

19  That's one difference.  But other than that, the repeating

20  basically the same melodic material that we heard in the first

21  phrase.

22          I just would reiterate that the pitch sequence that we

23  looked at a moment ago would be very similar as well as the

24  rhythms and the placement within the bar, the meter.  The

25  underlying chords are almost identical.  The harmonic rhythm is

1  identical.  So this melodic expression is happening in the same

2  musical context in both songs.

3  Q.  Dr. Stewart, could you share with us, the court, your

4  observations, your analysis with respect to the chorus melody,

5  first phrase of *Thinking Out Loud*?

6  A.  Yeah.  So now we turn to the second melodic similarity that

7  I identified, and this is in the chorus or the hook of *Thinking

8  Out Loud*.  The first phrase has the pitch sequence that I've

9  notated below, 354433 and then 331 in black, because they are

10 not the same, and then ending on 23.

11       So here you have most of the pitches, almost all of

12 them the same.  And in the notation, the musical notation, they

13 are also indicated in red.  Once again, we're over the same

14 harmonic context and the harmonic rhythm as well, so...

15 Q.  So to be clear, before you play the audio samples, the

16 numbers below depict the pitches, is that correct?

17 A.  Yes.  So that's the pitch sequence that we looked at in

18 terms of turning each melody into a sequence of numbers, Arabic

19 numbers in order to see the pitch sequence.

20 Q.  And in the instances in which the pitches are red, that

21 means that they identify the same pitches, is that what you're

22 stating?

23 A.  Yes.

24 Q.  OK.  Thank you.

25       Could you play the samples, Ms. Passey.

1                (Audio played)

2           OK.  Did you have any other comments with respect to

3      the slide, Dr. Stewart, or any other analysis?

4      A.  No.  Let's look at the rest of the chorus.

5           So the chorus of *Thinking Out Loud* consists of three

6      phrases that are very similar to what the one we just heard and

7      then it goes to ending that I'll talk about in a minute.

8           Let's listen to the *Let's Get It On* phrase again, and

9      this is an important phrase in *Let's Get It On* because it

10     references the title.  You see at the end of the phrase it says

11     *Let's Get It On*, so if you believe in love, *Let's Get It On*.

12          So let's listen to each example.  First the phrase

13     from *Let's Get It On* and then the entire chorus of *Thinking Out*

14     *Loud*.

15               (Audio played)

16          So the only difference really of any significance is

17     the second phrase has a slightly different ending to it, on the

18     words 1,000 stars.  Something else interesting about this is

19     that the end of the phrase from *Let's Get It On* with the words

20     *Let's Get It On* right here, *let's Get It On* is practically --

21     it's the same pitch sequence as you see at the ending of the

22     chorus of *Thinking Out Loud* down here.

23          I'm *Thinking Out Loud*, so it's the same pitches.  So

24     even the ending of the chorus or the hook mirrors what we're

25     hearing in *Let's Get It On*.

1   Q.  Do you have any other observations with regard to other

2   melodies that you believe have common elements?

3   A.  Yes, I do.  So I said at the outset that there were three

4   main melodic similarities, and this last one is related to the

5   phrase, we're all sensitive people, which is the opening phrase

6   of the second verse of *Let's Get It On*.  This similar phrases

7   appear in several places in *Thinking Out Loud*.

8         So first let's listen to we're all sensitive people

9   with the, once again, the recording made by the defense of the

10  Deposit Copy.

11        (Audio played)

12        So the first instance where there is a similar phrase

13  in *Thinking Out Loud* is the second, and the second verse the

14  third phrase, when the vocal is when my hands don't play the

15  strings the same way, and we'll talk about the pitch sequence

16  in just a moment.

17        Let's go to the next slide.

18        This is essentially a descending scale with repeated

19  notes starting on eight seven and turn back to eight and then

20  seven and then to six.

21        Let's listen to the recording again from the Deposit

22  Copy recording made by the defense and then the excerpt from

23  *Thinking Out Loud* from the released recording.

24        (Audio played)

25        (Continued on next page)

1          THE WITNESS:  Okay.  On the next slide, we see a

2     similar phrase in the interlude of "Thinking Out Loud" on the

3     vocables.  Now, vocables are nonlexial syllables, meaning they

4     don't actually have meaning like words.  So tra, la, la, la is

5     a typical vocable.  This is where the vocal in "Thinking Out

6     Loud" uses the syllables la, la, la, la, la, la, la, la, la,

7     la.

8          So let's compare again first from the recordings

9     themselves on the right.

10          (Audio played)

11          THE WITNESS:  And I think for these examples we also

12     have audio on the transcription.

13          (Audio played)

14          THE WITNESS:  You can hear, and you can see that in

15     "Thinking Out Loud" trails downward a bit further.  The pitch

16     sequence is, again, there on the bottom left.  This is sort of

17     a complicated diagram with a lot of arrows and numbers.

18          We can see that in "Let's Get It On;" there is a

19     similar pitch sequence in terms of going from 6 to 5, although

20     it's in the next phrase, and a 3 and, eventually, 1.  So there

21     is a similar expression in "Let's Get It On," but admittedly it

22     is in the next phrase.

23          The pitch sequence at the bottom has a gap to show

24     where that occurs in "Let's Get It On" so there is no attempt

25     here to say that this is all a part of the same phrase, but it

 1    is the next musical expression that you hear.

 2            So there is one more spot where we hear a very similar

 3    melody.  And that's the guitar interlude that is kind of

 4    nearing what you just heard of the vocables -- la, la, la.  So

 5    let's listen again to a recording made by the defense of "Let's

 6    Get It On" and then an excerpt from "Thinking Out Loud."

 7            (Audio played)

 8            THE WITNESS:  The pitch sequence again shows a

 9    descending scale with repeated notes.

10    BY MR. FRANK:

11    Q.  Do you have any other observations or analysis with regard

12    to the melodies?

13    A.  No.

14            MR. FRANK:  Can we go to the next slide, please.

15    Q.  Can you identify what this particular slide is.

16    A.  This is the concert footage which I believe is from Zurich.

17    It relates to what we've just been listening to.

18    Q.  Dr. Stewart, for clarification to the Court, can you please

19    identify or explain the difference between mash-ups, medleys,

20    and interpolation.

21    A.  Can we just listen to this more continuously to what we

22    just heard?

23            MR. FRANK:  Absolutely.

24            (Audio played)

25            THE WITNESS:  So what we heard there is the same

1   melody we just heard in "Let's Get It On" and in "Thinking Out

2   Loud" in those three places in "Thinking Out Loud," both in the

3   second verse, third phrase, and in the interlude twice.

4          Now, you asked a question about interpolation.

5   Q.  Why do you refer to this particular slide as an

6   "interpolation" as opposed to a "mash-up" or "medley"?

7   A.  There is a difference between all three of those.  The

8   mash-up is when you have two recordings that are superimposed

9   over each other.  So they're being played simultaneously.

10          A medley is when do a sequence of songs.  Generally

11   you don't go back to the song you were playing before.  When I

12   think of medley, I think of Las Vegas and hearing Elvis

13   Presley's hits one after another segueing from one to the next.

14          An interpretation is taking a song and inserting it

15   within another.  So in this instance, the song from "Let's Get

16   It On" is inserted into "Thinking Out Loud," and then it goes

17   seamlessly right back to "Thinking Out Loud."

18          There's no -- it's not a medley because it goes back

19   to the other song.  It's not a mash-up because it's not really

20   happening in terms of overlaying a song.  again, that's more of

21   a recording.

22          So I think the important point here is that you can go

23   so easily from one to the other.  Also this melodic similarity

24   that we've been listening to.

25   Q.  If you would, Dr. Stewart, could you give us sort of a

1  brief summation of your analysis.

2  A.  Sure.  So in "Thinking Out Loud," there are three melodic

3  sections with important similarities -- pitch sequences, the

4  melodic contours, rhythmic elements, phrasing, and underlying

5  harmony.

6       And we hear it in verse 1A of "Thinking Out Loud."  In

7  the chorus, we hear it almost throughout the entire chorus,

8  which, again, is the most valuable part of the song, and then,

9  again, the interlude which has the "We're All Sensitive People"

10  phrase, one of the most iconic phrases from "Let's Get it on."

11       Now, these are not exactly complicated melodies.  We

12  don't really find a lot of complicated melodies in these songs.

13  It's not Mozart or Beethoven.  But like so much popular music,

14  these are simple melodies, and they're happening -- and this is

15  so important -- they're happening in conjunction or

16  simultaneously with the same accompaniment.  The accompaniment

17  is the same and the melodic figurations are the same.

18  Q.  So per your analysis, Dr. Stewart, you would conclude that

19  the chords are identical and the harmonic rhythms are identical

20  of the song?

21       MS. FARKAS:  Can you try not to lead the witness.  Can

22  you let him just answer the question.

23       MR. FRANK:  Sure.

24  Q.  Can you describe your analysis with regard to the chords

25  and the harmonic rhythm.

1    A.   Yes.  They're almost identical.  We've seen that there is

2    just a note that is sometimes present in one that's not in the

3    other.  Again, it's identical harmonic rhythm with the

4    anticipated second and fourth chords.  The melodic similarities

5    are happening with this.  So it's the same creative choices in

6    terms of melodic notes and the underlying harmony.

7    Q.   Now, Dr. Stewart, with respect to the work you do outside

8    of consulting and teaching, you teach; right?  At the

9    University of Vermont?

10   A.   Yes.

11   Q.   Have you ever taught any courses that relate to music

12   copyright?

13   A.   Yes.

14   Q.   Could you describe that to the jury, just very briefly.

15   A.   Yes.  One course that I teach that's very popular is on

16   music copyright and music business.  So this is a field that's

17   always rapidly changing, especially with technological

18   developments.  So I've taught this course for a number of

19   years.  And there is a lot of focus on music copyright, and we

20   look at different cases that have come up.

21   Q.   Do you have occasion to deliver speeches or papers at

22   scholarly or academic conferences?

23   A.   Yes.  There was recently at the American Musicological

24   Society, which is kind of the premier scholarly society for

25   historical musical research.  I had a paper accepted, which is

1   not the easiest thing to do.  It's all peered to do.

2          The session was titled "Substantial Similarity in the

3   Role of the Forensic Musicologist in Copyright Litigation."

4   The title of my paper was "Melody, Beats, and Minimalism,

5   Copyright in Contemporary Popular Music."

6          Part of the point of that was to talk about, how, in

7   contemporary popular music, a lot of times these melodic

8   formations are rather simple or minimal, especially in rap and

9   hip-hop.  So it was asking the question, how do we examine

10  substantial similarity in those contexts.

11  Q.  As a professor who teaches music copyrighting testifies,

12  can you explain to the Court what prior art is.

13  A.  Prior art is generally, in the context of music, it's songs

14  that came earlier than the earlier song.  In the situation

15  that's being examined, so in this case, the earlier song

16  obviously was "Let's Get It On" from 1973.  So prior art would

17  be songs that are earlier than 1973.

18         I have examined all of the prior art submitted by the

19  defense.  There was something unusual in this case because

20  generally, when I'm engaged to work on something, there is not

21  already a prior art search.  I do my own.  Early on, almost as

22  soon as I was engaged in this case, I received Dr. Ferrera's

23  preliminary report, which already contained a prior art search.

24         And, in my experience, Dr. Ferrera's prior art

25  searches are pretty comprehensive.  I've done prior art

1    searches concurrent with his where I haven't seen his, and we

2    come up with mostly the same material.

3        So I was able to base my preliminary report on the

4    same prior art that he was using to base his preliminary report

5    on.

6    Q.  What is your opinion, one way or another, about the prior

7    art that was proffered by Dr. Ferrera?

8        MS. FARKAS:  Your Honor, objection.  This is

9    inconsistent with your Honor's prior ruling on his ability to

10   testify about any prior art search that he did as it's already

11   been ruled that he did not conduct a prior art search.

12       MR. FRANK:  With respect to opposing counsel, she's

13   correct.  The specific question that is before Dr. Stewart and

14   before the Court at this time if he had occasion to review the

15   prior art cited by their experts, not whether he did his own

16   report.

17       MS. FARKAS:  That's not what he just said.

18   BY MR. FRANK:

19   Q.  Did you have occasion to review the prior art that was

20   submitted by Dr. Ferrera?

21   A.  Yes, even before I wrote my preliminary report.

22   Q.  From reviewing those materials, did you come to any

23   conclusions?

24   A.  Yes.  And that is that the expression that I've been

25   looking at here with the melodies and the underlying harmonies,

1   none of the prior art identified comes close to containing this

2   same expression.

3          Some of the songs that were brought up don't predate

4   the songs at issue here, for example, Lionel Richie's "Do It To

5   Me," which is much later, 1992, or a Michael Jackson song.  In

6   only one recording of "Georgy Girl," which was done by a rather

7   obscure Mexican band leader, is the harmonic rhythm with the

8   anticipated second or fourth chords the same as in "Let's Get

9   It On" and "Thinking Out Loud."

10  Q.  To be clear, the "Georgy Girl", who originally did "Georgy

11  Girl"?

12  A.  The hit was by the Seekers, and that was 1968.

13  Q.  The version that was cited by Dr. Ferrera was not the

14  Seekers?

15  A.  No, it wasn't.

16  Q.  Whose version was it that was actually cited by

17  Dr. Ferrera?

18  A.  I think one of the next slides will indicate that.

19         So this goes into it in somewhat more detail.  Of the

20  15 songs containing this progression, only "Georgy Girl" has

21  this hormonic rhythm, and the best-known version by the

22  Seekers, the fourth chord is not even clearly anticipated.

23         Most importantly, the melodic similarities that we've

24  been looking to, especially, for example, the melodic

25  similarity of the chorus, there is nothing like that in "Georgy

1    Girl." So you don't have the same creative choice of melody

2    and harmony that you find in both "Thinking Out Loud" and

3    "Let's Get it on." Overall.

4         Go ahead.

5    Q. No. Please continue with what you were saying.

6    A. Why don't we listen to a little bit of "Georgy Girl".

7    There's an audio clip there.

8         (Audio played)

9         THE WITNESS: I think enough.

10        So if that sounds anything like the songs at issue in

11   this case, I don't hear it. The most important thing though is

12   there is no melodic similarity at all. Even the fourth chord

13   is not clearly anticipated like we heard.

14        Now, there is a version of "Georgy Girl", the easy

15   listening version, where the second and fourth chords are

16   clearly anticipated.

17        If we could just play a little bit of this.

18        (Audio played)

19        THE WITNESS: So the idea that that was an influence

20   on the creation of "Let's Get It On" is, I think, preposterous.

21        There was one other version identified by the

22   musicologist for the other side that's even more obscure. It's

23   a version by Beto Diaz. I've never heard of him, and I've

24   worked a lot on Mexican music, as you know.

25        It's next to impossible that this received any airplay

1    in the U.S. or that, before the internet, that ed Townsend

2    could have heard this.  We could listen to a little bit of it.

3    This does have clearly anticipated second and fourth chords,

4    but you do not have any melodies, once again, that are similar

5    to the ones that I've looked at.

6          (Audio played)

7          THE WITNESS:  Okay.  So that's sort of an easy

8    listening, Mexican version of "Georgy Girl".

9          MR. FRANK:  Can we proceed to slide 81, please.

10   Q.  Can you explain your analysis here, Doctor.

11   A.  Yes.  So of these songs identified as "prior art,"

12   so-called, and the three principal melodic similarities that

13   we've looked at, there is only one of the melodies that has

14   anything remotely similar to what we were listening to in

15   "Thinking Out Loud" and "Let's Get it on."

16         And that is the descending scale, sequence 8, 7, 6 but

17   with the repeated notes.  It's important that there are

18   repeated notes on this descending scale.  The only one that has

19   that is "Fun, Fun, Fun" by the Beach Boys.

20         But see the melody is completely different.  It starts

21   with 5, 6, 5.  "We'll have fun, fun, fun 'till daddy takes the

22   keyboard away."  It goes up and then down and then back up

23   again and then down.  So it's not just the descending scale.

24         Again, although this is the only one that has that

25   similarity in terms of the descending scale with the repeated

1     notes, it doesn't sound like anything like what we heard with

2     "We're All Sensitive People", that phrase.

3     Q.  Did you have an audio clip to accompany this?

4     A.  I do.

5            (Audio played)

6     BY MR. FRANK:

7     Q.  In your opinion, Dr. Stewart, are any of the prior art

8     cited by the defendant, are any of them applicable in this

9     case?

10           MS. FARKAS:  Objection.  Leading.

11           THE WITNESS:  Are they applicable?

12    BY MR. FRANK:

13    Q.  Are they appropriate prior art?

14           MS. FARKAS:  Same objection.  I don't know what that

15    means.  Perhaps he can explain.

16           THE COURT:  Overruled.  That objection is overruled.

17    BY MR. FRANK:

18    Q.  Dr. Stewart, can you repeat the question, please.

19           MR. FRANK:  Sure.

20    Q.  Do you believe that the prior art that's been cited by the

21    defendants, in your professional opinion, is appropriate in

22    this instance?

23    A.  Well, the works that predate the songs at issue here that

24    have the same chord progression, yes, are appropriate for

25    comparison's sake.  But I would like to reiterate that none of

1   them have the melodic similarities that we looked at.  So the

2   chorus, which is so similar between each of these songs, there

3   is nothing in any of this art that is like that.

4           So the creative choices, the selection and arrangement

5   of materials that we hear that are common between "Let's Get It

6   On" and "Thinking Out Loud" are not found in any of these

7   works.

8   Q.  Dr. Stewart, did you get the opportunity to review the

9   deposition that was taken of Ed Sheeran in connection with this

10  case?

11  A.  I looked at some of it, yes.

12  Q.  Are you aware that Mr. Sheeran cites Van Morrison and

13  "Crazy Love" as inspiration for "Thinking Out Loud"?

14          MS. FARKAS:  Objection.  Mischaracterizes the

15  testimony.

16  BY MR. FRANK:

17  Q.  Are you aware of Mr. Sheeran's allusion to Van Morrison?

18  A.  Yes, I am.

19  Q.  Did you have occasion to read that particular portion of

20  the deposition?

21  A.  Yes, I did.

22  Q.  Do you have any opinion one way or another as to the

23  legitimacy of that reference?

24          MS. FARKAS:  Objection.

25          MR. FRANK:  I'll withdraw.

1    Q.  Dr. Stewart, are you aware of any Van Morrison songs or,

2    "Crazy Love" in particular, that have common elements with

3    "Thinking Out Loud"?

4    A.  Well, as I read the transcript -- and I looked at some of

5    the video -- I understood Mr. Sheeran to say that his

6    inspiration for the song was Van Morrison's "Crazy Love" and,

7    in fact, they were calling it "the Van Morrison song" for a

8    while.

9         But "Crazy Love" is nowhere near as similar as "Let's

10   Get It On" is to "Thinking Out Loud."  First of all, it only

11   has three chords.  So after the 1, 3, 4, progression that we've

12   seen, it goes right back to 1.  So it spends most of its time

13   on the 1 chord.  So it's not nearly as similar as anything that

14   we've listened to, especially "Thinking Out Loud" and "Let's

15   Get it on."

16        He also says that all songs have the same four chords,

17   and I think that's obviously untrue.  This one only has three.

18   Q.  For the record, Dr. Stewart, how many chords does "Thinking

19   Out Loud" have?

20   A.  Four.

21   Q.  Four?

22   A.  Yes.

23   Q.  Thank you.

24        MS. FARKAS:  For the record, I want to object to that

25   last line as also mischaracterizing Mr. Sheeran's testimony.

1  BY MR. FRANK:

2  Q.  Dr. Stewart, slide 83.

3       Dr. Stewart, what do you mean when you say "emulation"

4  on this particular slide?

5  A.  That was Mr. Sheeran's word in his deposition.  So this

6  takes a closer look at "Crazy Love," just again to show how it

7  is not merely as similar as "Let's Get It On" and "Thinking Out

8  Loud."

9       I've circled the chords in green so you can see it

10 goes D, F sharp, G, and then back to D.  So it spends most of

11 its time on D.  It never goes to the 5 chord.  It keeps

12 resolving back to the tonic or 1 chord every two measures.

13      It goes back before it reaches the end of the second

14 measure.  So it has a very different kind of feel.  The only

15 harmonic anticipation is on that fourth chord when it goes back

16 to D, the fourth chord which is a repeat of the first chord.

17 So it's not a fourth chord that is different.

18      I have an audio example here so you can hear that it's

19 really nothing like what we've been listening to.

20           (Audio played)

21           THE WITNESS:  So when we get to that section about

22 love, love, love, of course that's totally different too.  It's

23 not the same chords at all.  It's completely different chords.

24 BY MR. FRANK:

25 Q.  So, to summarize, what are your opinions with regard to the

1    prior art cited by the defendants?

2    A.  So the creative selection and arrangement of the expressive

3    material is different in "Let's Get It On" than any of these

4    other songs.  So none of these songs are as similar to "Let's

5    Get It On" and "Thinking Out Loud" as "Let's Get It On" and

6    "Thinking Out Loud" are to each other.

7    Q.  Do you believe that "Let's Get It On" was original for its

8    time?

9    A.  I do.

10              MS. FARKAS:  Objection.  He is specifically prohibited

11   from giving such testimony, and he just violated another court

12   order.

13              THE COURT:  Sustained.

14              MR. FRANK:  If you could go to the next slide, please.

15   Q.  Could you explain your opinion here as it relates to

16   interpolations.

17   A.  Yes.  As the slide says, the interpolation speaks to the

18   innate similarity between these two songs because it's possible

19   to move so effortlessly from one to the other.  There are no

20   changes required whatsoever to make this transition, both to

21   "Let's Get It On" and back to "Thinking Out Loud."

22              So the songbeds, the foundation of each song, is

23   identical.  Interestingly, it goes right very soon -- in the

24   interpolation it goes right to the "We're All Sensitive People"

25   phrase, which has a corollary in "Thinking Out Loud" as we've

seen.

Q.   Have you had the opportunity to review some of the other

concert footage or videos of Mr. Sheeran doing one or more

songs together?

A.   Yes, I have.

Q.   Which ones have you reviewed?  And could you speak to that?

A.   Well, I looked at about 15 different concert recordings,

videos.  And none of them are like this transition from or

interpolation from "Thinking Out Loud" to "Let's Get It On" and

back to "Thinking Out Loud."

They're all very different.  First of all, most of

them are medleys.  So they're a string of songs played one

after another.  They never go back to the original song.  They

progress from one song to the next.

Q.   Do you know, as you sit here, the videos of the medleys,

that you saw, do you know one way or another, as you sit here

today, whether those medleys predated the interpolation we've

seen here today that we've referred to as "the Zurich video"

where Mr. Sheeran plays "Let's Get It On" and "Thinking Out

Loud"?

MS. FARKAS:  Objection.  Irrelevant.

THE WITNESS:  I honestly don't know.  I'm not sure.  I

think most of those videos were from 2014 to 2015.

BY MR. FRANK:

Q.   What were the specific mash-ups that you reviewed?

 1   A.  There were no mash-ups.

 2   Q.  What were the specific melodies that you reviewed?

 3   A.  If we could go to the next slide.

 4        One example is "Take It Back" where Mr. Sheeran goes

 5   into "Superstition" and then eventually into "Ain't No

 6   Sunshine" by Bill Withers.  He essentially stays on the chord

 7   changes of "Take It Back."  So these are not standard chord

 8   changes for either "Superstition" or "Ain't No Sunshine."

 9        I guess it fits with his concept of all songs have the

10   same four chords, but these are not the standard chords for

11   "Superstition" or "Ain't No Sunshine."

12        Another example is "Can't Help Falling In Love" which

13   he does play the standard chord changes and then goes into

14   "Thinking Out Loud."  That is clearly a medley.  He doesn't go

15   back to "Can't Help Falling In Love."

16        And then two of his originals, "Kiss Me" and "Thinking

17   Out Loud," which, again, have different chord changes, so it's

18   very clear that he's moving from one to the other.  There is no

19   seamlessness like you hear with "Thinking Out Loud" and "Let's

20   Get It On."  And, again, no return back to the first tune.  So

21   it's not moving from one song to another and then back again.

22   It's a medley.

23   Q.  As opposed to an interpolation?

24   A.  Yes.

25   Q.  Were there any other selections that you had the occasion

1    to review?

2    A.  I think the next slide.  Yes.  In the first one there,

3    "Take It Back," we talked about that.  The next one on the list

4    here -- "Loyal," "No Diggity," the "Next Episode," and

5    "Nina" -- don't.  "No Diggity" and "Next Episode" are raps.

6         So on the original recordings, they're basically one

7    chord.  They're not a chord progressions at all.  Again, it's a

8    medley.  It doesn't go back to the first song.

9         A basic characteristic of a lot of rap is that it

10   could happen over any kind of chord changes because the melodic

11   considerations are minimal.  So the basic underlying music

12   could be anything, unlike the transition, again, from "Thinking

13   Out Loud" into "Let's Get It On" and back to "Thinking Out

14   Loud."

15   Q.  In the materials that you reviewed, other than the video

16   that we saw which was "Thinking Out Loud" and "Let's Get It

17   On," are you aware of any other instances of interpolation by

18   Mr. Sheeran?

19   A.  There is one very short example where he briefly plays a

20   guitar with from Eric Clapton from Layla.  That's the only

21   instance of interpolation that I recall hearing.

22        So, once again, the example we've seen of "Let's Get

23   It On" and "Thinking Out Loud" is unique.

24   Q.  Do you have any other opinions or analyses as it relates to

25   Mr. Sheeran's interpolations or medleys?

 1    A.  If you go back to the last slide, there was one other

 2    example.  In "Take It Back," he briefly goes into the

 3    Backstreet Boys' "Everybody" for about eight seconds or six

 4    seconds at the end just to end his song.  So, again, it's a

 5    very different thing than what we've heard in the video from

 6    Zurich.

 7    Q.  Dr. Stewart, in light of all the materials that you've

 8    reviewed and in your professional experience, do you believe

 9    that Mr. Sheeran and Amy Wadge copied "Let's Get It On"?

10    A.  I think the preponderance of the evidence shows that there

11    was copying.

12              MS. FARKAS:  Objection, your Honor.

13              MR. FRANK:  I'll withdraw the question, and I'll

14    re-ask it.

15              THE COURT:  Sustained.

16    BY MR. FRANK:

17    Q.  Dr. Stewart, do you have an opinion as to whether Amy Wadge

18    and Ed Sheeran copied "Let's Get It On"?

19    A.  I can answer that.

20    Q.  Do you have an opinion?

21    A.  Yes, I do.

22    Q.  What is that opinion?

23    A.  That, yes, there was some copying.

24    Q.  What leads you to believe that there was copying by Ed

25    Sheeran and Amy Wadge?

1   A.  Because you see this unique combination of creative choices

2   between the melody and the accompaniment.

3           MS. FARKAS:  Your Honor, I'm going to interrupt the

4   witness because he keeps using the word "unique" that

5   your Honor has prohibited him from uttering in this courtroom.

6   And I move to strike this witness' entire testimony on that

7   basis.  He has to be admonished at a minimum.  This is

8   outrageous.

9           THE COURT:  He's been doing that kind of thing all

10  afternoon without your objection, and I've been sustaining them

11  when you did object, and I'm sustaining this one.

12          MR. FRANK:  If we could go to the next slide, please,

13  the last slide, I believe.

14  Q.  Dr. Stewart, having reviewed the materials in question and

15  based on your professional experience, do you have an opinion

16  as to how much of "Thinking Out Loud" is attributable to

17  infringing upon "Let's Get It On"?

18  A.  Well, in my declaration, I estimated a value of 70 percent.

19  And that's based on the chorus, which is considered, as I've

20  said before, the hook, which is the most memorable and valuable

21  part of the song.

22          So the choruses of these songs being so similar

23  melodically and of course with the underlying chords, I think

24  that standard procedure in musicology is to take the

25  quantitative assessment, which would be maybe a cruder

1   measurement, just in terms of the amount of time that the

2   similar consent it present.  But that -- it can be adjusted

3   upward or downward according to the qualitative assessment of

4   the value of the expression.

5          So given that the chorus is generally considered the

6   most valuable expression, that's the number for the musical

7   value that I found, 70 percent.

8          MR. FRANK:  Thank you, Dr. Stewart.

9          If it please the Court.  I'd like a moment to confer

10  with my colleagues.  I think we're either done or just about

11  done.

12         (Counsel confer)

13         MR. FRANK:  Your Honor, while we reserve the right to

14  redirect, we tender the witness at this time.

15         THE COURT:  Let's take a ten-minute recess.  Then you

16  will have the floor.

17         (Recess)

18         (In open court; jury present)

19  CROSS-EXAMINATION

20  BY MS. FARKAS:

21  Q.  Good afternoon, Dr. Stewart.

22  A.  Good afternoon.

23  Q.  You are here to testify whether you believe there are

24  musical similarities between the two songs; right?

25  A.  Yes.

1  Q.  And you're not here today to offer an opinion on whether

2  "Thinking Out Loud" infringes "Let's Get it on."  Correct?

3  A.  Correct.

4  Q.  And in fact, you're not allowed to offer such an opinion;

5  correct?

6  A.  Correct.

7  Q.  And in fact, this Court has ordered that you're not

8  permitted to testify as to whether any part or parts of "Let's

9  Get It On" are unique or distinctive; correct?

10  A.  That's my understanding.

11  Q.  And that's because the Court properly ruled that you did

12  properly not look into whether, in fact, "Let's Get It On" or

13  any of its constituent elements are unique to "Let's Get it

14  on."  Correct?

15  A.  Well, I think that's a misunderstanding of how this case

16  developed.  Because, for me --

17  Q.  I just asked you a yes or no question, Dr. Stewart.

18  A.  This is not the way a case usually evolves for me.  I was

19  given a prior art search when I first started working on it.

20  Usually I don't start with any prior art search and have to do

21  my own.

22  Q.  Dr. Stewart, let me read to you the order that I was

23  referring to.  Maybe that will streamline things a little bit.

24  on August 18, 2020, this Court ordered:

25            "For reasons particular to this case, Dr. Stewart

1   shall not characterize "Let's Get It On" or a constituent

2   element of it, such as a chord progression or harmonic rhythm,

3   as being unique, distinctive, unusual or the like.  That is

4   because such opinions were not disclosed in his report, his

5   prior art research was not such as to support them, and there

6   is uncontradicted proof that those elements in this case are

7   common musical techniques."

8        Do you take issue with that ruling?

9   A.  I understand the ruling, and I hope I followed it in every

10  way.  I did use some of those words in my reports and could

11  point to them.  It seems like a misunderstanding to me.  I

12  respect the ruling and have attempted to follow it.

13  Q.  We can differ on that.  In fact, you have admitted that the

14  chord progression and the anticipation that's at issue in this

15  case appears in at least one other prior song before "Let's Get

16  It On"; right?  "Georgy Girl."  Correct?

17       (Interruption)

18       (Continued on next page)

19

20

21

22

23

24

25

```
 1              THE COURT:  Let's resume.
 2              MS. FARKAS:  I have a question pending, I'll just
 3    repeat it.
 4              Your Honor, do you want me to proceed?
 5              I want to be respectful of the plaintiff's ...
 6              I want to be respectful of what is going on at
 7    plaintiff's table.
 8              THE DEPUTY CLERK:  Do you want to take a recess?
 9              THE COURT:  We just had one.  As soon as the
10    electronics will allow it.
11              Mr. Frank, come up to sidebar.  We've got to figure
12    this out.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

1              (At the sidebar)

2         MR. GOLDSMITH:  If I can, your Honor.

3         My concern is that the jury is distracted, obviously,

4    by this and I'm worried about proceeding when they are in a

5    distracted state and about the condition of the plaintiff.

6         I know that counsel for the plaintiffs, I think, want

7    to stop at this point and take care of the plaintiff.

8         THE COURT:  Everything is being done that can be done.

9         MR. GOLDSMITH:  I understand that, your Honor.  I just

10   worry about the jury having seen this being sort of

11   distracting.

12        THE COURT:  The main thing for the jury is to be

13   entertained by cross-examination and in the usual way.  We'll

14   end the usual time, which is very close.

15        MR. GOLDSMITH:  If your Honor is comfortable the jury

16   is not going to be distracted, we're fine with going ahead.

17        THE COURT:  I think they are a great more collected

18   than you are.

19        MR. GOLDSMITH:  I'm reasonably collected.  I only seem

20   not.

21        MS. JACKSON:  Your Honor, Ms. Griffin is passed out --

22   Ms. Griffin, if we could not let the jury go not hallway, your

23   Honor, because she's in the hallway on the ground.

24        THE COURT:  Who are you representing?

25        MS. JACKSON:  I'm with Mr. Crump.  I work with

1   Mr. Crump, your Honor.  I'm with Mr. Crump.  I work with

2   Mr. Crump.

3          MR. FRANK:  She's an attorney with the Crump firm.

4          THE COURT:  What are you proposing?

5          MS. JACKSON:  She's laying in the hallway.

6          THE COURT:  She can go home.

7          MS. JACKSON:  No, sir.  She has passed out.  She's --

8          LAW CLERK:  She's unconscious.

9          THE COURT:  Whoever can take care of her, can take

10  care of her.  If you wish to be excused and take care of her,

11  you're welcome to go.

12          MS. JACKSON:  Yes, sir.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court)

 2          THE COURT:  Everything is being done that can be done

 3  and we have no way of contributing to it.  One of her friends

 4  and counsel has just gone out to be with her.  There is no

 5  reason for us not to continue.

 6          MS. FARKAS:  OK.

 7  BY MS. FARKAS:

 8  Q.  Dr. Stewart, you have admitted that the chord progression

 9  and anticipation that's at issue in this case appears in at

10  least one song prior to *Let's Get It On*, *Georgy Girl*, correct?

11  A.  In the two iterations by the Mexican band leader and the

12  easy listening version, yes.

13  Q.  OK.  We'll get to that song.  That's my only question.

14  Thank you.

15          We'll get to that in a little while.  I would like to

16  talk a little more about the chord progression.

17          You're aware that the court has ruled that the *Let's*

18  *Get It On* chord progression, that there is uncontradicted proof

19  in this case that the chord progression is common, correct?

20  A.  That's my understanding.

21  Q.  And that ruling was issued after you rendered your report

22  in this case, correct?

23  A.  I believe so.

24  Q.  And, in fact, the chord progression is included in basic

25  how to play guitar and piano instruction books, correct?

 1   A.  Without the anticipation.

 2   Q.  Yeah, I'll take you through everything.  I'm just talking

 3   about the chord progression right now.

 4           Correct?

 5   A.  As I recall, yes.

 6   Q.  I'm going to hope it's the same slide because it's changed

 7   a bit.  Can we look at your slide 24, please.

 8           Looking at your slide 24, you have testified that the

 9   basic chord progression in *Let's Get It On* is the 1,3,4,5,7,

10   correct?

11   A.  In the Deposit Copy, yes.

12   Q.  Correct.  And *Thinking Out Loud*, that's all that is at

13   issue here, Dr. Stewart.

14           And in *Thinking Out Loud*, it's the 1,1,3,4,5, correct?

15   A.  Not during the first 24 seconds.

16   Q.  OK.  We'll get to that, too.  But that's your slide, right?

17   A.  Yes.

18   Q.  OK.  And let's focus on the second chord in *Let's Get It*

19   *On*.

20           That's a minor chord, correct?

21   A.  Yes.

22   Q.  And the second chord in the *Thinking Out Loud* progression

23   is a major chord, correct?

24   A.  It's the same pitches over the same rote.

25   Q.  Is it a major chord?

1    A.  It is a major one chord with a three in the rote, which is

2    a distinct sound.

3    Q.  Is it a major chord; yes or no?

4    A.  Yes.  It's indicated by my --

5    Q.  Thank you.

6    A.  -- upper case Roman numeral I.

7    Q.  OK.  You were the one fighting me on it.  I'm just trying

8    to get the answer to my question.

9         Major chords and minor chords are not the same, are

10   they?

11   A.  That's correct.

12   Q.  And the fourth chord in the *Let's Get It On* progression is

13   a five seven chord, correct?

14   A.  In the basic, yes, in the Deposit Copy, um-hmm.

15   Q.  There's no seven after the five chord and the fourth chord

16   of *Thinking Out Loud*, correct?

17   A.  Well, in this basic outline of the harmony, there isn't.

18   But even in Dr. Ferrara's analysis, there are iterations of the

19   chord progression where there is a seventh present in the

20   fourth chord.

21   Q.  I'm looking at your slide.  I'm not trying to complicate

22   things.  I'm just looking at the slide and asking you some

23   questions about it, OK.

24        So a five and a five seven are not the same exact

25   chord, correct?

1            There's an extra note there, as you put in your own

2    slide, correct?

3    A.  Yes.  But it's, as I've said, that extra note appears all

4    over the place in *Thinking Out Loud*, too.  So this is a basic

5    harmony.

6    Q.  This extra note in the five seven chord in *Let's Get It On*,

7    you talked about for some time during your testimony, right;

8    you said it could be at the top, you said it could be at the

9    bottom, right?

10   A.  Yes.  Any of these notes and these chords can be reordered

11   in different ways.

12   Q.  OK.  But I'm saying you spent some time talking about the

13   various ways this fourth note could appear.

14           You obviously found some significance to it, correct?

15   A.  Pardon?

16   Q.  You spent some time in your testimony talking about this

17   fourth note in the five seven chord and saying that it could

18   either appear at the bottom of the three notes or at the top of

19   the three notes, correct?

20   A.  Yes.

21   Q.  And you actually sat at the piano and testified that it's

22   different to you depending on where it appears, right?

23   A.  Yes.  I mean, it's one reason that recording that you made

24   of *Thinking Out Loud* -- I mean of *Let's Get It On* -- is so

25   cheesy sounding is because of that chord, that it was voiced on

1    that recording.

2    Q.  Can we look at slide 29, please.

3         So this is something that you also testified about and

4    you refer to quite a bit in your testimony.  Do you see any

5    versions of the *Thinking Out Loud* chord progression where the

6    fourth chord is a V7?

7    A.  Yes.

8    Q.  Where is that?

9    A.  The eleventh implies that there is a seventh also.  Usually

10   when you're using chord symbols like this, if you're working

11   your way up the chord, it assumes that the lower -- these are

12   called extensions of the chord, the ninth, the eleventh, and

13   the thirteenth.

14   Q.  What --

15   A.  So the assumption in music theory is that if you have these

16   upper extensions like the ninth or the eleventh, that there is

17   seventh, also.

18   Q.  Is your testimony that it doesn't matter if a chord

19   progression has a five chord or a five seven chord, it's all

20   the same to you?

21   A.  No, I didn't say that.  I said when it says 511, that

22   implies that there is a seventh present.

23   Q.  So if it is five or five seven or five one one, all those

24   are the same to you?

25   A.  No, I didn't say that.

1    Q.   They are different?

2    A.   Well, if it just says five, that implies that it is only

3    the triad that wrote the third and the fifth.

4    Q.   And there is a seven or 11 or any other number, there is an

5    extra note there, correct?

6    A.   At least one.  There could be more.

7    Q.   Now, I believe you testified earlier that you in performing

8    your analysis of *Thinking Out Loud*, that you listened to the

9    song, I think you said, hundreds of times; is that an accurate

10   summary of what you said?

11   A.   I think so because.  This has been going on for eight

12   years, so it's been an awful lot of time.

13   Q.   And you spent a significant amount of time listening to the

14   recording when you were performing your analyses in this case,

15   I assume, correct?

16   A.   Yeah.  And to transcribe this to put it into musical

17   notation, you really have to go through it note by note by

18   note, and not just the melody, but all the parts that are

19   present on the recording.

20   Q.   And you do that, at the risk of asking you a silly

21   question, you do that to try to get it right, right?

22   A.   That's my attempt, yes.

23   Q.   You offered a report in this case, correct?

24   A.   Several.

25   Q.   And let's focus on the 2017 report.

```
 1              Everything you said in that report was, to the best of
 2   your knowledge, truthful and accurate, correct?
 3   A.   At the time.  I mean, over eight years there's been some
 4   evolution in my thinking and of the analysis.  I mean, it's not
 5   static.
 6   Q.   You spent a good amount of time preparing that report and
 7   writing it, correct?
 8   A.   Yes.
 9   Q.   And you also submitted a declaration in this case in 2018,
10   right?
11   A.   Yes.
12   Q.   And you're aware that a declaration is sworn statement
13   under oath subject to the penalty of perjury, correct?
14   A.   Yes.
15   Q.   And everything in your declaration was, to the best of your
16   knowledge, truthful and accurate, correct?
17   A.   Yes.
18   Q.   You've testified that the first 24 seconds of *Thinking Out*
19   *Loud* that the second chord is not a D/F sharp chord or a one
20   three chord, but that it's the three chord which you claim, you
21   know, is the same as the second chord in *Let's Get It On*,
22   correct?
23   A.   Well, I said that the note that would make it the one chord
24   over the three, the one note that would make it that is not
25   present in the guitar playing, which is the only accompaniment
```

 1    during those first 24 seconds.

 2    Q.  OK.  Isn't it true, Dr. Stewart, that in both your report

 3    and in your 2018 declaration, you transcribed the second chord

 4    during the first 24 seconds of *Thinking Out Loud* as a D/F sharp

 5    major and not a three chord?

 6    A.  I don't recall doing that, no.

 7    Q.  OK.  Well, let's refresh your recollection then.

 8           Can we project -- actually, this is just for

 9    demonstrative purposes, your Honor.  I would like to project

10    the transcription of your opening themes from *Let's Get It On*

11    and *Thinking Out Loud*, which is from page seven of your report.

12           His 2017 report, I will represent to you that this is

13    from page seven of your 2017 report and the same transcription

14    appears on page 18, paragraph 64 of your declaration.

15           What have you transcribed here as the --

16           Well, let me take a step back.  Looking at the

17    timestamp for *Thinking Out Loud*, what's the timestamp there?

18    A.  The beginning of the piece, zero.

19    Q.  This would include the first 24 seconds, wouldn't it?

20    A.  Um-hmm.

21    Q.  Yes?

22    A.  Yes.

23    Q.  Looking at the second chord there, what have you

24    transcribed there?

25    A.  I have put D/F sharp.  I was mistaken when I put that.

1   Q.  So you were mistaken in the report after you listened to

2   the song hundreds of times?

3   A.  Well --

4   Q.  Yes or no?

5   A.  -- this is an evolving process, and at some point during

6   this work over the eight years, I did more detailed

7   transcription, as did your musicologist.  Regarding the first

8   24 seconds in particular, we both did detailed transcriptions

9   of the guitar part during those first 24 seconds.

10  Q.  OK.

11  A.  And, moreover, I've testified that this single note is not

12  significant in the way it sounds anyway.

13  Q.  Well, so you're saying -- what are you saying, the second

14  chord is insignificant?

15  A.  No.  I'm saying that that note is not there during the

16  first 24 seconds.

17  Q.  OK.

18  A.  And if I wrote a wrong chord symbol there, then I was

19  wrong.

20  Q.  OK.  Well, it seems that you continued to be wrong in your

21  declaration, which was submitted the next year in 2018, where

22  you have the same transcription.

23  A.  Well, if I may --

24  Q.  No, there's actually no question pending, come to think of

25  it.

1          So, Dr. Stewart, are you wrong -- were you wrong then

2     or are you wrong now?

3     A.  In both your musicologist's transcriptions --

4          MS. FARKAS:  Your Honor, I would ask that you instruct

5     the witness to answer any questions instead of constantly

6     referring to what our expert musicologist did.

7          THE COURT:  Try to answer this question without

8     reference to your opposing expert, although I gather you put a

9     deal of reliance in his views.

10         Would you repeat the question?

11         MS. FARKAS:  Sure, your Honor.

12    BY MS. FARKAS:

13    Q.  Dr. Stewart, were you wrong then or are you wrong now about

14    the second chord in *Thinking Out Loud*?

15    A.  I was wrong then, and it's really a function of cut and

16    paste, which we are all very familiar with.  So cutting and

17    pasting in this example from my earlier reports was what I did

18    here.

19    Q.  Is there --

20    A.  That note does not appear in any of our transcriptions

21    during those 24 seconds.  What can I say, it's not there,

22    so ...

23    Q.  Well, it is there.

24    A.  It's an error.

25    Q.  Your report is about 11 pages and there is only a handful

1  of transcriptions, and you rely quite heavily on this

2  particular melody in your report for your conclusion of

3  copying.

4       And so are you suggesting that you just -- when you do

5  an analysis for a claim of copying and infringement, that you

6  just take the defendant's musicologist's reports and you cut

7  and paste their transcriptions; is that what you're saying?

8  A.  No.

9  Q.  So what do you cut and paste?

10 A.  From my prior reports.  And, um, to prepare these music

11 examples is a pretty tedious process using music notation

12 software.  This is not a significant difference.  I'm perfectly

13 happy to admit that it's an error.

14 Q.  So it's also an error -- so this is your 2017 report and in

15 your 2018 sworn declaration, that was another error?

16 A.  Apparently so.

17 Q.  I would like to show you what has been marked as Joint

18 Exhibit 4 in this case.

19       Can you please identify this for us?

20 A.  That is a version of the sheet music of *Thinking Out Loud*

21 and --

22 Q.  Would you agree that the first line of music in this

23 published sheet music corresponds to a portion of the first

24 24 seconds of *Thinking Out Loud*?

25 A.  Yes.  It's not exactly what I hear on the recording, but

1   sheet music is not usually that faithful in every detail.

2   Q.  Well, you heard it hundreds of times and you actually

3   transcribed the same thing, so...

4   A.  Not exactly, because I put it an inflection on the note

5   above work.

6   Q.  Right, the grace note.  We'll get to that, too.  I'm

7   talking about the chords now.

8           Would you agree that the second chord in the first

9   line of the music in this published sheet music for *Thinking*

10  *Out Loud* is D/F sharp major?

11  A.  That's the symbol that's used, but if you look down below

12  where you are not showing it, there is no D.

13  Q.  I'm not asking -- I'm asking you what the chord progression

14  that is reflected in the published sheet music of *Thinking Out*

15  *Loud*, is it D/F sharp major?

16  A.  It's -- that is the chord symbol, but that is not

17  necessarily the notes that are being played.  Because if you

18  look below, those notes are being played.  There is no D.

19  Q.  You're saying the sheet music is wrong now?

20  A.  Yes.

21  Q.  OK.  But the D/F sharp major, that is a one/three in Roman

22  numerals, correct?

23  A.  Yes.

24  Q.  OK.  So your own report, your own sworn statement and the

25  published sheet music all say one three, but now you are saying

1   that it's not that, and you want to make it more similar to

2   *Let's Get It On*, is that correct?

3   A.  Not at all, because if my declaration -- and I know in my

4   declaration I made a detailed description of these opening

5   24 seconds with the transcription of every note of the guitar,

6   as did the other musicologist, and they both -- we both agreed

7   that note is not there.

8   Q.  But I'm talking about --

9   A.  So the chord symbol --

10  Q.  Excuse me, Dr. Stewart.  I'm talking about the melodies in

11  the transcriptions that you have placed in issue in this place,

12  not other parts of other transcriptions you did.

13          So let's stay on topic.  You also claim similarity

14  with respect to the anticipation used in the chord progression,

15  correct; you say that the second and fourth chords are played

16  before or ahead of the beat, correct?

17  A.  I'm sorry, could you repeat that?

18  Q.  You claim similarity with respect to the anticipation

19  that's used with the chord progressions at issue, correct?

20  A.  Yes.

21  Q.  And that the second and fourth chords are played ahead of

22  the beat?

23  A.  Yes.

24  Q.  And you're aware that the court has ruled that there is

25  uncontradicted proof in this case that anticipation is common,

 1    correct?

 2    A.  Of course.  It's not --

 3    Q.  Are you aware of that?

 4    A.  It's with this combination of chords in anticipation that

 5    it's not common.

 6    Q.  That's not my question?

 7    A.  Yes.  But, of course, anticipation as a consent is common,

 8    yeah.  How could you --

 9    Q.  Before writing your report in this case, did you review all

10    of Ed Sheeran's prior songs?

11    A.  No.

12    Q.  Did you review any of them?

13    A.  Yes.

14    Q.  Were you aware that Ed Sheeran himself used anticipation in

15    at least 20 songs that he wrote before *Thinking Out Loud*?

16    A.  That would not surprise me at all.  All people use

17    anticipation.  I mean, not all, but many, many composers,

18    songwriters, use anticipation.  There has never been any claim

19    that anybody can own anticipation, that it's ...

20    Q.  Well, when we're talking about the combination of the chord

21    progression and the anticipation that's at issue here, you're

22    aware that you are prohibited from saying whether or not that

23    combination is unique to *Let's Get It On*, right?

24    A.  I'm not sure if I'm prohibited from saying the combination

25    is.

```
 1   Q.  Did you read the court's ruling before you testified today?
 2   A.  I did, and it was not clear to me that I couldn't say the
 3   combination.  But I would appreciate clarification.  I thought
 4   that separately the idea that anticipation and separately the
 5   chord progression couldn't be considered that way.
 6   Q.  So let's get you that clarification then.
 7           For reasons particular to this case, Dr. Stewart shall
 8   not characterize Let's Get It On or a constituent element of
 9   it, such as a chord progression or harmonic rhythm, as being
10   unique, distinctive, unusual, or the like.
11           So it refers to any other constituent element of it.
12   Does that give you some clarification?
13   A.  Well, the way I read that, it says "or," it doesn't say
14   "and."  And so I read it as they are separate concepts, which
15   indeed they are.
16   Q.  But, of course, maybe it doesn't matter because you've
17   already acknowledged that there is at least one song that has
18   that combination previous to Let's Get It On, right?
19           MR. FRANK:  Objection, calls for legal conclusion.
20           MS. FARKAS:  I'm not asking for a legal conclusion.
21   It was the same question he already answered before.
22           MR. FRANK:  You said does it matter.
23           THE COURT:  Overruled.
24           I think it calls for a factual conclusion.
25           MR. FRANK:  Thank you, your Honor.
```

BY MS. FARKAS:

Q.  Can you answer the question?

A.  Could you repeat it, please?

Q.  Probably not.  I'll do a similar one.

You agree that *Let's Get It On* was not the first song to combine the chord progression at issue and the anticipation at issue, correct?

A.  Combined the chord progression and what?

Q.  The anticipation of the second and fourth chords, correct?

A.  That's correct.  We have heard *Georgy Girl*.

Q.  You admitted that the same combination appears in at least two versions of a song called *Georgy Girl*, correct?

A.  Yes.

Q.  And if you look at your slide 78, you admit that a version of *Georgy Girl* has the same chord progression with the anticipation of the second and fourth chords as well; you admit that on your slide, correct?

A.  Yes, the two very obscure versions that would not have had widespread popularity.

Q.  Right.  But whether or not it is obscure or popular or anything, it existed before *Let's Get It On*, correct?

A.  Yeah.  But my understanding, and I'm not a lawyer, but my understanding that if it's not copied, it's original.

MS. FARKAS:  Move to strike, your Honor.

MR. FRANK:  He was answering a question, your Honor.

1              THE COURT:  I think we're quarreling over words.  The

2      motion is denied.

3      Q.  If we look at your slide 79, there's another version of

4      *Georgy Girl* that has the same combination of the chord

5      progression and anticipation of the chords, the one by 101

6      Strings Orchestra, correct?

7      A.  Yes.  Here, they are clearly anticipated.

8      Q.  And both of these versions of *Georgy Girl* were recorded and

9      released before *Let's Get It On*, correct?

10     A.  Yes.

11     Q.  And *Georgy Girl*, by the way, was the title song of a very

12     popular movie from the '60s, isn't that correct?

13     A.  Yes, it was.

14     Q.  And are you aware that the song was nominated for best song

15     at the Oscars?

16     A.  I was not aware of that.

17     Q.  And it was a number one hit in the United States?

18     A.  I'm sorry, what?

19     Q.  It was a number one hit in the United States, are you aware

20     of that?

21     A.  It wouldn't surprise me.  None of these versions were.

22     Q.  OK.  But in contrast to the version of *Georgy Girl* by the

23     Mexican band leader that you have disparaged, could you imagine

24     that a version of the song being nominated for an Academy Award

25     and achieving number one status on the charts would have some

1    influence?

2    A.   It was obviously a very popular song, so I'm not sure what

3    you're asking.

4    Q.   Well, you have no idea whether Ed Townsend heard any of

5    these songs, do you?

6    A.   I wouldn't be surprised at all if he heard the Seekers

7    version, but these other two versions I would be very surprised

8    if he heard that.

9    Q.   I'm not asking if you would be surprised, I'm asking if you

10   know.

11        Do you know whether or not Ed Townsend ever heard

12   either, any version of *Georgy Girl* before?

13   A.   Of course I can't know.  I wasn't with him.

14   Q.   Did you know that the Boston Pops also released their own

15   version of *Georgy Girl* in 1968?

16   A.   No, I didn't know that, but it's not surprising.

17   Q.   Do you know the Boston Pops version also uses this same

18   combination?

19   A.   That wouldn't be surprising.  That was basically easy

20   listening music, too, so ...

21   Q.   And do you find these versions, the 101 Strings, the

22   orchestra, and the Boston Pops version, more relevant than the

23   version created by someone you characterize as an obscure

24   Mexican band leader?

25   A.   I'm sorry, what?

 1  Q.  Do you find these versions more relevant than the one that

 2  you cast off as being recorded by an obscure Mexican band

 3  leader?

 4  A.  OK.  You know, I've spent a lot of time in Mexico

 5  researching Mexican music.  I don't think this is just sort of

 6  a casual statement.  But he would certainly be obscure to the

 7  average American.  I mean, how can that be disputed?

 8          So, I'm sorry, I don't -- if there is some other

 9  question here that you're getting at ...

10  Q.  Sure.  The question is whether this combination existed

11  before *Let's Get It On*, isn't that the relevant question?

12  A.  No, not in my opinion.

13  Q.  Well, let's look at the definition of unique.

14          So unique being the only one, so using that

15  definition, you would agree with me, don't you, that *Let's Get*

16  *It On* was not the only one to use the combination of the chord

17  progression with anticipated second and fourth chord, correct?

18  A.  I never said that that was unique and I wouldn't say it

19  now.

20  Q.  Are you familiar with the song *You've Lost the Sweetest Boy*

21  released in the 1960s?

22  A.  Which song?

23  Q.  *You've Lost the Sweetest Boy*?

24  A.  You lost the what?

25  Q.  The sweetest boy.  It was recorded by Mary Wells?

1    A.  As a matter of fact, I saw it in the slides that you

2    proffered, or that your side proffered, yes.

3    Q.  Right.  Have you ever --

4    A.  I was not aware of that song, no.

5    Q.  Are you aware -- I guess then you wouldn't be aware if it

6    was recorded in 1963?

7    A.  I am now, yes.

8    Q.  Have you ever performed with Mary Wells?

9    A.  No.  Mary Wilson from the Supremes, not Mary Wells.

10   Q.  Are you aware that *You Lost the Sweetest Boy* combines the

11   1,3,4,5 chord progression with anticipated second and fourth

12   chords?

13   A.  I listened to it after I received your slides, and I am

14   aware that it occurs three times in the course of the song,

15   three places for about six seconds each time.

16   Q.  OK.  So it does appear in the song?

17   A.  It appears, yes.  But it's easily missed because it's a

18   very small part of the song.

19   Q.  But it exists?

20   A.  It exists, yes.

21   Q.  Correct?

22         And did you also notice that *You Lost the Sweetest Boy*

23   is recorded or written in the key of E flat major, which is the

24   same key as *Let's Get It On*; did you notice that?

25   A.  I did notice that.

1    Q.  So *Let's Get It On* was not the first chord to combine those

2    elements together either, correct?

3    A.  Which elements?

4    Q.  The chord progression, the anticipation of the second

5    fourth, and that it happens to be in the same key as well?

6    A.  I don't think the key is relevant anyway.  I've never

7    claimed it was.

8    Q.  Combines the two elements you believe is relevant, the

9    chord progression and the anticipation of the second and fourth

10   chord?

11   A.  Yes, um-hmm, very briefly.

12   Q.  Hold on, please.  I would like to move on to the melodies

13   that you have placed at issue in this case.

14          First, I would like to talk about the definition of

15   melody, if we can put a definition on the screen, please.

16          Could you read that to yourself and tell me if you

17   agree with that definition of melody?

18   A.  I'm very familiar with that definition, and yes.

19   Q.  In fact, you previously swore under oath that this is the

20   proper definition of melody, correct?

21   A.  Yes.

22   Q.  And so focusing on, I believe -- for the record, I believe

23   that we may have bolded that language, so the record is

24   clear -- an essential element in the formation and recognition

25   of melodies is duration, correct, rhythm?

1    A.  Duration and rhythm are not exactly the same thing, but

2    yes.

3    Q.  What about metric placement of each note within the bars of

4    melody, that is also essential, right?

5    A.  It's another factor.

6    Q.  And, in fact, you previously swore under oath at your

7    deposition in this case that what is critical here is the

8    placement of the note, didn't you?

9    A.  I don't recall saying that.  What is the --

10   Q.  Why don't we put it up?

11   A.  What is the statement again, please?

12   Q.  We'll put it up on the screen.

13           MS. FARKAS:  It's the deposition testimony.  I think

14   it's 187.

15   Q.  So referring you to your deposition testimony in this case

16   where you said, What is really critical here is the placement

17   of the note.  The placement of the note on the end of one, and

18   that it is a note that is sustained.

19           Do you see that?

20           Do you remember that testimony?

21   A.  Not exactly.

22   Q.  Well, do you agree that, when thinking about and discussing

23   melodies, that the placement of the note matters?

24   A.  It matters, but I don't know what the context is here.  I

25   could be talking about a specific instance where it is really

1    critical in terms of, um, the analysis of the similarity.

2    Q.  OK.

3    A.  It doesn't mean that it is always, um, what do I say --

4    that it's always really critical.

5    Q.  So, generally speaking, duration and metric placement are

6    both essential when you're analyzing melodies, correct?

7    A.  One factor along with pitch sequence and other, yes.

8    Q.  Yes.

9    A.  It's a factor that definitely needs to be considered,

10   um-hmm.

11   Q.  And, of course, doing so accurately is also important,

12   wouldn't you agree?

13   A.  Yes.

14         MS. FARKAS:  Your Honor, this is a good breaking

15   point.  I can go on for another ten minutes, but in terms of

16   just subject matter, it's, I think, a convenient point if it

17   works for the court.

18         THE COURT:  If you would prefer to stop now, I think

19   it's fair.  We'll resume with the usual 11 tomorrow.  Keep an

20   open mind.  You have a lot to hear still, and something you

21   hear near the end may change your understanding.  Don't talk

22   with anybody, even each other, about the case.  Stay well and

23   I'll see you tomorrow morning.

24         Good night.  Have a good evening.

25         (Adjourned to Thursday, April 27, 2023, at 11:00 a.m.)

                          INDEX OF EXAMINATION

Examination of:                                        Page

 ALEXANDER STEWART

Direct   . . . . . . . . . . . . . . . . . . 232

Cross By Ms. Farkas  . . . . . . . . . . . . 307