N4RsGRI1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  KATHRYN TOWNSEND GRIFFIN, *et al.*,

4            Plaintiffs,

5       v.                          17 Cv 5221 (LLS)

6  EDWARD CHRISTOPHER SHEERAN, personally
   known as Ed Sheeran, *et al.*,
7
            Defendants.
8
   ------------------------------x
9                                New York, N.Y.
                                 April 27, 2023
10                               11:15 a.m.

11

12
   Before:
13
                   HON. LOUIS L. STANTON,
14
                                     District Judge
15                                   – and a Jury –

16                       APPEARANCES

17 FRANK & ASSOCIATES PC
   BY:  PATRICK RYAN FRANK
18      KEISHA RICE
        KATHERINE VIKER
19      – and –
   BEN CRUMP LAW
20 BY:  BEN CRUMP
        Attorneys for Plaintiffs
21
   PRYOR CASHMAN LLP
22      Attorneys for Defendants
   BY:  ILENE SUSAN FARKAS
23      DONALD S. ZAKARIN
        ANDREW MARK GOLDSMITH
24      BRIAN MAIDA

25

1              (Trial resumed; in robing room)

2              THE COURT:  What are we here about?

3              MR. FRANK:  Your Honor, it's pursuant to the

4    plaintiff's request.  We filed a motion, a fifth motion in

5    limine last week, and the reason why we did so was in

6    connection with the slides that were provided by Dr. Ferrara

7    who is going -- the defendant's expert who is going to testify

8    shortly.

9              THE COURT:  Today?

10             MR. FRANK:  I don't know whether he's going to testify

11   today or not.

12             MS. FARKAS:  Probably next week.

13             MR. FRANK:  The reason why we're bringing it up today

14   is because the subject matter of Dr. Ferrara's testimony that

15   we -- prospective testimony we have a problem with is that he

16   has come up with a new opinion and new information as it

17   relates to what he's going to talk about.

18             Our issue is the song by Mary Wells, I think it's

19   called *My Sweetest Boy*, this is referenced as prior art.  The

20   first time it has been brought up was when the slides were

21   provided to us by the defendant last week.  It is not in any of

22   Dr. Ferrara's reports.  It's never been disclosed before.  But

23   obviously Dr. Ferrara has not testified yet.

24             So that wouldn't be a problem but for the fact that

25   Ms. Farkas elicited testimony yesterday from our expert about

```
 1    that very song.
 2              THE COURT:  Well, well.
 3              MR. FRANK:  Yes.
 4              THE COURT:  Why not?
 5              MR. FRANK:  Because that is -- she did it predicated
 6    on the new opinion, the new prior art that was provided by
 7    Dr. Ferrara a week ago.  It was not in any of his expert
 8    reports.  It was not disclosed within discovery.  It was
 9    disclosed a week prior to the commencement of trial.  So we do
10    not believe that they have -- they should be allowed -- they
11    should be disallowed from referencing that song or Dr. Ferrara
12    from testifying with regard to that song.
13              Similarly, your Honor, you had made a ruling on one of
14    their motions in limine based on the absence of an opinion by
15    Dr. Stewart in one of his reports.  We're asking that the same
16    be done here.  If they can furnish they ever disclosed that
17    song before last --
18              Did you?
19              THE COURT:  Number one, be still, starting now.
20              MR. GOLDSMITH:  I apologize.
21              THE COURT:  Don't make gesticulations.
22              MR. GOLDSMITH:  I apologize, your Honor.
23              THE COURT:  Don't speak.  I know you're here, and
24    anybody here will be heard --
25              MR. GOLDSMITH:  I apologize, your Honor.
```

N4RsGRI1

1          THE COURT:  -- at a proper time and in a proper

2    manner.

3          MR. GOLDSMITH:  May I speak, your Honor?

4          THE COURT:  Excuse me, no.

5          MR. GOLDSMITH:  OK.

6          MR. FRANK:  Your Honor, the only other thing I would

7    say it's a new song not disclosed.

8          THE COURT:  You said that.

9          MR. FRANK:  What we're asking for is that it be, the

10   reference to it --

11         THE COURT:  What's the point at issue?

12         MR. FRANK:  The prior art argument.  They are using it

13   in support to bolster their prior art argument.

14         THE COURT:  In what connection?

15         What's the point at issue?

16         MR. FRANK:  They are saying that the combination of

17   chords, common elements as part of our selection and

18   arrangement claim, existed prior to *Let's Get It On*.

19         THE COURT:  What is the evidence that you want to

20   elicit?

21         What's your view of this dispute?

22         MS. FARKAS:  So there is a few things I would like to

23   say, your Honor.

24         First of all, their entire motion is predicated on

25   something that's simply not true.  The timing of this

1    disclosure, they keep -- so they keep saying that we disclosed

2    the information late.  We didn't.

3            And in terms of what the evidence goes to, there is no

4    new opinions.  This goes to a key issue in dispute that

5    Dr. Ferrara has in his original report and this is just more

6    evidence that supplements it.

7            The notion that we should be precluded, and Mr. Bosman

8    can talk more about the timing issues.

9            THE COURT:  What I want to understand is what the

10   issue is about, not issues of whether you can be precluded or

11   can say this or say that.

12           What are we talking about?

13           MS. FARKAS:  The relevance, your Honor?

14           THE COURT:  What does it have to do with --

15           MS. FARKAS:  So the issue that this pertains to is the

16   very issue in dispute, which is whether or not the combination

17   of the elements at issue existed in prior art.  This has all

18   been disclosed to them well in advance of trial, certainly much

19   earlier than the entirely new testimony of their expert that

20   was dumped on us a week before trial.

21           None of this is new opinions of Dr. Ferrara.

22   Dr. Ferrara's opinions have been unwavering since 2018.  All

23   this evidence does is supplement those same opinions that he's

24   had from the beginning and many of these -- we disclosed three

25   years ago that we had 52 examples of prior art.

N4RsGRI1

| | |
|---|---|
| 1 | Did they ask for it?  No.  And then, what, certainly |
| 2 | by the latest six weeks before trial, we had identified every |
| 3 | single one of these songs to them.  Their expert had ample time |
| 4 | to look at them.  They are publicly available.  Dr. Ferrara |
| 5 | wasn't changing his opinions whatsoever.  They were just more |
| 6 | examples. |
| 7 | THE COURT:  OK.  Too much history. |
| 8 | MS. FARKAS:  I shall stop. |
| 9 | THE COURT:  He's not going to testify today? |
| 10 | MS. FARKAS:  He is not. |
| 11 | THE COURT:  We're not going to sit tomorrow.  You've |
| 12 | got three days to take this and analyze it and date it and |
| 13 | react to it. |
| 14 | MR. FRANK:  Your Honor. |
| 15 | THE COURT:  The motion is denied. |
| 16 | MS. FARKAS:  Thank you, your Honor. |
| 17 | MR. GOLDSMITH:  Thank you, your Honor. |
| 18 | MR. FRANK:  Your Honor, if I may -- |
| 19 | THE COURT:  Of course. |
| 20 | MR. FRANK:  -- supplement? |
| 21 | Our issue is not with any of the other prior art that |
| 22 | they've referenced.  Our issue is with one song that was not |
| 23 | disclosed. |
| 24 | THE COURT:  I understand that. |
| 25 | MR. FRANK:  They did not disclose it.  The problem is, |

N4RsGRI1

 1    and they kind of --

 2            THE COURT:  How can it be an issue of fact whether you

 3    disclosed it or not?

 4            MR. GOLDSMITH:  Yes, your Honor.  Thank you.

 5            I am equally baffled, which is why I was

 6    gesticulating.  I apologize.

 7            THE COURT:  I wasn't asking about your internal

 8    emotional state, I'm asking about how --

 9            MR. GOLDSMITH:  We disclosed it on March 13.

10            THE COURT:  Show me the disclosure.

11            MR. GOLDSMITH:  I can go get it.  It's at counsel

12    table.

13            THE COURT:  Go get it.

14            How are we doing on the jurors?

15            THE DEPUTY CLERK:  They are all here.  I had told them

16    that sometimes they might come out late because there might be

17    some type of a conference between the attorneys.

18            (Discussion off the record)

19            MR. GOLDSMITH:  Judge, I have my laptop here, my

20    colleague's laptop, with an e-mail dated March 13 that says --

21            THE COURT:  Show it to him.

22            MR. GOLDSMITH:  -- to Pat.

23            This is to you?

24            May I put it on the table?

25            THE COURT:  Sure.

1          MR. GOLDSMITH:  In addition to the below noted

2     change -- because I had sent him an e-mail earlier about

3     changes to the liability pretrial order -- we have made a few

4     minor changes reflected in the attached track changes redline.

5          Now I'm opening the track changes redline, and

6     paragraph 18 is our proposed findings of fact.  And in redline,

7     it's underlined and highlighted, it lists *You Lost the Sweetest*

8     *Boy*, 1963, by Brian Holland, Lamont Dozier, and Edward Holland

9     Jr., as recorded by Mary Wells.

10          That was March 13.

11          MR. FRANK:  The operative date being March 13, well

12     after discovery had closed in the case.

13          THE COURT:  Well, that's too bad.

14          MR. FRANK:  OK, your Honor.  I wanted to make that

15     objection.

16          THE COURT:  Motion denied.

17          MR. FRANK:  Thank you, your Honor.

18          MS. FARKAS:  Thank you, your Honor.

19          (Continued on next page)

20

21

22

23

24

25

1                 (In open court; jury not present)

2                 THE COURT:  Good morning.

3                 ALL PRESENT:  Good morning, your Honor.  The jury is

4     coming right in.  You're welcome to sit, but the jury is coming

5     right in.

6                 We need to get Stewart in his seat.

7                 (Jury present)

8                 Another conference of counsel on a collateral point,

9     which it was better to get rid of before disrupting in the

10    middle of the day.  I'm aware that you were waiting, and I keep

11    it as short as I can.

12     ALEXANDER STEWART, resumed.

13                THE COURT:  Good morning, Dr. Stewart.  You are

14    reminded that you're still under oath.

15                THE WITNESS:  Yes, of course.  Thank you.

16    CROSS-EXAMINATION

17    BY MS. FARKAS:

18    Q.  Good morning, Dr. Stewart.

19    A.  Good morning, Ms. Farkas.

20    Q.  I would like to start off today by looking at what you call

21    the opening melody.

22    A.  Yes.

23    Q.  I would like to look at the Deposit Copy, if we can pull up

24    your slide 37, please.

25                Can you identify the top transcription for us, please?

N4RsGRI1                        Cross - Stewart

1   A.  Yes.  That's simply the notation that's in the Deposit

2   Copy.

3   Q.  And that's what you're calling now the opening melody,

4   correct?

5   A.  But it's the first phrase in *Let's Get It On* and it is

6   transposed to D.

7   Q.  And how many pitches are actually expressed in the Deposit

8   Copy of this melodic segment?

9   A.  I think 14.

10  Q.  And your prior transcriptions before last week, the prior

11  transcriptions that were in this case, am I correct that your

12  prior transcriptions of this melody only showed nine pitches?

13  A.  I would have to see it.

14  Q.  You don't remember?

15  A.  The exact number of pitches?  No.

16  Q.  OK.  Well, let's pull up Exhibit 3 from Dr. Stewart's

17  report.

18          It's OK.  I will represent to you that your prior

19  transcriptions in this case had nine pitches.

20  A.  Well, I really think I would like to see it.

21  Q.  OK.  I'm trying to get it.

22  A.  Sorry.

23  Q.  Here, you know what, I have it for you.

24          Example three, I'm sorry.

25          MS. FARKAS:  Is there some feedback; is anybody else

1    hearing that?

2              THE DEPUTY CLERK:  Yes, we're working on it.

3              MS. FARKAS:  OK.

4              Your Honor, if I can just approach the witness?

5              I can show him a page from his report.

6              MR. FRANK:  Do you have a copy for me?

7              MS. FARKAS:  It's your expert's report, page seven.

8              MR. FRANK:  Can we have it?

9    BY MS. FARKAS:

10   Q.  I'm trying.  It's now projected on the screen for everyone.

11   A.  Could you show that first page of the report again?

12   Q.  The entire page it's on?

13   A.  A moment ago you put the first page up which had the date

14   and so forth.

15   Q.  Hold on.  I'll give you the whole thing.

16              It's everything now but that page.

17   A.  Thank you.  OK.  December 2017 report.

18   Q.  Dr. Stewart, have you had a chance to look at your example

19   three from your 2017 report?

20   A.  Yes.

21   Q.  Does that refresh your recollection as to how many pitches

22   you identified in the opening melody of *Let's Get It On* prior

23   to last week?

24   A.  I see 11.

25   Q.  How are you counting 11?

N4RsGRI1                          Cross - Stewart

1    A.  Well --

2    Q.  Let's look at the last three notes over the notes baby.

3            So the first two of those notes you would count that

4    as one note or two?  One pitch, excuse me.

5    A.  Oh, that's one.  It's tied.

6    Q.  OK.  So you want to try again?

7    A.  I get 11, counting the raised note, the inflected notes.

8    Q.  Let's look at how you actually charted it in your report.

9            Can you look a further down on that page and count how

10   many pitches you charted?

11   A.  I'm not sure what you're getting at.  I'm counting 11

12   pitches there.

13   Q.  I'm asking you to look at your own report, sir.

14           If you look at that -- look at the page that I gave

15   you.

16   A.  Yes.

17   Q.  And if you count the number of pitches that you charted.

18   A.  Are you saying that different pitches or the number of

19   notes?

20           There is a difference between notes and pitch.

21   Q.  Yes, there is.  I'm asking pitches.

22   A.  How many different pitches are heard?

23   Q.  Can you go further down the page, please.

24           So you wrote following standard musicological

25   procedure, the first phrase in each song can be converted to

1     the following pitch sequence.

2              How many pitches in your pitch sequence for *Let's Get*

3     *It On* did you display there?

4     A.   OK.   In that pitch sequence, there are only one, two,

5     three, four, five, six, seven -- nine, yes.

6     Q.   OK.   So now let's compare the pitches that are actually in

7     the Deposit Copy of *Let's Get It On* with the pitch in your

8     report.

9              Scott, would you mind.   It's the pitches, the two

10    comparison of the LGO pitch sequences.   No, sorry.   I can take

11    back the report from you.

12             It's OK.   We'll move on.   I would like to turn to the

13    slide that we were referring to before where you defined

14    melody.

15             Could you read that definition into the record,

16    please?

17    A.   Melody is defined as "pitched sounds in musical time" or

18    the interaction of rhythm and pitch.   The Harvard and Oxford

19    Dictionaries of Music further explain that, along with pitch,

20    duration or rhythm is an essential element in the formation and

21    recognition of melodies.

22             While we may separate these elements for the purposes

23    of analysis, it is essential to remember that both are defining

24    characteristics of melody ...

25    Q.   So not only is the existence of duration important, but the

1  particular duration of each note within a melody is essential

2  as well, wouldn't you agree?

3  A.  Yeah.  They are often separated for the purposes of

4  analysis, but the overall melody, it's important to take into

5  consideration all these elements.

6  Q.  OK.  So let's look at your slide 49.

7          Can you please identify what this is for us?

8  A.  This is from my presentation this week.  It's a Deposit

9  Copy representation on the top and transcription of *Thinking*

10 *Out Loud*, the first phrase.  So it's the first phrase of each

11 song.

12 Q.  OK.  And in your declaration you had called it melody A,

13 but now you're calling it the opening melody, just so there is

14 clarity in the record?

15 A.  Yes.

16 Q.  And you provide scale degrees under your transcription --

17 under your transcriptions on slide 49, correct?

18 A.  Yes, I do.

19 Q.  OK.  And we're looking at your charting of those pitch

20 sequences right there?

21 A.  Yes.

22 Q.  If you look at your *Let's Get It On* charting, you have two

23 number twos in parentheses that look like it's a smaller font.

24          Why are those smaller in size?

25 A.  Well, I was attempting to explain that during my

1    presentation that those two pitches are on a vowel sound and

2    they are extremely rapid.  The 30-second note is like 7.5

3    hundredths of a second, and so there's no way that a singer

4    would really be able to articulate those as distinct notes.

5    Q.  OK.  But we're talking about sheet music right, we're not

6    talking about any particular performance of the sheet music,

7    right?

8    A.  But anything --

9    Q.  Yes or no?

10         MR. FRANK:  Excuse me.

11   A.  On a page --

12         MR. FRANK:  Excuse me, your Honor.  We have an

13   objection, but we would like a sidebar for that, please.

14         THE COURT:  What's your objection?

15         MR. FRANK:  Well, this particular slide was excluded

16   by you yesterday pursuant to the request of the defendants,

17   from our presentation.  They asked for it to be excluded and

18   you did so, 49.

19         MS. FARKAS:  48, 50, and 51.  That's incorrect, your

20   Honor.

21         THE COURT:  No, the three others were excluded, 48,

22   50, and 51, if memory serves, and 49 was admitted and you were

23   here.

24         MR. FRANK:  I apologize, your Honor.

25         THE COURT:  You should.

1                MR. FRANK:  I'm mistaken.

2      BY MS. FARKAS:

3      Q.  I think there was a question pending, but I'll let you --

4      A.  I wasn't done answering.

5      Q.  Maybe there wasn't a question pending.  Let me...

6                All of the notes that appear in your transcription,

7      they actually appear on the Deposit Copy, correct?

8      A.  Yes, but I was trying to explain that anything can be put

9      on a piece of paper.

10     Q.  OK.  But all of the --

11     A.  In terms of -- it doesn't matter what -- but it's turned

12     into, you know, actual sound.  There is some things you could

13     write on a piece of paper that would be impossible to turn into

14     sound that would be clearly representing that.

15               MS. FARKAS:  I move to strike that answer as

16     nonresponsive and lacks foundation.

17               THE COURT:  Try rephrasing the question.

18               MS. FARKAS:  Sure.

19     BY MS. FARKAS:

20     Q.  All of the notes that are in the Deposit Copy are

21     registered with the copyright office, not only the ones that

22     you think are audible, correct?

23     A.  Yes.

24     Q.  If we look at how you transcribed *Thinking Out Loud*, you

25     have a small note here that we have identified or you have

N4RsGRI1                          Cross - Stewart

1   identified as a grace note, correct?

2   A.   Yes.

3   Q.   But you don't chart the grace note when you chart the pitch

4   sequence, do you?

5   A.   That's because --

6   Q.   Yes or no, sir?

7   A.   It's the same toneme.  It's number three and it is slurred

8   in.  It's more of an inflection than a distinct pitch.

9   Q.   So if a pitch repeats itself, you don't chart it?

10  A.   I'm sorry?

11  Q.   If a pitch repeats itself, you don't chart it?

12  A.   I didn't say that.  I said it's an inflection and...

13  Q.   If we look at the pitch sequence that you have here, *Let's*

14  *Get It On* is three, four, five, four, and the first four notes

15  of *Thinking Out Loud* are three, five, six, five.

16          Do you see that?

17  A.   Yes.

18  Q.   Those are the threes line up and that's it, right?

19  A.   In terms of vertically lining up, yes, you're right.

20  Q.   And you've -- it seems like the only notes that actually

21  line up in terms of the pitch sequences are the first three and

22  then you have a four five four and then there's another three.

23          Basically if you count the notes that line up, we have

24  four of the 14 notes, is that correct?

25  A.   Didn't you leave off two there?

1    Q.  OK, five.  I'll give you one more.

2            The pitch sequences are different, aren't they?

3    A.  Well, why don't you go back to where we can see both

4    transcriptions at the same time, please?

5    Q.  Sure.  Can you answer my question first?

6    A.  Yeah.  So I would say the one also lines up, it's very --

7    Q.  Not the way you charted it, sir.

8            As a whole, these pitch sequences are different,

9    aren't they?

10   A.  They have similarities and they have differences.  I

11   pointed out the differences when I did my presentation.

12   Q.  And looking at the *Thinking Out Loud* Deposit Copy, you have

13   indicated certain notes are the Es are naturals, correct, the

14   three pitches, that they are not sharps as they normally would

15   be in the key of D major?

16   A.  Yes.  They are the same number three because it's standard

17   in blues analysis, with which I'm very familiar.  Just call

18   that three because --

19   Q.  You call that three.  If it's a three sharp or three flat

20   or three natural, you just treat it all the same?

21   A.  In terms of blues' scholarship and theory, yes, it's the

22   same.

23   Q.  Is *Thinking Out Loud* --

24   A.  It's still heard as number three in the song.

25   Q.  Is *Thinking Out Loud*, would you call it a blues song?

1    A.   No, that was part of my point.  It was less bluesy

2    sounding.

3    Q.   Yeah, OK.  Now, your pitch analysis here there is nothing

4    in this pitch analysis presents the jury with an analysis of

5    the rhythmic durations within these opening melodies, correct?

6    A.   In my presentation?

7    Q.   In this analysis, there is nothing -- you did not present

8    the jury with an analysis of rhythmic durations of the notes in

9    the opening melodies in *Let's Get It On* and thought, did you?

10   A.   No, but I mentioned certain aspects of it where the phrases

11   begin rhythmically and the -- and where they sound similar.

12   Q.   I'm trying to get you to answer my question, sir.

13   A.   Yeah.

14   Q.   You didn't present the jury with an analysis of the metric

15   placements of any of these notes, did you?

16   A.   Well, I did in terms of the beginning and the end of the

17   phrase.

18   Q.   Beginning and the end.  OK.

19   A.   Um-hmm.

20   Q.   Let's turn to what you have identified as the *Thinking Out*

21   *Loud* chorus melody B, which is your slide 67.

22        Now, the melody you selected from *Thinking Out Loud* is

23   on the chorus of *Thinking Out Loud*, correct?

24   A.   That is the first phrase, yes.

25   Q.   Well, it's actually the second line of the chorus, right;

N4RsGRI1                          Cross - Stewart

1  you left out the melody that goes with so honey now?

2  A.  There's a pickup to the chorus.  It's not technically

3  within the actual chorus.

4  Q.  Your testimony is that it's not within the chorus?

5  A.  As I recall, it's the measure before the chorus begins.

6  Q.  OK.

7  A.  I could look at the sheet music or the transcription that I

8  did and refresh my memory, but that's what I recall.

9  Q.  OK.  And then you chart the pitches on slide 67 underneath

10 it, right?

11 A.  Yes.

12 Q.  There's nothing indicating the duration of each pitch in

13 this pitch sequence, is there?

14 A.  Of course not.  It's a pitch sequence, and I've made it

15 clear that when you're doing the pitch sequences, this is the

16 way it's done.  It's standard.

17 Q.  Nothing indicating the metric placement of these notes

18 within the measure, correct?

19 A.  No, because it's about the pitch sequence.

20 Q.  Right.  And pitch sequences are not, without rhythm, are

21 not melody, correct?

22 A.  Yeah.

23 Q.  By your own definition?

24 A.  Um-hmm.

25 Q.  Yes; correct?

1   A.  Yeah.  Overall melody includes the durations and the

2   rhythms.

3   Q.  Right.  And your pitch sequences do not include the

4   rhythmic durations and the metric placement, correct?

5   A.  I did not take the jury or the court through each note in

6   terms of the different rhythmic considerations.  I consider

7   that these are very similar rhythmically.

8   Q.  OK.  Well, I'm not asking --

9   A.  They are not exactly the same.  Clearly they are not

10  exactly the same.

11  Q.  And the pitch sequences are different, aren't they?

12  A.  They are very close.

13  Q.  Well, they are not in the same order, are they; the ones

14  you highlighted in red, the pitches are not in the same order,

15  are they?

16  A.  I think they are.

17  Q.  Well, out of 11 pitches, you have five lining up, correct?

18          Let's look at the second two pitches.  You have a four

19  four in *Let's Get It On*, you have a five five in *Thinking Out*

20  *Loud*.

21          Those are different, aren't they?

22  A.  You're not counting the three three, which also lines up,

23  which is in terms of the pitch sequence.

24  Q.  Isn't that a six?

25          Oh, there's a six.  Six out of 11 line up is what

1   you're saying?

2   A.  Is there a question there?

3   Q.  I'm not sure.

4          Have you transcribed a grace note in the *Thinking Out*

5   *Loud* melody in slide 67, that first note --

6   A.  Yes.

7   Q.  -- of *Thinking Out Loud*?

8          And unlike your pitch chart of the opening melody in

9   which you show a grace note, but you don't include the grace

10  note in your pitch chart, this time now you do chart the grace

11  note in your pitch chart, right?

12  A.  That's because this is a different pitch.  It's not three

13  and the other one it was the same toneme that was --

14  Q.  It was a yes-or-no question.  I wasn't asking you why.  I'm

15  just asking you yes or no.

16          This time you chart it, correct?

17  A.  For very good reason, yes.

18  Q.  And the reason is because it lines up better with *Thinking*

19  *Out Loud* -- with *Let's Get It On*, right?

20  A.  Well, that is what you would like me to say.  That's not

21  why.

22  Q.  I'm just looking at it.  You know, it lines up, doesn't it?

23  A.  But that's -- the sound is there.  I heard it and I

24  transcribed it, and it's a different -- clearly a different

25  pitch, whereas in the other situation it was they were both

1    three.  They were the same toneme.

2    Q.  Well, you have no problem charting notes that are the same

3    when they appear together.  You've got a three three, you've

4    got a five five, you've got a four four.  So it's basically

5    when a grace note works for you, you'll include it in the

6    charting; when it doesn't, you omit it, is that correct?

7    A.  Absolutely not, no.  These are distinct pitches where they

8    are repeated, and they are even set to different symbols so

9    they are clearly articulated.

10   Q.  I'm going to show you what's been marked as Joint

11   Exhibit 4.

12           This is the published sheet music for *Thinking Out*

13   *Loud*.  Can you show us the portion of *Thinking Out Loud* that

14   we're talking about here?

15   A.  It would be the first system at the top.  It's more than

16   the first system.

17   Q.  No, no.  We're talking about the chorus melody now,

18   correct, Dr. Stewart?

19           We're talking about your grace note, when you

20   transcribed in the chorus melody, not the beginning?

21   A.  Yeah.  But you put up the beginning here, so I'm not sure

22   what you're doing.

23   Q.  Well, tell us where it is.  Do you need to turn to the next

24   page?

25   A.  What --

N4RsGRI1                           Cross - Stewart

1   Q.   OK.

2   A.   You put up the beginning of the piece.

3   Q.   So, wait.

4           MS. FARKAS:   Scott, can you go back please where you

5   just were?

6   A.   So are we talking about the beginning or the --

7   Q.   I'm talking about --

8   A.   The chorus?

9   Q.   Your chorus melody that you identified in this case.  Can

10  you find it?

11          MS. FARKAS:   Scott, can you go to the next page,

12  please.

13          So if we look at this page which looks like it starts,

14  if we're going around bar 23, maybe you can make it a little --

15          Is that large enough for you, Dr. Stewart?

16  A.   Sure.

17  Q.   You have a grace note charted before the lyric take me into

18  your loving arms.

19          Do you see a grace note there?

20  A.   No.   There is a lot of things missing from this.  It's

21  standard with sheet music, it's --

22  Q.   Simple question, Dr. Stewart.

23  A.   Somebody was hired to do, basically, a piano score

24  arrangement of this piece, which is not purported to be a

25  transcription of what is on the recording.  It's somebody who

1  did a piano and voice arrangement of it.

2          MS. FARKAS:  I would like to move to strike that

3  answer as nonresponsive.

4  A.  It also shows here --

5  Q.  Dr. Stewart, there is no question pending.  Thank you.

6          THE COURT:  There is an unanswered question pending

7  about the grace note.

8          MS. FARKAS:  Correct, because his answer didn't answer

9  my question.  I moved to strike.  I would like an answer to my

10 question.

11 A.  Could you -- I didn't...

12 BY MS. FARKAS:

13 Q.  Yes or no?

14 A.  I didn't realize there was still a question pending.

15         Could you repeat it, please?

16 Q.  It's only pending because you have yet to answer it.

17         There is no grace note before the lyric take in the

18 public sheet music of *Thinking Out Loud*, correct?

19 A.  It does not represent what's on the recording.  But no,

20 it's not on the published sheet music, which is --

21 Q.  Thank you.

22 A.  -- an arrangement of the song published.  I think what

23 we're dealing with here is what is on the recording of *Thinking

24 Out Loud*.  That's my understanding.  That's the copyrighted

25 work.

1          MS. FARKAS:  I would like to strike this recitation by

2     Dr. Stewart for going on much longer than what I even asked of

3     him, please.

4          THE COURT:  Denied.

5     Q.  When we chart the pitch in the chorus melody without the

6     grace note consistent with the published sheet music for

7     *Thinking Out Loud*, it looks like this.

8          And when we look at it like this, only four notes line

9     up, correct?

10    A.  If you want to look at it like this, the way you have

11    arranged it, that is what it shows.

12    Q.  The notes are scattered.  There is a note that lines up

13    here and then two notes later another one and then three notes

14    later another one, correct?

15    A.  Well, you move back and forth between the transcriptions of

16    the recording and then the sheet music, so this is

17    representing -- now, what's on the sheet music is what you say?

18    Q.  Yes.  This is without your --

19    A.  The arrangement prepared for the sheet music?

20    Q.  This is what is on the published sheet music of the song

21    *Thinking Out Loud*?

22    A.  Which is an arrangement of *Thinking Out Loud*.  If you

23    purport that's what's on the arrangement of *Thinking Out Loud*

24    that was published as sheet music, I wouldn't argue with that.

25    Q.  Thank you.

1              Let's turn to slide -- your slide 73.

2              Am I correct that this is your slide that compares the

3     purported melodies of the section of *Let's Get It On* with the

4     lyric we're all sensitive people to a portion of the interlude

5     of *Thinking Out Loud*, that's correct?

6     A.   Yes.

7     Q.   Now, the melody that you have selected from *Thinking Out*

8     *Loud* is in the interlude, correct?

9     A.   Yes, it is.

10    Q.   A guitar solo while Mr. Sheeran is sings the lyrics la la

11    la?

12    A.   Yes, yeah.

13    Q.   The melody you've selected from *Let's Get It On* doesn't

14    appear in the interlude section of *Let's Get It On*, correct?

15    A.   There is no interlude in *Let's Get It On*, there's a bridge.

16    But I don't think it really matters where something comes from.

17    If there is a similarity, it's a similarity.

18    Q.   OK.

19    A.   So if somebody borrows something from another piece and

20    they put it in a different place, it doesn't change the fact

21    that it is borrowed, speaking generally.

22    Q.   Well, Dr. Stewart, didn't you testify completely to the

23    contrary to that at your deposition?

24    A.   I don't think so.

25    Q.   OK.  I would like to just pull up your deposition testimony

N4RsGRI1                        Cross - Stewart

1   from your deposition in this case at page 233, lines 6 through

2   21.

3           I will read what you said.  You said:

4   "A.  We've discussed why this is all a distortion to begin

5   with --

6           MS. FARKAS:  I'm sorry.  Let me skip to line 14.

7   Well, no.  I'm going to start over.

8   "A.  We discussed why this is all a distortion to begin with

9   because it's not looking at -- it's looking at -- you know,

10  there's so many things we've already talked about.

11  "Q.  Can you answer --

12  "A.  That kind of distortion --

13  "Q.  Can you answer --

14  "A.  We're looking at two different parts of the song.  Now

15  we're looking at yet another part.  We're looking at the chorus

16  of *Thinking Out Loud* as opposed to the verse of *Let's Get It*

17  *On*.  Why aren't we comparing chorus to chorus?"

18  Q.  I will represent to you that that is your prior testimony

19  in this case.

20  A.  Yeah.  I don't recall --

21  Q.  There's no question.

22  A.  I'm sorry.

23  Q.  Let's return to slide 73.  You write scale degrees below

24  each of the notes in the transcriptions and then you chart the

25  pitches again at the bottom, isn't that correct?

N4RsGRI1                         Cross - Stewart

1   A.   Yes.

2   Q.   In your transcription of the LGO Deposit Copy in slide 73,

3   you tie the second to the last note to the last note, correct,

4   the last two notes?

5   A.   Yes, the five.

6   Q.   And that's why you didn't write a second five scale degree

7   under the pitch sequence?

8   A.   Of course.

9   Q.   OK.  Let's pull up the Deposit Copy at page two.

10          If you could identify the melody and the lyrics that

11   correspond to we're all sensitive people with so much to give.

12          If you could look at the last -- let me know when

13   you've found it.

14   A.   Yes, I've got it.

15   Q.   If you look at the last three notes sung to the lyric give,

16   do you agree that there is no tie between the last two notes?

17   A.   OK.  We're going from one -- how do I put this -- this is

18   written with the note values doubled, compared to what we're

19   using in our transcriptions that we're comparing.

20   Q.   I'm just asking if you the last two notes are tied?

21   A.   Could we go back to the other slide?

22          Well, it's going to be different because of the

23   rhythmic -- the bar lines are different in this example from

24   the Deposit Copy.

25   Q.   I don't --

1    A.  So that is going to make a difference in how the ties and

2    so forth come back, come out.

3    Q.  You think that rhythmic duration changes whether the third

4    and the third to the last note and last note are tied versus

5    the second to the last note and last note are tied?

6         You think that is why your transcription is wrong?

7    A.  Wait a minute.  So we're talking about on the word give?

8    Q.  Yes.

9         Let me ask you the question again just so we make sure

10   we understand each other.

11        Do you agree that there is no tie between the last two

12   notes in the Deposit Copy?

13   A.  Well, there is a slur on -- on the same pitch on the same

14   syllable it's hard.

15   Q.  If you were just coming at this cold, Dr. Stewart, and I

16   asked you to chart those last three pitches, how would you

17   chart them?

18        First time today.

19   A.  Can we go back to the other example for a moment?

20   Q.  No.  Actually, I want you to answer my question.

21   A.  What is your question?

22   Q.  If you came in cold today and I asked you, could you please

23   chart those three pitches over the lyric give, what would you

24   chart?

25   A.  Well, in this meter with the tempo, with all the note

1    values doubled?

2    Q.  Well, I don't know.  You don't seem to ever count meter or

3    rhythmic duration any other time that you're charting pitches,

4    so why start now?

5    A.  There's -- there's -- this is a different, um, way that

6    it's notated.  All the note values here are twice as long.  And

7    in the other example --

8    Q.  OK.

9    A.  So that is why I'm asking to go back and look at what was

10   in the other example.

11   Q.  Can you please chart the pitches as you would chart them if

12   you had to do so right now for the first time?

13   A.  What do you mean chart them?

14   Q.  Would it be a six five or a six five five?

15   A.  Well, I would look at the musical context and the fact that

16   it's -- there's a slur there and it's the same pitch on the

17   same syllable.  I think this is really trivial thing to be hung

18   up on, so I guess I would say five five.  I mean, in the

19   strictest sense, if you think that a significant omission or

20   error, I certainly don't.  I think ...

21   Q.  OK.  Thank you.

22   A.  Yep.

23            We're not going to be able to see the other example?

24   Q.  We're going to go back to now slide 73.

25            So given what we just discussed, would you agree that

1    your pitch sequence of *Let's Get It On* is inaccurate?

2    A.  Well, if you would like to add another five at the end, I

3    would be happy to do it.

4    Q.  It's not what I would like.  I'm trying to get an accurate

5    depiction of the Deposit Copy.  I'm not sure why this is a

6    fight.  I'm trying to get an actual depiction of the Deposit

7    Copy, so I showed you the Deposit Copy.

8             People make mistakes.  I'm not -- this is -- I'm not

9    trying to elevate this any more than it needs to be.  I'm just

10   trying to get an accurate pitch sequence here.

11            Now that you've looked back at the Deposit Copy and

12   had another opportunity to look at it, would you agree with me

13   that there should be another five at the end of the *Let's Get*

14   *It On* pitch sequence?

15   A.  I would be happy to put another five at the end, sure.

16   Q.  OK.

17            MS. FARKAS:  Scott, can you put 73 back on, please.

18   Q.  Now, the metric placements of these notes that you have

19   highlighted are different, aren't they?

20   A.  Yes.

21   Q.  So, for example, the eight eight at the beginning of the

22   LGO melody is within beat two, but the eight eight at the

23   beginning of the *Thinking Out Loud* melody is within beat four,

24   correct?

25   A.  On these vocables, yes.

Q.  And a metric placement within beat two is different from a

metric placement within beat four, isn't it?

A.  Sorry.  Where?

Q.  The metric, what we've just identified, the metric

placement within beat two is different than putting notes

within the metric placement within beat four, isn't it; it's

different metric placement, right?

A.  Yes.  I mean, the pitches and the way -- well, the way this

is perceived, it sounds like a very similar melody, but I

wouldn't argue at all with the fact that the metric placement

is different.

Q.  And staying with the two pitches on scale degrees eight

eight that you've highlighted at the beginning of the melody,

the rhythmic durations of the eight eight are 16th notes and

eighth note, correct?

        I'm sorry.  16th note and an eighth note, correct?

A.  No.

Q.  What are they?

A.  The first note is a 16th note and followed by eighth note

and the other is eighth note triplets.  So it is really -- if

you divided up those two pitches in *Let's Get It On* more

evenly, you would end up with the exact same rhythm as you have

in *Thinking Out Loud*.  You would be dividing the beat into

three and starting on the second and third part of that

division.

1    Q.  You have to divide it to be the same?

2    A.  The difference here you're talking about is so minuscule in

3    terms of the rhythmic duration that I think it is completely

4    insignificant.

5    Q.  OK.  But they are different, correct?

6    A.  Notationally it looks different, but it's not.  We're

7    talking about hundredths of a second in terms of duration.

8    Q.  Well, you say hundredths of a second there is no tempo in

9    the *Let's Get It On* Deposit Copy.

10            That would change depending upon the tempo, correct?

11   A.  I'm talking about the tempo in *Thinking Out Loud*, which we

12   do know, and we're basically comparing them at the same tempo

13   in order to have a valid comparison.

14   Q.  OK.  But you would agree with me that the metric placement

15   and the rhythmic duration of those two first notes in each song

16   is different?

17   A.  I would agree with you that the metric placement is

18   different.  I don't agree with you that there is any

19   significant difference in the duration.

20   Q.  OK.  And all these red arrows that some are pointing one

21   direction, some are pointing another direction, it seems like a

22   lot of work to find notes that mash up, doesn't it?

23   A.  It didn't take me time at all.

24   Q.  Um-hmm.  Sure, it didn't.

25            And the spaces that you created in your pitch sequence

1   there, you create that of course makes them line up a little

2   bit more, doesn't it?

3   A.  It does because it's really just looking at the pitch

4   sequence by itself.

5   Q.  Yeah.  But you didn't create those spaces in your other

6   charts of pitch sequences, did you?

7   A.  Are you talking about the space in *Let's Get It On* that I

8   left?

9   Q.  Yeah.

10  A.  Yeah.  I did that intentionally because I did not want to

11  distort the fact that those are two separate phrases, and I

12  made that clear in my testimony.  I'm not trying to create a

13  similarity that's not there, so I put a gap there to represent

14  that we're going from one phrase to another.

15  Q.  Now, just for that one purpose you considered, perhaps, a

16  rest where you didn't do it in anything else, and it just so

17  happens that it makes them line up a little bit more?

18  A.  Not at all.  We have two distinct phrases here, and I said

19  in my testimony -- first of all, my analysis really focused on

20  the first half of the phrase we're all sensitive people.  This

21  slide was merely to show that some of the pitch sequence

22  continued on into the next phrase.  I made that very clear in

23  my testimony.

24  Q.  Now, would you agree that the similarities in these pitch

25  sequences is mostly due to the fact that they descend down the

1    scale stepwise, correct; *Thinking Out Loud* is almost completely

2    stepwise?

3    A.  Yes, but it's a descending scale with repeated notes.

4    Q.  Right, eight, seven, six, five.

5           Is *Thinking Out Loud* the first song to descend

6    stepwise down a scale?

7    A.  Of course not.

8    Q.  And *Thinking Out Loud* or *Let's Get It On* for that matter

9    was hardly the first song to descend stepwise down a scale,

10   correct?

11   A.  Of course not.  I've not seen any other song that did it

12   over this particular harmonic and rhythmic structure that we

13   have been looking at.

14   Q.  Right.  And isn't it true that repeating descending notes

15   in a scale is probably centuries old?

16   A.  Of course.  It's the combination of this expression with

17   the other expression that makes it a creative choice made by

18   the composer.  If it were just this by itself, I don't think we

19   would be sitting here, but it's context harmonically.

20   Q.  While *Thinking Out Loud* is almost completely stepwise,

21   *Let's Get It On* is not, correct?

22          It goes eight seven and then it goes back up to eight

23   then it goes seven, six, five, it skips four, right; so it's

24   not completely stepwise, correct?

25   A.  There is no four.  But yes, it does have that one step back

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  up to eight, that's ...

2  Q.  OK.  We're done with this.

3  A.  That's the difference.

4  Q.  Thank you.

5        You now there's been talk about mashups and medleys

6  and a bunch of terminology on that.  But mashups and medleys

7  and interpolations, they've been around for many years, right?

8  A.  I wouldn't say mashups have been around for many years.

9  That's more of a contemporary phenomenon with digital recording

10  and so forth.

11  Q.  But certainly before the one at issue in this case,

12  correct?

13  A.  What, mashup?

14  Q.  Yes.

15  A.  Yes, of course.

16  Q.  And, in fact, musicians often perform mashups or medleys or

17  interpolations during live performances, correct?

18  A.  No.

19  Q.  What about medleys or interpolations, that is a common

20  thing during live performances, correct?

21  A.  Yes, medleys and interpolations wouldn't be that uncommon.

22  I think interpolations are probably less common, but...

23  Q.  And --

24  A.  But mashups are not something -- they usually involve

25  recordings and playing two recordings simultaneously.  So it's

1    not something that you expect typically in a live performance.

2    Q.  How many live performances have you seen?

3    A.  In my life, how many live performances?

4    Q.  Have you seen a live performance of every performer that's

5    happened over the last 20 years?

6    A.  Well, I'll say that you often hear --

7    Q.  Answer my question.

8    A.  -- DJs do mashups because they are working with recordings.

9    Q.  Well, you said --

10            I'll move on.

11            You testified that with respect to certain concert

12   footage of Mr. Sheeran, whatever label you put on it, that it

13   was significant in your mind because he didn't segway back --

14   because, I'm sorry, the other mashups that you watched, OK, you

15   watched concert footage of Mr. Sheeran and you dismissed them

16   as not significant because he didn't segway back into the

17   original song that he was performing and that was a distinction

18   between the Zurich performance that we've been talking about,

19   correct?

20   A.  Yes.  I made that point that it seemed to be unique among

21   those performances.

22   Q.  And are you aware that in a live performance of *Take It*

23   *Back* and *Superstition* and *Ain't No Sunshine*, that Mr. Sheeran

24   returns back to the song *Take It Back*, are you aware of that?

25   A.  It's certainly possible.

1    Q.  Are you aware that Mr. Sheeran also performed his song *I*

2    *See Fire* and then segwayed into *Feeling Good* by Nina Simone and

3    segwayed into *I See Fire*; are you aware of that?

4    A.  No.

5    Q.  Now, you've relied upon this video we've been talking it

6    the Zurich performance, I think, where Mr. Sheeran -- where he

7    segways into the lyrics of *Let's Get It On* while playing the

8    chords of *Thinking Out Loud* during, a performance of *Thinking*

9    *Out Loud*, correct?

10   A.  I'm sorry.  I didn't follow you.

11   Q.  The Zurich performance that you rely upon, it's where

12   Mr. Sheeran performs *Thinking Out Loud* and then he segways into

13   singing certain lyrics from *Let's Get It On* over the chords of

14   *Thinking Out Loud*, and then he segways back into the lyrics of

15   *Thinking Out Loud*, correct?

16   A.  Yes, I guess you could describe it that way.

17   Q.  All right.  I would like to show you a video and then I

18   have a couple of questions for you after it.

19          (Video played)

20   BY MS. FARKAS:

21   Q.  Dr. Stewart, doesn't this video demonstrate how one can

22   play the melody and lyrics ever one song over another if they

23   share a similar chord progression?

24   A.  Well --

25   Q.  Yes or no?

A.  -- that's the whole point of Axis of Awesome.  They play

these -- I think they are kind of making light of the fact that

there are all these pop songs that use this four-chord schemia.

There's been a lot of analysis of this in terms of music

theorists because of this phenomenon.  It's something

relatively recent in pop music, using these same four chords.

That doesn't mean that every song would fit over these four

chords, I think, but the point of the Axis of Awesome is that

they chose songs that do.

Q.  So that's a yes, that you can; if songs share a similar

chord progression, you can sing the melody of one song or

another song over that same chord progression, correct, just as

demonstrated in that video?

A.  Yes, um-hmm.

Q.  I would like to just show you your c.v. quickly.

On page two of your c.v., you list a total of two

books.  Your first book was published in 2007 and it's entitled

*Making The Scene:  Contemporary New York City Big Band Jazz*; is

that correct?

A.  Yes.

Q.  And the second book you list, am I correct that it's

actually a translation into Spanish that you completed of

someone else's book?

A.  No, it's not into Spanish.  It's from French and German

into Spanish.

N4RsGRI1                         Cross - Stewart

1    Q.  OK.  I'm not sure that's different from what I said.

2              That was a translation you did of someone else's book,

3    correct?

4    A.  Yes.

5    Q.  And that was published about 20 years ago, right, in 2003?

6    A.  Yes.

7    Q.  And am I correct that your most recent published article

8    was nine years ago, about 2014, is that correct?

9    A.  Let me take a look.

10             I have a chapter forthcoming in a book on protest

11   music by Oxford University Press that will be coming out very

12   soon.

13   Q.  OK.  But before that --

14   A.  So I'm still actively writing and researching.

15             In 2014, I published that article in the Law Review

16   Journal.  And then in 2013, I had two articles come out.

17   Q.  I was just asking about the most recent.  So 2014?

18   A.  But there is a forthcoming chapter.  I'm still publishing.

19   Q.  Now, turning to page one of your c.v., in the section on

20   your faculty ranks and dates at the University of Vermont, it

21   says you were the assistant professor from 1999 to 2005, and

22   the associate professor from 2005 to 2012, and then you were

23   promoted to professor in 2012, is that correct?

24   A.  That's what it says.  That's what I recall.

25   Q.  OK.  But if we look at slide two that you presented to the

N4RsGRI1                        Cross - Stewart

1    court yesterday, you indicated that your rank had been

2    professor of music since 1999.

3              But you actually weren't promoted to professor until

4    2012, isn't that correct?

5    A.  That's not what that is meant to indicate at all.  I meant

6    that I've been employed there since 1999.  It was not --

7    Q.  Well --

8    A.  To distinguish between the different ranks, I did not.

9    Q.  -- but, you know, I think you, you know, of anyone would

10   agree that there is a difference between professor and

11   associate professor and assistant professor, right; that has

12   meaning to you, correct?

13   A.  That's ridiculous.  That's not what this is about at all.

14   I wasn't going to put the year of each rank's promotion on a

15   slide.

16             What would be the point --

17   Q.  The point would be to be accurate, so...

18   A.  -- to show --

19   Q.  So to say that you have been a professor of music at the

20   University of Vermont since 1999 is actually incorrect?

21   A.  Not the way it was intended to be stated.  The day I

22   started working there, the students address me as Professor

23   Stewart, and I was thinking of it in that sense, not at all in

24   terms of rank.

25   Q.  I just want to talk a bit about your prior engagements on

1    copyright infringement claims.

2              Am I correct that there are three cases in which you

3    testified in a case on the liability portion against

4    Dr. Ferrara, who is defendant's expert in this case, is that

5    correct?

6    A.   Three, that's what you're saying?

7    Q.   That is what I'm counting.  You tell me if it's accurate.

8    I have the *Led Zeppelin* case, the *Smith v. The Weeknd*, and the

9    other one was *Batts v. Adams*; is that correct?

10   A.   The other one was what?

11   Q.   *Batts*, B-a-t-t-s, *v. Adams*.

12   A.   Yeah.  But we -- none of those -- we had a trial where we

13   were opposed to one another back in -- I don't remember the

14   exact year, if you want to pull up my c.v. -- where his side

15   lost and the court cited my testimony as being --

16   Q.   OK.  Well, you're clearly anticipating my testimony.  Let's

17   stick with my questions.

18             OK.  So we'll get to that one if you would like, but

19   putting that one to the side right now, am I correct that the

20   three cases where you were adverse to Dr. Ferrara on liability

21   were the three that I mentioned?

22   A.   I'm not sure what that means because we've been against

23   each other on probably more than three cases and that's not

24   including the one that I just mentioned, so...

25   Q.   So let's talk about the one that you just mentioned.

1          The one that you just mention is the Bridgeport case,

2    correct?

3    A.  Yes.

4    Q.  And you know, don't you, that at the point that Dr. Ferrara

5    came into that case, that the defendants had already conceded

6    liability because it was a sampling case and it was simply

7    about damages at that point, correct?

8    A.  I don't recall that exactly, but I know that they accepted

9    my evaluation of the damages over his.

10   Q.  But Mr. Ferrara had nothing to do with the claims of

11   infringement or the liability aspects of that case, correct?

12   A.  I don't know.  I have no idea.

13   Q.  In terms of your testimony versus his, his testimony that

14   you're aware of had nothing to do with the infringement claim,

15   it was on damages only, correct?

16   A.  I don't know.

17   Q.  Am I correct that in the *Led Zeppelin* case and *The Weeknd*

18   case and the *Batts v. Adams* case, that in all three of those

19   cases, Dr. Ferrara's opinions on liability were accepted over

20   yours, isn't that correct?

21   A.  That would seem to be correct.

22   Q.  Were you in the room when Ed Townsend wrote *Let's Get It*

23   *On*?

24   A.  Um, of course not.

25   Q.  And did you ever speak with Ed Townsend before he died

1   20 years ago?

2   A.  No.

3   Q.  While you have opined that you believe *Thinking Out Loud*

4   copies certain elements from *Let's Get It On*, you've never

5   spoken with Mr. Sheeran, have you?

6   A.  No.

7   Q.  You've never spoken with Amy Wadge either, his cowriter,

8   have you?

9   A.  No.

10   Q.  You certainly weren't in the room when they created

11   *Thinking Out Loud*, correct?

12   A.  No.

13   Q.  You testified earlier that you're not here today to offer

14   an opinion on whether or not *Thinking Out Loud* infringes *Let's*

15   *Get It On*, correct?

16   A.  That's not my role.

17   Q.  In fact, you can't offer that kind of opinion, correct?

18   A.  That's correct.

19   Q.  Nor can you testify as to whether any parts are distinctive

20   or unique, correct?

21   A.  Independently the parts, I'm not permitted to say, but I

22   think --

23   Q.  We'll disagree about the last part.

24   A.  Um-hmm.

25   Q.  How much are you being paid for your testimony today?

1    A.  You mean per hour or?

2    Q.  Sure?

3    A.  Total or what?

4    Q.  However you want to answer the question.

5    A.  My standard rates, which are significantly lower than many

6    musicologists, especially Dr. Ferrara's, are 275 an hour is my

7    standard rate.

8            MS. FARKAS:  Your Honor, if I could just have a minute

9    to confer, I may be done.  I think just one more question just

10   to clarify.

11   Q.  When the cases we talked about where the court accepted

12   Dr. Ferrara's opinions over yours -- it was the *Led Zeppelin*

13   case *The Weeknd* case, and the *Batts* case -- in all of those

14   cases you testified on behalf of the plaintiffs, correct?

15   A.  Yes, but I offered -- I have often worked for the defense

16   as well.

17           MS. FARKAS:  Thank you.  No further questions.

18           THE WITNESS:  Yeah.

19           MR. FRANK:  Redirect, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. FRANK:

22   Q.  Dr. Stewart, yesterday you were asked quite a bit about an

23   issue of, I guess, for lack of a better term, a note that you

24   got wrong, I think it was at the beginning of your testimony.

25           Do you remember that?

1  A.  Oh, it was about the chord symbol that was on the report on

2  the declaration, yes.

3  Q.  Do you remember when you were originally did that

4  transcription?

5  A.  The year, I think it was 2017 or 2018.

6  Q.  OK.  How many transcriptions do you believe that you put

7  together in this case over the last eight years?

8  A.  Countless.  My laptop has got dozens, maybe even hundreds.

9  Q.  Presumably all these transcriptions contain quite a few

10  notes, quite a few chords, quite a few other musical --

11  A.  Yeah.  Some are very small, they are just, you know,

12  intended to be an example that you can paste into a report.

13  Others are more lengthy, like a score for the entire piece of

14  music.

15  Q.  So I think if I understand you correctly, eight years ago

16  you got a note wrong in one transcription, is that fair?

17  A.  Well, I wouldn't say that.  I mean, it's a chord symbol

18  that they were stressing did not -- did not -- was inconsistent

19  with the chord symbols that I was using in the later in the

20  case, yeah.  Basically, the second chord being D major over F

21  sharp or F sharp minor, really a trivial difference dealing

22  just with one pitch.

23  Q.  All right.  And that was on the 2017 transcription that you

24  did, you got one symbol wrong?

25  A.  I guess you could put it that way, yeah.

1    Q.  Now, you were asked quite a bit about the sheet music for

2    *Thinking Out Loud*.

3              And if we could, could we put that back up?  That's

4    the Joint Exhibit 4.

5              I apologize, Ms. Farkas.

6              Now, if you could explain for the court and the jury,

7    what exactly is this sheet music?

8    A.  It's an arrangement --

9              MS. FARKAS:  Objection, lacks foundation.

10             THE COURT:  Overruled.

11   Q.  Can you explain what this is?

12   A.  It's an arrangement of *Thinking Out Loud* that was prepared

13   in order to sell to the public and these are issued in various

14   forms.  Some come in lead sheets, you can download these from

15   Music Notes.  You can see at the bottom Musicnotes.com.  This

16   is where I download sheet music as well.  Often they offer it

17   in several different formats, meaning a lead sheet or guitar

18   tablature.  This is a piano arrangement, so it's not intended

19   to be an exact representation at all of what is on the

20   recording.

21   Q.  When you use the word the term to be clear tablature,

22   guitar tablature, what is that?

23   A.  It's a way of representing the music without using notes,

24   and so guitar players often, if they don't read music, then

25   they would use tablature because it indicates where on the neck

1  you play the notes.

2  Q.  Above the staff at the beginning, at the beginning of the

3  song *Thinking Out Loud*, up there it's got the notes I believe.

4           That's delineates the notes, correct?

5  A.  Yeah.  If what you're getting at is the tablature at the

6  top giving the chord symbols, that is showing how to finger the

7  chords.

8  Q.  Would that be demonstrated how to finger the chords on the

9  guitar?

10  A.  Yes.

11  Q.  OK.  So those presumably those chord patterns that show

12  strings and where the fingers go over the threads, correct?

13  A.  Exactly.

14  Q.  So this would be useful presumably to someone who can't

15  read music, they are given a specific placing of the fingers?

16  A.  Yes.

17  Q.  Is this type of sheet music what is affectionately referred

18  to as guitar fake book or something of that nature?

19  A.  I'm sorry.  I don't understand.

20  Q.  Have you ever heard the term fake book?

21  A.  Yes.

22  Q.  Would this fit the bill for what a fake book is?

23  A.  Not really, no, because a fake book is usually more

24  minimal.  It has the chords -- the chords and the melody and

25  the lyrics and usually nothing else.

1   Q.  Would this -- but this particular sheet music would be

2   commercially available to people who wanted to maybe play the

3   song themselves either on guitar or piano?

4   A.  Right.

5   Q.  Does this sheet music conform with the actual

6   transcriptions that you did for *Thinking Out Loud*?

7   A.  It does not conform with my transcriptions, nor their

8   expert's transcriptions.

9   Q.  Is this sheet music, this commercially available sheet

10  music for people, is it an accurate depiction of the actual

11  sound recording of *Thinking Out Loud*?

12  A.  Absolutely not.

13  Q.  OK.  How close is it?

14  A.  Well, there is no piano in the first 24 seconds of *Thinking

15  Out Loud*, there's just guitar.  And those are not the pitches

16  that are being played on the guitar.

17          So, again, it's an arrangement.  It's for different

18  instruments, and I think no one would pretend that it's a

19  transcription of the recording.  That's not what it is intended

20  to be.  It's intended to be something that people can play.

21  Q.  During the course of your engagement in this case going

22  back to, I think it was, 2015, have you ever had occasion to

23  analyze this commercially available sheet music for *Thinking

24  Out Loud*?

25  A.  Yes.

1   Q.  You did?  OK.

2            Was it relevant to your analysis at all?

3   A.  I think it was something that provided another perspective

4   on the composition.  But in terms of the music examples that I

5   would cite in my reports, I wouldn't use it.

6   Q.  But as far as this case goes and what you were engaged to

7   analyze, you were engaged to analyze the sound recording,

8   correct?

9   A.  Yes.

10  Q.  So --

11  A.  That's the composition as I understand it, in terms of

12  *Thinking Out Loud*.

13  Q.  Right.  So other than giving you, perhaps, a different

14  perspective, this sheet music really isn't material to any of

15  the issues that you were asked to analyze?

16            MS. FARKAS:  Objection, your Honor.  I would just ask

17  that the leading stop.

18            MR. FRANK:  I'll rephrase the question.

19  Q.  Is this sheet music relevant, other than the perspective

20  you said, is it relevant to your analysis at all?

21  A.  No --

22            MS. FARKAS:  Objection, leading.

23  A.  -- not a bit.

24            THE COURT:  Sustained.

25            MR. FRANK:  If we could go to, I think it was, slide

N4RsGRI1                        Redirect – Stewart

67.

           THE COURT:  The jury will regard the last three

questions asked by Mr. Frank as being testimony by Mr. Frank

and utterly useless.  Pay no attention to it.

BY MR. FRANK:

Q.  Dr. Stewart, do you recall being asked about this earlier?

A.  Yes.

Q.  I wanted to be clear because it wasn't abundantly clear.

How many pitch sequence are actually in common here?

           It didn't seem as if we had an accurate number when

you were asked before.  Can you add them up and tell us how

many?

A.  Well, in *Thinking Out Loud*, you have one, two, three, four,

five, six, seven, eight pitches out of 11.

Q.  So, and what as far as the similarity in the pitches

between *Let's Get It On* and *Thinking Out Loud*, how many are

there?

A.  There are eight in *Thinking Out Loud*.

Q.  What are the common pitches between the two songs?

A.  Three five, four four, three three, and two three.

Q.  Do you know how many that is that they have in common?

A.  Eight.

Q.  OK.  Thank you.

A.  Eight out of 11.

Q.  Eight out of 11?

1   A.   Yeah.   And then this phrase in -- this is just looking at

2   the first phrase of the chorus, there are three phrases that

3   follow this, that follow a similar -- similar pattern.   So it's

4   really the bulk of the chorus.

5   Q.   OK.   Thank you.

6        You were shown, do you recall, a short while ago you

7   were shown a video called Axis of Awesome?

8   A.   Yes.

9   Q.   The songs that were shown, the songs that were shown by

10  that video or depicted in that video, are you familiar with any

11  of those songs?

12  A.   Not all of them.   There were a lot.

13  Q.   Do the ones that you're familiar with, do you know one way

14  or the other whether those songs don't have copyright

15  protection?

16  A.   I would assume they all do.

17  Q.   Thank you.

18       You didn't see *Let's Get It On* or *Thinking Out Loud*

19  depicted on that video, did you?

20  A.   No.

21  Q.   Dr. Stewart, with respect to the sound recording of

22  *Thinking Out Loud*, you were -- strike that.

23       Did you compare the Deposit Copy, attendant to your

24  analysis, did you compare the Deposit Copy of *Let's Get It On*

25  to the sound recording of *Thinking Out Loud*?

N4RsGRI1                      Redirect – Stewart

1   A.  Yes.

2   Q.  And that was what you were hired to do?

3   A.  No.

4   Q.  What were you hired to do?

5       MS. FARKAS:  Objection, your Honor.

6   A.  Just --

7   Q.  That's what -- that's the presentation you gave yesterday,

8   based on that analysis, the Deposit Copy and the sound

9   recording.

10  A.  I'm sorry.  Could you clarify what you're asking?

11  Q.  Your testimony yesterday that you gave in direct, was it

12  based on a comparison between the Deposit Copy of *Let's Get It*

13  *On* and the sound recording of *Thinking Out Loud*?

14  A.  Not initially.

15  Q.  Yesterday, your testimony?

16  A.  Oh, yesterday, it was all 100 percent based on the Deposit

17  Copy.

18  Q.  Thank you.

19      To be clear, the AI-generated recording that you

20  played during the presentation, did you create that?

21  A.  No.  That was created by the defense.

22  Q.  OK.

23  A.  So we had nothing to do with that.

24  Q.  Now, what is the selection and arrangement of common

25  elements from *Let's Get It On* that were taken by *Thinking Out*

1      *Loud*?

2                MS. FARKAS:  Objection, calls for a legal conclusion.

3                THE COURT:  Sustained.

4      Q.  What common elements combined together were taken from

5      *Let's Get It On* by *Thinking Out Loud*?

6                MS. FARKAS:  Same objection, but...

7      A.  The configurations I've identified --

8                MR. FRANK:  Wait for the judge to rule.  I'm sorry.

9                We respectfully submit it is not a legal conclusion.

10     He was called here to testify --

11               THE COURT:  The objection is sustained.

12               MR. FRANK:  OK, I see.

13     BY MR. FRANK:

14     Q.  What common elements of *Let's Get It On* appear -- what

15     combination of common elements from *Let's Get It On* appear in

16     *Thinking Out Loud*?

17               MS. FARKAS:  Objection, your Honor.

18               He's trying to be creative, but it's all seeking a

19     legal conclusion here that this witness is not competent to

20     testify about.

21               THE COURT:  Well, his purpose is not to be ruled on

22     and the question is nevertheless a different question and

23     itself unobjectionable.

24               Overruled.

25     Q.  Dr. Stewart, could you respond to my last question?

1    A.  Could you repeat it, please?

2    Q.  What combination of common elements from *Thinking Out Loud*

3    appear -- I'm sorry.

4           What combination of common elements from *Let's Get It*

5    *On* appear in *Thinking Out Loud*?

6    A.  The melodic figurations that I have identified, the

7    harmonic sequence of chords, the four chords, and then the

8    anticipation of the second and the fourth chord.

9    Q.  So those three common elements?

10   A.  Yes.

11   Q.  And in addition to that, do you have an opinion as to how

12   many melodies from *Thinking Out Loud* appear -- I'm sorry --

13   from *Let's Get It On* appear in *Thinking Out Loud*?

14   A.  Three.

15   Q.  Thank you.

16          Dr. Stewart, you were asked about your scholarly

17   writing.

18          You mentioned something about something that is

19   imminent that is going to be published.  Could you describe

20   that or identify that?

21   A.  Yes.  Oxford University Press is putting out a book on

22   protest music, and I contributed a chapter to this peer-

23   reviewed book and I've been waiting for it to come out now for

24   a little while.  I'm not sure what the delay is, but I'm told,

25   you know, the contracts have been signed and hopefully it will

1  be out any time now.  As far as I know, it's complete.  My

2  chapter is on protest music in Mexico.

3  Q.  With respect to other aspects of your scholarship, have you

4  spoken or attended any conventions or given any reports?

5  A.  I regularly attend all -- well, I have attended all of the

6  major scholarly organizations, such as the Society for music

7  Theory, the American Musicological Society, the Society for

8  Ethnomusicology, the Society for American Music, SAM, and I've

9  presented at all of these.

10         I've presented at the Latin American Studies

11  Association conference in Rio de Janeiro at the American

12  Studies Conference, and these are all national or international

13  conferences all the presentations are peer-reviewed.

14         So that's -- I'm a regular attendee.  I go to at least

15  one a year, sometimes more.  It's kind of expensive to pay all

16  the fees connected with registering for the concerts, the

17  travel, the hotel.  The university covers some of that, but I

18  try to keep abreast of all of the developments in the field.

19         I think that's really important.  every time I go, I

20  learn a lot about contemporary research and scholarship, and

21  that informs my work.  And I consider it essential in my role

22  as a research or a scholar, a teacher, to maintain that

23  activity.

24  Q.  When was the last time -- when would have been the last

25  time you went to one of these?

1   A.  Um, just this last fall.  It was a joint conference of

2   three of the major societies.

3   Q.  What was the presentation that you gave?

4   A.  I didn't give one that one.  The one I last presented at

5   was Minneapolis 2000, and that was a special panel on forensic

6   musicology, and it's role in determination of substantial

7   similarity in music copyright litigation.

8   Q.  All right.  You mentioned the term peer-reviewed.

9           What, if any, significance do you attach to that?

10  A.  That's important because that is -- that means that your

11  piers have looked at your work and evaluated it and determined

12  that it is worthy of being presented at these conferences.

13  Q.  All right.

14  A.  So peer review is kind of a way of trying to make sure that

15  the discourse is at a high-enough level.

16  Q.  And within the context of your work as a musicologist, have

17  you ever heard -- are you familiar with the premise that there

18  are only 12 notes which limits creativity?

19  A.  I am, indeed.

20  Q.  Do you have an opinion one way or the other as to that

21  premise?

22          MS. FARKAS:  Your Honor, I think we're getting outside

23  the scope of cross here.

24          THE COURT:  Sustained.

25          MR. FRANK:  Dr. Stewart, I think that's all I have.

1   Thank you.

2               Hold on one moment.

3               (Counsel confer)

4               That's all I have, Dr. Stewart.  Thank you.

5               MS. FARKAS:  I just have very quick few additional

6   questions.

7   RECROSS EXAMINATION

8   BY MS. FARKAS:

9   Q.  I would like to put slide 67, your slide 67 back on the

10  screen.

11              So focusing on the pitch sequence that you have

12  charted for these melody segments, is it your testimony that

13  eight of the pitches line up?

14              That's what you testified.  Are you sticking with that

15  testimony, Dr. Stewart?

16  A.  Were those my exact words?

17  Q.  I believe so.

18  A.  Well, I meant that they match.

19  Q.  Meaning that there are fours in both melodic segments, they

20  both have fours and they both have these and they both have

21  twos somewhere?

22  A.  And think are in similar sequence, yes.

23  Q.  So it's your testimony that the third and fourth note of

24  *Let's Get It On* matches the third and fourth note of *Thinking

25  Out Loud*; that's your testimony, you have it in red?

1    A.  No, I didn't say that at all.  I said that the ones in red

2    match.

3    Q.  Well, how does it match?

4         How does the four four match the five five?

5    A.  Well, because they both go from five to four.  This is

6    standard in terms of pitch analysis.  There's nothing unusual

7    about this, the sequence analysis.

8    Q.  OK.  But they don't line up in terms of the actual sequence

9    of pitches.  The third and fourth note of *Let's Get It On* is

10   four four and the third and fourth note of *Thinking Out Loud* is

11   five five, correct?

12   A.  No, I disagree with the way you're saying that.  I don't

13   think that --

14   Q.  The third -- I'm sorry.

15        The third and fourth note of *Thinking Out Loud* is not

16   five five.  Do you want to change your transcriptions?

17   A.  Well, you're covering up the transcription.

18   Q.  Well, let's let you take a look.

19   A.  So what I'm trying to say is that rhythmically they don't

20   line up exactly and -- but in terms of the actual pitch

21   sequence, I think that it's fairly represented, what's there.

22   Q.  OK.  And so the sixth, the fifth, and sixth note you have

23   three three in *Let's Get It On* and underneath it is four four

24   in *Thinking Out Loud*, but yet you made those red, too, right?

25        Those are not the same pitches, are they?

A.   Because they both go after the five, they both go to four.
This is standard procedure.

Q.   Well, actually it goes from five to four in *Thinking Out
Loud* and it goes from four to three in *Let's Get It On*, right?

A.   What I've done here is standard in terms of looking at the
pitch sequences and the fact that there is a few extra -- two
extra fives and one extra four does not change the similarity
in the pitch sequence.

It's just a question of the repetition of the notes
there.  It doesn't throw off the entire pitch sequence
analysis.

Q.   OK.  So no matter what the notes are, if they repeat, they
are going to be red for you, yeah?

A.   Not at all.

Q.   OK.  And this transcription also, just to include that
grace note as the first three pitch that we talked about
earlier, correct?

A.   Because it's a different pitch.  It's a different
introture.  It's a different -- you know, we talked about scale
degrees.  It's a different scale degree.

Q.   Right.  But that's the grace note that is not in the
published sheet music of *Thinking Out Loud*, correct?

A.   Which is -- yes, it's not in it, which is not a
representation of the recording.

Q.   Well, we'll see about that.

1   A.  Well, it's a fact.

2   Q.  It just so happens that when you put the three pitch in, as

3   the grace note into your charting, then it lines up with that

4   first three pitch of *Let's Get It On*, correct; they are both

5   threes, yes?

6   A.  Yes, um-hmm.

7           MS. FARKAS:  No further questions.

8           MR. FRANK:  Your Honor, at this time we would like to

9   move into evidence Dr. Stewart's report, which is listed at

10  Exhibit 102, by the plaintiff's, as well as his slides from

11  yesterday, minus the ones that were excluded by the court.

12          MS. FARKAS:  Objection, your Honor.

13          His report is hearsay and it is entirely based on --

14  it is not based on the Deposit Copy.  It's based on the sound

15  recording of *Let's Get It On*.

16          THE COURT:  We have his testimony at great length and

17  under some controls which were not applicable to the report.  I

18  think we will not take the report into evidence.

19          MR. FRANK:  Yes, your Honor.

20          May we move the slides into evidence, minus the three

21  that were excluded by the court yesterday?

22          MR. GOLDSMITH:  Objection, your Honor.  The

23  demonstratives are specifically for the purpose of

24  demonstration of testimony.  They are not substantive exhibits

25  to be admitted into evidence.

N4RsGRI1                        Recross – Stewart

1           THE COURT:  No.  The objection is sustained.

2           MR. FRANK:  Yes, your Honor.  Thank you.

3           (Counsel confer)

4           Yes, your Honor.

5           THE COURT:  I think it's time to adjourn for lunch.

6  We'll resume at 2:15 for the last afternoon of the week.

7           (Witness excused)

8           (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                                2:20 p.m.

3              (Jury not present)

4              THE COURT:  Was there something you wanted to do

5     before the jury comes in?

6              MS. ZAKARIN:  Your Honor, Mr. Frank hasn't rested yet,

7     so what I wanted to address --

8              THE COURT:  Wait.  Are you resting or sleeping?

9              MR. CRUMP:  No.  We haven't rested, your Honor.

10             THE COURT:  Then we'll have the jury.

11             (Jury present)

12             MR. CRUMP:  May it please the court, your Honor.

13             Plaintiffs call Mr. Stuart Camp to the witness stand.

14             THE DEPUTY CLERK:  Please stand and raise your right

15     hand.

16      STUART CAMP,

17         called as a witness by the Plaintiffs,

18         having been duly sworn, testified as follows:

19             THE DEPUTY CLERK:  Please state your full name and

20     spell it.

21             THE WITNESS:  It's Stuart Camp, S-t-u-a-r-t C-a-m-p.

22    DIRECT EXAMINATION

23    BY MR. CRUMP:

24    Q.  Mr. Camp.

25    A.  Hello.

 1   Q.  Could you tell the jury who you work for?

 2   A.  I work for myself.  I run a music management company.

 3   Q.  In this particular case, do you have an artist that you

 4   manage?

 5   A.  Yes.  I manage Ed Sheeran.

 6   Q.  Can you tell the juror what things you do for Ed Sheeran?

 7   A.  As a manager of a musician, you kind of oversee and look

 8   after all sort of professional aspects of their career.

 9   Q.  Do you promote his career?

10   A.  Yes.

11   Q.  Do you protect his career?

12   A.  Yes.

13   Q.  Do you help protect his copyrights?

14   A.  One of my -- we have a record label.  We have publishers

15   that look after the rights.  I have relationships with those.

16   Q.  Do you help protect his brand?

17   A.  Yes.

18   Q.  How long have you been working with Mr. Sheeran?

19   A.  About 12, 13 years.

20   Q.  Mr. Camp, did you have e-mail exchange about a conflict

21   Sony had with Jobete Records?

22   A.  Not to my knowledge.  I can't recall one.

23   Q.  So you don't remember having an e-mail exchange on

24   March 21, 2015 with Jim Doyle about Sony/ATV having a conflict

25   with Jobete Publishing?

1  A.  I don't.  I probably had an e-mail conversation with Jim

2  Doyle.  I don't remember the Jobete element, no.

3  Q.  OK.  Would you have any reason to not believe you and

4  Jim Doyle had a conversation about that conflict?

5  A.  No reason not to believe, I just honestly can't recall it.

6  Q.  All right.  I want to show you your e-mail between you and

7  Mr. Doyle and see if you recall this, and if I could have the

8  page.

9          Do you see the second sentence there?

10 A.  Yeah.

11 Q.  Can you read that second sentence?

12 A.  I think we need to tread carefully and take advice before

13 we do anything.  I want to get Sony/ATV out of the way first

14 with the settlement, as I believe they have a conflict with

15 Jobete.

16 Q.  So, in fact, back in March of 2015, you were talking about

17 the conflicts between Sony and Jobete Publishing, correct?

18 A.  That appears so, yes.

19 Q.  OK.  Now, can you tell the jury who manages your client Ed

20 Sheeran's catalog?

21 A.  For records, it's Atlantic Records U.K.  For publishing

22 it's Sony/ATV for his share of record rights and songs.

23 Q.  Did you come to find out that a Motown legendary artist

24 wrote publishings for Jobete Publishings?

25 A.  To be perfectly honest with you, sir, I probably didn't

1   acknowledge the name of the publishers at the time.

2   Q.  But you knew that Sony also managed Motown --

3   A.  We were aware there was a Sony -- there was a conflict with

4   Sony, yes.

5   Q.  They managed Marvin Gaye's publishing?

6   A.  Um-hmm.

7   Q.  You were aware of that?

8   A.  I wasn't personally, no.

9   Q.  You were not aware of that?

10  A.  No.

11  Q.  When you were sending e-mails with Jim Doyle, you weren't

12  aware of that Motown Publishing was --

13  A.  I would imagine this would have been the first time I was

14  really made aware of that conflict.

15  Q.  Were you aware that Ed Townsend's estate was managed, also

16  catalog publishing, was managed by Sony?

17  A.  We were ultimately made aware of that, yes.  We knew there

18  was issues.

19  Q.  And you all were talking about it back on March 21, 2015,

20  correct?

21  A.  That's what it says here, yes.

22  Q.  OK.  Now, as his business manager you acknowledge that

23  Sony/ATV manages his catalog, correct?

24  A.  For publishing, yes.

25  Q.  For publishing.

1          And that means they own all his copyrights, correct?

2     A.  Not all copyrights.  It's a share of the songwriting

3     royalties.  The recordings are owned by Atlantic Records.

4     Q.  So Sony gets money from managing that catalog, correct?

5     A.  Correct.

6     Q.  That means they go out and they collect for Ed Sheeran?

7     A.  Correct.

8     Q.  They go out and make sure somebody needs a license for

9     Ed Sheeran, that they manage it?

10    A.  They manage it in consultation with myself and my other

11    business partners.

12    Q.  OK.  And Atlantic Records, who is Atlantic Records?

13    A.  Atlantic Records is a record label that we are signed to in

14    the U.K.

15    Q.  OK.  And you understand what a copyright is, correct?

16    A.  Of course.

17    Q.  I'm sorry?

18    A.  Yes.

19    Q.  And do you understand copyrights are important, correct?

20    A.  Yes.

21    Q.  Because copyrights are very valuable, correct?

22    A.  Yes.

23    Q.  Now, Mr. Camp, do you understand that copyrights from all

24    artists are valuable, correct?

25    A.  Of course.

1    Q.   Ed Sheeran's copyrights are valuable, Marvin Gaye's

2    copyrights are valuable, correct?

3    A.   Correct.

4    Q.   And Ed Townsend's copyrights are valuable, correct.

5    A.   Correct.

6    Q.   In fact, Sony and Jim Doyle talked about there being a

7    conflict that in 2015 was them having all these rights to

8    oversee?

9         Is that a yes?

10   A.   Yes.

11   Q.   OK.   Thank you.

12        And, in fact, you know, there have been a lot --

13        Let me ask a question.   If copyrights weren't so

14   valuable, why would Sony be getting paid to license those

15   copyrights?

16        MS. ZAKARIN:   Objection.

17        MR. CRUMP:   Your Honor, he said he was in the music

18   business and helped manage Ed Sheeran's copyrights.

19        THE COURT:   What's the objection, Mr. Zakarin?

20        MS. ZAKARIN:   There are plenty of copyrights not

21   valuable.   It has nothing to do with the value of the

22   copyrights.

23        THE COURT:   Mr. Crump, I'm going to ask you to wait.

24   Give me a chance to rule on objections.   Don't just go on

25   taking testimony from the witness.   This came up yesterday, I

1    think.

2              MR. CRUMP:  Yes, sir, your Honor.

3              THE COURT:  All right.  Mr. Zakarin.

4              MS. ZAKARIN:  Yes, your Honor.

5              THE COURT:  What's the objection?

6              MS. ZAKARIN:  The objection is the question was if

7    copyrights are -- if copyrights weren't so valuable, why would

8    Sony get paid to license.  Sony gets paid to license under

9    agreements.  The question is irrelevant.

10             THE COURT:  What is the objection?

11             MS. ZAKARIN:  It has no foundation, your Honor.

12             THE COURT:  Excuse me?

13             MS. ZAKARIN:  It has no foundation for the question.

14             THE COURT:  It has no foundation.  Well, I think it's

15   argumentative and speculative, and I'm granting upholding the

16   objection on those grounds.

17             Bring it into this world or their world and they will

18   know what you're talking about.

19             MR. CRUMP:  I certainly will, your Honor.  I may need

20   direction from the court, when they do speaking objections, and

21   I can't respond --

22             THE COURT:  Are you calling this man as a hostile

23   witness?

24             MR. CRUMP:  Yes, sir, your Honor.

25             THE COURT:  I see.  I thought you were.

1               MR. CRUMP:  Thank you, your Honor.

2     BY MR. CRUMP:

3     Q.  Sony licensed *Let's Get It On* to Applebee's to sell here in

4     America.  Based on what you know about copyright, do you think

5     they did that for free?

6     A.  I couldn't possibly comment on what Sony's deal was.

7     Q.  Based on you being a business manager, would you license

8     and let an American restaurant chain use Ed Townsend selling

9     their commercials for free?

10               MS. ZAKARIN:  Objection, your Honor.  I don't know

11    what this has to do with infringement.

12               THE COURT:  Sustained.

13               MR. CRUMP:  May I be heard, your Honor?

14               THE COURT:  Speculative.

15               MR. CRUMP:  OK.

16    Q.  Are you aware of what copyright infringement is?

17    A.  Correct.

18    Q.  You understand what infringers are?

19    A.  Yes.

20    Q.  In fact, part of your job is to protect brands of your

21    artist, correct?

22    A.  Correct.

23    Q.  And had that ever been an issue with any of your artists

24    being called infringers?

25               MS. ZAKARIN:  Objection.

1              THE COURT:  Sustained as to form.

2              MR. CRUMP:  Yes, sir, your Honor.

3    Q.  As we sit in this court, have you ever had to deal with an

4    issue of Mr. Sheeran being called an infringer on the Internet?

5              MS. ZAKARIN:  Your Honor, this has been ruled upon by

6    your Honor and Mr. Crump is going into something your Honor has

7    long ago ruled is out of bounds.

8              MR. CRUMP:  Can I be heard, your Honor?

9              THE COURT:  Sustained.

10             You can be heard.  It might be better for you to be

11   heard at the sidebar.

12             MR. CRUMP:  OK.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  Mr. Zakarin, remind me of the Internet

3     situation.

4            MS. ZAKARIN:  Let's see.

5            THE COURT:  Speak into this.

6            MS. ZAKARIN:  I will, your Honor.

7            Your Honor, I'm going to hand you the order that

8     issued because, your Honor -- I'll wait until you read it.

9            MR. CRUMP:  Your Honor, this is a copyright

10    infringement case.

11           THE COURT:  It was until it turned into an estate

12    management.  Then it became a surrogate's court at issue.

13           MR. CRUMP:  Yes, sir, because the defendants who are

14    named have those issues that they are dealing with, namely

15    Sony.

16           But, your Honor, he stated that he was the manager,

17    that he was aware, part of his job was to promote and protect

18    Ed Sheeran's band, and he had been doing it for 15 years.  And

19    the only thing I was trying to establish with this witness is

20    this infringement issue because it came up in e-mails with him

21    and talking specifically about the *Let's Get It On* song, Judge.

22           This was a specific thing.  He even sent e-mails to

23    his client about it.

24           THE COURT:  If you had the e-mails mentioning *Let's*

25    *Get It On*, show them to me and Mr. Zakarin and maybe they are

1    proper for inquiry in this case.

2             MR. CRUMP:  I will.

3             MS. ZAKARIN:  That's fine, your Honor.

4             Let me just note though they've called him on their

5    case.  They may be calling him a hostile witness, but it's not

6    cross-examination.  It's their case.

7             THE COURT:  I'm sorry.  You can call a hostile

8    witness.

9             MS. ZAKARIN:  I know, but they haven't identified in

10   their direct examination, their list of exhibits, any of these

11   documents they are now talking about.

12            THE COURT:  Let's see the documents.

13            MS. ZAKARIN:  I agree, your Honor.

14            MR. CRUMP:  Your Honor, for the record, the documents

15   are e-mails from him and to him.

16            THE COURT:  Let's see them.

17            MR. CRUMP:  Yes, sir, your Honor.

18            MS. ZAKARIN:  Thank you, your Honor.

19            (Pause)

20            Do you want this back, your Honor?

21            It is number three.

22            THE COURT:  Yes.  I'll try and see what the dispute

23   underlying dispute is.

24            MS. ZAKARIN:  I'm anxious to find out myself.

25            Do you have a set for me?

1              MR. CRUMP:  You can look on from me.

2              MS. ZAKARIN:  I would rather have them for myself.

3              MR. CRUMP:  You have it.

4              MS. ZAKARIN:  I understand, but surprising I haven't

5      memorized everything.

6              All right.  Let me see.

7              MR. CRUMP:  Your Honor, I will keep my questions

8      specific only to things that he said involving this matter.

9              THE COURT:  Show them to me.

10             MR. CRUMP:  OK.  Yes, sir.

11             I may switch up, Judge, just a little bit here.  This

12     is what I was questioning on.

13             MS. ZAKARIN:  I don't know what this has to do with

14     this case.

15             THE COURT:  It's probably more for you to look at

16     these than me.

17             MS. ZAKARIN:  Yes, sir, your Honor.

18             MR. CRUMP:  I have some highlighted things here.

19             (Pause)

20             THE COURT:  Seems to me that the underlying briefing

21     with respect to that in limine application seems to involve a

22     prior claim of infringement by Sheeran.

23             MR. CRUMP:  And, Judge, I won't -- I won't talk about

24     any infringement anymore.  I want -- my goal with this witness

25     is simply to talk about when they knew about *Let's Get It On*

and *Thinking Out Loud* was an issue, the things that Sony did to
marginalize the claim, the fact that they knew about this video
in January of 2015, the one that has become a focus, and that
they even said Ed, during his video, was an issue.  They said
it.

THE COURT:  We'll get to that.

MR. CRUMP:  Yes, sir.

MS. ZAKARIN:  Your Honor.

THE COURT:  But just that.  That's all.

MR. CRUMP:  Well, Judge.

THE COURT:  What's the subject matter?

Never mind about the fiduciary duties or anything else
like that.

MR. CRUMP:  So let me say only to that, Judge, Sony is
a defendant, and I do believe a big part of our case is Sony
has a conflict because they were supposed to protect the
copyright infringement interests -- the copyright interests of
Ed Townsend's estate and they didn't do that.

MS. ZAKARIN:  If I can, your Honor.

THE COURT:  Let's first establish what the subject of
this inquiry is.  This one in 2015, seven years ago, eight
years ago.

MR. CRUMP:  Well, what he was doing then, they were
trying to squash this.

MS. ZAKARIN:  Your Honor, if I can on this?

1          THE COURT:  Yes.

2          MS. ZAKARIN:  What seems to be coming up here is a

3     claim that Sony did not fairly treat Mr. Townsend --

4          THE COURT:  Yes.

5          MS. ZAKARIN:  -- or his estate, which has nothing to

6     do with whether there is or is not an infringement.  And there

7     is no claim anyplace in this case that Sony laid back on its

8     ores.  What is here is Sony had a musicologist look at it and

9     said there is no claim, and Sony said since there is no claim,

10    they couldn't possibly do something to pursue a claim, and they

11    did what they did.  That's shown there.

12         What they are trying to show is that somehow Sony did

13    something wrong.  But that still doesn't relate to whether

14    there was an infringement.

15         THE COURT:  They did nothing when they should have

16    done nothing.

17         MR. CRUMP:  Exactly.

18         MS. ZAKARIN:  They did do something.  But even if they

19    did do nothing, which is not true, they did two independent

20    musicologists.

21         THE COURT:  Is there any reference to this in the

22    complaint in this action?

23         MS. ZAKARIN:  No.

24         MR. CRUMP:  But credibility is always an issue and --

25         THE COURT:  Whose credibility?

1          MR. CRUMP:  The defendant's.  Every defendants'

2     credibility is at issue.  And what Sony did, your Honor, then I

3     will shut up and follow the court's ruling.

4          THE COURT:  We are not receiving this on that issue.

5          MR. CRUMP:  It's not just on credibility.  It's the

6     fact that Sony did have the duty to deal with telling them

7     whether or not we know in these e-mails it shows from the

8     beginning, they were worried about trying to marginalize the

9     Gaye and the Townsend claims, the very claims that we're here

10    today.

11              It is critically important that --

12          THE COURT:  On the contrary, it's too remote

13              We are litigating a copyright infringement claim, not

14    one of a state administration or the conduct of a prior

15    discussion seven years ago.  It is not part of the claim in

16    this case.  It's not in the complaint.

17          MR. CRUMP:  OK.

18          THE COURT:  Is that accurate?

19          MS. ZAKARIN:  Correct, your Honor.

20          MS. FARKAS:  That's correct.

21          MS. ZAKARIN:  It's not in the complaint anywhere, your

22    Honor.

23          MR. CRUMP:  OK.  But I'll move on to other things.

24          THE COURT:  I think you should move away from it.

25          MR. CRUMP:  But, Judge, all I want to ask -- we hardly

1    ever object and let them try their case.  Every time we try to

2    try our case, they object and keep saying we can't try our case

3    how we want to try our case.

4                THE COURT:  But this is not part of your case.  The

5    case in this court is defined by the complaint in this court,

6    and it does not mention this as a claim.  We're trying an

7    infringement claim here, not one of state administration.

8                MR. CRUMP:  Thank you.

9                THE COURT:  Even if there is a similarity of motive.

10               MS. ZAKARIN:  Is this yours?

11               It belongs to you.  I think this one belongs to me and

12   this is yours.

13               MS. FARKAS:  I have a set.

14               MS. ZAKARIN:  OK.

15               THE COURT:  If there something you particularly want

16   to show me, I'll look at it.  But these are rulings that are

17   sound and I'm making.

18               MR. CRUMP:  You've given me direction, Judge.  I

19   understand it's about *Thinking Out Loud* and *Let's Get It On* and

20   those issues between those two songs.

21               THE COURT:  No, it's not.  Those aren't the issues.

22               MR. CRUMP:  OK.

23               THE COURT:  The issue is, was there infringement by

24   *Thinking Out Loud* of *Let's Get It On*.  That's the issue.  It

25   has nothing to contribute to it.

1          MR. CRUMP:  Judge, even about the concert video that

2     we have been talking about, he acknowledged in an e-mail that

3     this is a problem.  He acknowledged that in the e-mails.

4          THE COURT:  We are not discussing it in this case, in

5     this court.

6          MR. CRUMP:  I'm talking about the video, Judge.

7          MS. ZAKARIN:  They've played the video, we've seen the

8     video, and the video is what it is of Ed Sheeran when he played

9     *Thinking Out Loud* and went into *Let's Get It On*.  They've shown

10    it.  They've shown it.

11         MR. CRUMP:  I know we've seen it.  Judge, I think it's

12    only right that this jury know that Ed Sheeran and everybody

13    knew that this was a problem and then they started talking

14    about it amongst themselves.

15         MS. ZAKARIN:  So what.

16         THE COURT:  It's irrelevant to infringement.

17         MR. CRUMP:  OK.  Judge, let me ask all the questions

18    then.  If you're going to limit me, I want to at least proffer

19    what I was going to ask him about then because also we were

20    going to ask him about there is an issue about the creation of

21    the song that they talk about in the e-mails.

22         MS. ZAKARIN:  They've questioned -- they can question

23    Mr. Sheeran.  Mr. Camp was not there when --

24         THE COURT:  What's the --

25         MS. ZAKARIN:  -- when *Thinking Out Loud* was --

1              THE COURT:  What is the issue here in his papers

2     about --

3              MS. ZAKARIN:  Show it to me, too.

4              THE COURT:  -- about the creation?

5              MR. CRUMP:  Yes.

6              MS. ZAKARIN:  Camp has no personal knowledge of the

7     creation.

8              THE COURT:  He's got a document here.  All we want to

9     see is what's in the document.

10             MS. ZAKARIN:  I agree.  Show me.  I can't read that

11    way anymore.

12             MR. CRUMP:  I'll read it out to you.  We will also

13    need to counter the apparent online claim which I have not

14    seen.  That song was written at the request of Simon Cowell

15    based on Marvin Gaye.  And then you have conversations between

16    Ed Sheeran and his manager saying, Ed, we have to deal with

17    this issue that everybody is saying --

18             THE COURT:  Well, I'll allow you to do this.

19             Number one is don't testify.  Ask open questions, not

20    leading questions.  This is not a discovery dispute in your

21    other claim.

22             Number two, you can ask him what song was referred to

23    in that statement and what was the conversation in that

24    statement.

25             MS. ZAKARIN:  That's fine.

N4RsGRI2                         Direct - Camp

1          MR. CRUMP:  OK.  Yes, sir.  Thank you for the

2     direction, Judge.

3          MS. ZAKARIN:  That's fine, your Honor.  Thank you,

4     your Honor.

5          (Continued on next page)

1          (In open court)

2          MR. CRUMP:  If it may please the court.

3    BY MR. CRUMP:

4    Q.  Mr. Camp, did you have any discussions with Mr. Sheeran

5    about Simon Cowell talking about the creation of *Thinking Out*

6    *Loud* in any way?

7    A.  Not that I recall specifically.  I know there was -- there

8    was an insinuation about a Cowell conversation that came up

9    relatively recently that I was made aware of, but I can't

10   recall the conversation at all, no.

11   Q.  Would it help you to look at your e-mail, if that refreshes

12   your recollection?

13   A.  Yeah, yeah.

14          MR. CRUMP:  Your Honor, may I approach the witness?

15          THE COURT:  Yes.

16   Q.  Do you see that?

17   A.  I do, yes.

18   Q.  The date of April 2015?

19   A.  Correct.

20   Q.  And do you recall when *Thinking Out Loud* was released?

21   A.  Um, on the album it was summer 14.

22   Q.  OK.  And could you read what is in the e-mail between you

23   and Ed Sheeran?

24   A.  Yeah.  Yeah, that looks like a cut and paste from me.

25   Q.  Mr. Camp?

1    A.  Yes.

2    Q.  Could you read the e-mail?

3    A.  I did read the e-mail, yes.

4    Q.  OK.  Could you read it aloud?

5    A.  Starting from where?  What you can see on the screen?

6    Q.  Just that paragraph.

7    A.  From our side, we do urgently need Ed and Amy to give us

8    their written recollections with dates as to how the song came

9    about.  Clearly if Amy's interview last year is not correct,

10   then we need to know sooner rather than later.  We will also

11   need to counter the apparent online claim, which I have not

12   seen, that the song was written at the request of Simon Cowell

13   based on Marvin Gaye.

14   Q.  So this was an issue?

15   A.  I think there was something that we were made aware of by

16   our record label at the time.  But this e-mail, also this text

17   is not written by me.  This is cut and pasted from someone

18   else's e-mail, I believe.

19   Q.  Let's talk about that then.

20        Who was that e-mail sent to you from?

21   A.  I don't know.  It may have been Jim Doyle or Ben Cook.  I

22   honestly couldn't recall.

23   Q.  Who is Jim Doyle?

24   A.  Jim Doyle is somebody who works as part of the management

25   team.

1    Q.   Your management team?

2    A.   Mine, amongst others.

3    Q.   OK.  Does he have interaction with people in the states?

4    A.   Excuse me?

5    Q.   Did he have also dealings with people in the United States?

6    A.   We all have people with dealings with people everywhere.

7    Q.   Were you talking about, just this particular paragraph,

8    were you all talking with Sony/ATV as well as Warner Music

9    about this?

10   A.   I believe at the time this was the thirdhand conversation

11   with me about, I think -- I think Atlantic reached out to Sony.

12   I can't honestly recall, rather than it being a direct

13   conversation.

14   Q.   Had you all been made aware of any people from the estates

15   of Marvin Gaye and Ed Sheeran -- I'm sorry -- Ed Townsend

16   asking about the similarities between Ed Sheeran's *Thinking Out*

17   *Loud* and Marvin Gaye's *Let's Get It On*?

18   A.   Not -- not Ed Townsend.  I believe there was a conversation

19   with Ben Cook, who was the president of Atlantic Records at the

20   time.  Someone from the Gaye estate, I can't recall who, just

21   asked if we ever looked at it.

22   Q.   Was that Marvin Gaye III?

23   A.   I couldn't -- I couldn't confirm, but, you know, it could

24   have been.  I don't know exactly who it was.

25   Q.   Would seeing your e-mail refresh your recollection?

1   A.  Yeah, the whole one.

2   Q.  Again, on that same document you have, sir?

3   A.  Yeah, I'm just trying to ...

4   Q.  At the beginning?

5   A.  At the very beginning.  I'm sorry.

6           MS. ZAKARIN:  Your Honor, I'm just going to object on

7   relevance grounds.

8           MR. CRUMP:  Your Honor, I'll get back to the mic.

9           THE COURT:  What are you objecting to on relevance

10  grounds?

11          MS. ZAKARIN:  The inquiry relating to e-mails about a

12  claim after a claim was made.  I don't know how it is relevant

13  to the claim of infringement that we're litigating, that after

14  a claim was made, there were communications that a claim was

15  made.

16          THE COURT:  Well, that's the problem, I think, in

17  which he's trying to solve and that is if there is any

18  connection between these materials and the issues in this case.

19  And it may be that this witness's memory will explain whether

20  there is or is not.

21          MS. ZAKARIN:  Understand, your Honor.

22          I was just observing that maybe they will link it.  At

23  this point, I don't see the relevance, but I understand, your

24  Honor.

25  BY MR. CRUMP:

1    Q.  Mr. Camp.

2    A.  Yes.

3    Q.  Do you see the first part of that e-mail between you and Ed

4    Sheeran?

5    A.  Correct, yes.

6    Q.  And does that refresh your recollection about what's going

7    on with you all becoming aware in early 2015 of the claims that

8    Marvin Gaye estate has made?

9    A.  I've read the original e-mail.  It's not up on the screen

10   yet and it has, yes.

11   Q.  And what was that about?  You said you read it?

12   A.  That was -- that was Ben Cook who, like I said, was the

13   head of Atlantic Records in the U.K., had a conversation with,

14   as I said, Marvin Gaye III, and there had been an inquiry, was

15   the way to put it, about whether we had anyone look at it.

16   They thought there might be some similarities.

17   Q.  And, Mr. Camp, as the manager of Ed Sheeran, did you all

18   run the song for clearance to make sure that it had not copied

19   similarities of other songs before you released it?

20   A.  No.

21   Q.  You didn't do that, correct?

22   A.  No.

23   Q.  And, in fact, is it correct to say that after this became

24   an issue, you all started talking to Sony and others about we

25   need to get a report?

1    A.  I think Sony did the reports on their own back, but that's

2    normal.  If there's an inquiry made, we think there may be a

3    claim, it would be -- it would be prudent to check.

4    Q.  You said you think Sony did that on their own?

5    A.  I believe so.  I think the initial reports were for Sony,

6    yes.

7    Q.  OK.  So if I showed you your e-mail to refresh your

8    recollection that you all were inquiring of Sony to do that,

9    would that help you?

10   A.  Maybe.

11   Q.  OK.  Let's go to -- I think it's D.

12            MS. ZAKARIN:  Before something is posted on the

13   screen, can I see what it is?

14            I don't know what documents he's even dealing with

15   now.

16            MR. CRUMP:  It's the documents you all produced, but I

17   will give you what you all gave us.

18            MS. ZAKARIN:  I know we produced it, I just don't know

19   which one we produced you're using right this minute.

20            THE COURT:  This is not in evidence at the moment, is

21   it?

22            Please don't display things to the jury that are not

23   in evidence.

24            MR. CRUMP:  Yes, sir, your Honor.  It is marked as a

25   composite Exhibit 103 for the record, your Honor, and it has

1   not been admitted into evidence yet.

2          MS. ZAKARIN:  Your Honor, I would prefer not to

3   composite exhibits of things I don't even know what they are

4   compromising.

5          Again, your Honor, none of these exhibits were

6   identified, none of these documents were identified as exhibits

7   in the pretrial order by plaintiffs.

8          MR. CRUMP:  Here is your e-mail, sir, so you can

9   follow along.

10          THE WITNESS:  Thank you.

11          MS. ZAKARIN:  Mr. Crump, can you tell me what date

12   that document is?

13          MR. CRUMP:  March 21.

14   Q.  Mr. Cook, could you look at the e-mail --

15          THE COURT:  Mr. Camp, if you're going to offer it, I

16   would like to look at it, too.

17          MR. CRUMP:  Yes, sir, your Honor.

18   BY MR. CRUMP:

19   Q.  Do you see on March 21, Mr. Cook --

20   A.  Mr. Camp.

21   Q.  -- Mr. Camp, you received an e-mail from Ben Cook?

22   A.  Correct.

23   Q.  And what did it say regarding the musicology report?

24   A.  Which one?  This isn't regarding a report.  This is about

25   Ben Cook telling me there had been some communication.  I think

1    he's saying we should get a musicologist report, suggesting

2    someone should.

3    Q.  That's on the 21st, saying you should get one, and before

4    that nobody had ever gotten one?

5    A.  You wouldn't have any course to get a musicologist's report

6    normally on a song.

7    Q.  OK.  Then can you look also on that e-mail, March 26?

8    A.  Yeah.

9    Q.  Where you're talking about --

10          MS. ZAKARIN:  Excuse me.  Which e-mail do you want?

11   Because there's no March 26 on that e-mail chain.

12          MS. PASSEY:  Exhibit 128.

13          MS. ZAKARIN:  Exhibit 128 has been -- I thought it was

14   struck by the court.

15          But let me see it, please.

16          MR. GOLDSMITH:  We only go up to 127.

17          MS. ZAKARIN:  That's because 128 was stricken.  This

18   is a March 26 document?

19          MR. CRUMP:  Yes.

20          MS. ZAKARIN:  2015?

21          MR. CRUMP:  Yes, that e-mail from him and Peter --

22          MS. ZAKARIN:  I don't have it.  It was not among the

23   documents that you gave me to look at.

24          THE COURT:  Ms. Farkas.

25          Ms. Farkas, is the incidence, are the incidence in

1 │ these e-mails something to which you were referring in your

2 │ opening the other day?

3 │          MS. FARKAS:  No.

4 │          THE COURT:  No?

5 │          MS. FARKAS:  No.

6 │          THE COURT:  OK.  Thank you.

7 │          MR. CRUMP:  We've talked about e-mails in this trial,

8 │ your Honor.  I'll tell you exactly what I'm talking about.

9 │          MS. ZAKARIN:  I appreciate that.

10 │          THE WITNESS:  That one?

11 │          MR. CRUMP:  We're looking at the first paragraph of

12 │ March 26 there.

13 │          THE WITNESS:  Where your thumb is?

14 │          MR. CRUMP:  Yes, the first paragraph.

15 │          THE WITNESS:  OK.

16 │          MR. CRUMP:  OK.

17 │          MS. ZAKARIN:  Mr. Crump, can I see what that document

18 │ is?

19 │          MR. CRUMP:  You don't have that document.

20 │          MS. ZAKARIN:  That's what I've been saying for a bit.

21 │          You gave me a March 26 document.

22 │          MS. JACKSON:  Yes, sir, I did.

23 │          MS. FARKAS:  Is your graphics person publishing this

24 │ to the jury?  Because it's on our screen.

25 │          MS. JACKSON:  No.

1           MS. ZAKARIN:  The bottom of that page?

2           Let me see.  Excuse me.

3    BY MR. CRUMP:

4    Q.  Mr. Camp, could you look at that first paragraph between

5    you and Jim?

6    A.  Um-hmm.

7    Q.  And could you tell the jurors what you all are talking

8    about, or if you want to just read it?

9    A.  I think that's Jim telling me -- that's me telling --

10   initially telling Jim that I had spoken to Ed.  That, um, Peter

11   who is a musicologist at Sony, had been looking into this.

12   That's just Jim just saying, yeah, let's just see what comes,

13   really.

14   Q.  OK.  Can you read that paragraph?

15   A.  The one from Jim?

16          MS. ZAKARIN:  If I can, your Honor, these are not

17   documents in evidence.  I gather he's trying to refresh the

18   witness's recollection about what was transpiring, so they are

19   not in their list.  I don't know what they are doing with these

20   documents right now.  I don't think the witness should be

21   testifying about a document that I think is being used to

22   refresh his recollection about events in 2015.

23          MR. CRUMP:  That's why he's looking at them, and I'm

24   asking that question with the musicologist report.

25   Q.  Can you tell the jury what it was talking about?

1    A.   Sorry.  Can you repeat the question?

2    Q.   Can you tell the jury what you're talking about in this

3    e-mail exchange?

4    A.   We are talking about getting a musicologist report in

5    response to the Marvin Gaye conversation.

6    Q.   Do you say anything about Sony?

7    A.   Yes, it says what Sony/ATV's report says.  I believe they

8    commissioned the report.

9    Q.   Does it say, I do not think you should say anything more

10   than that until we see what the Sony/ATV report says?

11   A.   Yeah.

12   Q.   And then doesn't it also say, I think it is inadvisable to

13   say that Oxendale says there are no infringement at this stage?

14   A.   Yeah.

15   Q.   And that is on the 26th, correct?

16   A.   Correct.

17   Q.   I now want to show you March 27, one day after.

18   A.   OK.

19            THE COURT:  Mr. Camp, do you have any recollection

20   about what stimulated this exchange and these talks?

21            THE WITNESS:  Yeah, it was a meeting between Marvin

22   Gaye III -- it was a meeting between our record label and the

23   Marvin Gaye heir.

24            MR. CRUMP:  So --

25            THE COURT:  The question is what was it about?

1          THE WITNESS:  I don't know what their meeting was

2     about.  But in passing, it was discussed whether we had ever

3     considered that there was a similarity between *Thinking Out*

4     *Loud* and *Let's Get It On*.

5     BY MR. CRUMP:

6     Q.  So on March 26, you just stated that -- and you read that

7     e-mail about there is no infringement at this stage.

8          Now, the next day, March 27, that first paragraph

9     that's right above the one you just read.

10    A.  Yeah.

11    Q.  OK.  Isn't that paragraph, in fact, saying there is no

12    report yet?

13    A.  I believe -- um, yeah.  I don't think there was a written

14    report.  I think the initial -- the initial discussions were

15    verbal.

16    Q.  OK.  Well, it's important to explain to the jury then,

17    based on your interactions, they said there was no report.  But

18    then they said, but don't tell the Gayes.

19         Do you want to read that paragraph or does it refresh

20    your recollection enough?

21    A.  I can see it there.  Do you want me to read it out?

22    Q.  Yes, please.

23    A.  It is inadvisable to say Oxendale says there is no case.

24         THE COURT:  Please don't read it aloud --

25         THE WITNESS:  OK.

N4RsGRI2                            Direct - Camp

1          THE COURT:  -- until it's received in evidence.

2          THE WITNESS:  Fine.  I won't then.

3          MR. CRUMP:  OK.

4     BY MR. CRUMP:

5     Q.  Does it say that it is inadvisable to tell the Gayes there

6     is no case at this point because you all don't want them to get

7     upset without having evidence?

8          MS. ZAKARIN:  Your Honor, objection.  He's reading

9     from a document not in evidence.

10         THE COURT:  Mr. Crump.

11         MR. CRUMP:  Can I seek to move it into evidence, your

12    Honor?

13         THE COURT:  Do you remember I told you not to testify?

14         MR. CRUMP:  Yes, sir.

15         THE COURT:  It wasn't very long ago.

16         MR. CRUMP:  Yes, sir.

17         THE COURT:  Five minutes.

18         Did you just testify by reading from a document?

19         MR. CRUMP:  I did, your Honor.  My apologies.

20         Your Honor --

21         THE COURT:  This isn't the first of my directions that

22    you have forgotten and violated and apologized for.

23         MR. CRUMP:  Your Honor, I'm simply --

24         THE COURT:  Now I want to be sure that you are free to

25    contribute to the trial of this case.

1              MR. CRUMP:  Yes, sir.

2              THE COURT:  If you don't follow my instructions, I'm

3    going to disqualify you.

4              MR. CRUMP:  Yes, sir, your Honor.

5              THE COURT:  And you are warned.

6              MR. CRUMP:  Yes, sir.

7              THE COURT:  So it won't come as a surprise if I

8    relieve you from further service the next time you do that.

9              MR. CRUMP:  Yes, sir, your Honor.

10             At this time, we would seek to move into evidence the

11   e-mails of Mr. Camp with Mr. Sheeran, as well as with the

12   companies discussing the claims of similarities between

13   *Thinking Out Loud* and *Let's Get It On*.

14             MS. ZAKARIN:  Your Honor, I'm not sure fully what

15   Mr. Crump is offering into evidence, but these are documents

16   that have, after a claim was made and reflect what the --

17             THE COURT:  Excuse me, Mr. Zakarin.

18             MS. ZAKARIN:  I'm sorry, your Honor.

19             MR. CRUMP:  Your Honor, there were trial exhibits

20   marked 128 --

21             THE COURT:  Was that a question to the witness?

22             MR. CRUMP:  No.  I'm saying for the judge, it's marked

23   128, 129, the trial exhibits of these e-mails.

24             THE COURT:  Yes, sir.

25             MS. ZAKARIN:  Yes, your Honor.

1          THE COURT:  You're offering them?

2          MR. CRUMP:  Yes, we're offering them.

3          MS. ZAKARIN:  We object, your Honor.  These are post-

4    claim correspondence produced in discovery.  They were never

5    identified in the pretrial order as exhibits that they were

6    going to offer.  They are hearsay, filled with hearsay, and I

7    don't think they are relevant to the claim.  They are post-

8    claim communications.

9          MR. CRUMP:  Your Honor, I will only be heard --

10         THE COURT:  Well, I think it may have been fair at one

11   point to suspect that they might be related.  But that topic

12   has been pursued with this witness who has contributed nothing

13   in that direction.  On their face, they contribute nothing in

14   that direction, and they are excluded under Rule 403.

15         MS. ZAKARIN:  Thank you, your Honor.

16         MR. CRUMP:  Your Honor, if you exclude the e-mails

17   from this witness, then I have no further questions for him,

18   because I'm going to follow the court's direction.

19         THE COURT:  Well, since I've just done that, I assume

20   you're finished.

21         MR. CRUMP:  I am.  E-mails won't come in.

22         THE COURT:  OK.

23         MS. ZAKARIN:  I have no cross-examination of the

24   witness, your Honor.

25         THE COURT:  Thank you, Mr. Camp --

1              THE WITNESS:  Thank you.

2              THE COURT:  -- for coming and giving all the help you

3     could.

4              (Witness excused)

5              When we shall we return to the case?

6              MR. FRANK:  Yes, your Honor.

7              I've spoken with opposing counsel, Mr. Zakarin.  We

8     have four exhibits that were marked jointly, and I believe

9     there was no objection to having them admitted, Joint Exhibits

10    1 through 4.

11             Mr. Zakarin, can you confirm that?

12             THE COURT:  The joint exhibits, they are received.

13             MR. FRANK:  Thank you, your Honor.

14             (Joint Exhibits 1 through 4 received in evidence)

15             With that, your Honor, the plaintiffs would rest their

16    case.

17             THE COURT:  Do you want to take a ten-minute recess?

18             THE DEPUTY CLERK:  All rise.

19             THE COURT:  Members of the jury, the funny thing is

20    that underneath this, we have actually been making progress.

21    You may have your doubts, but we have been.

22             Take a ten-minute recess.

23             (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  Is there anything you would like to do?

3          Aha, Mr. Zakarin is standing.

4          MS. ZAKARIN:  I am.

5          Your Honor, I would like to hand up a formal written

6    50(a) motion, or we can e-file it if you prefer.  I would like

7    to deliver or summarize it briefly for your Honor right now, if

8    I can, orally.

9          THE COURT:  Yes.

10         MS. ZAKARIN:  A 50(a) motion, of course, is predicated

11   upon the plaintiff's failure to satisfy the elements of their

12   claim to make a prima facie case on their case such that no

13   reasonable jury properly instructed could find to the contrary.

14         In this case, the plaintiffs in the pretrial order,

15   the plaintiff's claim was a selection and arrangement claim

16   based upon chord progression, anticipation, and the key

17   signature, and that's said specifically in their proposed

18   findings of fact one and two.

19         As you heard from Dr. Stewart in his testimony, they

20   have abandoned that claim and they swapped out the key

21   signature for the supposed melodies.  So now their selection

22   and arrangement claim consists of supposed melodies, the chord

23   progression, and anticipation.  For a selection and arrangement

24   claim, the plaintiffs have to prove three things:

25         Numerosity, that the combination of unprotectable

elements are sufficiently numerous;

Secondly, that the combination of unprotectable elements are new, novel, haven't been done before;

Thirdly, that those elements are not merely substantially similar, but are identical or virtually identical.

And the reason that they have to take all of those requirements is because the courts do not want to truncate and restrict future songwriters from being able to use these common, commonplace unprotectable elements, so that if somebody combines them, they have to be truly new and not something that's been done before so that it doesn't restrict the use.

Well, here on the plaintiff's case they have established that they haven't –– they haven't even come close to satisfying that, and can't.

Let's look at it. Three elements should not and have not in any case been ever held to be sufficiently numerous.

Number two, in terms of new or novel, Dr. Stewart couldn't testify as to any uniqueness or new novelty, and Dr. Stewart admitted that the chord progression had been previously used in other songs. It was not original. The anticipation was used in earlier songs.

And with respect to the now swapped-in melodies, what Dr. Stewart says that these melodies are not really melodies at all, they are pitches. What he did in his testimony was to

1    essentially compared pitches, not melodies.  And the copyright

2    office has specifically said that a sequence of pitches is not

3    even copyrightable to begin with because it is not a melody.

4    Melody requires considerably more.  It requires that there be a

5    rhythmic organization of those pitches, and there is no

6    testimony about that at all on their case.

7            But even if they got past that, we get to the

8    identical or virtually identical.  Starting with the chord

9    progression, there is no dispute, Dr. Stewart admitted they

10   were not identical.  He admitted that there were different

11   chords in *Thinking Out Loud* than there are in *Let's Get It On*.

12   The anticipation is different in those two songs.

13           But perhaps, most importantly, as the court even saw

14   this morning, the pitch sequences are not identical.  They are

15   not virtually identical.  They are different.  That came

16   through loud and clear.  So even if the pitch sequences

17   themselves were melody, and they are not, the plaintiffs by

18   their own evidence established that they can't satisfy any of

19   those three requirements.  They can't -- they didn't prove

20   their case to a jury.

21           And the case at this juncture should be dismissed.

22   They don't satisfy numerosity, they don't -- they don't come

23   close to new or novel, and Dr. Stewart couldn't even testify to

24   that, and yet he also admitted they preexisted.  And they are

25   not identical or virtually identical.  And allowing a case like

1    that on a selection arrangement to go forward would restrict

2    songwriters of the future, present, from being able to use

3    commonplace elements because it would not be a thin copyright,

4    it would be a broader copyright of commonplace elements, and

5    that is contrary to law.

6              We respectfully, at this point, your Honor,

7    appreciating the jury's service and the dedication that they've

8    shown in this case, we believe that the plaintiffs have failed

9    to satisfy their burden of proof and this case should not go to

10   a jury and should be dismissed at this point.

11             Thank you, your Honor.

12             THE COURT:  What became of your defense of independent

13   creation?

14             MS. ZAKARIN:  The defense of independent creation

15   exists.  We would put that on obviously in our direct case.  If

16   we had to get to it, if they had made a prima facie case that

17   we would be rebutting and showing that our clients

18   independently wrote *Thinking Out Loud* without any reference to

19   *Let's Get It On*.

20             And that evidence, if we have to go forward, would be

21   shown.  But we don't have to disprove that on their case.  On

22   their case, they failed to satisfy their burdens of proof.  We

23   believe that, if we have to, we will prove independent

24   creation.

25             THE COURT:  There was some testimony on that point

1    yesterday.

2              MS. ZAKARIN:  Independent creation?

3              THE COURT:  I thought so.

4              MS. ZAKARIN:  Well, it may well have been when they

5    put Mr. Sheeran on in their case, that he may have testified to

6    it, but that was their requesting it.  If that is a case on

7    their case, the only evidence that is unrebutted is that he

8    independently created it.  But that goes to our burden of proof

9    would be satisfied since there was nothing to rebut it on their

10   case.  And that was their choice to call Mr. Sheeran on their

11   case.

12             THE COURT:  But you're not relying on it at this

13   juncture?

14             MS. ZAKARIN:  Your Honor, I'm perfectly happy to rely

15   on it because it is unrebutted testimony based upon their

16   having called Mr. Sheeran on their case.  There is nothing to

17   rebut it.  All I'm saying is that independent creation is

18   unrebutted evidence that they put in themselves.

19             But they also failed to satisfy, separate and apart,

20   their own burden of proof to make out a prima facie case for a

21   selection and arrangement, even if their having swapped out the

22   key for the supposed melodies at the last minute.

23             On both those bases, your Honor, we would request that

24   the claim be dismissed at this time.  I appreciate your Honor

25   reminding me that they have called Mr. Sheeran on their case

1    and there was some testimony that is unrebutted.

2              THE COURT:  Thank you.

3              MR. FRANK:  Would you like for me to respond, your

4    Honor?

5              Thank you.

6              As a preliminary matter, your Honor, we obviously are

7    at a little bit of a disadvantage.  I was just handed this

8    58-page motion, or however long it is, a minute ago.  But just

9    going off the cuff, your Honor, as a first point, the

10   defendants haven't raised anything new that wasn't raised in

11   excruciating fashion, pain-staking fashion, in their motion for

12   summary judgment and their subsequent motions for interlocutory

13   appeal, what have you.

14             There are three things which, as the court will

15   recall, it denied back in January of 2019, I believe.  But

16   probably more important, your Honor, there are three things for

17   copyright infringement we're required to prove.  Two of them

18   have been admitted to.  One being his beneficial interest.

19   They admitted to that.  One being an access.  They've admitted

20   to that.  So the only thing we were required to prove from a

21   copyright standpoint for purposes of the trial was copying.

22             And that was Dr. Stewart's role.  I think he gave

23   ample evidence to demonstrate copying.  There are two elements.

24   In fact, he was specifically asked prior -- he was specifically

25   asked --

1          MS. FARKAS:  Too close.

2          MR. FRANK:  OK.  He was specifically asked prior to

3    the close of his testimony on direct whether or not he, in his

4    musicological opinion, whether there is evidence that Amy Wadge

5    and Ed Sheeran copied *Thinking Out Loud*.  He said yes

6    unequivocally.  He was asked today specifically.  I had to ask

7    him several times to get to it.  He was asked today whether or

8    not the common musical element combination was in -- that he

9    thought was original in *Let's Get It On* was also in *Thinking

10   Out Loud*.  He did that.

11         I would point out for the court that there are two

12   components of the plaintiff's claims and that's reflected in

13   the proposed jury instruction.  One being Dr. Stewart has

14   identified three separate melodies that he, from his

15   professional opinion have been taken.  Those melodies alone,

16   even if the jury decided that one was infringed upon, that

17   would be enough to get to a jury.

18         But, again, that is a question of -- that is a

19   question to go to a jury.  They will have an opportunity to put

20   their musicologist on, Dr. Ferrara, and he can rebut whatever

21   he thinks is appropriate that Dr. Stewart testified to.  But

22   even one of those melodies taken alone is enough to prevent or

23   bar entry of the directed verdict.

24         But notwithstanding the three melodies that

25   Dr. Stewart testified to, he also testified to a selection and

1    arrangement.  I would note, just for clarification of the

2    record, that Mr. Zakarin, when he was speaking prior, suggested

3    that we were suggesting that the key -- that the key issue was

4    part of the selection and arrangement argument.  If you'll

5    recall, your Honor, Dr. Stewart was specifically asked by

6    Ms. Farkas yesterday whether the key made a difference, and he

7    said it didn't.

8           But he did mention that three separate common elements

9    combined together that are reflected in *Thinking Out Loud* was

10   the selection, constituted the selection and arrangement

11   argument.  If you recall, your Honor, I believe it was in your

12   order on the summary judgment.  We only need two and

13   Dr. Stewart testified to three.

14          So under those two theories, selection and arrangement

15   and the three independent melodies, I would respectfully submit

16   we have more than enough to be submitted to a jury.

17          THE COURT:  Thank you, Mr. Frank.

18          MR. FRANK:  Thank you, your Honor.

19          THE COURT:  Under the first sentence in Rule 50(b), a

20   decision on these matters is reserved.

21          Thank you very much.  We'll finish up the recess and

22   start with the defense case.

23          MR. FRANK:  Thank you, your Honor.

24          (Recess)

25

F4RsGRI2                        Direct - Sheeran

1              (Jury present)

2              MS. FARKAS:  Your Honor, the defense calls Ed Sheeran.

3              THE COURT:  Mr. Sheeran, you're still under oath.

4              THE WITNESS:  Yes.

5              THE COURT:  OK.

6     EDWARD CHRISTOPHER SHEERAN, resumed.

7     DIRECT EXAMINATION

8     BY MS. FARKAS:

9     Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Mr. Sheeran, how old are you?

12    A.  I'm 32 years old.

13    Q.  And are you married?

14    A.  I am, yes.

15    Q.  And do you have children?

16    A.  I have two daughters, yes.

17    Q.  And how old are they?

18    A.  One is two and a half, one is going to be one in two weeks.

19    Q.  Where were you born?

20    A.  I was born in Halifax, which is in West Yorkshire in the

21    north of England.

22    Q.  And while I think everyone knows the answer to this

23    question, what do you do for a living?

24    A.  I'm a songwriter and a performer.

25    Q.  And in addition to writing songs for yourself to perform,

1    do you also write songs for other artists to perform?

2    A.  I've written songs for other artists.  I've written songs

3    with other artists, yeah.  I've done all wide spectrum of

4    songwriting.

5    Q.  Could you name some of the artists for whom you've written

6    songs?

7    A.  Um, yeah.  I've wrote ones that you would know, I hope.  I

8    wrote *Love Yourself* for Justin Bieber, and another song that

9    went number one called *Corridor* for him.  I did billboard

10   number one for BTS *Permission to Dance*.  I've written with The

11   Weeknd, written with Taylor Swift, written with Beyonce,

12   written with Elton John.  A long list.

13   Q.  How did you first develop an interest in music?

14   A.  I joined the church choir when I was four years old.  My

15   mom sung in the church choir, and it seemed like something fun

16   to do, so I joined that.  That is where I learned harmony and

17   to sing in tune and stuff like that.

18          I went with my brother, and then I guess I picked up

19   playing the piano after that.  My grandmother, who *Thinking Out*

20   *Loud* was inspired by my grandmother who played piano, and she

21   taught they how to play-ish.  And then I gave up the piano to

22   start guitar because I wanted to be in rock and roll.

23   Q.  How old were you when you wrote your first song?

24   A.  I remember -- it's quite embarrassing to say -- a song I

25   wrote when I was 11, I wasn't a teenager yet, called *Typical*

F4RsGRI2                         Direct - Sheeran

1  *Average Teen* and the lyrics, I'm a typical average teen, if you
2  know what I mean.
3          I get asked about it a lot in interviews, and it does
4  get brought up every now and then and is embarrassing.
5  Q.  Have you had -- I won't ask you to sing that song.
6          Have you had any formal musical training?
7  A.  I mean, I don't really know what you would class as formal.
8  I had a piano teacher from -- a guy I went to school with's mom
9  taught piano and cello, and I had piano and cello lessons with
10  her for.  But, I guess, some of -- we call it primary school,
11  you guys call it elementary school, so a little bit of time in
12  there.  Then I had a guitar teacher when I was 11 for not a
13  very long period of time at all, and then another guitar
14  teacher after that.  So sporadically.
15          But I wouldn't say, like, I haven't got a degree in
16  music.  I can't read music.  I'm not a -- I am not classically
17  trained in anything, but I can play what I can play.
18  Q.  Now, you mentioned guitar.  Do you remember when you
19  started playing guitar?
20  A.  It was 2002 the Queen's jubilee, golden jubilee, and she
21  had a concert outside Buckingham Palace on television.  Eric
22  Clapton got up, played the first opening riff of *Layla*.  I
23  remember being 11 and being like, I want to do that.  And yeah,
24  I got a guitar for Christmas or my birthday or something and
25  learned.

F4RsGRI2                    Direct - Sheeran

Q.  Do you recall when you first performed in any way before a
live audience?

A.  Again, it was when I was 11 and it was the school charity
concert in the school hall.  And it was *Layla* by Eric Clapton,
because it was the only song I learned how to play.  I got up
and played that.

Q.  Do you sing your songs or songs written by others?

A.  Well, now?

Q.  Yes.  I'm sorry, no.  In that first performance, was it
just *Layla*?

A.  Oh, yeah.  Yeah, it was only *Layla*, yeah.  I started
writing songs when, like, properly -- oh, sorry.  Properly,
when I was 13 years old.  My dad took me to songwriting with
Eddie Rice with my cousin, and I always thought you had to be
in a band to write songs and be an artist.  I went to go and
see him.  It was one man on the stage with an acoustic guitar
singing songs that he had written.  And yeah, it was the sort
of point when you're a kid and you're, like, Oh, that looks
like something I can do.

        That is when I first started really writing songs.
And from that point, I didn't really cover songs.  I -- yeah,
unless it was like -- I used to play weddings to, um, make
money for rent.  So I would play cover songs at weddings on the
weekends.

Q.  What is the highest level of education you achieved?

F4RsGRI2                          Direct - Sheeran

1    A.  I mean, you wouldn't have it in America, but I didn't -- I

2    left school at 17, so I didn't get whatever that is.  I got

3    whatever you get at 16, and then -- so we call it GCSE

4    basically.  I don't know what you guys would call it in

5    America.

6    Q.  What was the name of the school that -- the last school you

7    went to?

8    A.  It's Thomas Mills High School, state-funded comprehensive

9    school in Suffolk.

10   Q.  And how old were you when you left that school?

11   A.  I was 17 years old when I left that school.

12   Q.  Do you recall why you dropped out of school at that time?

13   A.  Um, yeah.  I wanted to be a musician.  From where I stood,

14   all I needed to do was get experience and fall on my face a

15   couple of times.  And you sort of learn how to perform by

16   failing, basically.  You don't learn anything from achieving

17   things.  You learn stuff from failing.

18          I wanted to go out into the world, play gigs, bomb,

19   learn how to work audiences, learn how to write songs, and

20   write songs every day and do shows every day, sometimes three

21   in a night.  And, yeah, they just describe it as, like, getting

22   your chops.  So I went out to get my chops.

23   Q.  Are you familiar with someone who goes by the name Just

24   Jack?

25   A.  Yes.

F4RsGRI2                        Direct - Sheeran

1    Q.   Who is Just Jack?

2    A.   Just Jack is a U.K. artist who I'm pretty sure he had a

3    number one single when I was in high school, but he took me on

4    my first U.K. tour.  Well, my first, like, big U.K. tour.  I

5    had been on a U.K. tour in a minivan with a bunch of

6    singer/songwriters, but no one came to the gigs.

7    Q.   Do you recall how it came about that you went on tour with

8    Just Jack?

9    A.   Yeah.  I used to live above a pub called the T-bird, which

10   ran an open mic night every Thursday.  And I played the open

11   mic night every Thursday.  And the guy that ran the open mic

12   night was friends with Jack, and Jack was looking for an

13   opening act.  So the guy that that ran the open mic night said,

14   There is a kid that lives above this, he plays at the open mic

15   nights, I think he's good, take him on.  That's how I got the

16   gig.

17   Q.   Do you recall in what year and month that you went on tour

18   with Just Jack?

19   A.   Yeah, it was my first big tour.  It was October 2009.

20   Q.   Where was this tour?

21   A.   It was around England.  And I can't remember if we did

22   Scotland.  I'm pretty sure it was England, north of England,

23   London, Birmingham, those sorts of place.

24   Q.   And in terms of size, do you recall what types of venues

25   you were performing in on this tour?

1   A.  Between 1,000 and 2,000 people.  Depends, like, up north,

2   he didn't do as well as down south.  But yeah, it was those

3   sort of venues.

4   Q.  At this point, was that the largest size venues you had

5   performed in, generally speaking?

6   A.  Um, I had done a couple of support slots before that, but I

7   was always, like, the first, first, first on, so I would play

8   to an empty room or people getting their beers or whatever.  So

9   yes, this was the biggest crowd I played before.  I played

10  venues big before, but no one was in them.

11  Q.  Do you recall roughly how many shows you did with Just

12  Jack?

13  A.  Um, I couldn't give you a specific number.  It would be

14  between 10 and 15 probably.

15  Q.  How did your parents feel about you leaving school at that

16  time?

17  A.  Oh, my dad -- well, my dad was the one that suggested that.

18  He worked in the art world.  He was very much like, you don't

19  need a degree to learn how to paint.  You just have to paint

20  and then you learn as you go, trial add error.  So he was very

21  supportive of it.

22      My mom was my mom.  She was not keen on me sleeping on

23  stranger's sofas and not having income.  But she's all right

24  with it now.

25  Q.  At the time that you left school and went on tour with Just

1   Jack, had you released any music of your own?

2   A.  Yeah, I -- yeah.  I mean, release is a very, very -- like,

3   I printed up CDs that I sold at gigs from my backpack and,

4   yeah.  I wouldn't say that they were, like, commercially

5   successful, but, you know, people...

6   Q.  OK.  Before we get into specifics, I would like to just

7   explain a few terms.

8           Are you familiar with the term demo in the context of

9   recorded music and what does that mean to you, if so?

10  A.  A demo could be anything.  So in regards to *Thinking Out*

11  *Loud*, the demo of the song is the recording that me and Amy

12  recorded on the iPhone.  In my mind, that is what the demo is.

13          And then when we went into the studio to record it,

14  that would be the recorded version.  I've had a lot of songs of

15  mine.  The demo, quote-unquote, that you write on the day

16  actually just ends up being the song that you release.  For

17  instance, there is a song we wrote and recorded on that day,

18  and those vocals and most of the music on it is the music that

19  you hear released.  That is quite common.

20  Q.  Are you familiar with the term EP?

21  A.  Yeah, yeah.  EP -- well, it stands for extended play, and

22  today could be between sort of two and five tracks.  My manager

23  Stuart gets quite exasperated with me because I basically call

24  an EP anything to fit a load of songs on it, so it's not

25  technically an album.  I have released EPs with ten songs on

1    them before and I have released EPs with two songs on them

2    before.  But an album is technically anything over seven

3    tracks.

4    Q.  And the term LP, is that what you're referring to?

5    A.  LP is long play.  Yes, that would be an album.

6    Q.  Do you recall the first recorded music that you released to

7    the public?

8    A.  My dad got me a 4-track recorder for Christmas around the

9    time that I started writing songs, and I made a 14-track album

10    in my bedroom calling *Spinning Man*.  I think I printed up 20

11    copies of them and I sold them at school, and they now do quite

12    well on eBay.

13    Q.  And after releasing *Spinning Man*, do you remember what the

14    next music was that you released?

15    A.  It was EP called the *Orange Room*.  An EP which was five

16    tracks from *Spinning Man*.  There was a private school near the

17    area that had built a recording studio, and I met the guy that

18    worked in the private school of the recording studio.  He gave

19    me time in that studio to record this EP.

20    Q.  Do you recall when that was?

21    A.  I put it out in 2005, so it would have been around then.

22    But, by the way, putting it out is very, very loose.  Like, my

23    mom has most of them still.

24    Q.  Do you recall what you released next?

25    A.  It was an album -- my cousin worked in a studio in London,

F4RsGRI2                         Direct - Sheeran

1    and I worked with his mate that engineered there.  And I made

2    another 14-track album that I self-entitled.  After that --

3    well, pretty much directly after that I made another album

4    called *Want Some*, which -- the thing is, I wouldn't have -- I

5    wouldn't say they are in my discography.  They are not like

6    saying, this is my debut album.  They were records, I would see

7    them as, like, sketches before the painting, if that makes

8    sense.

9    Q.  And were you performing live during that time?

10   A.  Yeah.  Since I've got on stage, I've never not performed.

11   Q.  How often, like if we're talking about now in the 2006-

12   2007 time period, how often would you say you were performing

13   during that time?

14   A.  2006.  I was 15, so I would say weekends.  I would finish

15   school and I would go -- I did my first show in London when I

16   was 15, and we lived quite far from London.  I wouldn't gig

17   there that much, which is why I stopped school to go to London

18   to play every night.

19   Q.  And when you were performing during this time, we're

20   talking about -- what type of places were you performing at?

21   A.  Um, I mean, yeah, empty bars, clubs, restaurants.  I played

22   bingo halls.  Yeah, I've played anywhere where no one was.

23   Q.  At some point did you obtain professional management?

24   A.  I got my first manager when I was 16.  He found me on

25   Myspace.  He worked for a management company called Crown Music

F4RsGRI2                           Direct - Sheeran

1    Management, who at the time, I guess, artists you would have

2    heard of, they looked after Jessie J and Ellie Golding and the

3    Sugababes, who are a big girl band in England.

4           And yeah, I remember the Myspace message popping up

5    and going downstairs and showing my parents and being super

6    excited about it.

7    Q.  And I'm sorry if you said it.  How old were you at that

8    time?

9    A.  That was in 2007, so I was 16.

10   Q.  And what is your manager now?

11   A.  My manager is Stuart Camp, who didn't know he was coming up

12   here, but...

13   Q.  And how long has Mr. Camp been your manager?

14   A.  I met Stuart -- Stuart looked after Just Jack, the artist

15   that took me on tour.  So I met Stuart in at least 2009.  There

16   was a conflict of interest.  I had management at the time, who

17   I was leaving.  And he said, whenever you've left them, come

18   back to me.  So I officially started with Stuart in 2010.

19   Q.  And after the tour with Just Jack, did you release any

20   other EPs?

21   A.  Yep.  In 2010, shortly after the Just Jack tour, I

22   basically saved up all this music from being with this last

23   management company, thinking that I would get signed, get a

24   record deal, make an album.  It just wasn't happening.

25          So I had all this, like, all these songs that I had

F4RsGRI2                          Direct - Sheeran

written.  And I just said to Stuart, I'm just going to release

them, not on a label, because no one wants to sign them.  So I

might as well put them out there and let people hear them.  So

I released five EPs that year.  One was called *You Need Me* EP,

one was called *Loose Change*, one was called *Songs I Wrote With*

*Amy* -- and Amy is who I wrote *Thinking Out Loud* with -- one is

called *Live at the Bedford*, and one is called *No. 5*

*Collaborations Project*.

         And in the course of that year, they had gotten

attention.  *The A Team*, which is from the *Loose Change* EP

started to become a hit, and I got signed in 2011.

Q.  And did someone produce the *Loose Change* EP?

A.  Yeah.  So those EPs are the *Live at the Bedford*.  They were

all done by -- no, *Loose Change*, *Songs I Wrote With Amy*, and

*No. 5 Collaborations Project* were done by Jake Gosling, who he

produced *Thinking Out Loud* and *You Need Me*, an EP produced by a

guy named Julian Simmons, who made the first two, like, long

four albums that I made.  And then there was a dispute after

getting signed because he wanted more money.  We went back and

recorded them, and I guess I would have been the producer of

that.

Q.  When did you first meet Jake Gosling?

A.  I met Jake Gosling the day I moved to London.  I moved to

London top of September 2017 -- I'm sorry -- 2008.  And I moved

above this pub.  I came from the countryside and had never

F4RsGRI2                          Direct - Sheeran

1    heard, like, police sirens before.  I had grown up around cows

2    and sheep and stuff like that.

3           I was kept up all night next to a main road, and I

4    went down to where Jake lives and, sorry, it's about an hour

5    from London on the train, and I wrote a song called *The City*,

6    which is on my first album about how the city doesn't sleep,

7    and that was my first introduction to Jake.

8    Q.  What is the *No. 5 Collaborations Project* EP, can you tell

9    us a little bit about that?

10   A.  Yeah, it's -- there is a genre of music in England called

11   grime, which is, I guess, a derivative of hip hop, but very

12   different.  Very different beats per minute.  140 beats per

13   minute as opposed to 90, between 90 and 100.  And I had grown

14   up listening to grime music.  I'm not sure you have heard of

15   Dizzee Rascal, Scepter, and stuff like that.  That is sort of

16   the music in school I grew up listening to.

17          I moved to London.  I made friends with this guy

18   called Jamal, who ran a YouTube channel called SPTV, and he

19   introduced me to all these artists I had grown up listening to,

20   and I made a project with them.

21   Q.  Did you collaborate with other artists on this *Collaborate

22   No. 5*?

23   A.  Yeah.  Each song was a different collaboration with a

24   different artist.  Some songs had three artists, some songs

25   just had one.

F4RsGRI2                      Direct - Sheeran

```
1    Q.  Can you name some of the artists that were on that project?
2    A.  Um, the first song is with a guy called Devlin, next song
3    with P Money, then it's JME and Mikill Pane, Dot Rotten, and
4    Rem 32.  These are quite big artists in England.
5    Q.  And who came up with the concept for this album?
6    A.  I did, and -- yeah, I wanted to release five EPs to
7    showcase all the different types of music I was making in that
8    year and previously.  That was always meant to be the last one,
9    because it was the less like the music I had been making.
10           It was a bit more of a curveball.  A lot of my friends
11   told me not to pull out
12   Q.  Was Collaborations No. 5 successful?
13   A.  Yes, it was commercially successful, yes.
14   Q.  Do you recall whether it charted or?
15   A.  It was less about, like -- at that time it was less about
16   the actual chart position.  It charted at 46, which isn't that
17   impressive.  But on iTunes, which was hugely important at that
18   time, it went to number two and stayed there.  And I had put it
19   out myself and self-distributed it, so I had basically a lot of
20   record labels wanting to sign me.
21   Q.  At the time that this EP was released, did you have at
22   record deal?
23   A.  No.  I had been speaking to Atlantic -- well, I signed with
24   Asylum, which is a subsidiary of Atlantic, which is a
25   subsidiary of Warner Records.  So I had been speaking to Ed
```

Howard and Ben Cook, who was previously mentioned in this case

for, I guess -- I guess like half a year, maybe more.

I slept on Ed Howard's sofa unknowingly, and I didn't

know he worked for a record label. And Stuart was said I had

been playing songs for this guy from a record label. So I had

been speaking to them for a while, but I wanted to complete my

five EPs before signing a deal.

And so yeah, I put the EP out top of January, and I

signed my deal mid January.

Q. How old were you at the time?

A. I was 19 years old.

Q. Do you have an understanding as to what a music publisher

does?

A. I wouldn't know the ins and outs of everything they do. I

know they collect royalties on songs. They can set up

songwriting sessions. I guess they register the copyright.

That is something been made aware of to me in this case.

Yeah, in my mind, when I signed the record deal, it

was for records, and publishing was for songs. I didn't really

know that much about it.

Q. And did there come a time when you did sign with a music

publisher?

A. I signed with Sony that year. I remember wanting to wait

until *The A Team* had become a hit, because I hadn't signed my

record deal for a great deal of money, and I wanted to wait out

F4RsGRI2                          Direct - Sheeran

1    in publishing and buy a house.

2    Q.  Prior to signing with Warner and Sony, how often -- around

3    that time, how often were you performing live?

4    A.  I would play anywhere that would have me.  Yeah, that was

5    on Thursdays and Sundays would be nights that I could do three

6    gigs in a night.  There were -- yeah, I lived in basically

7    north London, and north London had, on the Tube line, probably

8    30 open mic nights in a week that you could play.  It was

9    probably three or four you could do in South, three or four in

10   East, three or four in West.  Primarily north London is where I

11   would do the shows, and they were everywhere.  Everywhere.

12   Q.  If you can remember, at the time that you signed with

13   Warner and Sony, roughly how many songs had you written?

14   A.  Hundreds.

15   Q.  What was your first full-length album after signing with

16   Warner?

17   A.  My debut album was an album called +, released September 9,

18   2011.

19   Q.  How many tracks are on +?

20   A.  On the standard version of +, there is 12 tracks.  On the

21   deluxe, there is 16.

22   Q.  What is a single?

23   A.  A single -- I mean, a single could be standalone.  It's not

24   actually an album.  The way I understand singles, you have an

25   album, you pick a song, that is used to promote the album, goes

F4RsGRI2                        Direct - Sheeran

```
 1    on radio, you play on TV.  People discover the album and listen
 2    to the album.  I've released singles that aren't on albums
 3    standalone.  It's just a song that lives on its own, but it
 4    could be connected to a project.
 5    Q.  And in connection with singles that are released that also
 6    appear as tracks on an album, how is it decided which tracks
 7    will be released as singles?
 8    A.  Back in those days before streaming, it was you picked them
 9    before.  So you would say *The A Team*, already had a music video
10    and already had generated quite lot of interest, so that would
11    be an obvious first single.  *You Need Me, I Don't Need You* was
12    my second single.  That was kind of a fan favorite I played at
13    gigs.  *Lego House* was probably the most pop I had on that
14    record, and then *Drunk*, again a real pop song on the record,
15    and then *Small Bump* was we wanted to showcase something from
16    the album that was a bit more artistic, I guess.  And then *Give*
17    *Me Love* just because that was a fan favorite as well.
18            But nowadays with singles, when I put out ÷, you
19    basically -- we chose *Shape of You* and *Castle on the Hill*
20    because they were exciting.  And then you put the album out and
21    fans basically stream songs.  And then you go, if they like
22    that song, we go to that song next.  Nowadays it is very much
23    fan led.  Back in the day, you would have a meeting and who
24    thinks this and who thinks that.
25    Q.  You mentioned *The A Team* as the first single off of +.
```

1    Was *The A Team* single successful in the United States?

2    A.  Yeah.  It took a very long time, though.  It took a long --

3    it was 18 months of every three months saying, we're giving up

4    on this, we're giving up on this, and I toured and toured and

5    toured and eventually it became a success.  Yeah, it's done

6    well in the States.

7    Q.  Has it reached any gold or platinum status?

8    A.  Multiple platinums, yes.

9    Q.  Can you describe what gold and platinum status means?

10   A.  Gold is 500,000 units in the United States, and platinum is

11   a million units and diamond is 10 million units.  It differs

12   from country to country.  England could be 300,000 units for an

13   album is platinum and 100,000 units for an album is gold.  In

14   New Zealand it's, like, 15,000 units is platinum and seven and

15   a half thousand is gold.  It differs from per capita,

16   basically.

17   Q.  Now, you mentioned other singles from +, I think you

18   mentioned *You Need Me, I Don't Need You, Lego House, Drunk,*

19   *Small Bump*, I think?

20   A.  *Give Me Love*, yeah.

21   Q.  Generally speaking, were those singles successful in the

22   United States?

23   A.  Um, generally speaking, no.  No.  Lego House, I think, went

24   to 46 or something like that, but it's -- as I said in my

25   testimony the other day, like, that chart position doesn't

F4RsGRI2                         Direct - Sheeran

1   necessarily doesn't always say what a hit is.  *Give Me Love* is

2   now multiple times platinum here, and that didn't really chart

3   here.  So over time a song can become quite big without

4   necessarily having the chart success.  I've had lots of songs

5   that have been commercial failures that have actually gone on

6   and done quite well over time.

7   Q.  Did you perform any of the songs from + on any television

8   shows that air in the United States?

9   A.  Yeah.  I played *The A Team* on all the late night, I did

10   Letterman before he stopped, I did Fallon and Kimmel, and CBS

11   This and Today Show.  Like, I'm not super familiar with, like,

12   everything.  I played the Grammys with Elton John.  We sung *The*

13   *A Team*.  I did -- I did all -- I played -- I remember playing a

14   TV show in Chicago for their weather report, and they were

15   running the credits as I started *The A Team* and I was like, oh.

16   So I didn't get to finish the song.  I played lots of TV shows

17   in the States.

18   Q.  Did you perform at any award shows other than the Grammy

19   Awards?

20   A.  I did The Billboards.  I did the Billboard Awards, I think

21   something in country music.  A lot at that time was --

22   everything was happening very, very fast, so I wouldn't able to

23   differentiate.  I think the VMAs, I did VMAs.  AMA.  I did

24   award shows, yes.

25   Q.  Have you ever performed at the Olympics?

F4RsGRI2                    Direct - Sheeran

1    A.  I played the closing ceremony at the Olympics.  I played

2    *Wish You Were Here* with Nick Mason from Pink Floyd, yeah.

3    Q.  Do you recall what year that was?

4    A.  That was 2012 in London.

5    Q.  And other than performing a duet with Elton John, have you

6    performed live with anyone else we might be familiar with?

7    A.  Yeah.  Yeah, I've song with Beyonce, I've song with The

8    Rolling Stones, sung with Taylor Swift, sung with Justin

9    Bieber, yeah.  Stevie Wonder, we did *Pastime Paradise* together.

10   Yeah, there's a long -- there's a long list.  Eric Clapton, I

11   sung with him.  Eminem, 50 Cent.  Yeah.

12   Q.  Overall, do you recall whether the + album achieved

13   commercial success in the United States?

14   A.  Yeah, it did.  It went multiple times platinum here.

15   Q.  And did you go on tour to promote +?

16   A.  Yeah, I went on extensive tours.  I toured first time I

17   came here with a band called Snow Patrol, and then I did two of

18   my headline tours here, which were sort of three, four months

19   long.  Then I went on Taylor Swift Red tour for six months and

20   then I did my own arena tour after that.

21   Q.  And in terms of Snow Patrol and Taylor Swift, what type of

22   venues were you performing in?

23   A.  Snow patrol, it was theaters, so anywhere between 2,000 and

24   5,000 people.  And Taylor was arenas and stadiums, so anything

25   between 12,000 people and 50,000 people.

1    Q.  Did there come a time when you toured on your own as the

2    headliner to promote +?

3    A.  I was constantly touring on my own throughout that --

4    throughout that, yeah.  So it was sort of in tandem to doing

5    that.

6    Q.  Did you perform at Madison Square Garden on your own?

7    A.  Yeah, I sold out Madison Square Garden in 2013.

8    Q.  Are you familiar with the film call *The Hobbit*?

9    A.  Yes.

10   Q.  And did there come a time you were asked to write a song

11   for The Hobbit film soundtrack?

12   A.  Yeah.  End of 2013, they were making The Desolation of

13   Smaug.  I don't know if you guys have seen it.  It's worth

14   watching.  Peter Jackson, who was directing it, got in touch

15   with me.  He flew me over to New Zealand and I wrote the end

16   song for that and produced it and played pretty much all the

17   instruments on it.

18   Q.  Turning back to the + album, when did you start writing

19   songs for that album?

20   A.  The first song I wrote for the album *You Need Me, I Don't*

21   *Need You*, which is when I was 15.

22   Q.  When did you finish writing songs for that album?

23   A.  I released that album -- I finished it probably February

24   2011, so my birthday is in February, so I was either 19 or just

25   turned 20.

1  Q.  Do you recall approximately how many songs you had written

2  at that point in time?

3  A.  Hundreds.

4  Q.  I would like to talk a little bit about your songwriting

5  process, and I would like to focus on the time period between

6  your early teens, sort of through the + album.

7  A.  Yeah.

8  Q.  Did you have any particular process for writing songs

9  during this time?

10 A.  There is not really a rule to writing songs.  It's, like,

11 it could be anything.  So *A Team*, for instance, was -- I wrote

12 lots of rhyming couplets, like A Team, daydream, day screen

13 pastry, and I had them on my phone at the time in my notes.

14 And then when inspiration hit for that song, I went on the

15 notes and saw all these rhyming couplets.  That is what the

16 song became.

17      Where as a song like *Lego House* written in the studio,

18 we were pitching for -- pitching means we were writing a song

19 for someone.  we were writing for a boy band, so we had a brief

20 to write this boy band song, and that is what we were going

21 for, basically.

22      So, yeah, there is, like, the process could be

23 anything.  Like *Perfect*, I took an acoustic guitar in a

24 basement.  *Shape Of You* was, like, sounds, I was in a studio

25 with three people, and we were throwing out ideas.  There is no

F4RsGRI2                    Direct - Sheeran

1  set rule to songwriting.

2  Q.  And staying with the timeframe of your teens through the +

3  album, how often would you say you were writing songs during

4  that time period?

5  A.  If it was a day of the week, I was writing songs.

6  Q.  And when you were writing songs during this time, just

7  getting a little more granular, would you write using an

8  instrument?

9  A.  Not always, no.  I wrote backing tracks.  There was a

10 doublet group that I wrote some songs for + on.  I wrote songs

11 for One Direction's album with them, and they were backing

12 tracks.

13 Q.  Did you ever use an instrument when you were songwriting?

14 A.  Yeah, of course.  Yeah.

15 Q.  What would that be?

16 A.  I have written songs on guitar.  I've written songs on

17 piano.  Yeah, mostly guitar and piano.

18 Q.  How do you preserve what you're writing?

19         Do you do anything else to record or save what you're

20 writing as you're writing a song?

21 A.  It would be voice memos.  I haven't had a phone since 2015.

22 But pre 2015, I would record them on voice memos on my phone,

23 and I've had an iPad since then and I work off e-mail, and I

24 record them on voice memos on my iPad.

25         It's more of a distraction thing.  I was always on my

1   phone, so I got rid of it, and now I'm present.

2   Q.  How about lyrics, was it your practice to write lyrics down

3   as you wrote them?

4   A.  Not really, no, no.  I mean, I have done -- I mean, I would

5   write lyrics on notes on iPhone or iPad, but quite a few songs

6   that I've written have been sort of line by line.  You go in a

7   booth -- have it in your head, go in the booth, record it, come

8   out, find the next line, go in the booth and record it.  They

9   would be written down later, basically.

10  Q.  When you first starting writing songs during this time, did

11  you write alone or write with other people?

12  A.  Both.  I've written -- *The A Team*, for instance, is alone.

13  *You Need Me* is alone.  *Small Bump* is alone.  *Lego House* would

14  be not alone.  *I See Fire* would be alone.  *Give Me Love* was not

15  alone.  It just really differs.

16  Q.  Who were some of your early musical influences?

17  A.  I was brought up on Elton John, Van Morrison, Eminem.  My

18  uncle bought me an Eminem CD when I was nine, and that

19  lyrically, I listened to him a lot.  Stevie Wonder I loved.

20  Joni Mitchell.  My mom had a Shania Twain CD.  That was pretty

21  much the only CD my mom bought for herself.  She's not a huge

22  music fan, although she'll say she's a fan of mine.

23  Q.  I should hope so.

24  A.  I never know if she is or not, though.

25  Q.  I'll leave that alone.  How, if at all, has your

1    songwriting process changed from the time that you started

2    writing as an early teenager until now?

3    A.  I think, like anything, you get better the more you do it.

4    So I would -- I guess when I was a teenager, I would write one

5    or two songs a day.  Now, the most I've written is probably

6    eight or nine songs in a day.  That just comes from practice.

7           Yeah, it's -- if you set up a soccer goal and made me

8    kick into the top corner 2,000 times, eventually I would get it

9    every single time, and that is kind of how it is in

10   songwriting.  You just learn -- you learn the process.

11   Q.  Would it be safe to say that is not unusual for you to

12   write a song within a day?

13   A.  No.  I actually, with this case, because Amy, who I wrote

14   *Thinking Out Loud* with is in town, we went in this weekend for

15   three days and wrote ten songs.  So, yeah, it's constant

16   songwriting.  Constant.

17   Q.  Just if you could indulge us, could you name a few songs

18   from + that you wrote in less than a few hours?

19   A.  Honestly, in terms of, like, if a song takes longer than a

20   day, it's not worth pursuing.  I'm very much of the mindset

21   that when inspiration hits, it happens quickly.  *A Team* was

22   super quick.  *Give Me Love* was super quick.  *Lego House* was

23   super quick.

24          Yeah, it's -- when you see interviews with songwriters

25   and they say, I wrote that song in half an hour, it's usually

1    not that unbelievable to believe that.  Because when

2    inspiration hits, you get excited and it just comes out.

3    Q.  Prior to writing *Thinking Out Loud*, did you receive any

4    nominations for any songwriting or recording awards?

5    A.  Yes.  *The A Team* won -- again, like, you guys wouldn't know

6    what it is, but it is basically the Grammys of England.  It is

7    a record called and the award would be Ivor Novello.  They give

8    three out per year.  It is voted by songwriters.  *The A Team*

9    won the best song lyrically at that.

10           Then in terms of American awards, I actually got

11   nominated 13 times at the Grammys before winning for *Thinking*

12   *Out Loud*, but I had been to the Grammys pretty much every year.

13   I had had a song of the year nomination for *The A Team*.  I had

14   best new artist.  I had album of the year.

15           What else?

16   Q.  Did you receive anything in the Brit Awards?

17   A.  I did win at the Brit awards.  Again, British awards, I won

18   album of the year there, best new artist, best male.  I had won

19   a few awards on +.

20   Q.  And you mentioned *A Team* being nominated for song the year

21   at the Grammys.  What type of award is song of the year?

22   A.  Song of the year is one of the, quote-unquote, big four.

23   They have album of the year, song of the year, record of the

24   year, and best new artist, I think is in that big four thing.

25           And, yeah, so that was my very first nomination for

F4RsGRI2                          Direct - Sheeran

1    the Grammys.  I remember I was in a tour bus in Miami and I

2    found out and it was, like, something that you just never

3    expect as an English singer/songwriter to get.

4            But yeah, it was big deal.

5    Q.  And just in terms of song of the year, what are they

6    acknowledging with that award?

7    A.  Songwriting, I guess.  I guess.  It meant a lot to me

8    because that song is a song I had written 100 percent myself.

9    It was cool to see my name up there next to Adele's and

10   Beyonce, yeah.

11   Q.  Turning to the next album that you released, on what album

12   does *Thinking Out Loud* appear?

13   A.  My second album called *X*.

14   Q.  Do you recall when *X* came out?

15   A.  I believe it was June 14, 2014.  Maybe I'm just seeing the

16   14 as 2014.  It was in June.

17   Q.  And when did you start writing songs for *X*?

18   A.  I guess as soon as + was finished.  There is some songs on

19   the bonus of *X* that were written in the + period, but yeah, the

20   majority of *X* was written while still on tour promoting the +

21   album.  I would have started it as soon as + came out.

22   Q.  Is there a reason you used math symbols for your albums?

23   A.  Yeah, I get asked that a lot.  So the five EPs, basically

24   when I was 18, I was, like, I'm going to make a plan and my

25   plan was to make 15 things.  So I had made the five EPs to

F4RsGRI2                         Direct - Sheeran

showcase all -- the first one was a band EP.  The second one

was sort of an electronic singer/songwriter.  Then there was a

traditional just singer/songwriter folk thing.  There was a

live EP and then there was a collaboration project.  Those were

the first five.

         + was then the addition onto that.  *X* was designed to

make everything I had done with + bigger.  ÷ was a double

album.  − was going to strip everything away and be an acoustic

album and = would be the sum of all the parts, like everything

from all of them.

         So that was -- I basically set out a ten-year plan in

my head of what I wanted to do.

Q.  Do you recall what the first single was from *X*?

A.  First single was a song called *Sing* that I made with

Pharrell.

Q.  Who is Pharrell?

A.  Pharrell is an artist music producer songwriter.  There's

lots of things Pharrell is.  He does a lot of things,

multifaceted.

Q.  Do you recall when *Sing* was released as a single.

A.  April, I think, of 2014.

Q.  And do you recall, generally speaking, how it performed?

A.  It was my first number one single in most major markets.

It didn't go top ten in America, but I think it went to 12 or

13.

F4RsGRI2                          Direct - Sheeran

1    Q.   And do you recall generally how the album *X* performed when

2    it first came out in June 2014?

3    A.   It went number one in most major markets like *+* and, yeah,

4    everyone was happy.

5    Q.   Do you recall what the second single was from *X*?

6    A.   Second single was a song called *Don't* that I made with

7    Benny Blanco.  And, yeah, that was then more of a -- basically

8    every hit that I had was getting bigger and bigger, basically.

9    So that was my first top ten in America.  And yeah, it went

10   multiple times platinum as well as *Sing*.

11   Q.   Do you recall when that was released as a single?

12   A.   I couldn't give you a specific date.  I imagine around the

13   summer.  I remember shooting a music video in the summer.

14   Q.   Does August 2014 sound about right?

15   A.   Could be.

16   Q.   And was *Don't* released as a single before or after the

17   album *X* came out?

18   A.   It came out after the album came out.

19   Q.   Do you recall how that single performed?

20   A.   Yeah, it did really well commercially.

21   Q.   And what was the third single released from *X*?

22   A.   The third single was *Thinking Out Loud*.

23   Q.   Do you recall when that was released?

24   A.   I think -- I remember shooting the music video in

25   September.  I imagine around then.

1    Q.  So when TLO, *Thinking Out Loud*, was released as a single, *X*

2    had been out for about three months, *Sing* had been out for

3    about five months, and *Don't* had been out for about two months?

4    A.  Yeah.  There was also a promotional single called *One*,

5    which was the first song on the album that was -- you call it

6    an instant grab.  So before the album comes out, we release

7    that song, and that charted in most major territories.  But it

8    wasn't necessarily a single that was pushed to radio.  So

9    technically there had been three, four -- three singles.

10   Q.  When in relation to the other songs that appear on *X* did

11   you write *Thinking Out Loud*?

12   A.  I wrote *Thinking Out Loud* towards the tail end.  I am

13   always writing music and always trying to make albums better

14   and better and better.  And yeah, I find that the pressure

15   of -- the pressure being off an album basically makes you write

16   better songs.

17        So when I thought I had finished *+*, for instance, I

18   wrote *Give Me Love* thinking, oh, this is for the next album.

19   That ended up being on *+* and arguably it's one of my favorite

20   songs on the album.  And same with *X*.  I wrote a song called

21   *I'm A Mess* and *Thinking Out Loud* towards the tail end, and they

22   went on last minute.  And *÷* would have been *Shape of You* is

23   probably one of the last songs I made for that.

24        It's just you sort of have your foot on the gas when

25   you're making an album, and then when you take your foot off

F4RsGRI2                         Direct - Sheeran

1   the gas and relax, that's usually when good stuff happens.

2   Q.  Now, with respect to *X*, prior to writing *Thinking Out Loud*,

3   did you write any songs that appear on *X* in less than a single

4   day?

5   A.  Yeah.  Again, like, I would say, most of them.  The only

6   song I can recall taking more than a day writing would be

7   *Shivers* and I was just overthinking it.  I had written the

8   chorus.  I knew the chorus was good, I didn't -- I was

9   overthinking the verses.

10          But most songs that I've written have been completed

11  the day I started them, yes.

12  Q.  And I assume you can see what's been projected on the

13  screen on your screen?

14  A.  Oh, yeah.  Sorry.

15  Q.  We've been populating this as we have been talking.

16          So if you look at this, does this give a sense of some

17  of your accomplishments and releases that existed prior to

18  *Thinking Out Loud*?

19  A.  Yeah.  Yeah, it's quite cool seeing it like that.

20  Q.  I think I can get you a copy.

21  A.  Thanks.  It's missing two, though.

22  Q.  Oh, you mean the two blanks?

23          It's OK.  I think we're good.  You testified about an

24  EP named *Songs I Wrote With Amy*.

25          Who is Amy?

F4RsGRI2                    Direct - Sheeran

1    A.  Amy Wadge is a singer/songwriter from Bristol who was

2    signed to this publisher who Jake Gosling produced my first

3    album, and those first EPs were assigned to.  And I had grown

4    up age 16 on the trains to go and write with her.  I think it

5    was a favor.  I think she was doing someone a favor having me

6    up there.  And I remember going in there, and I had never

7    worked -- I wasn't, like, that familiar with, like, what

8    cowriting was.

9           And the producers that I had been put in with were

10   very much, sort of, like producers.  I would write two songs or

11   we would create songs on the spot.  I had never written

12   one-on-one with another singer/songwriter and she was from the

13   same world as me, she had the same influences as me.

14          We, you know, talked about being on the same scene and

15   playing all the same gigs.  We wrote a lot of songs the first

16   day of meeting, I think four or five.  And then the next day

17   wrote another four or five, and kept in touch.

18   Q.  Do you recall how old you were?

19          I don't know if you said it.

20   A.  I believe I was 16 when I met her.

21   Q.  What was your understanding about why you were meeting with

22   her?

23   A.  I think to broaden my musical horizons and try different

24   things.

25   Q.  And overall how long did you spend with Amy that first

F4RsGRI2                        Direct - Sheeran

1    visit?

2    A.  I went up and stayed for two days.  She had just given

3    birth to her first child, and I think -- I think her daughter

4    was, like, three weeks old or something, so I wasn't trying to

5    overstay my welcome.

6    Q.  And how did you get along?

7    A.  We got along great.  You know, she's from the same world

8    that I'm in.  She's played empty rooms of people with acoustic

9    guitars.  She loves singing/songwriting music, and we really

10   clicked.  Yeah, we're still -- we are still working together.

11   There's is obviously something there.

12   Q.  I think you said you wrote eight or nine songs with her

13   during that two-day period, is that correct?

14   A.  I did, and I held on to those songs for a few years,

15   thinking I would get signed.  And then when I didn't, there was

16   a collection of them, and they were so defined by the sound, I

17   made an EP.  And I didn't know what to call the EP.  I called

18   it *Songs I Wrote With Amy*.

19   Q.  Can you describe how you and Amy worked together during

20   those few days in terms of writing songs?

21   A.  We sat guitar to guitar and wrote -- this was when I was

22   16.  I had just gotten into my first serious relationship,

23   first relationship.  And yeah, we were writing about that and

24   school, love.

25   Q.  So you had conversations with her about what was going on?

F4RsGRI2                          Direct - Sheeran

1    A.   Yeah.  I was sort of, like, yeah, when you get into a

2    songwriting session, it's usually, like, what's going on.

3    Yeah, what do you want to write about.  I had a lot that I

4    wanted to write about.

5    Q.   Would it be safe to say you and Amy became friends after

6    that first meeting?

7    A.   Totally, yeah.  Totally.  Yeah, we wrote together quite a

8    lot.  Yeah, we did some stuff for + and she opened up for me on

9    my + tour and came and sung a couple of songs with me.  We

10   remained close.

11   Q.   I would like to turn now to the song at issue in this case

12   *Thinking Out Loud*.

13        When did you write *Thinking Out Loud*?

14   A.   February 2014.

15   Q.   Did you write *Thinking Out Loud* with someone?

16   A.   I wrote *Thinking Out Loud* with Amy in my house.

17   Q.   Geographically speaking, where were you and Amy when you

18   wrote that song?

19   A.   Geographically, I live in -- it's -- so there's London and

20   then there is Essex and then there is Suffolk.  We are kind of

21   on the coast, about half an hour inland.  Farm towns.  And

22   yeah, that's where I have lived since I was four, and I live

23   currently.

24   Q.   Did Amy come and stay with you for a bit?

25   A.   Yeah.  Amy drove up and, yeah, we -- we hang a lot.  So she

1    came up.  She had been up to the house before, and she was

2    staying with me to catch up.

3    Q.  And do you recall what was going on in your personal life

4    in February of 2014?

5    A.  My granddad had just passed away and my grandmother had

6    just -- she had lots of different types of cancer that had --

7    one had removed her ability to walk.  And so that is where the

8    original conversation on the song had started.

9           I had just recently got into a new relationship a

10   month prior to that, so we were talking about that too.  And

11   Amy was having similar things going on in her life in terms of

12   members of her family were ill and whatnot.

13   Q.  Do you remember anything about what Amy told you about what

14   was going on in her life?

15   A.  I remember her saying that it was either her mother or

16   mother-in-law was ill.  I can't remember specifics.

17   Q.  Other than Amy, was anyone else at your home when you wrote

18   *Thinking Out Loud*?

19   A.  No.

20   Q.  That visit when Amy came to her -- to your house, can you

21   and Amy write any other songs together during that visit?

22   A.  Yeah.  We wrote a song that I did with a Dutch artist

23   called Marvin Garrick, which actually never got released.  We

24   wrote that, then maybe one other one.  I can remember writing

25   one other one and *Thinking Out Loud*.

F4RsGRI2                              Direct - Sheeran

1   Q.  Just me of give me one second, please.

2            (Counsel confer)

3            Do you recall what time of day it was when you and Amy

4   started writing *Thinking Out Loud*?

5   A.  It was evening time because we paused it go to go dinner

6   with my parents.

7   Q.  Do you recall how the writing of *Thinking Out Loud* start?

8   A.  We had written the Marvin Garrick song.  I had gone

9   upstairs to take a shower before dinner, and I have a kind of

10  kitchen that extends into a living room.  And then there is,

11  like, it's not even a balcony, it's like a walkway, looks down

12  on it.  I remember coming out the shower and hearing Amy

13  playing chords and mumbling, and looking down and being like,

14  We need to do something with that.  And then we went out for

15  dinner and came back and then finished it.

16  Q.  And do you recall what happened when you came back after

17  dinner?

18  A.  We finished the song.

19  Q.  Were either of you using a guitar at the time when you were

20  creating the song?

21  A.  Yeah.  I have lots of guitars at my house.  Yeah, so we

22  definitely would have been using guitars.

23  Q.  And do you recall who wrote what?

24            Can you give us a sense of what you recall about the

25  creation of the song after you came back from dinner?

A.  I mean, Amy definitely started strumming the chords and the

song doesn't just have those chords in it, it does move

elsewhere.  We probably at some point went back and forth on

chords for the bridge, which -- sorry, like the prechorus.

English people call it bridge, but it's either way.

          And then lyrically, it's very difficult to say who

writes what in songwriting.  It's very much a collaborative,

what about this and what about this.  And you sing back and

forth a melody and somebody changes a bit of the melody.  But

it's very -- it's a collaboration, it's not -- yeah, it's not

just someone going, sing this, do this.  It's very much you

discuss.

Q.  Was that process any different for the vocal melodies that

became *Thinking Out Loud*; do you recall the process for that?

A.  Yeah.  I think you just, like, I find when I write vocal

melodies, it's like phonetics.  You start singing or mumbling

anything.  So the original words of *Thinking Out Loud* were, I'm

singing out loud, and that phonetically is *Thinking Out Loud*.

But originally it was I'm singing out loud.

          We were writing the song and singing phonetically

melodies, and then words would fall into those melodies,

basically.

Q.  When did you and Amy finish writing the song together?

A.  I assume it was that night.

Q.  And do you have a recollection as to start to finish how

F4RsGRI2                      Direct - Sheeran

1    long it took you to write the song?

2    A.  Really not that long.  Like, really not that long.  It was

3    one of those ones where you, like, you know when it is a good

4    song when it is finished and you're excited about it.  If

5    you're, like, slogging away for hours and hour, when you finish

6    it, you're -- you sort of second-guess yourself.  You go, oh,

7    is it good, because it took quite a lot to get here.

8            When it just happens like that, you sort of know that

9    it's decent.

10   Q.  And after you and Amy finished writing the song that night,

11   did you do anything to preserve what you had written?

12   A.  We recorded it on iPhone voice message.

13   Q.  Was the writing process for *Thinking Out Loud* any different

14   than how you had written songs in the past with Amy?

15   A.  No, like not at all.

16   Q.  Did you and Amy discuss the meaning of the lyrics while

17   writing *Thinking Out Loud*?

18   A.  I think we discussed it beforehand and, yeah, there

19   probably would have been small discussions here and there about

20   what certain lyrics were and what they meant.  But the bulk of

21   the discussion for most songs that you would write with someone

22   would happen before, and then you get into it.  And maybe every

23   now and then you would write a line.  Oh, this line is that

24   because of this, but you wouldn't, like, stop and talk for two

25   hours.  You are sort of in the moment.

F4RsGRI2                          Direct - Sheeran

1   Q.  I think you mentioned about your grandparents.

2           Were you also in a relationship or in a relationship

3   at that time?

4   A.  I had just gotten into a new relationship, yeah.  But the

5   song is sort of, like, it's sort of a little bit of both, you

6   know.  Like, it was essentially looking at the love that --

7   just to put it in context, it was two sets of grandparents.

8           So I've got an Irish set of grandparents, and my Irish

9   grandfather passed away and he left my Irish grandmother alone.

10  And, you know, they had been together for 60 years.  I remember

11  that was an inspiration.  And then my other set of

12  grandparents -- who were both around at the time, my

13  grandmother now passed away, they were both around at the time,

14  she had lost the ability to walk.

15          So it was sort of looking at this side and being like,

16  wow, my grandmother has been with my grandfather for over 60

17  years, what must she be feeling right now.  And then looking at

18  my grandfather on this side, and being like, wow, my

19  grandmother has been with my grandfather over 60 years, what

20  must he be feeling now that she's lost the ability to walk.

21          It's very much drawing from two different sides of my

22  family and, yeah, I've got another song about my grandfather on

23  that album, on my Irish side.  He died and had Alzheimer's, so

24  I wrote a song about his Alzheimer's and him forgetting who my

25  grandmother was.

F4RsGRI2                          Direct – Sheeran

1          I drew inspiration a lot from things in my life and
2    family and emotion and stuff.
3    Q.  Who came up with the opening basic chord progression for
4    *Thinking Out Loud*?
5    A.  I mean, Amy was playing those chords, so Amy.
6    Q.  And can you tell us what that basic chord progression is
7    that Amy played?
8    A.  It's just -- so D, and then it's D with an F sharp, and
9    then G with a D, and then A.  But then you add, so it's --
10          (Guitar played)
11   Q.  Is that the same basic chord progression that appears in
12   the commercial recording of *Thinking Out Loud*?
13   A.  Yeah, that.  It's just that over and over and over again.
14          (Guitar played)
15   Q.  I want to direct your attention to the commercially
16   released recording of *Thinking Out Loud* and to Dr. Stewart's
17   testimony about the first 24 seconds.
18          You were here in the courtroom when Dr. Stewart
19   testified, correct?
20   A.  Yeah.
21   Q.  And you were here when Dr. Stewart testified that the
22   second chord in the *Thinking Out Loud* chord progression during
23   the first 24 seconds of *Thinking Out Loud* is different from the
24   chord progression --
25   A.  Well, I think he's saying that --

1  Q.  Let me just finish the question.

2  A.  Sorry.

3  Q.  For the court reporter, if nothing else.  I'm going to say

4  it again.

5           You were here when Dr. Stewart testified that the

6  second chord during the first 24 seconds of *Thinking Out Loud*

7  is different from the second chord during the remainder of the

8  song, you were here for that, correct?

9  A.  I was here for that, yes.

10 Q.  And what do you have to say about that?

11 A.  I think he's sort of saying that because it helps his

12 argument, obviously.  When you listen to the song, like, I was

13 listening to it being, like, I know what I play every single

14 gig is those chords.  I remember what I recorded.  I'm not --

15 I'm not the world's most talented guitar player.

16           (Guitar played)

17           So I would just play that, over and over and over

18 again.  But what he's saying I did was for that 24 seconds is

19 go...

20           (Guitar played)

21 Q.  Did you do that?

22 A.  Well, no.  Yeah, if you listen to it, you can't tell.

23 Like, he's listening to it just, or assuming, but I'm going,

24 *When your legs don't*...

25           That's exactly when the vocals come in.  how can you

F4RsGRI2                        Direct - Sheeran

1  say that, *when your legs don't work like they used to* -- it's

2  just him -- basically, it works very, very well for him, it's

3  just that is not the truth.

4          MS. FARKAS:  Your Honor, this might be a good breaking

5  point if it's OK with you.

6          THE COURT:  We will resume at 11 o'clock Monday

7  morning.

8          MS. FARKAS:  Thank you, your Honor.

9          THE COURT:  Have a good weekend.

10         (Jury not present)

11         THE COURT:  You're all free to go.

12         (Adjourned to Monday, May 1, 2023, at 11: a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    ALEXANDER STEWART

 4   Cross By Ms. Farkas . . . . . . . . . . . . 345

 5   Redirect By Mr. Frank . . . . . . . . . . . 382

 6   Recross By Ms. Farkas . . . . . . . . . . . 395

 7    STUART CAMP

 8   Direct By Mr. Crump . . . . . . . . . . . . 400

 9    EDWARD CHRISTOPHER SHEERAN

10   Direct By Ms. Farkas . . . . . . . . . . . . 443

11                     JOINT EXHIBITS

12   Exhibit No.                           Received

13    1 through 4                           434

14

15

16

17

18

19

20

21

22

23

24

25
```