N521GRI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

KATHRYN TOWNSEND GRIFFIN, *et
al.*,

                    Plaintiffs,

          v.                              17 Cv 5221 (LLS)

EDWARD CHRISTOPHER SHEERAN, personally
known as Ed Sheeran, *et al.*,

                    Defendants.

------------------------------x

                                          New York, N.Y.
                                          May 2, 2023
                                          11:11 a.m.

Before:

                    HON. LOUIS L. STANTON,

                                          District Judge
                                          – and a Jury –


                              APPEARANCES

FRANK & ASSOCIATES PC
BY:  PATRICK RYAN FRANK
     KEISHA RICE
     KATHERINE VIKER
     – and –
BEN CRUMP LAW
BY:  BENJAMIN CRUMP
     Attorneys for Plaintiffs

PRYOR CASHMAN LLP
     Attorneys for Defendants
BY:  ILENE SUSAN FARKAS
     DONALD S. ZAKARIN
     ANDREW MARK GOLDSMITH
     BRIAN MAIDA

ALSO PRESENT:
KIM PASSEY, paralegal

1                (In open court; jury not present)

2                THE COURT:  Good morning.

3                ALL COUNSEL:  Good morning.

4                THE COURT:  If you want to sit down, sit down.

5                (Jury present)

6                MS. FARKAS:  The defense would like to continue with

7   the examination of Dr. Lawrence Ferrara.

8                THE COURT:  Then where is he?

9                Good morning.

10               You're still under oath.

11               THE WITNESS:  Thank you.  Yes.

12               THE COURT:  That does not affect the piano playing.

13               THE WITNESS:  Thank you.

14    LAWRENCE FERRARA PhD, resumed.

15   DIRECT EXAMINATION CONTINUED

16   BY MS. FARKAS:

17   Q.  Good morning, Dr. Ferrara.

18   A.  Good morning.

19   Q.  Directing your attention back to "Thinking Out Loud," did

20   you transcribe the composition embodied in the sound recording

21   of "Thinking Out Loud"?

22   A.  Yes, I did.

23   Q.  And can you explain what it means to transcribe the

24   composition that's embodied in the sound recording of "Thinking

25   Out Loud."

N521GRI1                        Ferrara - Direct

1    A.  Yes.  A transcription is putting into written notation the

2    music that's embodied in a sound recording.  The process that I

3    use is to listen to the work in its entirety many times, but

4    then to zoom in to specific sections to start the transcription

5    process —— that is, taking note by note and putting it into a

6    notational software —— and in so doing, I put the audio into a

7    media player.  There are several that are available.  And what

8    it allows me to do is to loop various sections.  So I can

9    literally loop a section that's three seconds or four seconds

10   or more.  And a loop means to just automatically repeat it over

11   and over again.  It allows me to get a sense of what I'm

12   hearing, then to really zoom in to begin to write out, via that

13   software, each note, each chord, each lyric.

14           And then with respect to chords and to melody, I can

15   also match at the piano, which is right next to my keyboard for

16   the computer, and so it's a really slow and systematic,

17   deliberate process, so that you get the transcription that

18   really does represent the composition embodied in the sound

19   recording.

20   Q.  Thank you.

21           What elements of "Thinking Out Loud" did you

22   transcribe?

23   A.  I transcribed both the music and the lyrics.

24   Q.  And after you transcribed "Thinking Out Loud," did you

25   compare your transcription against the published sheet music

1    for "Thinking Out Loud"?

2    A.  Yes, I did.

3    Q.  And what did you find?

4    A.  I found that my transcription of the vocal melody, the

5    melody that Ed Sheeran sings, was the same as the vocal melody

6    in the published sheet music.  My transcription of the chord

7    symbols is the same as that in the published sheet music, and

8    my transcription of the lyrics were also the same as in the

9    published sheet music.

10   Q.  And is what we're looking at here the published sheet music

11   for "Thinking Out Loud"?

12   A.  Yes, it is.

13   Q.  Overall, did your transcriptions differ at all from the

14   topline of the published sheet music?

15   A.  There we go.  So by the topline, we're talking about this

16   — literally, this top line, or musical staff, and on this

17   topline, we have the chord symbols on top, the vocal melody,

18   these notes that are in the staff, and then of course you can

19   see two verse lyrics — the first verse lyrics and the second

20   verse lyrics.  This topline is consistent, exactly consistent,

21   with my transcription.

22          The bottom two lines are the piano arrangement, and

23   that is not what I transcribed.  I transcribed the melody, the

24   harmony, which would be the chords, and the lyrics.

25   Q.  And you mentioned the piano accompaniment in the bottom two

N521GRI1                        Ferrara – Direct

1    lines.  Is that piano accompaniment in the recording of

2    "Thinking Out Loud"?

3    A.  It is not.  It is a piano arrangement.

4    Q.  Apart from the materials that we've already discussed, did

5    you review any other materials in performing your analysis?

6    A.  Yes.  I reviewed many works that predate LGO or TOL, and I

7    also reviewed works of Ed Sheeran and of Amy ——

8    Q.  Wadge.  It's ——

9    A.  Yes, I'm always considerate of pronouncing it correctly,

10   but it is Wadge, I believe.

11   Q.  What are the component elements of music that you analyzed

12   in this case?

13   A.  The fundamental elements of music are the structure, the

14   harmony, the melody, the rhythm, and the lyrics.  There are

15   other elements that are not fundamental.  For example, the key,

16   the meter, the overall genre, or style, those are not as

17   fundamental because they're essentially musical ideas and

18   musical building blocks that are commonplace, whereas the

19   actual expression in the melody and harmony and the lyrics, so

20   forth, would be considered much more fundamental.

21   Q.  Are "Let's Get It On" and "Thinking Out Loud" written in

22   the same key?

23   A.  No.  "Thinking Out Loud" is written and recorded in the key

24   of D.  LGO is record —— is written in the key of E flat.

25   They're both major, so D major in TOL, E flat major in LGO.

1    Q.  In assessing the two songs in this case, did you consider

2    key to be an important factor?

3    A.  Key is not an important factor with respect to copying.

4    One needs to establish what key the work is in, but the point

5    is that whether a work is in E flat major or D major would not

6    be necessarily important in figuring out whether you think

7    there's evidence of copying.

8    Q.  Let's discuss the other elements in the "Let's Get It On"

9    sheet music.

10          We're looking at Joint Exhibit 2 here.  In addition to

11   key and meter, what other musical elements are included in the

12   "Let's Get It On" sheet music?

13   A.  Melody, harmony, and lyrics.

14   Q.  Anything else?

15   A.  No.

16   Q.  Can you please show us where we can find those elements in

17   the "Let's Get It On" deposit copy sheet music.

18   A.  The harmony —— and that is the chord symbols —— as you can

19   see, are right above the staff: E flat, G minor, A flat, B flat

20   7.  Beneath it is the melody, and that, once again, is

21   represented by the notes that are within the staff.  And below

22   each staff are the lyrics.

23   Q.  Is there a tempo notated in the deposit copy?

24   A.  No, there is no tempo in the LGO deposit copy.

25   Q.  And does "Thinking Out Loud" include a tempo?

1  A.  Yes, the slide that we just saw, in fact, had a tempo

2  marking of 80 beats per minute.

3  Q.  And in addition to tempo, are there other elements in

4  "Thinking Out Loud" that are not notated in the "Let's Get It

5  On" sheet music?

6  A.  Yes.

7  Q.  Does "Thinking Out Loud" include a bass part?

8  A.  No, it does not.

9  Q.  "Thinking Out Loud."

10  A.  Oh, "Thinking Out Loud."  I'm sorry.  Yes, "Thinking Out

11  Loud" has a bass part.

12  Q.  And what about "Let's Get It On," does that have a bass

13  part?

14  A.  "Let's Get It On" does not have a bass part.

15  Q.  And does "Thinking Out Loud" include drums?

16  A.  Yes, it does.

17  Q.  And does "Let's Get It On" notate drums?

18  A.  No.

19  Q.  Is it possible to notate a drum part on sheet music?

20  A.  Yes, of course.

21  Q.  So let's delve into the chord progressions at issue in this

22  case in some more detail.

23       What is the chord progression in "Let's Get It On"?

24  A.  In "Let's Get It On," it's E flat.  And if I don't say E

25  flat minor, it means it's E flat major.  So E flat, G minor, A

1    flat, B flat 7.

2    Q.   And what does that correspond to in Roman numerals?

3    A.   In Roman numerals, it corresponds, as you can see, to an

4    upper case I for the E flat, a lower case iii for the G minor,

5    and upper case IV for the A flat, and an upper case V for the B

6    flat.

7    Q.   And we have seen sometimes that the fourth chord on "Let's

8    Get It On" is notated with a 7 after it; is that correct?

9    A.   That is correct.  That is the way it's marked in the sheet

10   music.

11   Q.   And can you explain the 7 next to the V chord.

12   A.   Yes, the 7 after the —— the V represents an added pitch.

13   Each of those chords that we just saw are triads.  That is,

14   they're chords consisting of three notes, and the name of the

15   chord —— for example, E flat —— is the root and the lowest note

16   of the chord, the way these are marked.  The exception is the

17   V7.  That adds a fourth pitch, which is the interval of a

18   seventh above the root.  That specific note is an A flat.

19   Q.   Can you please play this chord progression on the piano.

20   A.   Yes.  Here is the chord progression.  That's the first

21   chord.  This is in E flat.  One, two, three, four . . .

22   (playing piano).  And that is just the chord progression.  I'm

23   not playing it in any particular harmonic rhythm other than

24   making each chord even, each chord at two beats.

25   Q.   What is the basic four-chord progression in "Let's Get It

1   On"?

2   A.   In a basic chord progression, musicologists often try to

3   consolidate, remove, add pitches, so the basic chord

4   progression would be the same chord progression except taking

5   the 7 off of the V, and that would result in this (playing

6   piano).  That doesn't erase the fact that the 7 is in the sheet

7   music.  It is part of the composition.  Each time this chord

8   progression is ── is written, it always has the seventh on that

9   fourth chord of the four-chord progression, but once again, for

10  the purposes of analysis, we talk about a basic chord

11  progression and that's what it is.

12  Q.   Let's move on to the chords in "Thinking Out Loud."  What

13  are your findings regarding the chord progressions in "Thinking

14  Out Loud"?

15  A.   The chord progression in "Thinking Out Loud" is different.

16  The fourth chord is different.  But most important is that

17  there are multiple chord progressions in "Thinking Out Loud."

18  Q.   What do you mean there are multiple chord progressions in

19  "Thinking Out Loud"?

20  A.   Well, they can be divided in half.  There are multiple

21  chord progressions that have some similarity to the chord

22  progression in "Let's Get It On," and then there are other

23  chord progressions that are significantly different from any

24  chord progression in "Let's Get It On."

25  Q.   What are the chord progressions in "Thinking Out Loud" that

1   have some similarity to the chord progressions in "Let's Get It

2   On"?

3   A.  Well, this is a slide that I understand Dr. Stewart showed.

4   This is my slide.  And it is meant to show at least five ——

5   there are more, but five of the similar chord progressions that

6   are in TOL, with LGO's chord progression on top.

7          So as you can see, at the topline, LGO, I, iii, IV, V,

8   VII.  These are not the basic chord progressions; these are the

9   chord progressions as they're actually played.

10         So in TOL, I–V, without getting into the theory,

11  simply means that the third of the chord is missing.  I/3 is

12  the one chord with the third of the bass, the IV is the IV

13  chord, as we expect, and the V has a different pitch.  It's

14  basically a suspended II chord.  Without getting any further

15  into it, essentially each one of these represents a chord

16  progression in TOL.  And there are others, but there are

17  similarities, you can see, to the chord progression in "Let's

18  Get It On."

19  Q.  Of the five "Thinking Out Loud" chord progressions in the

20  chart on the screen, which is the closest to the I–iii–IV–V

21  chord progression in "Let's Get It On"?

22  A.  In TOL No. 4, one can readily see that the I would be the

23  same as —— as the I in LGO; the I/3 of course is different as

24  compared to the iii; but then the IV and the V and, if we were

25  to go to the basic chord progression in LGO and drop the VII,

N521GRI1                      Ferrara – Direct

1  then it would be very close.

2  Q.  And is there another name that you would use to refer to

3  this TOL No. 4?

4  A.  Yes.  I'm referring to this as the basic chord progression

5  in TOL that is at issue.

6  Q.  And when you say basic chord progression, can you explain

7  what — again, what you mean by that.

8  A.  Yes.  As per my explanation a moment ago, each of these

9  chords consists of three pitches, and so there are no added

10  chords, no added pitches.

11  Q.  And does the slide that we're looking at include all of the

12  different chord progressions that appear in "Thinking Out

13  Loud"?

14  A.  No, it doesn't include any of those different chord

15  progressions.

16  Q.  Lastly, regarding the chord progression at issue, is the

17  LGO chord progression the same as the TOL chord progression?

18  A.  No.  As you can see, none of these similar chord

19  progressions are the same.  The closest would be TOL No. 4.

20  Q.  Could you please play for us the LGO chord progression

21  followed by the TOL chord progression at the piano, please.

22  A.  Yes.  Once again, without any harmonic rhythm, just playing

23  the chords, and so that we can hear them in the same key, I'm

24  going to start with LGO in the key of D major and then do the

25  TOL, also in the key of d major.

1          So this is LGO: (playing piano).  And now here is TOL:

2     (playing piano).  Those are the basic chord progressions in

3     both.

4     Q.  You mentioned prior art before, briefly.  Could you explain

5     what a prior art search is.

6     A.  Yes.  In doing a prior art search, you look for literally

7     works that predate one or both of the songs at issue, and in

8     this case, that would be 1973 for "Let's Get It On" and 2014

9     for TOL.  And given the similarities that are at issue, you

10    look to earlier works that embody those similarities that are

11    at issue.

12    Q.  And as a general matter, how do you perform a prior art

13    search when you're dealing with chord progressions?

14    A.  I have a library of method books, of sheet music and books

15    and so forth.  There are online indices.  And so I look through

16    those in order to find, locate, identify, and then ultimately

17    do the analysis of prior art.

18    Q.  In connection with this case did you conduct a prior art

19    search for songs that use the same basic chord progressions in

20    "Let's Get It On" and "Thinking Out Loud"?

21    A.  Yes, I did complete a prior art search with respect to the

22    basic chord progressions in both works.

23    Q.  And how did you conduct that search?

24    A.  Essentially the same way I just described a moment ago.

25    Q.  How many songs did you review in performing your search?

1    A.  Several hundred.

2    Q.  And when you found a song that used the same basic chord

3    progressions in "Thinking Out Loud" or "Let's Get It On," did

4    you do anything to record your findings?

5    A.  I created a list of those songs that embody either the TOL

6    or the LGO basic chord progression.

7    Q.  And at the end of your search, how many songs did you find

8    that used the same basic chord progressions in "Let's Get It

9    On" or "Thinking Out Loud"?

10   A.  101 songs.

11   Q.  I'd like to show you what's been marked for identification

12   as Defendant's Exhibit 210.

13          Do you recognize this document?

14   A.  Yes, I do.

15   Q.  And what is this document?

16   A.  This is the list of the 101 prior art works.

17   Q.  And does this document accurately reflect the names of the

18   101 songs that you found that use the same basic chord

19   progressions in "Let's Get It On" and "Thinking Out Loud"?

20   A.  Yes, it does.

21          MS. FARKAS:  Your Honor, I'd like to move Exhibit 210

22   into evidence.

23          MR. FRANK:  We would object, your Honor, based on

24   hearsay.  It's an expert report.  The best evidence is

25   Dr. Ferrara's testimony.  I would also note that Dr. Stewart's

1    report elements were left out based on the same basis.

2            MS. FARKAS:  Your Honor, the plaintiff's motion *in*

3    *limine* on this evidence was already denied.  And it's not

4    hearsay.  It's just a list of Dr. Ferrara's findings.  He can

5    — he's already testified that he conducted a search and

6    created a list.

7            THE COURT:  Received.

8            (Defendant's Exhibit 210 received in evidence)

9    BY MS. FARKAS:

10   Q.  How many songs did you find that use the same basic chord

11   progression in "Let's Get It On"?

12   A.  80.

13   Q.  And how many of those songs were created before "Let's Get

14   It On"?

15   A.  33.

16   Q.  How many songs did you find that used the same basic chord

17   progression in "Thinking Out Loud"?

18   A.  21.

19   Q.  And how many of those were created before "Let's Get It

20   On"?

21   A.  Four.

22   Q.  And as between the basic chord progression in "Let's Get It

23   On" and the basic chord progression in "Thinking Out Loud,"

24   which one did you find to be more common?

25   A.  The basic chord progression in "Let's Get It On" is far

1    more common than the basic chord progression in TOL.

2    Q.  But would your opinion be that "Thinking Out Loud" chord

3    progression is also considered common?

4    A.  Yes, it is.

5    Q.  What significance, if any, do you find in the fact that 80

6    songs out of the several hundred that you reviewed have the

7    same chord progression that is in "Let's Get It On"?

8    A.  When there are so many works that have an element that's at

9    issue in common, it makes much less likely the copying by the

10   writers of TOL of any one of those particular 80 songs, let

11   alone "Let's Get It On."

12   Q.  And how, if at all, does that inform your opinion as to

13   whether the authors of "Thinking Out Loud" copied from "Let's

14   Get It On"?

15   A.  Once again, it supports my finding that there is no

16   musicological evidence of copying.  And it establishes, once

17   again, two things: one, the commonplace status of the chord

18   progression — indeed, the chord progression would be

19   considered a musical building block, and that once again cuts

20   against the idea of copying; and secondly, that it's clear that

21   "Let's Get It On" was not nearly the first to use this chord

22   progression; there are at least 33 songs that predate it that

23   used the same chord progression.

24   Q.  And to be clear, do you believe that the 80 songs that you

25   identified that use the basic "Let's Get It On" chord

1   progression are the only songs in history that were authored

2   before "Thinking Out Loud" that used this basic chord

3   progression?

4   A.  No.  I'm confident that if I spent more time on a prior art

5   search, I would find additional works.

6   Q.  Dr. Ferrara, I'd like you to look at what's been marked for

7   identification as Defendant's Exhibit 201.

8           Do you recognize this document?

9   A.  Yes.  This is — the first page is the cover, the book

10  cover, of a book called *Money Chords*, subtitled *A Songwriter's*

11  *Sourcebook of Popular Chord Progressions*.

12          MS. FARKAS:  Your Honor, I'd like to move Exhibit 201

13  into evidence.

14          MR. FRANK:  Objection, your Honor; hearsay, relevance.

15          MS. FARKAS:  Your Honor, we're not offering it for the

16  truth of what's in the book; we're simply offering it to show

17  that the LGO chord progression is taught in beginner guitar and

18  piano books.

19          THE COURT:  Received.

20          (Defendant's Exhibit 201 received in evidence)

21  BY MS. FARKAS:

22  Q.  Dr. Ferrara, what's the significance of Exhibit 201?

23  A.  If we go to the third page that's within the book, you can

24  see at the bottom of the page, page 57, and at the top, it has

25  what's called a rock ballad chord progression.  And that arrow

N521GRI1                    Ferrara - Direct

1   is my arrow.  It's my handwritten arrow so that I could make it

2   easier for you to see it.  And you can see that the description

3   is the most frequent progressions that begin with the E chord

4   and then move to the G sharp chord.  And so this E, G sharp

5   minor, Ab7 chord progression is the identical —— not the basic

6   chord progression but the identical chord progression in "Let's

7   Get It On."  It just happens to be based on the key of E, not

8   based on the key of E flat.

9          In addition, in the preface of this book, the author

10  notes that chord progressions are "basic building blocks," as I

11  called them as well.  So this would be one of those basic

12  building blocks that the author is pointing to.

13          And in the appendix of the book, the author names the

14  —— what the author thinks is the 80 most popular chord

15  progressions, and needless to say, there are many more, and

16  includes the chord progression that's at issue in LGO as one of

17  those popular chord progressions.

18  Q.  If you could please take a look at what's been marked for

19  identification as Defendant's Exhibit 202.

20          And if you could tell us if you recognize this

21  document.

22  A.  Yes.  This is the book cover, and then inside the book is a

23  repeated book cover, bibliographic page, and then some other

24  pages from a book for advanced beginners that are on a guitar

25  method.

1              MS. FARKAS:  Your Honor, we'd like to move Exhibit 202

2    into evidence.

3              MR. FRANK:  No objection, your Honor.

4              THE COURT:  Received.

5              (Defendant's Exhibit 202 received in evidence)

6    Q.  What is the significance of Exhibit 202, Dr. Ferrara?

7    A.  Well, the significance can be seen within the contents of

8    the book.  And just by way of example, if we could go to the

9    third page, or — one more.

10             Thank you.

11             So this, you can see at the bottom of the page, is

12   page 75, and I've once again put a handwritten arrow there to

13   point to the specific chord progression at issue.  You can see

14   that above that chord progression, there are other songs that

15   use it.  It shows up in songs — I'm reading — like "I Do" by

16   Jude, "If I Had a Hammer" by Pete Seeger, "Cruel To Be Kind,"

17   and so forth, "True Love Ways" by Buddy Holly, and the rest.

18   And that chord progression once again is identical.  In fact,

19   now you not only have the chords, in this case written in the

20   key of G, but you have the Roman numerals, and as you can see,

21   they're identical to the chord progression in "Let's Get It

22   On;" not the basic chord progression, but the chord progression

23   as written in the deposit copy.  So it even includes the V7.

24   I, iii, IV, V7.

25             And if we go to the very next page, we have another

1    chord progression at the bottom, and I have that —— once again,

2    put an arrow.  This is in the key of A.  A, C sharp minor, D,

3    E7, and the Roman numerals are exactly the same as before ——

4    that is, upper case I, lower case iii, upper case IV, upper

5    case V, with the 7.  So once again, in another category ——

6    Class 8 songs is what this writer is calling them —— in another

7    category, this very same, this identical, chord progression

8    from LGO deposit copy is here as one of those chord

9    progressions for guitar students to learn.

10   Q.  And does this book make any mention of "Let's Get It On"?

11   A.  Yes, it does.  If you look at the last page, right above my

12   arrow, in the right column.  By the way, even though "Let's Get

13   It On" was recorded in 1973, which is after dozens of other

14   I-iii-IV-V chords were recorded, I firmly believe that Marvin

15   Gaye did not plagiarize the song; he was simply writing a song

16   using a common progression, just like every other professional

17   songwriter does.

18   Q.  Do you agree with the opinion of the author?

19   A.  Of the author's writing?  Yes, I agree with it 100 percent.

20   Clearly, by the time that "Let's Get It On" was written, that

21   chord progression was common.  And that is, I've already

22   proffered 33 songs that predated that use the same basic chord

23   progression.  And so I do agree with it.  And I also agree that

24   given the commonplace nature, that there's no reason that one

25   would think that the writers of LGO copied any one of those

1    songs that predated it.

2    Q.  Can you please take a look at what has been marked for

3    identification as Defendant's Exhibit 203.

4    A.  Yes.

5    Q.  Do you recognize this document?

6    A.  I do.  This is another music method book.  This happens to

7    be a piano method — not a guitar method, a piano method book,

8    and you should see, it says, "How to Play Rock 'N' Roll Piano."

9    And if we go to the next page —

10   Q.  Hold on, Dr. Ferrara.  I think —

11   A.  I'm sorry.  You've got to admit it.  I'm sorry.  Thank you.

12           MS. FARKAS:  I'd like to move Exhibit 203 into

13   evidence, please.

14           MR. FRANK:  No objection, your Honor.

15           THE COURT:  Received.

16           (Defendant's Exhibit 203 received in evidence)

17   Q.  What is the significance of Exhibit 203?

18   A.  We can once again go into the book.  The next page, you can

19   see, is music.  It happens to be page 84 in the book.  And the

20   heading is Ten Popular Rock 'N' Roll Progressions.

21           I should add that this book was published in 1967 —

22   that is, six years before the creation of "Let's Get It On."

23   So this is a 1967 publication, and it lists Ten Popular Rock

24   'N' Roll Progressions.  And as you can see, once again, just to

25   facilitate, I put an arrow in at No. 4, and that is the C, E

1  minor, F, G chord that is the basic chord progression that is

2  in LGO.

3  Q.  Dr. Ferrara, have you reviewed the transcript of

4  Dr. Stewart's trial testimony?

5  A.  Yes.

6  Q.  And did you also review the PowerPoint slides that he used

7  to demonstrate his testimony?

8  A.  Yes, I did.

9  Q.  I'd like to direct your attention to Dr. Stewart's

10  testimony regarding the first 24 seconds of "Thinking Out Loud"

11  compared to the rest of "Thinking Out Loud."

12       Setting aside for a moment the first 24 seconds, are

13  you and Dr. Stewart in agreement as to the basic chord

14  progression in "Thinking Out Loud" after the 24-second mark?

15  A.  Yes.  It is my understanding and having read his report and

16  — that he and I both believe that certainly after 24 seconds,

17  the second chord in TOL is consistently the I/3 chord, not the

18  lower case iii chord that is in LGO.

19  Q.  Dr. Stewart testified that the second chord of "Thinking

20  Out Loud" during the first 24 seconds of "Thinking Out Loud" is

21  an F sharp minor or the iii chord as in "Let's Get It On."  Do

22  you agree with Dr. Stewart?

23  A.  No.  I disagree.  I believe that Dr. Stewart is wrong.

24  Q.  Now what is your basis for saying that the second chord in

25  "Thinking Out Loud" is a D/F sharp major and not the F sharp

1   minor?

2   A.   The basis of doing the transcription that I described

3   earlier, and, in addition, to considering the vocal melody that

4   is being sung with that harmony.

5   Q.   And is the published sheet music for "Thinking Out Loud"

6   consistent with your transcription and analysis?

7   A.   Yes, the published sheet music, right from the get-go and

8   through the song, wherever that chord progression at issue

9   occurs, has it listed as a, as you can see, a — thank you — a

10  D/F sharp, which would be a I/3 in Roman numerals.

11  Q.   Has Dr. Stewart been consistent on this point?

12  A.   No, he hasn't.

13  Q.   Can you please explain.

14  A.   Yes.  This is example 3 from Dr. Stewart's report.  This is

15  Dr. Stewart's example 3.  And as you can see, looking at TOL,

16  first we have a time stamp, so he is saying this is at the

17  beginning of TOL — i.e., in the first 24 seconds.  And as you

18  can see, the second chord that Dr. Stewart has written is a D/F

19  sharp chord.  You can see the F sharp minor chord in LGO, and

20  here in this report, Dr. Stewart concedes that the second chord

21  in TOL is D/F sharp.

22  Q.   As an example of the use of these two chords, could you

23  please play the portion of the vocal melody in "Thinking Out

24  Loud" that is sung with the second chord, first as a D/F sharp

25  chord and then as an F sharp minor chord.

N521GRI1                        Ferrara – Direct

1   A.   Yes.  And so here is the first —— just the melody, so, of

2   "Thinking Out Loud" that plays with the D/F sharp chord:

3   (playing piano).

4            Okay.  We have power.  (Playing piano.)

5            This is Dr. Stewart's transcription, and he adds a

6   grace note.  Would you like me to play it with the grace note

7   or as per the published sheet music, which doesn't have the

8   grace note?  That's the only difference.

9   Q.   As the published sheet music, please.

10  A.   Okay.  So without the grace note: (playing piano).  I

11  stopped there because that is where the melody with the D/F

12  sharp chord occurs.  And the words are "When your legs don't

13  work like they."  (Playing piano).

14           Okay.  Now I play it with the chord.  This is with the

15  D/F sharp chord.  (Playing piano)

16           And I just note that that very last note is a D

17  (playing), and it essentially matches the highest note in the

18  D/F sharp chord (playing).  That's the D/F sharp chord

19  (playing).  That highest note is also the last note of the

20  melody, so . . . (playing).

21           Now I do the same thing but using the F sharp minor

22  chord.

23           (Playing).  Play it a little louder (playing).  And

24  think about that last note once again.  It was so harmonious

25  with the D (playing) that now with the F sharp minor (playing),

1  it clashes.  That doesn't mean that it couldn't be written by a

2  composer, but the point is that when you play the two together,

3  you recognize that the buoyancy and the kind of message that

4  the opening of TOL gives is much more in line with D major,

5  which, again, continues throughout the rest of the song, and

6  not the F sharp minor chord.

7  Q.  Now let's assume for the sake of argument that the second

8  chord in both songs was the same.  Would you find that

9  significant?

10  A.  It would not be significant.  This is an important point.

11  What if the chord progression in TOL that's at issue was not

12  the I/3 but the iii?  That is, what if TOL, in those parts of

13  the song that have a chord progression at issue, had the same

14  chord progression as "Let's Get It On," the I-iii-IV-V?  It

15  would not be significant.  And the reason is that it is a

16  musical building block.  It's been used — in fact it was used

17  in 80 songs, prior to TOL.  The LGO basic chord progression was

18  used in 80 songs prior to the writers of TOL writing TOL.  And

19  therefore, it would not be significant.

20  Q.  Yesterday plaintiff's counsel asked Mr. Sheeran a line of

21  questioning that suggested to Mr. Sheeran that he was wrong

22  about the second chord in the "Thinking Out Loud" chord

23  progression during the first 24 seconds of "Thinking Out Loud."

24  and plaintiff's counsel also suggested that in your report that

25  you also disagreed with Mr. Sheeran about this second chord

1    during the first 24 seconds.  Do you have a reaction to that?

2    A.  Yes.  I was informed of this yesterday.  I was not in the

3    courtroom, but I was informed of this.  And so last night, when

4    I got home, I reviewed my report, and I didn't find any

5    sentence that at all suggested that the second chord in

6    "Thinking Out Loud" —— and the chord progression at issue is F

7    sharp minor.  I found that I'm consistent throughout that

8    report.  And so on that basis, Ed Sheeran and I are in

9    agreement on what that second chord is.

10   Q.  Setting aside the basic chord progression in "Thinking Out

11   Loud," are there other chord progressions in "Thinking Out

12   Loud" that are more different from the basic chord progression

13   in "Let's Get It On"?

14   A.  Yes, there are.

15   Q.  And in what sections of "Thinking Out Loud" do those

16   different chord progressions appear?

17   A.  The first section is in the pre-chorus sections.  The chord

18   progression there is quite different from anything in LGO and

19   certainly not at issue.  And then in the last two bars, bars 9

20   and 10 of each repeating chorus, there is a descending chord

21   progression that's quite different from anything at issue.  If

22   I may, I'll play it.  Yes?  Okay.  So here it is.  This is ——

23   these are the last two bars of the chorus in TOL.  And it's a

24   descending chord progression.  You'll hear it moving down step

25   by step (playing piano).

1    Once again (playing).  Now not only is there nothing

2    remotely like that in "Let's Get It On," as I'll point out

3    later, there are songs —— and particularly one song, "Crazy

4    Love" by Van Morrison, which was released three years before

5    the creation of LGO —— that has a very similar chord

6    progression.

7    Q.  I'd like to just briefly play 30 seconds from "Thinking Out

8    Loud" to confirm with you that that's the section that you've

9    been just speaking about.

10    MS. FARKAS:  So if we can play the chorus of "Thinking

11    Out Loud" starting at 1:11 to about 1:42.

12    (Audio playing)

13    A.  You're hearing the I/3, IV, V chord progression here.  This

14    is the —— you'll hear three iterations of it.  If we could

15    start that again.

16    (Audio playing)

17    A.  This is the chord progression at issue.

18    (Audio playing)

19    Q.  So can you just explain to us briefly what we just heard.

20    A.  Yes.  And so once again, we heard three iterations of the

21    basic chord progression at issue (playing piano).  And now

22    since we heard them with anticipation, I should play it that

23    way.  So we heard (playing).  We hear that three times and then

24    followed by bars 9 and 10, or measures 9 and 10, and we heard

25    that descending (playing).

1   Q.  Let's discuss the harmonic rhythm in more detail.  What is

2   harmonic rhythm?

3   A.  Harmonic rhythm is the rate of change of chords, rate or

4   pace of change of chords.

5   Q.  Is the harmonic rhythm in "Let's Get It On" the same as the

6   harmonic rhythm in "Thinking Out Loud"?

7   A.  It is not.

8   Q.  Dr. Stewart testified that when the tempo of "Let's Get It

9   On" is adjusted, the harmonic rhythm is identical to "Thinking

10  Out Loud."  Do you agree with him?

11  A.  No.  Following the *Harvard Dictionary of Music* definition

12  of "harmonic rhythm," you'll see in the beginning of the second

13  paragraph, harmonic rhythm does not itself depend on tempo, in

14  fact, any more than melodic rhythm does.  So whether you play a

15  song fast or slow, the relationships in the duration of those

16  chords remain.  If a chord is held for three beats and then it

17  changes, it's still three beats and a change, whether you play

18  it fast or whether you play it slow.  And that's what that

19  means in the *Harvard Dictionary of Music*.

20  Q.  And is there even a tempo notated in the deposit copy of

21  "Let's Get It On"?

22  A.  No, of course not.  As I mentioned earlier, there is no

23  tempo marked in the LGO deposit copy.

24  Q.  Let's discuss the alleged similarity with respect to

25  harmonic rhythm.

1     What has Dr. Stewart claimed is similar?

2   A.  In addition to the chord progression, he finds that both ——

3   and this is correct —— that both chord progressions feature

4   anticipation, where the chord comes in ahead of the beat, and

5   specifically, the anticipation of the second and the fourth

6   chord in each of the chord progressions.

7   Q.  Is it possible to perform a chord progression without

8   harmonic rhythm?

9   A.  No.  As soon as the chord progression is performed or if it

10  is written over a staff and there's actually beats, then the

11  chord progression includes the harmonic rhythm.

12  Q.  Can you please play for us the chords of "Thinking Out

13  Loud" at issue with anticipation and then play it without

14  anticipation and then please repeat that.

15  A.  Okay.  So here is with anticipation.  Two, three, four

16  (playing).  Without: (playing).

17  Q.  Can you repeat that, please.

18  A.  Yes, I'll do it again.  Here is with anticipation.  Two,

19  three, four (playing).  Without: (playing).

20  Q.  And what is your understanding of Dr. Stewart's opinion

21  regarding the significance of anticipation in this case?

22  A.  It's a linchpin for Dr. Stewart's finding that this

23  combination is significant.  Once again, the chord progressions

24  are not the same, but they are —— the anticipation on the

25  second and fourth is.  The problem with that opinion is

1    twofold:

2            First, anticipation in and of itself.  Anticipation is

3    a centuries-old device.  It is a musical building block.

4            And secondly, the fact that it happens to be used in a

5    second and fourth chord of a four-chord progression is also

6    common, and indeed, as I'll show later, there are even some

7    songs that predate "Let's Get It On" that have that chord

8    progression with that harmonic rhythm.

9    Q.  And do you recall what Dr. Stewart said at his deposition

10   about, you know, if there were no anticipation in this case?

11   A.  I attended Dr. Stewart's deposition years ago, by

12   telephone, so I listened in, and certainly had a transcript of

13   his deposition, and it is my recollection —— and it certainly

14   has come up since —— that Dr. Stewart conceded that the chord

15   progression in and of itself was commonplace.

16   Q.  And do you recall that he admitted that without

17   anticipation, the similar chord progression would not suggest

18   copying?

19           MR. FRANK:  Objection, your Honor.  He can't testify

20   as to what Dr. Stewart said in his deposition.  That's hearsay.

21   If they want to put up Dr. Stewart's deposition, they can

22   certainly do that.  But this is completely inappropriate to

23   elicit testimony from this witness about what another expert

24   said.

25           MS. FARKAS:  He's responding to their expert's

1   testimony about —— and concessions about what's at issue in

2   this case and what's not.

3           THE COURT:  Not offered for the truth.  It's offered

4   for the fact there were utterances by the other speaker.

5   Overruled.

6   A.  Could you repeat the question.

7   Q.  I'll try.

8           Do you recall that at Dr. Stewart's deposition he

9   admitted that without anticipation, the similar chord

10  progressions at issue would not suggest copying?

11  A.  Yes.

12  Q.  I'd like you to take a look at what's been marked for

13  identification as Defendant's Exhibit 204.

14          Do you recognize this document?

15  A.  I do.  The first page is the book cover of a method book

16  for guitarists, chord progressions, chord progressions for

17  guitarists, and that is followed by three pages of contents

18  from the book.

19          MS. FARKAS:  I'd like to move Exhibit 204 into

20  evidence.

21          MR. FRANK:  No objection, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit 204 received in evidence)

24  Q.  Generally speaking, what is being taught in these excerpts

25  from the guitar method book?

1    A.   In Chapter 1, you can actually see it in the text at the

2    top, it says a 2-bar strumming pattern.  Strumming is the strum

3    pattern of the guitarist.  That anticipates the chord changes

4    in measures 2, 4, 6, 8.  So this is essentially teaching

5    anticipation to guitar students.

6    Q.   And are there other examples in this book that you'd like

7    to point out?

8    A.   Yes.  So if you look at example 5, the first chord is on

9    the beat, which is like the chord progression in LGO; the

10   second chord anticipates —— that is, comes right before —— the

11   next bar, like LGO; the third chord is on the beat; and once

12   again, the fourth chord anticipates the next bar.  So

13   essentially this is showing, not using the same chords —— these

14   are not the chords in LGO, but these are showing anticipation

15   of not just chords but of the second and the fourth chords.

16           On the next page in the slide, which is page 17, we

17   have to go —— let's see.  Yes.  Go down to 27.  That's the

18   example in the middle.  And you can see that it's the same ——

19   that is, the A7 chord is on the beat; the E minor chord

20   anticipates the downbeat; the third chord A7 is on the beat.

21   And so once again, it's showing anticipation in the second and

22   fourth chords.  And once again, this is not the chord

23   progression at issue; this is just showing anticipation of

24   second and fourth chords.

25   Q.   And is there another example you'd like to just walk us

1   through?

2   A.  Yes.  And this is 98.  Here, we see the first chord on the

3   beat.  This is like TOL.  So the second chord anticipates the

4   third beat of the first bar, not the next bar, which is what we

5   have in LGO; but the second chord once again is anticipated;

6   the third chord is on the beat; the fourth chord is

7   anticipated.  Once again, this simply shows anticipation of the

8   second and fourth chords, in this case in a guitar method book.

9   Q.  And what is the significance of this being —— of these

10  examples of anticipation being in this guitar method book?

11  A.  It underlines the commonplace nature of something that any

12  musicologist knows, and that is that anticipation is centuries

13  old, it's a musical building block, and indeed it is

14  commonplace in popular music, not only to use it but to use it

15  specifically with respect to the second and fourth chords.

16  Q.  I'd like you to take a look at what's been marked for

17  identification as Defendant's Exhibit 212.

18          Do you recognize this document?

19  A.  Yes, I do.

20  Q.  And what is this document?

21  A.  This is published sheet music of songs —— that in some

22  cases predate LGO, in others postdate —— that I have selected

23  because they, once again, have a chord progression that has

24  anticipation of the second and fourth chords.

25          MS. FARKAS:  We'd like to move Exhibit 212 into

evidence.

MR. FRANK:  No objection, your Honor.

THE COURT:  Received.

(Defendant's Exhibit 212 received in evidence)

Q.  What songs are included in Defendant's 212?

A.  "People Get Ready," and that was released in 1964 by Curtis
Mayfield.

If we could move through.

"Lo and Behold," that was released by James Taylor in
1970.

So both of these first two predate LGO.  We can move
again.

"Billie Jean," which most of you probably know, by
Michael Jackson.  That was released in 1983.  That would be
post-LGO but many years before TOL.

And next, "Learning to Fly" by Tom Petty.  And that
was released in 1991.  That, once again, is post-LGO but many
years before TOL.

And finally, "Should've Been a Cowboy."  And that was
released in I think 1993.  It's rather small.  And that's by
Toby Keith.

Q.  Now I thought you had said that anticipation was common.
Why are we only looking at five songs in this exhibit?

A.  This is illustrative.  This is just a small sample of what
could have been many, many songs that use, once again, a ——

have a four-chord progression in which the second and fourth
chords are anticipated.  None of these five songs have the
chord progression at issue.

Q.  Could you briefly demonstrate "People Get Ready" on the
piano for the jury, please.

A.  Yes.  The chord progression in "People Get Ready" is this.
So one, two, three, four . . . (playing).  So I put the melody
now in the introduction.  I think you'll recognize it.  It
actually is recorded this way (playing).  So what you just
heard was the first chord on the beat (playing), the second
chord anticipated (playing), third chord on the beat (playing),
the fourth chord anticipated (playing).  So, (playing).

           And let's just think about, for the moment, what we're
talking about.  In the examples that I gave in the —— in the
method book, but particularly here, we're talking about this:
Two, three, four . . . (clapping).  That's it.  (Clapping)
That's all there is.  That's the anticipation.  That is the
harmonic rhythm.

Q.  The second song, "Lo and Behold," when was that released in
relation to "Let's Get It On"?

A.  Okay.  So once again, I'll play with the introduction.
This continues, as it does in the previous song, into the
verse.  But here's the introduction.  It's in the key of C.  So
(playing).  What we just heard was one, two, three, four, one,
two, three, four (playing), (clapping).  That's it.  That's the

1    anticipation that's at issue.

2    Q.  And do you know when that song was released as compared to

3    "Let's Get It On"?

4    A.  Yes.  Three years prior to "Let's Get It On," by James

5    Taylor.

6    Q.  Let's do one more.  When was "Learning to Fly" released?

7    A.  Okay.  "Learning to Fly," here's the intro.  And actually,

8    you can hear that clapped rhythm I just played because those

9    are the notes.  So, one, two, three, four (playing).  And that

10   chord progression continues with the vocal, as in the others,

11   when the vocal comes in, "Well, I started out down a dirty

12   road" (playing).  So the continuation, that is the anticipation

13   that's at issue.

14   Q.  And was that song released before "Thinking Out Loud"?

15   A.  This was released before "Thinking Out Loud."  I can see it

16   more clearly here.  1991.

17   Q.  Have you found examples of songs that feature the

18   anticipated second and fourth chords that also use the same

19   chord progressions that are at issue in this case?

20   A.  Yes, I did.

21   Q.  I'd like to direct your attention to the testimony of Ed

22   Sheeran using anticipation in prior songs.  What specifically

23   did you find?

24   A.  I'm sorry.  What song?

25   Q.  About Ed Sheeran using anticipation in prior songs.

1   A.  Oh, in prior songs.  I'm sorry.  I reviewed songs that Ed

2   Sheeran either wrote or co-wrote, and in all cases recorded,

3   prior to TOL.  In fact, the years, as I recall, was between

4   2005 and 2013, and what I discovered —— or even 2012 —— what I

5   discovered was 20 songs of —— that are part of Ed Sheeran's

6   repertoire, that he co-wrote or wrote, that include

7   anticipation.  And notably, of those 20 songs that include

8   anticipation, 10 of them have anticipation of the second and

9   the fourth chords.

10  Q.  And can you explain how you made those findings.

11  A.  Yes.  Once again, I went through sheet music and audio

12  particularly of the Ed Sheeran songs, and using the same

13  methodology that I mentioned before —— it's slow and

14  deliberate, I made certain that I was accurate in the analysis

15  —— and in so doing, I discovered that at least 10 of his songs

16  prior to TOL include this second and fourth anticipation

17  harmonic rhythm.

18  Q.  And when you were reviewing Ed Sheeran's prior songs and

19  you found a song that used anticipation, did you record or

20  write down your findings?

21  A.  Yes, I did.  I created a list.

22  Q.  Can you please take a look at what's been marked for

23  identification as Defendant's Exhibit 214.

24  A.  Yes.  That is the list that I created of the 20 songs, and

25  as you can see, some of the songs have ——

N521GRI1                    Ferrara - Direct

```
 1    Q.  Hold on.  Sorry.

 2    A.  Oh, I'm sorry, once again.

 3    Q.  Got to do it the right way.

 4             MS. FARKAS:  I'd like to move Exhibit 214 into

 5    evidence.

 6             MR. FRANK:  No objection, your Honor.

 7             THE COURT:  Received.

 8             (Defendant's Exhibit 214 received in evidence)

 9    Q.  Proceed.

10    A.  Okay.  I jumped the gun again.  All right.

11             As you can see, what this includes, in the

12    parentheticals — there are ten of them.  Starting with the

13    first one, "I Love You," the second and the fourth chord are

14    anticipated, and so if you — as you scroll down, you'll see

15    this occurs, parentheses, in 10 of the 20 songs.

16    Q.  And from a musicological perspective, what is the

17    significance, if any, of Mr. Sheeran's use of anticipation in

18    his prior songs?

19    A.  Well, first, anticipation itself is clearly part of the

20    vocabulary, an important part of the vocabulary of Ed Sheeran;

21    and in addition to that, anticipating the second and fourth

22    chords as well as anticipation of chords in and of themselves

23    is part of his toolbox.  It is part of his repertoire.  It's

24    what he does, and he did frequently prior to TOL.

25    Q.  So would it be safe to say that you find this list of songs
```

1   significant?

2   A.  Yes, this would be very significant, because once again, it

3   underlines the fact that what Ed Sheeran wrote and created in

4   TOL was growing out of the corpus of his works that predated

5   that.

6   Q.  Dr. Ferrara, is the harmonic rhythm in "Let's Get It On"

7   and "Thinking Out Loud" the same?

8   A.  No, it is not.

9   Q.  Would you like —— we're going to go through a slide that

10  will hopefully help you illustrate it for the jury.  I direct

11  your attention to the screen.

12          Can you tell us what we're looking at, Dr. Ferrara.

13  A.  Yes.  These are charts that I created to show the harmonic

14  rhythm in LGO, which is here —— and I'll explain it in a moment

15  —— and TOL, which is here.  I did the same —— for anyone who

16  didn't want to see it over musical staffs, I did it with boxes.

17  So these bottom two boxes merely replicate the staffs on top.

18          And so if we stay with the staffs on top, you can see

19  that in LGO, there is a I chord.  That's the one chord we

20  already know about.  These markings are rests, just to say that

21  we're not putting any vocal melody here, we're just talking

22  about the chords.  And those rests allow us to calibrate the

23  number of beats that each of these chords has as a duration.

24  So the first chord, the I chord, has three beats.  Duration is

25  three beats.  The iii chord comes in on the fourth beat of the

1    bar.  Call it the measure; it's the same.

2          And after the bar line, we have the second measure.

3    And what's important to note is that this iii chord continues.

4    It doesn't just play for this one beat, the fourth beat of the

5    first bar; it continues all the way through the next bar, until

6    the next chord change.  That iii chord is five beats.

7          Then the IV chord comes in for three beats, then the V

8    chord comes in.  Just like the iii chord, it starts at the end

9    of the third bar and continues in the fourth bar for five

10   beats.

11         You can see that they don't line up, and the reason

12   they don't is that in TOL, the first chord is one and a half

13   beats, not three; the second chord is two and a half beats, not

14   five; and so forth with IV and V.

15         And there's a very important point here.  Dr. Stewart

16   cuts in half the value of the chords in the harmonic

17   progression.  He cuts them in half.  And later I'll show you

18   that that can be done.  It could be done to facilitate a

19   comparative analysis.  But what's important here is that this

20   is what's in the deposit copy.  We cannot say that this chord

21   progression or the harmonic rhythm in TOL is the same as LGO.

22   It is not.  You can see that it is not.  This is an important

23   point with respect to key.  Because I've already testified that

24   the two songs are in different keys.  One's E flat, one's D.

25   But to facilitate the comparison, we put them both in D.  But

1  we never say, and therefore, "Let's Get It On" is in the key of

2  D.  We always say, with the qualification, we're transposing it

3  to D, but by the way, it is in the key of E flat.  So even if

4  you transpose, it doesn't make the two songs in the same key.

5  That's just a facilitation of the analysis.  It is exactly the

6  same here.  Yes, a musicologist —— and I do this later with

7  prior art —— will cut that note value and chord value in half.

8  We do that so that things line up.  But the key is, you can't

9  then come back and say, oh, now they're the same.  You can't

10 now come back, after you halved the chord progressions, and say

11 they're the same.  That would be like saying, oh, since I

12 transposed, well, "Let's Get It On" into the key of D, now it's

13 in the key of D, it isn't in the key of E flat.  Well, no, the

14 deposit copy is in the key of E flat, and it's different.  It's

15 exactly the same idea.  It's analogous.

16         And so no matter what you do, these two remain

17 different in harmonic rhythm.

18 Q.  So I'd like to direct your attention to the screen now.

19 Can you just walk us through quickly what the differences are

20 that you identified with respect to the harmonic rhythm in each

21 work.

22 A.  Yes.  And as you can see —— and I've already testified to

23 much of this —— the first difference is the I chord in LGO has

24 a duration of three beats.  You go to the right, the I chord

25 has a duration of 1.5 beats in TOL.

1     No. 2.  The iii chord, which is the second chord of

2  the progression, has a duration of five beats in LGO; the I/3

3  chord, which is the second chord in the progression in TOL, has

4  a duration of 2.5 beats.

5     No. 3.  As a difference, the IV chord in LGO has a

6  duration of three beats, the IV chord in TOL has a duration of

7  1.5 beats.

8     The fourth, the fourth and final chord in LGO, in this

9  four-chord progression, the V chord has a duration of five

10  beats.  The V chord in TOL has a duration of 2.5 beats.

11     And a fifth difference —— and there are many others,

12  by the way —— is that the duration of the anticipated chord is

13  a quarter note in LGO, but it is half that —— the anticipated

14  chord in TOL is an eighth note in duration.

15     Those are just five of many other differences in the

16  chord progressions as recorded and written by Ed Sheeran in TOL

17  and as written in the deposit copy of LGO.

18  Q.  Dr. Ferrara, I want to direct your attention to

19  Dr. Stewart's trial testimony.

20     Do you recall his testimony that your analysis of the

21  harmonic rhythm in "Let's Get It On" implies six chords in the

22  deposit copy?

23  A.  Yes, I do.

24  Q.  And I direct your attention to Dr. Stewart's slide 38.

25  What are we looking at here?

1   A.  This is an excerpt of I believe this is my declaration.

2   It's paragraph 28.  So what you're seeing in the body is after

3   —— after the No. 28, paragraph 28, is a direct excerpt from

4   that report.  And what it suggests is that somehow I created a

5   six-chord progression in —— in LGO, which is farcical.

6            I'll just give you one example.  In the second

7   sentence, the harmonic rhythm in the four-bar chord progression

8   is two chords in bar 1 —— no one disputes that —— one chord in

9   bar 2.  And if we could go back to that previous chart so that

10  I can just show you, so —— the previous one before that.  I'm

11  sorry.  That's it.

12           So this is what I was talking about.  So here, the iii

13  chord.  It's the second chord in bar 1.  The iii chord doesn't

14  end there.  It continues.  It's five beats.  How many chords

15  are there in bar 2?  One.  It's the continuation of the second

16  chord from the first bar.

17           He does the same thing —— that is, Dr. Stewart does

18  the same thing, and it's farcical —— by suggesting that by me

19  saying that in bar 3 there are two chords —— there are, we

20  agree —— and in bar 4 there's only one chord, of course there's

21  only one chord.  It's the V chord that continues.  That doesn't

22  create six chords.  It's simply showing that the duration of

23  the third and fifth chords and the V chords, the iii and the V

24  chords, continue into the next bar.

25  Q.  At any point during this case have you ever stated that

1    there are six, not four chords in the chord progression in

2    "Let's Get It On"?

3    A.   No.

4    Q.   Okay.  Let's discuss the melodies in a little more detail

5    now.

6              In your own analysis of the melodies in "Let's Get It

7    On," did you rely upon the deposit copy?

8    A.   Yes, I did.

9    Q.   And regarding "Thinking Out Loud," how did you analyze the

10   melodies?

11   A.   I analyzed the melodies by of course referring to the sound

12   recording but using the transcriptions that we discussed before

13   of the melodies and the chord progressions.

14   Q.   Could you please take a look at what's been marked for

15   identification as Defendant's Exhibit 238.

16             Do you recognize this document?

17   A.   238.

18             Yes.  This is my transcription of the opening melody

19   in LGO and the open —— opening melody in TOL, and the reason it

20   says Melody A is because up until recently —— I did it again.

21   Three times is a charm.  Hopefully this will be the last.

22   Q.   I raised a finger trying to warn you.

23             MS. FARKAS:  Your Honor, we'd like to move Exhibit 238

24   into evidence.

25             MR. FRANK:  No objection, your Honor.

1          THE COURT:  Received.

2          (Defendant's Exhibit 238 received in evidence)

3   A.  All right.  I will continue with my --

4   Q.  Are your transcriptions of the melodies in "Let's Get It

5   On" consistent with the deposit copy?

6   A.  Yes.

7   Q.  Okay.  Do you want to just briefly describe to us what this

8   exhibit is.

9   A.  Yes.  The —— the exhibit is a collection of my

10  transcriptions of the melodies that were placed in issue, and

11  they continue beyond Melody A.

12          Melody A is the opening melody of both works, and in

13  previous reports of Dr. Stewart, he referred to this as Melody

14  A., and so that is why —— since he has put the melody at issue,

15  I'm just using his terminology.

16          The next is Melody B, which we'll be getting to, and

17  finally, Melody C.  These are my transcriptions of the portions

18  at issue in those melodies.

19  Q.  And are your transcriptions of the melodies placed in issue

20  in "Thinking Out Loud" consistent with the published sheet

21  music of "Thinking Out Loud"?

22  A.  Yes.

23          MS. FARKAS:  If we could go to slide 13, Scott,

24  please.

25  Q.  Can you please take a look at what's on the screen and let

1    us know what we are looking at.

2    A.    This is my transcription of Melody A, and the top staff is

3    the transcription just as it appears in the "Let's Get It On"

4    deposit copy.   On the bottom is the opening ⎯ the

5    corresponding opening melody and lyric to TOL.

6    Q.    And what has been added to the screen?

7    A.    In the second comparative transcription, I have in LGO cut

8    in half the note values so that they align to facilitate the

9    comparison.   So if something ⎯ if there is a note ⎯ for

10   example, here, this is an eighth note, the first note, sung to

11   "I've."   This is the same note sung to "I've," but now it's a

12   16th.   Everything is cut in half.

13   Q.    And what effect, if any, does cutting the note values in

14   half have?

15   A.    You could probably see that just in terms of the expanse of

16   the melodic phrase, that this is much ⎯ the cutting in half is

17   much more compact.   The reason musicologists do this is to

18   facilitate the comparison.   In so doing, you end up erasing

19   some of the differences; for example, the differences in metric

20   placement, where on the beat or within the beat a note occurs,

21   you give that up.   The point, though, is that even erasing some

22   of those differences in rhythmic durations and in metric

23   placements, this melody cut in half, in LGO, and this melody ⎯

24   both the opening melodies in LGO and TOL, are so dramatically

25   different that it doesn't matter that you cut it in half and

1  lose some of those differences.

2  Q.  Now we're looking at Melody A here.  Did you also have the

3  notes in the other "Let's Get It On" melodies that Dr. Stewart

4  has placed in issue?

5  A.  Yes.

6  Q.  So let's stick with Melody A for now, which is the opening

7  melodies in each song.

8         At a high level, what, if anything, did you find with

9  respect to the so-called Melody A in each song?

10 A.  They're dramatically different.  The —— the pitch sequence

11 —— you saw some of that pitch sequence analysis with

12 Dr. Stewart —— is clearly different, and I will show that.  The

13 rhythmic durations of the notes are dramatically different.

14 The metrical placements of corresponding notes are different.

15 They're simply two very different melodies.

16 Q.  And are there any musicologically significant similarities

17 between these two melodies?

18 A.  There are none.

19 Q.  Could you please play Melody A in each work at the piano,

20 consistent with your transcriptions.

21        MS. FARKAS:  I think, Scott, if we could go to slide

22 14.

23 Q.  Unless you're comfortable with this one.

24 A.  Yes.  So I'll beat out, in eighth beats, one, and two, and

25 (playing).  That's LGO.  I'll play it again.  One and two and

N521GRI1                        Ferrara - Direct

1    (playing).

2            Here is TOL.  One and two and —— sorry.  One and two

3    (playing).

4            And now one after the other without interruption.  LGO

5    (playing).

6    Q.  Thank you.  Let's move on to slide 15.

7            Can you please identify for us what has now been

8    projected on the screen.

9    A.  Yes.  In the top projection, you can see that above each of

10   the notes, I wrote the scale degree.  The scale degree simply

11   identifies where on the scale each pitch occurs.  So if there's

12   a 3, it means that this is on scale degree 3 in a D major

13   scale.  (Playing).  It's that note.  And I have then trans ——

14   transposed those scale degree numbers above each of the notes

15   in the chart at the bottom.  And you saw similar charts with

16   Dr. Stewart.  That matches them literally, just in the order

17   that they occur.  And wherever they match, the same pitch, the

18   same scale degree, I highlighted it in green.  So there are 14

19   pitches in the LGO Melody A.  As you can see, they match up

20   with three in the Melody A in TOL.

21   Q.  Now I just want to direct your attention to where your

22   chart of scale degrees, some of the 3s have what looks like a

23   lower case b in front of it.  Can you explain what that is.

24   A.  Yes.  Part of the modality —— we'll talk about modal

25   quality later.  Part of the modality in LGO absent in the vocal

melody of TOL is that there are in fact about a dozen, in the

overall deposit copy, examples of scale degree 3, which is F

sharp (playing), third scale degree of the (playing).  That's

called the diatonic scale (playing).  This note, this is the

flat 3 (playing).  And that small b means flat.  So flat 3

(playing).  That is not part of the diatonic scale.  And it is

often referred to as a blue note — that is, when the scale

degree 3 is not in this case F sharp (playing) but it's F

natural (playing).  These are different pitches (playing).  3,

flat 3 (playing).

Q.  Is it musically significant for two songs to share some

pitches here and there?

A.  No.  As everyone knows, there are seven pitches in a

musical scale, and even adding the flat 3 would make eight

pitches, so it would not be unusual for two works to share some

pitches in order.

Q.  And if we look at the pitches that do line up, are they

consecutive?

A.  No.  They're scattered.  They're fragmentary.

Q.  And we've been discussing the pitch sequences for Melody A

in "Let's Get It On" and "Thinking Out Loud," meaning the order

of the pitches in each melody.  Is what we are looking at on

these chart of scale degrees, is this melody?

A.  No.  And by the way, the Xs are x'g out all of the scale

degrees, all of the pitches that are out of sequence.  The only

1   ones that are not X'd out are those pitches or scale degrees

2   that align.  So the first 3/3 and so forth.

3           So go ahead with that question?

4   Q.  I was asking if pitches are melody.

5   A.  Ah, whether pitches are melody.  Pitches are a part of

6   melody, but alone they are not.  A pitch is a melodic tone,

7   without duration, a melodic tone without duration.

8   Q.  And what is a note?

9   A.  A note is a pitch with duration.  It's a dramatic

10  difference.

11  Q.  In addition to pitch sequences, do you have an opinion on

12  whether, in assessing melodic similarities and differences, it

13  is important to also include an analysis of the rhythmic

14  durations and metric placements of those pitches?

15  A.  Of course.  You cannot do a proper musicological analysis

16  of melody without not only looking at the pitch sequence but

17  also doing an analysis of the —— of the melodic rhythms, and

18  that melodic rhythms include the rhythmic duration of each

19  pitch and the metric placement, where it falls in the bar.

20  Q.  Dr. Ferrara, I'd like to draw your attention to what's been

21  projected on the screen.

22          Do you recognize that?

23  A.  Oh, yes.  This —— this is a definition that Dr. Stewart

24  gave of "melody" in a previous case.

25  Q.  And in his definition, Dr. Stewart states that, "Along with

1    pitch, duration (rhythm) is an essential element in the

2    formation and recognition of melodies.  While we may separate

3    these elements for the purposes of analysis, it is essential to

4    remember that both are the defining characteristics of

5    melod[ies] . . ."

6    A.  Yes, I agree with that, that I think he ⸺ he has

7    essentially the content of both the Harvard and Oxford

8    dictionaries of music, and that essentially says that it's not

9    just pitched sounds, it's pitched sounds in musical time, which

10   means rhythmic durations, and measured time, which means

11   they're in bars, and we have to ⸺ is this on beat three, is

12   this on beat four, is this a quarter note, is this a half note?

13   That is, as ⸺ as he has said, an essential element in the

14   formation and recognition of melodies, and part of any proper

15   musicological analysis.

16   Q.  So at the risk of asking ⸺ I'll just ask the question.

17        Did you analyze the rhythmic durations and metric

18   placements of Melody A in both songs?

19   A.  Yes.

20   Q.  And did Dr. Stewart analyze the rhythmic durations and

21   metric placements in Melody A of both songs?

22   A.  No.

23   Q.  Is that proper musicological procedure?

24   A.  It is not proper musicological procedure.

25   Q.  So did Dr. Stewart actually analyze the melody in each

1    song?

2    A.  He only analyzed the pitch.  And once again, that's the

3    difference in the definition between a pitch and a note.  He

4    didn't analyze the notes in the melody because he never got to

5    rhythmic duration.  He only analyzed the pitches, which is part

6    of the contour.  The contour also follows the pitches, up and

7    down, but it doesn't tell us how long each note, the duration

8    of each note, where it falls into the bar.  That's what makes a

9    melody.

10            Let me just give an example.  Here is a —— a melody

11   that —— that you might find well known (playing).  What

12   distinguishes that melody —— which is only eight descending

13   notes, scale degrees 8, 7, 6, 5, 4, 3, 2, 1 —— what

14   distinguishes it —— ba, ba, ba, ba, ba, ba, ba, that's the

15   rhythmic duration.  That's the rhythmic duration.  That's

16   what's distinctive.  That it's just 8, 7, 6, 5, 4, 3, 2, 1 is a

17   musical building block.  That's been left out of Dr. Stewart's

18   analysis.

19   Q.  Looking at what's projected on the screen, if you could use

20   your pointer and explain your findings regarding rhythmic

21   durations and metric placements in Melody A.

22   A.  Well, first, let me say that I could spend a lot of time on

23   this.  But just in terms of the metrical placement, the ——

24   obviously, the first note here does not line up with the first

25   note; the second note here does not line up with the second

1    note there.  So the metrical placements within beats are

2    different.

3              But also, look at —— for example, the first note is,

4    on scale degree 3 —— here is the first note on scale degree 3,

5    but here, it comes in a 16th beat later in the bar and it is

6    tied over, it's held over, so in fact the rhythmic duration of

7    this note is an eighth.  The rhythmic duration of this 3 is a

8    16th.

9              And if we go through, this continues through.  And you

10    can see also that these notes are all off the beat.  So the

11    first three notes, "I've been real," even —— let's just do the

12    first two.  "I've been."  "I've been."  (Playing).  So, two and

13    (playing).  It's off the beat.  Two and (playing).  I'll do it

14    this way.  They're off the beat.  Whereas (playing) these are

15    on the beat within beats one and —— and eighth notes.

16              If you listen to the rhythm of just the first part of

17    the LGO melody, "I've been really try," just that first part,

18    here's the beat.  And two and (playing), as compared with

19    (playing).  And then the next, (playing).  That was the next

20    bar (playing), in LGO as compared with (playing).  That's a

21    dramatic difference in the rhythmic duration.

22              But what's also different, and not pointed out in the

23    analysis of Dr. Stewart, is the extraordinary difference within

24    each of these.  And that is, first, all of these notes in LGO

25    move, one to the next, in stepwise order.  That means they all

1    move to the next adjacent key on a piano or the next adjacent

2    number.  3, 4, 5, 4, 3, 2, 3, 2, 3, 2, 2.  Leaving out the

3    flats because they're all adjacent, all stepwise.  That's not

4    the case here.  From the 3 to the 5, we skipped 4.  That's

5    called a leap.  From this 5 to this 3, we skipped 4 again.

6          And here, we really are different in TOL as compared

7    to LGO.  Here we have 2b.  That is an interval, a space, of a

8    perfect fifth.  1, 2, 3, 4, 5, 6, 7.  That's seven half-steps

9    away.  Whereas in LGO, all of the notes are stepwise, and then

10   we have another leap.  So this is another difference.

11         But there's also a very important modal difference.

12   If you listen (playing) to that opening melody in TOL, they're

13   all diatonic.  They're all part of the D scale.  But very

14   specifically, they all use five of those seven notes.  Five of

15   them.  And that's called pentatonic.  Everybody knows what

16   "penta" means.  "Penta" just means five, five tones.  It's

17   these five tones (playing).  That's the pentatonic part of the

18   diatonic scale (playing).

19         Now you may recognize that because in fact, for

20   centuries, traditional Chinese music has been heavily using the

21   pentatonic scale.  It's also very popular in popular music.

22   That is the modality of the opening melodic phrases in TOL

23   (playing).  Now let's compare that to what is going on in LGO

24   (playing).  Blue note (playing); blue note (playing); blue note

25   (playing).  Those blue notes are gorgeous.  I love them.

1    Beautiful writing by Mr. Townsend.  But they are different,

2    they're very different, from (playing), from that.

3              Put all of that together, and these are dramatically

4    different melodies, from any perspective.

5    Q.  Dr. Ferrara, if we were to look at the slide that's on the

6    screen, can you explain to us what the red marks indicate.

7    A.  Yes.  If one were to compare the melody, the opening melody

8    in LGO as it is written in the deposit copy and the TOL

9    transcription — and by the way, the only difference in

10   Dr. Stewart's transcription and mine is that additional grace

11   note in his.  But if you were to — to X out every

12   corresponding note that is not the same pitch, one; two, not

13   the same rhythmic duration; and three, not the same metric

14   placement — this is an analysis I've done for more than 30

15   years, not just in popular music but before that in other music

16   — before litigation, that is, I should say — using that

17   benchmark, there's literally nothing left.  The melody

18   disappears because they're so different.  Nothing lines up.

19   Q.  I'd like to read you some of Dr. Stewart's testimony from

20   last week when I asked him about the rhythmic duration of the

21   notes in Melody A.

22             "Q.  You have to divide it to be the same?"

23             "A.  The difference here you're talking about is so

24   minuscule in terms of the rhythmic duration that I think it is

25   completely insignificant."

1          "Q.   Okay.  But they are different, correct?"

2          "A.   Notationally it looks different but it's not.

3    We're talking about hundredths of a second in terms of

4    duration."

5          Do you agree with Dr. Stewart's opinion?

6    A.   No.   I strongly disagree.   I think it's an absurd opinion.

7    The idea that you omit notes because they're fast in a musical

8    score is ludicrous.   It's in the score; you analyze it.   It's

9    uncomfortable, perhaps, for Dr. Stewart that these notes that

10   one would omit are notes of difference, and so he will say

11   these differences are insignificant, but in doing a proper

12   musicological analysis, you study all of the notes, and in so

13   doing, you find that they're all x'd out.   So I strongly

14   disagree with that.

15         Indeed, let's think about the —— the problem with

16   that.   Every work that is fast, you'd say, well, the fast notes

17   we're going to leave out, because it's only a hundredth of a

18   second.   We're just going to deal with the slow notes.   We'll

19   have all these big gaps.   We'll forget this section because

20   it's fast, we'll do this section because it's slow.   It's an

21   absolutely absurd musicological position.

22   Q.   Dr. Ferrara, I'd like to direct your attention to Stewart

23   slide 65.

24         And I want to draw your attention to the portion of

25   "Thinking Out Loud" that he presented to the Court last week.

N521GRI1                           Ferrara - Direct

1  Does this reflect all of the lyrics from "Thinking Out Loud"?

2  A.  I believe ——

3  Q.  If I direct your attention ——

4  A.  I believe the word "from" is missing.

5  Q.  And can you indicate where that is.

6  A.  Yes.  If you look at the bottom line, "Will your eyes still

7  smile," what's written is, "Will your eyes still smile your

8  cheeks?"  It's actually, "Will your eyes still smile from your

9  cheeks?"

10  Q.  And the notes that are colored in blue, has he changed the

11  notes of the melody of "Thinking Out Loud"?

12  A.  Yes.  Dr. Stewart changed scale degree 3 with a blue note,

13  and it's also called the blue third, the flat 3, and so instead

14  of the note F sharp (playing), he's substituted it with

15  (playing) that.

16  Q.  Dr. Ferrara, focusing on this opening melody of "Thinking

17  Out Loud," has Mr. Sheeran used a similar melodic sequence in

18  any of his prior songs?

19  A.  Of this.  Well, I'd just like to —— to perhaps play the

20  first two phrases in that slide that you have up.

21  Q.  Okay.

22  A.  So here, let's first hear what Ed Sheeran actually wrote

23  (playing).

24            And this is what Dr. Stewart's written (playing).

25            That is simply not what Ed Sheeran wrote.  I don't

1   know what the purpose of the exercise is, but it dramatically

2   changes not only the note but the character.  It changes what?

3   It changes the modality (playing).

4   Q.  So Dr. Ferrara, focusing on this, the first line that we

5   see up here, when it's actually accurately ——

6           MS. FARKAS:  Let's take this down.

7   Q.  So focusing on the opening melody of "Thinking Out Loud,"

8   has Mr. Sheeran used a similar melodic sequence in a prior

9   song?

10  A.  Yes, certainly, yeah.

11  Q.  And do you know what song that is?

12  A.  You'll have to help me with the title again because I'm

13  just analyzing the music and not the ——

14  Q.  Does "The A Team" sound familiar?

15  A.  "The A Team."  Of course.  My bad.

16          Yes.  In the chorus, in each chorus, there is a very

17  similar melody that not only has pitches but it also has some

18  similarity in the melodic rhythm, but using, for example ——

19  since this is the bar that's been set, using Dr. Stewart's

20  standard, are there pitches, is there a sequence of pitches in

21  the chorus of "The A Team" that is similar to the opening

22  melody in TOL, the answer is a resounding yes, and much more

23  than anything that Dr. Stewart suggested was similar in the two

24  songs at issue.

25  Q.  Are you able to play those melodies for us at the piano?

1    A.  Yes.  So it would be (playing).  This is the first seven

2    pitches.  I'm going to stop there.  It continues.  And there

3    are continued similarities.  But there's an extra note in

4    between.  But listen to that (playing).  That's what —— the

5    rhythm that it's sung.  So Ed Sheeran sings this in each chord.

6    So take "The A Team," and that I believe is 2011, about three

7    years before TOL.

8            So here are the —— here's the melody (playing).

9    Here's the opening of "Let's Get It On" (playing).  Okay.  So

10   (playing), as compared with (playing).  Seven identical pitches

11   in sequence.

12   Q.  Dr. Ferrara, you just said that you were playing the

13   opening melody from "Let's Get It On," but I think you meant

14   "Thinking Out Loud," correct?

15   A.  Did I say "Let's Get It On"?

16   Q.  You did.

17   A.  I'm just going in the flow.  Yes, it should have been ——

18   that's my bad.  It should have been "Thinking Out Loud." so

19   "Thinking Out Loud" (playing).  "The A Team" (playing).

20           "A Team" (playing).  "Thinking Out Loud."  Seven

21   identical pitches in a row.  There was nothing remotely as

22   similar between any of the melodies that Dr. Stewart put in

23   issue than this similarity between a work that Ed Sheeran wrote

24   in 2011 and "Thinking Out Loud."

25   Q.  I'd like to direct your attention to what's being projected

1    on the screen.

2              Can you please explain what we're looking at and the

3    significance of this slide, if any, to your analysis.

4    A.  This is a transcription — the top is — it's from the

5    publication — if I can get this to work.

6              All right.  Well, the top line is the — the melody as

7    it is — there it is.  This is the melody as it is in the — in

8    the library collection.  I have now transposed it to the key of

9    D and down an octave, and here I've created a comparative

10   transcription.  This is "Espressivo," from *Variations*.  This is

11   written by Francesco Pollini, who obviously died in 1846, and I

12   red highlighted the notes that have the same pitches.  This is

13   essentially what Dr. Stewart did in his comparative analyses.

14   And as you can see, 1, 2, 3, 4, 5, 6, 7, the same seven notes

15   that — the same seven pitches that I just pointed out in "The

16   A Team," 1, 2, 3, 4, 5, 6, 7.

17   Q.  Dr. Ferrara, have you also completed a combined analysis of

18   the chords and the melodies in what Dr. Stewart labels Melody A

19   in "Let's Get It On" and "Thinking Out Loud"?

20   A.  Yes.  So you can see that this is essentially the same

21   comparative transcription with LGO opening melody and TOL

22   opening melody, one on top, one on bottom, but now, in addition

23   to the notes, I've added the chord symbols.  And let me mention

24   that the chord symbols are based on what chords are actually

25   sounding in TOL at that moment.  So these are not the basic

1    chords.  This is what's actually sounding.  But I'm going to

2    actually play the basic chords for you, and that will cut out

3    some of the difference.  So I'm going to make the chords less

4    different between TOL and LGO.  The key is the chord context

5    with the melody.  Dr. Stewart suggested that in addition to the

6    combination of this common chord progression and the common use

7    of anticipation, in addition to that, we also had a melody

8    overlaying it.  Well, we now know the status of those melodies

9    and how different they are.  But the point is he made the

10   point, and one of the things that made the melodies more alike

11   is the fact that they have a chord progression that's going

12   that's very similar, at least.

13           I'm going to play the melody that you can see with the

14   F sharp minor chord, "I've really been try."  So here's that

15   melody (playing).  And here it is with the chord (playing).

16   Again (playing).  So we've contextualized the melody with the

17   harmony (playing).

18           I'm going to do the same thing now within that box of

19   don't —— "When your legs don't work like they," under the D/F

20   sharp (playing).  LGO (playing).  TOL (playing).

21           I don't find any help with the chords in making the

22   melodies sound more alike.  This is even more dramatic now in

23   the last bar, the second half of the phrase, as you can see,

24   under the next chord, the G chord.  And so here's a G chord

25   under the notes in the melody of LGO (playing).  Again

1    (playing).  And here it is in L —— TOL (playing).  The chords

2    don't help.  The melodies are still dramatically different.

3              And finally, with respect to the fourth chord, while

4    there are two notes under the A chord (playing), "Baby," there

5    are no melody notes under the A chord in TOL.

6    Q.  In conclusion, Dr. Ferrara, do you find any musicological

7    evidence that Melody A in "Thinking Out Loud" was copied from

8    Melody A in "Let's Get It On"?

9    A.  There's absolutely no remote evidence of copying, let alone

10   similarity.

11   Q.  And in fact, did Dr. Stewart even analyze the melody in

12   what he called Melody A?

13   A.  By disregarding what is defined as notes and only dealing

14   with pitches, he failed; he failed by omission to analyze the

15   melodies at issue.

16             MS. FARKAS:  Your Honor, I think we're at a good

17   breaking point.  We're about to move on to the next melodic

18   portion.  So if it's okay with your Honor, we'd like to break

19   for lunch?

20             THE COURT:  We'll resume at 2:15.

21             THE DEPUTY CLERK:  All rise.

22             (Luncheon recess)

23

24

25

                    AFTERNOON SESSION

                        2:25 p.m.

1        (Trial resumed; jury present)

2   LAWRENCE FERRARA, resumed.

3   BY MS. FARKAS:

4   Q.  Good afternoon, Dr. Ferrara.

5   A.  Good afternoon.

6   Q.  Let's move on to the second set of melodies that

7   Dr. Stewart has placed in issue, a portion of the melody in

8   "Let's Get It On" at the end of verse four and into the

9   beginning of chorus two as compared to a melody in the chorus

10  in "Thinking Out Loud."

11        Prior to his trial testimony, did Dr. Stewart have a

12  name for these second sets of melodies in each work?

13  A.  Melody B.

14  Q.  And at a high level, what, if anything, did you find with

15  respect to the second set of melodies that Dr. Stewart has

16  placed in issue?

17  A.  There are no relative similarities in Melody B other than

18  some contour similarity, which is very, very scant and thin.

19  But, once again, the melodies as notes are simply very

20  different.

21  Q.  Are there musicological similarities between Melody B in

22  "Let's Get It On" and "Thinking Out Loud"?

23  A.  No.

1    Q.  What are we looking at, Dr. Ferrara?

2    A.  This is my comparative transcription of the two melodies at

3    issue that we call Melody B.  On top is the passage from "Let's

4    Get It On" and on the bottom is the passage from "Thinking Out

5    Loud."

6    Q.  Could you please play Melody B in each work on the piano

7    consistent with your transcriptions.

8    A.  Yes.  I'll give a few beats so you know what the beat is.

9    4 and 1 (piano played).  TOL, 1 and 2 (piano played).  I can

10   play them back to back without interruption.  LGO (piano

11   played).  TOL (piano played).

12   Q.  Can you please identify for us what has now been projected

13   on the screen.

14   A.  As we did with melody A, given the scale degrees that are

15   written above the notes in the transcription on top, I've

16   simply brought them down into a chart of the scale degrees in

17   the order in which they occur.  And as you can see, when

18   pitches match, I've highlighted them in green.

19   Q.  And just to be clear, if you look at the transcription at

20   the top, you have halved the note values in LGO?

21   A.  That is correct, which is what it says, note values in LGO

22   are halved.

23   Q.  How many pitches line up in Melody B in each work?

24   A.  As you can see, four pitches out of 11 in LGO line up.

25   Q.  And if we look at the pitches that lineup, are they

N52HGri2

1    consecutive?

2    A.   Only two pitches, iii-iii, are consecutive, still

3    considered a fragment.

4    Q.   In addition to analyzing the sequences of the pitches, did

5    you perform an analysis of the rhythmic duration and metric

6    placements in Melody B in "Thinking Out Loud" and "Let's Get It

7    On"?

8    A.   Yes, I did.

9    Q.   Did you Dr. Stewart perform an analysis of the rhythmic

10   durations and metric placements in Melody B?

11   A.   No, he didn't.

12   Q.   Did Dr. Stewart actually analyze the melody in this section

13   of each song?

14   A.   To the extent that we use Dr. Stewart's definition, which

15   draws on the Oxford and Harvard dictionaries of music, he did

16   not because he failed to analyze the notes, that is, the

17   harmonic beat, melodic rhythm and the metric placement and the

18   pitches.

19   Q.   What is the similarity that Dr. Stewart has identified with

20   respect to this second melody?

21   A.   Essentially, that there is a descending contour that moves

22   up at the very end, so a movement of the pitches down and then

23   up at the end.

24   Q.   Is movement of pitches down a scale, was that commonplace

25   prior to "Thinking Out Loud"?

1    A.  Yes.  In fact, there are three basic contours, as you can

2    — a melody can go up (piano playing), a melody can go down

3    (piano playing), or a melody can just simply have repeated

4    pitches (piano playing).  That's it, up, down, repeat.  And so

5    contour, in and of itself, does not provide an awful lot of

6    information.

7    Q.  Focusing on descending down a major scale, was that

8    something that was commonplace prior to "Let's Get It On"?

9    A.  Indeed, yes.

10   Q.  Let's look at the next slide.

11           Can you please explain your findings regarding the

12   rhythmic durations and metric placements of Melody B in "Let's

13   Get It On" and "Thinking Out Loud"?

14   A.  Yes, and I'll try to expedite this.

15           So, here, the differences in metric placement, but in

16   particular in rhythmic duration are stark.  For example, this

17   begins with eighth note quarter note.  This begins with eighth

18   note 16th note.  The 16th is literally a quarter of the

19   rhythmic value of a quarter note.  Putting it in another way,

20   this note *some to you* in LGO is four times than the second

21   note, *some to me*.

22           The continuation here of the disparity in the rhythm

23   is really marked by these next three notes.  You can see that

24   there is a "3" in italics, the number 3 in italics.  That's not

25   a scale degree.  That's the sign that tells us that these three

notes *into your, into your*, are a triplet.  They divide the
beat into three, not into two or into four.  So it becomes
triple D, da da da.  There's nothing like that in the LGO
Melody B.  So that is quite different.

And once again, the melody LGO has, if you will, a lot
of starts and stops.  For example, we have *believe* and then
this is —— this is off the beat, *believe in love*.  Those are
all off the beat.  So what is the beat?  We have (piano
playing).  All those are off the beat.  Whereas, if you look at
into your loving arms, it's all basically without any
interruption of the beat (piano playing).

And those first three notes was the triplet, triple D
da da da da da.  That's into your loving arms, as compared with
(piano played).

So the rhythmic durations, the metric placements are
really quite different.  The similarity, which is scant, is
simply moving down from scale degree 5 to 4 to 3 (piano played)
and then notice to 1 -- not yet, Mr. Duvall.

OK.  It's 5, 4, 3, and then skipping to 1.  That's the
descent, 5, 4, 3, 1.  What's the descent in TOL?  5, 4, 3, 2,
no 1.  So they don't even go in the descent in the same way.

And also notice the disparity in the number of
repetition of scale degrees.  There's one scale degree 5, just
one, but there are three scale degree 5s in TOL.  There are two
scale degree 4s in LGO, but there are three scale degree 4s in

N52HGri2

TOL.  There are three scale degree 3s next, but only two in

TOL, and so forth.  And once again, you have the problem of the

1 as compared to the 2.  The scant similarity is that, yes,

they both turn up at the end on (piano played).  But this is

similar to suggesting that the word "crab," c-r-a-b, is the

same as the word "absent" because they both have a-b.  But the

point is that a-b is preceded by different letters in these two

words.  That's essentially what we're finding here, these

fragmentary and thin similarities that are simply meaningless.

Q.  Which notes in Melody B and "Let's Get It On" and "Thinking

Out Loud" ——

A.  I'm sorry.  Could you speak to the mic.

Q.  Which notes in Melody B in "Let's Get It On" and "Thinking

Out Loud" have both the same pitch in same metric position and

the same rhythmic duration?

A.  None.

Q.  Can you explain what was just projected on the screen?

A.  Yes, it does, it correctly represents that.

Q.  Am I correct that the red Xs show the notes that do not

share the same pitch or in the same metric position or the same

rhythmic duration?

A.  That is correct, they do not.

Q.  Did you also complete a combined analysis of the chords and

the melodies in what Dr. Stewart has labeled "Melody B" in both

songs?

1    A.  Yes, I did.

2    Q.  Can you explain to us what's projected on the screen?

3    A.  Yes.  So what we have here is the chords on top and the

4    same melody below with the same scale degrees.  One of the

5    interesting things about these corresponding, or not so

6    corresponding, melodies that Dr. Stewart has put in issue is,

7    as you can see, they occur with — in different parts of the

8    progression.  Remember, the progression in D in LGO is D F

9    sharp minor G A.  Well, this starts in the midst of the F sharp

10   minor chord, the second chord of the chord progression, whereas

11   in TOL it starts, actually, here on the G chord, which is the

12   IV chord, not the iii chord, and then A, which is the V chord.

13           Once again, as I mentioned, even though these chords,

14   particularly the A11, is actually what's sounding when we have

15   the singing of *take me into your loving arms*, I am going to

16   play that as a straight ahead A chord so that it is more like

17   the A chord.  I'm going to do the same in LGO.  That is, I'm

18   going to make them as much — as similar as possible with

19   respect to the chord to the basic chord progression.  So just

20   A, not A7, just A, not A1.

21           If we can, if it's possible, Mr. Duvall, to circle

22   this F sharp.  Sorry to thrust that upon you on the spot.

23           MS. FARKAS:  I think you need to go back a slide,

24   Scott.

25   A.  That's fine.  We've got a yellow mark there.

N52HGri2

1          Remember, F sharp minor is the second chord in the

2     chord progression in LGO.  The corresponding chord is D/F

3     sharp.  This is the second chord in the chord progression.  If

4     you could do a yellow slash through that as well.

5          So this tells you that at this point we're in the

6     second chord.  At this point we're in the second chord.  So the

7     chords themselves don't even align as you can see.  The G with

8     the F sharp, the G with the A, the A with the D, and so forth.

9     But with that in mind, let's listen to the chord with the

10    melody above it.  So here's the F sharp minor chord, which is

11    carrying over from the bar before it, three, four, one.  Those

12    are the only two notes (piano played).

13         If we look at the corresponding chord that is the

14    second chord of the chord progression in TOL, there's no

15    melody, so there's no — nothing comparable.

16         We next go to the G, and in LGO, we have *"believe in"*

17    under the G (piano played).  Again (piano played).  If we look

18    under the G in TOL, there are no notes.  So once again there is

19    no corresponding similarity with respect to the melody that is

20    being combined with the chords.

21         And if we look at the A chord — again, not A7, I'm

22    going to play it as the basic — and if we look at the notes

23    that follow, it is this (piano played).  Again (piano played).

24    And we compare that to just a straight A chord here.  Sorry

25    (piano played).  Again — that's the wrong chord (piano played)

1    as compared with LGO (piano played).  What is similar is that

2    ending, da dum, two notes, a-b, crab, absent.

3    Q.  To be clear, Dr. Ferrara, did you find any musicological

4    evidence that Melody B in TOL was copied from Melody B in ──

5    sorry, let me start that again.

6            Did you find any musicological evidence that Melody B

7    in "Thinking Out Loud" was copied from Melody B in "Let's Get

8    It On"?

9    A.  No, no musicological evidence at all.

10   Q.  In fact, once again, did Dr. Stewart even analyze melody in

11   what he called Melody B?

12   A.  Dr. Stewart failed to include in the analysis of melody the

13   melodic rhythms and the metric placements.

14   Q.  Without those two elements, are we talking about melody?

15   A.  Pitches by themselves are not melody, that's correct.

16   Q.  Let's move on to the third set of melodies, the melody at

17   the beginning of the verse two in "Let's Get It On" as compared

18   to the melody in the interlude of "Thinking Out Loud."

19           Prior to his trial testimony, did Dr. Stewart have a

20   name for this third set of melodies?

21   A.  Yes, Melody C.

22   Q.  Does Melody C in "Let's Get It On" appear in the same part

23   of the song as Melody C in "Thinking Out Loud"?

24   A.  No.  As you stated, the Melody C in TOL is in the

25   interlude, and there is no interlude at all in LGO.

Q.   At a high level, what, if anything, did you find with

respect to the so-called Melody C in each song?

A.   Once again, the similarities are bare, and what is similar

is essentially moving down the scale and repeating pitches as

you do.  So we know that the D scale has seven scale degrees,

1, 2, 3, 4, 5, 6, 7.  And when we're moving down from the high

note, we call this D, which is scale degree 1.  We call it 8.

So 8, 7, 6 — essentially, what we have is just repeated notes

on 8, repeated notes on 7, repeated notes on 6, and so forth,

but different numbers of repeated notes.

Q.   Are there any musicologically significant similarities

between Melody C in "Let's Get It On" and "Thinking Out Loud"?

A.   No, absolutely.  The easiest way to talk about that lack of

sufficient similarity is to think about an exercise that

undoubtedly thousands and thousands and thousands of students

practice every day on wind instruments and string instruments

and, believe it or not, on the piano as well but particularly

on wind instruments and string instruments.

     I remember when my son in grade school was playing

trumpet, and he would play an exercise, practice exercise,

that, again, students do all the time.  D, D, D, D — it would

be 8, 8, 8, 8, 8, 7, 7, 7, 7, 7, 8, 8, 8, 8, 7, 7, 7, 7, 6, 6,

6, 6, 5, 5, 5, 5, or as triples, D, D, D, C sharp, da da da da

da (piano played).  That's a trombone, da da da da da.  That is

a French horn.  That's a violin (vocalizing).

1          How many times have you been in an elementary school

2    and listened to an elementary school band doing that or a

3    beginning orchestra, string orchestra, fourth or fifth grade

4    (vocalizing).  That is the similarity, but the similarity

5    doesn't include four notes or three notes on each, it's a

6    different number of notes on each scale degree.

7    Q.  So let's look at slide 28, please.

8          What are we looking at on the screen, Dr. Ferrara?

9    A.  I'm sorry?

10   Q.  What are we looking at on the screen?

11   A.  The top line is that Melody C that Dr. Stewart has placed

12   at issue, and the bottom line is TOL.

13   Q.  Could you please play Melody C in each work on the piano

14   consistent with your transcriptions on the screen.

15   A.  Yes.  Tapping out the beat in eighth, 1 and 2 (piano

16   played).  And now TOL, 3 and 4 (piano played).

17   Q.  Now I'd like you to look at what's projected on the screen.

18   And what are we looking at here, Dr. Ferrara?

19   A.  The same exercise as before, and that is to simply

20   transport the upper numbers over the notes down into a chart.

21   And as you can see, the notes highlighted in green tell you out

22   of this — I think it's 15 notes in LGO — out of those 15

23   notes, five pitches, not notes but pitches, line up.

24   Q.  And what are the arrows next to the 3 and the 5 on the LGO

25   line stand for?

A.   The change of direction.  The interesting thing is that
while the purported similarities in this descent starting on 8
and moving down, down to 6 here but down to 5 here, suddenly a
complete change of direction and contour.  Instead of going
down, we now leap up, and because of that, we need to note that
this 3 is moving up and not down.  Because if we look at 5 and
think of 3, we might think it's this, like down here.

        Can you adjust that, Mr. Duvall?  Sorry.  Thank you.

        At the very end of TOL we have 5, 3 (piano played).
We have 5, 3 here as well, but it's going in the other
direction.  Instead of (piano played), it's a completely
different melody (piano played).

        And so in order to show the reader that, I put an
upward arrow 3 to show that, in fact, this 3 is not below this
5 like it is in TOL, but, in fact, it goes in the opposite
direction and a huge leap.  And then we have 3 going up to
5 again.  So to show that this 5 is not this 5, it's a whole
octave, 12 half steps apart, to show that this 5 is not the
lower 5 once again an arrow.

        These leaps at the end are completely different from
an almost completely stepwise descent, say, for the last
smaller interval of a third (piano played) as compared to
(piano played) and then another leap down.  So the contour is
quite different.  The only similarity in the contour is at the
beginning, and it's different as you can see 8, 8, two 8s,

three 8s, three 7s, two 7s, and then very important, in TOL
after the three 7s, the descent continues.  It's never
interrupted, 6, 6, 6, 5, 5, 5.

        Notice what happens in LGO, 8, 8, 7, 7 descent, but
then it goes up, back up to 8, and then 7, 7, and then a single
6 as compared with three 8s, three 7s, three 6s, three 5s.
These are really completely different melodies, only similar by
the fact that they have some number of notes that are repeating
on descending scale degrees.  And, again, what we're talking
about is an exercise that thousands of students practice every
day on wind and instrument and string instruments.

Q.  Did you perform an analysis of the rhythmic durations and
metric placements in Melody C of "Let's Get It On" and
"Thinking Out Loud"?

A.  Yes.  And because I'm going on much too long, and I
apologize, if you know, the melodic rhythm in TOL is marked by
these triplets, da da da, da da da, da da da, da da, and then
two 8s, da da da, da da da, da da da, da da, which is
completely different from the melodic rhythm here (piano
played).

        And let's just compare that barely similar part to
this.  So play LGO one more time, *we're all sensitive people*,
and then we're just going to go right to the la la la (piano
played).  TOL (piano played).

Q.  Did Dr. Stewart perform an analysis of the rhythmic

1    durations and metric placements in Melody C?

2    A.  No.

3    Q.  Which notes in Melody C in "Let's Get It On" and "Thinking

4    Out Loud" have the same pitch, the same rhythmic duration, and

5    the same metric placement?

6    A.  None that line up.

7    Q.  Did you find any significant similarity between Melody C in

8    "Let's Get It On" and Melody C in "Thinking Out Loud"?

9    A.  None.

10   Q.  So what is the similarity that Dr. Stewart has identified?

11   A.  Kids practicing (piano played).  That's it.  Once again,

12   with a different number of notes on each of those descending

13   scales, and in one case, LGO, going up and then going back

14   down; and in the case of TOL, only going down.

15   Q.  Has this repeating pitches on descending scale degrees

16   similarities been used in other songs that use the combination

17   of the chord progression and anticipation at issue in this

18   case?

19   A.  Yes.  "Since I Lost My Baby" as recorded by — I've

20   forgotten.

21   Q.  Want to see if you can get it?  Mr. French.

22   A.  Yes, Ray French.  OK.  So Ray French, 1966 release of

23   "Since I Lost My Baby," here's the introduction.  This is in

24   the key of E.  Would you like me to play it?

25   Q.  Sure.

N52HGri2

1   A.  OK.  All right.  This is in the key of E.  This is scale

2   degree 8.  Remember (piano played).  Ray French 1966, "Since I

3   Lost My Baby" (piano played).

4           What we just heard was 8, 8, 8, 7, 7, 6, 6, 6, 5, 5.

5   That's actually closer to the melody in TOL than the melody at

6   issue in LGO is to TOL.  Furthermore, it has the identical LGO

7   chord progression and anticipation (piano played).  This is the

8   basic chord progression in LGO (piano played).  Ray French

9   (piano played).  And if we add the melody (piano played).

10  Q.  We'll return to that song a little bit later.

11          Staying with Melody C, did you also perform a combined

12  analysis of the chords and the melodies in what Dr. Stewart has

13  labeled Melody C?

14  A.  Yes, and here the chords line up so D, F sharp minor, G, A,

15  D, D/F sharp, G, A.  And if we simply play the notes, I'll play

16  the chord and the notes that are sounding in the vocal with it

17  from the beginning just in the first bar, so *we're all*

18  *sensitive people*.  I'll put the melody up here (piano played)

19  so that we don't run into the chords below.

20          So three, four, one, two (piano played).  The notes

21  again (piano played).  Here it is, the D on all (piano played).

22  So that's going from *all sensitive p–*.  Those are the notes

23  that are sounding with the F sharp minor chord (piano played).

24  And the corresponding chord in TOL is D/F sharp.  Here we are,

25  and there's just two la la notes there, so (piano played), as

1    compared with (piano played).

2            Moving ahead with G, we have just one note (piano

3    played).  That's it.  In G here, we have the 8, 7, 7, 7 also on

4    the la's (piano played).  And finally on the A, a real

5    difference in the melody with those huge leaps upward, there's

6    the A with *with so much*, as compared with the notes with A here

7    in TOL (piano played).  So LGO (piano played) As compared with

8    (piano played).  So the chords don't save the differences in

9    the melody.  If anything, it shows how different the melodies

10   are.

11   Q.  Continuing with this third set of melodies, Dr. Stewart

12   also compared the vocal melody at the beginning of verse two in

13   "Let's Get It On" to the guitar melody in the interlude of

14   "Thinking Out Loud."

15           Is the guitar melody in the interlude of "Thinking Out

16   Loud" meaningfully different from the vocal melody in the

17   interlude of "Thinking Out Loud" we were just discussing?

18   A.  No.  In fact, the only difference is there is an extra note

19   on this rest right here.  So instead of da da da, it's da da da

20   da, but exactly the same note, 8, 8, 8, instead of these two

21   8s.  And here at the bottom instead of 5, 3, it's 5 ── it is 5,

22   5.  So what you hear ── here's the vocal, la, la, la.  Here's

23   the guitar (piano played).

24           That's it.  So only one extra note up front and one

25   slightly changed pitch at the end.  Otherwise, the sung part of

1   Melody C in the interlude of TOL, it's essentially the same,

2   with those two exceptions, as compared to the guitar melody.

3   Q.  So do all of your opinions and conclusions regarding the

4   vocal melody in the interlude of "Thinking Out Loud" also apply

5   with respect to the guitar melody in the interlude of "Thinking

6   Out Loud"?

7   A.  Yes, they do.

8   Q.  Dr. Ferrara, in sum, what is your opinion of Dr. Stewart's

9   conclusions regarding Melody C, including both the vocal melody

10  and the guitar melody, in the interlude of "Thinking Out Loud"?

11  A.  Putting the combination together, the underlying chord

12  progressions, first, are not the same.  But even if they were,

13  even if, for example, we were talking only about a I-iii-IV-V

14  chord progression, the basic chord progression in LGO, we're

15  talking about a musical building block that was in 80 songs

16  prior to TOL.  So that in and of itself is not —— is not

17  meaningful.

18          Importantly, though, that chord progression is not the

19  same in TOL.  The anticipation is —— is essentially not the

20  same because of the four bar, remember the four bar phrase in

21  LGO but the two bar phrase in TOL?  Did I cut it in half for

22  the purpose of analysis?  Of course, but the point is it

23  doesn't change the fact that the deposit copy is in that longer

24  format, and so the anticipation is not the same.  But even if

25  you say, well, they sound the same, the point is that they are

not the same on the sheet music, but even still then I found

other works that also embody that combination besides the Ray

French song.

       Finally, when you add the melodies —— I think I've

demonstrated that when you add the melodies to that chord

progression, it actually undermines any similarity because the

melodies are so different.  So the combination doesn't help

when you add melody to the chord progression and the

anticipation therein.

Q.  Did you find any musicological evidence that Melody C in

"Thinking Out Loud" was copied from Melody C in "Let's Get It

On"?

A.  None at all.

Q.  Once again, did Dr. Stewart even analyze melody in what he

calls Melody C?

A.  Due to the omission of necessary parts of the analysis, the

answer would be, since he delimited his analysis to pitches and

contour, no, he didn't complete an analysis of melody.

Q.  I'd like to direct your attention now to Dr. Stewart's

testimony regarding similarities in the modal quality between

"Let's Get It On" and "Thinking Out Loud."

       What is your understanding of the modal quality that

he was referring to?

A.  He's correctly referring to a kind of blues infusion in

"Let's Get It On."  There's no question that it is there, and

it's prominent in the use of the blue third (piano played).
That's part of the opening phrase.  There are five blue notes
in the first part of "Let's Get It On" (piano played).  That
has a distinctive blue note quality.

Q.  Are there any blue notes in the vocal melody of "Thinking
Out Loud"?

A.  I did not find any blue notes in the vocal melody in
"Thinking Out Loud."

Q.  To be clear, does Ed Sheeran sing any blue notes in the
commercially released recording of "Thinking Out Loud"?

A.  I don't hear any blue notes in Ed Sheeran's vocal.

        MS. FARKAS:  Yeah, I think we've covered this before,
Scott.  Thank you.

Q.  Setting aside vocal melody, do the instrumental parts in
"Thinking Out Loud" include any blue notes?

A.  Yes, in the guitar part — there's a guitar solo.  That's
not to be confused with Melody C.  There's a before — in fact,
together with Ed Sheeran's la, la, la, la, la, la, la, with
that la, la, la descending melody, there's a guitar solo that's
already begun and continues.  That's not the descending Melody
C guitar solo.  In that guitar solo at the start of the
interlude, there are three E Sharps.  They're actually written
as E sharp in the published sheet music, which is the same as F
natural.  So there are three blue notes in the guitar solo in
the interlude of TOL.

N52HGri2

1    Q.  Just to be clear, are there any blue notes in the Melody C

2    guitar melody that we analyzed earlier?

3    A.  None.

4    Q.  Did Dr. Stewart transcribe any blue notes in Melody C in

5    "Let's Get It On" during his testimony?

6    A.  Yes.

7    Q.  You testified that there are three blue notes in the guitar

8    solo melody in the interlude of "Thinking Out Loud."  Are there

9    any blue notes in any instrumental melodies in "Let's Get It

10   On"?

11   A.  There are no instrumental melodies in "Let's Get It On."

12   Q.  In summary, what is your opinion of the purported

13   similarity that Dr. Stewart has identified with respect to the

14   modal qualities in blue notes?

15   A.  There's no question that there is a wonderful and rich

16   blues infusion through the use of the blue note in "Let's Get

17   It On."  The use of the blue note in the guitar solo does not

18   add a — that level of blues infusion.  There's simply — in

19   the vocal part there really isn't a blue note present.  And so,

20   in fact, the modalities are different.  And I mention this.  It

21   will just take ten seconds.  Remember, this is the modality of

22   the melody in the opening, in fact, the opening phrases of

23   "Let's Get It On" — I'm sorry, of "Thinking Out Loud."  It's

24   pentatonic (piano played).  That is quite different in modality

25   to the wonderful blues infusion of (piano played) in "Let's Get

```
1    It On."
2    Q.  Earlier in your testimony, you testified that you found
3    songs that combine this basic —— same basic chord progression
4    at issue in "Let's Get It On" or "Thinking Out Loud" and the
5    anticipation that the plaintiffs have placed in issue in this
6    case.
7         Excluding songs authored by Van Morrison, which we'll
8    go over separately, how many songs did you find that combined
9    the chords at issue with the anticipation of the second and
10   fourth chords?
11   A.  Six songs.
12   Q.  What, if anything, is the significance of these songs to
13   your opinion in this case?
14   A.  It shows that, first, "Let's Get It On" is not the first
15   song to have combined these elements.  That, in fact, other
16   songs created prior to LGO and in one case between LGO and TOL
17   used the LGO chord progression and anticipation, and in two
18   other cases from those remaining —— from the six that we just
19   mentioned, one also predates LGO and one is after LGO but
20   before TOL.
21        What that tells me is that, once again, not only was
22   LGO not the first, but, importantly, that this unremarkable
23   combination of a building block chord progression, basic chord
24   progression, and a century's old building block called
25   "anticipation" is simply not remarkable in LGO or in TOL.
```

N52HGri2

1    These are commonplace elements that can easily be put together.

2    Q.  Are you familiar with the song "You Lost the Sweetest Boy"

3    recorded in 1963 by Mary Wells?

4    A.  Yes, I am.

5    Q.  And does that song combine the I-iii-IV-V chord progression

6    with anticipated second and fourth chords?

7    A.  Yes, it does.

8    Q.  And in addition to combining the chord progression and the

9    harmonic rhythm at issue, does "You Lost the Sweetest Boy"

10    include any melodic similarities to "Let's Get It On" or

11    "Thinking Out Loud"?

12    A.  Yes, it does.

13    Q.  In what key is "You Lost the Sweetest Boy"?

14    A.  "You Lost the Sweetest Boy," once again, released in 1963,

15    ten years before the creation of LGO, is in the same key as

16    LGO, the key of E flat major.

17    Q.  Dr. Ferrara, did you prepare any charts or graphics that

18    could demonstrate your testimony on this point?

19    A.  You're looking at the graphic summary.  Here we go with the

20    graphic itself.  And so you may recall that this is the kind of

21    graphic that I used for the two songs at issue, for LGO and

22    TOL, but what is important here —— and the pointer is not

23    working, Mr. Duvall —— what's important here is that I have

24    halved the —— there we go —— on the top line I've halved the

25    four bars into two bars.  And I mentioned that earlier, I think

N52HGri2

1    I've explained why, to facilitate the comparison.

2            But what you'll notice is TSB is "You Lost the

3    Sweetest Boy," so this is the Mary Wells song.  You can see

4    that the 1, 3, 4, 5 line up identically in harmonic rhythm, and

5    of course, they are the same basic chord progression, whereas

6    with respect to TOL, the harmonic rhythm lines up, but there is

7    a I-iii chord.  This is the same thing down here.  It's now

8    tripartite rather than just LGO and TOL.

9    Q.  What has been added to the screen?

10   A.  I'm sorry?

11   Q.  What has been added to the screen?

12   A.  We just added the earlier chart of just LGO and TOL where

13   you can see, in fact, in the deposit copy the chord progression

14   is four bars in LGO, not two.  For the purposes of analysis,

15   I've halved it here to two plus two plus two, but it still

16   remains four as I explained before.

17   Q.  And if the harmonic rhythm of "Let's Get It On" and

18   "Thinking Out Loud" were the same, would that be significant to

19   you?

20   A.  No, it would not.  It's a commonplace harmonic rhythm.  I

21   clapped it out several times earlier.

22   Q.  And what, if anything, does the chart projected on the

23   screen show with respect to the similarity in the harmonic

24   rhythm in "Let's Get It On," "Thinking Out Loud," and "You Lost

25   the Sweetest Boy"?

A.  What it shows is that every chord in TOL is either shared
with TSB, "The Sweetest Boy," or is simply not the same as LGO.
Q.  If we were to place a red "X" over each chord in "Thinking
Out Loud" for which any harmonic similarity is also found in
"The Sweetest Boy" and/or is not shared between LGO and TOL,
would any harmonic similarity remain between "Let's Get It On"
and "Thinking Out Loud"?
A.  No, none would remain.
Q.  And just to be clear, can you explain what you mean by
"harmonic similarity."
A.  By "harmonic similarity," I mean similarity in the chords,
that is, the basic chord progression, which we've gone over,
and also the harmonic rhythm, that is, with 1 and 3, in this
case on the downbeat, and 2 and 4 anticipated.
Q.  Dr. Ferrara, using the sheet music projected on slide 46,
could you please explain the harmonic and melodic similarities
you found in "You Lost the Sweetest Boy" as compared to "Let's
Get It On" and "Thinking Out Loud."
A.  Yes.  So what we have on the left is the first page of the
published sheet music of "You Lost the Sweetest Boy."  And
starting here, we actually have the chord progression that is
the same as the basic chord progression in LGO with the
anticipation.  I'll play it (piano played).  1, 2, 3, 4, 1, 2,
3, 4.  So it is the same.  It occurs two times.
Q.  And what about — I'm sorry, what about the melodic

1   similarities?

2   A.  We have to go back, please, to the other slide.  Thank you.

3          So in the very same place, right down here at the

4   bottom, here's the opening melody, so (piano played).  Again

5   (piano played).  And if I continue with the chord progression.

6   (piano played).  Listen to those opening notes, 3, 5, 6, 5, 3

7   (piano played).

8          OK.  Those are the same opening notes as TOL (piano

9   played), TOL.  (Piano played) Mary J. Wells ten years before

10  the creation of LGO.

11         Now, what's really important is that's not meaningful.

12  That's the kind of analysis that Dr. Stewart did, oh, we've got

13  five notes or four notes —— not even notes, five pitches, and

14  so forth, lining up.  It's not meaningful.  I'm not suggesting

15  it is.  I'm simply trying to make clear that, based on the

16  criteria used and the analysis used by Dr. Stewart, that those

17  similarities that he found are in a song that was released ten

18  years before "Let's Get It On."

19  Q.  And are there any blue notes in this song?

20  A.  Yes.  If we could now go to the next, we're on the second

21  page now here of "You Lost the Sweetest Boy," and there is

22  again a wonderful switch in the modality starting there with

23  the title lyrics, *And lost the sweetest boy that you had that*

24  *time, the sweetest boy that you had*.

25         So here is that melody now with the title lyrics

1    (piano played).  Da da dum, 3, 2, 2, that's a blue 3, 2, 2, 3,

2    2, 2.  And of course, you can see here this is the deposit copy

3    of "Let's Get It On," those very notes (piano played)

4              So is that significant, that in addition to having the

5    chord progression and the harmonic rhythm, there's some blue

6    notes that we can point to?  No, it's not.  It's just simply

7    answering a charge that it is significant in "Let's Get It On"

8    and TOL, or in many cases with respect to TOL, it's not

9    existent.

10   Q.  Let's move on to the next song.  You mentioned "Since I

11   Lost My Baby" by Ray French earlier?

12   A.  Yes.

13   Q.  Does that song combine the I-iii-IV-V chord progression

14   with anticipated second and fourth chords?

15   A.  Yes, as I performed and explained.

16   Q.  And when was that song released?

17   A.  1966.

18   Q.  In addition to combining the chord progression and the

19   harmonic rhythm at issue, does "Since I Lost My Baby" contain

20   any melodic similarity to the "Let's Get It On" or "Thinking

21   Out Loud"?

22   A.  Yes, the descending.

23   Q.  That's what you demonstrated to us earlier, correct?

24   A.  That's correct.

25   Q.  In what key is "Since I Lost My Baby"?

A.  It's in the key of E, which is a half step above E flat.
That is the key of "Let's Get It On."  So the relationship is
the same as the relationship with the TOL, which is a half step
below E flat.  So TOL in key to LGO is essentially the same as
the 1966 Ray French in key to LGO.

Q.  Dr. Ferrara, we looked at charts and crossed out musical
transcriptions for the previous song "You Lost the Sweetest
Boy."  Did you prepare similar charts and transcriptions for
"Since I Lost My Baby"?

A.  Yes, I did.

Q.  And if we were to go through the same exercise for "Since I
Lost My Baby" and if you were to play the chords and the
harmonic rhythm of that song on the piano, would it show the
same thing with respect to the chord progressions and harmonic
anticipation as in "You Lost the Sweetest Boy"?

A.  It would.  It would show that, once you made that
comparison, that no chords remain in TOL that aren't in, in
this case, "Since I Lost My Baby" or that are not shared with
LGO.

Q.  Are you familiar with the song called "Georgy Girls" by 101
Strings Orchestra?

A.  Yes.

Q.  Does that song combine the I-iii-IV-V chord progression
with anticipated second and fourth chords?

A.  Yes, it does.

N52HGri2

1   Q.  When was that song released?

2   A.  Song was released in 1967 by 101 Strings.

3   Q.  Are there other versions of "Georgy Girl" recorded by

4   others that also use the same chords and anticipate the second

5   and fourth chords?

6   A.  Yes.  The Boston Pops also had in the following year, 1968,

7   their own arrangement of the same song, "Georgy Girl," and it

8   was in fact in E flat, the same key as "Let's Get It On."  So

9   that was five years, 1968, five years before "Let's Get It On,"

10  and there is also The Seekers version in 1967.  1967, I have to

11  say, that the bass part doesn't include the anticipation.  It's

12  on the beats, but the guitar part anticipates the notes.  So

13  (piano played).

14       The vocal melody and the —— and the guitar part do

15  anticipate, whereas in the other two versions, the 101 Strings

16  and the Boston Pops, they're dead on.  They have the same chord

17  progression and the same anticipation in a much more full way.

18  Q.  Dr. Stewart testified that "Georgy Girl" supposedly sounds

19  nothing like "Let's Get It On" or "Thinking Out Loud."  Do you

20  have a response to that?

21  A.  First of all, it doesn't matter whether it sounds alike.

22  The key here for a musicologist is, to the extent that you're

23  saying that someone has copied expression from your work and

24  you believe that you have some level of ownership thereof, the

25  key is are there other works, in this case, that predate LGO

1    that embody that same expression?  That's what counts.  Whether

2    it's written for a symphony orchestra or for a rock band, a

3    musicologist moves into the underlying music and ultimately

4    shows empirically whether or not that expression is in the

5    earlier works.

6            And of course, the other point that I guess makes this

7    moot is that the deposit copy in LGO is sheet music.  It's not

8    a sound recording, it's sheet music.

9    Q.  Dr. Ferrara, we looked at charts and crossed out musical

10   transcriptions for "You Lost the Sweetest Boy."  Did you

11   prepare similar charts and transcriptions for "Georgy Girl"?

12   A.  Yes.

13   Q.  If we were to go through the same exercise for "Georgy

14   Girl" and if you were to play the chords and the harmonic

15   rhythm of "Georgy Girl" at the piano, would it show the same

16   thing with the respect to the chord progression and harmonic

17   anticipation as "You in Lost the Sweetest Boy"?

18   A.  Yes, all of the chords in TOL would be X'd out.

19   Q.  Let's move on to the next song.

20           Are you familiar with a song called "I've Got Love on

21   My Mind" by Natalie Cole?

22   A.  Yes.

23   Q.  Do you recall when that song was released?

24   A.  1977.

25   Q.  Does that song combine the I-iii-IV-V chord progression

1    with anticipated second and fourth chords?

2    A.  Yes, it does.

3    Q.  And in addition to combining the chord progression and the

4    harmonic rhythm at issue, does "I've Got Love on My Mind"

5    include melodic similarity to "Let's Get It On" or "Thinking

6    Out Loud"?

7    A.  It does.

8    Q.  What is the key of "I've Got Love on My Mind"?

9    A.  It's in the key of D major, the same key as TOL.

10   Q.  Dr. Ferrara, we looked at charts and crossed out musical

11   transcriptions for the previous songs.  Did you prepare similar

12   charts and transcriptions for "I've Got Love on My Mind"?

13   A.  Yes, I did.

14   Q.  And if we went through the same exercise that we've been

15   talking about, would it show the same thing with respect to the

16   chord progression and harmonic anticipation as in "You Lost the

17   Sweetest Boy"?

18   A.  Yes.  Once again all of the chords in TOL would be X'd out.

19   Q.  Could you please perform the chord progression and harmonic

20   rhythm from "I've Got Love on My Mind" followed by the chord

21   progression and harmonic rhythm from "Let's Get It On."

22   A.  Yes.  Here it is, both in the key of D in "I've Got Love on

23   My Mind" (piano played).  The basic chord progression, that is

24   the same.

25   Q.  You also mentioned melodic similarity to "Let's Get It On"

1    or "Thinking Out Loud."  What melodic similarity did you find?

2    A.  After three iterations of that I-iii-IV-V chord

3    progression, the basic I-iii-IV-V chord progression, it moves

4    to blue notes.  So starting at the beginning, if you look right

5    here, *I've got love on my mind*, the title lyric, that's the

6    four-bar chord progression that repeats, it repeats again, and

7    then all of a sudden we go to these blue notes, and there's

8    nothing particularly wrong.

9            So we start with the chord progression and melody

10   (piano played), and that was three times.  Now listen, there's

11   blues.  Da da da da, that's lowered, 3 to 2 (vocalizing) that's

12   LGO.  This is Natalie Cole (piano played).  This is after LGO.

13   Many years before TOL, 1977, but after 1973.  The key is that

14   these similarities are not meaningful.  They're simply using a

15   common chord progression with a common anticipation, harmonic

16   rhythm and, in this case, moving into some blue notes.  These

17   are blue notes that have been used for decades in countless

18   songs.

19   Q.  Dr. Ferrara, did you find any songs that combined the basic

20   I-I/3-IV-V chord progression in "Thinking Out Loud" with

21   anticipated second and fourth chords?

22   A.  Yes.

23   Q.  And how many did you find?

24   A.  Two.  One before LGO and one after.

25   Q.  And could you name those songs for us?

N52HGri2

1    A.   Yes.  We just saw it on the screen.  This is 1962 by The

2    Contours, "Do You Love Me".

3    Q.   And when was "Do You Love Me" released?

4    A.   1962.

5    Q.   And what was the second song that you found?

6    A.   "Six-Pack Summer." That's by Phil Vassar, and that's

7    released in 2000.

8    Q.   Dr. Ferrara, we looked at charts and crossed out musical

9    transcriptions for "You Lost the Sweetest Boy."  Did you

10   prepare similar charts and transcriptions for these songs as

11   well?

12   A.   Yes, I did.

13   Q.   If we were to go through the same exercise for "Do You Love

14   Me" in "Six-Pack Summer," would it show the same thing with

15   respect to the chord progression and harmonic anticipation?

16   A.   Yes.  Once again, in both cases, in "Do You Love Me" and

17   "Six-Pack Summer," all of the chords in TOL would be X'd out.

18   Q.   Could you please demonstrate the chord progressions from

19   "Do You Love Me" followed by "Six-Pack Summer" followed by

20   "Thinking Out Loud" on the piano.

21   A.   Yes, I'll put them all in D.  So "Do You Love Me" (piano

22   played).  "Six Pack" (piano played).  "Thinking Out Loud"

23   (piano played).

24   Q.   Dr. Ferrara, we've now gone through a number of songs that

25   feature the same combination of the basic chords in "Let's Get

It On" and "Thinking Out Loud" and anticipation on the second
and fourth chords, some of which also included some limited
melodic similarity to "Let's Get It On" and "Thinking Out
Loud."

From a musicological perspective, what is the
significance, if any, of these songs that combine these
elements together?

A.  With some of them it shows that this combination was not
first in LGO; that, in fact, there were songs that predate LGO
that use the combination, including, for example, the Mary
Wells, the 1963 "You Lost the Sweetest Boy" that also have
melodic similarities at issue.  So that is significant because
it establishes that LGO was not the first with respect to this
combination and including some of the melodic similarities that
have been thrown in here by Dr. Stewart.

In addition, it continues to undermine the claim of
copying because it shows that, even before LGO, writers put
these basic elements that are out there and commonplace
together.  It really undermines this claim of copying.

Q.  Using Dr. Stewart's logic, do you believe that "Let's Get
It On" copied from "You Lost the Sweetest Boy" or any of these
other prior songs?

A.  No, and I hope I made that clear.  It is not my opinion
that "Let's Get It On" copied these elements at issue from the
songs that precede the creation of LGO.

1   Q.   Why is that?

2   A.   For the same reason I just mentioned a moment ago, and that

3   is we're talking about commonplace elements that multiple

4   writers have put together.

5   Q.   I'd like to draw your attention back to Defendant's

6   Exhibit 210.  And if you look at the final entry on page 5, I'd

7   like to draw your attention to a song called "Better Than Me."

8   Who authored that song?

9   A.   As you can see, Pete Riley and Amy Wadge.

10   Q.   And do you know when "Better Than Me" was released?

11   A.   My understanding is that it was released in 2012.  As you

12   can see, there may be a 2013 other version of it, but certainly

13   before the writing of TOL in 2014.

14   Q.   What is the chord progression in "Better Than Me"?

15   A.   It's the same chord progression as in TOL.  It's I — these

16   are Roman numerals — I-I/3-IV-V, yes.

17   Q.   And does "Better Than Me" also feature anticipated chords?

18   A.   It does.  The second, third, and fourth chords of the

19   four-chord progression I just cited are anticipated in "Better

20   Than Me."

21   Q.   So what is the difference between the harmonic rhythm in

22   "Thinking Out Loud" and "Better Than Me"?

23   A.   It's just one more chord anticipated, the third chord,

24   which is, of course, the third chord of the four-chord

25   progression, which is that IV.  So there are three anticipated

1    chords in "Better Than Me," the second, third, and fourth

2    chords.  There are two anticipated chords in TOL, the second

3    and fourth chord.

4    Q.  Do you find that to be a significant difference?

5    A.  It is not.

6    Q.  What is the significance, if any, of "Better Than Me" to

7    your analysis here?

8    A.  It shows that this chord progression and this kind of

9    anticipation was part of the writing of Amy Wadge before she

10   joined with Ed Sheeran to create "Thinking Out Loud."

11   Q.  And so how does that impact your opinion about whether

12   "Thinking Out Loud" copies from "Let's Get It On"?

13   A.  It further undermines the claim of copying.

14   Q.  I'd like to discuss Van Morrison, who Mr. Sheeran

15   identified as one of his musical influences.  Mr. Sheeran also

16   mentioned some specific songs during his testimony.  He

17   mentioned "Crazy Love," "Tupelo Honey," "Have I Told You

18   Lately," and "Why Must I Always Explain."

19          In assessing "Let's Get It On" and "Thinking Out

20   Loud," did you analyze the works of Van Morrison?

21   A.  Yes, I did.

22   Q.  Broadly speaking, what did you find?

23   A.  I found that in some cases there were both harmonic and

24   melodic similarities to works by Van Morrison and TOL,

25   including some of the expression that's at issue now.  And in

```
 1   two cases, "Crazy Love" and "Tupelo Honey," those were works
 2   released by Van Morrison before the creation of LGO.
 3   Q.  Can you please take a look at what's been marked for
 4   identification as Defendant's Exhibit 213A.
 5            Do you recognize this?
 6   A.  Yes.  It begins with the published sheet music of "Crazy
 7   Love."  Would you like me to ——
 8   Q.  If you can just identify what's in the document.
 9   A.  OK.  The next is "Tupelo Honey."  This is all published
10   sheet music.  Next is "Checking It Out."  These are all Van
11   Morrison songs, published sheet music.  "Tore Down a la
12   Rimbaud", "Have I Told You Lately."
13            MS. FARKAS:  Your Honor, I'd like to move
14   Exhibits 213A into evidence, please.
15            MR. FRANK:  We'd stipulate to all of the sheet music
16   they're attempting to put in.  No objection, your Honor.
17            THE COURT:  Received.
18            MS. FARKAS:  Mr. Frank, does that apply to 213B as
19   well.
20            MR. FRANK:  Yes, all of the ones under the
21   subheadings.
22            MS. FARKAS:  Thank you.
23            (Defendant's Exhibits 213A and 213B received in
24   evidence)
25   BY MS. FARKAS:
```

1    Q.  I want to direct your attention to 213B just for a moment.

2    Can you identify that for us?

3    A.  Yes.  This is another Van Morrison song, 1991, "Why Must I

4    Always Explain," and this is not published sheet music.  What

5    you see on this first page is my transcription of the opening

6    introduction, melody, and chords, and the verse, melody, and

7    chords.  This is in the key of G.

8            On the next page, the final page of 213B, you'll see

9    the same transcription but now transposed to the key of D so

10   that it can be compared with the works at issue.

11   Q.  OK.  Let's talk about "Crazy Love."  What did you find

12   significant about "Crazy Love"?

13   A.  Well, both similarities in the chord progression and in the

14   melody.

15   Q.  Can you describe to us what the chord progression is,

16   please.

17   A.  The chord progression in "Crazy Love" is I-iii-IV-I.  So in

18   an LGO it's I-iii-IV-V (piano played).

19           In "Crazy Love," it's I-iii-IV, but then it goes back

20   down to I.  That chord progression continues through all of the

21   verses.  And very important, at the end — after the verses, we

22   have a chorus.  Listen to the chord progression and the melody.

23   In fact, this is the famous chorus, *She gives me, love, love,*

24   *love, love, crazy love* (piano played), and it continues (piano

25   played).

1          And I want to call your attention to that first set of

2   descending chords on *love, love, love* (piano played).  And

3   remind you of this (piano played).  That's TOL.  That's the end

4   of the chorus of TOL (piano played).  Chorus "Crazy Love"

5   (piano played).

6          The melody is very close, in the key of D, scale

7   degree 3, 3, 2, 1, and then moving down and then back up,

8   that's "Crazy Love" (piano played).  And what we have, of

9   course, in TOL is (piano played).  So instead of moving down to

10  B, we move down to A (piano played).

11         So there is a real similarity in the melody, not just

12  the pitches, the contour, but also the melodic rhythms, quarter

13  notes that are descending, but of course the idea of having in

14  the chorus and ultimately ending the chorus with descending

15  chords is clearly very similar, so (piano played).

16         That's TOL (piano played).  "Crazy Love," it continues

17  (piano played).  When you put that together with something

18  else, and then I'll stop, when you put that together with this,

19  this is now the ⸺ I think it's the fourth melodic phrase in

20  the verses.  Let's listen to this melody (piano played).

21         Again (piano played) 3, 5, 6, 5, 5, 3.  What's the

22  opening of TOL?  (Piano played).  So there is a real melodic

23  similarity.  There's a slight melodic rhythm similarity; that

24  is, we have short, short, long.  That's "Crazy Love," short,

25  short, long.  But otherwise, it's not a meaningful similarity.

1    Why?  Because "Crazy Love" is based on pentatonic, and nobody

2    owns pentatonic.  And moving from 3 to 5 to 6, 5 to 3 is kind

3    of a natural and expected thing when you're in a pentatonic

4    mode.

5          So the point is that, yes, there are similarities of

6    basic chord progression that is different with respect to the

7    last chord and, of course, the second chord is the same as LGO.

8    This is "Crazy Love," 1970, three years before "Let's Get It

9    On," three years before LGO.  So you have this aggregate of

10   similarities in the chord progression and, of course, in the

11   melody and then in this final chord progression (piano played).

12   You put all that together, and we have a similarity that is not

13   enjoyed to this extent with melody and chords and in this

14   descending chord progression between LGO and TOL.

15   Q.  I think you may have answered this already, but are you

16   suggesting that Ed Sheeran copied from "Crazy Love"?

17   A.  Not at all.  Once again, descending chord progressions are

18   something that is a commonplace idea.  No one owns it.  And,

19   again, the use of the pentatonic and even (piano played), it's

20   such a natural way to play this pentatonic scale and the use of

21   a I-iii-IV-I chord progression, none of those things in and of

22   themselves would suggest that Ed Sheeran copied from Van

23   Morrison.

24   Q.  I'd like to direct your attention to Dr. Stewart's

25   testimony regarding "Crazy Love" and slide 83 from his

N52HGri2

presentation.

          Could you please briefly respond to Dr. Stewart's

analysis about "Crazy Love."

A.   Once again, if you pardon the expression, this is a failure

of omission, or a failure by omission, that's more proper.  And

what do I mean by that?  Remember I mentioned that the third or

fourth phrase in "Crazy Love" is *where we go* (piano played).

Well, that's omitted.  Dr. Stewart's only put in the first two

phrases.  What Dr. Stewart has put into that, into that slide,

is simply the chord progression (piano played), but what he's

left out is not only this (piano played), that melody, but he's

also left out the amazing (piano played) that's "Crazy Love."

And it's not in Dr. Stewart's slide, so that's a failure of

omission and by omission.

Q.   Do you find it significant that "Crazy Love's" fourth chord

is different from TOL and LGO?

A.   It's not a significant difference in and of itself.

Q.   Let's move on to the next song.  What do you find

significant about "Tupelo Honey"?

          THE COURT:  Ms. Farkas, could you come up for a

minute.

          MS. FARKAS:  Sure.

          (Continued on next page)

1            (At sidebar)

2            THE COURT:  I'm not saying that it doesn't add

3    something in each instance, but I'm getting a little worried

4    about accumulation and Rule 403.

5            MS. FARKAS:  So, your Honor ——

6            THE COURT:  How much more —— how many more of these

7    examples of what is essentially the same point do you have?

8            MS. FARKAS:  So I hear you.  The difference is I have

9    about two or three more examples, but I can do one more and

10    wrap up the other two without doing the examples.  It was

11    because we moved on to Van Morrison as opposed to the other

12    ones who Mr. Sheeran has said is an influence.  So it's a

13    bit ——

14            THE COURT:  Excuse me.

15            MS. FARKAS:  We moved on to Van Morrison songs, which

16    is a variation on the theme because of Mr. Sheeran's testimony

17    that Van Morrison was a significant influence on him.

18            THE COURT:  Yes.

19            MS. FARKAS:  But I can try to expedite the conclusion.

20    I am almost done.

21            THE COURT:  I think ——

22            MS. FARKAS:  And I will do what I can do to get done

23    faster than I was planning on getting done.

24            THE COURT:  You will have my full support.

25            MS. FARKAS:  Well, then I hear you loud and clear.

N52HGri2

1            (In open court; jurors present)

2            THE COURT:  Everybody needs a break.  Ms. Farkas is

3   almost finished.  Would you like to take a break now?

4            JUROR:  Please.

5            THE COURT:  Or can you wait until she finishes?

6            THE DEPUTY CLERK:  No.

7            THE COURT:  OK.  Right now.

8            JUROR:  Thank you.

9            (Recess)

10            (Continued next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury present)

 2    BY MS. FARKAS:

 3    Q.  I'd like to talk to you briefly about "Tupelo Honey" by Van

 4    Morrison.  What did you find significant about "Tupelo Honey"?

 5    A.  "Tupelo Honey" was released in 1972, one year before LGO.

 6    It includes the I-iii-IV-I chord progression that was in "Crazy

 7    Love," but it also includes a I-iii-IV-V progression.  Of

 8    course that is the chord progression in LGO.  The fourth chord

 9    is anticipated in that chord progression.  Whether it's the I

10    chord or the V chord, it's always anticipated.  And the opening

11    three pitches are the iii-V-VI opening three pitches in

12    "Thinking Out Loud."

13    Q.  Let's talk about the next Van Morrison song called "Tore

14    Down a la Rimbaud."  What, if anything, did you find

15    significant about this song?

16    A.  As you can see, this was released in 1984, after LGO but

17    many years before TOL.  The introduction features the LGO

18    chords, the verses feature the TOL chords; and with respect to

19    anticipation, the introduction includes the LGO chords and

20    anticipated second and fourth chords.

21    Q.  Dr. Ferrara, during their testimony, Ed Sheeran and Amy

22    Wadge both testified that the Van Morrison song "Have I Told

23    You Lately" features the same chords as "Thinking Out Loud;" is

24    that correct?

25    A.  Yes, it is correct.

1   Q.  Last one.  I'd like to direct your attention to another Van

2   Morrison song called "Why Must I Always Explain?"  Can you tell

3   us what's significant with that song.

4   A.  Yes.  "Why Must I Always Explain?" was released in 1991,

5   and it alternates between the "Crazy Love" chords, and that, of

6   course, is the I-iii-IV-I, the LGO chords, the I-iii-IV-V, and

7   the TOL chords, the I-I/3-IV-V, and it also includes the

8   stepwise descending chord progression, and that is, of course,

9   similar to the one in "Thinking Out Loud" that we went through

10  in my testimony.  As you can see, with respect to anticipation,

11  "Why Must I Always Explain?," in those chord progressions I

12  just specified, the second and fourth chords are anticipated;

13  and also, here again, the opening pitches in fact, there are

14  several opening pitches that line up with the opening pitches

15  of TOL, and indeed they are more similar to the opening pitches

16  in "Thinking Out Loud" than the opening pitches between

17  "Thinking Out Loud" and LGO.

18  Q.  Overall, what do you find significant about the Van

19  Morrison prior art that we have looked at?

20  A.  The Van Morrison prior art establishes that whether in his

21  two works that predate LGO or the other works that are between

22  the release of LGO and TOL, in both cases, they show that it's

23  not remarkable that a great writer like Van Morrison, a great

24  writer like Ed Sheeran, would take these otherwise commonplace

25  elements and put them together and make them into a great piece

of music.  The underlying elements, though, are commonplace,

and I take that away from the Van Morrison songs.

Q.  And how does that affect your opinion about whether or not

"Thinking Out Loud" copies from "Let's Get It On"?

A.  It continues to undermine the claim of copying.

Q.  Let's turn now briefly to the lyrics of each song.

From a musicological perspective, generally speaking,

what importance do you place on lyrics?

A.  Lyrics are significant.

Q.  Did you find any meaningful similarities between the lyrics

in "Let's Get It On" and "Thinking Out Loud"?

A.  No, I did not.

Q.  Let's turn to song structure.

During his trial testimony, did Dr. Stewart adopt your

analysis regarding the song structures of both songs?

A.  Dr. Stewart showed my structural analysis and appeared to

adopt it during his testimony.

Q.  Did you find any significant structural similarities

between "Let's Get It On" and "Thinking Out Loud"?

A.  None at all.

Q.  I'd like to direct your attention to Dr. Stewart's

testimony regarding the YouTube video of Ed Sheeran singing

some of the lyrics of "Let's Get It On" over the chords of

"Thinking Out Loud."  Have you seen that video?

A.  Yes, I have.

1    Q.  And do you find that video significant?

2    A.  No.

3    Q.  Is it common for performers to do medleys or mashups or

4    interpolations?

5    A.  Yes.

6    Q.  In his performance did Mr. Sheeran alter any of the lyrics

7    of "Thinking Out Loud"?

8    A.  No.

9    Q.  What chords is Mr. Sheeran playing while he's singing some

10   of the lyrics to "Let's Get It On"?

11   A.  He's playing the same I-I/3-IV-V chord progression that's

12   at issue in "Let's Get It On."  He continues to play that chord

13   progression under the LGO lyric.

14   Q.  You identified the I-I/3-IV-V chord progression.  That's

15   the chord progression in "Thinking Out Loud," correct?

16   A.  Exactly.

17   Q.  And so when you just said earlier, I think you misspoke

18   when you identified that as the chord progression of "Let's Get

19   It On."

20   A.  If I said that, I misspoke to be sure.

21   Q.  When Mr. Sheeran starts singing the lyrics to "Let's Get It

22   On" in that video, does he sing those lyrics to the LGO vocal

23   melody or to the TOL vocal melody?

24   A.  To the LGO vocal melody.

25   Q.  And so the melody that Mr. Sheeran is singing changes,

1   correct?

2   A.  It changes from the TOL melody to the LGO melody.

3   Q.  And does it correspond to Melody C that Dr. Stewart has

4   placed in issue?

5   A.  It does.

6   Q.  Dr. Stewart testified that he found it significant that

7   Mr. Sheeran segued from TOL to the lyrics of LGO, back to TOL.

8   Do you find that significant?

9   A.  No.

10  Q.  Dr. Ferrara, before we conclude, I just have a few more

11  questions.

12          Did you analyze "Let's Get It On" and "Thinking Out

13  Loud" in their entireties?

14  A.  Yes, I did.

15  Q.  And briefly, what is your overall conclusion in this case?

16  A.  I found no musicological evidence of copying.  I found no

17  significant similarities.

18  Q.  Can students at the NYU Steinhardt School major in

19  songwriting?

20  A.  Yes, we have a bachelor's and a master's program in

21  songwriting.

22  Q.  And if the plaintiffs are awarded ownership of the chord

23  progression at issue, coupled with the rhythm at which the

24  chords are performed, how, if at all, would that affect the

25  songwriting majors at Steinhardt?

1          MR. FRANK:  Objection.  Calls for speculation.  And

2    also relevance.

3          THE COURT:  Sustained.

4          MS. FARKAS:  No further questions at this time.

5          MR. FRANK:  May it please the Court.

6    CROSS EXAMINATION

7    BY MR. FRANK:

8    Q.  Dr. Ferrara, I want to thank you for being here today, and

9    I hope you'll indulge me and be patient, as my musical

10   knowledge probably is not on par with yours.

11         First question I wanted to ask you, just so we're

12   clear for the record, you seem to place a lot of emphasis ——

13   A.  Could you speak closer to the microphone.

14   Q.  I apologize.  Can you hear me okay now?

15   A.  I can.

16   Q.  One of the items that you analyzed in connection with the

17   analysis that you provided for us here today is the

18   commercially available sheet music for "Thinking Out Loud,"

19   correct?

20   A.  I analyzed that early on before Judge Stanton's order, but

21   with respect to the deposit copy.

22   Q.  I understand.  So is that a yes?

23   A.  Yes, I ——

24   Q.  Thank you.

25   A.  —— said that I did, yes.

1   Q.  And would you agree with me that the analysis that is at
2   issue in this case for purpose of the jury's determination is
3   the similarities between the studio recording of "Thinking Out
4   Loud" and the deposit copy of "Let's Get It On"?  Would you
5   agree with that?
6   A.  Yes, the —— what is at issue is the composition embodied in
7   the TOL sound recording and the deposit copy of LGO.
8   Q.  Thank you.  I want to take the opportunity, Dr. Ferrara, to
9   see if we might revisit a few items that were listed with
10  respect to your pedigree and background.
11          First off, I wanted to know, are you currently an
12  active —— actively participating musician?  Do you do gigs
13  around town or play anywhere?
14  A.  I do not do gigs around town, no.
15  Q.  Was there ever a time where you did do that?
16  A.  Yes.  In fact, starting when I was 14, having moved out of
17  Brooklyn to New Jersey, I got into bands; worked my way through
18  college right into and through a PhD playing in bands, playing,
19  obviously, popular music.
20  Q.  Did you ever have occasion to play, just by way of
21  illustration, a bar mitzvah or wedding, the general sort of gig
22  circuit?
23  A.  Yes.
24  Q.  You did.  Did you ever have occasion to play "Let's Get It
25  On" at any one of these gigs?

1  A.  I don't recall ever playing that, no.

2  Q.  Did you ever have occasion to play any medleys in

3  connection with any of these gigs that you played a number of

4  years ago?

5  A.  Certainly medleys; not of the songs at issue, needless to

6  say, but certainly medleys.

7  Q.  Okay.  And when was the last time you actively were

8  performing as a musician?

9  A.  I stopped band playing back in the early '80s, I guess, but

10  I continued — I'm also a pianist and I have accompanied some

11  great singers, and I continued accompanying singers well into

12  the late '90s, and I also continued giving in some cases solo

13  recitals at the piano well into the 1990s.

14  Q.  Okay.  So would it be fair to say that you haven't

15  performed as a musician for maybe in excess of 20 years?

16  A.  I — I would qualify that by saying that I perform for my

17  students in classes all the time.  I use the piano as, you

18  know, as a tool, and so —

19  Q.  Sure.

20  A.  — with that qualification, the answer would be, I don't

21  continue to perform as a professional pianist outside of the

22  classroom.

23  Q.  Thank you.

24       Now I wanted to clarify with respect to the portion of

25  your CV that addresses publications.  It looks like, if I

1  understand correctly, that the last book you actually published

2  was 2005; is that correct?

3  A.   That's correct.  That's per my testimony.

4  Q.   And the — but it listed on the CV that the book was

5  actually a fourth edition, was it not?

6  A.   No.  Fourth edition was 1993, fifth edition was 2005, which

7  is exactly what I said in my testimony.

8  Q.   So the 2005 was actually a new book —

9  A.   2005 — I'm sorry.  Go ahead.

10  Q.   I'm sorry.  Was that a new book that you published in 2005?

11  A.   2005 was a fifth edition with change of chapter, and what

12  we did, Roger Phelps and I were co-writers of the fourth

13  edition and — and the fifth edition.  And I had two junior

14  colleagues at the time at Steinhardt, and we asked them to

15  co-write a single chapter on technology and research, and so

16  that — that's essentially what that fifth edition was about.

17  Q.   I understand.  Could you tell us when the first edition was

18  actually written.

19  A.   First edition goes way back.  It was Roger Phelps's own

20  edition.  So Roger is an institution in — in research

21  methodology.  He wrote a first, second, and third edition solo.

22  He asked me to co-author the fourth edition.  We also asked

23  another scholar, Thomas Goolsby, to also add a chapter, and

24  then again in the fifth edition, he asked me to — to co-write

25  the fifth edition with him, and I suggested those two junior

1  colleagues to do that additional chapter.

2  Q.  And I appreciate that, Dr. Ferrara, but I think my original

3  question was:  When did you write the first edition of the

4  book?

5  A.  I don't remember.  I don't know when the first edition of

6  the book — as I tried to state, Roger Phelps is the sole

7  author of the first, second, and third editions of that book.

8  Q.  Can you specify for us when was the last time you published

9  a book of new material?

10 A.  Well, 2005.

11 Q.  That was — that — you said that was a fourth or fifth

12 edition and it had some changes.

13 A.  Yes.

14 Q.  But it wasn't a completely new —

15 A.  Oh, it wasn't —

16 Q.  — iteration, was it?

17 A.  As fifth and fourth editions aren't as well.  There is —

18 there are changes in the fifth edition as compared to the

19 fourth.  The fourth was quite a bit different than — than

20 Roger Phelps's third edition, so the fourth is really largely

21 fresh cloth.  The fifth edition, I think your implication is

22 correct that there's certainly material that was left over from

23 the fourth edition in the fifth edition, which one expects.

24 Q.  Do you have occasion, in connection with your research and

25 work, to go to conventions with colleagues and deliver

1   presentations?

2   A.   I — I do.  I'm particularly active in the greater New York

3   chapter of the American Musicological Society.  By the way, the

4   American Musicological Society is housed at New York

5   University, and so presenting at that chapter is — is rather

6   significant for me, and I noted that I've done five

7   peer-reviewed papers there since 2013.  But to answer your

8   question even more specifically, I don't tend to go to national

9   conventions, and I'll be happy to tell you why.

10  Q.   I think I know why, Dr. Ferrara.  I read a deposition

11  recently, I'll represent to you, in a case that said you don't

12  like to travel; is that correct?

13  A.   That was during COVID.

14  Q.   Right.

15  A.   You put that in perspective.  That is exactly right.  Like

16  many, I was very concerned about traveling during COVID.

17  Q.   Could you share with the Court how — I don't think you

18  spoke to this in your direct testimony — how you initially got

19  into the field of musicological consulting.

20  A.   Well, I had already published in the '80s works in music

21  analysis; and in the early '90s, probably by 1991, I was asked

22  if I could complete an analysis with respect to a music

23  copyright matter.  Soon after that, probably by 1992, I became

24  involved as Andrew Lloyd Weber's musicologist, and in 1998, I

25  was his musicologist at trial in this Southern District of New

1    York with respect to the *Phantom of the Opera* trial.  So that's

2    essentially how I came into this area.

3    Q.  That was your first involvement in litigation or

4    consulting?

5    A.  No.  I believe that between 1992 and 1998, there were other

6    litigations, but no other trials.

7    Q.  Now you represented in your initial testimony on direct

8    that you have worked for both plaintiffs and defendants in the

9    past; is that correct?

10   A.  That's correct.

11   Q.  Could you share with the Court some of the cases over the

12   last five years that you served in the capacity of a musical ——

13   musicological consultant for plaintiffs.

14   A.  In the last five years, no published, and by published I

15   mean no copyright litigations that were actually filed.  Before

16   that, needless to say, yes, but in the last five years, I have

17   done any number of analyses for potential plaintiffs —— that

18   is, for parties who intend to make a claim, and in some cases

19   those things were settled and so no published reports would be

20   available.  But I certainly have worked on behalf of plaintiffs

21   and potential plaintiffs in the last five years; indeed, in

22   every year in the last five years.

23   Q.  What about unpublished reports?  Who did you work for?  Who

24   retained you to provide a report?

25   A.  Those would be confidential.

1    Q.  On what basis would you claim that they would be

2    confidential?

3    A.  To the extent that —— that I had —— I was the consultant.

4    Difference between a consultant and an expert witness is that a

5    consultant does not have to be and in fact is not proffered to

6    the other side.  When you're an expert witness, you must be

7    identified.  We're talking about then potential plaintiff's

8    cases that were early on settled, or they just walked away, in

9    which case I was not identified.  To that extent, that —— that

10   work would be confidential.

11   Q.  I understand that, Dr. Ferrara, but respectfully, you're

12   not a CPA, a priest, or a lawyer, so could you identify what

13   particular privilege you're asserting in not answering my

14   question.

15          MS. FARKAS:  Objection, your Honor.

16          THE COURT:  Sustained.  It's in the Federal Rules of

17   Civil Procedure.

18   Q.  Could you tell us how many times that you have served as a

19   consultant for a defendant in the past five years.

20   A.  I would say that on average, I provide a report probably

21   two to three times a year for a potential defendant, and so

22   over the last five years, 10 to 15 reports would certainly be

23   reasonable.

24   Q.  And I think you gave us a list of some of the individuals

25   and entities that you've worked for in the past in your direct

1    testimony.  But I also believe at the onset of your testimony

2    yesterday you had occasion to say that you've represented

3    clients in the past and you've given them some bad news, told

4    them that there was an infringement, but they were actually

5    happy about it, because you were truthful with them, and they

6    came back to you.  Do you recall that testimony?

7    A.  I do.  They weren't happy with the bad news, but ——

8    Q.  Could you tell us, share with the Court to whom you gave

9    news that they infringed and they actually came back to you?

10              MS. FARKAS:  Objection, your Honor.

11   A.  I think that —— sorry.

12   Q.  I'll withdraw the question.

13              For the record, could you tell us about some of the

14   parties that you have told had committed infringement in the

15   past five years.  Have you ever actually made a positive

16   finding of infringement?

17   A.  I think there is an objection.

18              MR. FRANK:  Yes, there is.

19              MS. FARKAS:  I was waiting.  Objection, your Honor.

20              THE COURT:  Would you repeat the question.

21              MR. FRANK:  Certainly.

22              THE COURT:  I understand you withdrew the earlier one.

23              MR. FRANK:  I did, your Honor, and I apologize.  I

24   should have waited until you were finished.

25              THE COURT:  Yeah.

N521GRI3                        Ferrara - Cross

BY MR. FRANK:

Q.  For the record, the question was:  Could you tell us about
some of the parties that you have told had committed
infringement in the past five years.

           MS. FARKAS:  Objection.  Irrelevant, outside the scope
of this expert's testimony.  He is not a lawyer.  I'll stop
there.

           MR. FRANK:  Respectfully, he's here to provide a
musicological opinion, and I believe his specific testimony
yesterday is, you should believe him because he is here for the
music, and an arbiter of the music, arbiter, neutral arbiter,
so what — I'm trying to probe whether or not he actually is in
fact neutral.

           MS. FARKAS:  It's outside Rule 26, your Honor.

           THE COURT:  He's not required to answer the question.
He may if he wishes.

BY MR. FRANK:

Q.  Dr. Ferrara, would you like to answer my question as to
when you have found infringement on behalf of your clients in
the past five years?  Would you like to take my invitation to
respond to that?

           MS. FARKAS:  Objection to form.  Lacks foundation.

Q.  Are you willing to give that information?

           THE COURT:  Doctor, you heard my ruling.  Just follow
that and forget his interpretation.

1          THE WITNESS:  Thank you.  Thank you.

2          MR. FRANK:  Fair enough.

3    A.  So the answer is essentially the same.  If a potential

4    plaintiff —— be specific now, because you've actually earlier

5    misrepresented my testimony earlier.  So why don't you restate

6    the question so I'm quite clear as to which parties you're

7    asking about.

8    Q.  Absolutely.  Has there ever been an instance in the past

9    five years that a party has come to you for professional

10   assistance and you have said that they committed infringement?

11   A.  You're saying that that party committed an infringement?

12   Q.  Well, they asked you for an opinion about whether they had

13   infringed.

14   A.  You're not being clear, so let's make it clear.

15   Q.  Please.

16   A.  Okay.  Are you asking whether a potential plaintiff —— and

17   this is something that I mentioned early on in my testimony

18   yesterday.  So if you're asking did a potential plaintiff

19   provide materials to you and did you say to that plaintiff,

20   yes, I believe you have musicological evidence to support your

21   claim ——

22   Q.  Actually, you raise a good point, Dr. Ferrara.

23   A.  That's what I want to know.  Is that what you're asking?

24   Q.  I'm speaking directly with regard to a prospective

25   defendant who's been accused of infringing who came to you and

1    asked you for an analysis to determine whether or not they had

2    infringed or not.  Have you in the past five years told someone

3    of that ilk that there is evidence to support the infringement?

4    A.  Many, many, many times.  And the point is, as I made before

5    — it's twofold.  In these instances, I am a consultant, and my

6    understanding under Rule 26 is that as a consultant, all that

7    is going on between that party and I is confidential.  Once I

8    become an expert witness, that is quite a different story.

9              But I will tell you — I'll give you an example.  Just

10   about a year ago — and again, there are just so many of these

11   examples — a major publisher in Nashville, one of the, you

12   know, the national major publishers, and their office is in

13   Nashville, I was sent a work that received a claim — not a

14   complaint, just a letter claim saying, we believe that your

15   work, your song, has infringed our work.  That publisher sent

16   it to me, and I did a lot of work on it, and I said, I do

17   believe there's musicological evidence of copying and I

18   strongly recommend that you settle the case.  I do that very

19   frequently, and there's no question that that is why the motion

20   picture companies and the publishers and the labels come to me,

21   because they know I'm going to give them an honest opinion,

22   even when it's bad news.  They're never happy, contrary to what

23   you — what you conflated earlier.  They're never happy to get

24   bad news, but they appreciate it.

25   Q.  I see.  And to be clear, you're declining to provide the

1    names of the people involved in that scenario you just provided

2    and you're not going to tell us the song.

3    A.  I'm sorry.  Can you speak closer to the mic.

4    Q.  Are you in a position to tell us who you were working for

5    and what song was involved?

6            MS. FARKAS:  Objection.  Rule 26.

7            THE WITNESS:  Right.

8            MR. FRANK:  I'll withdraw the question.

9            THE COURT:  Well, the question is, is he in the

10   position to, in a sense, substantially what I ruled he could do

11   from his own knowledge.  And we will respect it either way.

12   BY MR. FRANK:

13   Q.  Are you in a position to identify for whom you were working

14   and what song was involved?

15   A.  I would literally have to contact, in this case, that ——

16   that company in Nashville and get permission to —— to state

17   that.  I could not break that confidence.

18   Q.  So as you sit here today and testify, you can't provide ——

19   you can give us generalizations but you can't provide

20   identification of the specific cases ——

21   A.  Yeah.

22   Q.  —— is that fair?

23            MS. FARKAS:  Objection.  Asked and answered.

24   A.  Yeah, I think I have answered the question.

25   Q.  Thank you.

1          Dr. Ferrara, during your career as a musical ——

2     musicologist, rather, have you ever participated in a case

3     where you were accused of being dishonest or failing to

4     exercise candor in the proceedings?

5          MS. FARKAS:  Objection, your Honor.  If Mr. Frank is

6     going to start venturing into other cases where Dr. Ferrara

7     served as an expert and seek to elicit some sort of —— to see

8     whether if any courts have criticized his testimony, countless

9     courts in this circuit, including the Second Circuit, have

10    rejected attempts to cross-examine experts about opinions they

11    provided in other cases and other courts' treatments of their

12    opinions.  It's irrelevant, it's utterly unrelated to this

13    case, and it could potentially confuse the jury.

14         MR. FRANK:  I think it's absolutely relevant as to

15    credibility, and it doesn't go to his opinions, it goes to ——

16    it goes to motions that were filed in the case that I'm about

17    to ask him about, with respect to the methodology employed.

18         THE COURT:  Knowing that humanity has its failings and

19    there are examples of overreaching, particularly in the music

20    industry and litigation, I'm going to object to the form of

21    that question.  I will allow you to ask him if there was ever

22    an occasion where a court found that he had acted improperly.

23         MR. FRANK:  Yes, your Honor.

24         THE COURT:  Charges of impropriety are easy to make.

25         MR. FRANK:  I understand, your Honor.

1    BY MR. FRANK:

2    Q.  Dr. Ferrara, you recall testifying in the "Stairway to

3    Heaven" case?

4    A.  Yes.

5    Q.  I believe it's affectionately referred to sometimes as the

6    *Skidmore* case?

7    A.  Yes.

8    Q.  Were there any issues adjudicated by the court with regard

9    to conflicts of interest or any other problems?

10   A.  I'm very happy you asked that question.  Yes, indeed.  I

11   was engaged on behalf of Jimmy Page and Robert Plant of Led

12   Zeppelin and Warner Music in that case, and ultimately went to

13   trial.

14          Some years before, I was contacted by Universal Music

15   Group, who had some interest in "Taurus," the plaintiff's song.

16   They called me.  I completed an analysis.  I can't tell you

17   what that analysis was.  It's confidential.

18          About perhaps a year later —— I don't know —— I

19   received a call from Warner Music asking if I could take a look

20   at this case for them, and I gave them exactly that

21   information.  And they said, well, Universal Music is not

22   suing; the estate of the writer is suing, but Universal Music

23   is not suing.  So I said, if you want me to —— to be a

24   testifying witness in this case, you must get approval from

25   Universal Music Group for me to do that, which they did.

1              And the key is now, specifically, the attorney for the

2    plaintiff said that I had broken some kind of rule, federal ——

3    Federal Rule 26, by having a conflict of interest in having

4    done an initial analysis and then done a subsequent analysis,

5    even if my findings were the same in both.  The district court

6    judge said, nonsense, and dismissed that.  The Ninth Circuit

7    three-judge appellate court said, nonsense, and dismissed it.

8    And the *en banc* panel, either nine, ten, or eleven appellate

9    judges, said nonsense, and dismissed that claim.

10             So I'm happy you asked.

11             THE COURT:  For the record, the Court of Appeals

12   opinion mentions his testimony in that case.

13   Q.  "Ferrara is the go-to expert for major industry players.

14   He gives them the opinions they want."  Have you ever heard

15   that before?

16   A.  No, I haven't.

17   Q.  You don't recall that from the *Skidmore* case?

18   A.  No.  Are you saying that the attorney for the plaintiff

19   said that?

20   Q.  From a pleading in the *Skidmore* case.

21   A.  Are you asking —— are you saying that the attorney for

22   Skidmore ——

23             MS. FARKAS:  Objection, your Honor.  I think Mr. Frank

24   should not be quoting from advocacy pleadings.  I think your

25   Honor had suggested that he stick to actual rulings.

1          MR. FRANK:  Dr. Ferrara brought up the issue

2    responsive to my question about the conflict of interest.  I'm

3    trying to delve into that.

4          THE COURT:  The question is bad in form, and the

5    objection is sustained.

6          MR. FRANK:  Thank you, your Honor.

7    BY MR. FRANK:

8    Q.  Do you agree with that statement, Dr. Ferrara, that you're

9    the go-to guy?

10         MS. FARKAS:  The objection was sustained.

11         MR. FRANK:  I didn't ask ── I asked a new question.  I

12   asked him if he had heard that statement and I asked him if he

13   agreed with it.

14         MS. FARKAS:  It's the same question, your Honor.

15         THE COURT:  Do you have a basis for asking that

16   question, Mr. Frank?

17         MR. FRANK:  I do.  Because the ── I believe it goes to

18   ── he spoke, when ──

19         THE COURT:  Come up and make your offer here at the

20   side.

21         MR. FRANK:  Yes, your Honor.

22

23

24

25

1            (At the sidebar)

2            THE COURT:  When was that statement made and by whom

3    and to whom?

4            MR. FRANK:  It was made in a pleading in the *Skidmore*

5    case by the plaintiff, in a motion to disqualify Dr. Ferrara.

6            MS. FARKAS:  In a losing motion to disqualify

7    plaintiff.

8            THE COURT:  Excuse me?

9            MS. FARKAS:  It was in the losing motion to disqualify

10   Dr. Ferrara.

11           THE COURT:  The motion which the Court denied.

12           MR. FRANK:  I understand that, your Honor, but the

13   problem is that what we have here is that Dr. Ferrara ——

14   Ms. Farkas took extensive testimony yesterday from —— trying to

15   make the point that Dr. Ferrara is neutral, he has no skin in

16   the game, he is a neutral arbiter of whether it's infringement

17   or not.  The fact that they put that there, they placed his

18   neutrality squarely at issue, and we have a right to probe

19   that.

20           THE COURT:  And lost.

21           MR. ZAKARIN:  And lost.  Exactly.

22           MR. FRANK:  I've got some more cases where ——

23           THE COURT:  Well, I want to see a basis for that

24   question.

25           MR. FRANK:  I'll withdraw the question.  I'll withdraw

N521GRI3                         Ferrara - Cross

1   the question.

2              THE COURT:  Well, that's up to you.

3              MR. FRANK:  I'll withdraw it.  Thank you, your Honor.

4              THE COURT:  Suit yourself.

5              MR. FRANK:  All right.  I'll withdraw it.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. FRANK:

3    Q.  Dr. Ferrara, you indicated in your preliminary testimony

4    that you're a full-time professor at NYU?

5    A.  I'm on the full-time faculty, that's correct.

6    Q.  Could you —— is there a distinction between being full time

7    versus being full-time faculty?

8    A.  No.

9    Q.  So do you work the same amount of hours, same case —— I

10   guess the same class load?

11   A.  Yes.  The standard class load for a full professor is two

12   classes per semester; in addition, student advisement, thesis

13   advisement.  There are sitting on faculty committees.  For

14   example, there is a merit review of all tenured faculty, a

15   large committee that takes quite a bit of time that I sit on,

16   and there is the important promotion and tenure committee, and

17   we talked a little bit about that with respect to someone

18   moving from associate to full or assistant to associate.  I sit

19   on those committees and —— and work through those assessments

20   of applicants for promotion and tenure.

21   Q.  How much of your annual income would you say is

22   attributable to this kind of work you do, working on cases?

23   A.  I would say that it's about 60 percent, particularly when

24   —— when there's a trial.  I mentioned in my direct that over 30

25   years, this is probably the 10th trial, so on average, around a

1    trial every three years.

2    Q.  All right.  But preceding the trials, would it be fair to

3    say that there is quite a bit of prep work, depositions,

4    reviewing materials, coordinating with counsel, and presumably

5    you bill for all of that?

6    A.  Yes, of course.

7    Q.  Can you tell us when you were initially engaged in

8    connection with this case.

9    A.  To the best of my recollection, it was in 2015.

10   Q.  So eight years ago.

11   A.  Yes.

12   Q.  And what were you initially asked to do?

13   A.  Initially, I was sent sound recordings by Sony of the two

14   works at issue and asked to complete an analysis.

15   Q.  Okay.  So is it Sony that actually engaged you in

16   connection with this case?

17   A.  To the best of my recollection.  It's been eight years, but

18   I believe it was Sony.  It could — I could be wrong.

19   Q.  Well, presumably in the last couple months in the lead-up

20   to trial, you've been giving bills to someone, correct?

21   A.  Oh, yes.

22   Q.  And who are you giving the bills to?

23   A.  Bills to —

24   Q.  Your invoices for your time.

25   A.  Invoices.  I'm trying to think whether they go to Pryor

1    Cashman, the attorneys, or to — to the Ed Sheeran management

2    in the UK.  Probably the latter, to Ed Sheeran management.

3    Q.  Well, presumably you've received a check responsive to

4    those invoices a couple times; is that fair?

5    A.  Yeah.  As a bank wire, but yes.

6    Q.  And who has cut the checks to you?

7    A.  Again, to the best of my recollection, it would be the

8    company that manages Ed Sheeran.  I don't recall the name of

9    that company.

10   Q.  So it's Ed Sheeran's management company that's been paying

11   you since 2015?

12   A.  Oh, no, no.  That — you — you had shifted to —

13   Q.  Oh, okay.

14   A.  — to, you know, deposition — not deposition — to getting

15   ready for trial.  So no.  Back in 2015, I think it was Sony.  I

16   don't remember explicitly.  But I would have been billed — I

17   would have billed Sony if that is the case and Sony would have

18   paid my fee.

19   Q.  Okay.  And this would have been I guess attributable to

20   when the case was still in a presuit posture.

21   A.  That's right.

22   Q.  And you would have been giving an advisory opinion to Sony

23   at that time.

24   A.  That's correct.

25   Q.  If you were to aggregate all of the money that you've

1  received since you were hired by Sony in 2015 through the

2  present, how much have you been paid to provide services on

3  this case?

4  A.  I don't think I can even find all of that information over

5  the last eight years, so I really don't know the answer to

6  that.

7  Q.  You have no idea how much you've been paid by the

8  defendants in this case?

9  A.  No, I don't.

10  Q.  Could you give us a proffer, a ballpark figure.  Is it a

11  hundred thousand, 200,000?  Do you have a range?

12  A.  It could — it would certainly — let me put it this way.

13  It would certainly be 100,000 since 2015, but one of the

14  reasons is because of the reports that went back and forth

15  initially that were pre the order by Judge Stanton about the

16  deposit copy; and then in particularly the last four months and

17  in the last few weeks, the plaintiffs, to be quite candid, have

18  changed so many things and have caused me, therefore, to change

19  what I'm doing, for example, in the selection in arrangement —

20  Q.  Excuse me.  I asked you how much —

21  A.  Well, I'm giving you —

22  Q.  — how much you've been paid.  How much have you been paid?

23  Do you have an answer to that or not?

24        MS. FARKAS:  I think he's answering your question, if

25  you let him answer the question, please.

1          MR. FRANK:  It's a numerical figure we're trying to

2     identify, not the back story.

3          MS. FARKAS:  You asked him how much, he said he

4     couldn't remember, and then you tried to ask him how he can

5     remember, and he's going through in his head how he can

6     remember how much he billed.

7          MR. FRANK:  He's using it as a subterfuge to criticize

8     the plaintiff's expert, and I'd appreciate he wait until he's

9     redirected before he does that.  We just want to know how much

10    money he's been paid, if he does.

11         THE WITNESS:  I've already answered that.

12         MR. FRANK:  You have to wait for the judge's ruling.

13         THE WITNESS:  Oh, I'm sorry.

14         THE COURT:  He answered that he couldn't; he didn't

15    have the figure.

16         MR. FRANK:  Fair enough.  Thank you.

17    BY MR. FRANK:

18    Q.  Dr. Ferrara, have you ever been engaged by this particular

19    law firm that's defending Mr. Sheeran?

20    A.  I haven't been engaged by the law firm, but I have been

21    engaged by clients of the law firm.  So I —— in other words, I

22    have done other litigation issues with Pryor Cashman.

23    Q.  Do you have a recollection as you sit here today as to how

24    many times you've worked with Pryor Cashman?

25    A.  Over the last few years that I can certainly remember,

1    probably three times outside of this case.  It's hard for me to

2    say.

3    Q.  And that was always for defendants, correct?

4    A.  Yes.

5    Q.  Have you ever done any work outside of this particular song

6    on behalf of Ed Sheeran?

7              MS. FARKAS:  Objection, your Honor.  This is getting

8    ── anything outside of this litigation and this case I think is

9    dancing very close to violating your Honor's order.

10              MR. FRANK:  I didn't say anything about cases.  I

11    asked if he did some work, and we could certainly exclude

12    litigation issues.

13              MS. FARKAS:  It's the same objection, your Honor.

14    It's irrelevant.

15              THE COURT:  Let me see my order.

16              MR. FRANK:  I think that was the order on No. 3, your

17    Honor.

18              THE COURT:  I've got it here.

19              I'll read you the order so we all know what it says.

20              MR. FRANK:  Yes, your Honor, I would appreciate that.

21              THE COURT:  Because I know you're very desirous of not

22    violating it.

23              MR. FRANK:  Yes, your Honor.

24              THE COURT:  This was entered on October 5, 2020.

25    "There shall be no reference, mention, evidence, or argument

1    concerning any other litigation or claim of infringement

2    between the parties or any other parties and any defendant, or

3    the outcome of any such claim.  The trial shall be devoted

4    entirely to the facts and law involved in this case, and any

5    reference to other claims, copying, infringements, or

6    litigations are excluded under Federal Rule of Evidence 403 and

7    404."

8             MR. FRANK:  Thank you, your Honor.

9             THE COURT:  That order is still in effect, and I think

10   it's clear.

11            MR. FRANK:  Thank you, your Honor.  I'll move on to

12   the next question.

13            THE COURT:  Be my guest.

14            MR. FRANK:  Thank you.

15   BY MR. FRANK:

16   Q.  Have you ever been on the opposite sides of Dr. Stewart in

17   a case where he represented one side's interest and you worked

18   on the other side?

19   A.  Yes.

20   Q.  Okay.  Can you tell us the times that you did that.

21   A.  Well, the Led Zeppelin case, Dr. Stewart was the defendant

22   — was the plaintiff's musicologist.

23            Let's see.  A little more recently —

24            THE COURT:  And in fairness to my remarks that the

25   Court of Appeals referred to Dr. Ferrara, they also referred to

1    Dr. Stewart.

2              MR. FRANK:  Oh, great.  Thank you, your Honor.

3    A.  There's another case, *Smith v. The Weeknd* —— that's not Sam

4    Smith, this is a different Smith, and The Weeknd was the

5    defendant, or a part of defendants.  Dr. Stewart worked on

6    behalf of Smith, I worked on behalf of The Weeknd.  And so that

7    case was dismissed.  In fact, Dr. Stewart's report was

8    excluded.  It's in the decision.

9              I know there's ——

10   Q.  What about a case in which you represented Mark Ronson in

11   connection with "Uptown Funk"?

12   A.  Oh, yes.

13   Q.  You were an expert for the defendant, Mark Ronson, were you

14   not?

15   A.  Yeah.  That never —— I don't think we even had depositions

16   in that —— in that case.

17   Q.  This case was settled, was it not?

18   A.  It was settled, yes.

19   Q.  Didn't you also provide consulting services for Justin

20   Bieber and Dan + Shay in connection with a case called —— I

21   think it's a song called "10 Hours"?  Or was it —— does that

22   sound familiar to you?

23   A.  Yeah.  That was recent, and I was not heavily involved in

24   that case, but, yeah, I've done other cases for Justin Bieber.

25   Q.  Dr. Stewart was the opposing expert, was he not?

N521GRI3

1   A.  Actually, I don't even know that.  I don't think I ever saw

2   any report from the other side.  Again, I — there was very

3   little work that I did in that case.

4   Q.  Thank you, Dr. Ferrara.

5   A.  It's my pleasure.

6       MR. FRANK:  Your Honor, I've been advised that we are

7   getting close to the proverbial witching hour and that this

8   might be a good point to stop, if the Court is so inclined.

9       THE COURT:  We'll resume at the usual time tomorrow

10  morning.

11      I promised during your selection that I would keep you

12  posted, and — can you hear me now?  Is this better?

13      JUROR:  Yes.  Thank you.

14      THE COURT:  Thank you for — that I would keep you

15  posted.  And it's my impression that the case is growing

16  towards the end and I expect it to close up within the next

17  couple of days.

18      Does any counsel differ?

19      MR. FRANK:  Your Honor, if I may --

20      THE COURT:  I'm not an expert on these things.

21      MR. FRANK:  And I would invite Ms. Farkas to tell me

22  if I'm wrong, but it's my understanding that after this

23  witness, the defendants are going to be resting.  Is that

24  correct?

25      MS. FARKAS:  That's correct, your Honor.

N521GRI3

1          THE COURT:  After they rest, the remaining work is

2     closing arguments and charge, and before the closing arguments

3     are held, I go over the charge with counsel so there are no

4     surprises and they know what I'm going to charge and can

5     address you accordingly.  And normally that takes maybe a

6     couple of hours on some day, and either later that day or early

7     the next, the opening of the next morning, there will be the

8     closing arguments and charge.  The charge doesn't last terribly

9     long —— half an hour, perhaps; perhaps less.  And then you have

10    the case to decide.

11         So that's the remaining work to be done after the

12    closing.  And I would think —— well, it depends on the length

13    of the cross-examination, for one thing.  That means it will be

14    in your hands probably tomorrow or the next day.

15         See you tomorrow.

16         (Adjourned to May 3, 2023, at 11:00 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 LAWRENCE FERRARA PhD

Direct By Ms. Farkas . . . . . . . . . . . . . 666

Cross By Mr. Frank . . . . . . . . . . . . . . 773

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

 210     . . . . . . . . . . . . . . . . . . . 678

 201     . . . . . . . . . . . . . . . . . . . 680

 202     . . . . . . . . . . . . . . . . . . . 682

 203     . . . . . . . . . . . . . . . . . . . 684

 204     . . . . . . . . . . . . . . . . . . . 694

 212     . . . . . . . . . . . . . . . . . . . 697

 214     . . . . . . . . . . . . . . . . . . . 701

 238     . . . . . . . . . . . . . . . . . . . 708

 213A and 213B   . . . . . . . . . . . . . . . 761