N53HGri1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KATHRYN TOWNSEND GRIFFIN, *et
    al.*,

4
                    Plaintiffs,
5
            v.                          17 Civ. 5221 (LLS)
6
    EDWARD CHRISTOPHER SHEERAN,
7   personally known as Ed
    Sheeran, *et al.*,
8
                    Defendants.
9
    ------------------------------x
10                                      New York, N.Y.
                                        May 3, 2023
11                                      11:05 a.m.

12

13

    Before:
14
                        HON. LOUIS L. STANTON,
15
                                        District Judge
16                                      – and a Jury –

17                      APPEARANCES

18  FRANK & ASSOCIATES PC
    BY:  PATRICK RYAN FRANK
19       KEISHA RICE
         KATHERINE VIKER
20       – and –
    BEN CRUMP LAW
21  BY:  BEN CRUMP
         Attorneys for Plaintiffs
22
    PRYOR CASHMAN LLP
23       Attorneys for Defendants
    BY:  ILENE SUSAN FARKAS
24       DONALD S. ZAKARIN
         ANDREW MARK GOLDSMITH
25       BRIAN MAIDA

            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

1          (Trial resumed; jury present)

2          THE COURT:  Morning, members of the jury.

3          Doctor.  And you're still under oath, doctor.  You're

4     reminded.

5          THE WITNESS:  Thank you, your Honor.

6     LAWRENCE FERRARA Ph.D., resumed.

7          MR. FRANK:  May it please the Court.

8     CROSS-EXAMINATION CONTINUED

9     BY MR. FRANK:

10    Q.  Good afternoon, Dr. Ferrara.

11    A.  Good morning.

12    Q.  Thank you very much for coming back this morning.

13    A.  Thank you.

14    Q.  I wanted to pick up where we left off yesterday, I believe.

15    I wanted to ask you a little about your methodology as far as

16    how you went about doing the analysis of the two songs at

17    issue.  Could you walk us through that.

18    A.  Yes.  As I testified yesterday, I begin by working through

19    both works in their entirety, in this case, the deposit copy of

20    LGO and the sound recording.  I then transcribe the music and

21    lyrics in the sound recording in the method — rather,

22    deliberate and slow systematic method.  Once those

23    transcriptions are completed, I then complete a comparative

24    analysis of the sheet music, which is the deposit copy of LGO,

25    and what is now the written transcription of the notation and

N53HGri1 Ferrara – Cross

the lyrics in my transcriptions.  And I do a detailed analysis

of that.  That analysis includes an analysis, as I testified

yesterday, of the five fundamental elements, certainly the

structure, the harmony, the rhythm, the melody, the lyrics.  I

certainly look at other less fundamental elements like key and

meter, and so forth, but that overall process is the

methodology that I use.

Q.  Thank you.

     I wanted to see if we could zoom in on the

transcription process.  I think you mentioned yesterday you

used some kind of software to do that?

A.  Yes.

Q.  Could you describe that?

A.  Of course.  I mentioned that there are any number of what's

called media player softwares.  In fact, there's a Windows

Media Player and there is QuickTime Apple media player.  I also

have Audacity, which is a software.  Those media players

essentially, you know, instead of putting your audio into,

let's say, iTunes and playing it back, you put it into the

media player, and you can play it just as it is.  But it also

allows you to zoom in and to take a small section ⎯ it can

literally be a section that constitutes five or six notes of

the melody ⎯ and loop it, that is, play it over and over and

over again.

     That allows me, then, to begin to match at the piano,

N53HGri1 Ferrara - Cross

1    to write down what I believe I'm hearing, go back and forth.

2    And I literally do that section by section, and the media

3    player software allows me to do that systematically.

4    Q.  Forgive me, I'm probably not as technologically adept as

5    you are, doctor, but does the program operate by you playing,

6    for instance, "Thinking Out Loud" aloud and then it translates

7    it into musical notation?

8    A.  No.

9    Q.  How does it work?

10   A.  Well, let's not confuse.  The media player is what allows

11   me to zoom in on the audio, in this case that would be the

12   audio of TOL, because we're talking about my transcription of

13   TOL.  I didn't have to transcribe into musical notation LGO,

14   because that's the deposit copy.  So we're only talking about

15   the transcription of TOL, and that is where the media player

16   comes into place.

17        I think what you're talking about is a different

18   process altogether, and that is, after I have put into the

19   software —— and the software that I use is used by many, if not

20   most, is called Sibelius.  It is a notation system so that you

21   literally write in into the —— and you can play on a keyboard,

22   but you get every note, every rest, every chord, every lyric.

23   It writes right into the software.

24        And then what it does, instead of having something

25   that I would write on manuscript paper, which would be

N53HGri1 Ferrara - Cross

handwritten, it gives you a published look.  So it's a lot

easier.  The transcriptions that you saw yesterday were

Sibelius, that is, my input, my content, but they made it into

a form so that you could actually see the notes in a clearer

way.

That Sibelius software also has a MIDI file use, and I

believe Dr. Stewart testified that he used that in creating his

own audios.  So what you can do is, once you have completed

that transcription and written notation, in this case of the

melody, let's say, in TOL, you can then have the Sibelius

software create what's called a MIDI file, which is an audio

file, and you can play it back.  And once again, based on my

reading of the testimony of Dr. Stewart from last week, that's

what he did to create some of the audio in his slides.

Q.  Sure.  Thank you for that.

I guess what I'm trying to get to, Dr. Ferrara, is

whether there was any point in time where you sat in a room and

listened to the music of "Thinking Out Loud" and actually

manually translated it into musical notation?

A.  Yes.  First I went through several listenings, many

listenings of "Thinking Out Loud" in its entirety; and in each

of those moments, when, for example, if I'm listening to a

three-second loop, that is, digitally enacted repeat of those

three seconds of TOL, I'm listening to the TOL sound recording

piece by piece by piece over and over again.  So all of that

N53HGri1 Ferrara – Cross

1   transcription is informed by the TOL sound recording, of

2   course.

3   Q.  OK.  When you're sitting there listening to the loop, are

4   you typing into a computer, the transcription, or are you doing

5   it manually?

6   A.  Oh, no, what I just testified before, that you use your

7   keyboards to the computer to type in an A, a B, to type in an A

8   that is a quarter note, a B that is a half note, and so forth.

9   So all of that is done through the computer.  And again, it's

10  informed by my listening and matching and literally creating a

11  transcript that, in my opinion, represents, in this case, the

12  melody, the harmony, and the lyrics of the portions at issue in

13  TOL.

14  Q.  OK.  I think I understand now.  Thank you, doctor.

15          Did anyone else assist you in this process of

16  transcribing "Thinking Out Loud"?

17  A.  No.

18  Q.  And I believe you represented that what we saw, the

19  transcription in your presentation, was actually the product of

20  the software deriving from the input that you put into the

21  computer, correct?

22  A.  It is a product of the use of the software which represents

23  my notation, that is, my transcription, yes.

24  Q.  Doctor, are you familiar with the prevalence of —— in

25  popular music of the last several decades of guitar-themed

1    music?  You might call it the heavy use of riffs or hooks.  Do

2    you know what a riff is?

3    A.  I do know what a riff is.

4    Q.  Can you define what a riff is?

5    A.  A riff is a musical passage.  For example (piano played),

6    that's a riff.  That's a riff on a blues scale.

7    Q.  What would you call a hook?  How would you describe that,

8    if you know?

9    A.  Yeah, a hook is different from a riff.  A riff could be a

10   hook.  A hook is generally defined as the most memorable part

11   of the song.  And in the business, "hook" is often interchanged

12   with "chorus."  Very often in the business someone will say

13   play the hook, and they will mean play the chorus; play the

14   chorus, and they mean play the hook.  Most of the time,

15   certainly not always, most of the time, the hook, i.e, the most

16   memorable part of the song, is in the chorus.

17   Q.  In your experience, are hooks often repeated in popular

18   music?

19   A.  Are hooks often with ──

20   Q.  Hooks that you mentioned, the memorable part, are they

21   often repeated?

22   A.  Oh, repeated?

23   Q.  Yeah.

24   A.  Yes.

25   Q.  In a particular song.

N53HGri1 Ferrara - Cross

1   A.   Indeed.  The chorus generally is the portion of a song that

2   is repeated.  It can be iterated, that is, a number of times,

3   two times, three times.  There could be chorus one, two, and

4   three.  In so doing, the chorus is repeated to the extent that

5   the hook is part of the chorus.  The hook is being repeated in

6   the chorus.

7   Q.   The opening salvo of, for instance, "Satisfaction" by The

8   Rolling Stones ——

9   A.   (Vocalizing).

10  Q.   —— those ubiquitous open notes, would you call that a

11  guitar hook or a theme?

12  A.   That's a good point.  The hook of "(I Can't Get No)

13  Satisfaction," is *I can't get no* —— it's literally the title.

14  You don't want me to sing.  It's the title of the song, "(I

15  Can't Get No) Satisfaction," and that melody to which it is

16  set, that's the hook of the song.  I don't think anybody

17  disputes that.

18          On the other hand, there are songs like that that have

19  what's called the instrumental hook, so (vocalizing).  That's

20  an instrumental hook, to be sure.  It's certainly one of the

21  memorable moments of the song.

22  Q.   You call that an instrumental hook?

23  A.   Yes.

24  Q.   "Deep Purple," "Smoke on the Water," the open chorus --

25  A.   (Piano playing) Yeah.

N53HGri1 Ferrara - Cross

Q.  Would you call that an instrumental hook?

A.  Yes.

Q.  Doctor, if you could, what are the chords at issue for "Thinking Out Loud"?  What are the chords in the main verse?

A.  Sure.  In "Thinking Out Loud," we have the D chord.  That's a I chord, also the letter D, D major.  The next chord is another D chord but with the lowest note as F sharp, and that is, of course, the uppercase Roman numeral I/3.  The next chord is G, and that's a IV chord.  And the next chord is A, and that is a V chord.  That's the basic chord progression.  Remember, there are multiple chord progressions in TOL, and we've just basically boiled that down to a basic chord progression to facilitate the comparison.

Q.  Is it fair to say that that chord progression that you just identified and played for us is probably the most repeated element of "Thinking Out Loud"?

A.  Well, actually not.

Q.  It's not?

A.  No, because that basic chord progression is —— is iterated.  It certainly is iterated in certain moments in the song.  But you'll all recall, because you saw it twice, Dr. Stewart showed and I showed again yesterday, my chart of similar chord progressions, and I only listed five of them, saying these are five similar chord progressions in TOL that have similarity to the chord progression in LGO.  And so those other chord

N53HGri1 Ferrara – Cross

1    progressions are also sounding at times, and so the number of

2    repeats of the actual I-iii-IV-V chord progression is not

3    throughout the song.

4    Q.  But it goes throughout the two main verses, correct?

5    A.  No.  In fact, as you can see if you have the sheet music ——

6    and I agree with the chords in the sheet music —— just look at

7    the first eight bars, which is verse 1A, just look at that, and

8    maybe there's one iteration of that chord progression, maybe

9    not even.

10   Q.  That chord progression is the chord progression that opens

11   the song, though, correct?

12   A.  No, the chord progression ——

13   Q.  It's not?

14   A.  —— that opens the song is a D5, not a D.  That's D.  This

15   is a D5.  This is wonderful opening that's kind of expansive

16   because it doesn't tell you whether it's major or minor.  It

17   just kind of opens it up.  But it makes D the moment.  That is

18   what goes on.

19           Then in the next chord change, we have two notes, F

20   sharp and A (piano played).  And within the context of that

21   (piano played) D, that creates a D chord but with F sharp as

22   the lowest note and also within the context (piano played) of

23   what's going on in the vocal melody and, of course, backed up

24   by the fact that thereafter it's always the D chord with F

25   sharp in the bass.

1          By the way, the next chord is not a G major chord,

2     which is part of the bass, a chord progression, that's this.

3     (piano played).  The next chord in the first iteration of the

4     chord progression that's played by Ed Sheeran on the guitar is

5     a G5 chord.  Remember I said the first chord was D5 because it

6     didn't have the —— didn't have the third of the chord?  Well,

7     the third chord is a G5 chord.  That doesn't have the full

8     third.  And then we have —— instead of an A chord, what we

9     actually have is an A sus 2, which is this (piano played).  And

10    what's happened is the C sharp, which is the third, has been

11    suspended, and we're using the second instead.

12         So the direct answer to your question is absolutely

13    not.  The I-iii-IV-V chord progression, which for the purposes

14    of analysis we've been calling the basic chord progression,

15    Dr. Stewart uses the same terminology, that's the bass chord

16    progression.  That's not what opens TOL.

17    Q.  I understand.

18         I'm a little bit confused, though, Dr. Ferrara,

19    because I believe you testified yesterday that there was a D

20    note, a D root note in the second ——

21    A.  I'm sorry, your voice dropped off.

22    Q.  I believe you testified yesterday you were asked about

23    Mr. Sheeran's prior testimony regarding the opening 24 seconds.

24    Mr. Sheeran represented that there was a D note in the second

25    chord of the opening 24 seconds.  You testified that he was

1    right, but just said it was an F and an A chord.  So I don't

2    understand the inconsistency there.  Could you explain that.

3         MS. FARKAS:  Objection, mischaracterizes the

4    testimony.

5         MR. FRANK:  I'll withdraw it.  I'll ask a better

6    question.

7    Q.  Dr. Ferrara, so can you just reiterate what the opening

8    chords are for —— what the actual chords are for the opening

9    sequence?

10   A.  Yes, of course.  So the opening chord is D5, the next chord

11   is an F sharp as the lowest note D chord, then we have a G5,

12   and then we have an A sus.  And that is consistent with my

13   testimony yesterday, by the way.

14   Q.  When you say "A sus" or "D5," those are variations on the

15   bass chord of a D major, is that correct?

16   A.  That —— you're confusing terms.

17   Q.  OK.  A D7, for instance, you just said is a D major chord

18   adding in a 7, is that correct?

19   A.  D7 is this, yes, (piano played).  Right.

20   Q.  So you're building on the bass chord, is that correct?

21   A.  You're —— unfortunately, you're confusing a couple of

22   musical terms, so it's difficult to answer your question.

23   Q.  Well, let me ask you this:  When you add a seventh or A sus

24   or G5, the root note is a G, correct, or D, and that's the bass

25   note that determines what the chord is, and then there are

1   variations or permutations of the chord, correct?

2   A.  Well, a lot to unpack there.

3          The name of the chord is the root of the chord, and so

4   the root of the D chord is D.  And certainly, on that chord you

5   could leave out the third, as Ed Sheeran does at the opening of

6   the song with this wonderful just kind of openness because of

7   the perfect fifth.  That's called a perfect fifth.  It's a D5

8   chord (piano played).  But you're quite right, Mr. Sheeran

9   could have added a very, very different modality, but he could

10  have started with a D7 chord, in which case, as you pointed out

11  correctly, the root would still be D.

12         But there's quite a bit of difference.  To simply call

13  this a variant of this (piano played) is pretty dramatic.  Had

14  the opening been this (piano played), I just can't imagine the

15  opening melody in "Thinking Out Loud" against a D7 chord.

16  Q.  I think you testified, if I understand correctly, the

17  pattern in "Thinking Out Loud" for the verse that we were

18  discussing earlier, the four-chord pattern, is D-D/F sharp, is

19  that the proper way to call it, that chord?

20  A.  Sure.

21  Q.  G major and, is it, A, the last chord?

22  A.  An A.  That's the basic chord progression for the purposes

23  of analysis, otherwise every passage that would be compared,

24  we'd have to be comparing this version of a four-chord

25  progression with an A sus or this with an A11 or this with an

N53HGri1 Ferrara – Cross

open fifth. And that's why we do that, for the purposes of

comparison, not failing to remember that, based on the initial

question that brought us into this line of questions, that the

answer is, no, it doesn't start with that (piano played).

There are many versions of chord progressions that, agreeably,

are similar to the chord progression in LGO but not as similar

as the basic chord progression (piano played) in TOL is.

Q. I see. Thank you.

So we're on the same page, the chords are D, D/F

sharp, G and A, is that correct?

A. D is the first chord, the second chord is D with F sharp as

the lowest note, G and A.

Q. For purposes of ⎯⎯ do you play guitar?

A. I can't even say that I play. I played instantly when I

was a kid, but I went to bass.

Q. Isn't on the guitar, which is what Mr. Sheeran is playing

on the song, isn't the guitar D/F chord? It's a D major chord

with another finger on the root note for the F sharp, is that

correct?

A. Well, I can't say how Mr. Sheeran performed it on the

guitar.

Q. But that's how it's formed, though, the chord, you're

playing an F sharp with a D chord?

A. What I ⎯⎯ well, the F sharp and the A is part of the D

chord, not with a D chord. It's part of the D chord. It's not

N53HGri1 Ferrara - Cross

1    two separate things.

2              So what I can testify to, and certainly what I base my

3    analysis on, was the transcription of what he actually played.

4    That's what musicologists do.

5    Q.  I understand.

6              But in the second chord, there's a root note above an

7    F sharp, is there not?

8    A.  That is not a root note of an F sharp.  It's a simply wrong

9    statement.

10   Q.  There's no F sharp in that chord?

11   A.  You said there's a root note.

12   Q.  My apologies.  Where does the F sharp fall?

13   A.  The F sharp is the lowest note of the D chord which is the

14   second chord.  We call it I/3.  And the reason we label it I/3

15   is because the F sharp is the lowest chord.  That also can be

16   written as a D chord/F sharp.  And you may recall that

17   yesterday I showed Dr. Stewart's original report, Example 3,

18   that did exactly that.  Dr. Stewart initially said this is a

19   D/F sharp chord.

20   Q.  And the F sharp is the lowest note, you said?

21   A.  The F sharp is the lowest note, but it is not the root.

22   Q.  So we have D, D/F sharp chord, G and the A for TOL.  What

23   are the chord for L —— "Let's Get it On," after you've

24   transposed them?

25   A.  Yes, that's important, as I transposed them and Dr. Stewart

1    transposed them.  So the basic —— let's say the chord

2    progression first is a I chord —— and here we have full chords

3    because that's what Ed Townsend wrote into the score.

4    Q.  I appreciate that.  You can just tell me what the chords

5    are.  You don't need to play them at this point.

6    A.  Oh, OK.

7    Q.  I appreciate the offer, though.

8    A.  Absolutely.

9         In the key of D, we have a D chord, I, then we have an

10   F sharp minor chord, iii, then we have a G major chord,

11   uppercase Roman numeral IV; and then we have a V with an Arabic

12   number 7, and that, of course, is in this key of D an A7 chord.

13   Q.  So the only chord, the difference between the two sequences

14   that we've talked about, is the second chord is a D/F sharp as

15   opposed to in "Let's Get it On" it's an F sharp, is that

16   correct?

17   A.  And the other difference is the 7 on the V chord.  Once

18   again, when we reduce that to the basic chord progression that

19   both Dr. Stewart and I did, look, the basic chord progression

20   in "Let's Get it On" is I-iii-IV-V, so there is no 7.  So if

21   that were the case, then the answer would be yes.  With respect

22   to the actual deposit copy, the answer would be no.  There's

23   also the difference of the seventh on the V chord which is not

24   the case in TOL.

25   Q.  Do you attach any type of musicological significance to ——

 1    well, let me back up.

 2            For purposes of the record, when you say the "fifth

 3    chord," I believe you're talking about the A, the final chord?

 4    A.  V chord.

 5    Q.  When you say that that's an "A7," from a musicological

 6    standpoint, do you attach any significance to that?

 7    A.  Well, an A7 chord is not the same as an A chord.  That's

 8    A7.  That's A (piano played) but --

 9    Q.  I guess the question was, is there an appreciable

10    difference in your mind?

11    A.  So the point is it depends from what —— it depends ——

12    musicologically it depends on what is at issue in the analysis.

13    If we're talking about the function of that chord, and I'm not

14    going to get into esoterics right now, that chord has a

15    different function with a 7 on it than it has without the 7.

16    That would be musicologically significant.

17            Within the context of this case and the reason why

18    both Dr. Stewart and I said, look, the basic chord progression

19    doesn't include the 7 is, no, it wouldn't be a significant

20    difference.  It wouldn't be a significant difference to the V

21    chord in TOL and the V7 chord.  It's a difference, but within

22    the context of what we're looking for, not the function

23    necessarily of that V7 chord.  It's not huge, but it is a

24    difference.

25    Q.  In your experience, is it uncommon for guitar players to,

1    when they're playing, add that to add a little flavor to it, a

2    seventh, give it a bluesy feel?

3    A.   I think that's a little bit too loose for me to hypothesize

4    on what guitar players do.

5    Q.   OK.  Dr. Ferrara, you talked quite a bit about prior art

6    yesterday, and I wanted to see if we could delve into that.

7          First, did you conduct the prior art search by

8    yourself?

9    A.   Yes.

10   Q.   And I think you said you had some encyclopedias.  Were

11   those your source materials?

12   A.   No.

13   Q.   I might have heard it wrong.  Can you tell me what you

14   looked to.

15   A.   The only time I think I used "encyclopedia" was an entry I

16   wrote, a co-authored for an encyclopedia.

17          No, there are chord books like chord method books —— I

18   showed you some yesterday —— that have chord progressions, and

19   so there was a chord method book of popular songs, *Money*

20   *Chords, Popular Songs*, *Popular Chord Progressions* by Richard

21   Scott, and therein there are any number of chord progressions

22   that, according to that author, are popular in music —— popular

23   music.  And I pointed to with one of my arrows the identical

24   chord progression in "Let's Get it On" in that book and noted

25   other portions of the book.

1           There was that second book for ⸺ *Advanced Beginner*,

2   advanced beginner guitar students, and in that book, they also

3   ⸺ on two separate pages I had arrows that listed the LGO.  So

4   I used those books, for example, and other books.

5           One of the things about books for chord progressions

6   is there are thematic indices, indexes of themes, that are

7   online for melodies but not for chords.  So ⸺ then I also went

8   to sheet music that I have, just kind of eyeballing and finding

9   things.

10  Q.  Thank you for that.

11          Did you find the songs that you listed, did you find

12  them in these chord books or did you go elsewhere to get them?

13  A.  Well, some of the songs that are listed in ⸺ are in books.

14  For example, the Mary Wells "You Lost the Sweetest Boy" that

15  was in 1963 prior art, I found that in a ⸺ I think it's an

16  R & B big book.  It's called a lead sheet book, and this ⸺

17  there are couple hundred songs in there.  And leafing through,

18  literally, bang, there it was in E flat major.  So that's how I

19  found the Mary Wells song.  So it's a mix.

20  Q.  When you conduct your prior art research or within the

21  context of the prior art analysis, can you explain, because I

22  don't think it's been explained to date, what prior art is and

23  why you're looking for it.

24  A.  Of course.  The prior art that I did, for example, the

25  prior art that I completed post my, what's called, Rule 26

1    report, that prior art was meant to supplement and provide

2    support for the findings in that Rule 26 report, and

3    importantly, my conclusions today are the same as in that

4    Rule 26 report.

5            So the purpose of that prior art was to supplement the

6    findings.  And the findings were that (1) there simply are not

7    any significant similarities at all between the two songs.  And

8    furthermore, for argument sake, let's say that with respect to

9    the combination of the chord progression and the pop, pop, pop,

10   pop, the anticipation rhythm, the prior art will establish or

11   not establish, it does in this case, that in fact before LGO

12   there were any number of songs that had that combination of

13   those two songs.

14           So that informs me so that I have literally an

15   informed opinion and can say honestly that, no, I don't —— in

16   fact, I have found objectively that LGO was not the first to

17   use this combination; that it was used before.  And so the

18   purpose of the prior art search is to find out whether that's

19   the case or not, and sometimes it is not the case.

20   Q.  So if I understand you correctly, doctor, you're saying

21   that the purpose of looking for the prior art is to determine

22   whether or not the alleged infringed-upon work was original at

23   the time it was made?

24   A.  I don't necessarily use the word "original" because it has

25   a legal connotation.

N53HGri1 Ferrara – Cross

1    Q.  Creative or novel or new?

2    A.  No, whether it was the first, that's one of the things.

3    Q.  OK.

4    A.  And the point is did other writers put this combination

5    together before LGO?  It's not a matter of whether it was

6    original or not.  Did they?  And the answer in this case is

7    yes, they did, and I demonstrated that, I think yesterday.

8    Q.  You used the words "whether it was the first," and that

9    brings me to my next question.  What is the relevance of the 80

10   songs, some-odd songs, that you've cited that came after LGO?

11   A.  That's a misstatement.

12   Q.  There aren't many songs you listed after LGO?

13   A.  Yeah, so ——

14   Q.  Why would you list those?  We're talking about prior art,

15   correct?  Those aren't prior art, are they?

16   A.  They are.  Thirty-three of --

17   Q.  They are?

18   A.  I divided in my testimony the 80 songs that include the

19   basic chord progression in LGO; 80 songs, basic chord

20   progression, LGO.  And I noted in my testimony that 33 of them

21   predate LGO.  I also noted in my testimony that 47, the

22   remaining 47 of those 80, were created and released after LGO

23   but before TOL.

24           That's significant for two reasons:  First, with

25   respect to the 33, I also testified that, I believe, that if I

1    were to continue a prior art search, I'd find more.  But let's

2    say that there's only 33.  Well, that makes LGO the 34th song

3    to use this combination.  If I found more, it might be the 37th

4    or the 38th or the 49th.  That's the reason for those 33.  They

5    are significant for that reason.

6          Now, with respect to the remaining 47, these were

7    songs also that embody this commonplace combination of two

8    fundamental musical building blocks, the I-iii-IV-V chord

9    progression and anticipation on the second and fourth.  Those

10   47 songs do that as well.

11         Why is that important?  To answer your question

12   directly, it's important because, in any case, the writers of

13   TOL could know any number of those 80 songs, and who is to say

14   that if you really believe they copied something, that they

15   didn't copy one of the other songs?  When you have that many

16   songs, it undermines the claim of copying, that they copied a

17   particular song in those 80.

18   Q.  So you're suggesting the assertion of the citation to the

19   other songs ——

20   A.  I'm sorry, you're speaking away from the mic.  This is a

21   dead spot with the ——

22   Q.  I apologize.

23   A.  Yeah.

24   Q.  So you're suggesting that the existence of other songs

25   postdating LGO are indicia of the prospect of Mr. Sheeran

N53HGri1 Ferrara – Cross

1    having plagiarized another song?

2    A.  No.

3            MS. FARKAS:  Objection.

4    Q.  Is that what you're saying?

5            THE COURT:  Well, the question is, is that what you

6    said, doctor?  I think he'd like him to answer.

7            THE WITNESS:  Your Honor ——

8            MS. FARKAS:  It's just argumentative, your Honor.

9            THE COURT:  Yes, but that's not —— there's a good deal

10   of prior art about that in this case.

11           THE WITNESS:  With your permission, may I get a cup of

12   water?

13           THE COURT:  Help yourself.

14           THE WITNESS:  I appreciate it.  Thank you, your Honor.

15   BY MR. FRANK:

16   Q.  And if you're more comfortable, Dr. Ferrara, I don't think

17   we'll need you to play keyboard anymore.  If you'd like to be

18   on the stand, if that's more comfortable ——

19   A.  If that's what you'd prefer, yes.

20   Q.  It's your preference, whatever you prefer.

21   A.  Are you planning on projecting anything?

22   Q.  No.

23   A.  Yes.

24           THE COURT:  I think there's a pending question.

25           THE WITNESS:  Thank you.

1    BY MR. FRANK:

2    Q.  Do you remember the question?

3    A.  Do I remember?

4    Q.  The pending question?

5    A.  No.

6    Q.  OK.  I'll repeat it.

7           You cited music that postdates "Let's Get it On," and

8    my understanding of what you just said is that it suggests ——

9    it's indicia of the prospect of Mr. Sheeran plagiarizing

10   another song as opposed to "Let's Get it On."  Do I understand

11   that correctly?

12   A.  No, that mischaracterizes exactly what I said.  In fact,

13   it's just the opposite.  The point is with not only the 33

14   songs that predate LGO but an additional 47, that undermines

15   the prospect that the writers of TOL copied any particular

16   song.  And so, you know, the idea of plagiarism is, I think, a

17   distraction here.  We're talking about copying, and I really do

18   not believe there is copying going on here because of the

19   unremarkable combination of these two elements that existed in

20   80 songs before TOL.  That's what the indication is.

21   Q.  With respect to prior art, you understand, Dr. Ferrara,

22   that even if prior art does exist to thinking —— I'm sorry,

23   "Let's Get it On," there still has to be a demonstration that

24   Mr. Townsend was actually aware of that prior art.  You

25   understand that, correct?

1              MS. FARKAS:  Objection.  I think he's misstating the

2        law to this witness.

3              THE COURT:  Sustained.

4        Q.  Dr. Ferrara, as you sit here — well, let me ask you this:

5        Presumably, you weren't in the room when Ed Townsend wrote

6        "Let's Get it On," did you?

7        A.  Of course not.

8        Q.  Were you aware of who Ed Townsend was before you engaged in

9        this case?

10       A.  Yes.

11       Q.  You were.

12             Yesterday you showed a book that seemed to suggest

13       that Marvin Gaye wrote "Let's Get it On."  You remember that?

14       A.  Well, let me answer that in two parts.  First, I remember

15       the book, and secondly, you've mischaracterized what the author

16       of that book wrote.

17             The author of that book wrote, very specifically, I do

18       not believe that Marvin Gaye, thinking — you know, that it was

19       Marvin Gaye who wrote the song alone and not with Ed Townsend,

20       but I do not think that author wrote that Marvin Gaye

21       plagiarized or copied any of the many songs that predate LGO.

22       He started with — there are many songs that predate LGO, but I

23       do not — and this is what I testified to — I do not think

24       that Marvin Gaye copied any of those songs because it's so

25       common.  So your characterization is a complete

1    mischaracterization.  That's not what I said.

2    Q.  What I'm trying to understand is whether or not you

3    understand that it's Ed Townsend who wrote "Let's Get it On"

4    and not Marvin Gaye, and it seems to be misrepresentative, that

5    text.

6    A.  That's what I just said.  I just clarified that.  I just

7    said the author mentioned Marvin Gaye obviously not realizing

8    that Ed Townsend did the writing.  So, of course — so the

9    answer is, yes, I just said that.

10   Q.  OK.  With regard to Ed Townsend, do you have any personal

11   knowledge as to any of his influences?

12   A.  I don't, no.

13   Q.  Have you looked at, taken a deep dive, or done any type of

14   analysis of his back catalog or the 165 other songs he's

15   written?

16   A.  No.

17   Q.  So you wouldn't know one way or the other whether those

18   common elements were combined in that way earlier as well?

19   A.  That is correct.  And by the way, that is not at issue.

20   Q.  Thank you for sharing.

21   A.  Sure.

22   Q.  I would like to distill it down to this:  After we get past

23   all the songs that you cited yesterday, I think you finally

24   arrived at six songs ——

25   A.  Yes.

1   Q.  ⸺ six songs that you claim constitute prior art?

2   A.  And that is excluding the Van Morrison songs, so six songs

3   above Van Morrison.

4   Q.  We'll get to that in a moment.  Thank you.  I appreciate

5   that.

6   A.  Sure.

7   Q.  Two of them, two out of the six you cited, actually came

8   after "Let's Get it On," correct?

9   A.  That is correct.  I testified to the years they were

10  released.  One with the basic chord progression in LGO came out

11  after LGO and one with the basic chord progression in TOL came

12  out after LGO.  The other four were released prior to LGO.

13  Q.  So we're down to four.

14         "You Lost the Sweetest Boy" by Mary Wells, I'll

15  represent to you that Dr. Stewart testified that the rhythmic

16  durations were different in the song.  Do you agree or

17  disagree?

18  A.  Well, I showed the sheet music.  It certainly is the same

19  as in the sound recording, and there's no question that, in the

20  same key as LGO, this 1963 work has a section that has an E

21  flat chord with a G minor chord that anticipates the beat, an A

22  flat chord and then a B flat chord that anticipates the beat.

23  That is the basic chord progression with the identical harmonic

24  rhythm if you have cut in half the harmonic rhythm, as we've

25  done now, for the purposes of analysis.

N53HGri1 Ferrara – Cross

1              So what I can say is that, to the extent that you have

2    accurately represented Dr. Stewart's testimony, that he's

3    wrong.

4    Q.  OK.  "Since I Lost My Baby" by Ray French ——

5    A.  Yes.

6    Q.  —— that's one of the prior art you cited?

7    A.  1966, yes.

8    Q.  Wasn't that a remake or a cover of a Temptations song that

9    was written by Smokey Robinson?

10   A.  Exactly, yes.

11   Q.  So you didn't go to the original source material, you found

12   a cover?

13   A.  No, I went to both.

14   Q.  OK.

15   A.  And the chord progression in the original is I-iii —— that

16   is, lower case iii —— I-iii-IV-I.  It doesn't go I-iii-IV-V, it

17   goes I-iii-IV-I.  And when I checked the cover, the Ray French

18   cover, 1966, I noted and I played for you with that descending

19   melody, it has indeed the identical basic chord progression in

20   LGO.

21   Q.  So if I understand correctly, the original work by The

22   Temptations didn't match your prior art analysis, is that fair?

23   A.  Well, it mischaracterizes it.  When you say it doesn't

24   match my prior art analysis, it was part of my prior art

25   analysis ——

N53HGri1 Ferrara - Cross

1   Q.  The original Temptations song "Since I Lost My Baby" as

2   recorded, which you just testified you looked at, didn't have

3   the same elements you're talking about here today?

4   A.  Slightly different question.

5   Q.  Thank you.

6   A.  Some of the elements were there.  It had the I, the III,

7   and the IV.  It didn't have the V thereafter.  So, again, the

8   question is not completely accurate, and so, unfortunately, I'm

9   sorry to take the jury's time, but I want to clarify the

10   answer.

11   Q.  Thank you.  I appreciate that.

12        "Georgy Girl," what we've talked about a little bit,

13   the Mexican —— it's originally by The Seekers, correct?

14   A.  That's correct.

15   Q.  You're not citing the original Seekers version, you're

16   citing a Spanish-language, was it —— was there language in it?

17   I can't remember.  Was there singing in it?

18   A.  Yeah, *Hey there, Georgy Girl*.

19   Q.  OK.  There was.

20        Can I ask you, just out of curiosity, where did you

21   find this Mexican "Georgy Girl"?

22   A.  You do an online search for covers of "Georgy Girl."  But I

23   didn't testify to the Diaz recording.  Probably a name you

24   don't recall from my testimony because I didn't testify to it.

25   As I testified yesterday, I found that the identical

1   combination at issue is in the 101 Strings recording of "Georgy

2   Girl."  It's still available on iTunes.  I also found that the

3   Boston Pops Orchestra recording, that's 1967 and 1968,

4   respectively, also has the identical combination and, in fact,

5   in the same key as LGO.

6          So that those are —— those are the two works that I

7   testified to that both predate the creation of LGO by either

8   six or seven years.  And I testified that the original —— and

9   this is what you're talking about —— The Seekers version, in

10  that original version, the —— first of all, the chord

11  progression is the same, but the anticipation is partial, you

12  can say, because it's in the guitar part.  And by the way, it's

13  also in the vocal, *Georgy Girl,* that's that anticipation, da da

14  da, and the guitar follows that.  So the guitar anticipates the

15  chord, the second and the fourth chord, but nonetheless, I want

16  to be absolutely honest, the bass is actually square on the

17  beat.

18         So I said in my testimony, in The Seekers version,

19  while you have anticipation in the guitar and certainly in part

20  in the vocal, you don't have it in the bass.  But nonetheless,

21  the two principal ones that I went forward with, that I used

22  the charts, for the 101 Strings were the three that I

23  presented.  I didn't mention anything about the Diaz version.

24  Q.  As you sit here —— I'll get in front of the mic again —— as

25  you sit here today and testify, Dr. Ferrara, do you have any

1   information, personal knowledge whether or not —— whether or

2   not Ed Townsend had access to the Boston Pops version of

3   "Georgy Girl"?

4   A.  I'll answer that in two parts:  (1) Obviously, no, and (2)

5   there is no implication —— I've made that any number of times

6   yesterday —— no implication that I think that Ed Townsend

7   copied anybody in creating this chord progression and

8   anticipation.  I made that very clear.  It's just simply too

9   commonplace.  It's too fundamental a musical building block for

10  one to say, oh, you must have copied so because you've used the

11  same fundamental musical building block.

12  Q.  But wouldn't Ed Townsend need to be aware of these specific

13  songs you've cited for them to count as prior art?

14  A.  What Ed Townsend had to be aware of, because it is a

15  musical building block, is I-iii-IV-I chord progression.  You

16  couldn't be a writer, a musician playing songs, and so forth,

17  you have to be on a different planet ——

18  Q.  As I understand, doctor --

19  A.  Well, if I can continue?

20  Q.   —— the combination of elements, not the chord progression,

21  are you saying that —— you have no evidence to support that Ed

22  Townsend was aware of these songs, do you?

23       MS. FARKAS:  I would just request that you let the

24  witness answer the question that you pose to him.

25       MR. FRANK:  Sure.

N53HGri1 Ferrara – Cross

1    Q.  I apologize, doctor.

2    A.  That's OK.

3           So what we're talking about is the word that you used,

4    Mr. Frank, is combination.  We're talking about a combination,

5    so what's been combined.  And I was in the midst of explaining

6    that the first thing that's been combined is a musical building

7    block, chord progression, those four chords, I-iii-IV-V.  And

8    so you ask me do I have any knowledge as to whether Ed Townsend

9    never heard that I-iii-IV-V chord progression.  I can't imagine

10   that ——

11   Q.  Respectfully, that's not what I asked, I asked if you

12   heard ——

13   A.  I did hear the question, sir.  I'm trying to answer it.

14   Q.  I apologize.  Proceed.

15   A.  Within the context of we're talking about a combination,

16   your word, and so the first element of that, he had to have

17   known.  This (clapping), once again, got to be on a different

18   planet not to have heard that anticipation.  It's a musical

19   building block.

20          And now here is the direct answer.  It's unremarkable

21   to put these two things together.  That's why it doesn't matter

22   whether Ed Townsend heard any of those 33 songs that have the

23   chord progression or any of the four songs that have the

24   combination.  The point is it's simply unremarkable to put them

25   together because they're two building blocks.

1   Q.  If it's unremarkable, Dr. Ferrara, as you suggest, why are

2   there only four songs?  You in your vast knowledge of music,

3   you could only find four songs, and it doesn't seem like you

4   can tie any of them to Ed Townsend's knowledge.

5           MS. FARKAS:  Mischaracterizes the testimony.

6   Q.  Why are there only four songs?

7   A.  Shall I answer?  Thank you.

8           There are four songs because that is where my prior

9   art search left off.  There could be more, but here is the key.

10  What those four songs show is that before the creation of LGO,

11  that there were writers of other songs that did the same thing,

12  that LGO was not the first.  And to the extent that that is the

13  case, it informs whether or not LGO was the first or not, and

14  so that's why those four songs are important.  They're

15  significant.

16  Q.  During your research —— well, let me back up.

17          The fourth songs I don't think we've addressed is The

18  Contours song "Do You Love Me."

19  A.  Yes.

20  Q.  Is that the one?

21  A.  It is.

22  Q.  Is that the song that "Dirty Dancing" made famous in 1988,

23  "Do You Love Me"?

24  A.  I can't say whether —— whether its popularity was impacted

25  in any way by "Dirty Dancing."  It's a movie that I saw too many

1    years ago and I don't remember it well enough.

2            The key is, to my understanding, "Do You Love Me" was

3    a hit by The Contours.  It was in 1962.  So the point is that,

4    whether it had another boost through a movie, I don't know.

5    Q.  You don't have any direct knowledge that Ed Townsend was

6    aware of this specific song, do you?

7    A.  No, of course not.

8    Q.  Thanks.

9            Dr. Ferrara, attendant to your research and

10   preparation for testimony in this case, did you have occasion

11   to look at the various mashups online of "Let's Get it On" and

12   "Thinking Out Loud"?

13   A.  I viewed the mashup that is at issue, yes.

14   Q.  OK.  When you say "the mashup at issue," we've

15   affectionately referred to it as the Zurich recording.

16   A.  If that is where it was, yes.

17   Q.  Are you aware of any other —— any other recordings online

18   by famous artists who've combined both of those songs together?

19   A.  No, I'm not.

20   Q.  You didn't have —— curiosity didn't direct you to look?

21   A.  That other artists who have combined "Thinking Out Loud"

22   and "Let's Get it On"?

23   Q.  Numerous other artists have combined those two specific

24   songs.

25            MS. FARKAS:  Objection.  I would ask counsel not to

N53HGri1   Ferrara - Cross

1    testify.

2              MR. FRANK:  I was asking whether he was aware of

3    numerous other artists.

4              MS. FARKAS:  And he told you he isn't, but you keep

5    asking questions.

6              THE COURT:  Mr. --

7              MR. FRANK:  I apologize.

8              THE COURT:  What you stated is "Numerous other artists

9    have combined those two specific songs."  That's not a

10   question.  It is a statement, and counsel properly objected to

11   your testifying.

12             MR. FRANK:  Yes, your Honor.

13             THE COURT:  Try not to.

14             MR. FRANK:  Thank you, your Honor.  I will.

15   BY MR. FRANK:

16   Q.  Dr. Ferrara, when you were ⸺ you recall yesterday when you

17   were doing the analysis of the three melodies --

18   A.  Yes.

19   Q.  -- that have been cited by Dr. Stewart as ⸺ I'm sorry.  Go

20   ahead.  You wanted to say something.

21   A.  I have to correct that.  There are not three melodies.

22   There are six melodies, Melody A in LGO and Melody A in TOL.

23   They're different melodies.  Melody B in LGO and Melody B in

24   TOL.  They're two different melodies.  Melody C in LGO and

25   melody C in TOL, they're different.  They're two different

N53HGri1  Ferrara – Cross

1  melodies, and the only similarity is da da da da da da da da

2  da, an exercise that string players and kids play every day.

3  Q.  Dr. Ferrara, I understand, but if you don't mind, I'd like

4  to ask the questions.

5  A.  You suggested that there was a Melody A.  There isn't.

6  There are two Melody As, and they're different.

7  Q.  Let me reframe the question.  I understand that we're

8  comparing melodies in TOL and melodies in "Let's Get it On."

9          Dr. Stewart —— would you agree with me that

10  Dr. Stewart has identified three melodic passages that he

11  believes are substantially similar?

12  A.  No.

13          MS. FARKAS:  Objection.

14  Q.  That he believes are similar.

15  A.  He identified six passages, not three.

16  Q.  OK.  With regard to the passages that he identified, what

17  I'm trying to establish is your protocol.  You indicated ——

18  well, you didn't say anything, but on your slides yesterday it

19  seemed to indicate that you halved the note values of "Let's

20  Get it On" in your comparison.

21          Do I have that correct?

22  A.  Yes.  For the purpose of analysis, that's correct, and that

23  is what Dr. Stewart did as well.

24  Q.  You halved the notes just in "Let's Get it On"?

25  A.  Just in "Let's Get it On" as Dr. Stewart did.

1    Q.  I wanted to ask you about, also, were you involved in the

2    production of the musical realization of the deposit copy?

3    We've referred to it here at the trial as the AI version of

4    "Let's Get it On."

5    A.  No.

6    Q.  Didn't ⸻

7    A.  I'm sorry.  You mean the computerized?

8    Q.  The computer-generated song version of "Let's Get it On"

9    that we heard, were you involved in its creation?

10   A.  No, not at all.

11   Q.  Wasn't your colleague at NYU involved in it?

12   A.  The person that defendants' counsel contacted is Professor

13   Paul Geluso.  He heads the music technology program at NYU

14   Steinhardt.  It's a bachelor's, master's, and Ph.D. program.

15   He has, in fact, testified and been deposed, so he is an entity

16   that is well-known, but he's a music technologist, not a

17   musicologist.  And it is my understanding that defendants'

18   counsel contacted Professor Geluso directly.  I have not and

19   would not discuss this with Professor Geluso.  That would be a

20   problem of privilege and confidentiality.

21       So the answer is, to be sure, I was not involved with

22   the creation, and I was not involved with any decisions that

23   were made between defendants' counsel and Professor Geluso.

24   Q.  Thank you very much.  That's what I was trying to find out.

25   A.  Sure.  Thank you.

1  Q.  Doctor, it seems in your testimony that you've gone to

2  great lengths to suggest that "Let's Get it On" is not

3  original.  Do you believe "Let's Get it On" is not original?

4  A.  Once again, "original" is a legal term, as well as an

5  English-language term, and so I'm very careful not to use

6  "original" so that I am not mixing musicology with the law.

7        What I have preferred to say, rather than use the word

8  "original," is to say "not the first."  And so if you don't

9  mind, it's easier for me to answer the question if it's not

10 using the word "original," which has legal overtones.

11 Q.  I appreciate that, Dr. Ferrara.

12        Would you agree with me that "Let's Get it On" is ——

13 was and is a very successful song commercially?

14 A.  It is, it was, and I love it.

15 Q.  Well, thank you for that.

16        So I guess my question for you, Dr. Ferrara, is if

17 there's nothing —— well, if it's not the first, to use your

18 terminology --

19 A.  Not the first to use the combination of similarities,

20 specifically, the chords and the anticipation.  There is no

21 combination of melodies because similarities are nonexistent.

22 There's six different melodies.

23 Q.  The songs that you cited as prior art, "Six-Pack Summer"

24 and "Since I Lost My Baby," people aren't still singing those

25 all over the world, are they?

1          MS. FARKAS:  Objection.  Lacks foundation.

2   A.  Yeah.  First, I certainly am not a marketing or business

3   affairs person, so I can't tell you how many people —— *Do you*

4   *love me,* da da bump, I don't know how many people stream that,

5   but it wouldn't surprise me if a lot of people continue to

6   listen to The Contours version, but I have no evidence one way

7   or the other on any of those songs as to who was listening to

8   them.  Of course, that is irrelevant to the musicological work

9   that's being done.

10  Q.  Well, it seems like you've gone to great lengths to find

11  what you've referred to as prior art, going so far as to citing

12  the "Georgy Girl," the Spanish version.  Doesn't that suggest

13  —— the reliance on these esoteric songs, doesn't that suggest

14  uniqueness or creativity in "Let's Get it On"?

15         MS. FARKAS:  Objection to form and mischaracterizes

16  his testimony.

17  Q.  The fact that you ——

18         MS. FARKAS:  Would you let him rule on the objection.

19         THE COURT:  Sustained.

20  Q.  Does the fact that you need to go to such lengths to find

21  what you term prior art suggest in itself that "Let's Get it

22  On" is pretty novel or unique?

23         MS. FARKAS:  Objection.

24  A.  The answer is ——

25         MS. FARKAS:  Let him ——

1    A.  —— is no.

2    Q.  He has to rule first.

3          THE WITNESS:  I'm sorry, your Honor.

4          THE COURT:  I'm trying to figure out the reasoning

5    underlying that question, and it alludes me.  So I suppose that

6    we're in the hands of an experienced expert.  We better take

7    his answer.

8    A.  So you continue to ——

9          THE COURT:  To me it sounds like a *non sequitur*.

10          MR. FRANK:  I understand.

11    Q.  If you understand the question, Dr. Ferrara.

12    A.  Sure.  Yes, I think I understood it.

13          You continue to use the version by Diaz.  Once again,

14    I did not testify with respect to Diaz.  And Dr. Stewart, in

15    his presentation, called Diaz an obscure Mexican bandleader, or

16    something, talked about the fact that no one outside of Diaz's

17    backyard would have heard this.  Very insensitive and, I think,

18    impolite language that was literally, you know, a part of

19    Dr. Stewart's testimony and his report.

20          That notwithstanding, I haven't used that.  The idea

21    that 101 Strings, that is a —— that is a version, in fact, that

22    has been on more than 101 Strings albums; that is, they have

23    different albums that put together certain tracks, certain

24    songs from earlier albums.  So this continues to be on —— in

25    fact, I'm pretty sure maybe a couple of weeks ago I looked on

1    iTunes and I found the 101 Strings version of "Georgy Girl"

2    still available on two different albums.

3         So the point is you can call it obscure, but it's not.

4    And the point is that it doesn't matter if it's obscure.  What

5    matters is that LGO didn't do it first, and it is not

6    particularly remarkable to put these two musical building

7    blocks together.

8    Q.  Presumably, doctor, Ed Townsend didn't have access to

9    iTunes in 1973, did he?

10   A.  Obviously, no, and that's irrelevant.

11        MR. FRANK:  Thank you, doctor.  I'll tender the

12   witness.

13   REDIRECT EXAMINATION

14   BY MS. FARKAS:

15   Q.  Dr. Ferrara, yesterday, I believe plaintiffs' counsel asked

16   you a question about the *Skidmore-Led Zeppelin* case, and he

17   referenced a comment made in that case about —— that you are

18   the go-to expert for major industry players, and he gives them

19   the opinions they want.  Do you remember that questioning

20   yesterday?

21   A.  Yes, I do.

22   Q.  And that quote that Mr. Frank read to you, was that an

23   opinion or a statement or a conclusion by the Court in that

24   case?

25   A.  Absolutely not.  It was an opinion by the

1   plaintiffs' counsel being an advocate for their client.

2   Q.  And the Court in *Skidmore* actually accepted your opinions

3   over the opinions of Dr. Stewart, isn't that correct?

4   A.  That is correct, both at the district court, the appellate,

5   and the en banc.

6   Q.  You have identified 101 songs that contain the chord

7   progressions at issue in this case, and I believe eight songs,

8   including Van Morrison songs, that include the combination that

9   has been placed at issue.

10          Other than "Georgy Girl" and "You Lost the Sweetest

11  Boy" in which Dr. Stewart conceded those songs contain the

12  combination at issue, did Dr. Stewart address any of the other

13  combination prior art that you identified?

14  A.  If we put them in two categories of the six, you're correct

15  that he only dealt in his testimony with "Georgy Girl" and "You

16  Lost the Sweetest Boy."  He did not dispute in any way or

17  analyze the other four combination prior art.

18          With respect to the Van Morrison songs, he only put up

19  a slide, and as I said, it was a slide that failed by omission,

20  of just the opening of "Crazy Love."  He didn't go into the

21  other Van Morrison songs, but he did do "Crazy Love," and he

22  did it in a way that was really deeply, deeply flawed, leaving

23  out all of the other expression that was indeed at issue.

24          So he failed to dispute four of the six of what we

25  could call the combination prior art, and he only dealt with

1    one in a very flawed way of the Van Morrison.

2    Q.  And other than mentioning —— I'm now focusing on the

3    exhibit that had 101 songs that contain the chord progressions

4    at issue, Exhibit 210 —— other than mentioning 15 of those

5    songs, did Dr. Stewart even address any of the other prior art

6    that you found?

7    A.  In reviewing Dr. Stewart's testimony, I didn't find any

8    dispute of the other songs, other than those that you've just

9    mentioned.

10   Q.  Now, in your testimony a few minutes ago when Mr. Frank was

11   asking you questions, I think at one point you referred to this

12   list as songs containing the combination of the chord

13   progression and the anticipation at issue.  I just want to make

14   the record clear that Exhibit 210 solely addresses the chord

15   progressions at issue, correct?  I'm sorry.

16   A.  If I misspoke, by the 80 songs, I meant, to be sure, the

17   four chord progression in LGO that either predate or postdate

18   LGO.

19   Q.  Right.

20   A.  Only the chord progression.

21   Q.  And to the extent that any of these songs on this list of

22   101 also contain anticipation, they have been discussed in your

23   other testimony, correct?

24   A.  That is correct.

25   Q.  Dr. Ferrara, whether there is two songs or three songs or

N53HGri1                        Ferrara - Redirect

1   five songs or seven songs that predate "Let's Get it On" that

2   contain the combination at issue, would that change your

3   testimony that "Let's Get it On" wasn't the first to combine

4   these elements?

5   A.   If there were a few more or one or two less, it would not.

6   Q.   Do you know who wrote "Do You Love Me"?

7   A.   Yes, Ed Townsend.  It's a great song, 1958.

8   Q.   No, no, we're talking about —

9   A.   Oh, "Do You Love Me," yeah.

10  Q.   Was that Berry Gordy?

11  A.   I was thinking of Ed Townsend's great 1958 "For Your Love,"

12  *For your love I would do anything.*  Sorry.  Ask the question

13  again.

14  Q.   So the song "Do You Love Me," was that written by Berry

15  Gordy?

16  A.   Yes.

17  Q.   Do you know who Ed Townsend was writing "Let's Get it On"

18  for?  Was he also writing for Berry Gordy at the time?

19  A.   My understanding is that "Let's Get it On" was released by

20  one of the subsidiaries of Motown Records, which, of course,

21  would be Gordy.

22          MS. FARKAS:  No further questions at this time, your

23  Honor.

24          MR. FRANK:  No redirect, your Honor — recross.

25          THE COURT:  Thank you, Dr. Ferrara.  You're excused.

N53HGri1                    Ferrara – Redirect

1              THE WITNESS:  It has been an honor.  Thank you.

2              (Witness excused)

3              MS. FARKAS:  Your Honor, the defendants rest.

4              THE COURT:  I'd like to see a representative from each

5    side briefly at the sidebar because I want to discuss the

6    schedule of day, and anybody who's capable of doing that can

7    help me.  And the reasons are so that I can advise the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (At sidebar)
 2              THE COURT:  My theory is that we could have —— it's
 3    12:15 now.  We could have a charge conference at about 12:30.
 4    I'm ready to go on it.
 5              MR. ZAKARIN:  I don't know.
 6              THE COURT:  Does it take two of you?  You're welcome
 7    to stay.
 8              MR. FRANK:  It's OK.
 9              THE COURT:  But if we have a charge conference at,
10    say, 12:30, get that out of the way before lunch, have closings
11    arguments starting after lunch --
12              MR. FRANK:  Yes, your Honor.
13              THE COURT:  -- with the hope that we'll get to enough
14    time left for (a) giving the charge and letting the jury
15    deliberate for a little while before they go home.  Generally,
16    it's a good idea to give them an hour or so of actually
17    deliberating if they want to.
18              MR. ZAKARIN:  Your Honor, two things, your Honor, if I
19    can.
20              THE COURT:  Yes.
21              MR. ZAKARIN:  One ——
22              THE COURT:  It wouldn't change the schedule.
23              MR. ZAKARIN:  What I was going to suggest —— not so
24    much.  I don't know if you have any rebuttal case or not.
25              MR. FRANK:  No, no rebuttal case.
```

1            THE COURT:  So it's defendant, plaintiff.

2            MR. FRANK:  No, no, no, we have no rebuttal.

3            MR. ZAKARIN:  OK.

4            THE COURT:  Well, and in argument, in summations, I

5    think I may have said at some point that we would use the

6    criminal common one of plaintiff, defendant, rebuttal.  It

7    seems to me in this case really more sensible to do it as the

8    civil way: defendant, plaintiff, then charge.

9            MR. ZAKARIN:  We're fine with that, your Honor.

10           THE COURT:  It's not a major difference.

11           MR. FRANK:  I'm sorry.  Wouldn't it be plaintiff,

12   defendant, plaintiff, rebuttal?

13           THE COURT:  Well, that's ⸺ you see, that's what I'm

14   asking.

15           MR. FRANK:  Yes, that's what we'd ⸺ yes.

16           THE COURT:  It would be ⸺ we would use the civil form

17   used in this court, which is defendant, plaintiff, charge.

18   There isn't a rebuttal.

19           MR. FRANK:  OK.

20           MR. ZAKARIN:  We're fine with that, your Honor.

21           MR. FRANK:  We would like the opportunity for

22   rebuttal.

23           THE COURT:  Well, because you like to save things and

24   do them later, and I'm thinking that the best way for the jury

25   and the case is to do it the other way ⸺

N53HGri1                        Ferrara - Redirect

1          MR. FRANK:  Yes, your Honor.

2          THE COURT:  —— which is the common way in this court

3     in civil cases.

4          MR. FRANK:  Yes, your Honor.

5          THE COURT:  There has been a lot of argument along the

6     way, and put it into your closing statement.

7          MR. FRANK:  Yes, your Honor.

8          MR. ZAKARIN:  I have one more piece, which is

9     consistent with the rules, and I think I know the answer, but

10    we would want to make a further 50(a) motion at the close,

11    which I can do very quickly orally for your Honor.

12         THE COURT:  I'm glad you raise that.  You should make

13    your motion.  Whoever loses should make it.

14         MR. ZAKARIN:  Yes.

15         THE COURT:  I'll reserve argument on it until after we

16    have a verdict.

17         MR. ZAKARIN:  Yes, your Honor.

18         THE COURT:  So just make it for the record purposes ——

19         MR. ZAKARIN:  That's what I wanted to do.

20         THE COURT:  —— rule purposes.

21         By the way, Mr. Frank, it's on my conscience.  I said

22    to you the other day, I think yesterday, that the question

23    about the disclosure of experts was in the Federal Rules of

24    Civil Procedure.  I haven't had time to check it, but it came

25    to me in the night that it may well be in the 28 U.S. Code

N53HGri1                         Ferrara – Redirect

1    instead.

2                MR. FRANK:  I think you might be right, your Honor.

3                THE COURT:  Well, I've got to be right one or the

4    other.

5                MR. FRANK:  Yeah, absolutely.  Thank you for that.  I

6    appreciate that.

7                THE COURT:  I'm not too embarrassed to miscite it

8    probably.

9                MR. CRUMP:  Judge, can I ask a question?  The

10   plaintiffs were prepared to do it the way that we had

11   traditionally done closing with plaintiff, defendant, and then

12   rebuttal.  We understand that the Court isn't going to do it

13   that way.  Can the plaintiffs have the closing argument divided

14   between the two people, because that's how we were prepared to

15   go forward today?

16               THE COURT:  What's the reason for it?

17               MR. CRUMP:  Because we —— we prepared that we were

18   going to have one person make the first argument and then

19   another person make the rebuttal argument as ——

20               THE COURT:  Well, this was going to be somebody else

21   and then you.  I remember that.

22               MR. CRUMP:  Yes, sir, and that's how we prepared to do

23   it, but if ——

24               THE COURT:  And I'm asking the reason.

25               MR. CRUMP:  Because that's what our client prefers.

1     She wanted me to be the ——

2               THE COURT:  Why don't you do it all?

3               MR. CRUMP:  Well, we —— we can.  We hadn't prepared

4     for that, but we can.

5               We would respectfully request that the Court would let

6     us divide it, but as always, we've been following your

7     direction, Judge.  But that's what we wanted to do, and we're

8     letting the Court know that's how we prepared to do it.

9               THE COURT:  Well, is that so that you can make the

10    estate administration argument?

11              MR. CRUMP:  No, sir.  Every time you gave me an

12    instruction, I tried to change everything I did.

13              THE COURT:  I'm not saying you don't.  I'm just trying

14    to fathom the reason for splitting the closing argument.

15              MR. FRANK:  I think we were operating under the

16    understanding that we had a rebuttal.  That's why we split it.

17              THE COURT:  I see.

18              MR. CRUMP:  Yes, sir.

19              MR. FRANK:  That's why we split it up.

20              THE COURT:  Do you care?

21              MR. ZAKARIN:  You know, in civil cases I'm most

22    accustomed to one person closing and not dividing it up.  I've

23    never seen it.  It doesn't ——

24              THE COURT:  You see, this is what they do in Florida.

25              MR. ZAKARIN:  I know.  And if we were trying this case

1    in Florida, I would accommodate their methodology, but we're

2    trying it here.

3           MR. CRUMP:  I've tried cases — two cases in New York,

4    and we've done it that way, Judge.  I'm not trying to do

5    anything deceptive.  Out of all the cases I've tried, I've

6    always done plaintiff, defendant, rebuttal, but —

7           THE COURT:  How long do you think you'll be?

8           MR. CRUMP:  No more than 30 minutes.

9           THE COURT:  Hmm?

10          MR. CRUMP:  No more than 30 minutes.

11          MS. FARKAS:  That's the one or two?

12          MR. CRUMP:  An hour, tops.

13          THE COURT:  Him 20 minutes.  So it collapses 20

14   minutes into his closing.

15          MR. CRUMP:  Yes.

16          THE COURT:  I haven't seen it, but there's a new day

17   for everything.

18          MR. FRANK:  Yes, your Honor.

19          THE COURT:  OK.  I'll do that.

20          MR. CRUMP:  Thank you, your Honor.

21          MS. FARKAS:  Just, your Honor, so I'm clear, they're

22   going to go first, and they're going to go twice?

23          MR. ZAKARIN:  They're going to divide it up.

24          THE COURT:  Yes.

25          MS. FARKAS:  I didn't think they were going to say the

N53HGri1                        Ferrara – Redirect

 1   same thing twice.

 2             THE COURT:  How long do you think you'll be?

 3             MS. FARKAS:  Forty minutes.

 4             THE COURT:  Yes.  That's good.

 5             And you, jointly?

 6             MR. CRUMP:  Yes, sir.  No more than an hour, but 40

 7   minutes is fine.

 8             THE COURT:  Something around that.

 9             MR. CRUMP:  Yes, sir.

10             THE COURT:  Two hours in all.  I think we can do it.

11             OK.  Thank you.

12             MR. FRANK:  Thank you, your Honor.

13             MR. CRUMP:  Thank you, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N53HGri1

1              (In open court; jurors present)

2              THE COURT:  We think a practical schedule is for you

3    to take a recess now.  We have to do legal work about the

4    charge that's a part of every case, and I think we can regroup

5    at 2:15 and have the closing arguments.  They'll take about two

6    hours, or maybe less, and then the charge itself will take 20

7    minutes, half an hour.  And then at the end of that, you'll be

8    deliberating.

9              That's the program, so enjoy lunch.

10             (Jury excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N53HGri1

1              (Jury not present)

2              THE COURT:  You'll need time to read that.  Let's

3    resume at quarter of 1:00.

4              MR. FRANK:  Yes, your Honor.

5              MR. ZAKARIN:  Your Honor, if I might, do you want to

6    do the 50(a) for the record?

7              THE COURT:  Yes.

8              MR. ZAKARIN:  In the robing room during —— or now?

9              THE COURT:  Yes, yes.

10             MR. ZAKARIN:  OK.  Here now?

11             THE COURT:  Just place on the record, your —— yes.

12             MR. ZAKARIN:  Your Honor, we will formally file our

13   posttrial, post-close of evidence 50(a) motion.

14             Just very quickly, to summarize the points, they (a)

15   duplicate the points we made before, which is the plaintiffs

16   have not proved in any shape, manner, or form sufficient to go

17   to a jury any of their claims.

18             But, more importantly, during the defendants' case,

19   Dr. Ferrara, in particular, demonstrated conclusively that the

20   plaintiffs have not introduced any evidence on melodies or

21   similarity of melodies.  All they've introduced are pitch

22   sequences, which are uncopyrightable to begin with, pitch

23   sequences being like letters of the alphabet; that the chord

24   progression, as your Honor has already ruled, is commonplace,

25   unprotectable, same thing with the anticipation; and that the

1    combination preexisted.  There is no dispute in the evidence on

2    that.

3            And of course, while the plaintiffs have recently

4    added the melodies to their selection and arrangement or

5    combination claim, the melodies are utterly and completely

6    different, and plaintiffs did not even provide any evidence

7    about comparing the melodies.

8            So there's nothing there.  Indeed, it's

9    self-defeating, because under the law, properly, to avoid

10   restricting the development of intellectual property, selection

11   and arrangement claims are thin copyrights.  They require — as

12   the last element, they require numerosity, they require that it

13   be new or novel, and of course we know that they're not new or

14   novel.  The evidence is clear it wasn't.  And the third element

15   is that they have to be identical, or virtually identical, one

16   to the other.  And the introduction, not only — strike that.

17           Not only are the chord progressions different and the

18   anticipation different, and Dr. Ferrara testified to that, but

19   the melodies, or the supposed melodies, as well as the pitch

20   sequences, which as I said are uncopyrightable, the melodies

21   are totally different.  There's no similarity.  So using them

22   as an element of a selection and arrangement claim defeats the

23   claim all on its own.

24           So we don't believe that there is anything that need

25   be submitted to the jury.  While we are grateful for their

1    service —— they were wonderful, they were attentive, it was

2    terrific trying a case in front of them, and I would hate to

3    deprive them of the opportunity —— this is the rare case where

4    we truly believe that there's nothing to be submitted to the

5    jury.  They could not come to a verdict otherwise than to

6    dismiss the complaint here, and we respectfully request that

7    our 50(a) motion be granted.

8          Thank you, your Honor.

9          THE COURT:  The question of numerosity is an open one,

10   maybe not wide open, but open in this circuit.  There are cases

11   in the Ninth Circuit which consider it a question of law and

12   don't allow more than four, in rough terms.

13         MR. ZAKARIN:  I agree, your Honor, with that.  I agree

14   with that.

15         THE COURT:  I am aware of that and am reserving my own

16   views on it to take the verdict and let the jury vote on it as

17   a question of fact.  I tilt towards the position that it's a

18   question of law, but I'm reserving the issues on that until we

19   see what the verdict is so that if I'm wrong in what I

20   ultimately do, the case doesn't have to be retried.

21         The same is true with the balance of the issues under

22   Rule 50.  We'll reserve the briefing on that until after the

23   verdict is delivered.

24         MR. ZAKARIN:  I understand.  Thank you.  And thank

25   you, your Honor.

N53HGri1

1          THE COURT:  See you in about 15 minutes.

2          MR. FRANK:  Thank you, your Honor.

3          (Recess)

4          THE COURT:  Who is speaking for the plaintiff?

5          MR. FRANK:  I will, your Honor.

6          THE COURT:  For the defendant?

7          MR. ZAKARIN:  I will speak, your Honor.

8          THE COURT:  What I need, and following the rule, is an

9    indication of the line and page and the language which the

10   lawyer proposes, and we proceed through the proposed charge

11   page by page.

12          Anybody got anything on page 1?

13          MR. FRANK:  Your Honor, yes, if I could —— as a

14   preliminary matter, we noticed that we don't have Atlantic ——

15   the other two defendants listed, Atlantic and Sony/ATV.

16   They're not listed at all in the forms, and they're defendants

17   in the case.

18          THE COURT:  Whether they're mentioned or not has

19   nothing to do with the law as I state it to the jury.  And at

20   the beginning of the case I defined the term "Townsend" as

21   including those defendants.

22          Next point.

23          MR. FRANK:  I understand.  And your Honor, given that

24   there are the other two defendants that are rolled into the ——

25   rolled into that definition, we're requesting that there be a

N53HGri1

```
1     ── I think that you used the Ninth Circuit, that the Ninth

2     Circuit instructions were used for this ──

3               THE COURT:  The what?

4               MR. FRANK:  ── we'd like a vicarious liability

5     instruction as it relates to Sony and Atlantic.

6               THE COURT:  No, I'm not going to get into that.  It

7     can be dealt with after trial.

8               MR. FRANK:  OK.

9               THE COURT:  Who's got the lowest page number?

10              MR. ZAKARIN:  Your Honor, we have nothing until

11    page 9.

12              THE COURT:  You got anything before page 9, Mr. Frank?

13              MR. FRANK:  We don't have anything else on the jury

14    instruction, your Honor.

15              THE COURT:  OK.  That gives you a clear field,

16    Mr. Zakarin, starting on page 9.

17              MR. ZAKARIN:  Starting on page 9, your Honor, line 21

18    ── and this will be something that we repeat ── it talks in

19    terms of the selection and arrangement as expressed, it says:

20    "Arrange the numerous elements in an original way," and I think

21    "original" is unclear.

22              THE COURT:  What language would you prefer?

23              MR. ZAKARIN:  I would prefer "new" or "novel," which

24    is consistent with the cases that we have seen.

25              THE COURT:  I agree, novel.
```

1          MR. ZAKARIN:  "Novel" is fine, your Honor.

2          THE COURT:  Excuse me?

3          (Discussion off the record)

4          THE COURT:  I think maybe I should hear you more fully

5     on that, Mr. Zakarin, because my lawyer tells me that the

6     Second Circuit prefers "original" as a legal term with which

7     they have —— which has meaning and with which they are

8     familiar.

9          MR. ZAKARIN:  I think they do, your Honor, in terms of

10    the copyrightability.  I don't think they do —— I don't know if

11    I'm not —— I don't think they do in terms of the selection and

12    arrangement because I think they look to whether what has been

13    selected and arranged is new or different or unique as opposed

14    to merely original.  Originality, we believe, goes to

15    copyrightability, and this goes to infringement, at least as

16    we've looked at the law.

17         And let me see also —— this is —— and the cases that

18    we have cited to your Honor in terms of —— there's New York

19    cases which talk about the new combination that is the novel

20    arrangement.  That's picking up from *Skidmore*, but it's also

21    picked up in the Western District of New York in ——

22         THE COURT:  Oh, I've made a considered decision not to

23    go into the New York law on this point.  In a diversity case,

24    of course, we do, and as a status which in our own federal

25    vocabulary does not.  The learning and the rulings I'm

N53HGri1

1    concerned with are going to be purely federal.  That doesn't

2    define the universe very narrowly.  And this is not a brief.

3    It's a communication to the jury that we want to have as clear

4    as possible.

5             Why is either "original" or "novel" preferable?

6             MR. ZAKARIN:  The reason why, your Honor, is because I

7    think "original" has not been explained to them in the context

8    of this case.  "New" and "novel" has been described, and "new"

9    and "novel" is what is used for selection arrangements because

10   it's combining the elements in a way that's not been done

11   before.  Originality, which is a different bar for

12   copyrightability, is a different and a lower bar, which is not

13   the same for whether a selection and arrangement infringes.

14            So we view new — either new or novel as being the

15   appropriate standard, which we think is consistent with the

16   cases in this circuit as well as in the Ninth Circuit.

17            THE COURT:  My lawyer tells me — and this may be a

18   consideration of some utility — that novel is a higher

19   standard than original, and it has not been used in the Second

20   Circuit.  For purposes of caution with the jury, if "novel" has

21   a connotation of higher than "original," then I don't want to

22   use it.  I want the bar to be, while existent, lower rather

23   than higher.

24            MR. ZAKARIN:  Then, your Honor —

25            THE COURT:  I think I'll stick with "original," then.

1          MR. ZAKARIN:  Your Honor, if I can say, if we're not

2     going to do "new" or "novel," I understand the idea of

3     "original," but instead what if it were "not been done before"?

4     Because we think that is truly the test, that it doesn't

5     preexist.

6          THE COURT:  You want to say "new"?

7          MR. ZAKARIN:  "New," I could live with "new" or "not

8     been done before."  The reason —— I don't want to interrupt

9     your clerk.

10          The reason that I think this is of some importance,

11     originality is the bar, and a low bar, for copyrighting

12     something.  But selection arrangement —— and the courts in this

13     district and this circuit have made clear that when you're

14     dealing with a selection and arrangement, to avoid restricting

15     the use of commonplace elements, it has to be something that is

16     new.  It's something that's not been done before.  Originality

17     goes to copyrightability, and new, novel, not been done before

18     goes to restricting the selection and arrangement, providing

19     for thin copyright protection, not the same copyright

20     protection that would be available for a "original" work.

21          THE COURT:  You've got your points on the record,

22     Mr. Zakarin.  I think I'm going to stay with "original," even

23     if it hampers you in arguing the appeal.

24          MR. ZAKARIN:  I'm hoping, regardless, that I'm not

25     going to be on the side of arguing the appeal, except maybe on

N53HGri1

```
 1    the adverse side.

 2              Since your Honor is staying with "original," that

 3    addresses and resolves line 4 on page 10.  My next comment is

 4    on line 18, on page 10, your Honor.

 5              THE COURT:  Line?

 6              MR. ZAKARIN:  18.

 7              THE COURT:  18?

 8              MR. ZAKARIN:  Yes.

 9              THE COURT:  And you'd like to have that read?

10              MR. ZAKARIN:  Well, what you're — what it says is

11    that that "Thinking Out Loud" is substantially similar to those

12    protected elements and only those protected elements, and I

13    think what you're referring to there, since it is the

14    quote/unquote melodies or pitch sequences, and I would want

15    after "protected elements" on line 18, "which are not the chord

16    progression or anticipation."

17              THE COURT:  Would you like to take out the language,

18    "and only those protected elements"?

19              MR. ZAKARIN:  No, because I think only those protected

20    elements is what you're driving at.

21              THE COURT:  Aha.

22              MR. ZAKARIN:  But I'm suggesting that the chord

23    progression and anticipation, consistent with your own rulings,

24    are not protected.  Those are not protected elements.  You're

25    not dealing with the selection and arrangement with this part
```

 1    of the instruction.

 2              THE COURT:  How would you like it to read?

 3              MR. ZAKARIN:  After the word "elements" in line 18,

 4    where it says "only those protected elements," I would put in

 5    "which are not the chord progression and anticipation."

 6              THE COURT:  I don't think — I think it's just a

 7    complication at this point.  They're dealt with separately.

 8              MR. ZAKARIN:  I just wouldn't want the jury to be

 9    confused about the chord progression and anticipation being

10    among the protected elements, as they're not.

11              THE COURT:  It might be an improvement, but I think

12    I'll live without it.

13              MR. ZAKARIN:  In line 24 --

14              THE COURT:  Yes.

15              MR. ZAKARIN:  — you have substantial means the amount

16    that's been copied is more than *de minimis*, minimal.  I don't

17    know where that is — I don't know if that's in a definition of

18    substantial similarity that I've seen.  I think saying that —

19              THE COURT:  It comes out of some case.  How would you

20    like to have it read?

21              MR. ZAKARIN:  I would — substantial means the amount

22    that was copied is significant or is significant in amount or

23    is qualitatively and quantitatively significant.

24              THE COURT:  The case that I just finished reading, I

25    guess yesterday, used the words "*de minimis*" and "minimal."  I

N53HGri1

1    think I'll stick with that.  I was shocked a little bit at how

2    low it was.

3            MR. ZAKARIN:  I think, your Honor, that is dealing

4    with fragmented literal similarity, and I think that's not the

5    normal standard for copyright infringement that substantial

6    similarity is simply *de minimis*.  I think the standard that we

7    have seen, at least that I've seen ⸺ I don't have the cases in

8    front ⸺

9            THE COURT:  I'll take out *"de minimis"* on the ground

10   that Latin is probably no longer taught in the common schools,

11   but I'll leave it as "minimal," which catches the thought.

12           MS. FARKAS:  Your Honor, if I could just make ⸺ my

13   concern is that the suggestion in what you're telling the jury

14   there is that substantial is anything more than minimal, and

15   substantial is something that is significant and something

16   meaningful.  So we're leaving no roadway between something that

17   is minimal and substantial.  There's a lot in between there.

18           MR. ZAKARIN:  I mean, we think ⸺ we do think, your

19   Honor, that ⸺

20           THE COURT:  I'll leave it as it is, "minimal," no *"de*

21   *minimis."*

22           MR. ZAKARIN:  Turning to page 11, your Honor ⸺

23           THE COURT:  Line?

24           MR. ZAKARIN:  Line 3, at the end of line 3 where

25   you're talking now about the combination ⸺

N53HGri1

1          THE COURT:  Very close copying.

2          MR. ZAKARIN:  Very close copying.  And we think that

3  ── I understand where that's coming from, but I believe that

4  the cases, *Odegard*, for instance, which is a Southern District

5  case, showing that the defendant used the same selection and

6  arrangement, it is the identity ── or identical or virtual

7  identical standard.  Very close copying is not quite the ── not

8  quite the same selection and arrangement or the identical ──

9          THE COURT:  What would you like to say?

10          MR. ZAKARIN:  We would like, your Honor, a showing

11  that they ── requires a showing of identity or virtual identity

12  between the selection ── between the combination or that they

13  are the same.

14          THE COURT:  The trouble is that "very close" was the

15  language the Second Circuit used.  The thought is not so very,

16  very different, but it is what the circuit said.  I think we're

17  stuck with it.

18          Moving right along.

19          MR. ZAKARIN:  Yes, I'm trying to, your Honor.  Again,

20  we've gone through the protected elements point already.  I

21  just don't want ── this is on line 12.  Just my concern only is

22  I think you're referring to ──

23          THE COURT:  What line?

24          MR. ZAKARIN:  Line 12, your Honor.  I think here, I

25  just want to make sure that the jury would not be confused by

N53HGri1

1   the difference between the selection and arrangement versus the

2   protected elements.

3            THE COURT:  Mr. Zakarin.

4            MR. ZAKARIN:  Yes, your Honor.

5            THE COURT:  If the jury is not confused by this, they

6   haven't read it.

7            MR. ZAKARIN:  That may well be true.  But my concern

8   is that we get a verdict that's consistent with the evidence.

9            Again, the only thing that I would do with that is,

10  again —— and your Honor has sort of indicated not in the prior

11  situation —— is that the protected elements do not include the

12  chord progression and anticipation.  And we had just been

13  talking about substantial similarity, the selection and

14  arrangement ——

15           THE COURT:  Well, those elements keep coming in and

16  going out.

17           MR. ZAKARIN:  I've noticed that myself, your Honor.

18           THE COURT:  Thank you.

19           Anything further?

20           MR. ZAKARIN:  On the jury instructions themselves,

21  your Honor, no.

22           THE COURT:  Thank you.

23           Are you talking about the verdict form?

24           MR. ZAKARIN:  On the jury —— I was just speaking to

25  the jury instructions.  I thought Mr. Frank might want to

N53HGri1

1    address the special verdict form first, if he has any comments.

2    If not, I will.

3              MR. FRANK:  Now that you've clarified the issue with

4    the vicarious issue, we don't have anything on the verdict

5    form.

6              THE COURT:  OK.  Let's resume at 2:15.

7              MR. FRANK:  I think they may have.

8              MR. ZAKARIN:  We do have some comments on the special

9    verdict form, your Honor.

10             THE COURT:  Well, that's what I asked you.

11             MR. ZAKARIN:  I just wanted to see if Mr. Frank had

12   any comments on that first because I just ——

13             THE COURT:  Look, it's 1:20, Mr. --

14             MR. ZAKARIN:  I'll be as quick as I can, your Honor.

15             Instruction No. 3, our concern is that we don't think

16   there's any evidence that they put in comparing melodies, and

17   it seems to start in Instruction 3 and Question 3 that Melody

18   A, B, and C are original.  It would have —— we would think

19   original, presumably, would be to LGO, and we think that a

20   question should first be have they proved that there exists any

21   melodies?  And I would put in, I guess, ahead of that that the

22   alleged Melody A, B, and C.

23             THE COURT:  Oh, is that the only improvement?

24             MR. ZAKARIN:  On that particular question.

25             THE COURT:  Yes —— no, on the —— please.

N53HGri1

1          MR. ZAKARIN:  No, your Honor.  Again, if you're going

2     to do it, you also have in Question 6 *de minimis* again.  Your

3     Honor ——

4          THE COURT:  I'm sorry.

5          MR. ZAKARIN:  In addition to *de minimis*," where you

6     talk about protected elements, I assume that you're talking

7     about the melodies there in Question 6.  Instead of protected

8     elements, I think you're referring to melodies.

9          THE COURT:  Yes.  You want "minimal" instead?

10          MR. ZAKARIN:  I guess, if that's going to be

11     consistent with your instructions.

12          THE COURT:  Consistency, yes.  OK.

13          MR. ZAKARIN:  Your Honor, you're dealing with minimal,

14     and under where it says "protected elements," we think it

15     should say "melodies" as opposed to "protected elements" so

16     it's specific.

17          THE COURT:  Look, we've got too much to do to indulge

18     in quibbles.

19          MR. ZAKARIN:  OK, your Honor.  I'm just trying to be

20     as clear as I can.  I'm not ——

21          THE COURT:  Thank you.

22          MR. ZAKARIN:  It's ——

23          THE COURT:  See you all at 2:15 —— did you have any,

24     Mr. Frank?

25          MR. FRANK:  No, your Honor.

N53HGri1

| | |
|---|---|
| 1 | MS. FARKAS:  Your Honor, just one more thing.  This is |
| 2 | not really substantive.  I think, unless ⸺ I've read it three |
| 3 | times, maybe it's me.  But Instruction No. 5 seems to suggest |
| 4 | that you skip it no matter what, and I don't know that that was |
| 5 | the intent. |
| 6 | THE COURT:  No, it has ⸺ that's sort of a shocking |
| 7 | effect at first, but then you realize it doesn't really mean |
| 8 | that.  I share your reaction, but it does ⸺ it's OK the way it |
| 9 | stands.  Thank you. |
| 10 | MR. ZAKARIN:  The only other thing, your Honor, is at |
| 11 | the end of Question 7, I think the word "Loud" was left out. |
| 12 | THE COURT:  I think it was.  Thank you. |
| 13 | MR. FRANK:  Thank you, your Honor. |
| 14 | THE COURT:  A winning point. |
| 15 | MR. ZAKARIN:  I'm glad that I got one at least. |
| 16 | THE COURT:  Good. |
| 17 | (Lunch recess) |

AFTERNOON SESSION

2:26 p.m.

1

2

3          (In open court; jury present)

4          MS. FARKAS:  Your Honor, may I proceed.

5          THE COURT:  Yes, please.

6          MS. FARKAS:  Good afternoon.

7          I stood here before you last Tuesday and I told you

8   what we would prove and I told you what the plaintiffs would

9   not be able to prove.  We said we would prove three critical

10  things that entitle Ed Sheeran, Atlantic Records, and Sony

11  Music Publishing to a verdict rejecting the claim of

12  infringement in this case.

13          First, we told you that the evidence would show that

14  Ed Sheeran and Amy Wadge independently created "Thinking Out

15  Loud."  And the evidence we presented to you, through the

16  testimony of the only two people who were there when "Thinking

17  Out Loud" was created ―― Ed Sheeran and Amy Wadge ―― is

18  completely unrebutted by the plaintiffs.

19          That means there is not a single shred of evidence

20  that is contrary to the testimony of Ed Sheeran and Amy Wadge,

21  who are both dedicated and successful songwriters.  They

22  independently created "Thinking Out Loud."  And they told you

23  exactly how it came to be that they wrote "Thinking Out Loud."

24  They told you the inspiration for the song; they told you how

25  the chord progression came about and how the anticipation came

1    about; and they told you how the melodies in the song came

2    about.  And by the way, you heard with your own ears, when

3    Dr. Ferrara played the actual melodies of the two songs ——

4    contrary to the purposefully misleading testimony of

5    Dr. Stewart about pitch sequences —— just how different the

6    melodies of these two songs are.

7            I will go through Dr. Stewart's testimony in some

8    detail in a little while, and I will compare that testimony to

9    both the testimony of Ed Sheeran and Dr. Ferrara.  I think you

10   all know, as Dr. Ferrara demonstrated, Dr. Stewart was not here

11   to tell you the truth; he was not here to present you with

12   honest musicological information; he was here to mislead you.

13           And so the undisputed evidence presented to you shows

14   that nothing in "Thinking Out Loud" came from or was influenced

15   by or derived from "Let's Get It On."  Ed Sheeran and Amy Wadge

16   wrote "Thinking Out Loud" on their own, just as they have

17   written many, many songs before that.  "Thinking Out Loud" was

18   their original creation.

19           And this proof of independent creation is also

20   supported by the evidence of just how common this chord

21   progression and anticipation technique is, how both Ed and Amy

22   have used them before, and how one of Ed's greatest influences,

23   Van Morrison, utilized the same and similar elements in at

24   least seven songs.

25           The unrebutted evidence of independent creation

1  standing alone is enough to support a verdict rejecting the

2  claim of infringement in this case, and that is without even

3  considering all of the evidence we provided to you, which I

4  will discuss in detail in a few minutes, which shows that not

5  only are these two songs very different, lyrically and

6  melodically, but even their chord progressions and the

7  anticipation used in countless songs, before "Let's Get It On"

8  and after "Let's Get It On," are different. In fact, as you

9  heard from Dr. Ferrara, the evidence in this case so clearly,

10  unequivocally, and overwhelmingly is contrary to the

11  plaintiff's claim that it should have never been brought. And

12  I'll discuss this evidence with you now.

13          The second thing I told you that we would prove is

14  that the only thing in these two songs that are at all similar

15  are basic musical building blocks that have been used time and

16  time again in so many songs —— songs that were written before

17  "Let's Get It On" and songs that continued to be written after

18  "Let's Get It On." The evidence here shows that these songs

19  are entirely different. We have different lyrics, we have

20  different melodies, we have different structures. They're

21  completely different songs. Dr. Ferrara was unequivocal about

22  those differences, and he demonstrated them for you. Ed

23  Townsend did not create any of these basic musical building

24  blocks, but he was absolutely free to use them; and Ed Sheeran

25  and Amy Wadge too did not create these musical building blocks

1    on their own, but they too were absolutely free to use them.

2    No one owns them.

3          And what are these musical building blocks?  A

4    frequently used chord progression and the rhythm of that chord

5    progression, which is known as anticipation.  We said we would

6    show you that these are two frequently used musical elements

7    that even the plaintiffs agree were not created by or capable

8    of being exclusively owned by Ed Townsend, but instead are

9    exceedingly common, basic musical building blocks, that no one

10   can own —— not plaintiffs, not Ed Sheeran, not anyone.  In

11   fact, the judge has already ruled that both of these elements

12   are free for all to use.

13          And the third thing we said we would prove to you was

14   that not only are the chord progressions and anticipation

15   commonplace and unprotectable individually but that "Let's Get

16   It On" was not the first to combine these elements.  These two

17   elements were used in at least eight songs created before

18   "Let's Get It On" and after "Let's Get It On," and Dr. Stewart

19   did not dispute a single one of them.

20          Ed Townsend was not the first songwriter to use the

21   chord progression he used in "Let's Get It On;" Ed Townsend was

22   not the first songwriter to use the specific anticipation he

23   used in "Let's Get It On;" and Ed Townsend was also not the

24   first songwriter to combine these two elements in exactly the

25   same way he did in "Let's Get It On."  This combination was not

1   original to "Let's Get It On."

2          Now did the plaintiffs provide you with any evidence

3   to the contrary?  No.  In fact, consistent with the judge's

4   rulings in this case, they admitted that the chord progression

5   was commonplace and preexisted "Let's Get It On" and admitted

6   that the anticipation was commonplace and preexisted "Let's Get

7   It On."  And they admitted that there were eight songs prior to

8   "Let's Get It On" that combined both the same chord progression

9   and the same anticipation that Ed Townsend used in "Let's Get

10  It On."  Some of these were by Mr. Sheeran's favorite — one of

11  his favorite artists, Van Morrison.

12         So what do the plaintiffs do to try and justify having

13  brought this case?  First, they point to what they have labeled

14  a confession, a smoking gun.  And what is this smoking gun?

15  It's a video of Ed Sheeran mashing up a few seconds of the

16  lyrics to "Let's Get It On" played over the chords of "Thinking

17  Out Loud."  You heard Ed Sheeran's testimony on this one

18  performance.  You heard him say that he had read somewhere that

19  these two songs shared a similar chord progression and so he

20  did a mashup one night.  That's plaintiff's confession?  Their

21  smoking gun?  You heard Ed testify that he's performed

22  countless mashups live, mashups of "Thinking Out Loud" with

23  other songs, like "Crazy Love" and "I Will Always Love You,"

24  mashups of his other songs with songs of Stevie Wonder,

25  Blackstreet, Nina Simone, and others.  If mashup or medley or

1    —— if you choose to accept Dr. Stewart's terminology ——

2    interpolation of two or more songs played over the same chords

3    were a confession, then every performer who mashes up songs is

4    confessing to something they never did.  The Axis of Awesome,

5    whose video you saw when they played about 50 songs over the

6    same chord progression, would be facing about 50 separate

7    lawsuits for infringing 50 different songs, and Ed Sheeran

8    would have confessed to infringing every song you saw him mash

9    up.  And I think he said it best —— if he had taken "Let's Get

10   It On" in creating "Thinking Out Loud," he would have had to

11   have been a fool to stand up in front of 20,000 people and mash

12   up the two songs.

13           Simply put, plaintiff's smoking gun was shooting

14   blanks.  Their confession assertion is plain nonsense, nothing

15   more and nothing less.

16           What else did plaintiffs offer to you as a

17   justification for bringing this claim?  As I will explain to

18   you shortly, they had their expert, Dr. Stewart, who pretended

19   there are supposed melodic similarities in the two songs.

20   First of all, as you heard from Dr. Ferrara, and as he

21   documented in his testimony, what Dr. Stewart told you are

22   similar melodies are not melodies at all, they are pitch

23   sequences, which are not copyrightable to begin with.

24   Dr. Stewart even admitted that pitch sequences are not melody,

25   they're just sounds devoid of duration and metric placement,

1    and thus there's no actual evidence of any similarity in the

2    melodies of these two songs because Dr. Stewart, having only

3    analyzed pitches, provided no such evidence and plaintiffs

4    provided no other witness other than Ms. Griffin, who had no

5    information at all to provide you that bears on this case.

6    Pitches are not melody.  There's no dispute about that.

7           And the uncontradicted evidence in the record is that

8    these pitch sequences are different, even after Dr. Stewart

9    purposefully manipulated them, which I will discuss in more

10   detail in a few minutes.  And Dr. Ferrara showed you exactly

11   how Dr. Stewart altered the actual notes in "Thinking Out Loud"

12   to make it appear that more pitches lined up than actually line

13   up.  But they were still completely different; and again, they

14   were pitches, not melody.

15          Again, plaintiff provided you with no evidence ——

16   nothing —— that compared the melodies of these two songs.

17   Dr. Ferrara played for you the actual melodies as they appear

18   in each song.  Ed Sheeran played for you his song, not as

19   manipulated and altered by Dr. Stewart but his actual song as

20   recorded and as he has performed it countless times.  And you

21   could hear with your own ears how these melodies sound when

22   played.  They're not remotely similar.

23          I'm now going to walk you through the evidence in this

24   case piece by piece.  And as I said, we proved to you what I

25   said in my opening we would prove.  The evidence in this case

1    leads to only one possible conclusion —— Ed Sheeran and Amy

2    Wadge independently created "Thinking Out Loud," and they did

3    not copy in any way "Let's Get It On."  The songs are very

4    different songs, and the only thing they share is a commonplace

5    and frequently used chord progression and anticipation that

6    were not created by Ed Townsend, not original to "Let's Get It

7    On," and which are freely available to be used by all

8    songwriters.

9         So first, let's talk more about the undisputed

10    evidence showing that "Thinking Out Loud" was independently

11    created.

12         You heard from Ed Sheeran, you heard from Amy Wadge ——

13    the only two people who were there when "Thinking Out Loud" was

14    created.  And I told you that the only evidence on independent

15    creation would come from them and that it would be unrebutted.

16    And I believe I kept my word.  And as you will recall, just as

17    I told you in my opening, the plaintiff, Ms. Griffin, admitted

18    that she had no knowledge as to how Ed Sheeran and Amy Wadge

19    came to write "Thinking Out Loud."  She wasn't there.  She

20    didn't know their musical influences.  She had no evidence at

21    all that "Let's Get It On" had anything to do with the creation

22    of "Thinking Out Loud."  In fact, she only told you what she

23    believed or wanted to believe, not what she knows.  The only

24    evidence at all, again, as I said in my opening, is what would

25    be provided to you by Ed Sheeran and Amy Wadge.  And

1    importantly, Ms. Griffin also admitted that she was not there

2    when Ed Townsend wrote "Let's Get It On."  She had no idea what

3    his musical influences were.  And so just as I told you in my

4    opening, plaintiffs did not provide you with any evidence about

5    the creation of "Let's Get It On" or "Thinking Out Loud."

6         Ed Sheeran and Amy Wadge both testified about how Amy

7    came to Ed's house for a visit, how they stayed up late the

8    night before "Thinking Out Loud" was created and talked about

9    Amy's mother-in-law, who was dying, and soon after passed away;

10   and you heard how Ed's grandfather had recently passed away;

11   and you heard about how these friends talked about what it must

12   be like to spend your whole adult lives with a loved one, to be

13   in a loving relationship for that many years, and then what it

14   must feel like to go on without that person, how lost Ed's

15   grandmother was without Ed's grandfather.  And you heard from

16   both Ed and Amy that it was this conversation that inspired

17   "Thinking Out Loud."

18        The plaintiffs have tried to suggest that this

19   conversation only impacted the lyrics to "Thinking Out Loud"

20   and that they don't make a claim as to the lyrics.  They

21   suggest that lyrics should be creatively divorced from the

22   melodies that were created simultaneously that night and which

23   accompany them.  This is not how the creative process works and

24   certainly not how this song was created.  As Ed and Amy

25   explained to you, the songwriting process is collaborative.

1    All of the elements of the song were part of the same creative

2    process for "Thinking Out Loud."  The chords, the rhythm, the

3    melodies, the lyrics, they were all happening at once.

4              Going back to the creation, you heard from Ed and Amy

5    that the next day they were getting ready to go out for dinner

6    with Ed's parents, and while Ed went up to take a shower, Amy

7    did what comes naturally to her; she picked up Ed's guitar.

8    She started strumming some basic chords while humming or

9    singing some melody and some lyrics over the chords.  And the

10   evidence in this case establishes that the chords Amy was

11   playing have been used in countless songs before and after

12   "Let's Get It On."  And those were the same chords that were

13   used in "Thinking Out Loud."  And you heard that the exact same

14   chord progression that Amy played that evening, the chord that

15   is in "Thinking Out Loud," is in another song she released

16   before "Thinking Out Loud," a song called "Better Than Me."

17   Amy also testified that she was performing "Better Than Me" at

18   gigs around the same time that she and Ed wrote "Thinking Out

19   Loud."  And as I told you in my opening, Ed and Amy both

20   testified that after Ed got out of the shower, he heard Amy

21   strumming the guitar and mumbling some melody and lyrics over

22   the chords, and you heard from both of them how the song came

23   together that evening, both before dinner with Ed's parents and

24   after.  Ed and Amy both testified that, fueled by their

25   real-life experiences, they built off that theme, and by

1    midnight that night, they had written "Thinking Out Loud."

2              There's no dispute in this case that both Ed and Amy

3    were aware of "Let's Get It On."  They've never denied it.

4    That knowledge is known as access.  But all of the access in

5    the world is not copying.  Ed and Amy have had access to

6    thousands and thousands of songs, just like we all have.  Does

7    that mean they copied all of those songs?  Of course not.

8              And as you heard, while Ed and Amy were both certainly

9    aware of "Let's Get It On," it was not a song they knew well.

10   Ed and Amy testified clearly and unequivocally that "Let's Get

11   It On" never crossed their mind the day they wrote "Thinking

12   Out Loud."  They were writing a song about being with the love

13   of your life until you were old, until your legs don't work

14   like they used to before, until your hair falls out and your

15   memory fades.  They were not writing a song about getting it on

16   —— not musically, not lyrically.  The undisputed evidence you

17   have heard is that Ed and Amy wrote "Thinking Out Loud" the

18   same way they had written dozens of songs before that one ——

19   collaboratively and within a few hours.

20             And this undisputed evidence of independent creation

21   is entirely consistent with the other evidence in this case ——

22   the ubiquity of the commonplace chord progression; the fact

23   that Amy had used this chord progression with anticipation in a

24   song that she was performing around the same time; that Ed had

25   used anticipation in 20 songs before "Thinking Out Loud"; then

1    of them having the exact same anticipation; that Van Morrison,

2    one of Ed's significant musical influences, had several songs,

3    including some before "Let's Get It On" was created, "Crazy

4    Love" and "Tupelo Honey," that used anticipation and a similar

5    chord progression.  And given the commonplace nature of the

6    elements that we're talking about here, elements used in no

7    less than 33 songs before "Let's Get It On" and in another 47

8    songs after "Let's Get It On," including several Van Morrison

9    songs written before and after "Let's Get It On," it's not

10   particularly surprising that Ed and Amy incorporated an

11   exceedingly common chord progression and an exceedingly common

12   rhythmic pattern, things that both Ed and Amy had used in prior

13   songs of theirs, in "Thinking Out Loud."  These chords and the

14   rhythmic pattern of anticipation were basic to the tool kit of

15   all songwriters, including Ed and Amy.

16         You heard about Van Morrison being a musical influence

17   of Ed's.  "Thinking Out Loud" was in the acoustical and love

18   song style of a Van Morrison song, and like dozens and dozens

19   of other songs, it shared similar chord progressions.  And you

20   heard from Ed Sheeran that after they wrote and recorded

21   "Thinking Out Loud," Ed's label and others gave it the nickname

22   "The Van Song."  They called it "The Van Song" because it

23   seemed to be in the style of Van Morrison.  It was, as I said,

24   a song about love, and it used an acoustic guitar.  Was

25   "Thinking Out Loud" copied from any Van Morrison song?  No.

1    And no one, other than the plaintiffs here at trial, have ever

2    suggested it was, and that suggestion was just a distraction as

3    it has nothing whatsoever to do with any claim of the

4    plaintiffs.

5          Ed showed you how "Thinking Out Loud" evokes the style

6    of Van Morrison's songs but was not copied from any Van

7    Morrison song.  We played for you "Crazy Love."  "Crazy Love"

8    was created before "Let's Get It On."  And "Crazy Love," like

9    so many songs, has a similar chord progression —— three of the

10   four chords —— as "Thinking Out Loud."  It was released in

11   1970, three years before "Let's Get It On."  And of course a

12   chord progression that's in the toolkit of all songwriters is

13   also free for all songwriters to use.  And nowhere found in

14   "Let's Get It On."

15         Ed also showed you a few other Van Morrison songs,

16   including "Tupelo Honey," also released before "Thinking Out

17   Loud," "Have I Told You Lately," and "Why Must I Always

18   Explain?"  All of them were released before "Thinking Out

19   Loud."  Ed performed these songs for you.  He segued from

20   "Thinking Out Loud" to "Crazy Love" and back again.  He segued

21   back and forth from "Tupelo Honey" to "Thinking Out Loud" and

22   back again.  And it's easy to do because singing lyrics from

23   different songs over similar chord progressions is common for

24   performers to do in concert.  And as you heard from Ed Sheeran,

25   Van Morrison loved "Thinking Out Loud," and contrary to

1   plaintiff's attempt to distract you, Van Morrison did not for a

2   second, unlike the plaintiffs here, accuse Ed of taking from

3   him.  He understood, as these plaintiffs don't, that the chord

4   progression in his songs, just like the chord progressions in

5   many, many other songs, including "Let's Get It On," were not

6   created and are not owned by him or anyone but are musical

7   building blocks freely available to use by all songwriters.

8   They are the scaffolding on which music is built.

9           And if the use of commonplace chord progressions in a

10  song were evidence of copying, then Ed Townsend copied from

11  many earlier songwriters who used the same chords and the same

12  anticipation in their songs.  He could have been accused of

13  copying "Earth Angel" and "Tears On My Pillow" when he wrote

14  "For Your Love."  But if Ed Townsend copied from these earlier

15  songs, he was free to do so, because no one owns these chords

16  and no one owns the anticipation, and no one made any claim

17  that Ed Townsend infringed any of these songs.  And the

18  plaintiffs are now not entitled, 50 years after "Let's Get It

19  On" was written, to withdraw these basic musical building

20  blocks from the toolkits of all songwriters and claim exclusive

21  ownership over something that preexisted "Let's Get It On,"

22  that Ed Townsend did not create, did not own, and which no

23  songwriter owns.  None of this was original to "Let's Get It

24  On."

25          "Let's Get It On" was not in the repertoire of Ed and

N531GRI2                    Summation – Ms. Farkas

1    Amy.  It was not in their minds when they wrote "Thinking Out

2    Loud."  It was not a song they knew well enough to copy if they

3    had wanted to copy it.  And they did not copy it — not

4    consciously, not unconsciously, and not at all.  In fact, both

5    Ed and Amy testified that at the time they wrote "Thinking Out

6    Loud," they did not even know what the chords of "Let's Get It

7    On" were; that if someone asked them to play these chords, they

8    wouldn't even know what they were or how to play them.

9          Plaintiffs have offered nothing more than

10   Ms. Griffin's belief that "Let's Get It On" was copied and

11   Dr. Stewart's purposeful distortion of pitch sequences to

12   create the illusion that there was some alleged similarities in

13   the melodies of both songs, but neither Dr. Stewart's

14   distortions nor plaintiff's unsupported speculation comes close

15   to overcoming the undisputed evidence of Amy and Ed's

16   independent creation of "Thinking Out Loud" based on their own

17   inspirations and their own personal musical toolkits.  This is

18   the undisputed evidence you heard about the creation of

19   "Thinking Out Loud."  Independent creation is not copying.

20          Let's break it down a bit more.  Let's look at what

21   plaintiffs claim was supposedly copied from "Let's Get It On."

22          What is the undisputed evidence about the chord

23   progressions?  First of all, they're different in the two

24   songs.  They are commonly used building blocks in music, like

25   the ABCs, the scaffolding of music, and the judge has already

1  ruled that the "Let's Get It On" chord progression is

2  commonplace and unprotectable.  And so is the anticipation.

3  We'll get to that after.

4       You've heard a lot about these two different chord

5  progressions at issue.  The two chord progressions at issue are

6  different.  Plaintiff's expert Dr. Stewart knows they are

7  different and admits they are different.  And even if they were

8  the same — and they're not — Ed Townsend did not create this

9  chord progression.  He does not own it.  No one owns it.

10      So what did Dr. Stewart do to try to mislead you about

11 the chord progressions?  Dr. Stewart testified under oath that

12 in the first 24 seconds of "Thinking Out Loud" the chord

13 progression is the same as "Let's Get It On."  It is not.  Let

14 me be clear.  That sworn testimony was contrary to

15 Dr. Stewart's own prior report and his sworn declaration in

16 which he transcribed the first 24 seconds of "Thinking Out

17 Loud" using as its second chord the D/F sharp.  It is also

18 contrary to the testimony of Dr. Ferrara and Ed Sheeran, the

19 one person who knows what he played on guitar.  And you heard

20 from Mr. Sheeran, the person who was there with Amy when

21 "Thinking Out Loud" was created, and who recorded the song and

22 has performed it countless times, there's nothing different

23 about the first 24 seconds of "Thinking Out Loud."  It's simply

24 a fabrication by Dr. Stewart, contradicted by Dr. Stewart's own

25 pretrial transcriptions.

1          So it is clear and undisputable, Dr. Stewart was not

2    telling you the truth when he said that "Thinking Out Loud" has

3    a different chord progression in the first 24 seconds of the

4    song.  It was not the same as "Let's Get It On."  There is no

5    I-iii-IV-V chord progression in "Thinking Out Loud."  So why

6    did he make up this story?  Because without it, he would have

7    to admit that the LGO chord progression is nowhere to be found

8    in "Thinking Out Loud."  But even if Dr. Stewart were correct

9    — and he's not — it still would not matter because this chord

10   progression is so common, and it was not original to "Let's Get

11   It On."

12        I will talk about the many, many other

13   misrepresentations of Dr. Stewart when I discuss his supposed

14   pitch similarities masquerading as melodic similarities.

15        So now that we've gotten one of Dr. Stewart's more

16   offensive misrepresentations out of the way, the undisputed

17   evidence shows that the chord progressions in each song are

18   different, and common.  Indeed, the judge has already ruled

19   that these chord progressions are commonplace and

20   unprotectable.  And as Dr. Ferrara showed you, they are exactly

21   that — commonplace, unprotectable, and they were used in

22   dozens of songs before "Let's Get It On."

23        In fact, as Dr. Ferrara documented for you, it is

24   undisputable that the I-iii-IV-V chord progression in "Let's

25   Get It On" is so basic that it has been used by songwriters in

1    no less than 33 songs before "Let's Get It On" used this chord

2    progression.  So no one —— not Ed Townsend, not Ms. Griffin,

3    not Ed Sheeran, not anyone —— can own it.  Instead, this

4    I-iii-IV-V chord progression is free for everyone to use.

5            You heard from Dr. Lawrence Ferrara, a highly

6    respected, full professor of music for over 30 years at New

7    York University, and an expert in this field.  And I think you

8    saw for yourself the difference between Dr. Stewart and

9    Dr. Ferrara.  Dr. Ferrara was here to inform you, to help you

10   understand the musicological evidence.  He was not here to

11   mislead you, confuse you, or distort the musicological

12   evidence.  Dr. Ferrara testified at length regarding the

13   claimed musical similarities between the songs, and he told

14   you, clearly and without hesitation, that these songs are

15   completely different, and there was no evidence to support a

16   claim of copying.

17           Dr. Ferrara showed you that Ed Townsend was hardly the

18   first person to use this chord progression.  Indeed,

19   Dr. Ferrara testified that he found over 100 songs that contain

20   the chord progressions at issue in this case.  Over 100.  And

21   again, no less than 33 before "Let's Get It On."  This chord

22   progression was not original to "Let's Get It On."

23           You saw the list.  Everyone from Buddy Holly to The

24   Beach Boys to the Bee Gees to The Beatles to Elton John had

25   used this chord progression before Ed Townsend used it in

1   "Let's Get It On."  Ed Townsend did not need The Beatles'

2   permission or the Bee Gees' permission or The Beach Boys'

3   permission or Elton John's permission to use this chord

4   progression in "Let's Get It On."  It was freely available to

5   all of them and to him, just as it is freely available to Ed

6   Sheeran and Amy Wadge.

7            Did ABBA or Natalie Cole or Van Morrison or Green Day

8   or Jack Johnson have to get Ed Townsend's permission to write

9   any of their songs that appear on this list?  Of course not.

10  But if you're to accept plaintiff's claim, hereafter, everyone

11  would have to get the permission of Ms. Griffin to use a chord

12  progression that has been in common use for decades,

13  preexisting "Let's Get It On" —— in fact, not only the "Let's

14  Get It On" chord progression but the different "Thinking Out

15  Loud" chord progression too, chord progressions that Ed

16  Townsend didn't even create that preexisted "Let's Get It On"

17  and has been used in nearly 70 songs since "Let's Get It On"

18  was written —— without any claim ever having been made.  And no

19  claim should have been made either.  Again, it is undisputed

20  that the chord progression in "Thinking Out Loud" is different.

21  So how can these plaintiffs seize control of the "Thinking Out

22  Loud" chord progression on top of the "Let's Get It On" chord

23  progression?  They can't, and you should tell them they can't.

24  No one can or should own any chord progression.

25            As Dr. Ferrara showed you, the I-iii-IV-V chord

1    progression that Ed Townsend used in "Let's Get It On" is so

2    common that it is taught in basic, how to play guitar and piano

3    books.  We showed you that in one of these books, a piano

4    instruction book published in 1967, six years before Ed

5    Townsend wrote "Let's Get It On," that this chord progression

6    is one of the ten popular rock and roll chord progressions for

7    the piano.  What could be clearer evidence that Ed Townsend did

8    not create this chord progression?  It was not original to him.

9            Dr. Ferrara testified that chord progressions like

10   this one are a part of the songwriter toolkit.  They are

11   fundamental, basic musical building blocks, like the ABCs of

12   music.

13           Now let's talk about anticipation.  Plaintiffs have

14   also claimed that there is a similarity relating to the

15   harmonic rhythm, the anticipation, or syncopation that is used

16   with this exceedingly common chord progression.  As you heard,

17   both Dr. Ferrara and Dr. Stewart agree that anticipation has

18   been used in music for hundreds of years.  Ed Townsend did not

19   create anticipation.  And consistent with this undisputed fact,

20   the Court has ruled that anticipation is commonplace and

21   unprotectable.  The plaintiffs do not own anticipation and

22   cannot demand that no one but them can use it.

23           The undisputed evidence shows that Ed Sheeran himself

24   used this commonplace rhythmic device in 20 of his own songs

25   before writing "Thinking Out Loud," and that he has used

anticipation of the second and fourth chords the same exact way

as in "Thinking Out Loud" in 10 of them.  These are all before

"Thinking Out Loud."  This is not something he took from "Let's

Get It On."  It is part of Ed Sheeran's toolkit in writing

songs, and it should remain in the toolkit of songwriters for

the future.

          Dr. Stewart again tried to mislead you,

misrepresenting that —— Dr. Ferrara's analysis of the harmonic

rhythm.  He claimed that Dr. Ferrara identified six chords

instead of four.  Dr. Ferrara debunked that in his testimony,

showing exactly how Dr. Stewart was misrepresenting his

analysis.

          Dr. Stewart also invented another fiction by claiming

that if you double the tempo, it removes the differences.

Dr. Ferrara explained to you what Dr. Stewart suggested not

only defies musicological analysis but if you accept the notion

that changing the harmonic rhythm somehow makes them the same,

which is of course nonsense, it's actually an admission that

they're different.  And they are different.  Dr. Ferrara showed

you that the harmonic rhythm, the anticipation used in

"Thinking Out Loud," is different than the harmonic rhythm used

in "Let's Get It On" in several ways.  And Dr. Ferrara also

showed you there are many songs written before "Let's Get It

On" that use the exact same anticipation of the second and

fourth chords.  And importantly, some of those songs also have

1   the exact same chord progression as "Let's Get It On."  And as

2   you heard from both Amy Wadge and Dr. Ferrara, the undisputed

3   evidence shows that Amy Wadge had co-written a song before

4   "Thinking Out Loud" that used the very same chord progression

5   used in "Thinking Out Loud," and anticipation in a similar

6   manner to "Thinking Out Loud" —— "Better Than Me".

7          In short, contrary to the —— to Dr. Stewart's

8   misguided attempt to pretend that the anticipation in the both

9   songs is the same, they are in fact different.  And perhaps

10  more importantly, anticipation is a centuries-old musical

11  building block, not created by Ed Townsend, not exclusively the

12  property of Ms. Griffin, and freely available to all

13  songwriters to use now and forever.

14         I want to briefly address a point made by plaintiffs

15  about Dr. Stewart's testimony that apparently 70 percent of

16  "Thinking Out Loud" is derived from "Let's Get It On."  He

17  provided no rationale for this number, and there is none.  The

18  lyrics of "Let's Get It On" are not at issue, and lyrics are

19  commonly accorded 50 percent of the value of any song.  The

20  melodies are completely different.  Entire sections of the song

21  are not even at issue.  That leaves the chord progression and

22  anticipation that Ed Townsend did not create and cannot own,

23  and random pitches that no one can own.  So instead of

24  Dr. Stewart's 70 percent, the actual percentage of relevant

25  similarities is actually 0 percent.

1          Second, Ms. Viker asked Amy Wadge if Mr. Sheeran paid

2     songwriters, perhaps in an attempt to mislead you.  The

3     question misrepresents how writers are compensated.

4     Collaborating songwriters don't pay a set fee or make some type

5     of payment to their co-writers.  Instead they typically share

6     songwriter credit on songs they create together, and how those

7     splits are determined are the result of a discussion among the

8     songwriters.  They then receive their piece of royalties based

9     on the earnings of the song, if anything, as they are

10    generated.  Songwriting is a risky profession.  As you have

11    heard, Ed and Amy have each written thousands of songs.

12    Precious few get recorded and released and generate money for

13    their songwriters, and fewer still are successful.  But

14    songwriters don't get paid any other way.  It's just — it's

15    just not how it works.

16         Dr. Stewart also testified about three supposed

17    melodic similarities between "Thinking Out Loud" and "Let's Get

18    It On."  And I told you in my opening that the plaintiffs would

19    not be able to prove that there were any melodic similarities

20    between the two songs because they were not remotely

21    melodically similar.  And in fact, just as Dr. Ferrara

22    explained to you, Dr. Stewart did not actually present any

23    evidence regarding the melodies of the two songs.  And the

24    reason he avoided it should be fairly obvious to you after

25    hearing Dr. Ferrara play them.  As your own ears have told you,

1    the actual melodies, not Dr. Stewart's pitches, are very, very

2    different.

3            Let's start with what's undisputed.  As Dr. Ferrara

4    showed you, Dr. Stewart's own slides defined melodies to

5    include the following:  "The Harvard and Oxford dictionaries of

6    music further explain that along with pitch, duration (rhythm)

7    is an essential element in the formation and recognition of

8    melod[ies]. . ."

9            Without rhythmic duration and metric placement, a

10   sequence of pitches is not melody.  A pitch is just a sound

11   devoid of duration, devoid of placement in music, and devoid of

12   relationship to any other note.  Pitches are not copyrightable,

13   and as I said, they're just sounds.  Pitches are not melody.

14   Dr. Stewart admitted that he did not analyze the rhythmic

15   duration of the notes in the two songs.  He admitted that he

16   did not analyze the metric placement of the notes in the two

17   songs.  He did not do so because he knew it would reveal the

18   very differences in the melodies of the songs that he was

19   intent on concealing.  So instead of melody, Dr. Stewart tried

20   to mislead you with charts showing only the supposed pitch

21   sequences as they appear in three sections of melody that he

22   claimed were similar in the two songs.

23           But even the pitch sequences identified by Dr. Stewart

24   are very different.  I'm sure you'll recall, Dr. Stewart tried

25   to suggest that pitches did not line up — that the pitches

that did not line up between the two songs could nevertheless

be counted as similar, so even pitches that appear in different

places in the two songs, Dr. Stewart still counted as being

matched in order to exaggerate the supposed small number of

similar or common pitches between the songs.

But that was not all he did.  He added notes that

don't exist in "Thinking Out Loud," and then, depending on when

it helped him match the pitches or hindered his matching, he

either ignored them or included them in his misrepresented

lineup of pitches to manufacture pitch similarities that simply

don't exist.  Dr. Ferrara's accurate transcriptions showed that

these notes don't exist; the published sheet music show that

these notes don't exist; and of course we have Mr. Sheeran's

testimony that they don't exist.  After all, he wrote the song,

with Amy, and he certainly has performed it many times.  He

would know.

Dr. Ferrara showed you that what Dr. Stewart was up

to.  Let's just — if you just take one example of Melody A, or

the opening melody, even if we accepted Dr. Stewart's pitch

charting as correct — and the evidence shows it is not — only

five of 14 pitches line up.  Five.  But even this is an

exaggeration, because three of the supposedly five similar

pitches, Dr. Stewart treats an F and an F sharp as the same

pitch.  They're not the same pitch.  These are blue notes that

are in "Let's Get It On," that give it that bluesy sound that

Dr. Ferrara talked about, and as Dr. Ferrara told you, there
are no blue notes in "Thinking Out Loud."I'm sure you can
figure out that an F and an F sharp are two different notes.
They're different pitches.  They sound different because they
are different.  So what did Dr. Stewart do to create an
illusion of similarity?  In addition to manufacturing grace
notes, he also changed the notes of "Thinking Out Loud" to put
in blue notes that nowhere exist in "Thinking Out Loud."

         And I'm sure you will recall, we walked through this
with Dr. Ferrara, and he showed you all of the notes in blue ——
two on each of the three lines of music that we were looking at
—— that Dr. Stewart invented and unilaterally decided to place
into "Thinking Out Loud."  He added six blue notes in one
segment of melody.  He changed six of the notes of melody in
"Thinking Out Loud" in order to create the appearance of
pitches matching up when no such notes exist in "Thinking Out
Loud."

         When you change the notes of the song, it's no longer
the same song; it's something else.  What Dr. Stewart did was
to change the melody of "Thinking Out Loud."  I don't think I
can improve upon Mr. Sheeran's reaction to what he did.  It was
not "Thinking Out Loud."  So when we remove these objectively
different pitches created by Dr. Stewart's invention of blue
notes, only two pitches line up.  And they're scattered.  This
is just one example of how Dr. Stewart altered "Thinking Out

Loud" to manufacture supposed similarities that in fact do not

exist.  He removed a lyric here, he tried to get you to

disregard pitches that he decided to put in a smaller font and

put in parentheses, claiming that they're inaudible.  You

remember the two pitches, two No. 2s in parentheses?

Dr. Stewart does not get to determine which notes count in the

deposit copy and which ones don't.  They all do.

What Dr. Stewart did is patently improper.  And

perhaps I can give you a plain-English example that will help

make clearer just how improper Dr. Stewart's attempt to count

up supposed common pitches to suggest supposed melodic

similarities that do not exist.

The words "rate" and "accelerate" both contain the

letters R-A-T-E; and "ire" and "conspire" both contain the

letters I-R-E; "bus" and "business" both contain the letters

B-U-S.  These words, as is perfectly obvious, are completely

different and have completely different meanings.  And I'm sure

you can think of many other examples.  And to make it simple, I

have used letters that make up words, but I could have just as

easily shown you a series of letters that don't even make up a

word, just like Jumble in the newspaper.  Letters of the

alphabet are not copyrightable.  They are basic building blocks

of words.  And individual words are also not protectable.  You

need to combine words into sentences to approach something that

might be copyrightable.  And that is the way it is with

1  pitches.  They're like letters in the alphabet.  Although they

2  require more than a coherent —— they require an ear-pleasing

3  order, they also require more than just letters do because they

4  require a specific rhythmic duration and metric placement in

5  order to create an ear-pleasing melody.  The point of this is

6  to show you how Dr. Stewart was trying to mislead you with

7  pitches.  Even though the words I mentioned have some of the

8  same letters, the words are totally different words.  So too

9  are the fragmentary pitches referenced by Dr. Stewart.  They're

10  not melody; they're just pitches.

11         The evidence shows that Dr. Stewart's three sets of

12  pitch sequences were not only completely different from each

13  other but they're not even melodies.  No one can own a series

14  of pitches, and certainly not a series of different pitches.

15  And once the actual melodies are analyzed, as Dr. Ferrara did

16  for you with precision and care, it is clear that there is

17  nothing remotely similar or meaningful about the melodic

18  segments placed at issue.

19         I now want to turn to what I would call the

20  plaintiff's "Hail Mary" attempt to manufacture a claim.

21  Because it's undisputed the chord progression is commonplace,

22  and it's undisputed that anticipation is commonplace.  And

23  there is no evidence of melodic similarities here, as I just

24  went through with you.  In fact, you were able to hear with

25  your own ears how different they are.  So the plaintiffs have

1    advanced a claim, what is called a selection and arrangement

2    claim.  And what is that?  It's a claim that says, okay, we

3    know that the musical elements I'm claiming are commonplace and

4    unprotectable, but I've combined them with what Dr. Stewart

5    falsely labels melodies in some new, novel, unique way that has

6    never been done before, and that combination can be protectable

7    even if each of the elements are not.  That's their claim.

8         Copyright law does not want commonplace elements to be

9    removed from the toolkits of all songwriters.  Copyright law

10   wants new works to be created based on musical building blocks

11   that are available to all of us.  So when someone claims that

12   they've created a new and novel, original selection and

13   arrangement of musical elements, the law creates a very high

14   bar for protection.  The combination has to consist of numerous

15   elements.  It has to be new, novel, original, and perhaps most

16   importantly here, the combination in both works has to be

17   identical or virtually identical.  It must be very, very close,

18   not just similar, and not substantially similar.  Again, a very

19   high bar to prevent commonplace and unprotectable elements from

20   being removed from usage by all writers.

21        So let's examine the evidence relating to plaintiff's

22   selection and arrangement claim.

23        As I said, the chord progressions in the two songs are

24   undeniably different.  Second, as Dr. Ferrara showed you ——

25   again, contrary to Dr. Stewart's assertions —— the anticipation

of the chord progressions in the two songs is also different.
And third, while the plaintiffs, until Dr. Stewart's testimony
to you last week, had claimed that their third element in their
selection and arrangement claim was the key signature of both
songs — which, by the way, is also different — during his
testimony, for the first time since plaintiff's lawsuit was
filed in 2017, Dr. Stewart and the plaintiffs made a wholesale
change to their election and arrangement claim, abandoned key
signature, and swapped in the supposed melodies as part of
their selection and arrangement claim.

So while we would suggest to you that these three
elements are not sufficiently numerous to support a selection
and arrangement claim, even if you believe the three was enough
and it's contrary to the dictionary definition of "numerous,"
plaintiffs still cannot support a selection and arrangement
claim for two more powerful reasons.  First, as Dr. Ferrara
showed you, the combination of the chord progression and
anticipation was used in multiple songs before "Let's Get It
On."  It was not new; it was not novel; it was not original to
"Let's Get It On."  Even Dr. Stewart was forced to admit that
there are two versions of "Georgy Girl" that have the same
combination of the elements at issue, and Dr. Stewart also
admitted that "You Lost the Sweetest Boy" has the same
combination.  And Dr. Stewart did not dispute or even address
the other six examples.

1              In fact, "You Lost the Sweetest Boy" also has some of
2      the same pitch sequences that Dr. Stewart put into issue, but
3      of course pitch sequences are not melody and are not
4      protectable.  And beyond these songs, Dr. Ferrara also
5      testified there are at least six songs that have the same
6      combination of the very chord progression and anticipation of
7      the second and fourth chords that plaintiffs claim in this
8      case.  None of this was disputed by Dr. Stewart.
9              Simply put, it is undisputed that "Let's Get It On" is
10     not the first or the second or the third or the fourth song to
11     use the chord progression and the anticipation that "Let's Get
12     It On" used.  The combination is not new or novel or original
13     to "Let's Get It On."
14             So now let's add in the supposed melody.  As you heard
15     from Dr. Ferrara, that simply seals the death of plaintiff's
16     selection and arrangement claim.  Why?  Because the melodies
17     are totally different.  By making the supposed melody as an
18     element of their claim, plaintiffs themselves defeat the very
19     claim that they make.  The combination of the commonplace chord
20     progression with anticipation, both of which are different in
21     each work, with completely different melodies, are not
22     identical, virtually identical, or certainly not very close.
23     On the contrary, they're very different.
24             This is a case that should have never been brought.
25     Ed Sheeran and Amy Wadge should never have been subjected to a

1    claim that their song, born out of their late-night discussion

2    of Ed's grandparents' long-term love and Amy's mother-in-law's

3    impending death, was infringing.  They independently created

4    their song.  I am persuaded that these plaintiffs, perhaps

5    impelled by Dr. Stewart's disingenuous and half-baked analysis,

6    convinced themselves of the existence of a completely

7    commonplace chord progression, which any songwriter would know

8    belongs to no one and to everyone, was enough to justify this

9    case.  They unjustly accused two dedicated and talented

10   songwriters.

11           You have the right and the opportunity, with your

12   decision in this case, to let it be known, not only to these

13   plaintiffs but to those who would pursue similar claims, that

14   no one can exclusively own commonly used chord progressions or

15   pitch sequences or harmonic rhythm.  These are basic musical

16   building blocks that all songwriters now and forever must be

17   free to use, or all of us who love music will be poorer for it.

18           Before I sit down, I want to take a moment to talk

19   about how important this decision is to songwriting in general.

20   You've heard testimony about musical influences.  All artists

21   are influenced by those who came before them, and that is one

22   significant way that artists are inspired to create new works

23   for all of us to enjoy.  If the plaintiffs prevail in this case

24   and are found to own a chord progression that Ed Townsend

25   admittedly did not create, performed in a way that is

1   undeniably common, even though he was not the first to combine

2   these two things, does that mean that every artist who wants to

3   write a song using a chord progression has to ask themselves,

4   wait, was there ever another song that used this chord

5   progression?  And how exactly do those songs play those chord

6   progressions?  What if I vary it a bit?  Will I still get sued?

7   Do I need to ask for permission?  Is there a three or a five

8   pitch in there somewhere?  Is that going to be a problem?  Does

9   every artist that goes into the studio or every songwriter that

10  sits down at the piano with a guitar to write or every child

11  that's in their bedroom trying to write a song, are they unable

12  to draw from the vocabulary of musicians?  Do we have to tell

13  the 11-year-old next Ed Sheeran that they better find out who

14  owns that chord progression?  Or maybe if you play it this way

15  and not that way, you'll be okay, fingers crossed?  We all

16  benefit from artists being free to create and build on what

17  came before them, to be inspired by the great artists that have

18  preceded them.  Buddy Holly influenced The Beatles, Bob Dylan,

19  and Eric Clapton; Stevie Wonder was influenced by Ray Charles

20  and Smokey Robinson; Little Richard influenced The Beatles,

21  Otis Redding, and Prince; Ed Townsend was inspired by The

22  Penguins and doowop groups like Little Anthony and the

23  Imperials, certainly when he created "For Your Love."  The list

24  can go on and on.  Influences provide inspiration ——

25  inspiration to build off the essential building blocks in every

1   songwriter's musical toolkit, to build off the styles and

2   contributions of these artists, and to bring all of us new

3   works of art into this world, with new spins, new perspectives,

4   new melodies, and new interpretations.  Without inspiration,

5   the music will stop.  If we start to dissect every song, to

6   hunt for similarities, and hand out ownership to things as

7   basic as chord progressions and the manner in which they are to

8   be performed, nothing will be left for songwriters to write.

9   Songwriters will not be inspired to create new music; rather,

10  creativity will be stifled for fear of being sued.

11          Here, it is as clear as day because every one here

12  agrees that the elements at issue are things no one can own.

13  No one can own a chord progression; no one can own the way it

14  is performed.  These are the letters of the alphabet of music,

15  the scaffolding upon which all songwriters are free to build.

16          We all want songwriters and all creators to keep

17  creating.  We need and benefit from what music brings to our

18  lives on a daily basis.  But a ruling for the plaintiff truly

19  puts songwriters in jeopardy.  If there is a finding that the

20  plaintiffs here can own this chord progression, even if this

21  chord progression with anticipation, you would be removing an

22  essential element in every single songwriter's toolkit.  Is

23  that really what we want to do to music?

24          Ed Sheeran and Amy Wadge are human beings.  They have

25  been dragged through this litigation and dragged through this

1    trial, all the while being accused of stealing.  Not only did

2    we show you that they independently created "Thinking Out

3    Loud," but we showed you that no one can own that which

4    plaintiff's entire claim is based on.  No one owns chord

5    progressions, no one owns anticipation.  These are entirely

6    different songs, different lyrics, different melodies,

7    different songs.

8              Plaintiff's counsel said in his opening, give credit

9    to where credit is due.  Give credit to Amy, and give credit to

10   Ed Sheeran.  Give them the credit that they are due for writing

11   a beautiful, emotional song that has resonated with so many

12   people.

13             I'd like to thank the jury for your time and your

14   consideration on this case.  I know firsthand that jury service

15   can be a significant burden and interfere with your jobs and

16   your lives.  So on behalf of Mr. Sheeran and all of the

17   defendants, we want to sincerely thank you for the time and the

18   sacrifice you have made.

19             THE COURT:  Thank you, Ms. Farkas.

20             Ms. Rice?

21             MS. RICE:  Ladies and gentlemen of the jury, may it

22   please the Court.  My name is Keisha Rice, and I am one of the

23   counsel for the plaintiffs in this matter.  And as Ms. Farkas

24   has said, we want to thank you for all the time, the

25   dedication, the patience that you've given to all of us for the

1    past however many days.

2              One of the interesting things that we encounter in

3    cases like this is how the evidence is presented, and certain

4    cases get the evidence presented in a particular way, and so

5    what I would like to do today is just kind of walk you through

6    how the evidence has been presented, how we've met our burden,

7    and you'll get to learn a little bit more about burden as you

8    go through the jury instructions.  All of the definitions that

9    you need will be present.

10             One of the things that I tend to —— or I think that

11   most people tend to do when they're talking about what you're

12   going to experience as the jury and what we're placing in your

13   hands is that the judge really is the only person to give legal

14   definitions.  And the reason that that happens is because, as

15   attorneys, we're going to naturally color how we feel that

16   particular law should be applied.  So you run into a little bit

17   of a problem if you give legal definitions that aren't

18   consistent with what's in the jury instructions.  So as you get

19   back there, please take a look, take your time, read the jury

20   instructions.  Everything that you need will be there.

21             Mr. Ed Sheeran is a performer, first and foremost, and

22   an entertainer, and it's okay to like him.  It really, really

23   is.  We are here advocating for positions for law so we are not

24   here to say whether or not someone is a good or bad person.

25   However, Mr. Sheeran is counting on you to be very, very

1    overwhelmed by his commercial success.  In fact, he spent over

2    an hour highlighting his accomplishments with his attorneys

3    during his testimony, and he clearly has an ability to connect

4    with people, to connect with audiences, and that connection

5    relies on you being willing to overlook certain facts in this

6    case.  The celebrity appreciation that he's relying on allows

7    you to determine that he is not accountable.  As long as the

8    defendants can rely on misrepresentation, misdirection, the

9    defendants can attempt to ensure that you will substitute your

10   good common sense for fan admiration.

11          I'd like to illustrate to you just how much defendants

12   are relying on you to ignore your basic common sense.  At the

13   beginning of this case, the judge specifically told you that

14   this was a case about two pieces of music —— the "Let's Get It

15   On" deposit copy and the "Thinking Out Loud" sound recording.

16   The judge told you that.  Dr. Ferrara spent literally hours

17   diverting your attention from the similarities between the two

18   songs by spending nearly all of his time discussing the

19   difference in the "Thinking Out Loud" sheet music, not the

20   sound recording, as is at issue in this case.  So if their

21   expert gives a presentation that's based on the analysis of the

22   two pieces of music that the judge mentioned, feel free to give

23   it all the weight it deserves.  However, that hasn't happened

24   here.

25          Now it would seem appalling that a defendant would be

1    glaringly dishonest in representing information to you.

2    However, I would never go as far as to label their actions as

3    criminal.  I'd simply argue that the defendants are hoping

4    you'd be blinded by their celebrity.  You, and only you, are

5    going to decide whether one expert is more trustworthy than the

6    other.  However, we hope that you'll also take into account

7    whether that expert has based their testimony on the actual

8    pieces of music at issue in this case —— the "Let's Get It On"

9    deposit copy and the "Thinking Out Loud" sound recording.

10          While we're on the matter of witness credibility, the

11   plaintiffs feel very confident that you're going to take the

12   extraordinary use of language into consideration.  If a witness

13   declares that there isn't a remote possibility of a particular

14   similarity, we know that you're going to apply your everyday

15   common sense.  All of us know that if there was absolutely no

16   possibility of similarity of any kind, none of us would be

17   here.  The Court, the parties, the attorneys, and especially

18   the experts have all gone through great lengths for over seven

19   years to present this case to you, the jury, to determine

20   whether or not these two songs are similar, and, if so, how

21   much.  And you, the regular, ordinary person, gets to decide

22   whether or not they sound similar.

23          Now here's another reason why the plaintiffs are

24   confident that you will not be blinded by the defendant's

25   celebrity.  At the beginning of this case, you all promised

1    that you would follow the law as instructed by the judge.  As I

2    mentioned earlier, the judge is going to give you jury

3    instructions, and that's the basic framework that you're going

4    to use to reach your verdict.  And here are some of the

5    critical pieces of evidence that you're going to place within

6    that framework.

7            The plaintiffs have three elements that we have to

8    prove for our copyright claim —— ownership of "Let's Get It

9    On," access, and copying.  Your jury instructions will tell you

10   what kinds of evidence, what pieces of evidence that you should

11   look to in order to look at information that will be what's

12   called probative of copying, indicators of copying, indirect

13   evidence of copying.  The reason that that is is because, like

14   I said earlier, there are just certain ways in which these

15   cases are presented.  Rarely, if ever, are you going to have

16   one of the parties ever stand up and say, hi, I copied.  That's

17   just not how it works.  So the jury instructions will walk you

18   through what evidence you look at to determine what is

19   considered probative of copying.

20           Now first of all, the plaintiffs do have an ownership

21   in "Let's Get It On," to which the defendants have agreed.  For

22   example, Sony has been paying the plaintiffs for years because

23   of their ownership of "Let's Get It On."

24           Next, the defendants, Mr. Sheeran and Ms. Wadge, have

25   both agreed that they had access to "Let's Get It On," meaning

N531GRI2                         Summation - Ms. Rice

1    that they had both heard "Let's Get It On" before they wrote

2    "Thinking Out Loud."  So our task has been to prove to you that

3    it's more likely than not that the defendants copied and/or

4    benefited from the copying of "Let's Get It On."

5         So in order to prove that "Thinking Out Loud" copies

6    "Let's Get It On," we needed to show you that unprotected

7    elements, as we discussed, of "Let's Get It On" have been

8    combined in a unique, original, or unusual way that makes them

9    protectable.  The plaintiffs proved this with respect to three

10   distinct, unique melodies.  We can call them A, B, and C.

11   They're the verse, the chorus, and the interlude.  Through the

12   testimony of Dr. Stewart, we showed that these three unique

13   melodies in "Let's Get It On" were expressed in an original way

14   that not only makes them protectable but makes them protectable

15   against Mr. Sheeran as well.

16        In addition, the plaintiffs have argued that there are

17   sufficiently numerous —— and, again, what does "numerous" mean?

18   You'll get instructions that will answer all of your questions,

19   but for the purposes of our conversation today, think of your

20   grade school definition.  More than one.  We're looking at

21   whether or not the plaintiffs have provided sufficiently

22   numerous, original, two or more maybe, unprotected elements to

23   warrant protection as a selection and arrangement.  In fact,

24   the plaintiffs, we've identified three common elements.  We

25   discussed the melodies with you; we discussed the chords, which

1    we're sometimes calling the harmony; and we discussed the

2    harmonic rhythm.  That's some of the issues we talked about

3    with the syncopation.  We'll talk about that a little bit more.

4            So let's look at those common elements.

5            Dr. Stewart identified those three elements that show

6    evidence of copying.  He identified the selection and

7    arrangement of the elements of melodies, harmonies, and

8    harmonic rhythm.  So let's just go ahead and start with melody.

9            Dr. Stewart identified three virtually identical but

10   certainly original melodies —— the verse, again, the chorus,

11   and that interlude.

12           I'm going to show you just a few of the slides that we

13   talked about this week with Dr. Stewart.

14           Thank you.

15           Now in slide 49, Dr. Stewart identified the first part

16   of the verse called 1A.

17           Do we have the ability to play sound on that?

18           (Audio played)

19           MS. RICE:  Let's try that one more time.

20           (Audio played)

21           MS. RICE:  That's the original deposit copy that the

22   judge said was at issue in this case —— the deposit copy of

23   "Let's Get It On."

24           Next, Dr. Stewart identified the second part of the

25   verse, in slide 50.

1           (Audio played)

2           MS. FARKAS:  Your Honor, this slide was excluded by

3     your Honor and they're showing it to the jury anyway.

4           MS. RICE:  Your Honor, I don't have that one as

5     excluded.

6           THE COURT:  I'm told it was excluded.

7           MS. RICE:  Your Honor, I did not have it on my list as

8     excluded.  I'm happy to not refer to it at all.

9           THE COURT:  Well, I don't think you should be playing

10    something that was excluded.

11          MS. RICE:  I agree, your Honor.

12          THE COURT:  And the person responsible for applying

13    whether it was excluded or not is you ——

14          MS. RICE:  Yes, your Honor.

15          THE COURT:  —— nobody else.

16          MS. RICE:  Yes, your Honor, that's correct.

17          THE COURT:  Well, take it away.

18          MS. RICE:  Thank you, your Honor.  My apologies to the

19    Court.

20          Next we're going to go to slide 67.

21          (Audio played)

22          MS. RICE:  And if we could play the second example

23    once again, please.

24          (Audio played)

25          MS. RICE:  Thank you.

1           Now on that slide, Dr. Stewart showed you that once

2     again, the melodies were virtually identical, and once again,

3     we've been able to look at the corresponding pitch sequences

4     that allow you to see visually what you're actually hearing.

5           Finally, Dr. Stewart showed you the interlude in slide

6     72.

7           (Audio played)

8           MS. RICE:  And if we could play both of those once

9     again.

10          (Audio played)

11          MS. RICE:  Now in those slides, Dr. Stewart discusses

12    the interlude in which the melodies are substantially similar

13    in "Thinking Out Loud" and "Let's Get It On."  Once again, he

14    showed you what you were hearing by the pitch sequences down at

15    the bottom where they are aligned.  You'll note the alignment

16    in the red.

17          So then Dr. Stewart drew your attention to the

18    virtually identical chords in the first 24 seconds of "Thinking

19    Out Loud."  Now Dr. Stewart demonstrated that, that

20    progression.  First, Dr. Stewart drew your attention to the

21    fact that there was no D note played in the protected sound

22    recording of "Thinking Out Loud" during the first 24 seconds.

23          Interestingly, however, in one of the several attempts

24    to impress you and distract you from the issues in this case,

25    Mr. Sheeran claimed that Dr. Stewart was wrong and even played

for you during his testimony to demonstrate that Dr. Stewart's

transcript testimony was incorrect, and in fact the D was not

present.  When confronted with the fact that even his own

expert testified that the note was absent in the sound

recording of "Thinking Out Loud," Mr. Sheeran declared that

both musical experts, with decades of specialized training in

these matters, were wrong.  Again, we will refer you to

Dr. Ferrara's testimony in which he describes the way that

these transcriptions are created the same way, using the same

program, for both experts.

Mr. Sheeran emphasized that despite his inability to

read music and his failure to remember which instruments were

present on his own sound recording, only he could be right,

however, about the transcriptions of the first 24 seconds.  So

what would be his motivation to argue this point?  Well, if

this one note is not present, then the chord progression goes

from virtually identical to identical.

So returning to the demonstration of the proof in our

case, Dr. Stewart demonstrated that the chord progressions in

both songs, even after the first 24 seconds, of "Thinking Out

Loud" were virtually identical, and as you can see in slide 26,

the chord progression in "Thinking Out Loud" is virtually

identical to "Let's Get It On."

And finally, with respect to —— I'm sorry.

(Audio played)

1          MS. RICE:  Finally, with respect to the harmonic

2     rhythms, Dr. Stewart demonstrated that the anticipation of the

3     chords on the second and fourth beats is virtually identical.

4     Now this isn't simply because anticipation is present, but it's

5     also because of the unique combination of the element of

6     anticipation and the chord progression, while being paired with

7     virtually identical melodies in the verse, the chorus, and the

8     interlude.

9          Go to the next slide.

10         So in summary, Dr. Stewart identified a unique and

11    creative selection and arrangement of not just two but also

12    three common elements —— melody, harmony, and harmonic rhythm

13    —— that, when combined in the manner in which Ed Townsend

14    uniquely combined them, created an original work that warranted

15    protection.

16         Finally, based on Dr. Stewart's analysis, he

17    determined that approximately 70 percent of "Thinking Out Loud"

18    came from "Let's Get It On."

19         So again, Mr. Sheeran argues that the plaintiffs claim

20    to own four chords, we own a common chord progression, or the

21    individual concept of anticipation.  This has never, ever been

22    the plaintiff's claim.  Their claim is simply that they own the

23    way in which these common elements were uniquely combined and

24    expressed within the copyright of "Let's Get It On."  And

25    that's exactly why artists like Ed Townsend and Amy Wadge and

1    Ed Sheeran copyright their music in the first place.  In fact,

2    in his testimony, Mr. Sheeran even agreed that "Let's Get It

3    On" deserves copyright protection just like his work deserves

4    copyright protection in "Thinking Out Loud."

5          So I'm sure that when Ms. Farkas argued to you that

6    the plaintiffs claimed that they owned four chords, you were

7    stunned and automatically thought that the plaintiffs seemed a

8    little strange with that claim.  Well, that's exactly what they

9    wanted you to think, so that you would discount our argument.

10   However, through the testimony of Dr. Stewart, we demonstrated

11   that our claim is much more realistic and specific than that.

12   Our claim is that "Thinking Out Loud" copies "Let's Get It On"

13   and that 70 percent of "Thinking Out Loud" is virtually

14   identical to "Let's Get It On."

15         Furthermore, we would additionally assert our claim

16   with respect to the selection and arrangement of the three

17   common elements of melody, harmony, and harmonic rhythm.  In

18   fact, the plaintiffs again went on to identify three melodies

19   in "Thinking Out Loud" —— the verse, the chorus, and the

20   interlude —— that are virtually identical to those in "Let's

21   Get It On."

22         So the question on everybody's mind is whether or not

23   Mr. Sheeran independently created "Thinking Out Loud."  As

24   Mr. Sheeran has said numerous times throughout this trial, only

25   he and Amy were there.  We'll never know what truly happened

1    when this song was created.  But what we do know is that both

2    artists agreed that they had access to "Let's Get It On" and

3    that at a self-confessed writing pace of eight to ten songs per

4    day, it's more likely than not that they, intentionally or

5    unintentionally, copied "Let's Get It On."  Even Mr. Sheeran

6    during his testimony admitted that it's possible he could have

7    subconsciously copied "Let's Get It On."

8            MR. SHEERAN:  No, I didn't.

9            MS. RICE:  He testified that at that writing rate, the

10   eight to ten songs per day, each song, containing about 300 to

11   600 words ── and yes, we Googled the number of words of his

12   lyrics because he requested that we do that in his testimony ──

13   it's a lot of lyrics to write each day.  A lot.  So the

14   additional question remains of how Mr. Sheeran, or anyone,

15   would be able to find time to write thoroughly vetted music

16   that doesn't infringe on the rights of others, especially when

17   he himself testified that he does not have a system in place to

18   ensure that copying does not take place, either for himself or

19   his collaborators.

20           So based on the 70 percent similarity testimony of

21   Dr. Stewart, Mr. Sheeran's own testimony of how many songs he

22   writes from scratch each day and the fact that at least

23   75 percent of his songs relies on the creativity and musical

24   influence of collaborators, it's highly unlikely that

25   Mr. Sheeran independently created "Thinking Out Loud."

1          Now add those portions of his testimony and combine

2     them with the fact that he writes songs with lyrics discussing

3     things like hidden plagiarism.  Remember those lyrics that we

4     talked about, the ones, "I'm not a rapper, I'm a singer with a

5     flow, I've got a habit of spitting quicker lyrics, you know,

6     you found me ripping the writtens out of pages they sit in, I

7     never want to get bitten 'cause plagiarism is hidden"?  He

8     never explained those lyrics, and it would have been entirely

9     appropriate, entirely appropriate, when his attorneys examined

10    him, for him to do so.  So besides challenging the listener,

11    there really aren't a whole lot of reasons to write about

12    plagiarism, not the least of which is the fact that it's pretty

13    difficult to find words that rhyme with the word "plagiarism."

14    But this is just simply another indicator that points to the

15    fact that it's more likely than not that Mr. Sheeran did not

16    independently create "Thinking Out Loud."

17          Furthermore, and most notably, Mr. Sheeran refused

18    over and over again during his testimony to simply state that

19    he independently created "Thinking Out Loud."  In fact, he

20    didn't even know what independent creation was, and in his

21    frustration, he even challenged me to tell him what it was.

22    For the reasons that I've mentioned earlier, I tried to stay

23    away from giving legal definitions to jurors.  And as much as

24    he attempted to try to convince you that independent creation

25    is some difficult, abstract, and theoretical legal concept,

1    it's just not.  Although only the judge can give you legal

2    definitions, I tried to give him examples so that you, the

3    jury, could see it wasn't a trick question.  He didn't want to

4    answer a simple yes or no question.  However, when you're under

5    oath, you can't answer that you independently created something

6    if you did not.  Please remember that in your deliberations.

7        We are confident that you will see that his question

8    to me in his testimony wasn't only a question of whether or not

9    he'd play a copied song in public but whether or not you will

10   hold him accountable for copying it.  Mr. Sheeran personally

11   challenged you, the jurors, by stating that he'd have to be

12   stupid to play the song in front of thousands of people.

13   However, this is, again, another attempt to mislead you.

14   "Thinking Out Loud" was released in September of 2014.  The

15   performance detailed in that Zurich video that we showed you

16   was taken in November of 2014.  Mr. Sheeran felt comfortable

17   playing the song that he had copied because he didn't think

18   that anyone had noticed yet.  Much of the negative feedback

19   that he received did not occur until the Zurich video was

20   taken, which was shortly after the release.  Remember, that

21   time period is September 2014 to November 2014.

22        It's more transparent that he played a song that not

23   only did he think that people wouldn't notice that he copied

24   but may be okay.  Unfortunately, he was wrong.  People noticed

25   fairly quickly.  And you heard from his manager, Stuart Camp,

1  that people on the internet began talking about the

2  similarities very openly.

3           So let's talk about some of the additional mashups

4  that Mr. Sheeran has introduced to all of us during this trial.

5           The additional mashups that he discusses were recorded

6  after the claim was made against Mr. Sheeran.  In addition to

7  mashups that Mr. Sheeran says define a significant portion of

8  his performances and/or his successes are in fact not the same

9  kind of performance as the performance shown in the Zurich

10 video.  The other songs are not identically inserted in the

11 exact same way, the same melodies, the same harmonies and

12 harmonic rhythms, in the way that "Let's Get It On" is inserted

13 into "Thinking Out Loud."  And if you notice, not a single of

14 the melodies in the mashups that Mr. Sheeran played in court

15 matched any of the melodies in the virtually identical way that

16 the melodies in "Thinking Out Loud" and "Let's Get It On"

17 aligned.

18          Additionally, Mr. Sheeran made significant

19 representations with his comparisons to Van Morrison that we

20 spent over an hour discussing with Dr. Ferrara.  Although he

21 plays them together, it's difficult, even when you're

22 listening, to believe that a three-chord progression in the Van

23 Morrison songs, "Thinking Out Loud" in any way fits over the

24 four-chord progression in the way that he says it does, and it

25 goes to show that just because you say something fits because

1   you forced it, doesn't mean it fits.

2           As an interesting note, in his testimony Mr. Sheeran

3   referred to the way that "Shape of You" and "No Scrubs" relate

4   to each other when he performs them together, as an

5   interpolation.  He specifically used that word.  And then he

6   describes the rest of the combinations of songs as mashups.

7   And he's correct.  And for someone who testified that he had no

8   idea what the differences were between an interpolation and a

9   simple mashup, those are very technical descriptions.  He

10  claimed, quote, he was not a musicologist, but he seemed to get

11  really lucky when accurately describing the relationship

12  between "Shape of You" and "No Scrubs" as an interpolation.

13  It's clear that he —— he particularly knows the difference, and

14  he's completely aware that the Zurich video specifically

15  highlights the special, virtually identical relationship

16  between "Let's Get It On" and "Thinking Out Loud."  The other

17  mashups are simple medleys reminiscent of that Axis of Awesome

18  video which we all got to watch, which we all have seen and

19  know and love.

20          The Zurich video is further evidence that Mr. Sheeran

21  knew exactly what he was doing when he specifically chose to

22  play those songs together.  As the judge mentioned at the

23  beginning of our case, this case is about two pieces of music

24  —— the "Let's Get It On" deposit copy and the "Thinking Out

25  Loud" commercial sound recording, not the "Thinking Out Loud"

1    sheet music, as Dr. Ferrara would like for you to believe.

2    They've attempted to misdirect your attention to differences in

3    notation, such as the placement of a note or chord that's

4    written differently, but let me be clear.  We're referring

5    particularly to "Thinking Out Loud" sheet music.  Those

6    differences do not matter at all, because the sheet music is

7    not at issue in this case.  They're not relevant to any of our

8    discussions.  So the only differences — or, in our case,

9    similarities — that you need to evaluate during your

10   deliberations are those between the "Let's Get It On" deposit

11   copy and the "Thinking Out Loud" sound recording.

12          Ms. Farkas mentioned something about creativity that

13   the plaintiffs really want you to take to heart.  No one here

14   wants to damage creativity.  No one does.  The plaintiffs

15   simply want to discourage theft.  That's the difference.  We

16   simply believe that credit should be given where credit is due.

17          The last thing that I'll say is about Dr. Stewart.

18   Remarks were made that Dr. Stewart made disparaging remarks

19   about one of the prior art songs that both he and Dr. Ferrara

20   evaluated for the particular — for the purposes of this case.

21   And as you know, Dr. Ferrara spent his time during his

22   Fulbright scholarship doing work evaluating music in Mexico and

23   found that statement particularly offensive, and so do we.

24          Finally, there's the issue of what's protectable and

25   what's not, what's copyrightable, what's not.  Again, those

1    kinds of definitions will be given to you, so that you can use

2    them in the way that you need to.  However, one comparison was

3    made that letters aren't protectable.  That's true.  The

4    alphabet is not protectable.  Novels, however, are.  It's the

5    combination of letters.  In order for you to believe their

6    arguments, you have to leave your common sense at the door.

7    And we don't want you to do that.  We want you to bring your

8    common sense into your deliberations and look at the

9    significant not only quantity but quality of the evidence that

10   we presented that Mr. Sheeran more likely than not did not

11   independently create "Thinking Out Loud" so that when you get

12   your jury verdict form, you answer yes or no to the question of

13   independent creation based on the information on the verdict

14   form, using that standard, and then you can easily go through

15   the rest of the questions.

16         Thank you so much for your time.  This is a difficult

17   bit of information to get ahold of if you don't have musical

18   training or if you have just simple — a simple enjoyment.

19   It's a lot.  And we just really appreciate your patience.

20   Thank you so much.

21         THE COURT:  Thank you, Ms. Rice.

22         Members of the jury, Mr. Crump asked if he could make

23   some closing remarks.  I'm not in the habit of giving one side

24   two closing statements and the other only one, and so I'm sure

25   he'll keep it brief, but I said he could do that.

1          MR. CRUMP:  Thank you, your Honor.

2          And we have the burden, so I'm giving the closing

3     remarks to simply remind you all of what we said in the very

4     beginning.  If you remember nothing else about all the

5     testimony you've heard all of the experts for plaintiff or

6     defendant said, please remember this case is about giving

7     credit where credit is due.  And even Amy Wadge, the co-writer

8     of "Thinking Out Loud," agrees with that.  When she was at the

9     witness stand and she said that, you know, Mr. Sheeran saw that

10    he copied her work, subconsciously, he went back and gave her a

11    percentage because she agreed it was only right that writers

12    get credit where credit is due.

13         We said that we had a smoking gun.  And that smoking

14    gun was the Zurich video.  You know, my grandmother taught me,

15    when I was a little boy, she said, *Your actions speak so loud*

16    *that I don't need to hear your words*.  And so when you look at

17    that Zurich video, those are the actions telling us what

18    Mr. Sheeran thought was similar to his song "Thinking Out Loud"

19    when he went from "Thinking Out Loud" to "Let's Get It On,"

20    back to "Thinking Out Loud."

21         I know there's been a lot made about Van Morrison

22    being a great inspiration, "Crazy Love."  Where is that video?

23    Where is that video of him performing that?  Because actions

24    speak louder than words.  Not only did we have a smoking gun

25    but we have bullets for that smoking gun, in the fact of his

1    own lyrics.  He said he writes from his heart, that his lyrics

2    are an expression of his heart.  And you heard about his

3    writing on the same album of "Thinking Out Loud" about

4    plagiarism.  And so you're looking at plagiarism here, same

5    album, and then you look at ——

6            MS. FARKAS:  Your Honor, I'd just like to note that

7    these lyrics are not in evidence.  In fact, Ms. Rice abandoned

8    this line of questioning with Mr. Sheeran.

9            MR. CRUMP:  Judge —— your Honor, not only ——

10           THE COURT:  Stay within the evidence, Mr. Crump.

11           MR. CRUMP:  Yes, sir, your Honor.  When they were

12   doing the mashups, they also played that song, the jury may

13   recall.

14           THE COURT:  Stay within the evidence as compared to

15   grand principles.

16           MR. CRUMP:  Yes, sir, your Honor.

17           And then you also heard Mr. Frank questioning his

18   producer, Jake Gosling —— I'm sorry.  You heard Mr. Frank

19   questioning Ed Sheeran about the declaration of Jake Gosling

20   and about the bass guitar, was it real or computerized bass,

21   and you heard that Mr. Gosling said, in his declaration, said

22   it was real.  Mr. Sheeran mistakenly thought it was bass.

23   Those are things for you all to consider.

24           And you heard Mr. Sheeran say if you rule in favor of

25   the plaintiffs, then he's done with music.  That's simply a

1    threat to try to play on your emotions.  I promise you, no

2    matter what your verdict is, he won't be done with music.  He

3    will continue to have an illustrious career.

4        You heard about them calling our expert a criminal.

5    They talked about it's absurd that we bring these claims,

6    Ms. Kathryn Townsend.  It may be absurd for plaintiffs to bring

7    this claim, but yet people all over the internet are talking

8    about the same thing.  You heard briefly his manager ——

9        MS. FARKAS:  Objection, your Honor.  Let's stick to

10   the evidence in the record and not Mr. Crump's view of the

11   world, not to mention hearsay.  But it's not evidence in the

12   record, and for good reason.

13        THE COURT:  Ms. Townsend testified.

14        MR. CRUMP:  Thank you, your Honor.

15        And so when the facts are not in your favor, as my

16   grandma taught me, you resort to name calling, insults, and

17   threats.  We saw it all here.

18        But Ms. Townsend is just trying to honor the promise

19   she made to her father as he was going into transition.  She

20   said, *I promise I will protect your intellectual properties and*

21   *your legacy,* and that's exactly what she was trying to do.

22        And I will quickly just state to you, you're going to

23   hear from the judge's instructions that it is substantial

24   similarities.  It is not virtually identical.  Substantial

25   similarities, you will hear from the instructions from the

1    judge.  And so you apply your common sense —— that's all we're

2    asking —— your sense; your sense of what you saw, your sense of

3    what you heard, and, most importantly, your common sense.

4           And let's be clear.  "Thinking Out Loud," the issues

5    in this case are not about the lyrics.  There couldn't be more

6    different lyrics when you think about the two songs.  It is the

7    music.  It is the melody.  So, you know, the defense efforts to

8    pull on your heartstrings about how the song was written and

9    why it was written is wholly irrelevant.  This is about the

10   music, the melodies, the harmonies, the chord progressions,

11   those things that we've been talking about, that the experts

12   have been talking about.  And don't let —— be charmed by

13   Mr. Sheeran.  He is a performer.  And I'm sure if Mr. Townsend

14   was alive and was in this court, he would have talked to you

15   about how he wrote, read, and performed music too, and he would

16   have been just as charming.

17          Ladies and gentlemen, it is somewhat preposterous to

18   say that the fate of the music industry lies on your decision.

19   It does not.  There have been other noteworthy people —— you

20   heard the experts talk about the Led Zeppelin case and the

21   George Harrison case.  They had copyright lawsuits, but they

22   went through it, and the music industry was just fine.

23   Mr. Sheeran's career is going to be just fine.  Don't let them

24   play on your emotions like that.

25          And what you heard, you know, Dr. Ferrara, he —— you

1    heard Dr. Ferrara attempt to create similarities between

2    "Thinking Out Loud" and other various songs by playing

3    renditions on the piano that simply do not sound like "Thinking

4    Out Loud" or "Let's Get It On."  Let's listen for ourselves for

5    a second.  He talked about "Do You Love Me" had the same chord

6    progressions and the melodies.

7            Can you play "Do You Love Me."

8            "Do You Love Me" by The Contours that he testified to

9    this morning, your Honor.

10           MS. FARKAS:  The song is not in evidence, your Honor,

11    the recording, presumably, that they're about to play.

12           THE COURT:  I think you're pretty well at the end of

13    your requested time, Mr. Crump.

14           MR. CRUMP:  Okay.  I will wrap up then.

15           "Do You Love Me," "Fine Fine Fine," "Georgy Girl,"

16    y'all know how those songs sound.  They sound nothing like

17    "Let's Get It On" nor "Thinking Out Loud."

18           And ladies and gentlemen, just know that you all can

19    understand that the Copyright Office encourages music creators,

20    that they're inventors of the music industry, and contrary to

21    what the defense would have you believe, copyright law does not

22    kill creativity; it encourages innovation and promotes giving

23    credit where credit is due.

24           You can have confidence in your verdict.  Each one of

25    you have a vote, and don't take that vote lightly.  You all are

1   going to have some conversations about what evidence is more

2   important than the other, but if you have the abiding

3   conviction that Ed Townsend deserves to get credit whether

4   Mr. Sheeran consciously or subconsciously copied it, then stand

5   your ground as you deliberate, and just make sure you say, I'm

6   ─ I have a vote, and this is an important vote, and I'm not

7   just going to give in my vote for a matter of convenience.

8   It's going to be some compromise, give-and-take.  That's what

9   always happens with juries.  You say, no, I want to make sure

10  that Mr. Townsend gets his credit where credit is due, and if

11  we can't agree, we can't agree, but don't give in on your vote

12  just because others think differently.  You have your right.

13  That's what makes America great, and that's why we are here.

14  We are here because you are the judge of facts.  You are the

15  judge of this case.  The judge is the judge of law, you are the

16  judge of facts.  So as you deliberate, make sure that you make

17  your vote count, and if you can't agree, you say, I can't

18  agree.  My vote is my vote.  That's what the system will

19  require you to do, to vote your conscience, and apply your

20  common sense.  That is the most important thing.

21          These songs sound substantially similar.  That's why

22  we're here in this courtroom today.  Thank you.

23          THE COURT:  Anybody want to recess?  One vote carries

24  in this, and we have two, three.  We'll take seven minutes.

25          (Recess)

1          (Jury not present)

2          THE COURT:  Those who have received a copy of my

3    charge will notice that I omit certain sections in the

4    beginning sections of generalities, and I do that in order that

5    the lawyers, who need their time, still leave the jury time to

6    deliberate.  They're just timesaving omissions.  They don't

7    deal with the substance of the case.

8          Let's have the jury in.

9          (Jury present)

10         THE COURT:  Now that you've heard all of the evidence,

11   it is my duty to give you instructions about the law under

12   which you should evaluate the evidence which has been admitted

13   into the record in this case.

14         It is your duty as jurors to follow the law as stated

15   in these instructions and to apply these rules of law to the

16   facts as you find them from the evidence in the case.

17   Regardless of any opinion you may have as to what the law ought

18   to be, it would be a violation of your sworn duty as jurors to

19   base a verdict on any other view of the law than that given in

20   these instructions —— I thought I might be too loud.  OK ——

21   just as it would be a violation of your sworn duty as judges of

22   the facts to base a verdict on anything other than the evidence

23   in the case.

24         Can you all hear me?  It's nice if everybody can, but

25   it's essential.  If anyone has stated a legal principle

1    different from that that I state in my instructions, it's my

2    instructions that you must follow.

3    Nothing that I say in these instructions and no ruling

4    I made during the trial, nor anything I may have said or done

5    during the trial, is to be taken as an indication that I have

6    any view about the facts in this case.  It's not my function to

7    determine the facts, but yours.

8    You have been chosen and sworn as jurors in this case

9    to try the issues of fact.  You are to perform your duty

10   without bias or prejudice as to any party.  Our system of law

11   does not permit jurors to be governed by sympathy or prejudice

12   or public opinion.  Both the parties and the public expect that

13   you will carefully and impartially consider all of the

14   evidence, follow the law as stated by the Court, and reach a

15   just verdict regardless of the consequences to any party.

16   What the lawyers said in their opening and closing

17   statements is not evidence.  Questions, objections, or

18   arguments are not evidence, and you should not draw any

19   conclusions from them.

20   You are permitted to draw from the facts in the case

21   which you find to have been proven such reasonable inferences

22   about other facts as seem justified in the light of your

23   experience.  An inference is not a speculation, and it's not a

24   guess.  It's a reasoned, logical deduction based on the proof

25   as to some fact that some other fact did or did not exist.

1          You are the sole judges of the facts, and you alone

2     decide what weight, if any, to give to each piece of evidence.

3     You must determine which of the witnesses you believe, what

4     portion of their testimony you accept, and what weight you

5     attach to it.  In your everyday affairs, you determine for

6     yourselves the reliability or unreliability of statements made

7     to you by others.  The same tests that you use in your everyday

8     dealings are the tests that you apply in your deliberations.

9     The interest, or lack of interest, of any witness in the

10    outcome of the case; the bias or prejudice of the witness, if

11    there be any; the appearance, the manner in which the witness

12    gives his or her testimony on the stand; the opportunity that

13    the witness had to observe the facts concerning which he

14    testified; the probability or improbability of the witness'

15    testimony when viewed in the light of all the other evidence in

16    the case ⸺ these are all items to be taken into your

17    consideration in determining the weight, if any, that you will

18    give to that witness' testimony.

19         You've heard testimony from experts.  An expert's

20    testimony is offered only to assist you.  You may accept it or

21    reject it, in part or in full.  If you find that the opinion of

22    an expert witness is not based upon sufficient education and

23    experience, or if you should conclude that the reasons given in

24    support of the opinion are not sound or outweighed by other

25    testimony ⸺ other evidence, you may disregard the opinion

1    entirely or accept those portions which you find it merits.

2              The party with the burden of proof on an issue must

3    prove its assertions by a preponderance of the evidence.  To

4    establish a fact by the preponderance of the evidence means to

5    prove that it is more likely true than not true.  This is an

6    evaluation of the quality of the evidence, not the quantity of

7    witnesses or documents.

8              This working OK?

9              If, after hearing all of the evidence, you believe

10   that a fact is more likely true than not true, then that fact

11   has been proved to you by a preponderance of the evidence.  If

12   you believe it more likely not true or did not occur, it has

13   not been proven.  And if you find the likelihood evenly

14   balanced, maybe yes, maybe no, the party having the burden of

15   proving that fact to you has not succeeded.

16             Ms. Townsend has the burden of proving by a

17   preponderance of the evidence that Sheeran's song "Thinking Out

18   Loud" infringes "Let's Get it On."  Sheeran has the burden of

19   proving by a preponderance of the evidence that he

20   independently created "Thinking Out Loud."

21             When determining whether "Let's Get it On" was copied,

22   you consider only the sheet music in the song.  That's because

23   Ed Townsend applied for a copyright registration of "Let's Get

24   it On," and he filed only the sheet music.  This became known

25   as the deposit copy, and anything that is not in the deposit

1    copy is not protected.  The sound recording by Marvin Gaye we

2    mentioned occasionally is not protected, and there's no claim

3    here that it is being infringed.

4        The deposit copy is comprised of elements that may be

5    protected or unprotected.  An element is not protected just

6    because it's in the deposit copy.  If the deposit copy contains

7    elements that are commonplace, then the element is not

8    protected even though the rest of the work may be.  That's an

9    important principle, and it goes all the way through this case.

10       To hold Sheeran liable for copyright infringement,

11   Townsend must prove by a preponderance of the evidence that

12   Sheeran actually copied and wrongfully copied "Let's Get it

13   On."  If you find that Townsend doesn't establish either by a

14   preponderance of the evidence, then you must find in favor of

15   Sheeran that he did not infringe the copyright of "Let's Get it

16   On."

17       To prove infringement of the copyright of "Let's Get

18   it On," Townsend must show by a preponderance of the evidence

19   that the similarities between the works arise from actual

20   copying and not mere coincidence.

21       Townsend can establish actual copying circumstantially

22   through indirect evidence by demonstrating that Sheeran had

23   access to "Let's Get it On" and that the similarities between

24   the songs are probative of copying.

25       The parties have agreed that Sheeran was aware of

N53HGri3

"Let's Get it On" prior to creating "Thinking Out Loud," so
therefore you don't have to decide the issue of access.

If you decide that the similarities between "Let's Get
it On" and "Thinking Out Loud" are such that the independent
creation of "Thinking Out Loud" is unlikely, then the
similarities are probative of copying.  The similarities
between the works can relate to any element and do not need to
be substantial.  Townsend only needs to show that "Thinking Out
Loud" draws from "Let's Get it On," and similarities can be
shown by expert testimony.

If you find that Townsend has failed to prove by a
preponderance of the evidence that Sheeran actually copied
"Let's Get it On" when creating "Thinking Out Loud," then you
must find that Sheeran did not infringe the copyright of "Let's
Get it On."

If you find that Townsend has shown actual copying,
then Sheeran may prove — challenge that by proving to you by a
preponderance of the evidence that he independently created
"Thinking Out Loud."

Independent creation is a complete defense to
copyright infringement.  If Sheeran independently created
"Thinking Out Loud," there is no copyright infringement no
matter how similar that song is to "Let's Get it On."
"Thinking Out Loud" was independently created if it was made
without reference to "Let's Get it On" or if it was based on

1    works already in the public domain.  If Sheeran even

2    subconsciously or innocently relied on "Let's Get it On," then

3    he did not independently create "Thinking Out Loud," but that

4    must be shown by facts, not merely guess or suspicion.

5         If Sheeran persuades you by a preponderance of the

6    evidence that he independently created "Thinking Out Loud,"

7    then you must find there is no copyright infringement no matter

8    how similar the songs are.

9         But if you find that Sheeran did not meet that burden,

10   that does not mean that he infringed the copyright of "Let's

11   Get it On."  Townsend must still show by a preponderance of the

12   evidence Sheeran's actual copying of "Let's Get it On" was

13   wrongful.

14        Wrongful copying is distinct from actual copying.  Not

15   all actual copying constitutes wrongful copying, because

16   copying unprotected aspects of a work is not wrongful.

17        You'll have a copy of this in the —— listen anyway.

18        Wrongful copying has occurred if you find that

19   Townsend has shown by a preponderance of the evidence that

20   there's a substantial similarity between the protected elements

21   of "Let's Get it On" and "Thinking Out Loud."  When deciding,

22   you cannot rely on any expert opinion that the alleged copying

23   is wrongful.  That is for you to determine.

24        Townsend argues that portions of the melody identified

25   by her as Melody A, Melody B, and Melody C, and the selection

1  and arrangement of certain unprotected elements in "Let's Get

2  it On" are protected.

3        An element is protected if it is an original work of

4  the author.  An element is original if it was independently

5  created by the author and has a minimal degree of creativity.

6  The requisite degree of creativity is extremely low.  Even a

7  slight amount will suffice.

8        To be protected, Townsend must show by a preponderance

9  of the evidence that the alleged Melody A, Melody B, and Melody

10 C each constitute an original pitch sequence that is

11 rhythmically organized in a coherent fashion so as to form an

12 aesthetic whole and that the sequence consists of more than a

13 few pitches —— a few notes.  If you find that the alleged

14 Melody A, B, or C are only a sequence of pitches, then it's not

15 a melody and cannot be protected.

16       An element is not protected if it is commonplace or

17 part of the public domain.  "Let's Get it On's" chord

18 progression, harmonic rhythm, which is also called the

19 anticipation, and short pitch sequences in Melodies A, B, and C

20 are all commonplace and may be used individually by anyone,

21 including Townsend or Sheeran.

22       However, a combination of numerous unprotected

23 elements is protectable if the author has selected and

24 coordinated and arranged the numerous elements in an original

25 way.  This selection and arrangement copyright protects the

particular way in which the arrangement of numerous elements

form a coherent pattern, synthesis, or design, rather than the

underlying elements themselves.

You must decide whether Townsend has shown by a

preponderance of the evidence that the chord progression and

harmonic rhythm constitute numerous elements which are selected

and arranged in an original way such that they warrant

protection, deserve protection.  If you have previously found

that Melodies A, B, and C are not protected, then the

combination you must evaluate includes their pitch sequences

along with the chord progression and the harmonic rhythm.

If Townsend fails to show by a preponderance of the

evidence that either the melodies themselves or the selection

and arrangement of the chord progressions, harmonic rhythm, and

possibly the pitch sequence in Melodies A, B, and C are

protectable, and if she fails to show that, then you must ——

you must find that Sheeran is not liable.

If Townsend has shown that either are protected, then

the next question is whether Townsend has shown by a

preponderance of the evidence that "Thinking Out Loud" is

substantially similar to those protected elements of "Let's Get

it On," because individually protected elements like A, B, and

C, if you find them protectable, and the combination of the

unprotected elements if you find the elements are numerous and

selected in an original way.

1          You will meet those considerations again in the form

2     of a jury verdict prepared for you which helps you order your

3     way through the considerations.

4          Substantial means the amount that was copied is more

5     than minimal.  If you find that only the selection and

6     arrangement of the combination of the uncopyrighted elements I

7     just mentioned of "Let's Get it On" is protected, then

8     substantial similarity requires a showing of very close

9     copying.  In determining whether the similarities are

10    substantial, consider whether the similarities relate to a

11    substantial portion of "Let's Get it On," not whether such

12    material is a substantial portion of "Thinking Out Loud,"

13    because "Let's Get it On" is the victim.

14         If you find that Townsend has shown by a preponderance

15    of the evidence that the protected elements of the two songs

16    are substantially similar, you must find Sheeran liable.

17         If Townsend has not shown by a preponderance of the

18    evidence that the protected elements are substantially similar,

19    then you must find Sheeran not liable.

20         In reaching your verdict, you are not to be affected

21    by sympathy for any of the parties or to be affected by the ——

22    what the reaction of the parties to your verdict may be.  You

23    should consider only the evidence presented, finding the facts

24    from what you consider to be believable evidence, and apply to

25    those facts the law as I have given you in these instructions.

1    Your verdict will be determined by your conclusions you reach

2    in that manner regardless of whom the verdict helps or hurts.

3          What the verdict should be is the exclusive duty and

4    responsibility of the jury.  The verdict must represent the

5    considered judgment of each juror.  In order to return a

6    verdict, it's necessary that each juror must agree.  Your

7    verdict must be unanimous.  It is your duty as jurors to

8    consult with one another and to deliberate with a view toward

9    reaching an agreement if you can do so without violating your

10   individual judgment.  You must each decide the case for

11   yourselves, but only after an impartial consideration of the

12   evidence with your fellow jurors.

13         In the course of your deliberations, don't hesitate to

14   reexamine your views, your own views, and change your opinion

15   if you are convinced it was wrong, but don't surrender an

16   honest conviction as to the weight or effect of evidence only

17   because of the opinion of your fellow jurors.  Remember at all

18   times you're not partisans, you are judges, judges of the

19   facts.  Your only interest is to seek the truth from the

20   evidence in the case.

21         Because Jesse Brown is sitting in seat No. 1 in the

22   jury box, he will be your foreman.  The foreman will preside

23   over your deliberations and may be your spokesperson here in

24   court.  That's simply for convenience, and it gives him no

25   greater authority, and his vote has no greater weight than that

N53HGri3

1    of any other juror.

2          If it becomes necessary in your deliberations to

3    communicate with the Court, you may send a note, signed by your

4    foreperson or by one or more members of the jury.  No member of

5    the jury should ever attempt to communicate with the Court by

6    any means other than a signed writing, and the Court will never

7    communicate with any member of the jury on any subject touching

8    on the merits of the case otherwise than in writing or orally

9    here in open court.

10          You will note from the oath about to be taken by the

11   marshal that he, as well as you, is forbidden to communicate

12   with any member of the jury on any subject touching on the

13   merits of the case.

14          Bear in mind that you are never to reveal to any

15   person, not even to the Court, how the jury stands, numerically

16   or otherwise, on any of the questions before you until after

17   you have rendered a unanimous verdict, which you may now retire

18   and consider.

19          THE DEPUTY CLERK:  Will the marshal please step

20   forward.

21          THE COURT:  Now you'll be given a form of verdict, and

22   it consists of seven, I think, questions which are written with

23   great particularity.  They're intertwined to make each one

24   clear and to sort out, as you go through it, the different

25   considerations that I've just explained to you.  Read it

1    carefully, follow each instruction mechanically, and it will

2    all turn out all right.  But don't just go at it, because it

3    will be a terrible mess.

4            Thank you.

5            THE DEPUTY CLERK:  Will the marshal please step

6    forward.

7            (Marshal sworn)

8            (At 5:04 p.m., the jury retired to deliberate)

9            (Jury not present)

10           THE COURT:  It's good for them to get a little

11   deliberation before they go home.  It gets a —— it ties them

12   together as a unit and makes them more looking forward to

13   returning tomorrow morning.

14           In the meantime, anybody who wants to leave is free to

15   leave as long as we can get in touch with them quickly if we

16   have some communication from the jury.  So tell Mr. Lee, who's

17   easy to find, where he can —— there —— where he can reach you

18   on short notice and be available on short notice if it's

19   required, and in that way you can —— you don't have to be in

20   this room.

21           We're not going to spend the night waiting for them,

22   but when you get impatient enough, tell me, and we'll think

23   about going home.

24           Counsel.  Counsel, one each or so.

25           (Recess pending verdict)

N53HGri3

1              (At 5:12 p.m., jury note)

2              (Jury present)

3          THE COURT:  Members of the jury, I have your note

4     saying, "We'd like to go home for the evening.  Can we go?"

5     And the answer is yes, but I have one or two things I should

6     tell you first.

7          Oh, and they wanted to — I'm told you want to start

8     at 10:30 tomorrow.  Is that a common desire?

9          JUROR:  Yes.

10         THE COURT:  It's up to — I'll tell you, it's up to

11    you, but the reason I ask is because of a few — if a few

12    members come, don't begin talking about the case until all of

13    you are there, because every member should be partaking —

14             (Discussion off the record)

15         THE COURT:  Oh, somebody else was asking about 10:30.

16    That's not you.  But we ought to set a time before you leave

17    that's convenient for each of you, and 10:30 would be fine.

18    11:00 is fine.  But don't discuss the case till you're all

19    there.

20         The other thing is when you're going back and coming

21    in, it's very tempting if you're in the elevator with somebody,

22    another juror, to say something about the case.  Stay away from

23    it.  Don't — from then on you're in a different being, and

24    when you resume all together, then discuss the case, and

25    everybody hears.

N53HGri3

1          Trying to think of whether there's anything else that

2     —— usually, as you know, I tell you to keep an open mind and

3     not discuss the case.  That's probably still good advice.  You

4     may form opinions and reject them and change your mind as the

5     process goes, and that's much easier to do if you haven't

6     discussed it with anybody else in the meantime.  So even though

7     you're deliberating, save the deliberations for when you're all

8     together and keep well and return.

9          When do you want to come back in the morning?  10:00?

10          JUROR:  10:00 works for me.

11          THE COURT:  Hmm?

12          JUROR:  10 o'clock.

13          THE COURT:  10 o'clock.  OK.  I'll tell you that I

14    will probably not be here until 10:30, so if you reach a

15    verdict, nothing will happen.  But I'll be here from then on.

16          Have a good evening.

17          (Jury excused)

18          (Recess pending verdict)

19                              o0o

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

LAWRENCE FERRARA Ph.D.

Cross By Mr. Frank . . . . . . . . . . . . . . 804

Redirect By Ms. Farkas . . . . . . . . . . . 843